**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

**Federal Trade Commission**
**600 Pennsylvania Ave. NW**
**Washington, DC 20580,**

                    **Plaintiff,**

    **v.**

**Innovative Marketing, Inc., also d/b/a**
**Billingnow, BillPlanet PTE Ltd., Globedat,**
**Innovative Marketing Ukraine, Revenue**
**Response, Sunwell, Synergy Software BV,**
**Winpayment Consultancy SPC, Winsecure**
**Solutions, and Winsolutions FZ-LLC**
**1876 Hutson Street**
**Belize City, Belize;**

**ByteHosting Internet Services, LLC**
**3864 McMann Road, Suite A,**
**Cincinnati, Ohio 45245;**

**James Reno, individually, d/b/a**
**Setupahost.net, and as an officer of**
**Bytehosting Internet Services, LLC**
**3844 Golden Meadow Ct,**
**Amelia, Ohio 45102;**

**Sam Jain, individually, and as an officer of**
**Innovative Marketing, Inc.**
**355 First Street 2801**
**San Francisco, California 94105;**

**Daniel Sundin, individually, d/b/a Vantage**
**Software and Winsoftware, Ltd., and as an**
**officer of Innovative Marketing, Inc.**
**107 Jermyn Street, Flat No. 1**
**London, UK SW1Y6EE;**

**CIVIL NO.**

**Marc D'Souza, individually, d/b/a Web
Integrated Net Solutions, and as an officer of
Innovative Marketing, Inc.
1 King Street W.
Toronto, Ontario CANADA M5H1A1; and**

**Kristy Ross, individually, and as an officer of
Innovative Marketing, Inc.
207 Deer Run Dr.
Walkersville, MD 21793
(Frederick County),**

**Defendants**

**AND**

**Maurice D'Souza
22 Carnegie Crescent
Thornhill, Ontario CANADA L3T5H1,**

**Relief Defendant.**

### Complaint for Injunctive and Other Equitable Relief

Plaintiff, the Federal Trade Commission ("FTC" or "Commission") for its complaint against

Defendants Innovative Marketing, Inc., ByteHosting Internet Services, LLC, James Reno, Sam Jain,

Daniel Sundin, Marc D'Souza, and Kristy Ross and Relief Defendant Maurice D'Souza, alleges as

follows:

1.      The Commission brings this action under Section 13(b) of the Federal Trade Commission Act

("FTC Act"), 15 U.S.C. § 53(b), to obtain preliminary and permanent injunctive relief against

the Defendants to prevent them from engaging in deceptive acts or practices in violation of

Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and to obtain other equitable relief, including

rescission, restitution, and disgorgement, as is necessary to redress injury to consumers and the

public interest resulting from the Defendants' violations of the FTC Act.

2

## JURISDICTION AND VENUE

2.    Subject matter jurisdiction is conferred upon this Court by 15 U.S.C. §§ 45(a), 53(b), and 28

U.S.C. §§ 1331, 1337(a), and 1345.

3.    Venue in the United States District Court for the District of Maryland is proper under 15 U.S.C.

§ 53(b), as amended by the FTC Act Amendments of 1994, Pub. L. No. 103-312, 108 Stat. 1691,

and 28 U.S.C. §§ 1391(b), (c) and (d).

## PLAINTIFF

4.    Plaintiff, the Federal Trade Commission, is an independent agency of the United States

government created by statute.  15 U.S.C. §§ 41-58.  The Commission enforces Section 5(a) of

the FTC Act, 15 U.S.C. § 45(a), which prohibits deceptive or unfair acts or practices in or

affecting commerce.  The Commission is authorized to initiate federal district court proceedings

by its own attorneys to enjoin violations of the FTC Act and to secure such equitable relief as

may be appropriate in each case, including restitution for injured consumers, consumer redress,

and disgorgement.  15 U.S.C. § 53(b).

## DEFENDANTS

5.    Defendant Innovative Marketing, Inc. ("Innovative Marketing") is a corporation incorporated

pursuant to the laws of Belize that maintains offices in Kiev, Ukraine.  Innovative Marketing

does or has done business as Billingnow, BillPlanet PTE Ltd., Globedat, Innovative Marketing

Ukraine, Revenue Response, Sunwell, Synergy Software BV, Winpayment Consultancy SPC,

Winsecure Solutions, and Winsolutions FZ-LLC.  Innovative Marketing transacts or has

transacted business in this District.

6.      Defendant Bytehosting Internet Services, LLC ("Bytehosting") is a limited liability company registered in Ohio that maintains offices at 3864 McMann Road, Suite A, Cincinnati, Ohio. Bytehosting transacts or has transacted business in this District.

7.      Defendants Innovative Marketing and Bytehosting have operated as a common enterprise while engaging in the deceptive acts and practices alleged herein (the "IMI Enterprise").

8.      Defendant James Reno is, or has been, an officer and/or director of Bytehosting.  Individually or in concert with others, he has formulated, directed, controlled, or participated in the acts and practices of the IMI Enterprise alleged in this complaint, and has done so at all times pertinent to this action.  Defendant Reno does or has done business as "setupahost.net."  Defendant Reno resides or has resided in this District and transacts or has transacted business in this District.

9.      Defendant Sam Jain is, or has been, an officer and/or director of Innovative Marketing. Individually or in concert with others, he has formulated, directed, controlled, or participated in the acts and practices of the IMI Enterprise alleged in this complaint, and has done so at all times pertinent to this action.  Defendant Jain resides or has resided in California and transacts or has transacted business in this District.

10.     Defendant Daniel Sundin is, or has been, an officer and/or director of Innovative Marketing. Individually or in concert with others, he has formulated, directed, controlled, or participated in the acts and practices of the IMI Enterprise alleged in this complaint, and has done so at all times pertinent to this action.  Defendant Sundin does or has done business as Vantage Software and Winsoftware, Ltd.  Defendant Sundin resides or has resided in London, England, and transacts or

4

has transacted business in this District.

11.    Defendant Marc D'Souza is, or has been, an officer of Innovative Marketing.  Individually or in concert with others, he has formulated, directed, controlled, or participated in the acts and practices of the IMI Enterprise alleged in this complaint.  Defendant D'Souza does or has done business as Web Integrated Net Solutions.  Defendant D'Souza resides or has resided in Toronto, Canada, and transacts or has transacted business in this District.

12.    Defendant Kristy Ross is, or has been, an officer of Innovative Marketing.  Individually or in concert with others, she has formulated, directed, controlled, or participated in the acts and practices of the IMI Enterprise alleged in this complaint, and has done so at all times pertinent to this action.  Defendant Ross resides or has resided in Maryland, and transacts or has transacted business in this District.

13.    Relief Defendant Maurice D'Souza is the father of Marc D'Souza.  Maurice D'Souza has received ill-gotten funds that are the proceeds of the unlawful acts and practices alleged in this complaint, and has no legitimate claim to those funds.  Maurice D'Souza is a resident of Ontario, Canada, and has received funds from business transacted in this District.

## COMMERCE

14.    At all times relevant to this complaint, the Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS PRACTICES

### Overview

15.     The Defendants operate a massive, Internet-based scheme that tricks consumers into purchasing computer security software.  Known in Internet parlance as "scareware," Defendants' software – and the misleading Internet advertising used to promote it –  exploits consumers' legitimate concerns about Internet-based threats like spyware and viruses by issuing false security or privacy warnings to consumers for the sole purpose of selling software to fix the imagined problem.

16.     The Defendants' scareware scheme relies on elaborate and technologically sophisticated Internet advertisements that Defendants place with advertising networks and many popular commercial websites.  These exploitive ads display to consumers a "system scan" that invariably detects on consumers' computers a host of malicious or otherwise dangerous files and programs, including viruses, spyware, or "illegal" pornography.

17.     Once the scan is complete, the Defendants urge consumers to download and install their software to resolve the security or privacy problems detected by the scanner.  In many instances, consumers who agree to install the software are then presented with another scan initiated by the Defendants' software.

18.     This second, software-based, scan repeats many of the same warnings from the initial scan and urges consumers to purchase the Defendants' software at a cost of $39.95 or more to resolve the security or privacy issues found by the scanner.

19.     In reality, the scans displayed in the Defendants' Internet advertisements and by the Defendants'

software are an elaborate ruse created to dupe consumers into purchasing the Defendants'

security software products.  Although the Defendants go to great lengths to make the scans

appear legitimate, no actual computer scans take place and the purported virus, spyware, or

illegal pornography purportedly detected by the Defendants' scanners does not exist on

consumers' computers.

20.     Unaware of the Defendants' trickery, more than one million consumers have purchased the

Defendants' software products to cure their computers of the non-existent problems "detected"

by the Defendants' fake scans.

21.     Although some consumers later realize they have been defrauded by Defendants and attempt to

seek refunds, Defendants routinely delay, obstruct and refuse to honor such requests.

**The Defendants' False and Misleading Representations**

22.     Since 2003 or earlier, the Defendants have conspired to market a wide array of computer

security software via deceptive advertising.  These software products include, but are not limited

to, "WinFixer," "WinAntivirus," "DriveCleaner," "WinAntispyware," "ErrorProtector,"

"ErrorSafe," "SystemDoctor," "AdvancedCleaner," "Antivirus XP," and "XP Antivirus 2008."

23.     Regardless of the product being pitched, Defendants employ the same modus operandi – bogus

scans that falsely detect the presence of dangerous or illegal files or programs on consumers'

computers.

24.     For instance, when marketing their AdvancedCleaner program, Defendants disseminate

exploitive advertisements that redirect consumers from the website they are viewing to the

AdvancedCleaner website.  Defendants then display a "system scan" that purports to search

consumers' computers for "privacy violations."  As the scan unfolds, Defendants display a series

of hard-core pornographic pictures, which the Defendants falsely claim reside on consumers'

computers.  The Defendants then offer consumers the opportunity to rid their computers of these

images by downloading and installing AdvancedCleaner.

A screenshot of the Defendants' AdvancedCleaner scan appears below:



25.     Once consumers download and install AdvancedCleaner, Defendants present consumers with

another bogus scan, which is initiated by the Defendants' software.  This second scan, which is

displayed below, repeats many of the same misrepresentations made in the original

advertisement, including this dire warning:

> **216 Adult Content Detected** [*sic*]
>
> **Your PC has stored 216 items that are dangerous to your reputation . . .**
> **To protect your family/career/property and get rid of these compromising contents,**
> **you need to hide them completely by means of AdvancedCleaner.  For software**
> **registration, please click the "Register Now!" button.**

A screenshot of the software-initiated warning appears below:



26.    The representations in Paragraphs 24 and 25 are wholly false.  Defendants have not scanned

consumers' computers and have not found "illegal porn" or "adult files" on consumers'

computers.

27.    Many consumers exposed to the Defendants' fake scans proceed to purchase AdvancedCleaner

at a cost of $39.95, or more, to remove from their computers the files purportedly detected by the

Defendants' fake scans.

28.    Defendants use similar "fake scan" tactics to sell their various other software products, including

WinAntivirus and DriveCleaner.

29.    For example, in the advertisement below for WinAntivirus, Defendants represent that an

"infection" identified as "W32.ZOTOB.C@mh" has been detected on, and that a "remote

computer" has gained access to, the computer on which the ad is displayed.  Both of these

representations are false.



30.    Similarly, in the advertisement below for DriveCleaner, Defendants represent that they have

scanned the computer on which the ad is displayed and detected 948 "COMPROMISING &

INTERNET TRACK FILES."  These representations are false.  Defendants have not scanned the

computer, and have not detected 948 "COMPROMISING & INTERNET TRACK FILES."



31.    Many consumers exposed to the false representations in Defendants' WinAntivirus and

DriveCleaner advertising proceed to purchase the programs at a cost of $39.95, or more, in order

to resolve the imagined security problems "detected" in the ads.

**The Defendants' Deceptive Marketing Efforts from 2004-2007**

32.    In 2004 or earlier, the Defendants began placing false and misleading advertisements for their

software products with major Internet advertising networks, including the MyGeek network

(now known as the AdOn network).  Advertising networks like MyGeek serve as advertising

11

brokers, distributing advertisements to their website partners across the Internet.

33.     Defendant Ross placed more than $3.3 million dollars worth of ads for the Defendants' products with the MyGeek network between October 2004 and November 2006.  Ross used a variety of methods to pay for these advertisements, including international wires from an account identified as "Innovative Marketing, Inc.," and credit cards belonging to Defendants Marc D'Souza and Daniel Sundin.

34.     In return, MyGeek contracted with its partners across the Internet to display the Defendants' advertisements, many of which were similar in function and appearance to those in Paragraphs 24, 25, 29 and 30.  Ross purchased nearly 680 million "impressions" – unique displays of the Defendants' ads – from MyGeek alone, including ads for "WinFixer," "ErrorProtector," "WinAntivirus," "DriveCleaner," "ErrorSafe," and "SystemDoctor."

35.     The advertisements placed by Defendant Ross on the MyGeek network quickly drew complaints from MyGeek's advertising partners.  On multiple occasions, representatives from MyGeek chastised Defendant Ross for placing advertisements that contained "auto-downloads" – advertisements that attempted to install the Defendants' software without consumer consent. MyGeek also warned Defendant Ross to stop placing ads that involuntarily redirected users to websites owned by the Defendants.  Although Ross promised to fix the offending ads – and claimed that these ads were mistakes – all such "fixes" proved temporary.  Despite multiple warnings to Defendant Ross, MyGeek continued to receive complaints about ads placed by Defendant Ross.

36.     On September 1, 2006, Ross received an email from a MyGeek representative informing her that

several of MyGeek's advertising partners would not run ads for anti-virus and anti-spyware

products, including the Defendants' products.  In response, Ross offered to remove MyGeek's

advertising partners' adware programs from the list of threats Defendants' security programs

detect on consumers' computers:

> We are 100% able to keep their product OUT of the database if they are
> willing to run the advertisements. You might also consider presenting that.
> I can do it with all the software sources we run.

37.     On March 29, 2007, MyGeek informed Ross via email that it would no longer accept advertising

for the Defendants' products.  Ross replied that "we have some 500 [other] advertising deals"

and reminded MyGeek that "we alone have spent well over a million dollars with your

company."

### The Defendants' Recent Deceptive Marketing Efforts

38.     With major advertising networks like MyGeek refusing to accept the Defendants'

advertisements, the Defendants have embarked on an elaborate scheme to dupe advertising

networks and commercial websites into accepting their deceitful advertising.

39.     In furtherance of this scheme, the Defendants have created a number of sham Internet

advertising agencies, which place advertisements exclusively for the Defendants' products.

These captive advertising agencies, including "Burn Ads," "Preved Marketing," "AdTraff,"

"NetMediaGroup," and "Uniqads," approach popular advertising networks and commercial

websites offering to purchase advertising space on behalf of legitimate companies, including

CareerBuilder.com, FrontGate, Travelocity.com, Priceline.com, and even OxFam International,

an anti-poverty charity.  Although these legitimate companies and organizations have no

affiliation with the Defendants, and have never authorized the Defendants to place advertising on their behalf, the Defendants falsely represent that they are authorized to place the advertisements.

40.    The Defendants then supply the targeted advertising network or website with a technologically sophisticated electronic advertisement, which is capable of displaying different content depending on a variety of criteria, including the Internet Protocol ("IP") address of the viewer.

41.    When this advertisement is viewed from a computer with an IP address associated with the advertising network or website upon which they are advertising, or any other IP range chosen by the Defendants, the advertisement appears as promised – as a banner ad for the legitimate company or organization Defendants claim to represent.  As a result, when the advertising staff of the targeted advertising network or website views the ad, they see nothing unusual and proceed to approve the Defendants' ad for distribution.

42.    However, due to hidden programming code inserted by the Defendants, the Defendants' advertisements appear entirely differently to those outside of this "walled off" IP range. Consumers with an IP address outside of the IP range walled off by the Defendants receive an exploitive ad that takes them from the website they are visiting to one of the Defendants' websites.  At this point, one of the Defendants' fake scans commences and proceeds to "detect" a host of critical issues that need immediate attention.

43.    Since 2007, the Defendants have used their stealthy and deceitful methods to place advertisements on a number of popular Internet websites.  As a result, Defendants' ads have redirected visitors on official websites such as Major League Baseball (mlb.com), the National

14

Hockey League (nhl.com), The Economist magazine (economist.com), the National Association

of Realtors (realtor.com), Zillow.com, and the popular Internet dating site E-Harmony

(eharmony.com), to the Defendants' websites, where the Defendants then launch their bogus

scans.

### The Role of James Reno

44.    Defendant Reno provides much of the technical expertise required to propagate the Defendants'

scam.  Reno has advanced computer skills and serves as a senior executive within the

Defendants' enterprise.

45.    Reno has entered into key contracts with vendors on behalf of the IMI Enterprise.  One such

contract was with LimeLight Networks, Inc., a content-distribution company that enables users

with high-bandwidth needs to distribute their content efficiently to Internet users around the

world.

46.    Records from LimeLight Networks show James Reno as the primary contact for the content

distribution agreement between LimeLight Networks and a company listed as "SetUpAHost."

The same records show Reno's email address as james@setupahost.net.

47.    Setupahost.net is a domain hosted in Ontario, Canada that is operated by the Defendants.  The

Setupahost.net domain houses much of the Defendants' software as well as the images that are

used in the Defendants' deceptive advertisements.  Reno has made multiple trips to Ontario to

maintain and reconfigure the servers used by the Defendants to host their websites.

48.    Reno, through his company Bytehosting, is also responsible for managing the Defendants' call

center, and is the owner of several of the technical support phone numbers used by the IMI

Enterprise.

49.    The IMI Enterprise's call center frequently receives calls from consumers who have been tricked

into purchasing the Defendants' products by the Defendants' false and misleading advertising,

and are requesting a refund.  Call center staff routinely obstruct and delay these consumers from

obtaining refunds by misleading consumers about the legitimacy of the fake scan that led them to

purchase the software, falsely telling consumers a refund has been issued when it has not, or

refusing to return calls from consumers seeking refunds.

50.    Reno owns and operates Bytehosting as part of a common enterprise with Innovative Marketing.

Reno and Bytehosting perform a variety of functions for Innovative Marketing that perpetuate

Defendants' scheme to defraud consumers.  Bytehosting is referred to as the "Ohio office" of

IMI Enterprise.  Bytehosting relies on IMI Enterprise for virtually all of its revenue.  In addition,

IMI Enterprise purchased computer equipment for Bytehosting and on numerous occasions

wired funds to Bytehosting for the express purposes of paying payroll, rent, taxes, and utilities.

**The Role of Sam Jain**

51.    Sam Jain is the Chief Executive Officer of Innovative Marketing.  Jain, along with Daniel

Sundin and Kristy Ross, formed Innovative Marketing in 2002.  Jain later recruited Marc

D'Souza to join the IMI Enterprise.

52.    Jain is involved in all aspects of the IMI Enterprise's business affairs, including marketing and

sales, and has personally invested a large amount of capital into the company.

53.    Jain has been responsible for developing relationships with payment processors who could

process the IMI Enterprise's credit card transactions.  After experiencing difficulty in

16

maintaining these relationships, Jain ceded this role to Marc D'Souza.

### The Role of Daniel Sundin

54.    Daniel Sundin is the former Chief Operating Officer and current Chief Technology Officer of

Innovative Marketing.  Sundin incorporated Innovative Marketing in Belize and is the

company's sole shareholder.

55.    Sundin set up Innovative Marketing's headquarters in Kiev, Ukraine and also opened facilities in

Argentina and India.

56.    Through his now-defunct company, Vantage Software, Sundin registered and paid for many of

the Defendants' primary websites, including WinFixer.com, DriveCleaner.com,

ErrorProtector.com, WinAntivirus.com, and SystemDoctor.com.

57.    Sundin controls foreign bank accounts, including an account in Sweden, that are used to fund the

Defendants' activities, including the account used to pay for the false and misleading

advertisements placed by defendant Ross on the MyGeek network.  Sundin has also used

multiple personal credit cards and bank accounts to fund the Defendants' activities.

### The Roles of Marc D'Souza and Maurice D'Souza

58.    Until his departure from the IMI Enterprise in late 2006, Marc D'Souza handled the company's

finances, and was responsible for developing relationships with payment processors who could

process the huge volume of credit card charges generated by the IMI Enterprise.

59.    With assistance from his father, Maurice D'Sozua, Marc D'Souza was able to establish

numerous merchant accounts with various payment processors around the world.

60.    Marc D'Souza's role was especially important because the IMI Enterprise had great difficulty in

maintaining relationships with payment processors due to the high rate of credit card

chargebacks and complaints from consumers.

61.    Both Marc D'Souza and Maurice D'Souza have retained millions of dollars in proceeds from the

IMI Enterprise in their bank accounts.  These funds are the subject of a lawsuit currently pending

in Ontario, Canada, in which Innovative Marketing alleges that Marc D'Souza and Maurice

D'Souza have embezzled millions of dollars from the IMI Enterprise.

**The Role of Kristy Ross**

62.    Ross is responsible for marketing the Defendants' products, and has placed millions of dollars

worth of false and misleading ads for the Defendants' products with Internet advertising

networks and other entities.

63.    Ross has been warned on multiple occasions that the ads she is placing are exploitive and

deceitful.  Despite these warnings, Ross has continued to place ads for the Defendants' products.

**COUNT ONE**

**Deceptive "Scareware" Marketing**

**(As To All Defendants)**

64.    In numerous instances, in the course of marketing, offering for sale, and selling computer

software, the Defendants represent or have represented, expressly or by implication, through a

variety of means, including Internet advertisements, software-generated reports, and customer

service telephone conversations, that they have conducted scans of consumers' computers and

detected a variety of security or privacy issues, including viruses, spyware, system errors and

pornography.

18

65.     In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 64, the Defendants have not conducted scans of consumers' computers and/or have not detected the purported security or privacy issues on consumers' computers.

66.     Therefore, the Defendants' representations as set forth in Paragraph 64 are false and misleading and constitute deceptive acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a).

## COUNT TWO

### Disgorgement of the Assets of the Relief Defendant

67.     Defendants have committed deceptive acts and practices against consumers in violation of Section 5(a) of the FTC Act in connection with the sale of their computer software.

68.     Relief Defendant Maurice D'Souza has received ill-gotten funds or otherwise benefitted from funds that are the proceeds of the Defendants' unlawful acts.

69.     Relief Defendant Maurice D'Souza has no legitimate claim to the ill-gotten funds in his possession, and will be unjustly enriched if he is not required to disgorge the funds or the value of the benefit he received as a result of the Defendants' unlawful acts.

70.     Maurice D'Souza should be required to disgorge the ill-gotten funds or the value of the benefit he received as a consequence of the Defendants' unlawful acts.

71.     By reason of the foregoing, Maurice D'Souza holds the proceeds of the Defendants' unlawful acts in a constructive trust for the benefit of the consumers who were deceived by the Defendants.

## CONSUMER INJURY

72.  The Defendants' violations of Section 5 of the FTC Act, 15 U.S.C. § 45(a), as set forth above, have caused and continue to cause substantial injury to consumers.  Absent injunctive relief by this Court, the Defendants are likely to continue to injure consumers and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

73.  Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and other ancillary relief, including consumer redress, disgorgement, and restitution, to prevent and remedy any violations of any provision of law enforced by the FTC.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, the Federal Trade Commission, requests that this Court, as authorized by Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and pursuant to its own equitable powers:

1.  Award plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including, but not limited to, temporary and preliminary injunctions, an order freezing assets, and a financial accounting;

2.  Enter a permanent injunction to prevent future violations of the FTC Act by Defendants;

3.  Award such relief as the Court finds necessary to redress injury to consumers resulting from the Defendants' violations of the FTC Act, including, but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies;

4.      Award such relief against Relief Defendant Maurice D'Souza that the Court finds necessary to

protect and return funds and other property that were derived from Defendants' violations of the

FTC Act, including an order to disgorge all ill-gotten gains or proceeds that he has received as a

result of the acts and practices complained of herein, and an order imposing a constructive trust

upon such gains or proceeds; and

5.      Award Plaintiff the costs of bringing this action, as well as such other and additional

relief as the Court may determine to be just and proper.


Dated: December __2__, 2008

                                    Respectfully submitted:

                                    WILLIAM BLUMENTHAL
                                    General Counsel


                                    _____/s/_____
                                    Ethan Arenson DC # 473296 (earenson@ftc.gov)
                                    Colleen B. Robbins, NY# 2882710 (crobbins@ftc.gov)
                                    Carmen J. Christopher, DC # 499917 (cchristopher@ftc.gov)
                                    Federal Trade Commission
                                    600 Pennsylvania Ave., NW, Room 288
                                    Washington, D.C. 20580
                                    (202) 326-2204 (Arenson); (202) 326-2548 (Robbins);
                                    (202) 326-3643 (Christopher)
                                    (202) 326-3395 FACSIMILE