# EXHIBIT

# 17

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | |
|---|---|
| **Federal Trade Commission** | |
| **Plaintiff,** | **CIVIL NO.** |
| **v.** | |
| **Innovative Marketing, Inc.,** *et al.* | |
| **Defendants.** | |

## DECLARATION OF CARMEN CHRISTOPHER

I, Carmen Christopher, pursuant to 28 U.S.C. § 1746, declare as follows:

1.     I am a U.S. citizen over the age of 18.  I am an attorney representing Plaintiff, Federal Trade Commission ("FTC"), an agency of the United States government, in this action.  I have personal knowledge of the facts stated herein.

2.     Attached at Attachments A-D are the following pleadings from the Ontario Superior Court of Justice in the matter of Innovative Marketing, Inc. v. D'Souza, *et al.* ("IMI Canadian Court File"): Attach. A, Statement of Claim; Attach. B, Statement of Defence and Counterclaim; Attach. C, Amended Statement of Claim; and Attach. D, Further Fresh as Amended Statement of Defence and Counterclaim.  The attached pleadings are authenticated pursuant to Federal Rule of Civil Procedure 44 and Federal Rule of Evidence 902 (3).

3.     Attached at Exhibit 15 is the Declaration of Arlene Wilcock, a Competition Law Officer in the Competition Bureau of the Government of Canada.  In her declaration, Ms. Wilcock describes how she obtained photocopies of documents from the IMI Canadian Court File and provided

those documents to the FTC.

4.      Attached at Exhibit 16 is the Declaration of Stephanie Moriarity, an Enforcement Support

Officer in the Competition Bureau of the Government of Canada.  In her declaration, Ms.

Moriarity describes how she photocopied documents from the IMI Canadian Court File.

5.      Attached at Attach. E is the order from the Ontario Superior Court entering a Mareva

injunction in the IMI Canadian suit.  The attached order was provided to the FTC by Ms.

Wilcock as described above and by Ms. Wilcock in her declaration.

6.      Attached at Attachments F-M are affidavits and referenced exhibits from the affidavits from

the IMI Canadian Court File as follows: Attach. F, Affidavit of Sam Jain sworn February 19,

2007;  Attach. G, Affidavit of Daniel Sundin sworn February 19, 2007; Attach. H, Affidavit of

Marc D'Souza sworn February 20, 2007; Attach. I, Affidavit of Daniel Sundin sworn March 6,

2007; Attach. J, Affidavit of Kristy Ross sworn March 6, 2007; Attach. K, Affidavit of Marc

D'Souza sworn March 7, 2007; Attach. L, Affidavit of Marc D'Souza sworn January 31, 2008;

and Attach. M, Affidavit of Sam Jain sworn March 6, 2007.  The attached IMI Canadian Court

File affidavits were provided to the FTC by Ms. Wilcock as described above and by Ms.

Wilcock in her declaration.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on November 26, 2008, in Washington, D.C.

Carmen Christopher, Esq.
Federal Trade Commission



```
Canada                    )
Province of Ontario       )
City of Toronto           )    SS:   CERTIFICATE OF AUTHENTICATION
Consulate General of the  )
United States of America  )
```

I, the undersigned,

### Molly P. Flores,

Vice Consul of the United States of America at Toronto, Ontario, Canada, duly commissioned and qualified do hereby certify that

### ---Sheila Tracey---

whose (fascimile) (true) signature and seal are, respectively, subscribed and affixed to the annexed document was, at the time of (attaching) (subscribing) the same

### Recording Officer Secretary of the Management Board of Cabinet, Province of Ontario, Canada

to whose official acts faith and credit are due. For the contents of the annexed document, I assume no responsibility.

IN WITNESS WHEREOF I have hereunto set my hand and affixed the seal of the Consulate General of the United States of America at Toronto, Ontario, Canada this, **22th** day of **November, 2008.**

(SEAL)

_____
Molly P. Flores
**Vice Consul of the United States of America**

Attachment A



Ontario

### MINISTRY OF GOVERNMENT SERVICES

I HEREBY CERTIFY AS FOLLOWS:

## NIGEL PHILIP WATSON

of the Province of Ontario, whose name is subscribed to the attached Instrument, was, at the time of subscribing thereto, a **NOTARY PUBLIC** in and for the Province of Ontario, Canada, duly commissioned and duly authorized by the laws thereof to administer oaths, to take affidavits and to certify the proof of deeds and other instruments in writing to be recorded within the said Province;

I FURTHER CERTIFY THAT I have compared the signature of the said **NOTARY PUBLIC** subscribed to the attached Instrument with the specimen signature of the said **NOTARY PUBLIC** filed in this office and verily believe the said signature to be genuine; and THAT I have compared the impression of the Seal of the said **NOTARY PUBLIC** appearing on the attached Instrument with the specimen of the Seal filed in this office and verily believe the impression of the Seal to be genuine.



IN TESTIMONY WHEREOF I have hereunto set my Hand and affixed the Seal of the Ministry of Government Services of the Province of Ontario at the City of Toronto in the said Province this twenty-first day of November, A.D. 2008.

*Sheila Tracey*

for the MINISTER OF GOVERNMENT SERVICES

**Page 46**

Attachment A

CANADA              )             **TO ALL WHOM THESE PRESENTS**
PROVINCE OF ONTARIO  )             **MAY COME, BE SEEN OR KNOWN**

**I, NIGEL PHILIP WATSON, a Notary Public, in and for the Province of Ontario, by Royal Authority duly appointed, residing at the City of Toronto in said Province,**

**Do Certify and Attest** that to the best of my knowledge the paper-writing(s) hereto annexed is(are) a true copy of a document produced and shown to me

**In Testimony Whereof** I have hereto subscribed my name and affixed my Notarial Seal of Office at the City of Toronto, in the Province of Ontario

this *2/* day of  November, 2008



*NI't*

NIGEL PHILIP WATSON
*NIGEL PHILIP WATSON*

A Notary Public in and for the Province of Ontario

Attachment A



THAT THIS
E OF
ITH THE
ERIOR COURT
E AT TORONTO, IS A
Y OF THE DOCUMENT
IN THIS OFFICE

LA PRÉSENT
DOCUMENT, DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

DA ... AT TORONTO THIS  _10_  DAY OF  _NOVEMBER_  20 _08_
FAIT À TORONTO LE  _____  JOUR DE

Joanne Nicoara
Registrar Superior Court of Justice
GREFFIER

REGISTRAR

Court File No.

# ONTARIO
## SUPERIOR COURT OF JUSTICE

B E T W E E N :

### INNOVATIVE MARKETING, INC.

Plaintiff

and

### MARC GERARD D'SOUZA, MAURICE D'SOUZA, MARINA D'SOUZA, ELVIRA MARTINEZ-ROMERO, CONRAD D'SOUZA, LEONARD D'SOUZA WINPAYMENT CONSULTANCY SPC, WEB INTEGRATED NET SOLUTIONS, INC., BILLINGNOW.COM, INC. BILLING SOLUTIONS, SPC, WINSOLUTIONS, FZ-LLC, REINSURANCE AND INSURANCE CONSULTING HOUSE SPC, SYNERGY, B.V., WINGEM, INC., WINSECURE SOLUTIONS, PTE, LTD., BILLPLANET, PTE, LTD., DSOFT, PTE, LTD., GE MANAGEMENT, PTE, LTD., and SCORGEM, PTE, LTD.

Defendants

## STATEMENT OF CLAIM

TO THE DEFENDANTS

A LEGAL PROCEEDING HAS BEEN COMMENCED AGAINST YOU by the plaintiff. The claim made against you is set out in the following pages.

IF YOU WISH TO DEFEND THIS PROCEEDING, you or an Ontario lawyer acting for you must prepare a statement of defence in Form 18A prescribed by the Rules of Civil Procedure, serve it on the plaintiff's lawyer or, where the plaintiff does not have a lawyer, serve it on the plaintiff, and file it, with proof of service, in this court office, WITHIN TWENTY DAYS after this statement of claim is served on you, if you are served in Ontario.

If you are served in another province or territory of Canada or in the United States of America, the period for serving and filing your statement of defence is forty days. If you are served outside Canada and the United States of America, the period is sixty days.

Instead of serving and filing a statement of defence, you may serve and file a notice of intent to defend in Form 18B prescribed by the Rules of Civil Procedure. This will entitle you to ten more days within which to serve and file your statement of defence.

IF YOU FAIL TO DEFEND THIS PROCEEDING, JUDGMENT MAY BE GIVEN AGAINST YOU IN YOUR ABSENCE AND WITHOUT FURTHER NOTICE TO YOU. IF YOU WISH TO DEFEND THIS PROCEEDING BUT ARE UNABLE TO PAY LEGAL FEES, LEGAL AID MAY BE AVAILABLE TO YOU BY CONTACTING A LOCAL LEGAL AID OFFICE.

Date    February 19, 2007         Issued by          A. Vaiciulenas.

                                                    Local Registrar

                                  Address of
                                  court office:   393 University Avenue
                                                  10th Floor
                                                  Toronto, Ontario
                                                  M5G 1E6

                                              AND TO:        MAURICE D'SOUZA

**TO:        MARC GERARD D'SOUZA**

                                              22 Carnegie Crescent
    1 King St. West                           Thornhill, Ontario Canada
    Toronto, Ontario                          L3T 5H1
    M5H 1A1

AND TO:   MARINA D'SOUZA                      AND TO:   CONRAD D'SOUZA

22 Carnegie Crescent                          96 Vanguard Road
Thornhill, Ontario Canada                     Concord, Ontario
L3T 5H1                                        L4K 5G7 CANADA

THIS IS TO CERTIFY THAT THIS          LA PRÉSENT ATTEST QUE CE
DOCUMENT, EACH PAGE OF                DOCUMENT, DONT CHACUNE
WHICH IS STAMPED WITH THE             DES PAGES EST REVÊTUE DU
SEAL OF THE SUPERIOR COURT            SCEAU DE LA COUR SUPÉRIEURE
OF JUSTICE AT TORONTO, IS A           DE JUSTICE A TORONTO, EST UNE
TRUE COPY OF THE DOCUMENT             COPIE CONFORME DU DOCUMENT
ON FILE IN THIS OFFICE                CONSERVÉ DANS CE BUREAU
DATED AT TORONTO THIS __10__ DAY OF _NOVEMBER_ 20 _08_
FAIT À TORONTO LE           JOUR DE
                                      **Joanne Nicoara**
                                      Registrar Superior Court of Justice
REGISTRAR                                GREFFIER

Page 49

Attachment A

AND TO:      LEONARD D'SOUZA
P.O. Box 18258
Vae Jebel Ali Freezone
Dubai, United .Arab Emirates

AND TO:      Elvira Martinez Romero
             No. 14 Cessna Street
             1300 Metro Manila
             Don Carlos Village, Pasay
             <u>Philippines</u>

AND TO:      Elvira Martinez-Romero
             Flat 41, Building 2625, Road
             2725,
             Manama,
             <u>Kingdom of Bahrain</u>

AND TO:      Winpayment Consultancy
             Government Avenue Road
             #601,
             Suite #12, Building #60,
             Manama
             <u>Kingdom of Bahrain</u>

AND TO:      Winpayment Consultancy
             PO Box 54838
             Manama
             <u>Kingdom of Bahrain</u>

AND TO: Web Integrated Net Solutions, In
             Romasco Place, Wickham
             Cay 1,
             PO Box 3140, Road Town
             Tortola
             <u>British Virgin Islands</u>

AND TO:      Billingnow.com Inc.
             22 Carnegie Crescent
             Thornhill, Ontario L3T 5H1
             <u>Canada</u>

BILLING SOLUTIONS, SPC
Suite #12
Building #60
Government Avenue Road #601
Manama 306
Kingdom of Bahrain

THIS IS TO CERTIFY THAT THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE
DOCUMENT, DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS  10  DAY OF  NOV      20 08
FAIT À TORONTO LE            JOUR DE

                    Joanne Nicoara
                Registrar Superior Court of Justice
REGISTRAR              GREFFIER

Attachment A

AND TO: Winsolutions FZ-LLC
    Office No. 1 Building 04
    Ground Floor
    PO Box 500772
    Free Zone, Dubai Internet City
    Dubai
    United Arab Emirates

AND TO:Reinsurance & Insurance Consult
    House (RICH) SPC
    PO Box 54838
    Manama
    Kingdom of Bahrain

AND TO: WinGem, Inc.
    No. 14 Cessna Street
    1300 Metro Manila
    Don Carlos Village, Pasay City
    Philippines

AND TO:Winsecure Solutions PVT Ltd
    Penthouse Level
    Suntec Tower Three
    8 Temasek Blvd
    Singapore 038988

AND TO: Billplanet Pvt Ltd
    Penthouse Level
    Suntec Tower Three
    8 Temasek Blvd
    Singapore 038988

AND TO: Synergy B.V.
    Dokweg 27 B
    1976 CA IJmuiden
    Netherlands

AND TO: DSoft PVT. Ltd.
    139 Lorong K Telok Kurau #01-
    03
    Singapore 425777

AND TO:GE Management PVT. Ltd.
    139 Lorong K Telok Kurau
    03
    Singapore 425777

THIS IS TO CERTIFY THAT THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

DATED AT TORONTO THIS 10 DAY OF NOV 20 08
FAIT À TORONTO LE        JOUR DE

REGISTRAR

LA PRÉSENT ATTEST QUE CE
DOCUMENT, DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

Joanne Nicoara
Registrar Superior Court of Justice

AND TO:     Scorgem Pte Ltd.
            Penthouse Level
            Suntec Tower Three
            8 Temasek Blvd
            Singapore 038988

THIS IS TO CERTIFY THAT THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE
DOCUMENT, DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS  10  DAY OF   NOV.  20 08
FAIT À TORONTO LE          JOUR DE

Joanne Nicoara
Registrar  Superior Court of Justice
GREFFIER

REGISTRAR

**Page 52**

**Attachment A**

THIS IS TO CERTIFY THAT THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE
DOCUMENT, DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS ___10___ DAY OF ___NOV-___ 20 08
FAIT À TORONTO LE            JOUR DE

_____
REGISTRAR

Joanne Nicoara
Registrar, Superior Court of Justice
GREFFIER

# CLAIM

1.    The Plaintiff claims as against each of the Defendants:

   a.    A full accounting of all money and property of the Plaintiff;

   b.    An order for the payment of all sums found to be due to the Plaintiff on the taking of the accounts above;

   c.    A declaration that, in respect of all sums of the Plaintiff's money and property paid or delivered to the Defendants:

      (i)    The Plaintiff is permitted to trace the money, property and/or proceeds thereof and any assets upon which the moneys of the Plaintiff have been expended into the hands of the Defendants or any of them; and,

      (ii)    Such sums and/or any of the proceeds thereof and/or assets upon which the Plaintiff's money has been expended are the Plaintiff's property;

   d.    An order to deliver up all sums, proceeds or assets traced or declared to be the property of the Plaintiff;

   e.    A declaration that all assets held by the Defendants, their officers, servants or agents, representing or derived from money received from the Plaintiff are held on constructive trust for the Plaintiff and for an order that the Defendants deliver all such assets to the Plaintiff;

   f.    Restitution to the Plaintiff of all moneys had and received by the defendants, their officers, servants or agents from the Plaintiff;

   g.    Damages for conversion and breach of contract, fraud and deceit, conspiracy to defraud, conspiracy to injure and breach of fiduciary duty, in the sum of that amount in Canadian currency sufficient to purchase the sum of US$48,000,000 at a Bank listed in Schedule 1 to the Bank Act (Canada) at the close of business on

**Page 53**

the first day on which the bank quotes a Canadian dollar rate for the purchase of United States Dollars before the day payment of the obligation is received by the Plaintiff;

h. Interest thereon both pre and post judgment in accordance with the provisions of the Ontario *Courts of Justice Act*;

i. punitive and exemplary damages in the amount

j. Its costs of this action on a substantial indemnity basis;

k. Such further and other relief as to this court seems just.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT KEPT IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS 10 DAY OF NOV. 20 08
FAIT À TORONTO LE            JOUR DE

Joanne Nicoara
REGISTRAR        Registrar, Superior Court of Justice
CERTIFIED

**The Parties**

2. The Plaintiff, Innovative Marketing, Inc ("IMI") is a corporation incorporated pursuant to the laws of Belize and carries on business as a designer, developer, marketer and distributor of a variety of Internet-based products ("the IMI Products") through its wholly-owned websites (the "IMI Websites"). It also provides services to its customers in the form of technical and other support related to its products and has carried on this business since 2002. IMI has offices located in Ukraine, Argentina and India.

3. The Defendant, Marc Gerard D'Souza ("Marc") is a Canadian citizen and a resident who, at all material times, was an employee of IMI, most recently holding the title of Director of Marketing, up until his resignation from that position on or about December 29, 2006. Together with Maurice D'Souza, Marc is the operating mind of all of the corporate defendants.

4. The Defendant, Maurice D'Souza ("Maurice") is an Ontario citizen and resident and is Marc's father. Maurice has never been directly employed by IMI, nor is he a party to any agreement with IMI that would allow him to receive funds from it. Together with Marc, Maurice is the operating mind of all of the corporate defendants.

5. The Defendant, Marina D'Souza ("Marina") is an Ontario citizen and resident and is the wife of Maurice and the mother of Marc. Marina has never been an employee of IMI,

nor has she been party to any agreement with IMI that would allow her to receive funds from it. Marina is the sole director of the corporate defendant, Billingnow.com, Inc. and acted as and/or allowed her identity to be utilized by Marc and Maurice as a front for various of their activities outlined herein.

6.   The Defendant, Conrad D'Souza ("Conrad") is an Ontario citizen and resident and is Marc's cousin. Up until December 31, 2006, Conrad was employed by IMI and held the position of sales manager.

7.   The Defendant, Leonard D'Souza is a Canadian citizen and a non-resident, residing in Dubai, United Arab Emirates and is Marc's cousin.

8.   The Defendant, Elvira Martinez-Romero is a citizen and resident of The Republic of the Philippines and a director of the defendants WinGem, Inc. and Scorgem Pte Ltd.

9.   The Defendant, BillingNow.com, Inc. is a corporation incorporated pursuant to the laws of Ontario.

10.  The Defendants, WinPayment Consultancy SPN, ("WinPay"), Billing Solutions, SPC ("BillSol") and Reinsurance and Insurance Consulting House SPC ("RICH") are entities incorporated or otherwise registered pursuant to the laws of the Kingdom of Bahrain.

11.  The Defendants, WinSecure Solutions, Pte, Ltd. ("WinSecure"), Bill Planet, Pte, Ltd. ("Bill Planet"), DSoft, Pte, Ltd. ("Dsoft"), GE Management, Pte, Ltd. ("GEM"), and Scorgem, Pte, Ltd ("Scorgem") are all corporations incorporated pursuant to the laws of the Republic of Singapore.

12.  The Defendant, Web Integrated Net Solutions, Inc. ("Web Integrated") is a corporation incorporated pursuant to the laws of the British Virgin Islands.

13.  WinGem, Inc. ("WinGem") is a corporation incorporated pursuant to the laws of the Philippines.

14.  WinSolutions FZ – LLC. is a corporation incorporated pursuant to the laws of the United Arab Emirates.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

DATED AT TORONTO THIS ___10___ DAY OF ___NOV___ 20_08_
FAIT À TORONTO LE

REGISTRAR

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE À TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

JOUR DE

Joanne Nicoara
Registrar  Superior Court of Ju
GREFFIER



WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

DOCUMENT, DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS ___ TO
FAIT A TORONTO ___ JOUR DE ___ NOV 20 08

REGISTRAR
Joanne Nicoar
Registrar, Superior Court of ...

Synergy, B.V. is a corporation incorporated pursuant to the laws of the Kingdom of the
Netherlands.

16.    All of the non-individual defendants are owned and/or controlled by Marc and Maurice
and have been used by them to facilitate the activities described herein.

### Background

17.    In or about November, 2001 Daniel Sundin ("Sundin") founded a software business with
operations in Kiev, Ukraine and Beunos Aires, Argentina. Shortly after establishing this
business, Sundin was introduced to Sam Jain ("Jain"), an individual with extensive
experience in Internet based sales and marketing initiatives.

18.    In July, 2002 IMI was incorporated under the laws of Belize and was initially capitalized
with funds contributed by Sundin who is the sole shareholder of IMI's shares. Jain also
made his own substantial financial contribution to the company.

19.    IMI primarily carries on the business of online sales of proprietary antivirus software, but
also offers other software products to the public through a variety of websites. IMI's
proprietary software is exclusively marketed through IMI-owned and maintained
websites, including: WinAntivirus.com, WinAdBlocker.com, WinAntiSpy.com,
WinContentFilter.com, WinDriveCleaner.com, MultimediaFixer.com,
ComputerShield.com, BySmarter.com, PCSuperCharger.com, StopGuard.com and
PopupGuard.com. IMI also owns and maintains other websites/domain names, which are
not related to software sales.

20.    In or about May, 2003, IMI 's Ukraine operations formally became a subsidiary office of
IMI. IMI's facility in Ukraine provides technical support services in relation to the
products offered through IMI's website. Due to the success of IMI's business, the
number of people employed in its Ukraine operation has grown from approximately 70
employees in January 2004 to over 300 employees in 2006.

21.    Similarly, IMI's gross sales revenues increased from approximately US$11 million in
2004 to approximately US$23 million in 2005 and US$53 million in 2006.

DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

DATED AT TORONTO THIS _10_ DAY OF _NOV_ 20 _08_

DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE À TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

FAIT À TORONTO LE _____ JOUR DE

**Sundin's Management vision for IMI**

22.	From IMI's inception until December, 2005, Sundin was acting in the role of the company's Chief Operating Officer and from that time until the present has been its Chief Technical Officer. While serving in both capacities, Sundin has been the chief designer of IMI's software products.

23.	Under Sundin's management and leadership, IMI also developed and implemented a growth strategy through which the company began to expand its product lines and marketing opportunities, thereby expanding IMI's customer base.

**The Agreement**

24.	In or about July 2002, IMI hired Marc to perform certain marketing and other services for IMI in exchange for a salary tied directly to IMI's financial performance. Specifically, this arrangement allowed for Marc to be paid 1% of IMI's monthly profits for the first $200,000.00 in monthly profits, plus 20% of IMI's profits for every dollar earned over $200,000.00 per month in profit ("the Agreement").

25.	At no time was Marc ever given a title that would suggest he had an ownership interest in IMI, nor was he ever identified by IMI or its principals as a partner or joint venturer in IMI's business. In any event, regardless of Marc's title or the nature of his relationship, at no time did IMI ever agree to amend the terms of the Agreement, particularly the remuneration he was to receive pursuant thereto.

26.	Marc's duties as an employee of IMI included:

>	(a) securing merchant accounts;

>	(b) sourcing suppliers and vendors;

>	(c) sales and marketing;

>	(d) any and all other duties as required by IMI from time to time.

SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

SCEAU DE LA COUR SUPERIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVE DANS CE BUREAU

DATED AT TORONTO THIS _10_ DAY OF _NOV_ 20 _08_
FAIT À TORONTO LE          JOUR DE

Joanne Nico

REGISTRAR          Registrar, Superior Court of Justice
                   GREFFIER

**Marc's Introduction of Maurice to IMI**

27.   Shortly after Marc was hired by IMI, he suggested that IMI use his father's merchant banking relationships, which he represented would allow IMI to process payments by its customers more economically than its existing arrangement. Marc represented that Maurice's contacts and expertise could benefit IMI and more efficiently process IMI's increasing sales volume, thereby assisting IMI's cash flow management.

28.   Marc represented to IMI that this proposed arrangement could provide processor and merchant bank services, including online bill and expense payment services for substantially less than IMI had been paying at that time.

29.   Based on Marc's representations outlined above, IMI entrusted Marc to handle IMI's cash flow and authorized him to hire support staff to facilitate this arrangement on its behalf.

30.   Based on Marc's representations outlined above, IMI authorised Marc and Maurice to set-up processing and merchant bank services on its behalf, with the first such relationship being established on or about June 29, 2002 with American Express, through a Dubai-based processor.

31.   Based on Marc's representations outlined above, Marc was also made responsible for IMI's merchant accounting operations and revenue management services and reported directly to Jain in that respect. In addition, beginning in 2004 Marc was responsible for most of IMI's day-to-day accounting and cash management, including: maintaining IMI's financial network, management of IMI's billing, external financial reporting and cash management information systems and maintaining IMI's banking relationships.

32.   IMI entrusted Marc to honestly and faithfully carry out his duties to the company, as is demonstrated by the high degree of control he was ultimately granted over the company's financial assets.

12

SEAL OF THE SUPERIOR COURT   SCEAU DE LA COUR SUPÉRIEURE
OF JUSTICE AT TORONTO, IS A   DE JUSTICE A TORONTO, EST UNE
TRUE COPY OF THE DOCUMENT   COPIE CONFORME DU DOCUMENT
ON FILE IN THIS OFFICE        CONSERVE DANS CE BUREAU

DATED AT TORONTO THIS _10_ DAY OF ___NOV___ 20 _08_
FAIT À TORONTO LE            JOUR DE

Joanne Nicoara
REGISTRAR   GREFFIER   Registrar, Superior Court of Justice

## DISCOVERY OF IRREGULARITIES

33. In or about late 2004, IMI's internal financial analyst, began requesting back-up materials from Marc for a full list of IMI's corporate accounts and credit card processing accounts. Marc deferred responding to these requests or actively concealed the true nature and content of the accounts from IMI's internal accounting personnel over an extended period of time.

34. From 2005 through to the middle of 2006, IMI's internal financial analyst began to retrieve information about the structure of the financial transactions handled by Marc and Maurice on behalf of IMI and to reconstruct the transactions.

35. IMI's inability to obtain a proper accounting from Marc regarding the elaborate financial structure and series of corporations that had been established for processing IMI's revenue became increasingly problematic through the latter half of 2006. It became apparent that IMI's financial resources had essentially been placed beyond its control by the series of transactions and entities created by Marc and Maurice. It also became clear that neither Marc nor Maurice were prepared to provide the transparency IMI sought and appropriate explanations for the nature of the structure they have created.

36. Finally, on or about December 29, 2006, without returning or accounting for IMI's assets, Marc terminated his relationship with IMI.

37. Marc advised IMI that he was purporting to unilaterally amend the Agreement and was demanding a larger share of IMI's profits. In other words, he sought to use the fact that he had gained control over the company's funds as leverage to achieve that goal.

38. Marc, acting in concert with Maurice, has converted the company's assets to their own use and in an effort to extort additional benefits from IMI have retained and hidden its funds through an elaborate network of accounts and corporations that had been established by him and Maurice.

39. Marc and Maurice hired a support team of approximately 30 employees, including numerous family members such as Marina, Conrad, and Leonard They have conspired

**Page 59**

Attachment A

SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE À TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS 10 DAY OF NOV. 2008
FAIT À TORONTO CE        JOUR DE

REGISTRAR

with each other and other individuals to engage in a series of fraudulent activities designed and intended to ensure that Marc and Maurice would control the assets, revenues and business relationships pertaining to essential accounting and sales functions of IMI.

40.  In furtherance of their scheme, Marc and Maurice, together with the other Defendants, conspired to perform a series of acts to the financial detriment of IMI, including but not limited to the following:

    a.  They submitted forged documents to bank officials, purporting to provide various authorisations on behalf of IMI.

    b.  They obtained inaccurate or false invoices from third party vendors in order to justify payment of certain ordinary operating expenses as reimbursement to themselves. Marc and Maurice also arranged payments to one or more lawyers by directing IMI funds for legal services unrelated to IMI's business. Marc and Maurice also manipulated or falsified IMI's authorisation to create an appearance to banking authorities that secreted transactions were part of the company's business.

    c.  They falsified records with the intent of avoiding and abrogating established IMI procedures and reporting requirements under laws regulating credit card sales transactions.

    d.  They misrepresented the cost to IMI of the merchant accounts arranged by them. Marc and Maurice knew that their acts and omissions violated various banking regulations, however, they concealed various facts regarding the cost of credit card transactions from IMI's accounting staff and/or deceived company management into doing so on their behalf

41.  On or about January 7, 2007, following the termination of Marc and Conrad's relationship with IMI, US$127,001.21 of IMI's funds was sent to a bank account in Dubai in the name of Leonard Dsouza. This is the same bank account where Conrad's D'Souza's compensation from IMI was typically sent. In or about January 2007, there was a further unauthorized payment of IMI's funds to Leonard D'Souza in the amount of US$82,000. It is not known whether either of these payments ended up in the hands of Leonard or Conrad, neither of whom were entitled to them, as they were not authorized by IMI.

**Page 60**

42. By reason of their activities as noted above, Marc and Maurice have breached their fiduciary duties to the plaintiff by taking for themselves the assets of the plaintiff and by furthering their interests over those of the plaintiff.

43. IMI pleads that, at all material times, Marc and Maurice were acting as agents for each other and the various corporate Defendants.

44. To the extent that the plaintiff's property, money and assets have been used by the defendants to purchase other assets and property, the plaintiff claims a tracing into those property, money and assets and a constructive trust over them in its favour.

45. The plaintiff has suffered damages at least equal to the amounts which have been withheld by the defendants from it and claims damages and restitution for that amount.

46. The conduct of the defendants in these circumstances is reprehensible and deserving of an award of punitive and exemplary damages.

47. The plaintiff relies on the provision of rule 17.02(g),(i)(o) with respect to the service of this originating process outside Ontario.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS _10_ DAY OF _NOV._ 20 _08_
FAIT À TORONTO LE _____ JOUR DE _____

Joanne Nico...
Registrar, Superior Court
GREFFIER, Superior Court

The plaintiff proposes this action be tried at Toronto.

~~February 19, 2007~~

19th. February 2007.

**BAKER McKENZIE LLP**
Barristers & Solicitors
181 Bay Street, Suite 2100
P.O. Box 874
Toronto, Ontario
M5J 2T3

Matthew J. Latella (39140R)
matthew.j.latella@bakernet.com

Tel : (416) 865-6985
Fax: (416) 863-6275
Solicitor for the Plaintiff

TORDMS-129058-v1-Statement_of_claim_(IMI).DOC

**Page 61**

**Attachment A**

INNOVATIVE MARKETING. INC.
Plaintiff

-and-

MARC GERARD D'SOUZA ET AL
Defendants

08 L 0073 5
0>-cv- 32,346  Pb 3

Court File No.

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**

PROCEEDING COMMENCED AT
TORONTO

**STATEMENT OF CLAIM**

**BAKER & MCKENZIE LLP**
Barristers & Solicitors
181 Bay Street
Suite 2100, P.O. Box 874
Toronto, Ontario
M5J 2T3

Matthew J. Latella (39140R)
matthew.j.latella@bakernet.com
Tel.: (416) 865-6985
Fax: (416) 863-6275

Solicitor for the Plaintiff

FILED / DÉPOSÉ
FEB 1 9 2007
AT / A
LOCAL REGISTRAR - GREFFIER LOCAL
TORONTO

CERTIFIED TO BE A
TRUE COPY THE
ORIGINATING PROCESS
ISSUED HEREIN
DATED:

COPIE AUTHENTIQUE CERTIFIÉE ET
CONFORME A L'ACTE INTRODUCTIF
D'INSTANCE DELIVRÉ CI-INCLUS
FAIT LE:

February 19, 20 07

Baker McKenzie LLP

SOLICITOR FOR THE
AVOCAT POUR LE

PER:
PAR:

**Attachment A**

**Page 62**



```
Canada                       )
Province of Ontario          )
City of Toronto              )     SS:   *CERTIFICATE OF AUTHENTICATION*
Consulate General of the )
United States of America )
```

I, the undersigned,

## Molly P. Flores,

Vice Consul of the United States of America at Toronto,
Ontario, Canada, duly commissioned and qualified do hereby
certify that

### ---Sheila Tracey---

whose (fascimile) (true) signature and seal are, respectively,
subscribed and affixed to the annexed document was, at the
time of (attaching) (subscribing) the same

### Recording Officer Secretary of the Management Board of Cabinet, Province of Ontario, Canada

to whose official acts faith and credit are due.  For the
contents of the annexed document, I assume no responsibility.

IN WITNESS WHEREOF I have hereunto set my hand and
affixed the seal of the Consulate General of the United States
of America at Toronto, Ontario, Canada
this,  **22th** day of  **November,  2008.**


(SEAL)                                    _____

                                          Molly P. (Flores
                                          **Vice Consul of the United
                                          States of America**


**Attachment B**          **Page 63**



Ontario

### MINISTRY OF GOVERNMENT SERVICES

I HEREBY CERTIFY AS FOLLOWS:

## NIGEL PHILIP WATSON

of the Province of Ontario, whose name is subscribed to the attached Instrument, was, at the time of subscribing thereto, a **NOTARY PUBLIC** in and for the Province of Ontario, Canada, duly commissioned and duly authorized by the laws thereof to administer oaths, to take affidavits and to certify the proof of deeds and other instruments in writing to be recorded within the said Province;

I FURTHER CERTIFY THAT I have compared the signature of the said **NOTARY PUBLIC** subscribed to the attached Instrument with the specimen signature of the said **NOTARY PUBLIC** filed in this office and verily believe the said signature to be genuine; and THAT I have compared the impression of the Seal of the said **NOTARY PUBLIC** appearing on the attached Instrument with the specimen of the Seal filed in this office and verily believe the impression of the Seal to be genuine.



IN TESTIMONY WHEREOF I have hereunto set my Hand and affixed the Seal of the Ministry of Government Services of the Province of Ontario at the City of Toronto in the said Province this twenty-first day of November, A.D. 2008.

Sheila Tracey

for the MINISTER OF GOVERNMENT SERVICES

**Attachment B**

**Page 64**

CANADA     )   **TO ALL WHOM THESE PRESENTS**
**PROVINCE OF ONTARIO** )   **MAY COME, BE SEEN OR KNOWN**

**I, NIGEL PHILIP WATSON, a Notary Public, in and for the Province of Ontario, by Royal Authority duly appointed, residing at the City of Toronto in said Province,**

**Do Certify and Attest** that to the best of my knowledge the paper-writing(s) hereto annexed is(are) a true copy of a document produced and shown to me

**In Testimony Whereof** I have hereto subscribed my name and affixed my Notarial Seal of Office at the City of Toronto, in the Province of Ontario

this 21st day of November, 2008

**NIGEL PHILIP WATSON**

A Notary Public in and for the Province of Ontario

**Attachment B**

LA PRÉSENT ATTEST QUE CE
DOCUMENT, DONT CHACUNE
~~THIS~~ DE CHACUN REVÊTU DE
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

ONTO THIS **6** DAY OF **NOVEMBER** 20 **08**
JOUR DE
Joanne Nicoara
Registrar, Superior Court of Justice
GREFFIER

Court File No. 07-CV-327940 PD3

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**

B E T W E E N :

INNOVATIVE MARKETING, INC.

Plaintiff

- and -

MARC GERARD D'SOUZA, MAURICE D'SOUZA, MARINA D'SOUZA,
ELVIRA MARTINEZ-ROMERO, CONRAD D'SOUZA, LEONARD D'SOUZA
WINPAYMENT CONSULTANCY SPC,
WEB INTEGRATED NET SOLUTIONS, INC., BILLINGNOW.COM, INC.
BILLING SOLUTIONS, SPC, WINSOLUTIONS, FZ-LLC,
REINSURANCE AND INSURANCE CONSULTING HOUSE, SPC, SYNERGY, B.V.,
WINGEM, INC., WINSECURE SOLUTIONS, PTE, LTD., BILLPLANET, PTE, LTD.,
DSOFT, PTE, LTD., GE MANAGEMENT, PTE, LTD., and SCORGEM, PTE, LTD.

Defendants

AND BETWEEN:

MARC GERARD D'SOUZA

Plaintiff by Counterclaim

- and -

INNOVATIVE MARKETING, INC.,
SAM JAIN and DANIEL SUNDIN

Defendants to the Counterclaim

**STATEMENT OF DEFENCE AND COUNTERCLAIM
OF THE DEFENDANT MARC GERARD D'SOUZA**

TO THE DEFENDANTS TO THE COUNTERCLAIM

A LEGAL PROCEEDING has been commenced against you by way of a
counterclaim in an action in this court. The claim made against you is set out in the following
pages.

IF YOU WISH TO DEFEND THIS COUNTERCLAIM, you or an Ontario lawyer acting for you must prepare a defence to counterclaim in Form 27C prescribed by the Rules of Civil Procedure, serve it on the plaintiff by counterclaim's lawyer or, where the plaintiff by counterclaim does not have a lawyer, serve it on the plaintiff by counterclaim, and file it, with proof of service, in this court, WITHIN TWENTY DAYS after this statement of defence and counterclaim is served on you.

If you are not already a party to the main action and you are served in another province or territory of Canada or in the United States of America, the period for serving and filing your defence is forty days. If you are served outside Canada and the United States of America, the period is sixty days.

If you are not already a party to the main action, instead of serving and filing a defence to counterclaim, you may serve and file a notice of intent to defend in Form 18B prescribed by the Rules of Civil Procedure. This will entitle you to ten more days within which to serve and file your defence to counterclaim.

IF YOU FAIL TO DEFEND THIS COUNTERCLAIM, JUDGMENT MAY BE GIVEN AGAINST YOU IN YOUR ABSENCE AND WITHOUT FURTHER NOTICE TO YOU. IF YOU WISH TO DEFEND THIS PROCEEDING BUT ARE UNABLE TO PAY LEGAL FEES, LEGAL AID MAY BE AVAILABLE TO YOU BY CONTACTING A LOCAL LEGAL AID OFFICE.

| | | | |
|---|---|---|---|
| Date | August 3, 2007 | Issued by | *Y. BROWN* |
| | | | Local registrar |

Address of   393 University Avenue
court office   10th Floor
Toronto, Ontario  M5G 1E6

TO:       SAM JAIN
          c/o Baker McKenzie LLP
          Barristers and Solicitors
          181 Bay Street, Suite 2100
          Toronto, ON  M5J 1T3

AND TO:   DANIEL SUNDIN
          c/o Baker McKenzie LLP
          Barristers and Solicitors
          181 Bay Street, Suite 2100
          Toronto, ON  M5J 1T3

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS __6__ DAY OF __NOVEMBER__ 20 08
FAIT À TORONTO LE                 JOUR DE

Joanne Nicoara
REGISTRAR          Registrar, Superior Court of Justice

AND TO:    BAKER McKENZIE LLP
Barristers and Solicitors
181 Bay Street, Suite 2100
P.O. Box 874
Toronto, Ontario
M5J 2T3

J. Brian Casey
Matthew J. Latella
Tel: (416) 865-6985
Fax: (416) 863-6275

Solicitors for the Plaintiff

AND TO:    MILLER THOMSON LLP
Barristers and Solicitors
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, Ontario
M5H 3S1

Robert L. Falby
Elizabeth Ackman
Tel: (416) 595-8173
Fax: (416) 595-8695

Solicitors for the Defendants, Maurice D'Souza, Marina D'Souza, Web
Integrated Net Solutions, Inc., Winpayment Consultancy SPC,
Billingnow.com, Inc., Billing Solutions, SPC, Winsolutions, FZ-LLC,
Reinsurance and Insurance Consulting House, Synergy, B.V., Wingem,
Inc., Winsecure Solutions, PTE, Ltd., Billplanet, PTE, Ltd., Dsoft, PTE,
Ltd., GE Management, PTE, Ltd., and Scorgem, PTE, Ltd.

THIS IS TO CERTIFY THAT THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE
DOCUMENT, DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS ___6___ DAY OF _NOVEMBER_ 20 _08_
FAIT À TORONTO LE             JOUR Joanne Nicoara
                     Registrar, Superior Court of Justice
REGISTRAR                        GREFFIER

THIS IS TO CERTIFY THAT THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

DATED AT TORONTO THIS ___6___ DAY OF ___NOVEMBER___ 20 _08_
FAIT À TORONTO LE                         JOUR DE

LA PRÉSENT'AI TEST QUE CE
DOCUMENT, DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

REGISTRAR

Joanne Nicoara
Registrar, Superior Court of Justice

# TABLE OF CONTENTS

A.    Overview ......................................................................................................

B.    The Parties and Other Important Entities ........................................................ 3
     1.    The Plaintiff - Innovative Marketing Inc. ("IMI") .................................... 3
     2.    The Defendant Marc D'Souza......................................................................... 4
     3.    The Other Defendants ................................................................................. 4
     4.    Sam Jain ...................................................................................................... 7
     5.    Daniel Sundin ............................................................................................. 9

C.    Non Parties Who Were Involved With the Business ........................................ 9
     1.    Kristy Ross ................................................................................................. 9
     2.    Marc Cohen.............................................................................................. 10
     3.    James Reno & Bytehosting ...................................................................... 10
     4.    Opensolutions .......................................................................................... 11
     5.    Shawn Dolven .......................................................................................... 11
     6.    Sunwell .................................................................................................... 12
     7.    Julie Wilson and 2028452 Ontario Inc..................................................... 12
     8.    Digiblitz................................................................................................... 12
     9.    Decatrend ................................................................................................. 13
     10.   Stellarc S.A. ............................................................................................ 13

D.    Marc's Introduction to Sam Jain ................................................................... 13
     1.    Marc's Early Success in E-Commerce Marketing .................................... 13
     2.    Marc Meets Jain ....................................................................................... 13
     3.    The eFront Scandal .................................................................................. 14

E.    The Business is not a Static Entity and Has Evolved Over Time ................... 15

F.    Marc and Jain Work Together in Business .................................................... 15

G.    The Business in 2002 – Online Sales of Computer Security Products ........... 16
     1.    Factors that Lead to Early Success in the Business.................................... 16
     2.    Marc Increased the Profits of the Business ............................................... 18
     3.    The Search For New Products and Services ............................................. 18
     4.    Increased Volume of Customers Lead to Increased Complaints ................ 19
     5.    Increased Complaints Lead to Chargebacks Resulting in Merchant Account Processing
        Facility Failures........................................................................................ 20
     6.    Marc's Trip to the Middle East – New Opportunities for the Business and New Ideas to
        Avoid Chargebacks .................................................................................. 20

H.    The Interim Compensation Agreement .......................................................... 21

I.    Sundin Joins the Business in 2002 ................................................................ 22

J.    Growth and Diversification of the Business in 2003 ..................................... 23
     1.    The Doom Virus – Marc's Marketing Success .......................................... 24
     2.    The Business use of "Adware"................................................................. 25
     3.    Development of In-House Anti-Virus Software ......................................... 25

K.       Practices Employed to Avoid Negative Publicity and Avoid Customer Complaints........26

L.       Jain's Troubles and the Transformation of the Business................................................28
         1.       The Failure of Jain's Merchant Account Processing Facilities .........................28
         2.       Jain's troubles and the Transformation of the Business...................................29

M.       The New Business Model.........................................................................................31

N.       The Business in 2004...............................................................................................33
         1.       In-house Adware ....................................................................................33
         2.       Problems with Billingnow...........................................................................34
         3.       Maurice Creates a Merchant Account Processing Facility With BBK Bank...........35
         4.       The Symantec Lawsuit...............................................................................36
         5.       Problems with the Authorities......................................................................37
         6.       Problems With Merchant Account Relationships with BBK Bank....................38

O.       The Business (February 2005 – June 2005) ...............................................................39
         1.       Loss of Merchant Account Processing Facilities..............................................39
         2.       Marc's Efforts to Establish New Merchant Account Processing Facilities ............40
         3.       Winfixer ................................................................................................41
         4.       The Business Experiences Tremendous Growth................................................42

P.       January 2006 Trip to IMU......................................................................................44

Q.       Sundin Retreats from the Business ...........................................................................46

R.       Marc and Jain Meet in Brazil..................................................................................46

S.       The Dispute over the Apportionment of Profits...........................................................46

T.       Marc's Termination...............................................................................................49

U.       The Business Continues to Send Invoices to Marc and the Other Defendants ...............49

V.       Marc's New E-Commerce Business ..........................................................................51

W.       The Business is a Partnership or alternatively a Joint Venture ....................................52

X.       As at December 31, 2006, approximately US$40,000,000 (Not US$48,000,000 as claimed
         by the Plaintiff) of the Business' Profits Were Held in Entities Controlled By Marc and
         Maurice................................................................................................................53

Y.       Response to Allegations of "Irregularities" in the Business...........................................54

         COUNTERCLAIM................................................................................................55

THIS IS TO CERTIFY THAT THIS          LA PRÉSENT ATTEST QUE CE
DOCUMENT, EACH PAGE OF                DOCUMENT, DONT CHACUNE
WHICH IS STAMPED WITH THE            DES PAGES EST REVÊTUE DU
SEAL OF THE SUPERIOR COURT           SCEAU DE LA COUR SUPÉRIEURE
OF JUSTICE AT TORONTO, IS A           DE JUSTICE A TORONTO, EST UNE
TRUE COPY OF THE DOCUMENT             COPIE CONFORME DU DOCUMENT
ON FILE IN THIS OFFICE                CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS ___6___ DAY OF _NOVEMBER_ 20 08
FAIT À TORONTO LE                     JOUR DE

                                      Joanne Nicoara
                              Registrar, Superior Court of Justice
REGISTRAR                         GREFFIER Court of Justice

LA PRÉSENT ATTEST QUE CE
DOCUMENT, DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

6 DAY OF November 20 08
JOUR DE

Joanne Nicoara
Registrar, Superior Court of Justice

THIS
OF
WITH THE
IOR COURT
RONTO, IS A
THE DOCUMENT
IS OFFICE
RONTO THIS
RONTO LE

EGISTRAR

## STATEMENT OF DEFENCE AND COUNTERCLAIM
## OF MARC GERARD D'SOUZA

1.      The defendant Marc Gerard D'Souza ("Marc") denies all allegations against him contained in the Statement of Claim ("Claim") and puts the plaintiff to strict proof thereof, except to the extent that Marc expressly admits or claims no knowledge in respect of such allegations herein.

### A.    Overview

2.      The plaintiff, Innovative Marketing, Inc. ("IMI"), has misrepresented the nature, content, substance and history of a multi-million dollar business ("the Business") whose genesis, continuation and success were in large part the result of the actions, contributions, and hard work of this defendant. Such misrepresentation was intended to deny Marc, many millions of dollars earned through his efforts and to appropriate to Sam Jain ("Jain") and Daniel Sundin ("Sundin"), the monies that would otherwise be due to Marc.

3.      The Business was in substance a partnership or in the alternative, a joint venture between Marc, Jain and Sundin. The Business commenced in or about January 2002. The original partners or joint venturers were Marc and Jain. In October 2002, Sundin became associated with the Business as either a partner or a joint venturer. Kristy Ross ("Ross") was associated with the Business from and after January 2002, but it was Marc's understanding that Ross' share of the earnings of the Business were to form part of Jain's partnership or joint venture interest.

4.      Prior to December 2003, the Business was carried on using different corporate entities to conduct the affairs of the Business. These corporate entities included GITO, an Anguilla corporation, Billingnow.com, an Ontario corporation, Pro Motion Management Consultants Inc., a Nevada corporation and its trade name Shopenter.

5.      After December 2003, there was a shift to using different corporate entities or fictitious entities for the commercial activities of the Business. Internally, and to some extent externally, the partners or joint venturers referred to the Business as GlobeDat, an unincorporated entity in 2004. The partners or joint venturers and others in the Business

started to use the e-mail server 'globedat.com' to conduct business internally and communicate externally with third parties starting in the middle of 2004. The Business also used Web Integrated Net Solutions Inc., a British Virgin Islands corporation, Winpayment Consultancy, a Bahrain corporation, Billingnow.com, an Ontario Corporation and WinSecure Solutions, a Singapore corporation and many of the other corporate defendants to represent itself to third parties. New business conducted after January 2004 was carried out in the names of these corporations or GlobeDat, while some pre-existing relationships continued to be carried out in the names of the corporations or business entities as existed before December, 2003.

6.      The Business engaged in the marketing and sale of products and services over the Internet. Some of the products and services belonged to the Business while others were licensed from third party suppliers. The products and services included anti-virus/anti-spyware software, Adware advertising, travel agency services, computer security software, career websites, music downloading sites, immigration support sites, online sales of the prescription drug Viagra and pornography.

7.      As will be set out below, amongst the defendant corporations and in addition to the defendant Web Integrated Net Solutions, Inc., Billingnow.com, Winpayment Consultancy SPC and WinSecure Solutions, Pte Ltd., the corporate defendant Billing Solutions SPC, Winsolutions, FZ-LLC, Reinsurance and Insurance Consulting House, SPC, Synergy, B.V., Wingem Inc., DSoft Pte Ltd., GE Management Pte Ltd. and Scorgem Pte Ltd. were all corporations which provided services to the Business either in dealing with third party customers . or suppliers or alternatively, in providing financial support and financial management to the Business.

8.      The convoluted structure of the Business was intentionally designed to maximize profitability while minimizing the legal and tax liabilities of the partners or joint venturers.

9.      The growth of the Business was explosive. From relatively minor income at the time when Marc first became involved, the Business grew to a multi-million dollar business by the end of 2006. While the growth of the Business was fairly

I PRESENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

DATED AT TORONTO THIS   6   DAY OF  NOVEMBER  20 08
FAIT À TORONTO LE                 JOUR DE
                                        Joanne Nicoara
                                        Registrar, Superior Court of Justice
REGISTRAR                               GREFFIER

Approximately three-quarters of the growth of the revenues of the Business occurred between June 2005 and December 2006.

10.     Marc and Jain agreed in July 2002 on the terms of an interim compensation formula ("Interim Agreement"), which Interim Agreement remained in effect until December 31, 2003. Neither Sundin nor IMI were involved in any way with the Interim Agreement, nor indeed with any aspect of the Business at the time Interim Agreement was entered into.

11.     Commencing on January 1, 2004, Marc and Jain became equal partners in the Business, while Sundin had an undetermined share of the profits. Subsequently, in April, 2006, Marc and Jain jointly agreed that they would pay Sundin no more than US$4,000,000 in exchange for a release of his entitlement to the profits of the Business. The remaining profit (after paying Sundin) was to be divided equally between Marc and Jain.

## B.     The Parties and Other Important Entities

### 1.     The Plaintiff - Innovative Marketing Inc. ("IMI")

12.     The plaintiff IMI is a corporation incorporated pursuant to the laws of Belize. Contrary to assertions made in the Statement of Claim, IMI is nothing more than one of the many shell corporations used by the Business to hold title to two of the development centers that provided services to the Business.

13.     IMI is a bearer share corporation. As such, no records are kept of who owns IMI's shares. Whoever physically holds the IMI bearer share owns the assets of IMI.

14.     IMI is a named defendant in a lawsuit commenced by Symantec Corporation, which lawsuit is described more fully below.

15.     IMI has two subsidiary corporations. Innovative Marketing Ukraine ("IMU") is a corporation incorporated pursuant to the laws of the Ukraine and operates one development and support center used in the Ukraine. IMI's second subsidiary is Stellarc, a corporation incorporated pursuant to the laws of Argentina. Stellarc also provides development services

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRESENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVETUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS ___6___ DAY OF ___November___ 20 08
FAIT À TORONTO LE                     JOUR DE
                                              Joanne Nicoara
                                              Registrar Superior Court of Justice
REGISTRAR                                     GREFFIER

support center for IMI. Both development and support centers in the Ukraine and Argentina formed part of the Business.

16.     The only contractual agreement between any of the defendants and IMI is a Marketing Service Agreement dated February 10, 2004 (but executed after July 27, 2004) between the defendant Winpayment Consultancy SPC and IMI whereby Winpayment Consultancy SPC agreed to purchase marketing and promotional services from IMI for at least US$60,000 for the period up to February 10, 2005. There was also another similar contract that existed between IMI and the defendants. If as alleged by IMI that it was the rightful owner of all aspects of the Business, there would have been no legitimate need to enter into these type of contracts. In fact, this particular contract was entered into as a *guise* to facilitate a transfer of funds from the Business to IMI for payment of payroll and other expenses.

17.     Contrary to allegations made in paragraph 24 of the Claim, IMI never employed Marc. Indeed neither Sundin nor IMI was part of the Business in July 2002 when Marc and Jain entered into the Interim Agreement. The Interim Agreement with Jain was *never* assigned to any third party with Marc's consent. Marc never received any payment from IMI, at any time. The allegation that IMI "hired Marc" is a fabrication.

### 2.   *The Defendant Marc D'Souza*

18.     The defendant Marc is a Canadian citizen and a resident of the City of Manama in the Kingdom of Bahrain. He is not now nor has he ever been an employee of IMI. He has been a partner or joint venturer in the Business since January 2002 and has contributed his services, his capital, and his expertise to the success of the Business. Marc terminated his relationship with the Business on December 31, 2006.

### 3.   *The Other Defendants*

19.     The defendant Maurice D'Souza ("Maurice") is a Canadian citizen and is the Marc's father. As will be set out subsequently in this pleading, Maurice acted as a conduit and...

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

DATED AT TORONTO THIS 6 DAY OF NOVEMBER 20 08
FAIT À TORONTO LE ___ JOUR DE ___

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

Joanne Nicoara

REGISTRAR      Registrar Superior Court of Justice
GREFFIER

number of corporations controlled by him, provided critical financial services to the Business and ensured its survival. Maurice provided the assistance personally or through the defendant corporations other than Billingnow.com Inc. which is owned by the defendant, Marina D'Souza and Synergy B.V. which is owned by Marc.

20.     The defendant, Marina D'Souza ("Marina") is a Canadian citizen and a resident of Ontario. Marina is the wife of Maurice and the mother of Marc. Marina resides in Thornhill, Ontario and is employed as a schoolteacher. Marina's only involvement with the Business is her position as the sole director of the corporate defendant, Billingnow.com, Inc, an entity used by the Business to process merchant account transactions and through which the Business made payments to suppliers.

21.     The defendant, Conrad D'Souza ("Conrad") is a Canadian citizen and a resident of Ontario. Conrad is Marc's first cousin. At all relevant times, Conrad was an independent contractor to the Business. IMI has recently discontinued this action against Conrad.

22.     The defendant Leonard D'Souza ("Leonard") is an Indian citizen and a resident of the United Arab Emirates. Leonard had no involvement in the Business, except to receive a number of commission payments from the Business on behalf of Conrad.

23.     The defendant Elivira Martinez-Romero is a citizen and resident of the Philippines and a director of the corporate defendants WinGem, Inc. and Scorgem Pte Ltd.

24.     The defendant BillingNow.com Inc. ("Billingnow") is a corporation incorporated pursuant to the laws of Ontario. Marina is the sole shareholder and director of Billingnow. Between December, 2003 and April, 2004, Billingnow provided the Business with financial services, which consisted primarily of the use of its merchant account processing facilities and bank relations.

25.     The defendants WinPayment Consultancy SPC ("Winpay"), Billing Solutions SPC ("Billsol") and Reinsurance and Insurance Consulting House SPC ("Reinsurance") are corporations incorporated pursuant to the laws of the Kingdom [...] are own[...] Maurice. At all material times, Winpay and Billsol provided [...] the [...] with corporate, legal, financial and logistical support services [...] merchant account [...]

THIS IS TO CERTIFY THAT THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE
DOCUMENT, DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS ___6___ DAY OF ___NOVEMBER___ 20 08
FAIT À TORONTO LE _____ JOUR DE
                                  Joanne Nicoara
                                  Registrar. Superior Court of Justice
REGISTRAR                                  GREFFIER

processing, management of accounts payable, management of accounts receivables, financial management and tax management. The defendant Reinsurance is owned by Maurice and provided the Business with certain services including banking services, merchant account processing and cash management services.

26.     The defendants, WinSecure Solutions Pte Ltd. ("Winsecure"), BillPlanet Pte Ltd. ("Billplanet"), DSoft Pte Ltd. ("DSoft"), GE Management Pte Ltd. ("GEM") and Scorgem Pte Ltd. ("Scorgem") are all corporations incorporated pursuant to the laws of Singapore. Each of these companies provided corporate and financial services to the Business including merchant account processing and cash management services.

27.     The defendant Web Integrated Net Solutions Inc. ("WINS") is a corporation incorporated pursuant to the laws of the British Virgin Islands. WINS is controlled by Marc and Maurice. WINS was incorporated in 2000, prior to the Marc's involvement with the Business. WINS was not used by the Business until 2004 (following the termination of merchant account processing facilities controlled by Jain) and thereafter WINS provided the Business with critical financial, infrastructural and marketing services. WINS was represented to third parties as the parent corporation of the Business with the full knowledge and consent of Jain and with the knowledge of others involved in the Business. Since January 1, 2007, Marc has used WINS as a corporate vehicle for his new e-commerce business.

28.     WinGem Inc. ("Wingem") is a corporation incorporated pursuant to the laws of the Philippines. At all relevant times, WinGem provided the Business with financial services.

29.     WinSolutions FZ-LLC ("WinSol") is a corporation incorporated pursuant to the laws of the United Arab Emirates. At all relevant times, WinSol provided the Business with financial services.

30.     Synergy B.V. ("Synergy") is a corporation incorporated pursuant to the laws of the Netherlands. Marc is the sole shareholder and director of Synergy. At all relevant times, Synergy was used by the Business for financial services.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE À TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS   6   DAY OF   NOVEMBER  20 08
FAIT À TORONTO LE              JOUR DE

Joanne Nicoara
REGISTRAR          Registrar, Superior Court of Justice
                                              GREFFIER

### *4. Sam Jain*

31.     Sam Jain ("Jain") is an American citizen who is believed to be currently a resident of Brazil.

32.     Jain has used a variety of names (any of which might be his real name) such as:

(a)     Shailesh P. Jain

(b)     Shelesh P. Jain

(c)     Claudio Ferreira Dos Santo

(d)     Claudio Santos

(e)     Jain Shaileshkumar

(f)     Dave Adams

(g)     Wen Kai Sheng

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS __6__ DAY OF __NOVEMBER__ 20 __08__
FAIT À TORONTO LE             JOUR DE

Joanne Nicoara
Registrar, Superior Court of Justice
REGISTRAR                                     GREFFIER

33.     In 1991, Jain was convicted of fraud in California.

34.     In 2005, Jain was condemned by the Honourable Percy Anderson of the United States District Court for the Central District of California in the case of *Symantec Corp v. James Reno et al.*, Case No. CV04-3017PA ("Symantec Lawsuit").   Justice Anderson described Jain as conducting "cynical and intentional manipulation" of the Court's proceedings by evading service, and engaging in "highly suspicious" conduct in an attempt to engineer the overturning of a default judgment for knowingly selling counterfeit anti-virus software.   Jain was aware of the Symantec Lawsuit and that judgment had been entered against him, and took active steps to evade service, intentionally mislead the Court, and has since operated in flagrant violation of a permanent injunction imposed by the Court.

35.     In 2006, a Uruguayan company, Financiera Volturno S.A., controlled by Jain had its financial assets of approximately US $18 million frozen in Switzerland through a Sequestration order obtained by the Swiss authorities.   The Sequestration order was based

OF JUSTICE AT TORONTO, IS A    DE JUSTICE A TORONTO, EST UNE
TRUE COPY OF THE DOCUMENT    COPIE CONFORME DU DOCUMENT
MAINTAINED IN THIS OFFICE    CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS _6_ DAY OF _November_ 20 _08_
FAIT À TORONTO LE _____

Joanne Nicoara

REGISTRAR    Registrar, Superior Court of Justice
GREFFIER, Court of Justice

upon Swiss allegations of money laundering. As described below, included in these frozen funds were profits of the Business.

36.    Jain is the owner and/or principal of the following corporations and entities that are or were used in the Business:

(a)    Gito Inc. ("GITO"), a corporation incorporated pursuant to the laws of Anguilla, British West Indies.

(b)    Pro Motion Management Consultants Inc. ("PMMCI"), a corporation incorporated pursuant to the laws of the State of Nevada in the United States of America.

(c)    Shifting Currents Financial Inc. ("Shifting Currents"), a corporation incorporated governed by the laws of the state of Nevada in the United States America.

(d)    Flyby Solução Informatica Ltd, a corporation incorporated by the laws of Brazil.

(e)    Société Financiera Volturno SA, a corporation incorporated pursuant to the laws of Uruguay.

(f)    Continental Moonbell, a corporation or other entity governed by the laws of Panama.

(g)    Old Moon Foundation, an entity of unknown organization, governed by the laws of Panama.

(h)    eFront, a corporation incorporated pursuant to an unknown state in the United States of America.

37.    Contrary to the allegations made in paragraph 25 of the Claim, in documents prepared internally and with Jain's knowledge and consent, Marc was referred to as the "C.E.O. and Managing Partner" of Web Integrated Net Solutions. Further in executing third party

DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE ISBAO DO THE SUPERIOR COURT OF JUSTICE AT TORONTO IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVE DANS CE BUREAU

FAIT À TORONTO LE          JOUR DE

REGISTRAR          GREFFIER

contracts on behalf of the Business, Marc executed such agreements either as a director or officer of the companies involved, and never as a director, officer, or employee of IMI.

### 5. *Daniel Sundin*

38.    Daniel Sundin ("Sundin") is a Swedish Citizen who maintained residences at various times in the United Kingdom, Washington State and Canada.    At certain times described below, Sundin was a partner or joint venturer in the Business.

39.    Sundin is an experienced programmer who has a background developing software, adult websites and sending unsolicited e-mail (known as "spam").

40.    Sundin is the owner and/or principal of the following corporations and entities that are or were used in the Business:

> (a)    Vantage Software Inc. ("Vantage"), a corporation incorporated pursuant to an unknown state in the United States America.    Vantage was used by the Business to process online cheque payments from consumers and to perform transactions using the "Discover" card.

> (b)    B.K. Group B.V. ("BK Group"), a corporation incorporated pursuant to the laws of the Kingdom of the Netherlands.

> (c)    Winsoftware, a corporation incorporated pursuant to the laws of the United Kingdom.

41.    In 2000, Sundin was convicted for indecent exposure in Arizona.

### C.    **Non Parties Who Were Involved With the Business**

### 1. *Kristy Ross*

42.    Ross is a United States citizen who has been involved in the Business at relevant times.    She has variously held herself out to be an employee of Jain's and a partner of Jain's.

THIS IS TO CERTIFY THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE
DATED AT TORONTO THIS
FAIT À TORONTO LE ,
REGISTRAR

DOCUMENT, DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE À TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU
JOUR DE

GREFFIER

43.    At or about the end of December 2006, Ross agreed with Marc to terminate her involvement with the Business and become a 20% equity partner in Marc's new e-commerce business.

44.    In early January 2007, Ross began to work with Marc in his new e-commerce business while claiming she was transitioning her responsibilities in the Business to others. Shortly thereafter, there was a falling out between Ross and Marc due to disintegration of their personal relationship and a disagreement about the value of Ross' services rendered to the Business. At some stage in early 2007, Ross apparently realigned her interests with those of Jain and Sundin.

### 2. Marc Cohen

45.    Marc Cohen is a citizen of the United Sates and a resident of Florida. Marc Cohen provided business development ideas to the Business and was eventually employed as a full time contractor by the Business.

46.    Marc Cohen is also named as a defendant in *Beatrice Ochoa v. Marc J. Cohen, James Reno and Does 1 through 100*, Case No. 106CV072057, a class action lawsuit currently pending in the Superior Court of the State of California, Santa Clara County in relation to downloadable software products known as WinFixer, ErrorSafe, WinAntiVirus and WinAntiSpyware ("WinFixer Class Action"). The WinFixer Class Action involves products to which the plaintiff claims ownership, but were actually developed exclusively for the Business and marketed and sold by or on behalf of the Business.

### 3. James Reno & Bytehosting

47.    James Reno is a citizen of the United States of America and a resident of Amelia, Ohio.

48.    James Reno is one of the named defendants in the WinFixer Class Action.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE DATED AT TORONTO THIS _____ DAY OF FAIT À TORONTO LE _____ JOUR DE

DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE À TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

NOV 20 08

Joanne Nicoara
REGISTRAR                    Registrar, Superior Court of Justice

49.     James Reno and Bytehosting Internet Services LLC are named defendants in the Symantec Lawsuit.

50.     Bytehosting Internet Services LLC ("Bytehosting") is a corporation incorporated pursuant to the laws of the State of Ohio in the United States of America. Bytehosting is owned by James Reno.   Bytehosting provided services for the Business including warehousing  and  drop-shipping  logistics,  customer  service  and  product  support, administrative hosting support and other technical support for websites used by the Business.

### 4.  Opensolutions

51.     Opensols Infotech PVT Ltd. ("Opensols") is a corporation incorporated pursuant to the laws of India and which operates in Bangalore, India.

52.     OpenSols was not a support and development office for IMI.   OpenSols did not provide any products or services for IMI or IMU.   OpenSols provided website development services and other business process functions services to the Business, similar to those provided by IMU, as well as marketing support for the Business' products and services.

### 5.  Shawn Dolven

53.     Shawn Dolven ("Dolven") is an American citizen, who relocated to Toronto in the early part of 2004 and was employed by the Business from 2003 until January 2005 as a contractor. Dolven was introduced to the Business by Sundin.  Dolven provided a number of services to the Business including merchant account processing facilities for websites which sold the prescription drug Viagra and adult pornography, as well as the ability to make wire transfers over the Internet.    On behalf of the Business, Dolven effected transfers of approximately  US  $3,000,000  in  accordance  with  instructions,  received  from  the partners/joint venturers in the Business.

54.     In January 2005, Dolven was contacted by the RCMP as part of an investigation related to the Business. Dolven immediately withdrew as an employee of the Business and

absconded with several thousands of dollars in funds, belonging to the Business.

THIS IS TO CERTIFY THAT THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT

LA PRÉSENT ATTEST QUE CE
DOCUMENT, DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO. EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS _6_ DAY OF ___November__ 20 _05_
FAIT À TORONTO LE          JOUR DE

Joanne Nicoara
Registrar Superior Court of Justice
GREFFIER

REGISTRAR

### 6. *Sunwell*

55.     Sunwell Corporation ("Sunwell") is a corporation incorporated pursuant to the laws of Latvia.   At the direction and on behalf of the Business, Sunwell received monies from accounts receivables of the Business, mainly from one of the businesses of placing on-line advertising.   Sunwell, is operated for the benefit of the Business by Andriy Dzyubenko, the director of the IMU Office in the Ukraine.

### 7. *Julie Wilson and 2028452 Ontario Inc.*

56.     Julie Wilson ("Wilson") was never an IMI employee, but provided accounting, customer support and other administrative support to the Business during the period from 2003 to the beginning of 2005.   Her accounting records were incomplete, inaccurate and unreliable and are relied upon by the plaintiff in this case. Wilson also provided some services to the Business through her company 2028452 Ontario Inc ("2028452").

57.     2028452 purported to carry on business as Vipfares.com, even though Vipfares.com was a different part of the Business.  Wilson and 2028452 entered into contracts with vendors on behalf of the Business for online advertising.  In one of these contracts, the Business failed to pay the vendor due to a contractual dispute.  The vendor sued 2028452 and obtained default judgment for US$120,075.85 plus interest and attorney's fees to be issued in the state of Washington, U.S.A., which judgment was subsequently registered in Ontario.

### 8. *Digiblitz*

58.     Digiblitz is a corporation located in Chennai, India.  Digiblitz provided customer support and other back office services to the Business as described below.  Unlike many of the other entities described thus far, Digiblitz is a separate company that is not owned or controlled by the Business.

THIS IS TO CERTIFY THAT THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE
DOCUMENT, DONT CHACUNE
PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS  6   DAY OF   NOVEMBER 20 08
FAIT À TORONTO LE                    JOUR DE

Joanne Nicoara
Registrar   Superior Court of Justice
REGISTRAR                                    GREFFIER

### 9.  *Decatrend*

59.    Decatrend is a corporation located in Chennai, India.  Decatrend provided customer support, website development, accounting services and other back office services to the Business as described below.  Unlike many of the other ntities described thus far, Decatrend is a separate company that is not owned or controlled by the Business.

### 10. *Stellarc S.A.*

60.    Stellarc S.A.("Stellarc") is a corporation incorporated pursuant to the laws of Argentina and operates in Buenos Aries, Argentina.  Stellarc provided the Business with graphic user interface design for the software marketed by the Business, translation services and website design services.

## D.    Marc's Introduction to Sam Jain

### 1.  *Marc's Early Success in E-Commerce Marketing*

61.    In 1999, Marc developed a highly successful e-commerce business using an online music website known as look4mp3.com.  The success of this business was predominantly as a result of Marc securing lucrative advertising deals with large online companies and other marketing efforts.

### 2.  *Marc Meets Jain*

62.    In early 2000, Marc was introduced to Jain, who at the time owned a company called Netwhirl, later known as eFront.  eFront was an affiliate marketing network which purchased successful websites, such as Penny Arcade and BetaNews, and pooled web traffic to those sites to command higher prices for advertising.

63.     In early 2000, Jain expressed an interest to Marc in buying the look4mp3.com website and associated business. After Marc declined Jain's offer, Jain offered Marc the opportunity to work for eFront *remotely* as an independent contractor to recruit new business. Marc agreed to Jain's offer to recruit new business for eFront. The agreed upon compensation for Marc's work for eFront was a US $2000 monthly fee, plus some shares in any potential initial public offering for eFront.

64.     At or about March, 2000, Marc began to work *remotely* for eFront as an independent contractor.

### 3. The eFront Scandal

65.     In 2001 there was a scandal at eFront, when ICQ instant messaging logs between eFront CEO Jain and other employees were leaked onto the Internet through the website known as "Fuckedcompany.com" (the "eFront Scandal"). The ICQ instant messaging logs detailed Jain's activities, such as deliberately withholding payment from suppliers, sending legal threats to websites that spoke poorly of eFront, and threatening to "rape her and spit on her" (referring to a female webmaster angry about not receiving her compensation from the company).

66.     Jain aided and abetted eFront in defrauding advertisers by falsely attributing the traffic and ownership of third party websites to eFront, without their permission or consent.

67.     After the eFront Scandal, eFront shut down. Jain went into hiding in Hawaii and Las Vegas.

68.     At or about the same time, Marc wound up his look4mp3.com website and its associated business. In September 2001, Marc attended law school at Boston College in Massachusetts.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS _6_ DAY OF _NOVEMBER_ 20 08
FAIT À TORONTO LE          JOUR DE

Joanne Nicoara
Registrar, Superior Court of Justice
REGISTRAR                    GREFFIER

**E.     The Business is not a Static Entity and Has Evolved Over Time**

69.     As described below, the Business is not a static entity.  Over time, it has used different corporate entities, sold different products and services and undergone a complete restructuring resulting in a change in management.

**F.     Marc and Jain Work Together in Business**

70.     Initially, the Business was carried on through corporations (mainly GITO and PMMCI) and capital that was contributed by Jain.  There was never any formal corporate structure to the Business.

71.     On or about December 2001, when Marc was attending his first semester of law school, Jain contacted Marc by instant messenger to discuss the possibility of working together in a new e-commerce business.  Jain informed Marc that he was impressed with Marc's marketing and business development abilities, and wanted Marc to work with him on some business ideas that he had set up.  Jain informed Marc that the business would be primarily operated through his companies GITO and PMMCI.  Jain also informed Marc that his long time friend Ross would be involved in the business and that its programming and customer service functions would be provided by some individuals in Peterborough, Ontario whom Ross had previously introduced to Jain in 2001.

72.     Marc was initially hesitant to get involved with the business because of his law school commitments, but ultimately decided to work with Jain.  He recruited the services of his cousin Conrad as an independent contractor.  At the time, Conrad was working for another company, but decided to work full time for the Business on or about February 2002.

73.     At no time, was Marc ever an employee of Jain's, or for that matter of PMMCI or GITO.  Jain's offer to Marc was to work together in business.  This offer reflected the informal organization and culture of the partnership/joint venture.

THIS IS TO CERTIFY THAT THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE
DOCUMENT, DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS _____ DAY OF _NOVEMBER_ 20 O8
FAIT À TORONTO LE            JOUR DJoanne Nicoara
                            Registrar, Superior Court of Justi.

REGISTRAR                              GREFFIER

## G.   The Business in 2002 – Online Sales of Computer Security Products

74.   At or about January 2002, the Business was primarily engaged in the business of selling software over the Internet. The software mainly consisted of security products such as antivirus programs from large vendors such as Symantec and McAfee. The software was sold in CD format, and was marketed over the Internet. Downloadable versions of the software were also offered on websites controlled by members of the Business. The CDs were usually bought from grey market suppliers that charged the Business around US $6-8 per CD, and were resold on the Internet for a typical price of US$44.95 per CD. In addition to its software sales, the Business was engaged in other direct marketing activities in areas including promoting large online web properties such as Priceline.com, a travel website and Proflowers, a flowers website.

75.   Neither the Business' sale of software CDs nor its practice of allowing software to be downloaded from its websites were authorized by Symantec or the other software companies. In fact, customers were provided with licensing keys that Symantec had not authorized for the "instant" online downloads provided by the Business to customers.

THIS IS TO CERTIFY THAT THIS          LA PRÉSENT ATTEST QUE CE
DOCUMENT, EACH PAGE OF                DOCUMENT, DONT CHACUNE
WHICH IS STAMPED WITH THE             DES PAGES EST REVÊTUE DU
SEAL OF THE SUPERIOR COURT            SCEAU DE LA COUR SUPÉRIEURE
OF JUSTICE AT TORONTO, IS A           DE JUSTICE A TORONTO, EST UNE
TRUE COPY OF THE DOCUMENT             COPIE CONFORME DU DOCUMENT
ON FILE IN THIS OFFICE                CONSERVÉ DANS CE BUREAU
DATED AT TORONTO THIS __6__ DAY OF _NOVEMBER_ 20 _08_
FAIT À TORONTO LE          JOUR DE
REGISTRAR                             GREFFIER

### 1.   Factors that Lead to Early Success in the Business

76.   The Business' success in selling of security software (and many of its other early ventures) depended on four critical components:

   (a)   **Online advertising and search engine marketing** – Marc used his business and marketing skills to develop extensive connections and secure advertising deals with online advertising and search engine marketing companies to attract customers to purchase the Business' security software, as well as the other products and services in the Business. As described below, Marc was primarily responsible for the Business' increased financial success in selling security software and other online products and services. Marc trained and worked with Conrad to increase the Business' marketing relationships. Ross and Jain assisted with marketing to a lesser extent.

THIS DOCUMENT... DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE À TORONTO EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

NOV 20 08
6 DAY OF
JOUR DE
GREFFIER

Joanne Nicoara
Registrar. Superior Court of Justice

Business Development – Marc used his business and negotiation skills to facilitate business deals with companies who provide support and fulfillment for the products and services marketed by the Business. Additionally, Marc used his skills to identify and bring on board new and profitable business ideas and projects throughout the course of the Business.

(c)   **Merchant account processing** – Customers paid for the products and services offered by the Business primarily by way of credit card transactions. Jain used corporations in Nevada and the British West Indies to engage in merchant account relationships with financial institutions to process online credit card transactions on behalf of the Business. This type of financial processing is known as e-commerce merchant account processing.

(d)   **Logistics** – Jain hired James Reno, to provide logistical services to the Business through his company GITO. Reno and his company Bytehosting in Ohio accepted bulk shipments of software CDs, and used their warehouse fulfillment center to ship copies of software CDs to customers. Additionally, Marc decided it would be better for the Business to start utilizing cost efficient outsourcing relationships in India, instead of the unreliable support that was being provided by the Peterborough Office. Marc brought on board outsourcing vendors in India to support the Business (initially Digiblitz, which provided customer support), and Decatrend (originally Kasyap Radiant Systems Ltd.) in Chennai, India.

(e)   **Website Development and Customer Support** – The Business had a number of individuals located in Peterborough, Ontario who provided website development and customer service for the Business' sales of software CDs and other products and services. Eventually two Ontario corporations were setup for the Peterborough operations, including 2028452. The operations in Peterborough were unreliable.

THIS IS TO CERTIFY THAT THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

DOCUMENT, DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS   6   DAY OF   November   20  08
FAIT À TORONTO LE              JOUR DE

REGISTRAR                    GREFFIER

### 2.  Marc Increased the Profits of the Business

77.     In the first half of 2002, Marc *dramatically* increased the profits of the Business from US $200,000 per month to over US $400,000 per month by introducing new products and services, business development and employing new advertising techniques.    With the agreement of Jain, Marc and Conrad used their connections in the online advertising business to secure new forms of Internet media, such as banner advertisements and popup advertisements, to promote sales.

### 3.  The Search For New Products and Services

78.     In early 2002, Jain and Marc experimented with offering a variety of other products and services over the Internet.   The goal was to find products and services that were gimmicky or highly appealing for an end-user to buy.   Through aggressive marketing, and deceptive websites, these products and services were sold to end users.

79.     Some of these early ideas included:

   (a)     mp3u.com, a music website that gave the impression that customers could download "unlimited" music for a 99 cent fee.   However, included in the fine print of the agreement on this website were arduous and concealed conditions which entailed partially disclosed much larger upfront fees.

   (b)     An online travel agency website known as vipfares.com that was established on or about June 2002.   Unlike its competitors who informed and displayed their service charges to their customers (usually around US $5-$10 per airline ticket), the vipfares.com website hid its service charge (typically US $28.36 per airline ticket) in the price of the ticket.

   (c)     A home careers business, which represented itself as an "Employer", but was in reality a ploy to persuade job seekers to sign up for membership based services.

(d)    A website to market and sell gas masks, in the wake of the Anthrax scare in the United States during the spring of 2003.

### 4.  *Increased Volume of Customers Lead to Increased Complaints*

80.    During 2002, the volume of customers to the Business' websites *dramatically* increased, primarily because of Marc's marketing efforts.  At the same time, the number of customer complaints and requests for refunds also increased substantially.  Some of the issues that customers complained about:

(a)    Delays or non-response to customer service inquires;

(b)    Inability to access or make use of the services offered by the Business post sale;

(c)    Failed or delayed shipments of software CDs; and

(d)    Deceptive and misleading fees charged by websites operated by the Business.

81.    In order to deal with the increased complaints by customers, the Business responded in a number of creative ways.  Marc, utilizing his network of business contacts, contacted several customer service outsourcing firms in India in order to improve on the poor customer service.  At or about March 2002, at Marc's direction, the Business employed Digiblitz in Chennai, India to manage customer service issues.  Although Digiblitz was much more efficient in handling customer complaints than the previous contractor, they were still not able to resolve the increasing volume of bitter customer complaints due to the Business' faulty products and services as well as their use of misleading and aggressive advertising.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS  6  DAY OF  *NOVEMBER* 20 08
FAIT À TORONTO LE              JOUR DE

Joanne Nicoara
REGISTRAR          Registrar, Superior Court of Justice

### 5. Increased Complaints Lead to Chargebacks Resulting in Merchant Account Processing Facility Failures

82.     Many customers initiated what is known as a "chargeback", whereby they contacted their credit card company and disputed their charge. A high volume of chargebacks in a merchant account will usually result in the termination by a bank of that merchant account.

83.     In fact, as early as the summer of 2002, one of the Business' major merchant account processing facilities with Globalpayment, (which was held in the name of a corporation controlled by Jain) was shut down due to high chargeback rates.

### 6. Marc's Trip to the Middle East – New Opportunities for the Business and New Ideas to Avoid Chargebacks

84.     In the summer of 2002, Marc took a trip to India and the Middle East to improve the support infrastructure for the Business and to seek out new business opportunities for the Business. Even though at this time Marc was still a full time law student, he was devoting an increasing amount of time to the Business. His activities in the Business had expanded from marketing and business outsourcing, to developing new ideas for the Business, culturing them with his connections abroad, and overseeing their implementation. Marc paid the costs associated with this trip, without reimbursement from the Business.

85.     During his trip:

(a)     Marc consulted with his father Maurice, who had extensive banking connections from his experience in the insurance industry. Marc told Maurice that the Business was expanding because of its increasing sales of products and services, however the Business required additional merchant account processing facilities to expand and grow. Maurice suggested that setting up merchant account processing facilities with banks in countries outside the United States would be a good strategy. Marc agreed because of the higher tolerance for chargebacks and customer complaints, as well that would be provided against legal issues.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

DATED AT TORONTO THIS 6 DAY OF November 20 08

Joanne Nicoara

REGISTRAR

new lucrative opportunities for the Business. Through his

...with Monster India and his father's Bahrain based company,

Crescent Global Services, WLL, Marc established a marketing relationship for a home based careers website that the Business was developing on terms more favourable than possible with a U.S. provider and a U.S. based corporation.

## H.   The Interim Compensation Agreement

86.   At or about July 2002, Marc and Jain had a series of instant messaging conversations concerning Marc's compensation for his efforts in the Business. Due to Marc's efforts, the Business had expanded significantly, and was developing new opportunities overseas. Jain showed Marc some financial data (although no financial statements were shown to Marc until mid 2006), and represented that the Business (which at the time was operating primarily through GITO and PMMCI) was earning profits of US $200,000 per month, before Marc became involved with the Business.

87.   Marc and Jain agreed on an interim compensation formula ("the Interim Agreement") for Marc out of the Business's profits that recognized Marc's contribution as a partner or joint venturer. The essential terms of the Interim Agreement were (that Marc was to be receive monthly out of the profits of the Business):

(a)   1% of the first US$200,000 of monthly net profits; and

(b)   20% of all monthly net profits in excess of US$200,000

88.   Marc and Jain set a goal to double the monthly profit of the Business to US $400,000 per month. That goal was achieved in or about October, 2002.

89.   The Interim Agreement remained in effect until December 31, 2003, when as more particularly, set out below the entire Business had to be restructured and Jain's role was dramatically reduced as a consequence of the legal and financial difficulties he faced.

90.     Marc's entitlement was "reinvested" in the Business in a manner consistent with an equity partner. In this regard, Marc was treated on the same basis as Jain and subsequently Sundin (during Sundin's active participation in the Business). Jain admitted that during his negotiations with Sundin in October 2002 that Sundin insisted on having at least an equal percentage of the Business partnership as Marc had at that time. Marc and Jain jointly agreed to leave Sundin's equity participation undetermined. As described below, Marc and Jain did not discuss Sundin's compensation again until April 2006, when Sundin had already retreated from the Business.

## I.     Sundin Joins the Business in 2002

91.     At or about October 2002, Jain introduced Marc to Sundin. Sundin had a software development company located in Kiev, Ukraine (IMU), with another office in Argentina (Stellarc).

92.     Jain represented to Marc that Sundin had extensive experience with the development of online security software, as well as experience in providing marketing related support. Jain and Marc agreed that Sundin's addition could contribute to the Business' expansion and growth. There was some discussion between Jain and Sundin about his financial stake in the Business, however no entitlement was ever finalized with Sundin in these discussions.

93.     Sundin became a partner or joint venturer in the Business and agreed to contribute his resources including the IMU and Stellarc development centers to the Business in order to develop online security software and services for the Business.

94.     Sundin's software development contributions were not satisfactorily completed until several months later in June 2003. Until that time, Sundin tried to help the Business by directing     and     developing     "hard-core"     Internet     pornography     websites     such     as hummerhump.com, hotlivegirls.com and penisenhancer.com which the Business attempted to

THIS IS TO CERTIFY THAT THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

DATED AT TORONTO THIS __6__ DAY OF _NOVEMBER_ 20 _08_
FAIT À TORONTO LE              JOUR DE

REGISTRAR

LA PRÉSENT ATTEST QUE CE
DOCUMENT, DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

Joanne Nicoara
Registrar, Superior Court of Justice
GREFFIER

95.     The Business provided marketing for Sundin's "hard-core" Internet pornography websites through search engine marketing. Sundin would send the Business keywords, in order to market these websites. The keywords, which were all related to the content of the "hard-core" Internet pornography websites included:

    (a)     "Amateur Incest Pictures"

    (b)     "Amateur Teen galleria"

    (c)     "Anal Masturbation"

    (d)     "Animals and Girls"

    (e)     "Cock enlargement"

    (f)     "Little girls nude"

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS _6_ DAY OF _NOVEMBER_ 20 _08_
FAIT À TORONTO LE          JOUR DE

Joanne Nicoara
REGISTRAR          Registrar, Superior Court of Justice

96.     The Business would use these keywords to attempt to drive Internet traffic to the "hard-core" Internet pornography websites. Sundin wanted to play a role in the other pre-existing areas of the Business while his software products were developed. However, Sundin and his offices in the Ukraine and Argentina lacked the business development and marketing skills required to contribute meaningfully to the bottom line, so his participation was limited in the Business.

## J.     Growth and Diversification of the Business in 2003

97.     In early 2003, Marc and Jain contracted a second business outsourcing office in India to develop products and services for the Business. The Business used Decatrend in India to develop a variety of e-commerce websites that the Business could market. The initial plan called for many websites, each generating around US $5,000 to US $10,000 in profit per month. A variety of ideas were experimented with including many variations of self help sites such as ezdivorceguide.com and ezwillkit.com. Ultimately the Business used Decatrend to support its home careers websites and Decatrend provided customer support services, back office accounting and other website development and design services for the Business.

98.     Also in early 2003, the Business developed a so-called "Green-Card" lottery website. This website provided its visitors with instructions and filing assistance with their Green-Card Applications for immigration to the United States. The Business used the Bytehosting office in Ohio to provide application processing. Advertising from large sites such as Yahoo, MSN, and Advertising.com was used to drive Internet traffic to this website. However, due to high volumes of customer fraud, the website eventually failed, and as a result more of Jain's merchant account processing facilities in the United States were cancelled, despite his and Marc's attempts to salvage the relationship.

### 1.  *The Doom Virus – Marc's Marketing Success*

99.     In the summer of 2003, Sundin's computer security firewall software, "Computershield" was ready to market. Around this same time, Marc was visiting Bahrain in order to obtain a residency permit, and there was a global outbreak on the Internet of the virus known as Doom.

100.    Marc decided that the paranoia that accompanied the outbreak of the Doom virus created a perfect marketing opportunity for the Business. Through his skills and efforts, a number of aggressive advertising campaigns were utilized to market its new computer security firewall software. The software itself did not remove the Doom virus as it claimed. It was poorly written software, full of software "bugs". Most users ended up deleting the software.

101.    Jain told Marc that the quality and functionality of the software did not matter, and that the Business could be selling a "block of ice" to paranoid customers with the offer of a cure to the virus and still get sales. Marc decided to at least provide customers with a link to a free patch on Microsoft's web site that removed the Doom virus. The result of this marketing effort was an increase in the Business' net profits to at least US$1,000,000 per month.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS  6  DAY OF  NOVEMBER  20 O8
FAIT À TORONTO LE            JOUR DE
                                   Joanne Nicoara
                         Registrar, Superior Court of Justice
REGISTRAR                           GREFFIER

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

DATED AT TORONTO THIS _6_ DAY OF _NOVEMBER_ 20 _08_

LA PRESENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

FAIT À TORONTO LE                    JOUR DE

REGISTRAR                    GREFFIER

## 2. *The Business use of "Adware"*

102. In the fall of 2003, the Business, primarily as a result of Marc's advertising research and success with several third party "Adware" programs, began to experiment with its own "Adware" to market its products and services. Adware is software that is installed on a user's computer that is typically hidden from plain view. Its purpose is to display advertising, usually in the form of aggressive and random pop-up advertisements that harass users to purchase products and services. As one of the features of the Business' anti-virus/anti-spyware products was to alleviate the harmful effects of Adware, it was decided that this form of advertisement would be a good fit. A potential customer would be harassed by advertising from the Adware program, and they would click on an advertisement for one of the Business' anti-virus/anti-spyware products in order to alleviate the effects of the Adware. The Business also utilized Adware to promote other products and services it marketed such as travel and music websites.

103. In 2003, the Business began to expand its use of aggressive and in some instances misleading advertising to sell its security software products. The Business expanded its practices of establishing business relationships with websites having similar phonetic spellings to Symantec and other computer security products. When a user visited these websites, they were redirected to websites selling the Business' products. In addition, the Business extensively employed aggressive search engine marketing. Keywords and phrases relating to the Business' products and services, including keywords and phrases that related to Symantec products were placed on search engines and Adware networks to redirect users to visit websites selling the Business's security software products instead of Symantec's products.

## 3. *Development of In-House Anti-Virus Software*

104. In late 2003, the Business decided to phase out its practices of re-selling grey-market branded security software, in light of:

    (a)    Increased customer complaints;

LA PRÉSENT ATTEST QUE CE
DOCUMENT, DONT CHACUNE
DES PAGES EST REVÊTU DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

THIS     6   (b)y OF
LE          JOUR DE

GREFFIER

- 26 -

Potential claims from the software companies (such as Symantec and McAfee) due to the Business' use of aggressive advertising campaigns and unauthorised licensing keys. In fact Symantec, eventually brought suit against these practices (See description of the "Symantec Lawsuit" below);

(c)   The ability of the Business to customize software that it controlled to provide features that were more attractive to consumers; and

(d)   Software developed for and controlled by the Business would have a lower "per copy" cost than branded antivirus software and other branded security software products as licensing costs would be largely eliminated. Additionally the business would not have to purchase grey-market branded antivirus CDs.

105.   IMU was directed to complete development of anti-virus software for the Business, with some support by Stellarc which would replace the promotion and sale of the branded security software products.

106.   Eventually, at or about December 2003, the Business began to replace the Symantec and other branded security products with antivirus software developed by the Business' IMU office. The products were initially marketed under the name Windows Antivirus. Windows Antivirus had similar likeness, design, colour scheme as products offered by Symantec. This new software was marketed and sold through winantivirus.com, a website controlled by the Business. All merchant account processing for sales of winantivirus.com occurred through entities involved with the Business.

### K.   Practices Employed to Avoid Negative Publicity and Avoid Customer Complaints

107.   The Business has always maintained a degree of anonymity when dealing with third parties in order to avoid exposure to negative publicity, and to avoid customer complainants. This anonymity was achieved by employing questionable business practises including:

(a)   **Fictitious or Misleading Vendor Names.** Names of fake entities were used, usually corresponding to the domain name (i.e. vipfares.com represented that it

was owned by vipfares.com). In many cases the Business' products and services themselves were claimed to be owned by fake companies in the name of the product itself. For example, mp3u.com (relating to the Business' music downloading site described above) claimed that it was owned by "mp3u.com", while the domain registration information revealed an obscure address in Rawalpindi, Pakistan.

(b) **Providing false information for domain registration**. All websites on the Internet have to be registered in a directory known as a domain registry. The domain registry is supposed to contain accurate information about who owns a domain, and what entity should be contacted for technical assistance or support with respect to products and services sold through a domain. Although Sundin had previously registered many of the domain names that were eventually used to market the Business' products and services, when those products and services were *actively* used to sell the Business' products and services, domain registration information was modified to conceal the identity of the true operators of the Business. In addition, domain registration information was frequently changed to confuse the public and shield the Business from liability. In fact as the Business grew, detailed policies were established to provide maximum anonymity in the registration, operation and administration of the Business' domains. The domains themselves were used for a short period of time and then discarded or abandoned when there were too many customer complaints or complaints from individuals and security companies who encountered the aggressive or misleading advertising.

(c) **Maintaining multiple e-mail accounts, identities, and bank accounts**. The Business maintained a variety of different e-mail accounts, a variety of identities (some real, some fake), and bank accounts in order to confuse, and misdirect customers, suppliers and vendors. The multiple identities (both corporate and personal) allowed the Business to leverage its relationships with online advertisers. In many cases, the Business would have concurrent relationships with the same online advertiser using different identities. If one

LA PRESENT ATTEST QUE CE
DOCUMENT DONT LE __ ___
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

THIS 6 DAY OF _NOVEMBER_ 20 08
LE __ JOUR DE

GREFFIER

relationship was terminated due to complaints, the other relationships would be ramped up.

(d) **Obtaining digital licence certificates for the Business' websites and the Business' software using false information**. In order to process online sales through a "secure" website, the Business had to obtain a digital certificates for its websites and its software (known as SSL and CSC certificates respectively) from trusted 3rd party certifiers, to demonstrate to end users that: a) websites were secure and b) software was legitimate. The Ukraine office doctored articles of incorporation and other official documents to misrepresent to trusted 3rd party certifiers, the true owners of the Business' software products and websites. In addition, in many cases fake e-mail addresses were provided and documents were sent to digital license certificate providers using an anonymous fax.

(e) **Utilizing expired and unauthorized licenses from third party antivirus companies**. The Business utilized a third party antivirus engine to power its own "Winantivirus" product illegally.

(f) **Utilizing third party trademarks or likeness to confuse consumers into misidentifying the source of the product**. Despite the Symantec Lawsuit and legal advice obtained by the Business, the Business continued to violate trademark rights of third parties.

## L.  Jain's Troubles and the Transformation of the Business

### 1.  The Failure of Jain's Merchant Account Processing Facilities

108.  Even though the Business continued to diversify its products and services throughout 2003, and was experiencing tremendous sales because of its marketing of security software products and other non-software products, a critical component was failing. Because of the high volume of customer complaints and high risk nature of the transactions being charged, most of the Business' merchant account processing facilities (which at this time were held in

companies controlled by Jain) were being cancelled or were on the verge of being cancelled. As stated earlier, the Green-Card site had already triggered the cancellation of some of his merchant accounts.

109.    As Jain's problems sustaining merchant account processing facilities grew, Marc played an increasing role in the financial management of the Business. Capitalizing on his overseas and Canadian contacts, Marc proposed to Jain that the Business obtain an International outlet for merchant account processing in Canada. The result was that in the summer of 2003, the defendant Billingnow was incorporated. Marc's mother, Marina, was the director of the company because Marc believed that her good credit rating and standing with the banks, would enable the Business to get a high volume merchant account. In the summer of 2003, Marc worked with Marina to obtain a merchant account for Billingnow from the Toronto Dominion Bank in Canada. In December 2003, the Business began to use Billingnow's merchant account. Marina's involvement included some payments and transfers of money on behalf of the Business, and other administrative tasks as Marc requested her to perform from time to time.

110.    At or about September 2003, Marc also obtained a merchant account for the home based careers website in Marc Cohen's name.

### 2. *Jain's troubles and the Transformation of the Business*

111.    Jain began to experience a variety of problems with government authorities in the United States. In December 2003, he was stopped by customs officials and his laptop was seized for his involvement with the Green-Card lottery website, www.usnis.org, which bore a likeness to the official US government website for Immigration (www.usins.org). In addition, at this time Jain was carrying an undeclared cheque for US $1,000,000 from his GITO company. Jain also apparently had not filed income taxes in several years. The authorities seized Jain's laptop and wanted him to come in for more questioning. Instead of complying, in January 2004, Jain resurfaced in Rio de Janeiro, Brazil.

THIS IS TO CERTIFY THAT THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE
DOCUMENT DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS   6   DAY OF   NOVEMBER  2008
FAIT À TORONTO LE          JOUR DE

REGISTRAR

Ioanna Nicoara
GREFFIER of Justice

THIS
OF
THE
COURSE
TO, IS A
DOCUMENT
ICE

LA PRESENT ATTEST QUE CE
DOCUMENT, DONT CHACUNE
DES PAGES EST REVETUE DU
SCEAU DE LA COUR SUPERIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVE DANS CE BUREAU

NOV    20 08
JOUR DE
GREFFIER

112.    Jain's troubles meant that he no longer had the ability to obtain merchant account processing facilities. As a result, Jain's troubles signalled the beginning of a decline in his contributions to the Business. Although Jain had provided a lot of the initial capital and some of the initial business ideas, one of his key contributions during the initial expansion of the Business were his merchant account processing facilities.

113.    Jain's remaining small merchant account facilities were no longer used.    Instead, Billingnow and other merchant account relationships arranged by Marc with the assistance of Maurice became the primary provider of merchant account processing facilities to the Business.

114.    Jain no longer represented himself to third parties as the apparent owner or principal of the Business, because in the aftermath of the eFront scandal, the collapse of his merchant account processing facilities and his problems with governmental authorities, he no longer had credibility within the e-commerce industry.

115.    Jain tacitly recognized the fundamental change in the Business by taking out a substantial amount of the profits of the Business earned up to the end of November 2003. Jain removed approximately US $5,000,000 from the treasury of the Business in early 2004, which funds represented his *alleged* share of the profits of the Business for the period July 2002 to November 30, 2003.    Included in these funds was the entitlement of Marc to participate in the profits of the Business during this time frame according to the terms of the Interim Agreement.

116.    As of January 2004 Marc assumed the primary executive role in the management of the Business.    In addition to meeting with third parties to enter into, maintain and expand business deals, Marc made regular trips to the overseas offices to set business goals and to improve productivity of the overseas offices.    In mid 2004, Marc moved to Bahrain in order to establish merchant account processing and financial management of the Business with the involvement of his father, Maurice.

117.    Jain, on the other hand attempted to remain invisible and did not attend at the overseas offices or meet their management, until the end of December 2006, when planning to

disentitle Marc to his equity share in the Business. Jain was pre-occupied with his various legal problems, which minimized the extent of Jain's involvement with the affairs of the Business.

118. The previous corporate structure used by the Business effectively came to an end at the beginning of 2004. The major corporate vehicles, namely GITO and PMMCI were dissolved. New banking relationships had to be established and new merchant account processing facilities had to be created for the Business. As described in detail below, in order to save the Business it was necessary for Marc and Maurice to assume financial control of the Business. The Business was transformed from an organization controlled in the United States to an international one. The demise of the previous corporate structure brought with it the demise of the Interim Agreement. In its place Jain and Marc were to be equal partners with Sundin holding an indeterminate share in the profits of the Business. Subsequently, in April 2006, Marc and Jain jointly agreed that they would pay Sundin no more than US $4,000,000 in exchange for a release of his entitlement to the profits of the Business. Sundin did not contact Marc regarding his entitlement in the Business until December 2006.

119. Marc and Maurice set about creating the new business model described below, whose structure was created by Marc and Maurice alone and without the infusion of new capital from Jain and Sundin or their corporations.

120. Conversely, Marc and Maurice provided the seed capital to create some of the defendant companies including Winpay, where they provided all of the start up capital required.

### M. The New Business Model

121. A new business model took shape for the Business. The new business model was organized into two primary functional spheres:

    (a)    **A financial sphere**, consisting of companies that were used for merchant account processing facilities, executing contracts with third party vendors and banks. These companies started with Billingnow, and eventually expanded

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENTE ATTESTE QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE À TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS  6  DAY OF  November  20 08
FAIT À TORONTO LE  JOUR DE  Joanne Nicoara
Registrar, Superior Court of Justice

REGISTRAR      GREFFIER

JE PRÉSENT ATTESTE QUE CE
DOCUMENT, VU SOUS LE SCEAU
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

THE
COURT
TO, IS A
DOCUMENT
ICE
THIS _6_ DAY OF _NOV_ 20__
LE          JOUR DE

GREFFIER

into other companies, that were in most cases setup by Maurice, with the assistance of Marc;

(b) **A development and operational sphere**, that relied largely on its network of overseas outsourcing offices including IMU, Stellarc, OpenSols and others to develop products and services, provide customer support, conduct website design and administration, and accounting functions. In addition, the Business also used a number of third party vendors and independent contractors.

122. There was little or no formal connection between these spheres. The partners or joint venturers directly or indirectly controlled or contracted with the constituent elements of these spheres. When payments were needed to be made from one sphere to another (i.e. reimbursement of expenses, payment of salaries, etc.), requests for wire transfer were made over an internal Internet site.

123. Records of these payments were maintained by the Business by Maurice and the defendant corporations. These records were available to Jain and Sundin over the same internal Internet site. In fact, during 2005 and 2006, IMU retained a copy of these records.

124. Many of the Business' expenses were billed to credit card accounts opened for the Business. The credit card accounts were opened in the name of Marc and/or Maurice. The credit card information was provided to Jain, Sundin, Ross and employees of the Business who routinely charged expenses to these credit cards. The vast majority of charges on these credit cards relate to business expenses paid to third parties. There are also some personal charges on these cards. The personal charges were incurred by Marc, Maurice, Jain, Sundin and Ross who all routinely charged the credit cards for travel, food and lodging.

125. Although the genesis of this new business model resulted primarily from Jain's inability to maintain his merchant account processing facilities, the new business model actually provided a better environment for the continued growth of the Business. Because of the increased diversification of the Business's entities and their separation into functional spheres, the new business model allowed for more aggressive advertising than ever before. The Business' offshore presence allowed it to escape regulation from the Federal Trade

Commission and avoid State Attorneys who were sanctioning and shutting down similar organizations, as well as other civil liabilities from tens of thousands of dissatisfied end consumers. Additionally, the Business started to target people outside of the United States. Many of these people were also extremely dissatisfied with the Business' products and services. They were also angry with the Business' use of misleading and aggressive advertising methods but lacked the knowledge to initiate the chargeback process or seek other types of recourse with their credit card company. Accordingly, the Business was able to maintain lower chargeback rates while continuing to sell sub-par products and services and to use misleading and aggressive advertising methods.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE À TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS 6 DAY OF NOVEMBER 2008
FAIT À TORONTO LE       JOUR DE
Joanne Nicoara
Registrar, Superior Court of Justice
REGISTRAR                GREFFIER

## N.   The Business in 2004

### 1. In-house Adware

126.   At or about the spring of 2004, Marc and Jain discussed setting up an in-house Adware network for the Business. Until that point, the Business had used third party Adware networks to advertise its products and services. Marc and Jain agreed an in-house Adware network should be setup. Sundin had previously developed an Adware platform but it was inactive. On instructions from Jain and Marc, the IMU office developed and deployed the software. Jain contracted a person in Brazil to "promote" the Adware software by installing it on end-users' machines through the illegal practice of computer hacking. In the result, the Business had its own Adware network for the promotion of its own products and services as well as the promotion of third parties' products and services.

127.   The IMU development center also created a so-called "affiliate network" for the Business's Adware network. The affiliate network paid independent third parties, 10 cents for every computer they installed the Adware software on. The revenue return for the Business ended up being as high as US $2-$5 per desktop through the sale of software and non-software products and services offered by the Business, as well as the display of third party advertisements for companies such as Expedia on its Adware network. Most affiliates installed the Adware product on end-user's computers illegally through the use of browser hijacking and other nefarious methods that did not obtain end-user consent.

THIS IS TO CERTIFY THAT THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
ON FILE IN THIS OFFICE

DES PAGES EST REVETUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVE DANS CE BUREAU

DATED AT TORONTO THIS ____6____ DAY OF ___NOVEMBER___ 20 _08_
FAIT À TORONTO LE                JOUR DE

Joanne Nicoara
REGISTRAR          Registrar, Superior Court of Justice
                                                      GREFFIER

### 2. Problems with Billingnow

128.    As Marc was finishing his law degree, Billingnow began to experience problems with its host bank, the Toronto Dominion Bank in Toronto, Ontario ("TD Bank"). The overall chargeback rate of the Billingnow's merchant account was at an acceptable range. However, due to its high volume of transactions, the shear number of chargebacks in the account was tremendous – sometimes in excess of 100 per day. TD Bank initially expressed concern about the volume of chargebacks, as well as concerns about the aggregate value of transactions, which at the time was in the millions of dollars. Representatives of TD Bank insisted on a face-to-face meeting to discuss their concerns.

129.    Billingnow's merchant account processing facility was *not* what is known as a third party "master merchant account". That is, Billingnow was only permitted to process credit card transactions for its own products and services, and not for third parties.

130.    At or about March 2004, Marc moved to alleviate the concerns of TD bank. With the knowledge and consent of Jain, a PowerPoint presentation was prepared by Decatrend that identified Billingnow as the owner of the products and services sold using Billingnow's merchant account (at this time, the majority of sales of the Business' products and services were being processed through Billingnow).

131.    Marc met with representatives of TD Bank and showed them the PowerPoint presentation. The PowerPoint presentation stated that Billingnow employed around 80 programmers, 50 customer support representatives and 60 fulfillment employees in locations such as India, the Philippines, Ukraine and the United States. Jain was aware of this PowerPoint presentation, and supported Marc's efforts to keep Billingnow's merchant accounts active. Billingnow's merchant account status was maintained.

132.    In addition, Marc set up a trade name for Billingnow called "Billingnow doing business as WinAntivirus". The trade name corresponded to WinAntivirus, a product described below that the Business was selling using Billingnow's merchant account. A new TD merchant account was setup under that trade name. However, by April 2004, the

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

FAIT À TORONTO LE ___6___ DAY OF ___NOV.___ 20 08
JOUR DE

Joanne Nicoara
Registrar  Superior Court of Justice
REGISTRAR                    GREFFIER

relationship with TD Bank soured and the merchant account was terminated due to ongoing customer disputes and chargebacks.

### 3. *Maurice Creates a Merchant Account Processing Facility With BBK Bank*

133.   As continued success of the Business depended on the availability of merchant account processing facilities, in order to process the increasing number of daily transactions, Marc, with the full knowledge, agreement and consent of Jain and Sundin, took on the added responsibility of obtaining new sources of merchant account processing.

134.   Capitalizing on the advice that Maurice had provided Marc in the summer of 2002, in the beginning of 2004 Marc asked Maurice to establish an overseas merchant account processing facility in Bahrain.   Locating this facility in Bahrain offered a number of advantages including less sophisticated banks that were more forgiving of high chargeback rate, tax advantages and greater anonymity for Jain, Marc and Sundin.

135.   Establishing the merchant account processing facility in Bahrain was not easy.  The defendant Winpay, a company capitalized and incorporated by Maurice with his personal funds, was established as the front-line entity for the new merchant account processing facility in Bahrain.  A merchant account was setup for Winpay at the Bank of Bahrain & Kuwait ("BBK").

136.   At or about the summer of 2004, Marc moved to Bahrain to assist full time with the growing operations of the financial sphere in Bahrain.   As the volume of transactions increased through Winpay's merchant account processing facilities, Maurice had to employ a number of people to support the ever growing complaints that were being received by BBK Bank.  These employees were compensated by Maurice directly.

137.   By the middle of 2004, most merchant account processing facilities for the Business were carried out by Maurice, and a new network of companies that had been set up in the Middle East.  Jain no longer had any viable merchant account processing relationships of his own, and could not assist with this vital aspect of the Business.

138.    By extension, virtually all payments made to the Business's vendors were made from Maurice's companies.  Maurice's companies became de facto merchants in the eyes of the banks.

139.    Jain used some funds from accounts in the now defunct GITO and PMMCI companies (which were used for merchant account processing) to pay off a number of the Business' debts.   When Jain removed approximately US $5,000,000 from the treasury of the Business in early 2004 as described above, it was also from these same accounts.   Jain used at least a significant portion of these funds for personal investments, including high risk leveraged foreign currency exchange transactions and US securities investments.  These investments belong to the Business and not to Jain or to any company controlled directly or indirectly by him.  As described above, apparently these investments ended up in the Uruguayan company, Fiananciera Volturno S.A. which has assets of approximately US $18,000,000 that have been frozen by Swiss authorities for allegations of money laundering.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVE DANS CE BUREAU

DATED AT TORONTO THIS 6 DAY OF NOV 2008
FAIT À TORONTO LE        JOUR DE

REGISTRAR                          GREFFIER

### 4.   The Symantec Lawsuit

140.    In early 2004, the Business obtained a legal opinion to the effect that its Windows Antivirus product was too similar to Symantec's products and that it should discontinue its mimicry of Symantec's trade designs and potential violation of Microsoft's intellectual property rights.  The product was changed from a yellow to a red colour scheme, and its name was changed to Winantivirus.

141.    These cosmetic changes did not prevent Symantec from taking action.  Symantec sued Jain, James Reno, Karen Sena, Bytehosting, IMI, Promotional Management Consulting, and 50 unknown defendants, in the United District Court for the Central District of California – Western Division (Case # 2:04-cv-03017-PA-Mc) (the "Symantec Lawsuit").

142.    Jain was aware of the Symantec Lawsuit through Reno and his parents.  Marc, who was not named in the Symantec Lawsuit encouraged Jain to defend.  Jain refused to do so initially.  Jain played games with the Court, evaded service, and eventually a default judgment was entered.

-37-

143.    In his sworn declaration in support of his *ex parte* application for relief from default or, in the alternative, for an order shortening time, Jain falsely swore that:

(a)    He had not known about the lawsuit throughout its existence;

(b)    He did not have legal representation at the time of the lawsuit;

(c)    He had never engaged in "pop-up" advertising, "hijacking" of web traffic or sending "Spam"; and

(d)    He had never knowingly sold or marketed any counterfeit software products bearing the Plaintiff's trademarks.

144.    In rejecting Jain's application to overturn the default judgment entered against him, the Honourable Justice Percy Anderson described Jain as conducting a "cynical and intentional manipulation" of the Court's proceedings by evading service, and engaging in "highly suspicious" conduct to attempt to engineer the overturning of a default judgment for knowingly selling counterfeit anti-virus software.

145.    Jain was aware of the Symantec Lawsuit and that judgment had been entered against him, and took active steps to evade service, intentionally mislead the Court. With his continued involvement in the Business, Jain continues to operate in flagrant violation of a permanent injunction imposed by the Court.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRESENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS _6_ DAY OF _NOVEMBER_ 20 _08_
FAIT À TORONTO LE          JOUR DE

Joanne Nicoara
REGISTRAR    Registrar, Superior Court of Justice

### 5.    *Problems with the Authorities*

146.    While the Business' financial sphere increasingly benefited from Marc's and Maurice's efforts, the Business' development and operational spheres came under increased scrutiny from the authorities.

147.    Shawn Dolven, who was recruited by Sundin to assist with marketing and business development was stopped at the Canadian border in January 2005. Dolven had been doing some minor merchant account processing for the Business' websites that were selling the prescription drug Viagra, and pornography websites.

- 38 -

148.    At or about January 2005 Marc Cohen was called in for questioning by the Federal Bureau of Investigation in Florida.

149.    At about the same time, Julie Wilson was also called in for questioning by the RCMP.

150.    Following their encounters with the authorities Shawn Dolven and Marc Cohen distanced themselves from the Business, absconding with funds they were not entitled to keep. It was jointly decided by Jain, Sundin and Marc that they should not be pursued, and their debts should be written off.

151.    In early 2005, Sundin became "spooked" by all of the problems with the authorities. Sundin had just moved to Canada, but decided on the spur of the moment to leave the country and return to Sweden.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS __6__ DAY OF _Nov_ 20 08
FAIT À TORONTO LE                JOUR DE

Joanne Nicoara
REGISTRAR        Registrar, Superior Court of Justice

### 6.    Problems With Merchant Account Relationships with BBK Bank

152.    Towards the end of 2004, the Business's relationship through Winpay with BBK Bank began to sour. Apparently Winpay had the highest volume of merchant account processing of any entity in Bahrain. BBK Bank was concerned that chargeback rates were continuing to increase. They were also concerned when they came across a gambling website that IMU had set up for the Business that was mistakenly directed towards the BBK Bank merchant account processing facility. Gambling is strictly prohibited by Islamic law and the Kingdom of Bahrain operates under Islamic law.

153.    BBK Bank demanded to see evidence of agreements that Winpay had in place with its various overseas affiliates such as customer service centers, software authors, and other vendors. As some of these agreements did not exist in written form, they had to be drafted and executed on extremely short notice. Jain was aware of this entire situation and supported the efforts to kept the BBK Bank merchant processing facility active.

154.    Contrary to the allegations made at paragraph 40(a) of the Claim, Marc and Maurice *never* provided forged documents to bank officials purporting to provide various authorisations on behalf of IMI.

155.    The documentation presented was not enough to prevent BBK Bank from terminating Winpay's merchant account processing facilities.   This termination left the Business with effectively no ability to process merchant account transactions.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS _6_ DAY OF _NOVEMBER_ 20 0 8
FAIT À TORONTO LE           JOUR DE

Joanne Nicoara
Registrar, Superior Court of Justice
REGISTRAR                         GREFFIER

### O.    The Business (February 2005 – June 2005)

#### 1. Loss of Merchant Account Processing Facilities

156.    From February 2005 until approximately June 2005, the Business had no access to merchant account processing facilities for the vast majority of its sales transactions.

157.    The Business could have tried to use third party merchant account processing providers in the United States, or small personal merchant accounts that Ross and James Reno had earlier obtained or were able to obtain for the Business to use.  However it was decided that these options were not feasible because:

    (a)    the extremely aggressive nature of the Business' marketing would quickly close these accounts because of high chargebacks;

    (b)    third party merchant account processing would involve significant fees and the assumption of significant risk because the Business, as described in detail below enjoyed significant advantages from the merchant accounts setup by Marc and Maurice;

    (c)    the Symantec Lawsuit would make operating merchant accounts through a provider in the United States an extremely risky proposition; and

    (d)    the investigation of people associated with the Business, such as Shawn Dolven, Marc Cohen, Julie Wilson and Jain would also create the potential for risk, should the authorities make a connection with the Business' merchant account processing facilities.

158.   During this time, there were concerns whether the Business would survive.   Sundin was instructed to procure or arrange merchant account processing facilities for the Business, but his attempts failed.

159.   As well, Jain tried to establish some merchant account processing facilities in Uruguay, but was unsuccessful.   His connections in the United States and abroad had been seriously damaged from his past indiscretions.

160.   At this time, Jain had an online discussion with Marc in which Jain stated that merchant account processing was "90% of the business" and the fundamental key to success of the direct marketing e-commerce business.

161.   Despite the fact that the Business had no merchant account processing facilities, it continued to operate.   Because during this time its revenues were effectively close to 0, the Business queued the pending credit card transactions.   Sales would occur, but they would not be billed to customer's credit cards.   Marc convinced Jain that he would be able to find another merchant account facility to save the business, as he had done earlier using Billingnow and Winpay.   Marc also told Jain that he would find a way to "batch" process all of these queued transactions at some point in the future.

162.   At or about May 2005, Marc travelled to Dubai to try and get a bank in Abu Dhabi to agree to "batch" all of the transactions that had been queued (over 45,000 transactions amounting to approximately US $1.8 million).   The bank would not agree.

163.   The financial strain caused by virtually no revenue placed a considerable stress on the operational and development sphere of the Business, and expenses were cut.   The IMU office in Ukraine was downsized due to the substantial cash flow issues identified above.

### 2.   Marc's Efforts to Establish New Merchant Account Processing Facilities

164.   Marc, who was now the front-line person in the Business, expended a considerable amount of effort during this period of uncertainty, to establish some new merchant account processing facilities.   Marc's many contributions to the Business include:

THIS IS TO CERTIFY THAT THIS   LA PRÉSENT ATTEST QUE CE   DOCUMENT, DONT CHACUNE   WHICH IS STAMPED WITH THE   DES PAGES EST REVÊTUE DU   SEAL OF THE SUPERIOR COURT   SCEAU DE LA COUR SUPÉRIEURE   OF JUSTICE AT TORONTO IS A   DE JUSTICE À TORONTO, EST UNE   TRUE COPY OF THE DOCUMENT   COPIE CONFORME DU DOCUMENT   HELD IN THIS OFFICE   CONSERVÉ DANS CE BUREAU   DATED AT TORONTO THIS   6   DAY OF   NOVEMBER   20 0 8   FAIT À TORONTO LE   JOUR DE

Joanne Nicoara
Registrar  Superior Court of Justi
REGISTRAR   GREFFIER

(a)    Contacting banks in the Netherlands to establish merchant account relationships;

(b)    Coordinating with Maurice to establish new merchant account relationships in Dubai and with DBS Bank in Singapore; and

(c)    Negotiating with BBK Bank in Bahrain to reactivate the terminated merchant accounts.

165.   Marc's establishment of new merchant account processing relationships saved the Business.  In fact from, June 2005 until Marc's departure from the Business at the end of December 2006, tens of millions of dollars of merchant account processing went through the merchant accounts that Maurice set up at DBS Bank in Singapore.  This was an order of magnitude larger than any merchant account processing that the Business had ever undertaken, and reflected approximately three-quarters of the growth of the revenues of the Business.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS __6__ DAY OF __NOV.__ 20 08
FAIT À TORONTO LE                  JOUR DE

Joanne Nicoara

REGISTRAR    Registrar, Superior Court of Justice
GREFFIER

### 3.   *Winfixer*

166.   In April 2005, while the Business had virtually no merchant account processing facilities, Marc travelled to San Francisco, California to attend an advertising conference. Through his connections, Marc was introduced to a new method for online marketing of computer security software products.  The method employed what is known as the "scanner approach".  In the past, the Business' security products were sold as straight purchase transactions.  That is, aggressive advertising lured customers to the Business' websites, where customers would have to pay for a product before they could download it to their computer. The "scanner approach" provided customers with a free, limited version of the software that would identify and diagnose problems only.  To correct any problems, a customer was required to purchase the full version of the software.

167.   When Marc returned from this trip, he contacted Jain and told him about the discovery and success of those individuals who had used the "scanner approach".  It was agreed that the

IMU office would clone this type of "scanner approach" for the Business' anti-virus/anti-spyware software. The Business had previously experimented and failed with a different type of "scanner approach" because the techniques previously used were unpolished and rudimentary. The new approach initiated and coordinated by Marc proved to be far more successful.

168.    By the end of June 2005, coinciding with Marc's introduction of the large scale merchant account processing facility at DBS Bank in Singapore, the Business' new software, including the cloned "scanner approach" was completed. It was marketed under the name Winfixer.

169.    Winfixer was initially tested using the Business' in-house Adware network in order to gauge customer interest. The results were extremely positive. Marc then used his experience with online advertising to engage in media buying in a number of test markets, to continue to gauge customer interest. Again, the results were extremely positive.

170.    Marc spearheaded the Business' efforts to mass market Winfixer by using paid advertisements.

171.    The Business decided to use a variety of other names to market variants of Winfixer. The product was marketed under names including errorsafe, systemdoctor, systemerror, errorpatrol, errorprotector, and drivecleaner.

THIS IS TO CERTIFY THAT THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

DATED AT TORONTO THIS __6__ DAY OF __NOV__ 20__08__
FAIT À TORONTO LE

JE CERTIFIE ATTEST QUE CE
DOCUMENT, DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE À TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

Joanne Nicoara
Registrar, Superior Court of Justice
GREFFIER

REGISTRAR

### 4. *The Business Experiences Tremendous Growth*

172.    Winfixer increased the Business's revenues to the order of *US $4-5 million* per month. The overhead to develop, market and sell Winfixer along with its variants were extremely low, as they were accomplished using the Business' overseas offices.

173.    The majority of the Business's merchant account processing for Winfixer and its variants were effected, almost exclusively through DBS Bank facility that Maurice had setup in Singapore.

THIS IS TO CERTIFY THAT THIS
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

DATED AT TORONTO THIS   6   DAY OF   NOV   20 08

LA PRÉSENT ATTEST QUE CE
DOCUMENT, DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE À TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

FAIT À TORONTO LE   JOUR DE

Joanne Nicoara

REGISTRAR                    Registrar, Superior Court of Justice
                             GREFFIER

174.    In addition to the DBS Bank facility, there were a few such small merchant account facilities used by the Business at this time:

    (a)    Sundin set up a small merchant account processing facility for electronic cheques and Discover credit card transactions.

    (b)    Jain also able to coordinate a small merchant account processing facility for local markets in South America (which apparently processed only about US $50,000 per month).

    (c)    The Business' India Office running through OpenSols also set up a processing facility for Indian credit card sales, which amounted to around $5,000-$10,000 per month.

175.    Because of the extremely high volume of transactions, DBS Bank became concerned with the high chargeback rates and numerous customer complaints.

176.    Contrary to the allegations made in paragraph 38 of the Claim, the network of accounts and corporations established by Marc and Maurice provided substantial benefits to the Business, by facilitating a tremendous volume of merchant account processing, while minimizing merchant account issues such as termination and other sanctions due to high chargebacks and other concerns of financial institutions. Maurice, Marc and many of the defendant companies took on a high level of risk by allowing all high risk credit card transactions to be processed, realizing that high volumes of chargebacks and consumer fraud would continually threaten their merchant account processing relationships.

177.    The network of accounts and corporations established by Marc and Maurice provided the Business with substantial benefits over the merchant accounts that had been used in the past including:

    (a)    the reduction or elimination of substantial fees, rolling reserves and hold periods normally charged on "high risk" merchant accounts;

    (b)    the Business, on the basis of Maurice's banking relationships and relationships with payment gateway providers, was able to control the credit card

process, a function not normally provided to the holder of a merchant account. The Business exploited this process to increase revenues by retaining customer credit card data for transactions, and by reattempting to process failed transactions multiple times.

178.    In July 2005, Marc's efforts to establish a merchant account processing facility in the Netherlands succeeded. Marc was able to establish the defendant, Synergy B.V a company in the Netherlands. Synergy's merchant account processing facilities were used to "batch" the queued transactions that had accumulated during February 2005 until end of May 2005. The success rate at processing the queued transactions was approximately 60-65%, however, the customer complaints and chargeback rates were tremendous. Many customers were suspicious that they were being billed for transactions that had occurred months earlier. Synergy's merchant accounts were also used to process some newer transactions. Synergy's merchant accounts remained operative until February 28, 2006 when they were terminated by the bank due to the unacceptably high chargeback rate.

179.    In November 2005, Marc also set up another merchant account processing facility using Synergy in order to process several types of European debit card transactions and Japanese credit card transactions. This merchant account processing facility was active, when Marc left the Business at the end of December 2006.

**P.      January 2006 Trip to IMU**

180.    In November 2005, Marc planned a trip to the IMU office to conduct a series of meetings with the marketing and customer service personnel and other departments. Jain proposed that Sundin should join this trip as well. At this time, Sundin was increasingly distant from the day-to-day activities of the business. The agenda on this trip included plans to increase the efficiency of the IMU office and to proceed with a planned expansion by instituting Sundin as Chief Operating Officer of IMU.

181.    The trip was made to the IMU office in the middle of January 2006. Ross, Sundin and Conrad accompanied Marc on the trip. Jain did not accompany them.

182.    One key issue that had to be dealt with at the outset of the trip was whether to dismiss Andriy Dzuybuekno ("Dzuybuekno"), who was in effect running operations at IMU. Jain and Ross wanted to fire Dzuybuekno because they believed that he was interfering with the operations of the office and was not a competent leader, while Marc thought it was prudent to keep him, because of his experience running the IMU office. Ultimately, Marc and Jain agreed to keep Dzuybuekno in charge.

183.    It was planned that both Marc and Sundin would take the lead role in meetings with staff during this trip on the technical and organizational side. However, Sundin was not able to function correctly. Sundin engaged in sudden outbursts and inappropriate behaviour. It was clear to everyone who attended the trip, that Sundin was physically and psychologically ill. Sundin withdrew from all meaningful participation in the meetings although he continued to be physically present.

184.    Marc was extremely disturbed by Sundin's sudden outbursts and inappropriate behaviour.  In fact, Marc learned from Ross subsequent to this trip that Jain had promised Ross a larger share of his profits if she was able to convince Sundin to take a lower percentage of profits.

185.    Towards the end of the trip, Marc had an instant messenger conversation with Jain who was not on the trip, where they jointly decided that Sundin should not serve as the Chief Operating Officer of the IMU office as it was clear he was unable to properly function. In order to save face, Marc and Jain decided to give Sundin the role of Chief Technology Officer of IMU.

186.    During the trip, Marc was able to save the Business from a serious problem. An accidental mistake by one of the Business' employees had exposed a massive amount of customer credit card information on the World Wide Web. Marc acted quickly, together with the Business' legal counsel to take steps necessary to minimize damage to the Business' merchant account processing facilities and to avoid public disclosure.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE C DOCUMENT, DONT CHACUN DES PAGES EST REVÊTUE D SCEAU DE LA COUR SUPÉRIEUF DE JUSTICE A TORONTO, EST UN COPIE CONFORME DU DOCUMEI CONSERVÉ DANS CE BURE/

DATED AT TORONTO THIS  6  DAY OF  NOV   20 05
FAIT À TORONTO LE           JOUR DE

Joanne Nicoara
Registrar Superior Court of
REGISTRAR                     GREFFIER

DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE À TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS ___6___ DAY OF ___NOV___ 20 _0 8_
FAIT À TORONTO LE ___ JOUR DE ___

GREFFIER

**Q.    Sundin Retreats from the Business**

187.    After the January 2006 trip, Sundin moved to London, England.  In February 2006, Sundin was increasingly withdrawn from participating in the Business.  Eventually, by March 2006, Sundin stopped all forms of communication with Jain or with Marc.

**R.    Marc and Jain Meet in Brazil**

188.    In March 2006, Jain informed Marc of problems that he was having with an investment in Switzerland.  Jain told Marc that the investment consisted of approximately US $18 million consisting of proceeds from high risk leveraged foreign currency exchange transactions and US securities investments made through Merrill Lynch, Uruguay.  These funds had been frozen by Swiss authorities.  Jain asked Marc if he could assist with resolving these problems.  Marc was unaware that included in the frozen funds in Switzerland, were the earnings of the Business as described above.  However, subsequently Ross told Marc that she had not been paid for her services to the Business and that her entitlement was included in Jain's frozen funds in Switzerland.

189.    Marc travelled to Brazil to meet Jain in person (for the first and only time) on April 2, 2006.  Marc planned to discuss the apportionment of the Business' surplus.  Jain, however, was fully pre-occupied with attempting to resolve his problems with the Swiss authorities.

190.    Marc and Jain did discuss what to do about Sundin.  Sundin had retreated entirely from the Business.  Marc and Jain jointly agreed that they would pay Sundin no more than US $4,000,000 in exchange for a release of his entitlement to the profits of the Business, but in the meantime Sundin would not be factored into the apportionment of the profits of the Business as between Jain and Marc.  Jain promised to coordinate an accounting of the surplus for the Business.  Jain did not provide his version of the accounting until September 2006.

**S.    The Dispute over the Apportionment of Profits**

191.    In September 2006, Marc and Conrad took a business trip to the IMU office in Ukraine to coordinate some development projects.  While on this trip, Marc became aware of the WinFixer class action lawsuit.

192.    While Marc was in the Ukraine, Jain delivered to Marc an incomplete and inadequate accounting of the Business' profits, which he had undertaken to prepare for the Business in April 2006.

I, MARY ... THAT THE PRESENT ... DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

JE ... ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS __6__ DAY OF __NOV__ 20 __O8__
FAIT À TORONTO LE                 JOUR DE

REGISTRAR                              GREFFIER

193.    The accounting provided by Jain was in three parts:

a)      January 1, 2002 to June 1, 2002 – the net income of the Business for the five months was said to be US$1,167,191, with Marc sharing in the profits from and after March 1, 2002 based on the Interim Agreement.

b)      June 1, 2002 to November 30, 2003 – a calculation of profit reflecting alleged actual revenues but with assumed expenses of 50% of revenue.  Based on this calculation, the net income of the Business during this period was stated to be US$7,928,842 and that Marc's share, based on the Interim Agreement was US $ 901,891

c)      A cash flow calculation in which Jain alleged that his contributed capital was US$2,026,090 while retained earnings to November 30, 2003 were US $7,638,763. Jain calculated Marc's entitlement from July 2002 and not from March 2002 as he had done in other calculations.  Jain inconsistently concluded that Marc's entitlement based on the Interim Agreement was US $ 442,534.60 for the period July 1, 2002 to November 30, 2003.

194.    Quite apart from the inadequacy of the accounting, Marc disputed that the Interim Agreement was to apply after December, 2003.

195.    In November 2006, Jain provided Marc with additional inadequate accounting of the Business for the period January 1, 2005 to October 31, 2006.  The additional accounting reflected Jain's recognition of the fundamental change in the Business described above.  Quite notably, in this additional accounting:

(a)     Jain admits knowledge of the network of companies that Maurice had setup for the financial sphere of the Business including comprehensive information



THIS IS TO CERTIFY THAT THIS,   LA PRÉSENT ATTEST QUE CE
WHICH IS STAMPED WITH THE   DOCUMENT, DONT CHACUNE
SEAL OF THE SUPERIOR COURT   DES PAGES EST REVÊTUE DU
OF JUSTICE AT TORONTO, IS A   SCEAU DE LA COUR SUPÉRIEURE
TRUE COPY OF THE DOCUMENT   DE JUSTICE A TORONTO, EST UNE
ON FILE IN THIS OFFICE   COPIE CONFORME DU DOCUMENT
                              CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS  6  DAY OF   Nov   20 08
AT TORONTO THE

                              Joanne Nicoara
REGISTRAR                     Registrar, Superior Court of Justic
                              GREFFIER

about their associated merchant accounts, their bank accounts and balances;

(b)    Jain admits knowledge that substantial monies were transferred from corporate accounts setup by Maurice to personal accounts in the name of Marc and/or Maurice.  In fact, the additional accounting shows that by Jain's own calculations, he was fully aware that since January 2006 at least US $10,917,023.30 of funds were transferred from corporate accounts to personal accounts;

(c)    Jain acknowledges that the Interim Agreement was no longer in effect when unlike the previous accounting, Jain does not include any calculation or even mention Marc's entitlement under the Interim Agreement;

196.    Jain has not provided an accurate accounting for the period November 30, 2003 to December 31, 2004.

197.    Due to the disagreement over the appropriate split of surplus, relations between Marc and Jain became increasingly strained between September and December, 2006.

198.    Jain demanded that Marc transfer US$20 million to him, as pre-condition of even negotiating a split in profits.  As a sign of good faith, and in an attempt to get negotiations started, Marc agreed in October, 2006 to transfer US$10 million to Jain.  This transfer was to take place in two equal instalments.  The first proceeded and at Jain's instructions, the sum of US$5 million was transferred to Continental Moonbell, a Panamanian company that Jain had set up.  Consulting agreements were created between WINS and Continental Moonbell to give the transfer the appearance of a legitimate business transaction.  Contrary to the plaintiff's assertions, Marc never authorized a transfer to IMI.  Jain apparently diverted the payment intended for Continental Moonbell to a Dutch bank account maintained by BK Group, a company owned by Sundin.  Sundin has subsequently admitted that the US$5 million went to Jain and not to IMI as alleged.

199.    Marc did not proceed with the second US$5 million dollar transfer to Jain, because Jain's demands had become increasingly unreasonable and Jain began to make threats against

Marc and his family.  On November 12, 2006, Jain and Marc had an instant messenger conversation wherein Jain told Marc "im never ever going to let u get away with 50%.  you can bet your life on that."  In the same conversation, Jain admitted that Marc and Maurice only controlled $40,000,000 in cash and reserves of the treasury of the Business, not $48,000,000 as now alleged by the plaintiff.  Jain also informed Marc that he had already put in place a plan to cut Marc out of the Business, if Marc did not agree to Jain's demands.

200.    During the fall of 2006, Jain and Sundin moved to take control of the development and operational sphere of the Business.  Merchant account processing for the Business was moved away from Maurice's companies.  Sundin was able to set up a new merchant account processing facility.  Sundin's new merchant account processed at least US$3 million before Marc departed the Business at the end of December 2006.

201.    During the months of November and December, 2006 and January 2007, Jain attempted to roll all of the assets of the Business into a Panamanian foundation, Old Moon Foundation.  The first steps were to involve the transfer of Opensols in India and IMI.  The controlling shareholder of Opensols, refused to go along with Jain's plans.  Subsequently as described below Jain threatened ShivaKumar P.K. ("Shiva"), the controlling shareholder of Opensols stating in an instant messenger conversation that he would "fuck Shiva  just fucked up Marc."

I HEREBY ATTEST QUE CE
DOCUMENT, EACH PAGE OF          DOCUMENT, DONT CHACUNE
WHICH IS STAMPED WITH THE        DES PAGES EST REVÊTUE DU
SEAL OF THE SUPERIOR COURT       SCEAU DE LA COUR SUPÉRIEURE
OF JUSTICE AT TORONTO, IS A      DE JUSTICE A TORONTO, EST UNE
TRUE COPY OF THE DOCUMENT        COPIE CONFORME DU DOCUMENT
ON FILE IN THIS OFFICE           CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS  6  DAY OF  NOV  20 08
FAIT À TORONTO LE          JOUR DE

                        Joanne Nicoara
REGISTRAR              Registrar, Superior Court of Justice

## T.    Marc's Termination

202.    Marc gave notice that he was terminating his relationship with the Business effective December 31, 2006.  Due to the informal organization of the Business, he styled his notice as a Notice of Termination of the Joint Venture.

## U.    The Business Continues to Send Invoices to Marc and the Other Defendants

203.    Since January 1, 2007, the Business continues to incur trade liabilities without paying its suppliers.  Some of these liabilities have been wrongly incurred by utilizing the identities

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRESENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS   6   DAY OF   NOV   20 0 8
DATÉ A TORONTO CE    Q JOUR DE

REGISTRAR
REGISTRAIRE

GREFFIER

of defendant companies as the so-called purchaser of services, at least one of those trade liabilities involves Jain using the alias "dave adams" in conjunction with a fictitious entity "Revenueresponse". Jain and others involved with the Business have been directed the Business' creditors to harass Marc and the other defendants despite Marc's advice that he has had no further involvement with the Business after December 31, 2006.

204. After delivering his termination notice, Marc and Maurice continued in January 2007 to pay hundreds of thousands of dollars to third parties for liabilities that the Business had incurred until December 31, 2006, and in some cases into January. Jain, Ross and Sundin were aware that Marc was making these payments. In fact, some of the employees still involved in the Business were instructed to contact Marc and request him to make payments on behalf of the Business. The plaintiff has deliberately mischaracterized these payments as Marc and Maurice's attempt to dissipate funds.

205. At the same time, the corporate defendants were no longer receiving receipts from merchant account processing of ongoing transactions.

206. In addition, Marc and Maurice's credit card accounts were charged for operating expenses incurred by the Business in January, February, March and April, 2007. The plaintiff so far has refused to investigate or agree to have these business liabilities discharged despite repeated requests by Marc.

207. In addition, a misdirected e-mail sent by one of Maurice's employees but not disclosed to the Court on the plaintiff's motion for a Mareva injunction clearly shows that over US$3 milllion in payments were made on behalf of the Business by Marc and Maurice from the middle of December 2006 through February 2007.

208. At or about November 2006, Jain contacted Marc and told him about a scheme that to obtain millions of dollars in free advertising illegally. Sam told Marc that the Business would be able to get US $5 million by using the services of a person who he had associated himself with in Brazil. He stated that that person had access to the 'credit' of thousands of new immigrants into the United States who had a high 'FICO' rating. The scheme involved manipulating the good credit rating of these people to obtain millions of dollars in advertising

credit and then not pay the bills. Marc informed Sam that it would be fraudulent to engage in such a scheme and told Jain that he wanted no part of it. Marc is not aware of whether Jain implemented this scam after Marc terminated his relationship with the Business. Nevertheless the Business itself has and continues to have several unpaid advertiser invoices that are still being forwarded to defendants and defendant companies to pay for unpaid advertising services that were delivered both during the Business and the ongoing business activity being engaged in by Jain.

209.    Additionally, even as late as July 2007, Jain and Sundin continued to use illegal advertising fronts to illegally promote the software products of the company.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

DATED AT TORONTO THIS __6__ DAY OF
FAIT À TORONTO LE _____ JOUR DE

LA PRÉSENT ATTEST QUE CE DOCUMENT DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE À TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

__NOV__   20 _08_

Joanne Nicoara
Registrar Superior Court of Justice
GREFFIER

REGISTRAR

## V.    Marc's New E-Commerce Business

210.    Since January 1, 2007, Marc has operated his own new e-commerce business, distinct and separate from the Business. Jain, directly and indirectly has harassed, threatened or otherwise coerced Marc's vendors and suppliers, thereby tortuously interfering with Marc's economic relations with such third parties.

211.    The plaintiff, Jain and/or Sundin hired Jack Pallandino ("Palladino"), a private investigator to harass Marc and ruin his new e-commerce Business. Palladino and his associates have contacted and visited many of Marc's business and personal contacts alleging that Marc and Maurice have embezzled money and committed fraud. Amongst the people visited include Marc's uncle, Father Edwin D'Souza, a Roman Catholic priest, and Marc's sister, Marlene, who is an actuary in Seattle, Washington.

212.    On December 19, 2006, Jain had an instant messenger conversation with a mutual business contact of Jain and Marc. In this conversation, Jain threatened to expose proprietary information and trade secrets of the business contact because Jain was under the impression that the business contact wanted to work with Marc in his new e-commerce business.

213.    In March 2007, priceline.com, an advertiser with whom Marc had developed a significant relationship over the years, informed Marc that due to this litigation and after

THIS IS TO CERTIFY THAT THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE
DOCUMENT, DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS  6  DAY OF  NOV  20 08

Joanne Nicoara

REGISTRAR          Registrar, Superior Court of Justice

receiving significant demand letters from the plaintiff, they were suspending their relationship with Marc's new e-commerce business.

214.    As discussed above, as late as April 26, 2007, Jain has continued to gloat about how he is ruining Marc's new e-commerce business when he threatened to ruin OpenSols by "fuck[ing] Shiva just like [he] fucked up Marc."

215.    Marc has been unable to significantly grow his new e-commerce business because of his inability to access funds frozen by a Mareva injunction and his reputation has been smeared by the actions of any of the plaintiff, Jain and/or Sundin.  At the same time, the plaintiff, Jain and Sundin have been able to freely spend all receipts of the Business earned after December 2006 (and in some cases before), including the US $5 million that Jain received in November 2006 and the at least US $3 million of the Business' receipts that accumulated in the new Jettis merchant account that Sundin setup at the end of 2006.

## W.    The Business is a Partnership or alternatively a Joint Venture

216.    Marc pleads that the Business was a partnership or joint venture amongst Marc, Jain and Sundin.

217.    The Business is was a partnership because:

(a)    it carried on business with a view to generating profits;

(b)    there was joint control and management of the business by Marc and Jain and a lesser degree of control and management by Sundin;

(c)    there was equal access to information about the business amongst the partners;

(d)    the partners made joint use of the "globedat.com" email server; and

(e)    each partner contributed capital, resources, sweat equity and business relationships to the financial success of the Business.

218.   Jain and Marc treated each other as partners.   Important decisions that impacted the Business were made jointly by them, with or without consultation with Sundin.

219.   In the alternative, Marc pleads that the Business was a joint venture between Marc, Jain and Sundin because each:

    (a)   contributed capital, property, skills and knowledge to a common undertaking;

    (b)   had a joint interest in the subject matter of the business;

    (c)   had mutual control and management in the business;

    (d)   expected to share in the profits earned.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS __6__ DAY OF __NOV__ 20 __08__
FAIT À TORONTO LE            JOUR DE

Joanne Nicoara
REGISTRAR            Registrar, Superior Court of Justice

## X.   As at December 31, 2006, approximately US$40,000,000 (Not US$48,000,000 as claimed by the Plaintiff) of the Business' Profits Were Held in Entities Controlled By Marc and Maurice

220.   Contrary to the assertions made in the Claim, as of December 31, 2006, Marc pleads that the approximate profits of the Business held in entities controlled by Marc and Maurice amounted to less than US $40,000,000 *not* US $48,000,000 as alleged by the plaintiff.

221.   As discussed above, Jain prior to the commencement of this lawsuit agreed with Marc that the correct amount was US $40,000,000.

222.   Marc has consented to a forensic accounting of the Business' profits.

223.   An additional amount of the Business' profits, unknown to Marc is held in entities controlled by Jain and Sundin.   These additional profits include:

    (a)   Profits realized on the Business' assets which are currently held as in sequestered funds in Fiananciera Volturno S.A. in Switzerland;

    (b)   Sundin's Bank of America account(s) apparently held in the name of Vantage, related to the Business' merchant account processing of Discover credit cards and e-cheque payments

(c) Merchant account processing receipts for the Business held in accounts of Flyby Soluçao Informatica Ltd in Brazil;

(d) A bank account(s), the identity of which is unknown to Marc into which Jain deposited cheques for the Business starting in the fall of 2006;

(e) Merchant account processing receipts for the Business held in accounts Shifting Currents.

(f) Monies held in the accounts of BK Group, including *at least* the US $5,000,000 payment that Marc sent to Jain;

(g) Monies held in the accounts of Continental Moonbell;

(h) Monies received from the Business' vendors held in the accounts of Sunwell;

(i) Other receipts of the Business, including funds converted by Jain, Sundin or Ross to personal investments, unknown to Marc.

I HEREBY CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

JE PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS ___6___ DAY OF ___NOV___ 20 _08_
FAIT À TORONTO LE ___ JOUR DE ___

Joanne Nicoara
REGISTRAR                    Registrar. Superior Court of Jus

## Y. Response to Allegations of "Irregularities" in the Business

224. Contrary to the allegations in paragraphs 33-41 of the Claim, Marc pleads as follows:

(a) Marc and Maurice cooperated fully with the Business' internal financial analyst, providing all information requested that was available to them without delay or concealment;

(b) Marc denies converting the assets of the Business to his own use but rather the assets of the Business were placed in bank accounts in the names of some of the defendants for the protection of the funds from legal liability and for the minimization of taxation, all in accordance with the agreement of Jain or Sundin.

(c)     Marc denies that inaccurate or false invoices from 3rd party vendors were obtained to justify payment of ordinary operating expenses as payments to him.

(d)     Marc assumes, that the allegation of an improper payment to a lawyer or a law firm refers to a payment to Miller Thomson for legal services for the defendant Billingnow, and in particular a tax assessment filed by the Canadian Taxation Authorities. This expenditure related *directly* to the affairs of the Business;

(e)     Marc denies that he falsified records with the intent of avoiding and abrogating established IMI procedures and reporting requirements under laws regulating credit card sales transactions;

(f)     Marc denies that he misrepresented the costs to IMI of the merchant accounts arranged by Marc and Maurice.

(g)     Marc denies the allegations in paragraph 00 and asserts that any and assets payments referred to therein were for Justice and services that a specifically approved by Jain, by confirming e-mail.

THIS IS TO CERTIFY THAT THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE
DATED AT TORONTO THIS ___6___ DAY OF ___NOV___ 20 _08_
FAIT À TORONTO LE                    JOUR DE

LA PRÉSENT ATTEST QUE CE
DOCUMENT DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE À TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

Roxanne Nicoara
Registrar, Superior Court of Justice

REGISTRAR                    GREFFIER

**COUNTERCLAIM**

225.    Based on the facts pleaded in the defence, Marc hereby makes claim against Jain and Sundin for:

(a)     Damages for breach of fiduciary duty to the Business partnership, by dealing with Marc in bad faith by conspiring to oust him from his rightful share to the Business's profits.

(b)     Damages for reimbursement of expenses of the Business satisfied by Marc and Maurice that relate to expenses that were incurred after December 31, 2006

(c)     Damages pursuant to subsection 42(1) of the *Partnerships Act*, R.S.O. 1990, c. P.5 ("*Partnerships Act*") for Marc's share of profits generated by the Business partnership after Marc retired from the partnership on December 31, 2006.

(d)     In the alternative to subparagraphs (a), (b) and (c), damages and lost profits as, similar to those characterized in subparagraphs (a), (b) and (c), if the Court finds that the Business was a Joint Venture, and damages for breach of the Joint Venture agreement;

(e)     Damages for intentional interference with economic relations

226.    Marc pleads and relies upon the facts set out in the statement of defence in support of his allegation that Marc, Jain and Sundin were partners or joint venturers and that Jain and Sundin owed Marc fiduciary obligations of good faith.

227.    As discussed above, Marc has suffered financial losses in his new e-commerce Business as a result of the actions of Jain and Sundin, including lost profits as a result of business relationships being terminated with advertisers and financial institutions

228.    Marc's actual damages will be detailed before trial.

229.    Based on the facts pleaded in the defence, Marc also makes claim against IMI for a declaration that IMI does not own the Business and has no ownership interest in the assets of the Business.

230.    Because of the high-handedness of the actions of Jain and Sundin, Marc claims punitive damages in the amount of US $5 million.

231.    Marc also claims his costs on the main action and in this counterclaim on substantial indemnity basis with applicable Goods and Services tax.

232.    Marc pleads and relies on the provisions of the *Partnerships Act*, R.S.O. 1990, c.P.5 and *Rules 29.01 and 17.02* of the *Rules of Civil Procedure*.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS ___6___ DAY OF ___NOV___ 20 _08_
FAIT À TORONTO LE                JOUR DE

Joanne Nicoara
Registrar, Superior Court of Justice
REGISTRAR                          GREFFIER

August 3, 2007

**LAX O'SULLIVAN SCOTT LLP**
Counsel
Suite 1920, 145 King Street West
Toronto, Ontario  M5H 1J8

Clifford Lax, Q.C.  LSUC#: 12010A
Daniel Schwartz    LSUC#: 52381V
Tel: (416) 598-1744
Fax: (416) 598-3730

Solicitors for the Defendant,
Marc Gerard D'Souza

THIS IS TO CERTIFY THAT THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE
DOCUMENT, DONT CHACUNE
DES PAGES EST REVETUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS   6   DAY OF   Nov        20 08
FAIT À TORONTO LE             JOUR DE
                                    Joanne Nicoara
                        Registrar  Superior Court of Justice
REGISTRAR                                   GREFFIER



THIS IS TO CERTIFY THAT THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE
DOCUMENT, DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS  6    DAY OF   NOV      20 O8
FAIT À TORONTO LE              JOUR   Joanne Nicoara

Registrar. Superior Court of Justice

REGISTRAR                           GREFFIER

080L007952

Court File No: 07-CV-327940 PD3

Innovative Marketing, Inc. vs. Marc Gerard D'Souza, et al

*ONTARIO*
## SUPERIOR COURT OF JUSTICE

Proceeding commenced at Toronto

## STATEMENT OF DEFENCE AND COUNTERCLAIM OF THE DEFENDANT MARC GERARD D'SOUZA

## LAX O'SULLIVAN SCOTT LLP

Counsel
Suite 1920, 145 King Street West
Toronto, Ontario  M5H 1J8

Clifford C. Lax, Q.C. LSUC#: 12010A
Daniel Schwartz  LSUC#: 52381V
Tel: (416) 598-0988
Fax: (416) 598-3730

Solicitors for the Defendant,
Marc Gerard D'Souza

