

```
Canada                      )
Province of Ontario         )
City of Toronto             )    SS:   CERTIFICATE OF AUTHENTICATION
Consulate General of the )
United States of America )
```

I, the undersigned,

### Molly P. Flores,

Vice Consul of the United States of America at Toronto,
Ontario, Canada, duly commissioned and qualified do hereby
certify that

### ---Sheila Tracey---

whose (fascimile) (true) signature and seal are, respectively,
subscribed and affixed to the annexed document was, at the
time of (attaching) (subscribing) the same

### Recording Officer Secretary of the Management Board of Cabinet, Province of Ontario, Canada

to whose official acts faith and credit are due.  For the
contents of the annexed document, I assume no responsibility.

IN WITNESS WHEREOF I have hereunto set my hand and
affixed the seal of the Consulate General of the United States
of America at Toronto, Ontario, Canada
this,  **22th** day of  **November,   2008.**

(SEAL)

Molly P. Flores
**Vice Consul of the United
States of America**

Attachment C                                   Page 1



Ontario

## MINISTRY OF GOVERNMENT SERVICES

I HEREBY CERTIFY AS FOLLOWS:

## NIGEL PHILIP WATSON

of the Province of Ontario, whose name is subscribed to the attached Instrument, was, at the time of subscribing thereto, a **NOTARY PUBLIC** in and for the Province of Ontario, Canada, duly commissioned and duly authorized by the laws thereof to administer oaths, to take affidavits and to certify the proof of deeds and other instruments in writing to be recorded within the said Province;

I FURTHER CERTIFY THAT I have compared the signature of the said **NOTARY PUBLIC** subscribed to the attached Instrument with the specimen signature of the said **NOTARY PUBLIC** filed in this office and verily believe the said signature to be genuine; and THAT I have compared the impression of the Seal of the said **NOTARY PUBLIC** appearing on the attached Instrument with the specimen of the Seal filed in this office and verily believe the impression of the Seal to be genuine.



IN TESTIMONY WHEREOF I have hereunto set my Hand and affixed the Seal of the Ministry of Government Services of the Province of Ontario at the City of Toronto in the said Province this twenty-first day of November, A.D. 2008.

*Sheila Tracey*

for the MINISTER OF GOVERNMENT SERVICES

CANADA                    )          **TO ALL WHOM THESE PRESENTS**
PROVINCE OF ONTARIO  )          **MAY COME, BE SEEN OR KNOWN**

**I, NIGEL PHILIP WATSON, a Notary Public, in and for the Province of Ontario, by Royal Authority duly appointed, residing at the City of Toronto in said Province,**

**Do Certify and Attest** that to the best of my knowledge the paper-writing(s) hereto annexed is(are) a true copy of a document produced and shown to me

**In Testimony Whereof** I have hereto subscribed my name and affixed my Notarial Seal of Office at the City of Toronto, in the Province of Ontario

this **21** day of  November, 2008



**NIGEL PHILIP WATSON**

A Notary Public in and for the Province of Ontario

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**

THIS IS TO CERTIFY THAT THIS
Court File No. 07-CV-32 WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE
DATED AT TORONTO THIS 10 DAY OF NOV. 20 08
FAIT À TORONTO LE

LA PRÉSENT ATTEST QUE CE
DOCUMENT DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE À TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU
JOUR DE
Joanne Nicoara
Registrar, Superior Court of Justice
REGISTRAR   GREFFIER

LOCAL REGISTRAR   GREFFIER LOCAL
SUPERIOR COURT OF JUSTICE   COUR SUPÉRIEURE DE JUSTICE

### INNOVATIVE MARKETING, INC.

Plaintiff

and

**MARC GERARD D'SOUZA, MAURICE D'SOUZA, MARINA D'SOUZA,
ELVIRA MARTINEZ-ROMERO, ~~CONRAD D'SOUZA, LEONARD D'SOUZA~~
WINPAYMENT CONSULTANCY SPC,
WEB INTEGRATED NET SOLUTIONS, INC., BILLINGNOW.COM, INC.
BILLING SOLUTIONS, SPC, WINSOLUTIONS, FZ-LLC,
REINSURANCE AND INSURANCE CONSULTING HOUSE SPC, SYNERGY, B.V.,
WINGEM, INC., WINSECURE SOLUTIONS, PTE, LTD., BILLPLANET, PTE, LTD.,
DSOFT, PTE, LTD., GE MANAGEMENT, PTE, LTD., and SCORGEM, PTE, LTD.**

Defendants

## AMENDED STATEMENT OF CLAIM

### TO THE DEFENDANTS

A LEGAL PROCEEDING HAS BEEN COMMENCED AGAINST YOU by the plaintiff. The claim made against you is set out in the following pages.

IF YOU WISH TO DEFEND THIS PROCEEDING, you or an Ontario lawyer acting for you must prepare a statement of defence in Form 18A prescribed by the Rules of Civil Procedure, serve it on the plaintiff's lawyer or, where the plaintiff does not have a lawyer, serve it on the plaintiff, and file it, with proof of service, in this court office, WITHIN TWENTY DAYS after this statement of claim is served on you, if you are served in Ontario.

If you are served in another province or territory of Canada or in the United States of America, the period for serving and filing your statement of defence is forty days. If you are served outside Canada and the United States of America, the period is sixty days.

Instead of serving and filing a statement of defence, you may serve and file a notice of intent to defend in Form 18B prescribed by the Rules of Civil Procedure. This will entitle you to ten more days within which to serve and file your statement of defence.

2

IF YOU FAIL TO DEFEND THIS PROCEEDING, JUDGMENT MAY BE GIVEN AGAINST YOU IN YOUR ABSENCE AND WITHOUT FURTHER NOTICE TO YOU. IF YOU WISH TO DEFEND THIS PROCEEDING BUT ARE UNABLE TO PAY LEGAL FEES, LEGAL AID MAY BE AVAILABLE TO YOU BY CONTACTING A LOCAL LEGAL AID OFFICE.

Date   February 19, 2007          Issued by _____
                                              Local Registrar

                    Address of
                    court office:   393 University Ave.      THIS IS TO CERTIFY THAT THIS        LA PRÉSENT ATTEST QUE CE
                                                            DOCUMENT, EACH PAGE OF              DOCUMENT, DONT CHACUNE
                                    10th Floor              WHICH IS STAMPED WITH THE           DES PAGES EST REVÊTUE DU
                                                            SEAL OF THE SUPERIOR COURT          SCEAU DE LA COUR SUPÉRIEURE
                                    Toronto, Ontario        OF JUSTICE AT TORONTO, IS A         DE JUSTICE A TORONTO, EST UNE
                                                            TRUE COPY OF THE DOCUMENT           COPIE CONFORME DU DOCUMENT
                                    M5G 1E6                 ON FILE IN THIS OFFICE              CONSERVÉ DANS CE BUREAU

                                    DATED AT TORONTO THIS  10  DAY OF   NOV.      20 08
                                    FAIT À TORONTO LE           JOUR DE
                                                                         Joanne Nicoara
                                                                 Registrar Superior Court of Justice
                                    REGISTRAR                            GREFFIER

TO:        MARC GERARD D'SOUZA              AND TO:    MAURICE D'SOUZA
           1 King St. West                            22 Carnegie Crescent
           Toronto, Ontario                           Thornhill, Ontario Canada
           M5H 1A1                                     L3T 5H1


AND TO:    MARINA D'SOUZA                   AND TO:    ~~CONRAD D'SOUZA~~
           22 Carnegie Crescent                       ~~96 Vanguard Road~~
           Thornhill, Ontario Canada                  ~~Concord, Ontario~~
           L3T 5H1                                     ~~L4K 5G7 CANADA~~

3

AND TO:   ~~LEONARD D'SOUZA~~
          ~~P.O. Box 18258~~
          ~~Vao Jebel Ali Freezone~~
          ~~Dubai, United .Arab Emirates~~

AND TO:   Elvira Martinez Romero
          No. 14 Cessna Street
          1300 Metro Manila
          Don Carlos Village,
          Pasay City
          Philippines

AND TO:   Elvira Martinez-Romero
          Flat 41, Building 2625, Road
          2725,
          Manama,
          Kingdom of Bahrain

AND TO:   Winpayment Consultancy
          Government Avenue Road
          #601,
          Suite #12, Building #60,
          Manama
          Kingdom of Bahrain

AND TO:   Winpayment Consultancy
          PO Box 54838
          Manama
          Kingdom of Bahrain

AND TO:   Web Integrated Net
          Solutions, Inc
          Romasco Place, Wickhams
          Cay 1,
          PO Box 3140, Road Town,
          Tortola
          British Virgin Islands

AND TO:   Billingnow.com Inc.
          22 Carnegie Crescent
          Thornhill, Ontario L3T 5H1
          Canada

AND TO:   BILLING SOLUTIONS,
          SPC
          Suite #12
          Building #60
          Government Avenue Road
          #601
          Manama 306
          Kingdom of Bahrain

THIS IS TO CERTIFY THAT THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE
DOCUMENT, DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS  10  DAY OF  NOV.  20 08
FAIT À TORONTO LE              JOUR DE

Joanne Nicoara
REGISTRAR        Registrar, Superior Court of Justice

4

AND TO:   Winsolutions FZ-LLC
Office No. 1 Building 04
Ground Floor
PO Box 500772 ·
Free Zone, Dubai Internet City
Dubai
United Arab Emirates

AND TO:   Reinsurance & Insurance
Consulting House (RICH) SPC
PO Box 54838
Manama
Kingdom of Bahrain

AND TO:   WinGem, Inc,
No. 14 Cessna Street
1300 Metro Manila
Don Carlos Village, Pasay City
Philippines

AND TO:   Winsecure Solutions PVT Ltd.
Penthouse Level
Suntec Tower Three
8 Temasek Blvd
Singapore 038988

AND TO:   Billplanet Pvt Ltd
Penthouse Level
Suntec Tower Three
8 Temasek Blvd
Singapore 038988

AND TO:   Synergy B.V.
Dokweg 27 B
1976 CA IJmuiden
Netherlands

AND TO:   DSoft PVT. Ltd.
139 Lorong K Telok Kurau
#01-03
Singapore 425777

AND TO:   GE Management PVT. Ltd.
139 Lorong K Telok Kurau
#01-03
Singapore 425777

THIS IS TO CERTIFY THAT THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

DATED AT TORONTO THIS 10 DAY OF
FAIT À TORONTO LE

LA PRÉSENT ATTEST QUE CE
DOCUMENT, DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE À TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

NOV. 20 08
JOUR DE

Joanne Nicoara
Registrar. Superior Court of Justice
GREFFIER

REGISTRAR



THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS $10$  DAY OF  NOV.  20 $08$
FAIT À TORONTO LE            JOUR DE
                                      Joanne Nicoara
REGISTRAR                   Registrar, Superior Court of Justice
                                      GREFFIER

## CLAIM

1. The Plaintiff claims as against each of the Defendants:

   a. A full accounting of all money and property of the Plaintiff;

   b. An order for the payment of all sums found to be due to the Plaintiff on the taking of the accounts above;

   c. A declaration that, in respect of all sums of the Plaintiff's money and property paid or delivered to the Defendants:

      (i) The Plaintiff is permitted to trace the money, property and/or proceeds thereof and any assets upon which the moneys of the Plaintiff have been expended into the hands of the Defendants or any of them; and,

      (ii) Such sums and/or any of the proceeds thereof and/or assets upon which the Plaintiff's money has been expended are the Plaintiff's property;

   d. An order to deliver up all sums, proceeds or assets traced or declared to be the property of the Plaintiff;

   e. A declaration that all assets held by the Defendants, their officers, servants or agents, representing or derived from money received from the Plaintiff are held on constructive trust for the Plaintiff and for an order that the Defendants deliver all such assets to the Plaintiff;

   f. Restitution to the Plaintiff of all moneys had and received by the defendants, their officers, servants or agents from the Plaintiff;

   g. Damages for conversion, breach of contract, copyright infringement, breach of confidence, intentional interference with economic rights, fraud and deceit, conspiracy to defraud, conspiracy to injure and breach of fiduciary duty, in the sum of that amount in Canadian currency sufficient to purchase the sum of

US$68,000,000 at a Bank listed in Schedule 1 to the Bank Act (Canada) at the close of business on the first day on which the bank quotes a Canadian dollar rate for the purchase of United States Dollars before the day payment of the obligation is received by the Plaintiff;

h.   A declaration that the defendant has infringed the plaintiff's copyright in the IMI Software, the IMI Websites, and the Winsinc Website as hereinafter defined;

i.   An accounting of the defendants' profits derived from any acts of copyright infringement;

j.   A permanent injunction restraining the defendant, any corporation in which it has an interest or which it controls, any affiliated corporations, and its and their shareholders, officers, directors, employees, agents, servants and assigns, any other person or entity acting on its or their behalf, and any person having knowledge of any injunction this Honourable Court may cause to be issued, from, directly or indirectly, having, making, using, copying, reproducing, transferring, selling or offering for sale any unauthorized copies of the IMI Software and Website Content or any infringing parts or copies thereof;

k.   An order requiring the defendant to deliver up to the plaintiff all infringing copies of the IMI Software, the IMI Websites, and the Winsinc Website, as hereinafter defined, in its possession, power or control, wherever located;

l.   Interest on all sums found to be payable;

m.   both pre and post judgment in accordance with the provisions of the Ontario *Courts of Justice Act*;

n.   punitive and exemplary damages in the amount of $5 million;

o.   Its costs of this action on a substantial indemnity basis;

p.   Such further and other relief as to this court seems just.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

DATED AT TORONTO THIS 10 DAY OF NOV. 20 08

REGISTRAR

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

FAIT À TORONTO LE JOUR DE

Joanne Nicoara
Registrar Superior Court of Jus
GREFFIER

### The Parties

2.  The Plaintiff, Innovative Marketing, Inc ("IMI") is a corporation incorporated pursuant to the laws of Belize and carries on business as a designer, developer, marketer and distributor of a variety of Internet-based products ("the IMI Products") through its wholly-owned websites (the "IMI Websites"). It also provides services to its customers in the form of technical and other support related to its products and has carried on this business since 2002. IMI has offices located in Ukraine, Argentina and India.

3.  The Defendant, Marc Gerard D'Souza ("Marc") is a Canadian citizen and a resident who, at all material times, was an employee of IMI, most recently holding the title of Director of Marketing, up until his resignation from that position on or about December 29, 2006. Together with Maurice D'Souza, Marc is the operating mind of all of the corporate defendants.

4.  The Defendant, Maurice D'Souza ("Maurice") is an Ontario citizen and resident and is Marc's father. Maurice has never been directly employed by IMI, nor is he a party to any agreement with IMI that would allow him to receive funds from it. Together with Marc, Maurice is the operating mind of all of the corporate defendants.

5.  The Defendant, Marina D'Souza ("Marina") is an Ontario citizen and resident and is the wife of Maurice and the mother of Marc. Marina has never been an employee of IMI, nor has she been party to any agreement with IMI that would allow her to receive funds from it. Marina is the sole director of the corporate defendant, Billingnow.com, Inc. and acted as and/or allowed her identity to be utilized by Marc and Maurice as a front for various of their activities outlined herein.

6.  ~~The Defendant, Conrad D'Souza ("Conrad") is an Ontario citizen and resident and is Marc's cousin. Up until December 31, 2006, Conrad was employed by IMI and held the position of sales manager.~~

7.  ~~The Defendant, Leonard D'Souza is a Canadian citizen and a non resident, residing in Dubai, United Arab Emirates and is Marc's cousin.~~

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE À TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS  10  DAY OF  NOV  20 08
FAIT À TORONTO LE           JOUR DE

Joanne Nicoara
Registrar, Superior Court of Justice

REGISTRAR                              GREFFIER

6. The Defendant, Elvira Martinez-Romero is a citizen and resident of The Republic of the Philippines and a director of the defendants WinGem, Inc. and Scorgem Pte Ltd.

7. The Defendant, BillingNow.com, Inc. is a corporation incorporated pursuant to the laws of Ontario.

8. The Defendants, WinPayment Consultancy SPN, ("WinPay"), Billing Solutions, SPC ("BillSol") and Reinsurance and Insurance Consulting House SPC ("RICH") are entities incorporated or otherwise registered pursuant to the laws of the Kingdom of Bahrain.

9. The Defendants, WinSecure Solutions, Pte, Ltd. ("WinSecure"), Bill Planet, Pte, Ltd. ("Bill Planet"), DSoft, Pte, Ltd. ("Dsoft"), GE Management, Pte, Ltd. ("GEM"), and Scorgem, Pte, Ltd ("Scorgem") are all corporations incorporated pursuant to the laws of the Republic of Singapore.

10. The Defendant, Web Integrated Net Solutions, Inc. ("Web Integrated") is a corporation incorporated pursuant to the laws of the British Virgin Islands.

11. WinGem, Inc. ("WinGem") is a corporation incorporated pursuant to the laws of the Philippines.

12. WinSolutions FZ – LLC. is a corporation incorporated pursuant to the laws of the United Arab Emirates.

13. Synergy, B.V. is a corporation incorporated pursuant to the laws of the Kingdom of the Netherlands.

14. All of the non-individual defendants are owned and/or controlled by Marc and Maurice and have been used by them to facilitate the activities described herein.

*Background*

15. In or about November, 2001 Daniel Sundin ("Sundin") founded a software business with operations in Kiev, Ukraine and Beunos Aires, Argentina. Shortly after establishing this

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

DATED AT TORONTO THIS 10 DAY OF
FAIT À TORONTO LE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVE DANS CE BUREAU

NOV- 20
JOUR DE Joanne Nicoara
Registrar, Superior Court of Justice
GREFFIER

REGISTRAR

business, Sundin was introduced to Sam Jain ("Jain"), an individual with extensive experience in Internet based sales and marketing initiatives.

16. In July, 2002 IMI was incorporated under the laws of Belize and was initially capitalized with funds contributed by Sundin who is the sole shareholder of IMI's shares. Jain also made his own substantial financial contribution to the company.

17. IMI primarily carries on the business of online sales of proprietary antivirus software, but also offers other software products to the public through a variety of websites. IMI's proprietary software is exclusively marketed through IMI-owned and maintained websites, including: WinAntivirus.com, WinAdBlocker.com, WinAntiSpy.com, WinContentFilter.com, WinDriveCleaner.com, MultimediaFixer.com, ComputerShield.com, BySmarter.com, PCSuperCharger.com, StopGuard.com and PopupGuard.com. IMI also owns and maintains other websites/domain names, which are not related to software sales.

18. In or about May, 2003, IMI 's Ukraine operations formally became a subsidiary office of IMI. IMI's facility in Ukraine provides technical support services in relation to the products offered through IMI's website. Due to the success of IMI's business, the number of people employed in its Ukraine operation has grown from approximately 70 employees in January 2004 to over 300 employees in 2006.

19. Similarly, IMI's gross sales revenues increased from approximately US$11 million in 2004 to approximately US$23 million in 2005 and US$53 million in 2006.

**Sundin's Management vision for IMI**

20. From IMI's inception until December, 2005, Sundin was acting in the role of the company's Chief Operating Officer and from that time until the present has been its Chief Technical Officer. While serving in both capacities, Sundin has been the chief designer of IMI's software products.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

DATED AT TORONTO THIS 10 DAY OF NOV. 20 08
FAIT À TORONTO LE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

JOUR DE

Joanne Nicoara
Registrar, Superior Court of Justice
REGISTRAR

Under Sundin's management and leadership, IMI also developed and implemented a growth strategy through which the company began to expand its product lines and marketing opportunities, thereby expanding IMI's customer base.

**The Agreement**

22. In or about July 2002, IMI hired Marc to perform certain marketing and other services for IMI in exchange for a salary tied directly to IMI's financial performance. Specifically, this arrangement allowed for Marc to be paid 1% of IMI's monthly profits for the first $200,000.00 in monthly profits, plus 20% of IMI's profits for every dollar earned over $200,000.00 per month in profit ("the Agreement").

23. At no time was Marc ever given a title that would suggest he had an ownership interest in IMI, nor was he ever identified by IMI or its principals as a partner or joint venturer in IMI's business. In any event, regardless of Marc's title or the nature of his relationship, at no time did IMI ever agree to amend the terms of the Agreement, particularly the remuneration he was to receive pursuant thereto.

24. Marc's duties as an employee of IMI included:

   (a) securing merchant accounts;

   (b) sourcing suppliers and vendors;

   (c) sales and marketing;

   (d) any and all other duties as required by IMI from time to time.

**Marc's Introduction of Maurice to IMI**

25. Shortly after Marc was hired by IMI, he suggested that IMI use his father's merchant banking relationships, which he represented would allow IMI to process payments by its customers more economically than its existing arrangement. Marc represented that

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

DATED AT TORONTO THIS 10 DAY OF NOV - 20 08
FAIT À TORONTO LE     JOUR DE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

Joanne Nicoara
Registrar, Superior Court of Justice
GREFFIER

REGISTRAR

Maurice's contacts and expertise could benefit IMI and more efficiently process IMI's increasing sales volume, thereby assisting IMI's cash flow management.

26. Marc represented to IMI that this proposed arrangement could provide processor and merchant bank services, including online bill and expense payment services for substantially less than IMI had been paying at that time.

27. Based on Marc's representations outlined above, IMI entrusted Marc to handle IMI's cash flow and authorized him to hire support staff to facilitate this arrangement on its behalf.

28. Based on Marc's representations outlined above, IMI authorised Marc and Maurice to set-up processing and merchant bank services on its behalf, with the first such relationship being established on or about June 29, 2002 with American Express, through a Dubai-based processor.

29. Based on Marc's representations outlined above, Marc was also made responsible for IMI's merchant accounting operations and revenue management services and reported directly to Jain in that respect. In addition, beginning in 2004 Marc was responsible for most of IMI's day-to-day accounting and cash management, including: maintaining IMI's financial network, management of IMI's billing, external financial reporting and cash management information systems and maintaining IMI's banking relationships.

30. IMI entrusted Marc to honestly and faithfully carry out his duties to the company, as is demonstrated by the high degree of control he was ultimately granted over the company's financial assets.

## DISCOVERY OF IRREGULARITIES

31. In or about late 2004, IMI's internal financial analyst, began requesting back-up materials from Marc for a full list of IMI's corporate accounts and credit card processing accounts. Marc deferred responding to these requests or actively concealed the true nature and content of the accounts from IMI's internal accounting personnel over an extended period of time.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

DATED AT TORONTO THIS 10 DAY OF NOV 2008
FAIT À TORONTO LE

LA PRESENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE À TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

Joanne Nicoara
Registrar, Superior Court of Justice
GREFFIER

REGISTRAR

Attachment C

From 2005 through to the middle of 2006, IMI's internal financial analyst began to retrieve information about the structure of the financial transactions handled by Marc and Maurice on behalf of IMI and to reconstruct the transactions.

33. IMI's inability to obtain a proper accounting from Marc regarding the elaborate financial structure and series of corporations that had been established for processing IMI's revenue became increasingly problematic through the latter half of 2006. It became apparent that IMI's financial resources had essentially been placed beyond its control by the series of transactions and entities created by Marc and Maurice. It also became clear that neither Marc nor Maurice were prepared to provide the transparency IMI sought and appropriate explanations for the nature of the structure they have created.

34. Finally, on or about December 29, 2006, without returning or accounting for IMI's assets, Marc terminated his relationship with IMI.

35. Marc advised IMI that he was purporting to unilaterally amend the Agreement and was demanding a larger share of IMI's profits. In other words, he sought to use the fact that he had gained control over the company's funds as leverage to achieve that goal.

36. Marc, acting in concert with Maurice, has converted the company's assets to their own use and in an effort to extort additional benefits from IMI have retained and hidden its funds through an elaborate network of accounts and corporations that had been established by him and Maurice.

37. Marc and Maurice hired a support team of approximately 30 employees, including Marina and other family members ~~such as Marina, Conrad, and Leonard~~. They have conspired with each other and other individuals to engage in a series of fraudulent activities designed and intended to ensure that Marc and Maurice would control the assets, revenues and business relationships pertaining to essential accounting and sales functions of IMI.

38. In furtherance of their scheme, Marc and Maurice, together with the other Defendants, conspired to perform a series of acts to the financial detriment of IMI, including but not limited to the following:

THIS IS TO CERTIFY THAT THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

J'ATTESTE PAR LA PRÉSENT QUE CE
DOCUMENT, DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS 10 DAY OF NOV. 20 08
FAIT A TORONTO LE            JOUR DE

Joanne Nicoara
Registrar, Superior Court of Justice
GREFFIER

REGISTRAR

*13*

a.   They submitted forged documents to bank officials, purporting to provide various authorisations on behalf of IMI.

b.   They obtained inaccurate or false invoices from third party vendors in order to justify payment of certain ordinary operating expenses as reimbursement to themselves. Marc and Maurice also arranged payments to one or more lawyers by directing IMI funds for legal services unrelated to IMI's business. Marc and Maurice also manipulated or falsified IMI's authorisation to create an appearance to banking authorities that secreted transactions were part of the company's business.

c.   They falsified records with the intent of avoiding and abrogating established IMI procedures and reporting requirements under laws regulating credit card sales transactions.

d.   They misrepresented the cost to IMI of the merchant accounts arranged by them. Marc and Maurice knew that their acts and omissions violated various banking regulations, however, they concealed various facts regarding the cost of credit card transactions from IMI's accounting staff and/or deceived company management into doing so on their behalf.

~~39.   On or about January 7, 2007, following the termination of Marc and Conrad's relationship with IMI, US$127,001.21 of IMI's funds was sent to a bank account in Dubai in the name of Leonard D'Souza. This is the same bank account where Conrad's D'Souza's compensation from IMI was typically sent. In or about January 2007, there was a further unauthorized payment of IMI's funds to Leonard D'Souza in the amount of US$82,000. It is not known whether either of these payments ended up in the hands of Leonard or Conrad, neither of whom were entitled to them, as they were not authorized by IMI.~~

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

DATED AT TORONTO THIS _10_ DAY OF ___NOV___ 20 _08_
FAIT À TORONTO LE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

JOUR Joanne Nicoara
Registrar, Superior Court of Justice
GREFFIER

REGISTRAR

### Copyright Claim

#### Software

39.　In May 2002, Sam Jain began to develop and author a suite of computer programs (the "IMI Software") on behalf of IMI. Since that time, the IMI Software has been further developed, modified, improved or maintained by Sam Jain, or other employees of IMI.

40.　The IMI Software and each of its component programs is an original literary work in which copyright subsists.

41.　IMI is the sole owner of all rights, title and interest, including copyright, in all versions of the IMI Software and in each of its component programs.

42.　The IMI Software includes, but is not limited to, key components such as the IMI Search Software, the IMI Analytics Software, the IMI Travel Software, and the IMI Billing Software. These and other components of the IMI Software generate HTML code or otherwise control the presentation of some of the IMI Websites, as well as performing a variety of other functions including processing online payments and/or collecting invaluable marketing data for the IMI Websites.

43.　The IMI Search Software runs on a number of the IMI Websites. When a user of the IMI Websites submits a search query, the IMI Search Software returns a list of results relevant to the user's query, featuring most prominently links to IMI advertisers who offer IMI the highest rate per click. The IMI Search Software also performs certain certain statistical collection functions.

44.　The IMI Analytics Software runs on IMI servers, including those associated with the domain reliablestats.com. The IMI Analytics Software performs a variety of statistical, collection and analytic functions, which are integral to IMI's business. These functions include collecting and analyzing statistical information relating to users and their interactions with the IMI Websites.

45.　The function of the IMI Billing Software is to efficiently and securely process credit card and other payments made via the Internet by users of the IMI Websites.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRESENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS _10_ DAY OF _NOVr_ 20_08_
FAIT À TORONTO LE     JOUR DE

Joanne Nicoara
Registrar, Superior Court of Justice
REGISTRAR

*Websites*

46. The IMI Websites include original design and layout elements, HTML and other code, and images, text and other content which IMI has developed and in which it holds copyright.

47. In or about July, 2002, IMI began to develop a new travel website project. IMI employees devoted extensive development efforts to the creation of a website interface (the "IMI Travel Website") and enabling software (the "IMI Travel Software") which allows users to search for and book flights, hotels, and rental cars. The IMI Travel Website consists of design and layout elements, HTML and other code, and images, text, and other content. IMI has at all material times retained copyright in the IMI Travel Software, and the IMI Travel Website design, code and content.

48. IMI identified nettravel.com as a domain on which it wished to launch the IMI Travel Website, and proceeded to purchase that domain for that purpose.

49. In or about November 2006 IMI employees installed, customized and configured the IMI Travel Software and the IMI Travel Website on IMI servers located at nettravel.com.

50. When Marc's employment with IMI was terminated, he directly or indirectly and without authorization or colour of right converted the nettravel.com domain to his own use. This was done with the knowledge, agreement, acquiescence and assistance of Maurice

51. At that time, Marc, without license, authorization or colour of right, copied or caused to be copied the nettravel.com source code, images, and content from IMI's servers, and placed unlicensed and unauthorized copies of same on servers under his control.

52. The defendants continue to operate nettravel.com, making use of unlicensed and unauthorized copies of the IMI Travel Software.

53. In or about March 2006, acting on behalf of IMI, IMI employees designed the website now located at winsinc.org (the "Winsinc Website"). The Winsinc Website consists of design and layout elements, HTML and other code, and images, text, and other content.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRESENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS 10 DAY OF NOV 20 08
FAIT À TORONTO LE   JOUR DE

Joanne Nicoara
Registrar, Superior Court of Justice
REGISTRAR

IMI has at all material times retained copyright in the Winsinc Website design, code and content.

54.   The IMI Software, the IMI Websites, and the Winsinc Website were created and developed in their entirety in countries which are signatory to the *Berne Convention for the Protection of Literary and Artistic Works* (the *"Berne Convention"*).

55.   By virtue of the *Berne Convention* and section 3(1) of the *Copyright Act*, IMI has the sole right to produce or reproduce the IMI Software, the IMI Websites, and the Winsinc Website, or any substantial part thereof, in any material form whatever, to communicate same to the public by telecommunication, and to authorize such acts.

56.   In or about September 2007, IMI learned that Marc, had made or caused to be made, copies of the IMI Software, the IMI Websites, and the Winsinc Website or substantial parts thereof on many of the defendants' websites, including the defendants' websites associated with the domains acetopsearch.com, searchcreature.com, searcherplus.com, searcheningineuk.com, searchci.com, adonsearch.com, searchoneclick.com, searchologic.com, 1searchweb.com, addasearch.com, searchmeetingplace.com, searchsuperb.com, nettravel.com, ebillsecure.com, searcherbee.com, paybillpro.com and eyestats.com.

57.   Specifically, such instances of unlicensed and unauthorized copying of the IMI Software, the IMI Websites, and the Winsinc Website include the use of infringing copies of the proprietary IMI Search Software on the defendants' websites associated with the domains acetopsearch.com, searchcreature.com, searcherplus.com, searcheningineuk.com, searchci.com, adonsearch.com, searchoneclick.com, searchologic.com, 1searchweb.com, addasearch.com, searchmeetingplace.com, searchsuperb.com, and searcherbee.com.

58.   Further, IMI has learned that Marc has directly or indirectly copied the IMI Analytics Software, and that he caused an unlicensed and unauthorized copy of the IMI Analytics Software to be installed and used on the defendants' website associated with the domain eyestats.com.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE À TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS 10 DAY OF NOV. 20 08
FAIT À TORONTO LE          JOUR DE

Joanne Nicoara
Registrar Superior Court of Justice
REGISTRAR          GREFFIER

1. IMI has also learned that the defendants have copied the IMI Billing Software, and that Marc has caused unlicensed and unauthorized copies of the IMI Billing Software to be installed and used on the defendant's servers, including those located at paybillpro.com and ebillsecure.com. The defendants have configured these infringing copies of the IMI Billing Software to process payments on the websites owned by the defendants' and their affiliates, including those websites associated with the domains bestglobaltv.com, traininghill.com, freepctvdownloads.com, errorkiller.com, and macrovirus.com.

60. Also in or about September 2007, IMI learned that Marc had made, or caused to be made, copies of the Website Content on many of the defendants' websites. One example of such copying is the defendants' website associated with the domain searcherbee.com, which reproduces substantial parts of IMI's easybestdeals.com website, including but not limited to reproductions of link lists, website structure and substantial blocks of text, including IMI's privacy policy.

61. During his employment with IMI, Marc had access to the IMI Software and its source code. The Website Content can be accessed by any person who visits the IMI Websites.

62. When Marc's employment with IMI was terminated, he retained control over the Winsinc Website. Without license or authority or colour of right, Marc continues to publish on the Winsinc Website the website design, code and content which was authored by, and has always been owned by IMI.

63. The defendants' websites are hosted on servers located in Canada and elsewhere. Through these websites, the defendants are targeting and making sales to Canadians and others.

64. All copies of the IMI Software, the IMI Websites, and the Winsinc Website in the defendants' possession or control are unlicensed and unauthorized. By virtue of the *Berne Convention* and sections 3(1) and 27(1) of the *Copyright Act*, these copies in and of themselves, and their communication to the public by telecommunication constitute an infringement of IMI's copyright therein.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS 10 DAY OF NOV - 20 08
FAIT À TORONTO LE                    JOUR DE Joanne Nicoara
                                     Registrar, Superior Court of Justice

REGISTRAR                            GREFFIER

The defendants' infringing activities have caused, and will continue to cause IMI significant damages, including, but not limited to lost profits and lost control over its intellectual property.

66. All instances of copyright infringement described herein as undertaken directly or indirectly by Marc, were so undertaken with the knowledge, agreement, acquiescence and assistance of Maurice.

67. The defendants knew of IMI's rights when they undertook the activities herein described. Nonetheless, they undertook these activities with a view to obtaining an unfair competitive advantage, in flagrant disregard of IMI's rights. In the circumstances, an award of punitive or exemplary damages is appropriate.

68. By reason of their activities as noted above, Marc and Maurice have breached their fiduciary duties to the plaintiff by taking for themselves the assets of the plaintiff and by furthering their interests over those of the plaintiff.

69. IMI pleads that, at all material times, Marc and Maurice were acting as agents for each other and the various corporate Defendants.

70. To the extent that the plaintiff's property, money and assets have been used by the defendants to purchase other assets and property, the plaintiff claims a tracing into those property, money and assets and a constructive trust over them in its favour.

71. The plaintiff has suffered damages at least equal to the amounts which have been withheld by the defendants from it and claims damages and restitution for that amount.

72. The conduct of the defendants in these circumstances is reprehensible and deserving of an award of punitive and exemplary damages.

73. The plaintiff relies on the provision of rule 17.02(g),(i)(o) with respect to the service of this originating process outside Ontario.

THIS IS TO CERTIFY THAT THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE
DOCUMENT, DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS  10  DAY OF    NOV -  20 08
FAIT À TORONTO LE        JOUR DE
                              Joanne Nicoara
                     Registrar, Superior Court of Justice
REGISTRAR                              GREFFIER

ιe plaintiff proposes this action be tried at Toronto.

February 19, 2007 - el
~~February 19, 2007   November 22, 2007~~

**BAKER McKENZIE LLP**
Barristers & Solicitors
181 Bay Street, Suite 2100
P.O. Box 874
Toronto, Ontario    M5J 2T3

Matthew J. Latella (39140R)
matthew.j.latella@bakernet.com
Tel : (416) 865-6985
J. Brian Casey (15895A)
j.brian.casey@bakernet.com
Tel:  (416) 865-6979
Brad Procter (796900)
brad.procter@bakernet.com
Tel:  (416) 865-2310
Fax: (416) 863-6275
Solicitor for the Plaintiff

TORDMS-1290SR-v1-Statement_of_claim_(IMI).DOC

THIS IS TO CERTIFY THAT THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE
DOCUMENT, DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS  10  DAY OF  NOV  20 08
FAIT À TORONTO LE        JOUR DE
                Joanne Nicoara
        Registrar, Superior Court of Justice
REGISTRAR                        GREFFIER

INNOVATIVE MARKETING, INC.
Plaintiff

-and-

MARC GERARD D'SOUZA ET AL.
Defendants

Court File No. 07-CV-327940 PD3

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**

PROCEEDING COMMENCED AT
TORONTO

**AMENDED STATEMENT OF CLAIM**

**BAKER & MCKENZIE LLP**
Barristers & Solicitors
181 Bay Street
Suite 2100, P.O. Box 874
Toronto, Ontario
M5J 2T3

Matthew J. Latella (39140R)
matthew.j.latella@bakernet.com
Tel.: (416) 865-6985
Fax: (416) 863-6275

Solicitor for the Plaintiff

Attachment C



Canada                        )
Province of Ontario           )
City of Toronto               )    SS:   *CERTIFICATE OF AUTHENTICATION*
Consulate General of the )
United States of America )


I, the undersigned,

### Molly P. Flores,

Vice Consul of the United States of America at Toronto,
Ontario, Canada, duly commissioned and qualified do hereby
certify that

### ---Sheila Tracey---

whose (fascimile) (true) signature and seal are, respectively,
subscribed and affixed to the annexed document was, at the
time of (attaching) (subscribing) the same

### Recording Officer Secretary of the Management Board of Cabinet, Province of Ontario, Canada

to whose official acts faith and credit are due.  For the
contents of the annexed document, I assume no responsibility.

IN WITNESS WHEREOF I have hereunto set my hand and
affixed the seal of the Consulate General of the United States
of America at Toronto, Ontario, Canada
this,  **22th** day of   **November,  2008.**


(SEAL)

**Molly P. Flores**
**Vice Consul of the United**
**States of America**



Ontario

**MINISTRY OF GOVERNMENT SERVICES**

I HEREBY CERTIFY AS FOLLOWS:

## NIGEL PHILIP WATSON

of the Province of Ontario, whose name is subscribed to the attached Instrument, was, at the time of subscribing thereto, a **NOTARY PUBLIC** in and for the Province of Ontario, Canada, duly commissioned and duly authorized by the laws thereof to administer oaths, to take affidavits and to certify the proof of deeds and other instruments in writing to be recorded within the said Province;

I FURTHER CERTIFY THAT I have compared the signature of the said **NOTARY PUBLIC** subscribed to the attached Instrument with the specimen signature of the said **NOTARY PUBLIC** filed in this office and verily believe the said signature to be genuine; and THAT I have compared the impression of the Seal of the said **NOTARY PUBLIC** appearing on the attached Instrument with the specimen of the Seal filed in this office and verily believe the impression of the Seal to be genuine.



IN TESTIMONY WHEREOF I have hereunto set my Hand and affixed the Seal of the Ministry of Government Services of the Province of Ontario at the City of Toronto in the said Province this twenty-first day of November, A.D. 2008.

*Sheila Tracey*

for the MINISTER OF GOVERNMENT SERVICES

CANADA                    )          **TO ALL WHOM THESE PRESENTS**
**PROVINCE OF ONTARIO** )          **MAY COME, BE SEEN OR KNOWN**

**I, NIGEL PHILIP WATSON, a Notary Public, in and for the Province of Ontario, by Royal Authority duly appointed, residing at the City of Toronto in said Province,**

**Do Certify and Attest** that to the best of my knowledge the paper-writing(s) hereto annexed is(are) a true copy of a document produced and shown to me

**In Testimony Whereof** I have hereto subscribed my name and affixed my Notarial Seal of Office at the City of Toronto, in the Province of Ontario

this 21 day of November, 2008

NIGEL PHILIP WATSON

A Notary Public in and for the Province of Ontario



PRÉSENT ATTEST QUE CE
DES PAGES EST REVÊTU DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVE DANS CE BUREAU

FAIT À TORONTO LE _____ JOUR DE
ED AT TORONTO THIS 10 DAY OF NOVEMBER 20 08

Court File No. 08-CL-7352

Joanne Nicoara

Registrar, Superior Court of Justice

REGISTRAR

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE

B E T W E E N :

INNOVATIVE MARKETING, INC.

Plaintiff

- and -

MARC GERARD D'SOUZA, MAURICE D'SOUZA, MARINA D'SOUZA,
ELVIRA MARTINEZ-ROMERO, CONRAD D'SOUZA, LEONARD D'SOUZA
WINPAYMENT CONSULTANCY SPC,
WEB INTEGRATED NET SOLUTIONS, INC., BILLINGNOW.COM, INC.
BILLING SOLUTIONS, SPC, WINSOLUTIONS, FZ-LLC,
REINSURANCE AND INSURANCE CONSULTING HOUSE, SPC, SYNERGY, B.V.,
WINGEM, INC., WINSECURE SOLUTIONS, PTE, LTD., BILLPLANET, PTE, LTD.,
DSOFT, PTE, LTD., GE MANAGEMENT, PTE, LTD., and SCORGEM, PTE, LTD.

Defendants

AND B E T W E E N :

MARC GERARD D'SOUZA

Plaintiff by Counterclaim

- and -

INNOVATIVE MARKETING, INC., SAM JAIN, GITO INC., PRO MOTION
MANAGEMENT CONSULTANTS INC., SHIFTING CURRENTS FINANCIAL INC.,
FLYBY SOLUÇAO INFORMATICA LTD., SOCIÉTÉ FINANCIERA VOLTURNO SA,
CONTINENTAL MOONBELL, OLD MOON FOUNDATION, DANIEL SUNDIN,
VANTAGE SOFTWARE INC., B.K. GROUP B.V., WINSOFTWARE and SUNWELL INC.

Defendants to the Counterclaim

### FURTHER FRESH AS AMENDED STATEMENT OF DEFENCE AND
### COUNTERCLAIM OF THE DEFENDANT MARC GERARD D'SOUZA

TO THE DEFENDANTS TO THE COUNTERCLAIM

A LEGAL PROCEEDING has been commenced against you by way of a
counterclaim in an action in this court. The claim made against you is set out in the following
pages.

IF YOU WISH TO DEFEND THIS COUNTERCLAIM, you or an Ontario lawyer acting for you must prepare a defence to counterclaim in Form 27C prescribed by the Rules of Civil Procedure, serve it on the plaintiff by counterclaim's lawyer or, where the plaintiff by counterclaim does not have a lawyer, serve it on the plaintiff by counterclaim, and file it, with proof of service, in this court, WITHIN TWENTY DAYS after this statement of defence and counterclaim is served on you.

If you are not already a party to the main action and you are served in another province or territory of Canada or in the United States of America, the period for serving and filing your defence is forty days. If you are served outside Canada and the United States of America, the period is sixty days.

If you are not already a party to the main action, instead of serving and filing a defence to counterclaim, you may serve and file a notice of intent to defend in Form 18B prescribed by the Rules of Civil Procedure. This will entitle you to ten more days within which to serve and file your defence to counterclaim.

IF YOU FAIL TO DEFEND THIS COUNTERCLAIM, JUDGMENT MAY BE GIVEN AGAINST YOU IN YOUR ABSENCE AND WITHOUT FURTHER NOTICE TO YOU. IF YOU WISH TO DEFEND THIS PROCEEDING BUT ARE UNABLE TO PAY LEGAL FEES, LEGAL AID MAY BE AVAILABLE TO YOU BY CONTACTING A LOCAL LEGAL AID OFFICE.

Date   ~~January 28, 2008~~   Feb 1 2008

Issued by _____
                          Local registrar

Address of    393 University Avenue
court office   10th Floor
                    Toronto, Ontario M5G 1E6

TO:      SAM JAIN
            c/o Baker McKenzie LLP
            Barristers and Solicitors
            181 Bay Street, Suite 2100
            Toronto, ON M5J 1T3

AND TO:   DANIEL SUNDIN
                c/o Baker McKenzie LLP
                Barristers and Solicitors
                181 Bay Street, Suite 2100
                Toronto, ON M5J 1T3

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS 10 DAY OF NOV 2008
FAIT À TORONTO LE                    JOUR DE

Joanne Nicoara
Registrar, Superior Court of Justice
GREFFIER

REGISTRAR

3/

AND TO:    GITO INC.

AND TO:    PRO MOTION MANAGEMENT CONSULTANTS INC.

AND TO:    SHIFTING CURRENTS FINANCIAL INC.

AND TO:    FLYBY SOLUÇAO INFORMATICA LTD.

AND TO:    SOCIÉTÉ FINANCIERA VOLTURNO SA

AND TO:    CONTINENTAL MOONBELL

AND TO:    OLD MOON FOUNDATION

AND TO:    VANTAGE SOFTWARE INC.

AND TO:    B.K. GROUP B.V.

AND TO:    WINSOFTWARE

AND TO:    SUNWELL INC.

AND TO:    BAKER McKENZIE LLP
           Barristers and Solicitors
           181 Bay Street, Suite 2100
           P.O. Box 874
           Toronto, Ontario
           M5J 2T3

           J. Brian Casey
           Matthew J. Latella
           Tel: (416) 865-6985
           Fax: (416) 863-6275

           Solicitors for the Plaintiff

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS 10 DAY OF NOV. 20 08
FAIT À TORONTO LE         JOUR DE

Joanne Nicoara
Registrar, Superior Court of Justice
REGISTRAR

AND TO:    MILLER THOMSON LLP
           Barristers and Solicitors
           40 King Street West, Suite 5800
           P.O. Box 1011
           Toronto, Ontario
           M5H 3S1

           Robert L. Falby
           Elizabeth Ackman
           Tel: (416) 595-8173
           Fax: (416) 595-8695

           Solicitors for the Defendants, Maurice D'Souza, Marina D'Souza, Web
           Integrated Net Solutions, Inc., Winpayment Consultancy SPC,
           Billingnow.com, Inc., Billing Solutions, SPC, Winsolutions, FZ-LLC,
           Reinsurance and Insurance Consulting House, Synergy, B.V., Wingem,
           Inc., Winsecure Solutions, PTE, Ltd., Billplanet, PTE, Ltd., Dsoft, PTE,
           Ltd., GE Management, PTE, Ltd., and Scorgem, PTE, Ltd.

THIS IS TO CERTIFY THAT THIS          LA PRÉSENT ATTEST QUE CE
DOCUMENT, EACH PAGE OF                DOCUMENT, DONT CHACUNE
WHICH IS STAMPED WITH THE             DES PAGES EST REVÊTUE DU
SEAL OF THE SUPERIOR COURT            SCEAU DE LA COUR SUPÉRIEURE
OF JUSTICE AT TORONTO, IS A           DE JUSTICE A TORONTO, EST UNE
TRUE COPY OF THE DOCUMENT             COPIE CONFORME DU DOCUMENT
ON FILE IN THIS OFFICE                CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS  10  DAY OF   NOV.    20 08
FAIT À TORONTO LE              JOUR DE
                              Joanne Nicoara
                              Registrar, Superior Court of Justice
REGISTRAR                           GREFFIER

## FURTHER FRESH AS AMENDED STATEMENT OF DEFENCE AND COUNTERCLAIM OF MARC GERARD D'SOUZA

1.    The defendant Marc Gerard D'Souza ("Marc") admits the allegations contained in paragraphs 6, 7, 8, 9, 10, 11, 12, and 13 of the Amended Statement of Claim.

2.    Marc denies the allegations contained in paragraphs 2, 3, 4, 5, 14, 17-31 and 33-69 of the Amended Statement of Claim and further denies that the plaintiff is entitled to the relief claimed in paragraphs 1, 70, 71, and 72.

3.    Marc has no knowledge with respect to the allegations set out in paragraphs 15, 16 and 32 of the Amended Statement of Claim.

### A.    Overview

4.    Paragraphs 5 to 23 of this Statement of Defence are a summary of Marc's defence. Particulars for each allegation are set out in greater detail thereafter.

### 1. Marc Was a Partner, Not an Employee

5.    Contrary to the allegations contained in the Amended Statement of Claim, Marc was never an employee of the plaintiff, Innovative Marketing Inc. ("IMI"). He was never paid remuneration by IMI. He never had an employment agreement with IMI. He has not infringed any copyright belonging to IMI.

6.    At all material times Marc was a partner of Sam Jain ("Jain") and Daniel Sundin ("Sundin"). Jointly the three partners were engaged in a series of highly profitable Internet business ventures. These ventures relied on convoluted, complex, and opaque business structures designed to confuse customers and regulators as to the identity of the true owners and operators of these ventures and to minimize tax liability for the principals. The partners and the corporations under their control relied on few or no written documents to record the partnership's activities; revenues earned by the ventures ended up in different corporate accounts; the partners had no formal, written partnership agreement and deliberately sought not to keep formal records of the partnership's activities.

THIS IS TO CERTIFY THAT THIS
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS  10  DAY OF   NOV   20 03
FAIT À TORONTO LE            JOUR DE
                            Joanne Nicoara
                    Registrar. Superior Court of Justice
REGISTRAR                              GREFFIER

7.      The allegation that Marc was an employee of IMI is a creation of the plaintiff. Not only is the allegation untrue, it fails to explain how Marc came to be in control of net earnings alleged to be US$48 million. While Marc disputes the amount of the net earnings, he admits that in February 2007 as a partner he was in control of approximately US$39 million of such earnings.

8.      Contrary to the allegations in the Amended Statement of Claim, IMI was not the owner of the ventures or of any intellectual property related to the ventures. It was merely one of many corporate and unincorporated entities that contributed technical and support services to the partnership. Marc, Jain, and Sundin each exercised independent control of numerous corporations and unincorporated entities that made contributions of technical, support, financial and marketing services.

9.      Marc and Jain (and to a lesser extent, Sundin) exercised joint control and management of the partnership. They had equal access to information about the partnership's business activities and exercised joint control over those activities. Marc, Jain and Sundin each contributed capital, resources, "sweat" equity and business relationships to the partnership; the contributions from each of the partners are what made the partnership a profitable enterprise.

10.     In the alternative, Marc claims that he, Jain, and Sundin were engaged in a joint venture because they each:

        (a)     contributed capital, property, skills and knowledge to the common undertaking;

        (b)     had a joint interest in the subject matter of the venture;

        (c)     had mutual control and management of the venture;

        (d)     expected to share in the profits earned by the venture.

11.     For the purposes of this pleading, the entire business structure, which consisted of incorporated and unincorporated entities (enumerated in which is stamped with the be

I HEREBY CERTIFY THIS TO BE A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE
DOCUMENT. EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

JE CERTIFIE QUE LE PRÉSENT DOCUMENT EST UNE COPIE CONFORME DU DOCUMENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS 10 DAY OF NOV. 20 08
FAIT À TORONTO LE JOUR DE

Joanne Nicoara
Registrar  Superior Court of Justice
REGISTRAR                    GREFFIER

"Business". Throughout this pleading, the Business is intended to refer to the partnership, or in the alternative to the joint venture, that existed between Marc, Jain and Sundin.

### 2. *Marc's Entitlement to a Share of the Profits*

12.    Marc's entitlement to a share of the Business's profits changed from time to time. When the Business first commenced in January 2002, Marc was a law student. Sundin was not yet involved in the Business. To reflect the fact that Marc would be unable to make an equal contribution of time to the Business while he was in law school and to take into account Jain's initial investments, Marc and Jain agreed in July 2002 to a compensation formula that would distribute a greater proportion of the Business's profits to Jain (the "Interim Agreement"). An implied term of the Interim Agreement was that this formula was only operative while Marc was a law student, and that the partners would revert to an equal split of the Business's profits once Marc was no longer a student and was able to become more involved in the Business.

13.    Sundin was not a party to the Interim Agreement because he was not involved in the Business when the Interim Agreement was entered into. Sundin did not join the Business until October 2002, three months after Marc and Jain negotiated the Interim Agreement. When Sundin joined the Business, Marc and Jain did not finalize the terms of Sundin's entitlement to a share of the profits. Later, in April 2006, when Sundin's active role in the Business had ended, Marc and Jain jointly agreed to pay Sundin no more than US$4,000,000 for his partnership interest.

14.    As of January 2004, a date that was earlier than the partners anticipated in July 2002, Marc's involvement in the Business increased while Jain's diminished. At this point, the Interim Agreement was implicitly terminated and Marc and Jain were each entitled to an equal share of the Business profits, subject to buying out Sundin's interest.

### 3. *The Business's Activities*

15.    The Business was engaged in a series of disparate business to consumer Internet commerce ventures which were highly profitable, but which required an opaque business organization so as to avoid problems with regulatory authorities and disgruntled customers.

THIS IS TO CERTIFY THAT THIS    LA PRESENT ATTEST QUE CE
DOCUMENT, EACH PAGE OF    DOCUMENT, DONT CHACUNE
WHICH IS SEALED WITH THE    DES PAGES EST REVETUE DU
SEAL OF THE SUPERIOR COURT    SCEAU DE LA COUR SUPÉRIEURE
OF JUSTICE AT TORONTO, IS A    DE JUSTICE A TORONTO, EST UNE
TRUE COPY OF THE ORIGINAL DOCUMENT
ON FILE IN THIS OFFICE    CONSERVE DANS CE BUREAU

DATED AT TORONTO THIS _10_ DAY OF __NOV__ 20 08
FAIT À TORONTO LE    Joseanne Nicoara

Registrar, Superior Court of Justice

REGISTRAR    GREFFIER

3c

These ventures consisted of websites selling third-party and "in-house" computer security software, travel websites, career websites, pornography websites, music websites, immigration websites, finance websites, pharmaceutical websites and self-help websites. Each partner made a different contribution to each venture.

16.     The authoring of the computer software for each venture, including but not limited to the web design, web content, and support software, was performed by third party programmers. Whenever IMI was employed as the third party programmer, it was compensated for its services and the intellectual property associated with the venture belonged to the Business.

17.     For every venture described above, revenues came from credit card payments, which required merchant account processing facilities in order to transfer payments from a customer's credit card account to the Business's accounts. At first Jain provided the merchant account processing facilities, but later they were provided by Marc and his father Maurice D'Souza, with the express consent of Jain and Sundin.

18.     By establishing and managing most of the merchant account processing facilities, Marc had de facto control over most of the Business's funds. Contrary to the Amended Statement of Claim, this control was not a result of any wrongdoing by Marc but because he was the partner in charge of controlling the Business's finances in order to minimize tax and legal liabilities for the Business.

19.     The Business also relied on third-party contractors to provide the technical work required to support these websites. Each of the partners brought to the Business their relationships with these contractors and/or managed these relationships to ensure that the websites were profitable.

### 4. Marc's Departure from the Business

20.     Commencing in September 2006, Marc and Jain began to disagree over the appropriate split of the Business's profits. In an attempt to placate Jain and to maintain cordiality, in November 2006 Marc transferred $5 million to Jain. On the same instruction, Jain transferred the funds to BK Group, a corporation owned by Sundin and Jain.

THIS IS TO CERTIFY THAT THIS
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE
DOCUMENT DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE À TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVE DANS CE BUREAU

DATED AT TORONTO THIS _10_ DAY OF _NOV_ 20_08_
FAIT À TORONTO LE             JOUR DE

Joanne Nicoara

Registrar Superior Court of Justice

REGISTRAR                     GREFFIER

Attachment D

know that BK Group was owned by Sundin and believed that he had transferred the funds to Jain.

21.     Following this first transfer, negotiations over the division of profits completely broke down. Marc refused to carry out further transfers. As a result, Jain and Sundin took control of the Business's various ventures and established new merchant account processing facilities, and eventually took control of all of the Business's assets other than the funds remaining in the merchant account processing facilities still under Marc's control.

22.     In December 2006, Marc notified Jain that he was leaving the Business effective December 31, 2006. Because there was no formal organization for the Business, this notice was written as a "Notice of Termination of the Joint Venture".

23.     Marc is entitled to his fair share of the Business's profits, consisting of the compensation still owed to him under the terms of the Interim Agreement and a share of the profits equal to Jain's from January 2004 to December 2006.

## B.     The Parties

### 1.  Innovative Marketing Inc. and its Subsidiaries

24.     The Plaintiff, IMI, is a corporation incorporated pursuant to the laws of Belize.

25.     IMI has two known subsidiary corporations: Innovative Marketing Ukraine ("IMU") and Stellarc. IMU is incorporated pursuant to the laws of the Ukraine and operates a website development and support centre in the Ukraine. Stellarc is incorporated pursuant to the laws of Argentina and also operates a development and support centre for IMI. These development and support centres formed part of the Business.

26.     IMI is directly or indirectly controlled by Sundin.

### 2.  Marc Gerard D'Souza

27.     The Defendant, Marc, is a Canadian citizen and a resident of the Kingdom of Bahrain. Marc has been a partner in the Business since January 2004.

THIS IS TO CERTIFY THAT CE DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

JE CERTIFIE PAR LES PRÉSENTES QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPERIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS  10  DAY OF   NOV  20 08
FAIT À TORONTO LE          JOUR DE
                                    Joanne Nicoara
                          Registrar  Superior Court of Justice
REGISTRAR                                    GREFFIER

31, 2006, he contributed his services, capital, and expertise to the development and success of the Business.

### 3. The Other Defendants

28.     The defendant Maurice D'Souza ("Maurice") is a Canadian citizen and is Marc's father. As will be set out subsequently in this pleading, Maurice personally and through a number of corporations controlled by him, provided financial services to the Business and ensured its survival. Maurice provided the assistance personally or through the defendant corporations other than Billingnow.com, Inc., which is owned by the defendant, Marina D'Souza, and Synergy B.V., which is owned by Marc.

29.     The defendant, Marina D'Souza ("Marina") is a Canadian citizen and a resident of Ontario. Marina is the wife of Maurice and the mother of Marc. Marina resides in Thornhill, Ontario and is employed as a schoolteacher. Marina's only involvement with the Business is through her position as the sole director of the corporate defendant, Billingnow.com, Inc., an entity used by the Business to process merchant account transactions and through which the Business made payments to suppliers.

30.     The defendant Elivira Martinez-Romero is a citizen and resident of the Philippines and a director of the corporate defendants WinGem, Inc. ("Wingem") and Scorgem PTE Ltd. ("Scorgem").

31.     The defendant BillingNow.com, Inc. ("Billingnow") is a corporation incorporated pursuant to the laws of Ontario. Marina is the sole shareholder and director of Billingnow. Between December 2003 and June 2004, Billingnow provided the Business with financial services, which consisted primarily of the use of its merchant account processing facilities and bank relations.

32.     The defendants Winpayment Consultancy SPC ("Winpay"), Billing Solutions, SPC, Winsolutions, FZ-LLC, Reinsurance and Insurance Consulting House SPC, Wingem, Billplanet, PTE, Ltd., Dsoft PTE, Ltd., GE Management, PTE, Ltd. and Scorgem are all owned or controlled by Maurice D'Souza.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

NOUS CERTIFIONS QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE À TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS ___10___ DAY OF ___NOV___ 20_08_
FAIT À TORONTO LE                    JOUR DE

Anne Nicoara
the Court of Justice
REGISTRAR                                GREFFIER

33.     The defendant Winsecure Solutions PTE, Ltd. is a company owned by Marc and Maurice.

34.     The defendant Web Integrated Net Solutions Inc. ("WINS") is a corporation incorporated pursuant to the laws of the British Virgin Islands. WINS is controlled by Marc and Maurice. WINS was incorporated in 2000, prior to the Marc's involvement with the Business. Since January 1, 2007, Marc has used WINS as a corporate vehicle for his new e-commerce business.

35.     The defendant Synergy, B.V. ("Synergy") is a corporation incorporated pursuant to the laws of the Netherlands. Marc is the sole shareholder and director of Synergy.

**C.      Jain, Sundin, and their Related Corporations**

### 1. Sam Jain and Related Corporations and Entities

36.     Jain is an American citizen who has been a resident of Brazil until at least the end of 2006.

37.     Jain is the owner and/or principal of the following corporations and entities that are or were used in the Business:

  (a)    Gito Inc. ("Gito"), a corporation incorporated pursuant to the laws of Anguilla, British West Indies;

  (b)    Pro Motion Management Consultants Inc. ("PMMCI"), a corporation incorporated pursuant to the laws of the State of Nevada in the United States of America. PMMCI also operates under the trade name "Shopenter";

  (c)    Shifting Currents Financial Inc. ("Shifting Currents"), a corporation incorporated governed by the laws of the state of Nevada in the United States America;

  (d)    Flyby Soluçao Informatica Ltd. ("Flyby"), a corporation incorporated by the laws of Brazil;

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVETUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST LXE COPIE CONFORME DU DOCUMENT CONSERVE DANS CE BUREAU

DATED AT TORONTO THIS 10 DAY OF NOV 20 08
FAIT À TORONTO LE                JOUR DE

Joanne Nicoara
Registrar, Superior Court of Justice
GREFFIER

REGISTRAR

 (e) Société Financiera Volturno S.A., a corporation incorporated pursuant to the laws of Uruguay;

 (f) Continental Moonbell, a foundation governed by the laws of Panama;

 (g) Old Moon Foundation, a foundation governed by the laws of Panama;

 (h) Innovative Marketing Group, a corporation governed by the laws of Belize.

38. Since January 2002, Jain has used the following names in the course of his involvement with the Business:

 (a) Claudio Santos;

 (b) Dave Adams;

 (c) Wen Kai Sheng.

These pseudonyms were used to prevent third parties from learning his real name.

### 2. Daniel Sundin and Related Corporations

39. Sundin is a Swedish citizen who maintained residences at various times in the United Kingdom, the United States and Canada. At certain times described below, Sundin was a partner in the Business.

40. Sundin is a computer programmer who has experience developing software, adult websites and unsolicited e-mail marketing (known informally as "spam").

41. In addition to IMI and its subsidiaries, Sundin is the owner and/or principal of the following corporations and entities that are or were used in the Business:

 (a) Vantage Software Inc. ("Vantage"), a corporation incorporated pursuant to an unknown state in the United States of America. Vantage was used by the Business to process online cheque payments from consumers and to perform transactions using the "Discover" card.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS __10__ DAY OF __NOV__ 20 0 8
FAIT À TORONTO LE __JOUR DE__ Joanna Nicoara

Registrar, Superior Court of Justice
REGISTRAR     GREFFIER

(b)     B.K. Group B.V. ("BK Group"), a corporation incorporated pursuant to the laws of the Kingdom of the Netherlands.

(c)     Winsoftware, a corporation incorporated pursuant to the laws of the United Kingdom.

### 3. Sunwell Inc.

42.     Sunwell Inc. ("Sunwell") is a corporation incorporated pursuant to the laws of Latvia. Sunwell received funds from vendors who owed money to the Business. To date, it has not fully accounted for those funds to Marc.

### D.     Response to the Allegations in the Statement of Claim

### 1. Marc Was Not an Employee of Jain or IMI

43.     Marc denies every instance in the Amended Statement of Claim, including but not limited to paragraphs 3, 22, 23, 24, 25, 27, 28, 29, 30, 34 and 35, where the Plaintiff alleges or implies that Marc was an employee of IMI.

44.     Contrary to paragraph 3 of the Amended Statement of Claim, Marc was never an employee of IMI, nor did he ever represent himself as IMI's Director of Marketing.

45.     In January 2006, in a presentation to IMU, Marc referred to himself as the Marketing Director of the Business. In the same presentation, Sundin referred to himself as the Chief Operating Officer of the Business. These references were made for the purpose of explaining to IMU's employees how the principals of the Business divided up their responsibilities in relation to the Business and the offices of the Business.

46.     Marc was not an employee of IMI because he had no employment contract with IMI, he was never paid compensation by IMI, he never reported to anyone at IMI and because his role within the Business extended beyond any relationship with IMI. At all material times, Marc was a partner or joint venturer with Jain and Sundin in the Business, which was much larger in scope than the activities of IMI.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS  10  DAY OF  NOV  20
FAIT À TORONTO LE

Joanne Nicoara
Registrar Superior Court of Justice

REGISTRAR                                  GREFFIER

(a) Marc Never Entered Into an Employment Contract with IMI or Jain

47.     Contrary to paragraph 22 of the Amended Statement of Claim, Marc was not hired by IMI. Marc has never signed an employment contract with IMI, nor did he orally agree to become an employee of IMI. The compensation formula described in paragraph 22 of the Amended Statement of Claim was an agreement between Marc and Jain, as partners or joint venturers in the Business, and was a means of distributing the Business's profits during the time Marc was a law student. During the course of negotiating this formula (defined in paragraph 12 of these pleadings as the Interim Agreement), Jain never represented to Marc that he (Jain) was acting as an agent for IMI or that the Interim Agreement was anything other than an agreement between two partners personally.

48.     The Interim Agreement, which IMI correctly stated was negotiated in July 2002, was negotiated before Marc was introduced to Sundin or IMI. It is therefore impossible for Marc to have contracted with IMI, a Sundin-controlled company, as in July 2002 Marc had never heard of either Sundin or IMI.

49.     The Interim Agreement, which was not a formal written contract but a series of instant message communications between Marc and Jain, did not include a term whereby one party could assign the rights or responsibilities contained in the agreement to another party. If Jain has purported to assign the Interim Agreement to IMI, he did so without the knowledge or consent of Marc and such purported assignment is of no force and effect.

50.     Given that there was no employment agreement with IMI, IMI's allegation that it never agreed to amend the terms of the agreement is a nonsensical statement. Without an agreement, there was nothing to amend.

(b) Marc Never Received Compensation from IMI

51.     IMI never paid Marc any compensation.

(c) Marc Never Reported to Anyone at IMI

52.     Contrary to the allegations in paragraphs 28, 29 and 30 of the Amended Statement of Claim, Marc never sought nor required IMI's "authorization" with respect to any aspect in relation to the Business's activities. Nor did Marc "report directly" to anyone. Marc's sole communication with

I HEREBY CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRESENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES PORTE LE SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS  10  DAY OF  NOV  20 08
FAIT À TORONTO LE          JOUR DE

Joanne Nicoara
REGISTRAR                    Superior Court of Justice
                              GREFFIER

regarding the *Business's* merchant account operations and revenue management services were at all material times communications between *partners* or *joint venturers*.

53.    Any communications between Marc and employees of IMI were carried out as between a partner or joint venturer in the Business and between one of the entities that contributed to the Business's revenue-generating activities. No employee of IMI purported to give Marc "instructions" or "authorization" to carry out any activities; instead, Marc, in his capacity as one of the partners or joint venturers in the Business, would give instructions to IMI employees, and was referred to as a "stakeholder" in the Business by IMI's employees.

(d) Marc's Role Extended Beyond IMI

54.    The Business, as described in Part E below, involved more than just IMI. IMI was merely one corporation controlled by Sundin that performed Internet technical support and site and software development services for the Business. There were many corporations or third party contractors other than IMI, which made similar contributions of technical or other services to the Business. The material facts in relation to those services will be pleaded below.

55.    Since IMI was not in control of the business, nor was it the only corporation involved in the Business, the allegation in paragraph 23 of the Amended Statement of Claim that Marc was never identified by IMI or its principals as a partner in IMI's business is nonsensical, as the Business was much larger in scope than IMI. While Marc is claiming a beneficial interest in IMI's profits in the Counterclaim, he has not claimed and does not claim now to be a partner or joint venturer with IMI. Rather, Marc was a partner or joint venturer with Sundin, who directly or indirectly controls IMI.

### 2. *Marc Did Not Owe Any Duties to IMI, Fiduciary or Otherwise*

56.    Marc denies every instance in the Amended Statement of Claim, including but not limited to paragraphs 24, 30 and 68, where the Plaintiff alleges or implies that Marc owed any legal duties to IMI.

(a) Duties as an Employee

57.    In paragraphs 24 and 30 of the Amended Statement of Claim, IMI alleges that Marc owed it duties because he was its employee. Marc denies these allegations, pleaded above.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF DOCUMENT, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT

DATED AT TORONTO THIS   10  DAY OF   NOV.   20 08
FAIT À TORONTO LE                 JOUR DE

Joanne Nicoara
REGISTRAR          Registrar, Superior Court of Justice

Marc was never an employee of IMI and thus he never owed it any duties as an employee. Whatever interaction Marc had with IMI (which will be pleaded in more detail below) was as a partner or joint venturer in the Business, in which the principal of IMI (Sundin) was a fellow partner or joint venturer.

### (b) Fiduciary Duties

58.     Marc denies the allegation in paragraph 68 of the Amended Statement of Claim that he owed IMI a fiduciary duty.

59.     Marc was not a director or officer of IMI.

60.     Marc's role within the Business did not give him any discretion or power over the interests of IMI. To the extent that Marc controlled funds that were owed to IMI, the legal basis for those obligations was contractual, not fiduciary, in nature. The funds were owed under a series of express or implied contracts whereby IMI was entitled to be compensated for the services it provided to the Business. IMI is not and was never entitled to a share of the Business's profits.

61.     While Marc denies that he owed IMI a fiduciary duty, he admits that he, Jain and Sundin, as partners or joint venturers, were fiduciaries to each other. As the three principals of the Business, Marc, Jain and Sundin owed a duty to each other to manage the entities under their respective control in the best interests of the Business. However, principals who did not control a particular entity were not fiduciaries of that entity.

### 3. Marc Did Not Deceive IMI or Act Fraudulently

62.     Marc denies every instance in the Amended Statement of Claim, including but not limited to paragraphs 25, 26, 31, 33, 36, 37 and 38, where IMI alleges or implies that Marc made representations to IMI, made misrepresentations to IMI, deceived IMI or acted fraudulently with respect to IMI.

63.     The alleged representations in paragraphs 25 and 26 of the Amended Statement of Claim were never made to IMI. These representations were made to Jain and Sundin, and these were at all times Marc's partners or joint venturers in the Business. These

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE À TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS 10 DAY OF NOV. 20 08
FAIT À TORONTO LE      JOUR DE

Joanne Nicoara
Registrar, Superior court of Justice
REGISTRAR                GREFFIER

facts relating to Marc's control of most of the Business's merchant accounts will be set out below in Part E of these pleadings.

64.     Marc denies the allegations in paragraphs 31 and 33 of the Amended Statement of Claim that he concealed the true nature and content of IMI's credit card processing accounts, or that he did not provide them with a "proper accounting".

65.     Marc admits that starting in late 2004, an accountant employed by IMU regularly requested information from Marc in relation to bank accounts. However, contrary to the allegations in the Amended Statement of Claim, that information was not intended as an accounting to IMI, but to assist the accountant in his role of preparing monthly profit and loss statements for the Business. IMI was acting as a contractor by providing accounting services to the Business. In addition, contrary to the allegations in the Amended Statement of Claim, Marc provided complete answers to those requests in a timely fashion.

66.     Marc denies the allegation in paragraph 36 of the Amended Statement of Claim that he converted IMI's assets for his own use. The impugned funds were never IMI's assets. Marc does not control any assets belonging to IMI. He also denies any allegation that he attempted to "extort" additional benefits from IMI or that he "hid" any funds.

67.     The aggressive nature of the Business's marketing activities and the need to avoid regulatory oversight required a complex and opaque accounting structure. This structure was deliberately set up by Marc, Jain and Sundin to maximize the Business's profits. Jain and Sundin participated in the creation of this elaborate structure and at all times were aware that the Business was using an elaborate network of corporations and bank accounts in a number of different jurisdictions. This convoluted structure was deliberate and mutually agreed to by Jain, Sundin and Marc.

68.     Marc denies the allegations of fraud contained in paragraphs 37 and 38 of the Amended Statement of Claim. All transactions handled by Marc with respect to the Business's funds were expressly or implicitly agreed to by Jain and/or Sundin. Marc denies IMI's claim to any of these funds – the funds in the accounts controlled by Marc belonged to

THIS IS TO CERTIFY THAT THIS
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE
DOCUMENT, DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE À TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS  10  DAY OF  NOV  20 08
FAIT À TORONTO LE                JOUR DE

Joanne Nicoara
Registrar, Superior Court of Justice
REGISTRAR                          GREFFIER

Business, not to IMI. In response to the specific allegations in paragraph 38 of the Amended Statement of Claim:

(a)     Any documents submitted to bank officials on behalf of the Business were created by Marc, Jain and/or Sundin in order to further the interests of the Business and at all times, each of the principals approved of the other's conduct;

(b)     Marc denies submitting any invoices (false or otherwise) to IMI for approval. IMI was the not responsible for paying Marc's expenses – the Business was. Any invoices submitted to IMU (IMI's Ukraine subsidiary) were to assist IMU with its role as the contract accountant to the Business. All of Marc's claims for expenses were accurate and honest.

(c)     IMI's "procedures and reporting requirements" are immaterial to the merchant accounts. At all material times, any records created in relation to merchant account processing facilities were created with the express or implied consent of Jain and/or Sundin in order to further the interests of the Business.

(d)     Marc was under no obligation to represent the costs of merchant account processing facilities to IMI, nor did he make such representations to IMI. Therefore, there were no misrepresentations. Any alleged violations of bank regulations, which are not admitted to but are steadfastly denied, were made with the express or implied approval of Jain and/or Sundin in order to further the interests of the Business.

69.     To the extent that any alleged fraudulent conduct was carried out by Marc, which conduct is not admitted to but steadfastly denied, such conduct was carried out by all three of the partners in concert to further the interests of the Business. As previously alleged, Jain would use aliases to protect his true identity from third parties dealing with the Business. As Jain and Sundin were complicit in Marc's conduct; they were never deceived or defrauded by said conduct.

THIS IS TO CERTIFY THAT THIS          LA PRÉSENT ATTEST QUE CE
DOCUMENT, EACH PAGE OF              DOCUMENT, DONT CHACUNE
WHICH IS STAMPED WITH THE           DES PAGES EST REVÊTUE DU
SEAL OF THE SUPERIOR COURT         SCEAU DE LA COUR SUPÉRIEURE
OF JUSTICE AT TORONTO, IS A          DE JUSTICE A TORONTO, EST UNE
TRUE COPY OF THE DOCUMENT        COPIE CONFORME DU DOCUMENT
ON FILE IN THIS OFFICE                    CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS 10 DAY OF NOV 20
FAIT À TORONTO LE                    JOUR DE Joanne Nicoara
                                     Registrar, Superior Court of Justice

REGISTRAR                                      GREFFIER

### 4. *The Claim for Punitive Damages*

70.     Marc denies the allegation in paragraph 72 of the Amended Statement of Claim that he acted reprehensibly and that his actions deserve an award of punitive and exemplary damages.

71.     Marc denies that he deceived or acted fraudulently towards IMI.

72.     At all material times, Marc, Jain and Sundin communicated through informal channels such as instant messages and e-mails. There was little or no formal documentation to support major decisions made by the Business. The need for formal documentation was ignored by all of the partners.

73.     Marc's behaviour in this regard was no different from that of Jain and Sundin and in the circumstances is not reprehensible and deserving of an award of punitive and exemplary damages.

74.     In addition, each of Marc, Jain and Sundin treated the Business's revenues with little regard for the need to formally account for funds removed from Business accounts.

75.     At all material times when the parties were engaged in the Business, both Jain and Sundin treated Business funds held in accounts under their control as personal funds.

76.     In early 2004, Jain withdrew approximately US$5,000,000 from the treasury of the Business. Jain has failed to account to Marc for the funds he withdrew.

77.     Throughout 2005 and 2006, Jain transferred Business funds under his control to his personal control. The funds have been used to pay for Jain's personal legal fees, personal credit card expenses and other personal uses. To date, Jain has refused to account for these funds.

78.     In December 2006, at least US$3 million was paid into a merchant bank account or accounts controlled by Sundin and/or Jain. These funds are revenues from the Business's ventures. To date, Sundin and Jain have refused to account for the funds.

79.     The details of the personal withdrawals by Jain and Sundin are known to Jain and Sundin and to the other defendants by Counterclaim. A full and complete accounting is sought.

THIS IS TO CERTIFY THAT THIS        LA PRÉSENT ATTEST QUE CE
WHICH IS STAMPED WITH THE          DOCUMENT DONT CHACUNE
SEAL OF THE SUPERIOR COURT         DES PAGES EST REVÊTUE DU
TRUE COPY OF THE DOCUMENT          SCEAU DE LA COUR SUPÉRIEURE
ON FILE IN THIS OFFICE             DE JUSTICE À TORONTO, EST UNE
                                   COPIE CONFORME DU DOCUMENT
                                   CONSERVÉ DANS CE BUREAU
DATED AT TORONTO THIS ___10___ DAY OF ___NOV___ 20_08_
FAIT À TORONTO LE              JOUR DE  Joanne Nicoara
                                       Registrar, Superior Court of Justice
REGISTRAR                              GREFFIER

the Business and the ultimate distribution of these profits is needed to establish exactly how much Jain and Sundin removed from the Business.

### 5. *Marc Has Not Infringed Any Copyright Belonging to IMI*

80.   Marc denies the allegations contained in paragraphs 39-67 of the Amended Statement of Claim(the "Copyright Claim").

(a) Software

81.   IMI does not own the copyright to the software programs which it claims Marc has copied without its authorization. The term "IMI Software" is inaccurate; there was no such suite of software.

82.   In response to paragraph 39 of the Amended Statement of Claim, Marc denies that Jain developed or authored any computer software on behalf of IMI.

83.   In May 2002, Jain and Marc had already become partners in the Business. Any software program that Jain claims to have authored or developed, which is not admitted to but steadfastly denied, between January 1, 2002, and December 31, 2006, rightfully belongs to the Business and not to any other party.

84.   In response to paragraph 40 of the Amended Statement of Claim, the suite of software programs over which IMI claims copyright consists of a mixture of original and unoriginal literary works. The unoriginal works consisted of software developed by third parties that was licensed to the Business. The original works were developed by third parties on behalf of the Business.

85.   In both instances, contrary to the allegation in paragraph 41 of the Amended Statement of Claim, IMI did not own any rights to the so-called "IMI Software".

86.   In paragraphs 42-45 of the Amended Statement of Claim, IMI lists four components of the IMI Software and describes the functioning of three of those components. Marc denies that IMI owns the copyright to the software.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRESENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS _____ DAY OF _____ 20 ____
FAIT À TORONTO LE _____ JOUR DE _____

Registrar, Superior Court of Justice

REGISTRAR                    GREFFIER

87.   In paragraph 43 of the Amended Statement of Claim, IMI describes the "IMI Search Software . The paragraph describes a generic software programming process that is not unique to the software IMI allegedly owns. In addition or in the alternative to Marc's denial of IMI's ownership of this software, Marc notes that the mere coincidence of functionality among websites with similar purposes does not amount to copyright infringement. In designing the websites described in paragraphs 56 and 57 of the Amended Statement Claim, Marc has not infringed any copyrights owned by IMI.

88.   In paragraph 44 of the Amended Statement of Claim, IMI describes the "IMI Analytics Software". This software was designed by Open Solutions, an Indian corporation that provided accounting and website development services to the Business ("Open Solutions"). Open Solutions designed the software for use by the Business and copyright of the software belongs to the Business. In addition or in the alternative, Marc has not copied the so-called IMI Analytics Software nor has he used the IMI Analytics Software on the eyestats.com website as alleged in paragraph 58.

89.   In paragraph 45 of the Amended Statement of Claim, IMI describes the "IMI Billing Software". This software was initially designed by third party contractors located in the City of Peterborough, Ontario (the "Peterborough Programmers") and was later redeveloped by Open Solutions for use by the Business. Any copyright of the software belongs to the Business. In addition or in the alternative, Marc has not copied the so-called IMI Billing Software nor has he used the IMI Billing Software on any of the websites as alleged in paragraph 59.

(b) Websites

90.   The IMI Travel Website and the IMI Travel Software described in paragraph 47 of the Amended Statement of Claim was originally developed by Decatrend, an "e-business" process management services provider located in Chennai, India ("Decatrend") in 2003, and later by Open Solutions. They were not developed by IMI. At all material times the website and software described in paragraph 47 of the Amended Statement of Claim belonged to the Business and not to IMI, and it is the Business, not IMI, that owned the copyright described in that paragraph.

THIS IS TO CERTIFY THAT THIS   LA PRÉSENT ATTEST QUE CE
DOCUMENT, EACH PAGE OF   DOCUMENT DONT CHACUNE
BEARS THE SEAL OF THE   DES PAGES EST REVÊTUE DU
SEAL OF THE SUPERIOR COURT   SCEAU DE LA COUR SUPÉRIEURE
OF JUSTICE AT TORONTO, IS A   DE JUSTICE À TORONTO, EST UNE
TRUE COPY OF THE DOCUMENT   COPIE CONFORME DU DOCUMENT
ON FILE IN THIS OFFICE   CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS   10   DAY OF   NOV.   20 08
FAIT À TORONTO LE   JOUR DE
Joanne Nicoara
REGISTRAR   Registrar   Superior Court of Justice
GREFFIER

Attachment D

91.   In response to paragraph 48 of the Amended Statement of Claim, Marc denies that that the domain name nettravel.com was purchased by IMI. Marc purchased the nettravel.com domain in January 2007. Marc has never transferred ownership of the domain name to IMI.

92.   In response to paragraph 49 of the Amended Statement of Claim, the software that was installed on the nettravel.com domain was the software developed by Open Solutions. It did not belong to IMI. The software was initially hosted by the Business's servers. At all material times, Marc retained ownership of the domain name and the Business retained ownership of the website and software.

93.   Contrary to the allegations in paragraphs 50-52 of the Amended Statement of Claim, Marc has not used the intellectual property described in those paragraphs since January 2007.

94.   Following Marc's departure from the Business, he moved the nettravel.com domain, which he owns, to his own servers, and since that time he has used software provided by a third party, OneTravel.com, to list travel fares. The OneTravel.com software was installed on the nettravel.com site by Open Solutions, who used original software programming code to perform the installation and to link to OneTravel.com's software. As a result, any software that belonged to the Business has not been present on the nettravel.com site since January 2007.

95.   Contrary to the allegations in paragraph 53 of the Amended Statement of Claim, the Winsinc Website does not consist of any copyrighted material belonging to IMI. The site was registered by Maurice on March 19, 2005, and was designed by him shortly thereafter. In 2006, Marc supervised a re-working of the Winsinc Website by Stellarc and other third party contractors working for the Business. The contractors used stock imagery and unoriginal text to design the site. Stellarc's role in the creation of the Winsinc Website was limited to that of a third-party contractor acting on behalf of the Business; it was compensated for its work and it did not retain copyright in the finished product, including but not limited to the site's design, programming code and content.

96.   In response to paragraph 60 of the Amended Statement of Claim, the searcherbee.com was developed by Shiva Gowpada (on behalf of Open Solutions)

THIS IS TO CERTIFY THAT THIS,   LA PRESENT ATTEST QUE CE DOCUMENT, DONT CHACUME DES PAGES EST REVÊTUE DU SCEAU DE LA SUPERIOR COUR DE JUSTICE À TORONTO, IS A   DE JUSTICE À TORONTO, EST UNE TRUE COPY OF THE DOCUMENT   COPIE CONFORME DU DOCUMENT ON FILE IN THIS OFFICE   CONSERVÉ DANS CE BUREAU
DATED AT TORONTO THIS ___ DAY OF ___ 20 ___
FAIT À TORONTO LE ___ JOUR DE ___
Joanne Nicoara
REGISTRAR   ...rior Court of Justice
GREFFIER

who resides in India. Gowpada used generic original software programming and generic design elements to create the site for Marc.

97.     The elements of IMI's easybestdeals.com website described in paragraph 60 of the Amended Statement of Claim (link lists, website structure, and privacy policy) are generic website design elements that are common to thousands of websites. IMI's content is not unique and it cannot claim copyright to these elements. To the extent that any alleged copying by Marc of IMI's content is proven, which allegations are not admitted to but steadfastly denied, Marc claims that the content is not subject to copyright protection.

98.     All of IMI's copyright claims, where those claims offer sufficient details capable of a response, are false. It does not own the copyright to the software and websites described in the Amended Statement of Claim. In addition or in the alternative, Marc has not infringed any copyright belonging to IMI. Therefore, damages claimed by IMI in paragraph 65 of the Amended Statement of Claim are non-existent, and Marc puts IMI to the strict proof thereof.

### E.     The Business

99.     Marc, Jain and Sundin were partners in a Business that relied on a network of incorporated and unincorporated entities to develop, market, and operate different revenue-producing Internet sites and to manage the revenues derived from those sites.

#### 1.  The Internet Sites

(a) Third-Party Security Software Sales

100.    In December 2001, Marc was attending law school. He and Jain communicated by instant messenger to discuss working together in an e-commerce business Jain had started. They decided to work together to sell security software manufactured by vendors such as Symantec and McAfee over the Internet. The software was sold in CD and downloadable format. In order to activate the downloadable versions of the software, customers had to use licensing keys that were provided by the websites as part of the sale.

101.    The site's software sales were not authorized by Symantec nor the other software companies. The CDs were usually bought from grey market sellers, and the licensing keys were not authorized for the online downloads the Business sold to its customers.

I HEREBY ATTEST QUE CE DOCUMENT, EACH PAGE OF DOCUMENT, DONT CHACUNE WHICH IS STAMPED WITH THE DES PAGES EST REVÊTUE DU SEAL OF THE SUPERIOR COURT SCEAU DE LA COUR SUPÉRIEURE OF JUSTICE AT TORONTO, IS A DE JUSTICE A TORONTO, EST UNE TRUE COPY OF THE DOCUMENT COPIE CONFORME DU DOCUMENT ON FILE IN THIS OFFICE CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS   10   DAY OF   NOV   20
FAIT À TORONTO LE                JOUR  Rosanne Nicoara

Registrar, Superior Court of Justice

REGISTRAR                        GREFFIER



102.    The Business used many different website addresses to sell the software. The use of multiple addresses increased the market reach and allowed for multiple advertising angles for the software.

103.    Sundin, who had not yet become a partner or joint venturer, was not involved in this venture. All of the work was performed by Jain, Marc and third-party contractors. Jain developed the sites, sourced the products from wholesalers and managed the merchant account processing. Marc marketed the sites, managed customer service, sourced the products from wholesalers and helped implement the sites. Kristy Ross, an employee of Jain who later became an employee of IMI ("Ross"), managed the search-engine marketing for these sites, as she did for all of the websites described below except for the immigration website.

104.    Copyright to the sites and to all intellectual property associated with the sites that did not belong to third parties belonged to the Business.

105.    The sales of third-party security software continued until January 2004.

        (b) Travel Websites

106.    In June 2002, the Business launched its second venture, a travel website ("Vipfares.com"). Vipfares.com primarily sold airline tickets, although it also sold hotel rooms, vacation packages and partnered with other travel websites to sell travel-related products and services.

107.    Vipfares.com was a highly profitable business; its marketing strategy consisted of incorporating its service charge (typically US$28.36 per airline ticket) into the price of the ticket. This allowed the site to charge a substantially higher service charge than its competitors, who revealed the service charge to customers and typically charged US$5-10 per ticket.

108.    Sundin was not involved in this venture. All of the work was performed by Jain, Marc and third-party contractors. Jain negotiated with the third-party contractors who provided site development, the booking engine and ticket fulfillment services together with Marc, who

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE À TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS 10 DAY OF NOV 20 08
FAIT À TORONTO LE        JOUR DE

Joanne Nicoara
Registrar, Superior Court of Justice
REGISTRAR                GREFFIER

Attachment D



arranged business development deals with other Internet travel services for the site. In addition to business development, Marc managed customer service.

109.   The third-party contractors who assisted with this site were Ross, who managed the search-engine marketing; Maurice, who helped Marc negotiate deals to add new products to the site, and Patheo, Inc., a company that provided ticket fulfillment services. Merchant account processing services were provided by the vendors who sold their products on the site and by Marc. The website was developed by Decatrend.

110.   Decatrend did not retain any intellectual property rights over its development of Vipfares.com. Those rights, including copyright to the website design and content and to the software used to operate the websites, belonged to the Business.

111.   Vipares.com operated until the Business relationship terminated in December 2006.

(c) Home-Based Careers Websites

112.   In June 2002, the Business also launched websites that sold subscriptions to a database of telecommuting jobs to customers seeking to start a home-based career. The websites partnered with employment advertising sites (Monster, Careerbuilder, and Hotjobs) to promote home-based career opportunities.

113.   Sundin was not involved in this venture; all of the work was performed by Jain, Marc and third-party contractors. Jain provided the initial contact with Marc Cohen ("Cohen"), a third-party contractor who had referred the original idea for the sites to the Business. Marc and Jain negotiated the business marketing contracts for the sites. Marc also managed the marketing, business development and logistics for the sites. Merchant account processing was managed by Jain at first, but in September 2003 Marc took over this responsibility. Sundin offered translations services for the websites but the translations were not used by the Business.

114.   The sites were developed by Decatrend and were designed by the Peterborough Programmers, who retained no intellectual property rights over those rights.

THIS IS TO CERTIFY THAT THIS          LA PRÉSENT ATTEST QUE CE
WHICH IS STAMPED WITH THE             DOCUMENT DONT CHACUNE
SEAL OF THE SUPERIOR COURT            DES PAGES EST REVÊTUE DU
OF JUSTICE AT TORONTO, IS A           SCEAU DE LA COUR SUPÉRIEURE
TRUE COPY OF THE DOCUMENT             DE JUSTICE À TORONTO, EST UNE
ON FILE IN THIS OFFICE                COPIE CONFORME DU DOCUMENT
                                      CONSERVÉ DANS CE BUREAU
DATED AT TORONTO THIS ___ DAY OF ___ 20___
FAIT À TORONTO LE              JOUR DE
                              Joanne Nicoara
                              Registrar, Superior Court of Justice
REGISTRAR                                      GREFFIER

Attachment D

rights to the website design and content and to the software used to operate the websites, belonged to the Business.

115.    The home-based careers sites operated June 2004.

### (d) Music Websites

116.    In 2002, the Business launched a series of online music sales websites using many different domain names. The sites were very profitable as they advertised a low monthly subscription rate (e.g. US$0.99 per month) but the payment terms and conditions required an upfront payment for a one- or two-year subscription (e.g. up to US$23.76) when a customer subscribed to the site. This marketing technique generated a large number of sales but also resulted in numerous customer complaints and credit card chargebacks, which in turn led to the need to use different web addresses when a particular site developed a negative reputation or ran into legal trouble relating to copyright or trademark disputes.

117.    Jain provided the initial contact with Cohen, who referred the original idea to the venture. Jain also provided the merchant account processing facilities for the sites until December 2003, at which point Marc took over the management of merchant account processing for these sites. Marc also managed the marketing and optimization for the site. Sundin provided administrative support to maintain the websites.

118.    The sites were developed by the Peterborough Programmers. The intellectual property rights to these sites, including but not limited to the website design and content and the software used to operate the websites, belonged to the Business.

119.    The music sites actively operated until early 2005.

### (e) Adult Websites

120.    In October 2002, Jain introduced Marc to Sundin. Jain and Marc recognized that Sundin could contribute to the Business's expansion through the use of IMI and its subsidiaries as development centres for additional ventures. Sundin's first contribution consisted of assistance in developing and marketing "hard-core pornography websites" and Sundin managed the day-to-day operations of these sites and of the document.

THIS IS TO CERTIFY THAT THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE
DOCUMENT, DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE À TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVE DANS CE BUREAU

DATED AT TORONTO THIS  10  DAY OF  NOV  20 08
FAIT À TORONTO LE          JOUR DE
                                        Joanne Nicoara
                        Registrar, Superior Court of Justice
REGISTRAR                                GREFFIER

Attachment D

a third party contractor, managed the merchant account processing facilities. Marc assisted with marketing and logistics.

121.    The pornography sites operated until 2005.

122.    In the fall 2003, the same individuals performing the same functions created websites that sold erectile dysfunction products. Fulfillment for sales of the products was performed by Dany C. Patrick, a resident of India.

123.    Sundin also contributed adult dating websites that were developed by IMI. These sites, which operated until early 2006, did not produce significant revenue for the Business.

124.    Another adult-themed website was developed and marketed in 2004 by Frederico Poggio, a third-party contractor located in Uruguay. This site did not produce significant revenue for the Business.

(f) "In-House" Security Software Sales Websites

125.    In June 2003, IMI completed the development of its own security software programs that allowed the Business to stop selling third-party software and begin selling "in-house" security software.

126.    This venture was very profitable as its launch coincided with the global outbreak of a worm virus known as "Blaster", which raised global awareness of the threat of Internet viruses. The Business capitalized on this raised awareness by aggressively marketing the IMI-developed security software using different web address and product names.

127.    The sites were a co-operative effort of the three principals of the Business. Marc managed marketing, optimization, customer service and business development. Jain assisted with technical development, product design and testing for the sites. At first Jain managed merchant account processing, but Marc eventually assumed this responsibility. Sundin assisted Jain with technical specifications and testing and he also supervised IMU's development of the website and the software.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS 10 DAY OF NOV. 20
FAIT À TORONTO LE          JOUR DE
                    Joanne Nicoara
REGISTRAR        Registrar, Superior Court of Justice
                          GREFFIER

128.  In addition to her usual role assisting in the search-engine marketing, Ross assisted with the in-house security sites by assisting to supervise the development and design of the sites and products.

129.  When the original Canadian merchant accounts arranged by Marc ran into difficulties due to high customer dissatisfaction and chargebacks, Marc coordinated with Maurice to manage the banking relationships and merchant processing for the sites.

130.  At first, the sites were represented as being owned by Vantage. However, when the marketing for the products became more aggressive, the representation of ownership changed to the name of the website that was marketing the software. At all times, the Business was the real owner of the venture and all intellectual property associated with the venture.

(g) "Scanner" Software

131.  In April 2005, Marc learned of a new business model for marketing security software. Instead of forcing a customer to pay for software before downloading it to his computer, the new approach offered a free, limited version of the software that would scan the customer's computer and identify and diagnose any security problems. In order to correct the problems, the customer had to purchase the full version of the software.

132.  Under Marc's supervision, IMU developed a scanner software program that was marketed under the names "Winfixer", "Errorsafe", "Systemdoctor", "Sysprotect", "Errorpatrol", "Errorprotector" and "Drivecleaner". The product was highly successful and led to exponential growth in the Business's revenues.

133.  Although the software was developed by IMU, the Business owned the intellectual property associated with this venture.

134.  Variations of this venture are still being operated by Jain and Sundin.

(h) Immigration Assistance Website

135.  In late 2002, Jain and Marc created a website that provided assistance to persons who wished to participate in the "Green Card" lottery sponsored by the government of the United States. Although the United States Immigration and Naturalization Service (the "INS")

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT

LA PRÉSENTE ATTESTE QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVETUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE À TORONTO, EST UNE COPIE CONFORME DU DOCUMENT ORIGINAL CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS 10 DAY OF NOV 20 08
FAIT À TORONTO LE            JOUR DE

Joanne Nicoara
Registrar  Superior Court of Justice
REGISTRAR                    GREFFIER

provided the required forms for free on its own websites, private websites also sold the forms and offered to process them to customers who were unaware that the forms required no processing and were available for free from the government. Marc and Jain decided that the Business should develop its own site, which used a domain name ("www.usnis.org") and web design that closely resembled the INS website address ("www.usins.org") and design.

136.    Marc supervised the development and management of the site. The site development and management was contracted out to Decatrend, who reported to Marc. Jain managed the merchant account processing for the site and worked with Marc on the site design. The application processing was contracted out to Bytehosting Internet Services LLC ("Bytehosting"), a corporation incorporated pursuant to the laws of the State of Ohio. Bytehosting received the green card applications that were mailed by applicants and submitted them to the INS in bulk. Sundin did not contribute to the development or operation of this site.

137.    Although the site was profitable, it was only able to operate for a short period of time because it generated many customer complaints and credit card chargebacks.

(i)    Other Websites

138.    The Business also developed other websites that marketed various self-help services and financial loan services. These websites generated insignificant amounts of revenue and are not material to this dispute.

*2.    Merchant Account Processing Facilities*

139.    All of the Business's activities described above involved sales over the Internet. In order for the websites to generate revenue for the Business, prospective customers had to provide their credit card information to the site and funds had to be transferred from the customers' credit card accounts to a merchant account operated by the Business. Managing the merchant account processing facilities was crucial to the Business's success, as without those accounts the Business would be unable to generate significant revenue.

140.    At first, the Business used merchant accounts that were managed by Gito and Jain. However, in 2003 the large number of chargebacks generated by the companies

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

DATED AT TORONTO THIS 10 DAY OF NOV 20 08
FAIT À TORONTO LE                JOUR DE

LA PRÉSENT ATTEST QUE CE DOCUMENT DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE À TORONTO EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

Joanne Nicoara
Registrar, Superior Court of Justice

REGISTRAR                GREFFIER

to the cancellation of those accounts by the beginning of 2004. At the same time, Jain encountered legal troubles and chose to leave the United States, which significantly hampered his ability to secure new merchant account processing facilities.

141.    In January 2003, the defendant Billingnow was incorporated. Billingnow obtained a merchant account from the Toronto Dominion Bank (the "TD Bank") in Canada. The account was only permitted to process credit card transactions for its own products and services and not for those of third parties. However, in December 2003 the Business used Billingnow's merchant account to process sales from the Business's websites.

142.    A few months later, the large number of chargebacks in Billingnow's accounts led to a demand by the TD Bank for a face-to-face meeting with Billingnow's principals. In order to demonstrate to the TD Bank that Billingnow was complying with the terms governing the merchant account, Marc gave a PowerPoint presentation that identified Billingnow as the owner of the products and services sold through its merchant account. The presentation was created with Jain's knowledge and approval, and it led to the temporary maintenance of the account. However, in April 2004, the account was ultimately cancelled due to a high volume of customer complaints and chargebacks.

143.    In early 2004, before the cancellation of the Billingnow account, it became apparent that more merchant account processing facilities would be required to maintain the Business's flow of revenues. With Maurice's assistance, Marc used Winpay to establish a merchant account with the Bank of Bahrain and Kuwait ("BBK Bank") in Bahrain. In the summer of 2004, having completed his legal studies, Marc moved to Bahrain to manage the Business's financial operations on a full-time basis.

144.    By this time, Maurice had established a network of Middle Eastern corporations to facilitate the establishment of more merchant account processing facilities. Almost all of the Business's merchant accounts were being managed by Marc and/or Maurice. As a result, accounts controlled by these companies were used to pay the Business's vendors with Marc, Jain and Sundin's knowledge and approval.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS  10  DAY OF  NOV  20 08
FAIT À TORONTO LE,          JOUR DE

Joanne Nicoara

REGISTRAR          Registrar, Superior Court of Justice

Attachment D

145.    From April 2004 until December 2006, Maurice acted a third-party contractor who assisted the Business with the management of its financial operations. His services consisted of the creation and maintenance of merchant account processing facilities, tax sheltering, financial management of the Business's retained profits, corporate structure planning, management of payments to vendors and suppliers and management of internal expenses of the Business.

146.    At the end of 2004, BBK Bank was concerned by the high volume of credit card chargebacks generated by Winpay's merchant account and asked to see evidence of the agreements Winpay had with its overseas affiliates. Many of these agreements could not be located or did not exist in written form. In order to placate BBK Bank, Marc drafted and executed contracts to show the bank the evidence it requested. These agreements were made with Jain's and Sundin's knowledge and consent.

147.    In February 2005, BBK Bank cancelled Winpay's account when it discovered that the account was being used in relation to gambling activities, which are prohibited under Islamic law. BBK Bank was also concerned about the account's high level of chargebacks. As a result, from February 2005 through May 2005, the Business had no significant access to merchant account processing facilities. The Business suffered under significant strain; it continued to generate sales and to "queue" pending credit card transactions, but it was unable to bill customers' credit cards.

148.    In June 2005, Marc supervised the creation of new merchant accounts in Dubai and Singapore. In July 2005, Marc also managed to establish a new merchant account in the Netherlands through Synergy, a corporation he founded for that purpose. The Synergy account was used to batch the queued transactions that accrued from February to May 2005, and resulted in a realization of over US $1,000,000 of otherwise lost transactions.

149.    From June 2005 until December 2006, the Singapore accounts processed tens of millions of dollars of payments, which represented approximately three-quarters of the total revenues realized by the Business between 2002 and 2006.

I HEREBY CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS 10 DAY OF NOV 20 08
FAIT À TORONTO LE        JOUR DE

Joanne Nicoara
Registrar, Superior Court of Justice
GREFFIER

REGISTRAR

150.    In November 2005, Marc established a second merchant account processing facility through Synergy in order to process European debit card transactions and Japanese credit card transactions. Although the first Synergy account was terminated in February 2006, this second account continued to operate until Marc left the Business in December 2006.

151.    The merchant accounts managed by Marc and Maurice required a complicated network of corporations and accounts in order to prevent a second period where the Business would be left with no merchant account processing facilities. This complicated network was established with Jain and Sundin's knowledge and consent and was created for the benefit of the Business.

152.    In 2005, Sundin managed to establish a merchant account, but it was only capable of processing electronic cheques and Discover credit card transactions. Through Flyby, Jain established a small account for local markets in South America. Those accounts processed approximately US$50,000 per month. In addition, Open Solutions established a small merchant account to process Indian credit card sales, which amounted to a few thousand dollars per month.

### 3.   Joint Control and Management

(a) Marc Exercised Joint Control and Management over the Business

153.    At all material times from January 2002 to December 2006, Marc maintained joint control and management over all of the Business's websites and most of the Business's merchant account processing facilities. He supervised the marketing, logistics and optimization for the websites and ensured that the Business was able to turn sales into revenue by maintaining the merchant account network when his partners were unable to do so.

154.    One of Marc's roles was to negotiate and execute contracts on behalf of the Business to facilitate the ventures and merchant account processing facilities. It was understood by Jain and Sundin that all three partners were bound by these contracts, just as Marc knew that he was bound by contracts negotiated and executed by Jain and Sundin.

155.    While initially Jain contributed the bulk of the start-up capital and supervision for the websites and the merchant accounts, his role as approximately the business remained much the

THIS IS TO CERTIFY THAT THIS
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
IS A TRUE COPY OF THE DOCUMENT
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE
DES PAGES EST REVÊTU DU
SCEAU DE LA COUR SUPÉRIEURE
CONFORME À L'ORIGINAL, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS  10  DAY OF  NOV  20 08
FAIT À TORONTO LE                JOUR DE

Joanne Nicoara
Registrar  Superior Court of Justi

REGISTRAR                    GREFFIER

became encumbered by legal troubles and his inability to establish new merchant accounts. Over time, Marc's unrealized share of the Business's profits, which became re-invested in the Business, increased his capital contributions to the Business. While Jain remained in contact with Marc and participated in the major decisions involving the Business, he did not make a significant "hands on" contribution to the external Business structure after December 2003, when he permanently moved to South America to avoid his legal troubles in the U.S.

156.    In early 2004, during his last semester of law school, Marc's participation in the day-to-day management and control of the Business increased as Jain's participation decreased. During that year, Marc became the "front-line" principal of the Business and exercised the control and management necessary to ensure its ongoing success at a time when his partners were unable to do so.

157.    Sundin only joined the Business in October 2002. At first, Sundin's contribution was limited to the pornography and erectile dysfunction websites, but by 2003 his contribution increased when the security software products were ready for sale. At all times since he joined the Business, Sundin's role was limited to supervision of operations and development of individual products. He did not play a major role in the financial structure or marketing aspects of the Business, which were largely Marc's responsibility.

(b) Sundin Withdraws from the Business

158.    In January 2006, Marc and Sundin travelled to IMU's office in the Ukraine to meet with the marketing and customer service personnel located at that office. In advance of those meetings, Marc created a document in which he was described as "Director of Marketing". Sundin and Jain, for their part, created a similar document describing Sundin's role as "Chief Operating Officer". These descriptions did not correspond to formal titles within the Business, as there were none, but was merely intended to explain to the IMU staff who was responsible for particular issues.

159.    Although both Marc and Sundin were supposed to lead these meetings, Sundin did not actively participate in them. After the Ukraine trip, Sundin moved to London, England, and increasingly withdrew from participating in the Business's activities. By late 2006, Sundin stopped communicating with Marc and Jain.

THIS IS TO CERTIFY THAT THIS DOCUMENT, WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

DATED AT TORONTO THIS 10 DAY OF NOV 20 08

Joanne Nicoara
REGISTRAR     Ontario Superior Court of Justice

LA PRÉSENTE ATTESTE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE À TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

FAIT À TORONTO LE ___ JOUR DE ___ 20 ___

GREFFIER



160.    In March 2006, Marc and Jain met in Brazil and discussed the Sundin situation. At this meeting, they orally agreed to pay Sundin no more than $4,000,000 for his partnership interest in the Business.

### 4. Responsibility for Expenses and Debts

161.    From July 2002 until April 2007, Marc was responsible for debts owed by the Business. Expenses associated with his efforts to develop, market or support the Business's websites were paid by him through the defendant corporations, as were expenses associated with the establishment and maintenance of the merchant account processing facilities he managed.

162.    In December 2003, as Marc's involvement in the Business's marketing and financial management became more involved, his responsibility for expenses associated with the Business correspondingly increased. Marc assumed responsibility for cash management, third party suppliers, advertising, supplies, and professional fees. Marc's responsibility for those expenses was assumed on behalf of the Business.

163.    Contrary to the Amended Statement of Claim, IMI did not pay for expenses associated with the Business's earnings. The opposite is true: IMI's expenses were paid for by the Business. IMI would send monthly expense reports to Jain, Sundin and Marc, who would review those reports on behalf of the Business and re-imburse IMI for approved expenses.

164.    From January 2007 until April 2007, after Marc had terminated his relationship with the Business, invoices from third party contractors of approximately US$100,000 were directed to Marc and/or corporations under Marc's control. The invoices involved liabilities incurred both before and after December 31, 2006. In addition, Marc and corporations he controls are liable for expenses totalling approximately US$300,000, which were incurred on behalf of the Business, and for which he claims indemnity from Jain and Sundin.

### 5. Equal Access to Information

165.    At all times between January 2002 and December 2006, Marc and Jain had equal access to the information required to manage the Business. They communicated often by online instant messenger software and e-mail, ensuring that each was aware of the other's

THIS IS TO CERTIFY THAT THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE
DOCUMENT, DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPERIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS     10     DAY OF     NOV     20 08
FAIT À TORONTO LE                   JOUR DE        Joanne Nicoara
                                                    Registrar Superior Court of Justice
REGISTRAR                                           GREFFIER

activities and the activities of the Business in general. They arrived at management decisions during these instant messenger conversations, which contributed to the informal nature of the Business's management style: few decisions were recorded in formal agreements or documents, and very few documents were created to record the details of the complex relationships between the corporations and unincorporated entities that held the Business's assets.

166.    At all material times, aside from a period in late 2006 when Jain and Sundin attempted to take control of the Business, nothing significant happened in the Business that Marc was not aware of. He was in constant communication with the different contractors who performed services for the Business and he was regularly providing his partners with updates of his activities. At the same time, unless otherwise pleaded herein, Jain and Sundin were in constant contact with Marc to keep him apprised of their activities with relation to the Business. As set out above, Sundin kept Marc apprised of expenses incurred by IMI and its subsidiaries (so that the Business could compensate those companies for their expenses).

167.    From 2002 until Fall 2004, the Business relied on Decatrend to track the profitability of the Business's different ventures. In 2004, it became apparent to Marc and Jain that Decatrend was overcharging the Business for its various services and that it was not performing the accounting function efficiently. They decided to have IMU hire an accountant, Dmitriy Sancha ("Sancha"), to take over this task. Sancha was responsible for compiling the monthly profit and loss statements and for distributing these statements to the Business's principals: Jain, Marc and Sundin. IMU replaced Decatrend as a third party contractor supplying accounting services to the Business.

### 6.  Contributions of Capital, Resources, "Sweat" Equity and Business Relationships

168.    As set out above in the descriptions of the Business activities (paragraphs 100 to 152), the principals of the Business contributed different levels of capital, resources, sweat equity and business relationships to the Business's assets. From January 2002 until December 2003, Marc's contribution was reduced by his inability to devote his full attention to the Business, as he was still attending law school. This limited contribution was reflected in the Business' Agreement as set out below.

THIS IS TO CERTIFY THAT THIS
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS __10__ DAY OF __NOV__, 20 __08__
FAIT À TORONTO LE

Joanne Nicoara
REGISTRAR          Registrar, Superior Court of Justice



169.    However, from January 2004 until December 2006, Marc's contribution steadily increased as the contributions of his partners decreased. As first Jain, and later Sundin, receded from day-to-day management of the Business's financial and marketing activities, Marc took control of both of those responsibilities. During this time, Marc's contribution of business relationships, retained capital in the Business, sweat equity, and resources equalled, if not surpassed, that of his partners.

### 7.  Compensation

(a) Agreements between Marc and Jain

170.    Although Marc and Jain commenced their business relationship in January 2002, the parties did not discuss compensation until June 2002. In a series of instant messaging conversations that took place that month, Marc and Jain negotiated the Interim Agreement, whereby they agreed on a compensation formula that was intended to reflect Marc's attendance at law school and his concomitant limited ability to devote his full attention to the Business. The compensation terms of the Interim Agreement were:

(a)     One per cent of the first US$200,000 of monthly net profits; and

(b)     Twenty per cent of all monthly net profits in excess of US$200,000.

171.    An implied term of the agreement was that these compensation terms were only in effect while Marc was in law school and unable to devote his full attention to the Business. Neither party intended for the compensation formula to govern Marc's compensation after he began devoting his full attention to the Business or if Jain's contributions to the Business diminished.

172.    Another implied term in the Interim Agreement was the definition of the term "net profits". Although this term was fundamental to the monthly calculations, neither party discussed how it would be defined when they agreed on the compensation formula beyond agreeing that it would take into consideration unspecified marketing and infrastructure costs of the business.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS 10 DAY OF NOV. 20 08
FAIT À TORONTO LE          JOUR DE

Joanne Nicoara
Registrar, Superior Court of Justice
REGISTRAR                          GREFFIER

Attachment D



173.    Although the Interim Agreement contained a formula for determining Marc's compensation based on a monthly calculation of the Business's net profits, Marc was never compensated in full in accordance with the formula.

174.    Between August 2002 and August 2003, the partners withdrew the following amounts from the Business:

    (a)    In August 2002, Marc received approximately US$40,000 from PMMCI;

    (b)    On December 13, 2002, Marc received approximately US$50,000 from PMMCI;

    (c)    On January 3, 2003, Marc received approximately US$10,000 from PMMCI;

    (d)    On February 19, 2003, Marc received approximately US$15,000 from PMMCI;

    (e)    In June 2003, Marc received US$18,000 from PMMCI;

    (f)    On August 21, 2003, Marc received US$250,000 from PMMCI and GITO;

    (g)    In October 2003, Marc received US$10,000 from PMMCI;

    (h)    In November 2003, Marc received US$25,000 from PMMCI;

    (i)    In January 2004, Jain received approximately US$5,000,000 from PMMCI and GITO;

    (j)    Beginning in May 2004 until December 2006, Sundin received at least $1,000,000 of monies due to the Business from the operation of a merchant account he operated to process Discover card transactions;

    (k)    In July 2006, Marc received $1,150,000 from Winsecure;

    (l)    On September 22, 2005, Marc received $14 [illegible] Business bank account held by Maurice for the Business [illegible]

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE À TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS _10_ DAY OF _NOV._ 20 _08_
FAIT À TORONTO LE _____ JOUR DE

Joanne Nicoara
REGISTRAR    Registrar, Superior Court of Justice

**Attachment D**

-34-

(m)   On October 6, 2005, Marc received C$44,985 from WINS;

(n)   On October 25, 2005, Marc received $284,905 from the Business through a bank account held by Maurice for the Business;

(o)   On October 27, 2005, Marc received $200,000 from Winsecure;

(p)   On October 31, 2005, Marc received $390,905 from WinRe;

(q)   In December 2006, Jain received US$5,000,000 from WINS;

(r)   In December 2006, Marc received US$300,000 from an account he jointly held with Maurice;

(s)   In December 2006, Sundin received at least US$3,000,000 of monies due to the Business from a Spanish merchant account operated for the Business by Jettis.

175.   The total funds Marc has drawn against his entitlement to a share in the Business's profits was approximately US$2,800,000.

176.   The total funds Jain has drawn against his entitlement to a share in the Business's profits is at least $10,000,000; the exact amount is known only to him and will only emerge after Jain has provided a full accounting for Business accounts that were under his control.

177.   The total funds Sundin was drawn against his entitlement to a share in the Business's profits is at least $4,000,000; the exact amount is known only to him and will only emerge after Sundin has provided a full accounting for Business accounts that were under his control.

178.   Any profits not withdrawn by the partners were retained by the Business for investment in future ventures.

179.   Between 2002 and December 2003, when the Interim Agreement was in effect, neither Jain nor Sundin demanded that Marc provide them with an accounting for their entitlement under the agreement. The funds that would have been paid thereunder have, for their part, since been re-invested in the Business and converted into the export platform for the

THIS IS TO CERTIFY THAT THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

CECI CERTIFIE QUE CE
DOCUMENT, DONT CHACUNE
DES PAGES EST REVETUE DU
SCEAU DE LA COUR SUPERIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVE DANS CE BUREAU

DATED AT TORONTO THIS ___10___ DAY OF ___NOV___ 20 08
FAIT À TORONTO LE _____ JOUR _____ 20 ____

Joanne Nicoara
Registrar, Superior Court of Justice

REGISTRAR                                    GREFFIER

Business's profits in 2004 and thereafter. Jain and Sundin are now estopped from demanding that Marc withdraw his share of the 2002 and 2003 profits in accordance with the Interim Agreement by the equitable doctrine of laches, as Marc's share has contributed to further profits and he is entitled to benefit from the deferral of his entitlements under the Interim Agreement.

180. Beginning in January 2004, Marc's contribution of time to the Business increased corresponding to Jain's diminishing contribution. At the time, Jain was unable to devote his full attention to the Business as a result of his problems with the U.S. authorities and his decision to leave the U.S. and to re-locate to South America. Jain's role in the Business diminished even further when he became involved in a legal dispute with Symantec Corporation, a security software company. At the same time, Marc was almost finished law school and was determined to devote his full attention to the Business to ensure its survival and continued success.

### (b) Sundin's Compensation

181. Jain introduced Marc to Sundin in October 2002. At that time, it was understood that Sundin would contribute his software development skills and assets to the Business. While Marc and Jain had agreed that Sundin would join the Business as a partner or joint venturer, at the time they did not discuss Sundin's compensation.

182. From October 2002 until December 2006, Sundin's contributions were always limited. By March 2006, Sundin's contributions to the Business ceased entirely, and as a result Marc and Jain agreed at a meeting that month to pay Sundin no more than US$4,000,000 for his share of the Business.

183. As set out in paragraph 174 above, Sundin withdrew approximately $4,000,000 from the Business.

### 8. Marc's Departure from the Business

184. As 2006 progressed, Marc and Jain became uncomfortable with the large amount of undistributed profits that was accumulating in which Business's accounts. [illegible] increase in profits that began in 2005 had led to a large surplus. [illegible]

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A DETRUSTICE TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE À TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS ___10___ DAY OF _____ 20___
FAIT À TORONTO LE   JOUR  Anne Nicoara

Registrar, Superior Court of Justice
REGISTRAR                    GREFFIER



and Marc sought from Jain an accounting of the Business's retained profits from 2002-2003 (when Jain-controlled corporations managed the majority of the Business's merchant accounts) as a first step towards negotiating an orderly draw down on the Business's undistributed profits.

185.   Marc and Jain disagreed over the appropriate division of the Business's profits (after accounting for Sundin). Although Marc made repeated attempts to negotiate a division of the profits, Jain refused to participate in those discussions. Instead, Jain demanded that Marc transfer US$20 million to him for his personal use before any negotiations could commence.

186.   In October 2006, Marc and Jain agreed that Marc would transfer US$10 million to Jain as a sign of Marc's good-faith intentions during the negotiations. The transfer was to take place in two equal instalments. In November 2006 Marc agreed to transfer US$5 million to a Dutch bank account in the name of BK Group, to be paid pursuant to an agreement between WINS and Continental Moonbell (Jain's Panamanian foundation). This transaction took place on December 3, 2006, after the agreement was finalized and the bank that held the funds was satisfied that the transfer was legitimate. Marc later learned that BK Group was owned by Sundin.

187.   After the first transfer, Marc and Jain's relationship deteriorated further and Marc did not proceed with the second half of the US$10 million transfer. During this time (Fall 2006), Jain and Sundin moved to take control of the Business. They set up new merchant account processing facilities to replace the accounts controlled by Marc, and Jain attempted to transfer all of the Business's assets into Old Moon Foundation, a Panamanian foundation that he controlled.

188.   Marc realized that the Business relationship could not be salvaged. He sent Jain and Sundin a notice that he was terminating his relationship with the Business effective December 31, 2006. Due to the informal organization of the Business, Marc styled his notice as a Notice of Termination of the Joint Venture.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVE DANS CE BUREAU

DATED AT TORONTO THIS ___ DAY OF ___ NOV ___ 20 ___
FAIT À TORONTO LE               JOUR DE  Joanne Nicoara
                                         Registrar  Superior Court of Justice
                                                    GREFFIER
REGISTRAR

Attachment D

**F.**   **In the Alternative, a Joint Venture**

189.   In the alternative, the facts set out in paragraphs 99 to 188 are repeated to support Marc's allegation that he, Jain, and Sundin were engaged in a joint venture.

190.   Marc accordingly asks that this action be dismissed with costs on a full indemnity basis with applicable Goods and Services Tax.

## COUNTERCLAIM

191. .   Marc claims:

    (a)   Against IMI for a declaration that IMI does not own the Business and has no ownership interest in the assets of the Business.

    (b)   Against Jain and Sundin:

        (i)   For a declaration that the revenues generated by the ventures described in paragraphs 99 to 138 are the property of the Business;

        (ii)   For a declaration that Marc is a partner in the Business and the amount of his partnership interest on a *quantum meruit* basis;

        (iii)   In the alternative to clause (ii), for a declaration that Marc is a joint venturer in the Business and the amount of his interest in the joint venture on a *quantum meruit* basis;

        (iv)   For an order that Marc is entitled to retain such sums as are currently held in accounts under his control as are necessary to compensate Marc in accordance with the declarations sought in clause (ii) or (iii);

        (v)   Damages in the amount of $5,000,000.00 for intentional interference with economic relations with Marc's suppliers and customers in his

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CETTE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS  10  DAY OF  NOV  20
FAIT À TORONTO LE          JOUR DE

Joanne Nicoara
Registrar, Superior Court of Justice

REGISTRAR                    GREFFIER

venture since January 2007;

(vi) An interlocutory and permanent injunction barring Jain and Sundin from directly or indirectly contacting Marc's customers and suppliers



of his new venture and to refrain from interfering or attempting to interfere with his economic relations with the same;

(vii) Damages in the amount of $400,000.00 for reimbursement of expenses of the Business satisfied by Marc that relate to expenses that were incurred before and after December 31, 2006; and

(viii) Punitive and exemplary damages in the amount of $5,000,000;

(c) Against all of the Defendants by Counterclaim:

(i) For a full accounting of all assets, liabilities, and net revenue of the Business;

(ii) For a declaration that all assets held by the Defendants by Counterclaim, their officers, servants or agents, representing or derived from money received on behalf of the Business are held on constructive trust for the Business; and

(iii) For an order for the payment of all sums found to be due to the Marc on the taking of the accounts above or held by the Defendants by Counterclaim on trust for Marc.

192. Marc pleads and relies upon the facts set out in the Further Fresh as Amended Statement of Defence in support of his claims for damages. Marc also relies on the additional facts set out in this Counterclaim.

### 1. Intentional interference with economic relations

193. Since Marc's departure from the Business, Marc has set up new e-commerce ventures, which are distinct and separate from the Business. Jain and Sundin have directly and indirectly harassed, threatened, or otherwise coerced Marc's vendors and suppliers, thereby interfering with his economic relations with those vendors and suppliers.

194. In March 2007, priceline.com, an advertiser with which Marc developed a significant relationship, informed Marc that after having received any letters from....

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS __10__ DAY OF ___NOV___ 20 _0_
FAIT À TORONTO LE           JOUR DE

Joanne Nicoara
REGISTRAR     Registrar, Superior Court of Jus



and Sundin's attorneys, that they were suspending their relationship with Marc's new e-commerce venture. Jain and Sundin's communications with priceline.com amounted to harassment, threats, or coercion by wrongfully threatening priceline.com with legal action if it should continue its relationship with Marc. Jain and Sundin intentionally interfered with Marc's venture by wrongfully intimidating priceline.com with the intent to injure Marc.

195.    As a result of the suspension of this relationship, Marc's new venture has suffered a loss of revenue and damage to a valued relationship with a valued advertiser.

196.    In addition, Jain and Sundin have directly or indirectly contacted and harassed Marc's business associates, thereby straining those parties' relationships with Marc. Incidents of such contact include, but are not limited to:

(a)    On October 23, 2007 (October 24 in Australia), counsel for IMI contacted Ansearch Limited ("Ansearch"), an Australian company that works with Marc, to discuss an alleged "illegal" payment made to Marc. During this conversation, counsel for IMI requested that Ansearch provide IMI with the details of its contractual relations with Marc and any payments Ansearch made to Marc. The information sought by IMI under the guise of enforcing the Mareva injunction included confidential business information which, in the hands of Marc's competitors, is damaging to his new business;

(b)    In January 2007, Shiva Gowpada ("Gowpada"), a service provider to Marc's business, was visited by Jack Palladino, a private investigator retained by Jain ("Palladino"), and by Andiry Dzuybuenko, the IMU office director. Gowpada was told to stop working with Marc. In April, 2007, Gowpada was contacted by Jain and Dzuybenko, who threatened him if he did not stop working with Marc.

197.    All of the above is tortious interference with contractual relations which was intended to and did cause harm to Marc's new venture for which he claims damages of $5,000,000 plus punitive and exemplary damages from Jain and Sundin, other entities, and their agents, and their agents.

THIS IS TO CERTIFY THAT THIS
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE
DOCUMENT DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE À TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS  10  DAY OF  NOV  20___
FAIT À TORONTO LE           JOUR DE .

Joanne Nicoara
Registrar, Superior Court of Justice
REGISTRAR

## 2. *Breach of Fiduciary Duty*

198.    As set out in the Statement of Defence, Marc, Jain and Sundin were partners or joint venturers in the Business and owed each other a fiduciary obligation not to deprive the others of funds, property, or business opportunities that rightfully belong to the Business.

199.    From 2002 to 2006, Jain and Sundin have controlled accounts that held funds generated by the Business. These accounts were held either by Jain and Sundin personally or by corporate or unincorporated entities under their control. Despite Marc's repeated requests, Jain and Sundin have refused to provide him with the details of these accounts or to account for these funds. Marc seeks an accounting from Jain and Sundin and the entities under their control for all funds generated by the Business that were deposited into those accounts.

200.    Jain and Sundin have used these funds, which rightfully belong to the Business, for uses that are not related to the Business. By reason of these activities, they have breached their fiduciary duty to Marc and have deprived him of his rightful share of those funds.

201.    To the extent that Marc's property, money and assets have been used by Jain and Sundin and entities under their control to purchase other assets and property, such assets and property are subject to a constructive trust.

202.    Because of the high-handedness of the actions of Jain and Sundin, Marc claims that he is entitled to punitive damages and exemplary damages in the amount of $5,000,000.00.

203.    Marc also claims his costs on the main action and in this counterclaim on a full indemnity basis with applicable Goods and Services Tax.

204.    Marc pleads and relies on the provisions of the *Partnerships Act*, R.S.O. 1990, c.P.5 and rules 29.01 and 17.02 of the *Rules of Civil Procedure*.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS _10_ DAY OF _NOV_ 20 _08_
FAIT À TORONTO LE                  JOUR DE

Joanne Nicoara
REGISTRAR          Registrar Superior Court of Justice

December 11, 2007

**LAX O'SULLIVAN SCOTT LLP**
Counsel
Suite 1920, 145 King Street West
Toronto, Ontario M5H 1J8

Clifford Lax, Q.C. (12010A)
Daniel Schwartz (52381V)
Andrew J. Winton (54473I)
Tel: (416) 598-1744
Fax: (416) 598-3730

Solicitors for the Defendant,
Marc Gerard D'Souza

THIS IS TO CERTIFY THAT THIS       LA PRÉSENT ATTEST QUE CE
DOCUMENT, EACH PAGE OF             DOCUMENT, DONT CHACUNE
WHICH IS STAMPED WITH THE          DES PAGES EST REVÊTUE DU
SEAL OF THE SUPERIOR COURT         SCEAU DE LA COUR SUPÉRIEURE
OF JUSTICE AT TORONTO, IS A        DE JUSTICE À TORONTO, EST UNE
TRUE COPY OF THE DOCUMENT          COPIE CONFORME DU DOCUMENT
ON FILE IN THIS OFFICE             CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS  10 DAY OF   NOV.   20 08
FAIT À TORONTO LE              JOUR DE
                                   Joanne Nicoara
                                   Registrar Superior Court of Justice
REGISTRAR                          GREFFIER

Attachment D

Innovative Marketing, Inc. vs. Marc Gerard D'Souza, et al.

Court File No: 07-CV-327940 PD3

*ONTARIO*
SUPERIOR COURT OF JUSTICE

Proceeding commenced at Toronto

FURTHER FRESH AS AMENDED
STATEMENT OF DEFENCE AND
COUNTERCLAIM OF THE DEFENDANT
MARC GERARD D'SOUZA

LAX O'SULLIVAN SCOTT LLP
Counsel
Suite 1920, 145 King Street West
Toronto, Ontario M5H 1J8

Clifford C. Lax, Q.C. (12010A)
Daniel Schwartz (52281V)
Andrew J. Winton (54473I)

Tel: (416) 598-1744
Fax: (416) 598-3730

Solicitors for the Defendant,
Marc Gerard D'Souza

Court File No. 07-CV-327940 PD3

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### Commercial List

| | | |
|---|---|---|
| THE HONOURABLE MADAM | ) | THURSDAY, THE 22ND OF FEBRUARY 2007 |
| JUSTICE PEPALL | ) | |
| | ) | Toronto, Ontario |

BETWEEN:

### INNOVATIVE MARKETING, INC.

Plaintiff

- and -

### MARC GERARD D'SOUZA, MAURICE D'SOUZA, MARINA D'SOUZA, CONRAD D'SOUZA, LEONARD D'SOUZA, ELVIRA MARTINEZ-ROMERO, WEB INTEGRATED NET SOLUTIONS, INC., WINPAYMENT CONSULTANCY SPC, BILLINGNOW.COM, INC., BILLING SOLUTIONS, SPC, WINSOLUTIONS, FZ-LLC, REINSURANCE AND INSURANCE CONSULTING HOUSE, SYNERGY, B.V., WINGEM, INC., WINSECURE SOLUTIONS, PTE, LTD., BILLPLANET, PTE, LTD., DSOFT, PTE, LTD., GE MANAGEMENT, PTE, LTD., and SCORGEM, PTE, LTD.

Defendants

## ORDER

---

### - Penal Notice -

If you, the Defendants, disobey this order you may be held to be in contempt of court and may be imprisoned, fined or have your assets seized.

Any other person who knows of this order and does anything which helps or permits the Defendants to breach the terms of this Order may also be held to be in contempt of court and may be imprisoned, fined or have their assets seized.

---

THIS MOTION, made by the Plaintiff with notice to Marc Gerard D'Souza, Maurice D'Souza, Marina D'Souza, Conrad D'Souza and Billingnow.com, Inc., and without notice to, Leonard D'Souza, and Elvira Martinez-Romero, with service validated as against the remaining defendants, based on the service of Marc Gerard D'Souza and Maurice D'Souza, for an interim Order in the form of a *Mareva* injunction restraining the Defendants from dissipating their assets and other relief, was heard this day at Toronto, Ontario.

ON READING the Affidavit of Sam Jain, sworn February 19, 2007, and the Affidavit of Daniel Sundin, sworn February 19, 2007, the affidavit of Marc D'Souza sworn February 20, 2007 and Conrad D'Souza sworn February 20, 2007, and upon noting the undertaking of the Plaintiff to abide by any order concerning damages which the Court may make arising from the granting and enforcement of this Order, and on hearing the submissions of counsel for the Plaintiff and counsel for the Defendants, Marc Gerard D'Souza and Maurice D'Souza,

## *Mareva* Injunction

1.    THIS COURT ORDERS that the Defendants, and its servants, employees, agents, assigns, officers, directors and anyone else acting on their behalf or in conjunction with any of them, and any and all persons with notice of this injunction, are restrained from, directly or indirectly, by any means whatsoever:

   a)    selling, removing, dissipating, alienating, transferring, assigning, encumbering, or similarly dealing with any assets of the Defendants, and specifically those assets acquired or financed with funds or property directly or indirectly belonging to the Plaintiff, without leave of the Court, wherever situated worldwide, including but not limited to the assets and accounts listed in *Schedule "A"* hereto.

   b)    in any way disposing of or dealing with or diminishing the value of any of the Defendants' assets worldwide and specifically those assets acquired or financed with funds or property directly or indirectly belonging to the Plaintiff, and whether they are in the name of a Defendant or not and whether solely or jointly owned up to a value of USD$48,000,000 without leave of the court;

   c)    engaging in or proceeding with any transaction, the effect of which is to receive funds outside Ontario from the sale, transfer, assignment or encumbering of any of the Defendants' assets worldwide without leave of the court;

d)   instructing, requesting, counseling, demanding, or encouraging any other person to do so; and

e)   facilitating, assisting in, aiding, abetting, or participating in any acts the effect of which is to do so.

2.   THIS COURT ORDERS that paragraph 1 applies to all of the Defendants' assets whether or not they are in his/her/its own name and whether they are solely or jointly owned. For the purposes of this order, the Defendants' assets include any asset which one or more Defendants have the power, directly or indirectly, to dispose of or deal with as if it were their own.  A Defendant is to be regarded as having such power if a third party holds or controls the assets in accordance with his direct or indirect instructions.

3.   THIS COURT ORDERS that if the total value free of charges or other securities of the Defendants' assets exceeds USD$48,000,000, the Defendants may sell, remove, dissipate, alienate, transfer, assign, encumber, or similarly deal with them so long as the total unencumbered value of the Defendants' assets remains above USD$48,000,000.

## Disclosure of Information

4.   THIS COURT ORDERS that the Defendants Marc Gerard D'Souza, Maurice D'Souza, Marina D'Souza, Conrad D'Souza prepare and provide to the Plaintiff's counsel within seven (7) days of the date of service of this Order, a sworn statement describing the nature, value, and location of their assets worldwide, whether in their own name or not and whether solely or jointly owned.

5.   THIS COURT ORDERS that the Defendants Marc Gerard D'Souza, Maurice D'Souza, Marina D'Souza, Conrad D'Souza submit to examinations under oath within fourteen (14) days of the delivery by these Defendants of the aforementioned sworn statements.

6.   THIS COURT ORDERS that if the provision of any of this information is likely to incriminate the individual Defendants, they may be entitled to refuse to provide it, but it is recommended to take legal advice before refusing to provide the information.

Wrongful refusal to provide the information referred to in paragraph 5 herein is contempt of court and may render the Defendants liable to be imprisoned, fined, or have his assets seized.

## Third Parties

7.    THIS COURT ORDERS the banks listed in *Schedule "A"* (the "Banks") hereto to forthwith freeze and prevent any removal or transfer of monies or assets of any of the Defendants held in any account or on credit on behalf of any of the Defendants, with the Banks, until further Order of the Court, including but not limited to the bank accounts listed in *Schedule "A"* hereto.

8.    THIS COURT ORDERS that the Banks forthwith disclose and deliver up to Plaintiff's counsel any and all records held by the Banks concerning the Defendants' assets and accounts, including the existence, nature, value and location of any monies or assets or credit, wherever situated worldwide, held on behalf of the Defendants by the Banks.

## Alternative Payment of Security into Court

9.    THIS COURT ORDERS that this Order will cease to have effect if the Defendant provides security by paying the sum of USD$48,000,000 into Court, and the Accountant of the Superior Court of Justice is hereby directed to accept such payment.

## Variation, Discharge or Confirmation of Order

10.    THIS COURT ORDERS that anyone served with or notified of this Order may apply to the Court at any time to vary or discharge this order, on four days notice to the Plaintiff.

11.    THIS COURT ORDERS that this order shall be in force until trial or further Order of the court, on four (4) days' notice to the Plaintiff.

12.    THIS COURT ORDERS that this matter be placed on the Commercial List at Toronto.

13.    THIS COURT ORDERS that the costs of this motion shall be in the cause.

**Joseph Doria**
Registrar, Superior Court of Justice

ENTERED AT / INSCRIT À TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

FEB 2 3 2007

PER/PAR:

Attachment E

## Schedule A

Bank accounts under the names of the individual and corporate Defendants, namely,

| Bank Name | Address | Account Name | Account Number |
|---|---|---|---|
| IN THE KINGDOM OF BAHRAIN: | | | |
| Standard Chartered Bank | Manama Main Branch Building No. 180, Government Avenue, Manama 315, Kingdom of Bahrain<br><br>or<br><br>PO BOX 29 MANAMA, BAHRAIN | Maurice D'Souza | 02-2667983-01<br>02625080450l |
| Standard Chartered Bank | Manama Main Branch Building No. 180, Government Avenue, Manama 315, Kingdom of Bahrain | Winpayment Consultancy | 010163518330l<br>02-6351883-01 |
| Standard Chartered Bank | Manama Main Branch Building No. 180, | Billing Solutions SPC | 010163258801 |

| Bank Name | Address | Account Name | Account Number |
|---|---|---|---|
| Swift SCBLBHBXXX | Government Avenue, Manama 315, Kingdom of Bahrain | | |
| Standard Chartered Bank Swift SCBLBHBXXX | Manama Main Branch Building No. 180, Government Avenue, Manama 315, Kingdom of Bahrain | Web Integrated Net Solutions | 0101640718801 (USD) 1602640718801 (EURO) 0102640718801 (USD) |
| Standard Chartered Bank | Manama Main Branch Building No. 180, Government Avenue, Manama 315, Kingdom of Bahrain | Reinsurance & Insurance Consulting House (RICH) | |
| HSBC | PO Box 57 Building 93 Al Khalifa Avenue Road 385 Manama 304 Kingdom of Bahrain | Web Integrated Net Solutions | 001-051556-160 (USD) |
| HSBC | PO Box 57 Building 93 Al Khalifa Avenue Road 385 Manama 304 Kingdom of Bahrain | Winpayment Consultancy | 001-554245-100 (USD) |
| HSBC | PO Box 57 | Billing Solutions SPC | 001-562446-100 (USD) |

| Bank | Address | Account Name | Account Number |
|---|---|---|---|
| | Building 93<br>Al Khalifa Avenue Road 385<br>Manama 304<br>Kingdom of Bahrain | | 001-562446-001 (Bahrain Dinars) |
| HSBC | PO Box 57<br>Building 93<br>Al Khalifa Avenue Road 385<br>Manama 304<br>Kingdom of Bahrain | Marc D'Souza | 002-269652-020 |
| HSBC | PO Box 57<br>Building 93<br>Al Khalifa Avenue Road 385<br>Manama 304<br>Kingdom of Bahrain | Maurice D'Souza | 002-1 25730-1 21 (USD) |
| Bank of Bahrain and Kuwait BSC | Adiya Branch<br>Osama Bin Zaid Avenue 1<br>PO Box 597<br>Manama,<br>Kingdom of Bahrain<br><br>Credimax<br>Hidaya 1 Building<br>49 Government Avenue<br>Manama 305 | Winpayment Consultancy | 10200775651084 17 |

| Bank | Address | Account Name | Account Number |
|---|---|---|---|
| | Kingdom of Bahrain | | |
| Bank of Bahrain and Kuwait BSC | Adliya Financial Mall Osama Bin Zaid Avenue 1 PO Box 597 Manama, Kingdom of Bahrain | Billing Solutions SPC | |
| Bank of Bahrain and Kuwait BSC | Adliya Financial Mall Osama Bin Zaid Avenue 1 PO Box 597 Manama, Kingdom of Bahrain | RICH | 135002191510781O (USD) 135-02191516 |
| Bank of Bahrain and Kuwait BSC | Adliya Financial Mall Osama Bin Zaid Avenue 1 PO Box 597 Manama, Kingdom of Bahrain | Maurice D'Souza | 102-0074161108-429 |
| Bahraini Saudi Bank BSC | P.O. Box 1159, Manama, Kingdom of Bahrain | Maurice D'Souza | 002-125730-121 |
| Bahraini Saudi Bank BSC | P.O. Box 1159, Manama, Kingdom of Bahrain | Marc D'Souza Maurice D'Souza | 02E08-039326-00 |

**Attachment E**

10

| Bank | Address | Account Name | Account Number |
|---|---|---|---|
| **IN THE UNITED ARAB EMIRATES:** | | | |
| Emirates Bank | Beniyas Road, P O Box 2923, Dubai, UAE | WinSolutions FZ-LLC | 0079-713581-010 (USD) 0079-713581-251 (USD-TD) 0079-713581-001 (Dirhams) |
| Standard Chartered Bank Swift SCBLAEADXXXX | Dubai Main Branch Al Mankhool Road, P.O. Box 999, Dubai, UAE | WinSolutions FZ-LLC | 01-3275183-01 (USD) |
| **IN QATAR:** | | | |
| Standard Chartered Bank Swift SCBLQAQXXXX | Standard Chartered Bank Doha Main Branch Abdulla bin Jassim Street P.O. Box 29 Doha Qatar | Maurice D'Souza | 02-2667983-01 |
| **IN SINGAPORE:** | | | |
| ABN Amro | 63 Chulia Street Level 2 Singapore 049514 | GB Management Pte Ltd. | 05.02.83.995 (USD) 10.02.04.368 (SGD) |
| United Overseas Bank Singapore Swift UOVBSGSGXXX | 80 Raffles Place 08-01 UOB Plaza 1 Singapore 048624 | WinSecure Solutions Pte Ltd | 136-900-569-9 (USD) 136-313-1110 (SGD) |

**Attachment E**

11

| Bank | Address | Account Name | Account Number |
|---|---|---|---|
| Citibank | 3 Temasek Avenue #12-00, Centennial Tower, Singapore 039190 | Billplanet Pte Ltd | |
| Citibank | 3 Temasek Avenue #12-00, Centennial Tower, Singapore 039190 | WinSecure Solutions Pte Ltd | 0-470085-002 (USD) 0-470085-029 (EURO) |
| Swift CITISGSGGCB | | | |
| DBS Bank Ltd. | 6 Shenton Way DBS Building Tower 1 Singapore 068809 | Marc D'Souza Maurice D'Souza | 074-1-007358 |
| DBS Bank Ltd. | 6 Shenton Way DBS Building Tower 1 Singapore 068809 | WinSecure Solutions Pte Ltd | 0074-001090-01-2-022 (USD) 074-9008474 (SGD) 0074-001134-01-3-0221 (EURO) |
| DBS Bank Ltd. | 6 Shenton Way DBS Building Tower 1 Singapore 068809 | Scorgem Pte Ltd. | 0074-001151-01-5-022 (USD) 0074-001741-1-031 (USD FD) 074-900938-1 (SGD) |
| DBS Bank Ltd. | 6 Shenton Way DBS Building Tower 1 Singapore 068809 | DSoft Pte Ltd. | 0048-001635-01-7-022 (USD) |
| DBS Bank Ltd. | 6 Shenton Way DBS Building Tower 1 Singapore 068809 | GE Management Pte Ltd | 0074-012267-01-5-022 (USD) 074-901050-9 (SGD) |
| DBS Bank Ltd. | 6 Shenton Way DBS Building Tower 1 Singapore 068809 | Billplanet Pte Ltd | 0074-001136-01-7-022 (USD) 074-9009110 074-001136-01-7, |
| Swift DBSSSGSG | | | |

12

| Bank | Address | Account Name | Account Number |
|------|---------|--------------|----------------|
| | | | 0074-001137-01-9<br>0074-001730-6 |
| United Overseas Bank<br><br>Swift UOVBSGSGXXX | 80 Raffles Place<br>08-01 UOB Plaza 1<br>Singapore 048624 | DSoft Pte Ltd. | 364-900-189-6 (USD) |
| **IN CHANNEL ISLANDS:** | | | |
| HSBC Jersey (Channel Islands) | HSBC Bank International Limited, HSBC House, Esplanade, St Helier, Jersey, JE1 1HS | Maurice D'Souza | SBH00022C0000823-00001 |
| **IN SWITZERLAND:** | | | |
| UBS Switzerland | G Hongg, Limmattallstrasse 160, CH-8049, Zurich, Switzerland<br><br>contact Thomas Mueller, Maurice D'Souza personal banker | Maurice D'Souza | 836.360.60 W, 836.360.L1 G |
| **IN THE PHILIPPINES:** | | | |
| Chinatrust (Phils) Commercial Banking Corp. | 3/F Twr. I, Ayala Triangle, Paseo de Roxas cnr Ayala | Elvira M. Romero | 00206011480 |

13

| Bank | Address | Account Name | Account Number |
|---|---|---|---|
| | Ave, Makati City, Philippines | | |
| Rizal Commercial Banking Corp. | 6819 Ayala Ave cor Sen Gil Puyat Avenue, Makati City, 1200 Philippines | WinGem, Inc. | 820-8005449 (USD) 1-208-10399-3 (USD) 0-208-801961 (Phil Pesos) |
| Swift RCBCPHMM | | | |
| **IN THE NETHERLANDS:** | | | |
| ING Bank | Amstelveenseweg 500, 1081 KL Amsterdam, the Netherlands | Synergy B.V. | NL98INGB0020135165 (USD) NL89INGB0673085880 (EURO) |
| | | | |
| **IN CANADA:** | | | |
| Royal Bank of Canada / RBC DOMINION SECURITIES | 260 East Beaver Creek Road, Suite 301 Richmond Hill, Ontario L4B 3M3 | Marc D'Souza | 00002-4000162 3603691423 Marc D'Souza account |
| Bank of Nova Scotia | 1st St. Clair Ave East Toronto, Ontario M4T 1Z3 | Marc D'Souza | 61762 03288 20 |
| Bank of Montreal | First Canadian Place 100 King St West Toronto, Ontario M5X 1A3 | Maurice D'Souza | 0002001-1001-344 American Express Canada 3733-940-78121007 |
| Swift BOFMCAM2XXX | | | |
| TD Canada Trust | 100 Steeles Ave. West | Billingnow.com Inc. | 004-053312-026009593 |

14

| Bank | Address | Payable Name | Account Numbers |
|------|---------|--------------|-----------------|
| HSBC Bank Canada | Thornhill, Ontario L4J 7Y1 | | |
| | 70 York St | Maurice D'Souza | 002-397064-236 |
| | Suite 400 | | |
| | Toronto, Ontario M5J 1S9 | | |
| | | | |
| IN THE USA: | | | |
| Fleet Bank | 41 Beacon St. | Marc D'Souza | 9449901002 |
| | Framingham, MA 01701 | | |
| Swift 011000138 | USA | | |

Court File No. 07-CV-327940 PD3

INNOVATIVE MARKETING INC.
Plaintiff

and

MARC GERARD D'SOUZA ET AL.
Defendant

*ONTARIO*
SUPERIOR COURT OF JUSTICE
Commercial List

PROCEEDING COMMENCED AT TORONTO

ORDER

BAKER & McKENZIE LLP
Barristers & Solicitors
181 Bay Street, P.O. Box 874
Suite 2100
Toronto, Ontario M5J 2T3

Matthew J. Latella

Phone: (416) 865-6985
Fax:    (416) 863-6275

Solicitors for the Moving Party/Plaintiff,
Innovative Marketing, Inc.

**Attachment E**

Court File No.

## *ONTARIO*
## SUPERIOR COURT OF JUSTICE

B E T W E E N:

### INNOVATIVE MARKETING, INC.

Plaintiff

and

### MARC GERARD D'SOUZA, MAURICE D'SOUZA, MARINA D'SOUZA, CONRAD D'SOUZA, LEONARD D'SOUZA ELVIRA MARTINEZ-ROMERO, WINPAYMENT CONSULTANCY SPC, WEB INTEGRATED NET SOLUTIONS, INC., BILLINGNOW.COM, INC. BILLING SOLUTIONS, SPC, WINSOLUTIONS, FZ-LLC, REINSURANCE AND INSURANCE CONSULTING HOUSE SPC, SYNERGY, B.V., WINGEM, INC., WINSECURE SOLUTIONS, PTE, LTD., BILLPLANET, PTE, LTD., DSOFT, PTE, LTD., GE MANAGEMENT, PTE, LTD., and SCORGEM, PTE, LTD.

Defendants

### AFFIDAVIT OF SAM JAIN

I, Sam Jain of the City of Rio de Janeiro in the country of Brazil, MAKE OATH AND SAY:

1.      I am a managerial employee of the Plaintiff, Innovative Marketing, Inc. ("IMI"), and have performed the general functions of a Chief Executive Officer since approximately July, 2002. Based on my role in the operation of IMI, I have knowledge of the matters to which I hereinafter depose.

2.      I have reviewed Daniel Sundin's affidavit and am in agreement with its contents.

3.      I am an American citizen with B.Sc degrees in both computer engineering and computer science from Penn State University. I have been actively engaged in computer software development since 1993, and in online marketing, e-commerce through Internet-based business ventures since 1998. In October, 2001, I established a corporation called Gito Inc. ("Gito") in Anguilla, British West Indies for the purposes of E-commerce and online marketing. In early 2002, together with a business acquaintance Kristy Ross ("Kristy"), I decided to explore new e-commerce opportunities for investment and collaboration. Kristy introduced me to Daniel Sundin ("Daniel") who was building an international organization to develop and market online consumer products. I saw his organization as a potential vehicle for our marketing efforts. Daniel's company, which Daniel incorporated as Innovative Marketing, Inc. ("IMI") in July 2002, appeared to Kristy and me to be a business with tremendous growth potential; however, we felt that it lacked the marketing expertise that Kristy and I would be able to bring to the venture.

4.      After a number of discussions with Daniel, I determined that IMI was an attractive venture that I wanted to be involved with.. After some due diligence, between 2002 and 2003 I loaned and contributed to IMI over, USD$2,600,000.

5.      The compensation agreement I reached with Daniel for my participation was as follows, I would be reimbursed for money loaned or contributed to IMI, IMI would pay my living expenses and I agreed to defer my compensation (based on a percentage of net IMI profits in an amount to be determined between Daniel and me) to grow the company. Kristy's compensation, like mine was deferred.

**Origin of Relationship with Marc D'Souza**

6.    When I joined IMI, I brought with me over a dozen employees, one of whom was Marc
      D'Souza ("Marc"). In or around February, 2002, prior to my joining IMI, I began a
      business relationship with Marc, primarily through telephone conversations and instant
      messaging, whereby he began working for me as a sales and marketing consultant, to
      secure lucrative advertising and media buying deals.

7.    Kristy initially gave Marc her own leads to manage including but not limited to Google,
      and Priceline. Kristy and I also provided Marc with extensive training.

8.    Marc and I originally agreed on a monthly remuneration for his services in the amount of
      USD$4,000.00 per month which was paid by Gito.

9.    Between March and June of 2002, Marc earned our trust by helping to secure deals with
      Yahoo, Hotwire, Priceline, Monster.com as well as introducing me to outsourcing
      vendors such as Digiblitz from India.

10.   At the time he was hired Marc represented to me that he had contacts with merchant
      account providers in Asia and the Middle East that could offer better rates for processing
      credit card accounts with a lower chargeback limit. Based on this representation I
      authorized him to proceed to seek out such providers.

11.   Marc also advised me that his father, Maurice D'Souza ("Maurice") had contacts with
      banks in the Middle East and Asia due to his extensive experience in the financial
      services sector in those regions of the world. This is important to our business because,
      typically, a consumer purchases a product on an Internet website by entering their
      creditcard details via the website, following which, these details are then passed to the

merchant bank by IMI. The merchant bank then verifies the funds are available in the consumer's account, charges the specified amount to the consumer's creditcard and deposits the funds into the merchant account less processing fees and funds reserved in case of returns.

12. Starting in March, 2002, Marc began sourcing Merchant Accounts and advised me on June 29, 2002 that a deal with AMEX for a Merchant Account was ready to go. Attached hereto as *Exhibit "A"* to this affidavit is a true copy of an email dated June 29, 2002 from Marc to me.

13. By June, 2002, around the time that I was joining with Daniel, Marc wanted to renegotiate the original deal of $4,000/month. Marc proposed his new compensation be 10% of all net profit as he was now involved in more aspects of the company's business. I did not agree.

14. I declined Marc's proposal for the following reasons which I conveyed to him:

   a. Marc would have been receiving more than Kristy who had been with me for over a year.

   b. Kristy and I were deferring our compensation to grow the company and Marc required regular payments, particularly while he was in law school.

   c. I was in the process of providing the company with a substantial loan to secure a high volume merchant account with Bancorp, that would allow us to grow without being capped in our credit card processing volume; and

   d. Marc was not offering to leave any of his compensation in the company.

15.    Marc then countered with the following: he wanted 1% of all collected net profits up to the first USD $200,000 per month and 20% of all of the collected net profits above that figure (the "1%/20%" Formula).  He advised me that he felt this would give him the incentive to continue in the business for years as he anticipated the profits to be in the millions of dollars.

16.    During this period, Daniel also agreed to formally set up IMI and outlined his vision of offering dozens of online security software products as well as other products and services to Internet consumers.

17.    Understanding that we would need additional merchant accounts when IMI products launched as well as Marc's continued sales & marketing activities with IMI product rollouts, in July, 2002, I informed Daniel of Marc's agreement to the 1%/20% Formula and he had no objection.

18.    I informed Marc we had an agreement on the 1%/20% Formula for his compensation, but Marc proposed a further condition. He wanted this arrangement to apply retroactively to March, 2002.  I agreed with this additional term.

19.    Included in the final deal was that Marc would submit invoices based on the 1%/20% Formula and thereafter be paid along with Marc's invoiced expenses incurred on behalf of the company.  Attached hereto as *Exhibit "B"* to this affidavit are true copies of email invoices from Marc to me.

20.    Marc's Formula compensation was exclusively tied to the profitability of the business and never changed.

21.     In exchange for the 1%/20% Formula, Marc agreed to undertake all activities necessary to expand the business included, but not limited to:

      (a) securing merchant accounts;

      (b) sourcing suppliers and vendors;

      (c) sales and marketing;

      (d) any and all other duties as assigned by IMI.

22.     On July 18, 2002 Daniel incorporated IMI. Because the above terms constituted Marc's agreement with me, this agreement was adopted by IMI ("Marc's Agreement").

23.     In keeping with IMI's informal business culture, Marc's Agreement was not reduced to writing. Rather, our oral agreement was negotiated on the telephone and confirmed with his submission and my payment of his first invoice retroactive to March of 2002 in accordance with the 1%/20% Formula. Marc continued to generate invoices throughout 2003 reflecting the Formula. (See *Exhibit "B"*)

**Maurice D'Souza**

24.     As discussed above, prior to my joining IMI , Marc began advising me that he could save me a significant amount of money by utilizing his father's connections to the merchant banking industry in certain jurisdictions, such as Bahrain and other locations in Asia.

25.     Additionally, Marc suggested that he could assist me with marketing agreements by using his father's address in Bahrain to secure cheaper advertising rates as there was very little competition in emerging markets for online media buying.

26.   Once we began working with IMI, he suggested that, through these connections, IMI would also be able to establish a more streamlined and less expensive approach to the processing of online credit card payments for its products.

27.   He also represented to me that a local business entity and director would be required by the banks where he wanted to establish processing accounts. In this regard, he suggested his father's Dubai/Bahrain business identification number be used for these new processing transactions. I agreed to this so long as the processing saved IMI money. Attached hereto as *Exhibit "C"* to this affidavit is a true copy of an E-mail copied to me from Marc, dated October 23, 2002.

28.   At no time did Marc suggest that Maurice would be playing any active role in the operation of these accounts, nor was it envisaged, discussed or agreed that Maurice, or anyone else acting on Marc's behalf would receive any remuneration for assisting in the performance of Marc's Agreement.

29.   To the extent that there were expenses associated with establishing the new merchant banking arrangements for the sale of IMI's products, Marc would advise me of the cost and IMI would wire the funds as directed. Attached hereto as *Exhibit "D"* to this affidavit is a true copy of an E-mail dated October 31, 2002 from Marc to me.

30.   In 2003 Marc suggested opening a merchant account in Toronto, Canada at TD Canada Trust. In this regard we directed Julie Wilson, an IMI employee, to assist Marc in setting up this account. Marc again advised that a local business with a local director would be required to open and maintain this account. IMI provided the funding for setting up and operating the new entity and Marc and Julie set up a Canadian corporation named Billingnow.com. Inc. ("Billingnow") with Marc's mother Marina D'Souza ("Marina")

listed as a Director. Attached hereto collectively as *Exhibit "E"* to this affidavit are true copies of Billingnow.com, Inc.'s Certificate of Incorporation and Articles of Incorporation.

31.    In the summer of 2003, Billingnow opened a merchant bank account and processing agreement through TD Canada Trust. Attached hereto as *Exhibit "F"* to this affidavit is a true copy of a document dated August 27, 2003 from First Data Loan Company, Canada to Marina D'Souza in this regard. Attached hereto as *Exhibit "G"* to this affidavit is a true copy of a processing agreement between First Data Loan Company, Canada and Billingnow.com, Inc. dated October 9, 2003, listing Marc as the contact person for Billingnow.com, Inc.

32.    By 2004, IMI began to utilize the merchant account at Credimax in Bahrain which had been set up by Marc. Shortly thereafter Marc advised me that his father's contacts could further benefit IMI, through additional merchant banking services, such as online bill and expense payment services. I agreed and IMI began to forward its payable invoices to Marc or as he directed.

33.    In 2004, as IMI needed operating funds our accounting department would send Marc documentation regarding IMI's accounts payable and he would release funds held in various merchant accounts to pay these debts. Attached hereto as *Exhibit "H"* to this affidavit is a true copy of an email from Julie Wilson to Marc and me dated May 21, 2004 with attached accounts payable documents and a follow up E-mail from Julie to Marc and me dated May 25, 2004. Marc began utilizing Billingnow and other entities for bill and expense payment services.

34.   Shortly after funds from the sale of IMI's products began to flow into merchant accounts setup by Marc, IMI began having difficulty obtaining expense reports and supporting accounting information. While, IMI could and did access its own internal sales reports to track how much money was being processed from the sale of IMI products world wide, Marc did not provide proper information regarding certain expenses, wire transfers, reserves required by the merchant banks, credit card processing fees as well as his own Formula payments.

35.   Daniel and I trusted Marc to honestly and faithfully carry out his Agreement with IMI. While we understood that Maurice and Marina (his parents) would help Marc, who was only 23 and in law school when I hired him, at no time did we agree or even contemplate that they would take on any active role in Marc's activities on behalf of IMI

36.   In or around August-September, 2004 Marc suggested that we use Bahrain-based accountants to handle IMI's accounting.   However, in light of the difficulties to this point, including unsatisfactory accounting materials received from Marc, I requested that Andriy Dzyubenko, Managing Director of our Ukraine facility establish an accounting department and hire a Chief Accountant.   Subsequently, IMI hired Dmitriy Sancha ("Dmitriy") as Chief Accountant and his first task was to bring the company's books up-to-date.

37.   Between late December 2004 and the summer of 2006 various accounting and cash flow questions arose. While Marc provided some answers and supporting financial records to our accounting staff  he did not provide everything requested. In particular he did not provide answers to IMI's accountant Dmitriy Sancha (Dmitriy) which I forwarded to Marc to answer. Attached hereto as *Exhibit "I"* to this affidavit is a true copy of an E-

mail thread involving Marc, Dmitriy and I dated November 7 and 12, 2005. Attached hereto as *Exhibit "J"* to this affidavit is a true copy of an E-mail thread dated May 11 to 25, 2005 containing a request from Dmitriy regarding entities and transfers to a number of companies unknown to IMI at the time, such as GE Management, and Scorgem Pte, Ltd. Attached hereto as *Exhibit "K"* to this affidavit is a true copy of an E-mail from Dmitriy to Marc dated July 20, 2006 requesting additional accounting information.

(38)   In the summer of 2006, I became frustrated with Marc's repeated failure to respond to Dmitriy's requests for accounting and supporting documentation. Attached hereto as *Exhibit "L"* to this affidavit is a true copy of a thread of E-mails from July 12th to July 20th, 2006 seeking additional accounting information.

39.   Through its internal sales tracking program IMI knew that between 2004 and September 2006 it had sold over $75,000,000 in products and services. It had expanded its Kiev facility from 71 to around 300 full time employees, it had design facilities in Buenos Aries, Argentina (employing approximately 45 people) and it had expanded its sales and support facility in Bangalore, India from 5 to over 75 employees, yet Marc did not provide a full and complete accounting and explanation of what he had done with IMI's money, when asked to do so.

40.   In early October 2006 I began demanding that Marc release IMI's money. In an internal corporate communication channel exchange ("electronic messaging") with Marc, I requested he release $20,000,000 by the following Monday. He stalled and for the first time wanted to renegotiate his 1%/20% Formula. Attached hereto as *Exhibit "M"* to this affidavit is a true copy of an excerpt of the log of the electronic messaging exchange.

41.     These electronic messaging logs are excerpts of online conversations that took place between Marc and I. I began saving the logs of these discussions once I became suspicious of Marc's ongoing refusal to provide a proper accounting and release IMI's money. To properly read the logs one needs to recognize that text appearing immediately after "<Marc123>" represents text typed by Marc, while text appearing after "[msg(marc123)]" represents text typed by me to Marc.

42.     Marc did not release the funds I had requested in *Exhibit M*. However, after repeated demands for money to operate IMI, on December 6, 2006 he did wire $5,000,000 for IMI's use.

43.     On December 10, 2006 I asked him in a electronic messaging log when he would release more money. He responded "after everything is clear and decided upon for past, present, and future.. only then." I responded that it was "...extortion for you [Marc] to hold hostage money belonging to me, Daniel & Kristy so as to force us to make a deal with you." Attached hereto as *Exhibit "N"* to this affidavit is a true copy of an excerpt from the electronic messaging logs in this regard.

44.     Fearing that IMI's money was either being hidden, stolen, or embezzled and hoping to uncover evidence to assist IMI in locating its money, Daniel and I obtained access to Marc's email accounts operated on IMI's servers.

45.     Marc's email accounts revealed a remarkable amount of information. Specifically, they revealed Maurice's intimate involvement in virtually all aspects of IMI's merchant accounts and processing business as well as communication between Marc, Maurice and others that revealed the extent of their breaches of fiduciary duty and their scheme to defraud IMI. For example:

a. Maurice's e-mail of January 31, 2003 advising Marc to restore a British Virgin Islands company, Web Integrated Net Solutions, Inc., ("Web Integrated"), which they went on to use as part of their scheme. Attached hereto as *Exhibit "O"* to this affidavit is a true copy   of this email.

b. Maurice's e-mail of September 3, 2003 to Marc suggesting that Web Integrated's involvement in e-commerce (which, to my knowledge, can only have meant its connection to IMI) be utilized for "...justifying my income figures to spport the injury claim" (I am informed by Kristy and believe that Maurice was in an auto accident and filed an insurance claim as a result of that accident.) He later states: "We could later use it basically for all our business interests.".   Attached hereto as *Exhibit "P"* to this affidavit is a true copy of this email.

c. Marina's e-mail of October 7, 2003 to Marc regarding IMI's websites and IMI's funding of the Billingnow merchant account with TD Canada Trust, demonstrating her involvement in Marc and Maurice's activities.   Attached hereto as *Exhibit "Q"* to this affidavit is a true copy of this email.

d. A thread of e-mails dated March 20th and 21st, 2005 by and between Maurice and N.V. Bhaskaran, an accountant, regarding consolidating Maurice's personal funds with that of Web Integrated and Billingnow from 2000 through 2004 under a single set of books. This thread also references using Gito's funds.   Attached hereto as *Exhibit "R"* to this affidavit is a true copy of this email thread.

e. An email dated June 7, 2006 from Maurice to DBS Bank thanking them for transferring USD$1million each to two different bank accounts, one in Hong Kong and

**Attachment F**

13

one in Switzerland "using my personal letterhead". Attached hereto as *Exhibit "S"* to this affidavit is a true copy of this email.

f. An email dated July 20, 2006 from Maurice to Marc confirming the transfer of USD$1,150,000.00 to Marc's personal investment account at RBC Dominion Securities. Attached hereto as *Exhibit "T"* to this affidavit is a true copy of this email.

g. An email dated September 25, 2006 from Maurice to Marc regarding his advise that "payments made to Gito are in fact debits reflected in bank statements with respect to wires Mom made." Attached hereto as *Exhibit "U"* to this affidavit is a true copy of this email.

46.    Marc's e-mail accounts also reveal a number of admissions to third parties regarding the nature of the relationship between the D'Souza's and their entities and IMI.

a. E-mails from and to Marc dated May 3, 2003 establishing that IMI's websites would have been or were being processed and deposited to Winpayment Consultancy (Winpay), a company owned and controlled by Maurice. Attached hereto as *Exhibit "V"* to this affidavit is a true copy of these emails.

b. Maurice's February 16, 2005 e-mail to PKF in Dubai, UAE advising that his son will be the key operator of an e-commerce business with attached Resumes. Note, the resume of Maurice shows him as heavily involved in WINS and the owner of Billingnow, Winpay Consultancy and Billing Solutions and Marc's resume shows no ownership interest in IMI. Attached hereto as *Exhibit "W"* to this affidavit is a true copy of this email.

c. Maurice's e-mail of March 9, 2005 to KPMG representing that: "Winpay Consultancy provides marketing support to our associate companies, Web Integrated Network Solutions (WINS) and Innovative Marketing (IM) which are licensed in overseas. Winpay facilitates their Website transactions through our contracts with Altijara (Payment Gateway) and Credimax (VISA/Mastercard Acquirer) providing the e-commerce infrastructure in Bahrain. As consultants, Winpay is not directly involved in selling. Neither WINS nor IM engage in local sales in Bahrain. All transactions occur offshore except for the functions performed by Altijara and Credimax." Attached hereto as *Exhibit "X"* to this affidavit is a true copy of this email.

d. Maurice's e-mail of July 10, 2006 to DBS Bank regarding the Banks concerns about "huge inflow and outflow of funds from Winsecure Solutions from GE Management" in which Maurice responds that "Winsecure Solutions was set up as a merchant facilitating online credit card transitions for our affiliate Customers overseas". This e-mail goes on to say "we have agreed to hold part of the cashflow in Singapore for these affiliates until needed for further disbursement." Attached hereto as *Exhibit "Y"* to this affidavit is a true copy of this email.

e. A letter from Elvira Martinez Romero, director for Scorgem Pte, Ltd. dated April 24, 2006, in which she refers a third party to IMI's websites, WinAntiVirus.com, "the software authors". Attached hereto as *Exhibit "Z"* to this affidavit is a true copy of this email.

47. In the fall of 2005, I demanded that Marc send us a proper accounting of the company's financial affairs. Following this request and after repeated delays, Marc provided a "funds-flow accounting" on November 2, 2005. It was grossly inadequate. For example,

15

there were a number of transactions that referenced GITO, an entity that had nothing to do with IMI's business operations for a considerable period of time and, furthermore, there was no description of what the expenses were for. Attached hereto as *Exhibit "AA"* to this affidavit is a copy of the accounting provided by Marc at that time.

48.     Again, after repeated demands, Marc sent an updated "funds-flow accounting" on December 5, 2005. Attached hereto as *Exhibit "BB"* to this affidavit is a copy of the updated accounting provided by Marc at that time. I checked this updated accounting and determined that it was still incomplete and advised him accordingly. Attached hereto as *Exhibit "CC"* to this affidavit are a true copies of my e-mails to him seeking a proper accounting and his response.

49.     Over the period of time from October to December of 2006, the gravity of this situation was becoming clearer, as Marc both refused to send any proper accounting or to wire even 50% of IMI's funds that he and Maurice had placed under their control. Finally, as referenced above, on December 6, 2006 he sent a fraction of the funds that we believe he and Maurice are controlling by releasing USD$5 million. Based on the calculations that we have made, which are admittedly derived from imperfect information due to the lack of a proper accounting, it is believed that Marc and Maurice continue to retain approximately USD$48 million of IMI's money. Attached hereto as *Exhibit "DD"* to this affidavit is a true copy of documents created by IMI's accounting department, derived from information that was eventually received from Marc and Maurice.

50.   - By December 2, 2006 IMI began using a different processor for 10%-20% of its transactions, as the beginning of its attempts to regain control of the company's finances.

51.     After Marc failed to release any additional funds, IMI was left with no choice but to cease processing funds through the D'Souza controlled entities and approximately 80% of all transactions were moved to IMI controlled processors.

52.     On or about November 27, Marc had advised me that he would be sending out a proposal outlining the terms on which he was suggesting the dispute over IMI's funds be resolved. After repeated requests and further stalling by Marc in delivering this proposal, he finally sent a written proposal on December 13, 2006. Attached hereto as *Exhibit "EE"* to this affidavit is a true copy of this December 13, 2006 proposal.

53.     On or about November 5, Marc claimed that he understood from Maurice that IMI's cash totalled USD$20 million. Marc was claiming in the December 13, 2006 proposal referenced above that IMI's profits from 2004 until present were USD$50 million This is more than double the USD$20 million figure that he had suggested was correct approximately one month prior in an electronic messaging conversation on or about November 6. Attached hereto as *Exhibit "FF"* to this affidavit is a true copy of the electronic messaging log.

54.     The December 13 proposal was a Word document attached to an e-mail from Marc and sent to Daniel, Kristy and me. Somewhat confusingly, it begins by referring to Marc in the third person, although it is unclear whether that means that it was authored by Maurice or someone else on behalf of Marc or whether Marc himself chose to word that document in that fashion. In any event, the document does not set out a comprehensive proposal regarding IMI's funds, particularly given the use of vague terms like "remaining profits will be shared equitably between Sam and Marc.". Thereafter, despite repeated demands, none of the funds outlined in Marc's proposal were ever disbursed.

55. At this point, on December 29, 2006, I am informed by Dmitriy and believe that he discovered that IMI's electronic banking and accounting access to various merchant and commercial bank accounts were disabled. I am further informed by Andriy that Marc stated to him that the banks were experiencing "internet connectivity issues" due to an earthquake in Taiwan and refused to pay some of the salaries of IMI employees and other bills to be paid by the company.

56. A few hours later in the same day, on December 29, 2006, Marc sent a letter to Daniel, Kristy and I in which he communicates his termination of his relationship with IMI, which he characterizes as a joint venture. I had never characterized or understood IMI's relationship or that of myself, Daniel or Kristy with Marc to be a partnership or joint venture of any kind. Rather, I always understood his relationship to IMI to be that of a managerial employee, with his pay tied to the profits of the company. Attached hereto as *Exhibit "GG"* to this affidavit is a true copy of Marc' termination letter.

57. In any event, regardless of how one might characterize the relationship, the terms of his remuneration under Marc's Agreement have always been clear as stated in the 1%/20% Formula. It is only through the considerable efforts of Marc and Maurice to consolidate their control over the company's finances that have put them in a position where they were able to take more money out of the company than that to which they were entitled. It was also his consolidation of control over the company's finances that rendered the rest of IMI's management unable to ascertain the nature of these activities and to put a stop to it sooner. We, at no time, acquiesced in this conduct because we were simply unaware of what he was up to.

58.    On or about January 3, 2007 Marc delivered a notice advising that he would cease payment of all bills on behalf of IMI, including for certain past expenses dating back to October 2006, for activities that generated revenues for the company. Attached hereto as *Exhibit "HH"* to this affidavit is a true copy of this letter.

59.    On or about January 9, 2007 Marc advised that he was terminating certain advertising agreements entered into on behalf of IMI through D'Souza controlled entities, thereby causing significant losses for IMI. Attached hereto as *Exhibit "II"* to this affidavit is a true copy of this termination letter.

THE D'SOUZA'S MOVEMENT OF IMI'S FUNDS

60.    While IMI is unaware of the full particulars of where the D'Souzas might have moved various of the company's financial assets, we do know that a significant amount of money has been removed from a number of accounts held in Singapore. Based on the information recovered from Marc's e-mail accounts, we have learned that approximately UDS$3.5 Million was held in certain bank accounts in Singapore as at December 14-18, 2006.

61.    We have also obtained an e-mail from IMI's server, dated February 6, 2007 that was copied to Marc at one of his e-mail accounts on that server (marc@vipfares.com). This message, sent by Michelle Lecaros (mlecaros@rogers.com), an employee of the D'Souzas, who works in the D'Souza's Bahrain office in the finance/accounting department, is sent to Maurice (dsouza@rogers.com) and copied to a number of other individuals, including Marc.

62.     The text of Ms. Lecaros' message simply reads "Dear Sir, Please see attached updated SG Accounts balances for your reference. Best Regards, Michelle" and the e-mail attaches a spreadsheet entitled "SG Account Summary as of Feb 02-06". When one compares the balances of the accounts set out in the spreadsheet attached to Michelle's email to the balances that had been in those accounts as of December 14-18, 2006 we can see that approximately USD$2.6 Million has been removed from those accounts. IMI is presently unable to ascertain where these monies have been moved. Attached hereto as *Exhibit "JJ"* to this affidavit is a true copy of the e-mails recovered from Marc's e-mail accounts on IMI's server attaching these spreadsheets.

63.     In addition to being broken down along lines of departmental jurisdiction, there is also a hierarchy for the approval of expenditures within IMI, with Daniel and I having the ultimate authority to approve or reject any request for expenditures of the company's resources. Indeed, IMI has an elaborate internal accounting system where all payments must be approved along this departmental hierarchy.


FLIGHT RISK

64.     While both Marc and Maurice are Canadian citizens and Maurice maintains a residence in Thornhill, Ontario, and I am informed by Kristy and believe that Marc spends considerable time at a condominium at 1 King St. West, Toronto, Ontario, both Marc and Maurice have significant connections to other parts of the world, including Singapore, Bahrain, India, and California. More specifically, Maurice maintains a residence in Singapore and Bahrain, while Marc maintains a residence in Solana Beach, California and both of them maintain a Bahrain Temporary Population Card. Also, both Marc and

Maurice were born in India and maintain significant family and business ties to that jurisdiction. Attached hereto as Exhibit "KK" to this affidavit are true copies of Marc and Maurice's passports and Bahrain Temporary Population Cards, both of which were recovered from Marc's e-mail accounts.

 65.  In light of the D'Souza's connections to other jurisdictions and in light of their conversion of IMI's assets and the gravity of the situation involving IMI's assets, I have serious concerns that they could flee from Canada.

66.  I believe that if the assets of the defendants are not frozen in the immediate future there is a substantial risk that efforts will be made to place them beyond the plaintiff's reach, if they have not already done so.  Based on the partial accounting that was provided by December, 2006, our accounting department was able to put together a flowchart demonstrating the movement of IMI's assets through a complex network of corporations, holding bank accounts in jurisdictions from the British Virgin Islands to Bahrain, Canada, Switzerland, Singapore, Hong Kong, Dubai, the Netherlands, the Philippines and possibly others.  Attached hereto as *Exhibit "LL"* to this affidavit is a true copy of the chart prepared by our accounting department in that regard.

67.  An example of the supporting data relating to the data in *Exhibit LL*, prepared by IMI's accounting department, shows that approximately USD$22 Million of IMI's money ultimately went into accounts in the names of the D'Souza's personally, of which approximately USD$18 Million went into accounts in Maurice's name. Attached hereto as *Exhibit "MM"* to this affidavit is a true copy of the backup documentation prepared by our accounting department in that regard.

68.     Given Marc and Maurice's ties to various other jurisdictions, including Singapore and Bahrain, I have great concerns about whether they will cooperate with any court proceedings if they are not forced to stay in Canada.


**SWORN BEFORE ME** at the          )
City of Toronto, in the             )
Province of Ontario                 )
this 17ᵗʰ day of February, 2007     )

_____              _____
*Commissioner for Taking Affidavits*                    SAM JAIN

Matthew J. Latella

TORDMS-130060-v1-Affidavit_of_Sam_Jain_-_02-09-07.DOC

W

Attachment F

**Subject: DUBAI SET UP**
**Date:** Wednesday, February 16, 2005 7:06 PM
**From:** MD <mdsouza@batelco.com.bh>
**Reply-To:** "MD" <mdsouza@batelco.com.bh>
**To:** <stanypereira@pkfuae.com>
**Cc:** Marc <marc@vipfares.com>

Mr. Pereira,

It was a real pleasure speaking with you today. Thank you for the offer to assist us in setting up a company in the free zone. Attached is a brief synopsis of the e-commerce operations we would like to set up in Dubai or another suitable location you would recommend. As mentioned on the phone, I was impressed with the initiatives in Dubai a few years ago in building a global e-commerce infrastructure. Trust the recent developments are even more sophisticated to support our enterprise.

My son Marc will be the key operator of the business. Resumes of both of us are attached.

Kindly e-mail me back with your comments together with an outline of the formalities. We can travel to Dubai early next week to sign the initial paperwork. Please also let me know your fee model for getting us started in the business.

Best regards,
Maurice DSouza
+973 39655938
!DSPAM:42139a242111080160108361!

*This is Exhibit............referred to in the*
*affidavit of ............*
*sworn before me, this ...........*
*day of............20....*

*A COMMISSIONER FOR TAKING AFFIDAVITS*

# MAURICE DSOUZA

22 Carnegie Crescent
Thornhill, Ontario
CANADA L3T 5H1

☎ +1 (905) 881 2838 / 886 8883
📠 +1 (905) 881 7081 / 248 3702
dsouza@rogers.com

## EXECUTIVE SUMMARY

A senior financial services and e-commerce executive possessing a strong multi-disciplinary background, multi-faceted experience and cross-cultural skills acquired over a period of more than thirty years in international settings. A strategic thinker with a demonstrated capacity to execute. A leader, mentor and communicator who encourages independance, creativity, initiative, teamwork, excellence in performance and professionalism. Strong international affiliations, having lived and worked in India, Middle East, Canada and placed business into Asian, African, European and North American markets. Exceptionally well qualified in dealing and conducting business with diverse people, religions, cultures and traditions. Fluent in English, working knowledge of French and Arabic. Demonstrated track record and expertise in:

- General Management
- Board Member & Advisory Roles
- Start-up operations
- Strategic Planning

- International Market Development
- E-commerce consultancy
- Business Development
- Chief Executive Role

## BUSINESS EXPERIENCE

### *ENTREPRENEUR*                                    Since 1998

Engaged in the following:

### CRESCENT GLOBAL (Bahrain)

*Feasibility, Incorporation, Start Up of the company and Executive control of the Operations since inception.*
In this pivotal role, as the brain behind the operations provided exclusive advise and assistance to shareholders in all areas.

- Identified and secured several insurance company clients, including a significant number of Takaful operators; Directed the board meetings and strategy implementation.
- Established and directed the start up of the Qatar operations. Diligently built a full complement of strong, motivated and well trained staff and created a well knit team.
- Infused the organization with a service oriented culture. Introduced use of the Internet and web based solutions and, delivered continual process improvements in all areas resulting in a smoother and more efficient operation.
- Introduced and successfully promoted company recognition and boosted brand awareness through exposure in the industry circles through focused marketing and attendance at conferences.
- Championed use of Activity based costing which improved the overall operational effectiveness of the organization.

### QATAR RISK MANAGEMENT SERVICES (Qatar)

*Feasibility, Formation and Decision making for the venture*

- Undertook complete responsibility for obtaining license and the regulatory approvals
- Introduced and oversaw various risk management systems and processes within Mannai Group and associated offices; aggregate exposure controls, ROE modelling by insurance policy, resulting in a 40% reduction in risk exposure and a substantial saving in premium.

### REINSURANCE AND INSURANCE CONSULTING HOUSE (Bahrain)

*Feasibility, Establishment and Direction of the office*

- Spearheaded the Consulting and strategic planning process for Crescent Global, acquiring key clients like the Ministry of Finance & National Economy, Ministry of Electricity and Water, Ministry of Health, Unitag, United Hotels Co., Chartered Bank, etc.
- Developed substantial core relationships globally with other insurers, reinsurers and intermediaries, re-focusing geographic and business portfolio strategies for Crescent Global.
- Negotiated and procured Lloyd's accreditation for Crescent Global, being the only such broker in the Middle East

## WEB INTEGRATED NET SOLUTIONS (BVI)
*Feasibility, Set-up and Administration of the Processes*
- Heavily involved in all aspects including product developments, consulting, pricing, distribution and marketing.

## BILLINGNOW.COM Inc. (Canada)
*Feasibility, Network and Infrastructure support for the Corporation*
*Owner of:*
## WINPAYMENT CONSULTANCY s.p.c. (Bahrain)
## BILLING SOLUTIONS s.p.c. (Bahrain)

## *Regional Underwriter, NCCI, Saudi Arabia*                    1996 – 1998
- Complete technical control of the operations in the Eastern region.
- Leading the strategic Planning Process for the Region
- Participation in the Regional Management and Technical operations of the Company

## *Self-Employed* Consultant, *Toronto, Canada*                    1993 – 1996
(Carnegie Consulting Company)
Contracts with:
- Sunlife of Canada, Zurich Life Canada, Royal Insurance Canada, Manulife Canada
- Marsh & McLennan

## *Manager: Reinsurance,* Zurich Canada, *Toronto*                    1990 – 1993

- Head office function —managing the 'treaty' and 'facultative' underwriting and marketing operations for Canada

## *Underwriting Supervisor: Engineering,* Royal Insurance Canada, *Toronto*                    1989 – 1990

- Development of the Builders Risk program and product design
- Technical and Marketing Responsibility for the Boiler Machinery and Engineering business of Ontario Branch

## *Senior Vice President:* National Insurance Company, *Bahrain*    1978 – 1989

- Full control of the Technical and marketing functions in the company and its predecessor companies
  - National Insurance Services
  - Sedgwick Forbes Middle East

## *Officer in Charge:* Royal Insurance, *Bahrain*                    1975 – 1978

- Complete operational responsibility for the branch

## *Assistant:* Oriental Insurance, *Chanda, India*                    1972 – 1975

- Responsible for Underwriting and Accounting functions

# PROFESSIONAL EDUCATION & DESIGNATIONS

- **MBA**, Masters of Business Administration, University of Toronto, Canada, 1995
- **B.Com**, Bachelors of Commerce, 1972. University of Nagpur
- **FFII**, Fellowship examinations of the Federation if Insurance Institutes, India

# MARC GERARD DSOUZA

## EXPERIENCE

2001–2004      E-Commerce                         Boston, MA, USA
*International Marketing Director*
- Increased turnover from $2 million to $25 million.
- Added seven direct sales channels for new products through effective web advertising.
- Successfully negotiated over a dozen lucrative deals with suppliers.
- Provided General Management for the operations world-wide

1999–2001      E-Web Team                         Toronto, ON, Canada
*Partner*
- Set up an efficient on-line search engine for mp3 music.
- Lunched innovative advertising campaigns for the business.
- Managed the marketing activities of the company.

1998–1999      National Institute of Broadcasting   Toronto, ON, Canada
*Assistant director*
- Designed and marketed customized solutions for clients in the U.S.
- Expanded sales to include mass market accounts.
- Expanded sales team from 50 to 100 representatives.

1997–1998      Sitel Canada                         Toronto, ON, Canada
*Customer Service Manager*
- Marketed a competitive long distance telephone package to major U.S. Businesses.

1996–1997      DMS Market Services                  Toronto, ON, Canada
*Customer Service Representative*
- Sold insurance policies to Canadian residents on behalf of Heritage General Insurance Company

## EDUCATION

2001–2004      Boston Law College                  Boston, MA, USA

- Doctor of Law.

Post Graduate degree in Corporate law
Including Intellectual Propert and Cyber laws.

1997–2000       University of Toronto            Toronto, ON, Canada
- B.A., English/Criminology.

Graduated Summa Cum Laude.

**Awards**
- Deans List (1997-2000)
- Golden Key National Honor Society (1998-2000)
- University of Tornto Academic Scholarship (1998-2000)
- Debating champion, Onario Region (1996, 1997)
- Royal Canadian Legion Public Speaking – 1st place (Ontario level – 1997)

INTERESTS

Travel, E-commerce technology, Music, Software Innovations.

2

Court File No.

## *ONTARIO*
## SUPERIOR COURT OF JUSTICE

B E T W E E N:

### INNOVATIVE MARKETING, INC.

Plaintiff

and

### MARC GERARD D'SOUZA, MAURICE D'SOUZA, MARINA D'SOUZA, CONRAD D'SOUZA, LEONARD D'SOUZA ELVIRA MARTINEZ-ROMERO, WINPAYMENT CONSULTANCY SPC, WEB INTEGRATED NET SOLUTIONS, INC., BILLINGNOW.COM, INC. BILLING SOLUTIONS, SPC, WINSOLUTIONS, FZ-LLC, REINSURANCE AND INSURANCE CONSULTING HOUSE SPC, SYNERGY, B.V., WINGEM, INC., WINSECURE SOLUTIONS, PTE, LTD., BILLPLANET, PTE, LTD., , DSOFT, PTE, LTD., GE MANAGEMENT, PTE, LTD., and SCORGEM, PVT, LTD.

Defendants

### AFFIDAVIT OF DANIEL SUNDIN

I, Daniel Sundin of the City of London in the United Kingdom MAKE OATH AND SAY:

1.    I am the Chief Technology Officer of the plaintiff, Innovative Marketing, Inc. ("IMI"), having held that position since approximately December 2005. Prior to that time I was acting in the role of a Chief Operating Officer, although we did not use formal titles at the time of IMI's formation in July, 2002 until I became Chief Technology Officer. Accordingly, I have knowledge of the matters to which I hereinafter depose.

2.    I have read the affidavit of Sam Jain ("Sam") sworn February 18, 2007 and am in agreement with its contents.

3.    I have been involved in computer programming since 1993 and e-commerce since approximately 1998. My areas of specialty include consumer software design,

e commerce payment platforms, and web analytics. I started the business that would eventually become incorporated under the name Innovative Marketing, Inc. in or about November, 2001 to take advantage of globalization by organizing a vast international team to develop and build products such as Drivecleaner.com, as a vehicle for building a platform offering online consumer products specializing in security software.

4.   On or about July 18, 2002, I incorporated IMI as a Belize corporation.  Attached hereto as *Exhibit "A"* to this affidavit is a true copy of IMI's Certificate of Incorporation dated July 18, 2002.  I am IMI's sole shareholder and director. Attached hereto as *Exhibits "B" and "C"* to this affidavit are true copies of Share Certificate No. 1 of IMI and IMI's Certificate of Incumbency.

5.   Over the course of IMI's first two years of existence, I injected approximately $713,373.00 of cash equity and $2,657,571 of debt financing into the Company.  (All figures are in U.S. dollars).

6.   In approximately April of 2002, I was approached by Sam and Kristy Ross ("Kristy") regarding the possible collaboration on a business venture by combining each of our respective areas of expertise.  I had known Kristy since September 2000, having met her through other business acquaintances, and through her, I met Sam, and understood them to be effective marketing experts in the area of e-commerce business ventures. Following extensive discussion with Sam, I recognized the benefit of working with them.  Accordingly, I agreed to enter into an agreement with Sam, whereby he and I would take the lead roles in the new business venture.

7.   We did not reduce our agreement regarding our respective shares in the business operation to writing, nor did we specify in writing at that time what Kristy would receive.  However, there is no disagreement among Sam, Kristy and I as to each of

2

Attachment G

our respective entitlements to certain percentages of IMI's profit, nor has there been any such disagreement from the outset of our involvement in IMI.

8.       Sam informed me at the outset that he had hired Marc D'Souza ("Marc"), who was going to be working with us. In or about July 2002, I was first informed by Sam and believe that he established an agreement with Marc, whereby Marc would be paid 1% of the company's profits up to $200,000 a month and 20% of the company's profits in excess of $200,000 per month. Sam also advised me that, in exchange for that remuneration, Marc would be responsible for a range of duties, including: securing merchant accounts, sourcing suppliers and vendors, sales and product marketing, and any and all activities necessary to expand the business. I understood Marc would have an incentive to do this because his pay was tied to the profitability of the business. This understanding was verified as time passed and Marc's pay was drawn in that amount on presentation of requests for payment from him.

**IMI'S PRODUCTS**

9.       IMI's Proprietary Software is marketed through IMI-owned and maintained websites, including:      WinAntiVirus.com,      WinAdBlocker.com,      WinAntiSpy.com, WinContentFilter.com,      WinDriveCleaner.com,      DriveCleaner.com, MultimediaFixer.com, ComputerShield.com , PCSuperCharger.com, StopGuard.com, and Popupguard.com. IMI also owns and maintains other websites/domain names, which are not related to software sales.

10.      IMI's business model involves designing, developing and marketing its own line of proprietary software and other products through websites it owns. IMI also provides customer support services for its software through its facilities located in Kiev, Ukraine, Bangalore, India and other outsourced vendors. It also maintains a full staff

3

Attachment G

to localize the products into every major international language through its facilities in Buenos Aires, Argentina and Kiev, Ukraine in addition to our outsourced translators.

11.    I commenced operations in Ukraine in approximately December, 2001 and in Argentina in approximately January, 2002.   Our facility in Kiev is now IMI's corporate headquarters, currently employing approximately 300 people with a highly structured management hierarchy to oversee the global operations, while our facility in Argentina employs approximately 45 people.  We also have an office in Bangalore, India that currently employs 35 people.  All offices are integrated within IMI's global departmental hierarchies and report to the senior management team, who, in turn, report to me and/or Sam.

12.    The products designed by IMI are sold exclusively through IMI-owned websites and are the primary source of revenue for IMI.  IMI also generates a certain amount of revenue (approximately 5% of overall revenues) from the sale of advertising to third party companies through our IMI-owned websites.

13.    IMI's products generate revenue through credit card purchases by the consuming public through IMI's websites.  The payments are typically processed through third party processing companies, such as Altijara.com, Chargemelater.com and others, which arrange for the payments as a result of such purchases to be deposited into merchant banking accounts.  Attached hereto as *Exhibit "D"* to this Affidavit is a true copy of a "screenshot" showing the steps that a member of the consuming public would follow to purchase one of our products through our websites, thereby generating a credit card payment into one of the merchant banking accounts established to receive IMI's revenue stream.

14.    IMI's revenue stream began to grow exponentially beginning August 2003, continuing through 2006, as our products began to be purchased by increasingly large

4

Attachment G

numbers of customers around the world. Attached hereto as *Exhibit "E"* to this Affidavit is a true copy of a document generated by our Accounting Department based on IMI's internal sales records showing the growth in IMI's profits over the course of 2004 through 2006, as broken down by payment processor and website.

15. Over the past 12 years, I have suffered from bacterial overgrowth syndrome. From time-to-time, over the past 3 years, my condition has caused fatigue and affected my ability to dedicate as much time as I would like to my business endeavours. Accordingly, I have not always been able to be actively engaged in my duties on behalf of IMI and, accordingly, some of my duties have been assumed from time-to-time by Kristy, who I consider to be a savvy manager and technically knowledgeable in my areas of computer software and design as well as marketing skills.

## MARC'S SCHEME TO GAIN CONTROL OF IMI'S FINANCES

16. From the outset of Marc's involvement with IMI, he proposed that he could use his father's merchant banking connections in Bahrain and elsewhere in Asia to save IMI money, there was never any discussion or agreement about him receiving any additional compensation for doing so. Rather, his remuneration was structured with a long-term view and rewarded him for all his contributions as it was always tied to the profitability of the company.

17. I always understood that Marc's motivation for saving IMI money would be to maximize the company's profit and thereby increase his remuneration. We placed a high degree of trust in Marc to carry out his duties to IMI in a faithful and honest fashion. Our trust has resulted in a situation where the revenue stream generated by IMI's products through sales on IMI owned websites has been consolidated under the control of Marc and Maurice, leaving us in a situation where we are forced to bring legal proceedings to recover IMI's funds from them.

5

Attachment G

18.     As our demands for an accounting, described accurately in Sam's affidavit, began to unfold over the course of 2005 and 2006, we were faced with an increasingly desperate situation where we neither had a clear picture of the company's state of financial affairs, nor did we have control of our own funds and were concerned about the survivability of IMI as an ongoing concern. Accordingly, we became intent on retrieving IMI's money.

19.     It was in this context that I signed two documents, that Marc requested, each entitled "Advisory Agreement", in substantially the same terms, one dated December 19, 2006 and one dated December 20, 2006 and emailed them to Web Integrated Net Solutions Inc. ("Web Integrated"). I did not consider that the terms of the documents accurately described the nature of our business relationship, but I was looking to recover at least some of IMI's diverted funds. These agreements were never signed by D'Souzas on behalf of Web Integrated nor were any funds sent to IMI.

20.     On or about February 2004, I signed the Marketing Service Agreement between IMI and WinPayment Consultancy SPC ("WinPayment"), dated February 10, 2004 which expired one year later. I signed this agreement because Marc advised me that such an agreement was required. Attached as *Exhibit "F"* to this Affidavit is a true copy of the February 10, 2004 Marketing Service Agreement between IMI and WinPayment. The Marketing Service Agreement does not reflect the nature of the business relationship between IMI and WinPayment.

21.     After we experienced difficulties obtaining an accounting and recovering our money from the D'Souzas, as more fully outlined in Sam's affidavit, Sam and I began reviewing the contents of Marc's e-mails sent over IMI's corporate server. That review revealed that the D'Souzas had acted without either my or Sam's authorization on many financial matters. Particularly alarming to me was the discovery that they

6

**Attachment G**

25.   The email review also revealed that in early January 2005, the D'Souzas were coming under pressure to provide certain agreements to merchant banks as evidence of the "legitimacy" of their business operations. Attached hereto collectively as *Exhibit "I"* to this Affidavit are true copies of e-mail exchanges and correspondence with Credimax recovered from Marc's e-mails sent over IMI's server demonstrating the pressure that he and Maurice were coming under to provide certain agreements to merchant banks.

26.   It appears that without my knowledge or consent, Marc and Maurice submitted forged documents to one or more financial institutions to satisfy their inquiries, For example, based on Credimax's inquiries set forth in Exhibit I, Maurice sent an unsigned agreement with IMI as a party to Marc, saying, "Once final with signatures, we can print and fax the material to our office in Bahrain. They can package the stuff nicely and hand to Credimax. Let's keep our fingers crossed and hope for the best!" Attached hereto as *Exhibit "J"* to this affidavit is a true copy of January 11, 2005 email attaching an unsigned draft Marketing Service Agreement.

27.   On January 12, 2005, Marc and Maurice exchange emails which appear to show that they are practicing forging IMI's employees' signature. One of the signatures purports to be mine, and it is not. Attached hereto as *Exhibit "K"* to this Affidavit are true copies of an email exchange between Marc and Maurice in which they appear to be practicing how to correctly make certain forged signatures, including my signature which it is not.

28.   On January _13, 2005, Marc and Maurice forwarded the forged Marketing Service Agreement to Credimax. Attached hereto as *Exhibit "L"* to this Affidavit are true copies of the email showing that the document was submitted to Credimax.

8

29.  I believe that Marc and Maurice have refused to release IMI's assets to the company, in order to try to use their possession of such funds, however illegitimate, as leverage to negotiate a more favourable share of what they have learned is a very lucrative business.

30.  I swear this Affidavit in support of an order freezing Marc and Maurice's assets and those of their corporate interests worldwide, as I believe it is the only means by which IMI will be able to recover its assets.

SWORN BEFORE ME at the )
City of Toronto, in the )
Province of Ontario )
this 19ᵗʰ day of February, 2007 )

Commissioner for Taking Affidavits

Matthew Latella

DANIEL SUNDIN

9

Attachment G

D

## 1. User sees our advertising



Advertising pages are commonly hosted on our clusters.
*Stats on showing are sent to our server.*

## 2. Running of installer

In case user impressed by advertising he clicks on download button (it can be named 'Yes', 'Ok', 'Free', other).
In result our installer application is downloaded to users PC and run.



This Is Exhibit.............referred to in the
affidavit of............................
sworn before me, this.............
day of.............................20.....

A COMMISSIONER FOR TAKING AFFIDAVITS

Installers are commonly distributed via Limelight servers (special network for static files distribution)
*Stats on installer launched on user Pc are sent to our servers.*

## 3. Accepting EULA by customer
User is able to review EULA and accept it or decline.



In case of declining EULA Installer exists and nothing continue.
*Stats on user decision on EULA acceptances are sent to our servers.*

### 4. Downloading free version of software
In case users accepts EULA than free software is downloaded by installer, installed and launched on user's PC



*Stats on downloading and installing are sent to our servers.*

**Attachment G**

Court File No. 07-CV-327940PD3

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
Commercial List

## INNOVATIVE MARKETING, INC.

Plaintiff

– and –

## MARC GERARD D'SOUZA, MAURICE D'SOUZA, MARINA D'SOUZA, ELVIRA MARTINEZ-ROMERO, CONRAD D'SOUZA, LEONARD D'SOUZA, WINPAYMENT CONSULTANCY SPC, WEB INTEGRATED NET SOLUTIONS, INC., BILLINGNOW.COM, INC., BILLING SOLUTIONS, SPC, WINSOLUTIONS, FZ-LLC, REINSURANCE AND INSURANCE CONSULTING HGOUSE SPC, SYNERGY, B.V., WINGEM, INC. WINSECURE SOLUTIONS, PTE, LTD., BILLPLANET, PTE, LTD., DSOFT, PTE, LTD., GE MANAGEMENT, PTE, LTD. and SCORGEM, PTE, LTD.

Defendants

### Affidavit of Marc D'Souza
### (Sworn on February 20, 2007)

**I, MARC D'SOUZA,** of the City of Manama, in the Kingdom of Bahrain,

**MAKE OATH AND SAY AS FOLLOWS:**

1.  I am one of the defendants named in the within action and as such have personal knowledge of the matters to which I hereinafter depose. Where my knowledge is based upon the information of others, which information I believe to be true, I will identify the source of my information.

1.

**Overview**

2.    I have reviewed the affidavits of Sam Jain ("Sam") and Daniel Sundin ("Daniel"), sworn on February 19, 2007 in support of the plaintiff's ("IMI") motion for a Mareva Injunction.

3.    Both affidavits contain many significant factual inaccuracies and omissions.

4.    The principal allegation that IMI was or is the corporate vehicle that employed Sam or me is fabricated. Neither Sam nor I were ever employed by IMI. On the contrary, Sam and I were carrying on business for some time prior to IMI being identified by Sam as a potentially valuable source for the development of anti-virus software.

5.    Daniel never gave any directives to either Sam or me. He, through IMI, was simply the software development "unit" of the business jointly controlled and operated by Sam and me.

6.    Similarly, Kristy Ross ("Kristy") never considered Daniel or IMI as her employer. I spoke to Kristy as recently as yesterday, and she confirmed to me that she never considered herself to have been employed by Daniel or have an employment agreement with IMI.

7.      In short, it is my position herein that the e-commerce "business" was carried on
by Sam, Daniel, Kristy and me, not through IMI, but rather though a form of joint
venture (the ""Business").

**Sam and I Commence our Working Relationship in early 2002, prior to Sam's
Knowledge of Daniel Sundin or IMI**

8.      In paragraph 1 of his affidavit Sam states that he is a managerial employee of IMI
and that he has performed the general functions of a Chief Executive Officer since
approximately July, 2002. I have worked with Sam since early 2002 and never
heard him referred to either by himself or others as an officer of IMI, let alone as
its Chief Executive Officer. I know of no document that ever referred to Sam as
an officer of IMI.

9.      In paragraph 6 of his affidavit, Sam states that when he joined IMI (i.e. in July
2002) he brought with him over a dozen employees, one of whom was me.

10.     In fact, I had commenced my business dealings with Sam in January 2002, when I
started to assist him with the marketing for the e-commerce business he was then
carrying on under the names of GITO, Inc. and PMMCI ("GITO/PMMCI"),
British West Indies and Nevada incorporated companies, respectively. At that
time neither Daniel nor IMI were known to either Sam or me. At the time of my
initial dealings with Sam, I was enrolled full time at Boston College law school.

11. In or about July 2002, Sam and I reached an agreement pursuant to which GITO/PMMCI (not IMI) would compensate me for my efforts (the "Interim Agreement"). At the time of the Interim Agreement, I was still enrolled at Boston College in Massachusetts. Sam was then resident in Hawaii, in the United States of America. According to Sam, at the time of my involvement with him in January 2002, GITO/PMMCI's monthly net profit was approximately $200,000 and had been hovering around that $200,000 mark for some time prior thereto.

12. The essential terms of the Interim Agreement were as follows: Sam was to pay me or cause to be paid to me monthly

   a)    1% per of the first $200,000 of its monthly net profit; and

   b)    20% of all monthly profit in excess of $200,000,

   while I was enrolled at law school and could devote only some of my time to the Business.

13. I must add that GITO/PMMCI ceased to be used by us as the vehicle for the Business, and GITO/PMMCI's bank accounts became inactive in or about 2004.

14. It is untrue, as stated in paragraph 8 of Sam's affidavit, that he and I originally agreed on a monthly remuneration for my services in the amount of USD$4,000. In fact, Sam paid me or caused to be paid to me a total of $6,000 for services performed by me for January and February 2002 together with monies to reimburse me for certain out-of-pocket expenses.

**Daniel Enters the Picture in October 2002**

 15.　In or about October 2002 Sam told me that his long time friend, Kristy, had introduced him to Daniel, who apparently had a software development business in Kiev, Ukraine.  That was the first I ever heard of Daniel or IMI.

16.　Sam and I first started discussing doing business with Daniel and IMI in or about October 2002.  According to Sam, Daniel's expertise was in adult related e-commerce.  He apparently had also been involved in some failed soft-ware development ventures in Ukraine.

17.　More specifically, in or about October 2002, Daniel forwarded to us, inter alia, "porn key words" intended to be used by Sam and me to market Daniel's adult websites.  Examples of such "porn key words" were "Amateur Incest Pictures", "Amateur Teen Galleria", "Anal Masturbation" and "Animals and Girls", all relating to adult websites developed by Daniel.

18.　It was Sam's and my expressed intention to re-direct Daniel's technical software development skills to the development of security software to be marketed exclusively by us.  Sam and I saw this as a more advantageous business model than marketing the security software of other third party security software companies.

**Daniel and IMI Join Sam and me, rather than Sam and I Joining Daniel or IMI**

19. That Daniel/IMI joined the Business, rather than Sam and I joining IMI, is clearly illustrated by Sam's and my Instant Messenger Chat ("IMC") of November 12, 2006, a copy of which is attached hereto as Exhibit "A".

20. In that IMC, Sam himself states that "Daniel joined us in October 2002".

21. I also note that, prior to Daniel/IMI joining us, Sam and I were marketing products such as e-commerce travel, telecommuting home career based portals, music websites and flowers, products unrelated to anything Daniel or IMI were involved with.

22. In the opening paragraph of his affidavit, Sam states that he is a "managerial employee" of IMI and has "performed the general functions of a Chief Executive Officer" of IMI since approximately 2002. Attached as Exhibit "B" hereto is an email from Andriy Dzybenko, IMI's Office Director in Kiev, Ukraine, addressed to Daniel, Sam and myself to which was attached an organization chart for IMI. I note that Sam's name is nowhere to be found on that organization chart.

**Merchant Account Providers**

23. Sam is not telling the entire truth when he states in paragraph 9 of his affidavit that I represented to him at the time "[I] was hired" that I had contacts with

merchant account providers in Asia and the Middle East that could offer better rates for processing credit card accounts with a lower charge back limit.

24.     Throughout 2002 and most of 2003, all merchant account providers to Sam and me had been chosen by Sam. I had no direct involvement with any merchant bank providers. The merchant bank providers for Sam and me, until late 2003, were Bancorp., GlobalPayments and iBill, all of which companies had been selected solely by Sam.

25.     All I communicated to Sam was that I thought that it would be prudent to diversify our merchant bank relationships by establishing additional and/or alternate relationships with other merchant bank providers. The prudence of this plan was demonstrated when, in June 2002, when one of Sam's merchant bank providers, Globalpayment, notified Sam that it was terminating its relationship with Sam. A true copy of that notification, dated June 18, 2002, is attached as Exhibit "C" hereto.

26.     In fact, it was not until December 2003 that, on the strength of my family's pre-existing good relationship and credit rating, a merchant bank relationship was started with the T-D Bank in Toronto.

27.     As it turned out, the establishment of a merchant bank provider relationship with T-D Bank stood us in good stead when we experienced problems with the

merchant bank providers with whom Sam had set up relationships.  One of the reasons for such problems was the relatively high rate of charge backs.

### The Interim Agreement

28.    Paragraph 15 of Sam's affidavit is misleading and, in some respects, false.  While the "1%/20% Formula" was indeed agreed upon between Sam and myself (i.e. the Interim Agreement"), I never advised him or otherwise intimated that it "would give [me] the incentive to continue in the business for years as [I] anticipated the profits to be in the millions of dollars".  In fact, Sam was given to clearly understand and clearly understood that the Interim Agreement was just that: a provisional agreement which was to govern while I was a full-time law student and was only devoting some of my time to the Business.

29.    In paragraph 19 of his affidavit, Sam states that that "included in the final deal was that [I] would submit invoices based on the 1%/20% Formula and thereafter be paid along with [my] invoiced expenses incurred on behalf of the company".  Exhibit "B" to Sam's affidavit purport to be copies of e-mail invoices from me to Sam.  What Sam omitted to say is that the invoice attached as Exhibit "B" to his affidavit is the **only** invoice ever submitted by me to Sam.  In fact, Sam, in paragraph 23 of his affidavit, misrepresents that "[I] continued to generate invoices throughout 2003 reflecting the Formula".

30.   I further note that the one and only invoice I ever sent to Sam, was not directed to IMI.

31.   I hasten to add that, as time progressed, and as I graduated from law school at Boston College, my involvement with the Business increased such that I devoted my full time and attention to the Business.  It was always understood by Sam and me that the Interim Agreement had come to an end even prior to my finishing law school.  I can say without fear of contradiction that my contributions to the Business were a very significant, if not the single most important contributing factor to the ever increasing volume of sales and profits of the Business.

**The Interim Agreement is Allegedly Adopted by IMI**

32.   In paragraph 22 of his affidavit Sam states that the Interim Agreement was "adopted by IMI".  I note that neither Sam nor Daniel have produced any document substantiating this alleged adoption of the Interim Agreement. Furthermore, and in any event, I never received notification, verbally or otherwise, of such alleged adoption.

33.   None of the payments I ever received for the services I performed was made by IMI.

**Maurice DSouza**

34. By way of overview, my father's involvement and that of some of the companies used by him to manage the financial affairs of the Business (the "DSouza Management Companies"), was prompted by Sam's and my desire to

   a) earn the monies from our e-commerce business in the most cost effective and tax advantageous manner; and

   b) form and sustain effective and lasting merchant account relationships.

35. All financial dealings of my father and were always transparent to Sam. He knew where and why my father had set up DSouza Management Companies. He similarly knew at all times how much money was in any of the DSouza Companies' accounts, and in fact had electronic access to many of the DSouza Companies' operating accounts. Also, if and when monies were transferred to personal accounts of either my father or myself, he knew what amounts had been transferred and why and, in fact, was in ostensible agreement with all these transfers.

36. Contrary to what Sam states in paragraph 28 of his affidavit, I made it clear to him right from the outset that my father and the DSouza Companies expected to be paid for the services they performed for the Business. Furthermore, Sam knew full well that my father, commencing in or about mid-2003 (following a motor vehicle accident injury suffered in Bahrain) operated and managed the DSouza Companies on a full time basis.

10

37.     It is blatantly absurd for Sam to have assumed and to now suggest that my father
        or the DSouza Companies were performing their services for free.  It was always
        clearly understood by him that my father and the DSouza Companies were
        entitled to fair compensation for the services they performed for the Business.

38.     In paragraph 29 of his affidavit, Sam states that, upon my advice to him of certain
        expenses associated with the establishment of "new merchant banking
        arrangements for the sale of IMI products", "IMI would wire the funds as
        directed".  He then refers to Exhibit "D" as supporting documentary proof of my
        request.  I note that

        a)     my e-mail was not directed to IMI, but to Sam to make payment from
               GITO/PMMCI;

        b)     no funds were ever transferred to me, my father or any of the DSouza
               Companies by IMI; and

        c)     GITO/PMMCI was not selling or marketing IMI's security software
               products until in or about the summer of 2003.

39.     Contrary to what Sam states in paragraph 30 of his affidavit, Julie Wilson was not
        an employee of IMI, but instead was employed by GITO/PMMCI.  Also, IMI did
        not provide any funding for "setting up and operating the new entity".  Such
        funding was provided by GITO/PMMCI.

11

40.     In paragraph 32 of his affidavit, Sam suggests that "by 2004, IMI began to utilize
        the merchant account at Credimax in Bahrain". IMI never utilized any merchant
        account at Credimax in Bahrain.

41.     Paragraphs 33 of Sam's affidavit is somewhat accurate, but mischaracterizes the
        true relationship between the parties.  IMI, at all material times,was a software
        development resource used by GITO/PMMCI and then by the Business to
        develop security software to be sold and marketed by us.   The financial
        compensation agreement between us and IMI was that IMI would send monthly
        invoices reflecting its expenses (i.e. payroll, rent, etc.), and we would cover these
        expenses and would also make payments to IMI to have it make bonus payments
        (tied to performance) of some of its own employees.  Daniel, as the principal of
        IMI, in addition, was entitled to a percentage of the profits of the Business.

42.     I must add that Daniel's/IMI's request to be reimbursed for IMI's monthly
        expenses was in the form of asking me to approve of the expenses detailed in his
        money transfer requests and I would sometimes review these expense submissions
        and ask for further clarification before authorizing payment.

43.     Paragraph 34 of Sam's affidavit is fabricated.  If Sam, IMI or anyone else had any
        "difficulty obtaining expense reports and supporting accounting information",
        they never notified me or my father.  Also, it is incorrect that Sam or IMI could
        only track "how much money was being processed from the sale of IMI products

world wide". In fact, Sam and Daniel, at all material times could accurately track the flow of all revenues generated from the sale of all products sold or marketed by the Business.

44. Throughout most of 2004, the discreet responsibility to track profit or loss of the Business, with the knowledge and approval of Sam, was handled to a substantial degree, by a third party business process outsourcing company by the name of Decatrend Ltd. in India. Sam had free access to all records of Decatrend. It was only after Sam and I had suspicions that Decatrend was overcharging us that Sam and I jointly decided to have the Decatrend's function taken over by Dmitriy Sancha.

45. The reason why Sam and I agreed to permit IMI to hire Mr. Sancha was that, while the DSouza Companies kept accurate, but separate records of all revenues and expenses, the expenses were not systematically characterized or sorted to accurately determine the profit or loss for the Business. Expenses were incurred for payroll, third party suppliers, advertising, supplies, rent in many locations world wide (including IMI's offices and offices in countries such as India, Philippines, Urugay, Brazil, etc.) professional fees, capital acquisitions, etc. In short, the accounting records of the DSouza Companies, while complete and accurate, did not lend themselves to easily determine profits. This, I repeat, was the discreet task to be performed by Mr. Sancha (and formerly performed by

Attachment H

13

Decatrend). I hasten to add that all information sought by Mr. Sancha was made available to him.

46.    The email attached as Exhibit "I" to Sam's affidavit does not suggest that my father, the DSouza Companies or I withheld any information from Mr. Sancha. In fact, all Mr. Sancha was asking was if "anything was missing". I do know that Mr. Sancha was ultimately able to accurately determine the profits for the "business" for the period from June to October 2005.

47.    Similarly, Exhibits "J" and "K" to Sam's affidavit merely demonstrates that what questions were asked of the DSouza Companies were answered. There never was any attempt to withhold any information from Sam or Mr. Sancha.

48.    As for Exhibit "L" to and paragraph 39 of Sam's affidavit, I can categorically state that all questions asked of the DSouza Companies were always and fully and accurately answered. I note that Sam failed to produce the complete email log. Attached as Exhibit "D" hereto are the missing email communications.



49.    As for paragraph 40 of Sam's affidavit, it is untrue that the "first time [I] wanted to renegotiate [my] 1%/20% Formula" was in October 2006. Sam knows that he and I met face to face in Brazil in April 2006 and that we discussed Daniel's effective exit from the Business (Daniel had by this time ceased all e-mail and Instant Messenger communications with Sam and myself) and what we (i.e. Sam

14

and I) were prepared to propose to Daniel as fair compensation for his involvement in the Business. Sam explicitly acknowledged that I had to agree to what Daniel would receive and, generally speaking, it was obvious that Sam and I considered me his "partner" and a joint decision maker in respect of the Business.

50.     In paragraph 42 of his affidavit, Sam states that "after repeated demands for money to operate IMI, on December 6, 2006, [I] did wire $5,000,000 for IMI's use". I make three observations.

51.     First, if, as suggested by Sam, I was trying to secret, dissipate, abscond or otherwise misappropriate monies belonging to IMI, neither I nor the DSouza Companies would have transferred $5,000,000 to Sam.

52.     Second, the $5,000,000 was transferred, on Sam's instructions, to a Netherlands bank account in the name of BK Group BV ("CMI"). The $5,000,000 payment was made pursuant to a "Consulting Agreement" prepared by Sam and made between Web Integrated Net Solutions Inc. (one of the DSouza Companies) and Continental Moonbell Inc. ("CMI"). A true copy of the Consulting Agreement is attached as Exhibit "P" hereto. CMI is unrelated to IMI.

53.     Third, the $5,000,000 were represented by Sam to be required for certain foreign exchange trading to be undertaken by him personally (he referred to it as monies needed for "personal stuff").

54) In paragraph 44 of his affidavit, Sam appears to suggest that, "fearing that IMI's money was either being hidden, stolen, or embezzled", Daniel and he "obtained access to [my] email accounts operated on IMI's servers. First, the server in question does not belong to IMI (see Exhibit "E" hereto). Second, I knew at all material times that Sam could obtain access to my email account on that server; however, since I had nothing to hide, I freely used this email account.

55. In specific reference to the allegations of my father's and my "breaches of fiduciary duty and [our] scheme to defraud IMI":

a) Sam, at all material times, was aware of the existence of Web Integrated;

b) Web Integrated was incorporated in 2000 (pre-dating my involvement with Sam) and was used by my father and myself for business dealings unrelated to the Business;

c) It was always known by Sam that my mother was the principal of Billingnow;

d) The intention behind this email was to facilitate the opening of a merchant bank facility in Singapore following the termination of one of the DSouza Companies' merchant accounts in Bahrain in order to support the Business. There was no nefarious intent in so doing;

e) I don't know if the transfer of USD$1 million, as referenced in Exhibit "S" to Sam's affidavit relates to any funds belonging to the Business.

16

Attachment H

However, if the funds belonged to the Business, Sam and Mr. Sancha would have known of such transfer. I repeat that no financial information was ever withheld from Sam;

f)   Sam was fully aware of the fact that I had caused to be transferred the amount of USD$1,150,000 to my personal investment account at RBC Dominion Securities. All Sam wanted to know was that that sum was going to debited to my entitlement of the Business;

g)   The email attached as Exhibit "U" to Sam's affidavit merely evidences a mischaracterization of payments made by Billingnow to GITO when in fact they should have been characterized as proper payments on behalf of the Business to third parties.

56.   With respect to the allegations in paragraph 46 of Sam's affidavit,

a)   the websites named on Exhibit "V" to Sam's affidavit were properties which the Business owned. It is a mischaracterization to suggest that these were IMI owned websites. For example the "VIPFARES" and "HOMECAREER SEARCH" websites had been established prior to any dealings with Daniel or IMI's involvement;

b)   the email communication in Exhibit "W" to Sam's affidavit simply was intended to set up another merchant banking facility in Dubai to replace a facility that had been terminated;

c)   the referenced communication in Exhibit "X" to Sam's affidavit is with respect to issues a DSouza Company experienced with regard to

processing online transactions for the Business. The email makes it clear that the DSouza Company in question ("Winpay Consultancy") has an association with the Business, including IMI;

d)      Exhibit "Y" to Sam's affidavit merely refers to the ongoing strategy by the DSouza Companies to tax effectively manage funds on behalf of the Business; and

e)      The letter shown as Exhibit "Z" to Sam's affidavit merely evidences a reply to a "cease and desist" demand against Winsecure from a third party anti-virus company. That letter was intended to and did indeed succeed in satisfying the third party anti-virus company.

57.     I am not entirely certain what probative value Exhibits "AA", "BB" and "CC" attached to Sam's affidavit have. Exhibit "BB" demonstrates that the DSouza Companies were trying to provide Sam with a complete and accurate picture of the flow of funds through the DSouza Companies.

58.     I cannot comment on the accuracy of Exhibit "DD"" attached to Sam's affidavit, since I do not know what source documents were used to prepare that Exhibit.

59.     The fact that Sam caused to use a different processor for 10%-20% of the Business' transactions was indeed one of the very reasons why my father and I decided to terminate our relationship with the Business.

60.     My proposal contained in Exhibit "FF" to Sam's affidavit merely evidences my view as to the respective entitlement of Sam, Daniel, Kristy Ross and myself. It also references the entitlement of the DSouza Companies for the services provided by the DSouza Companies.

61.     There indeed was an earthquake in Taiwan that caused "internet connectivity issues", and any suggestion that I had used that disaster to avoid payment obligations of the DSouza Companies is simply false.

62.     With respect to my email to Sam, Daniel and Kristy attached as Exhibit "HH" to Sam's affidavit, I note that the DSouza Companies, notwithstanding the contents of my email, continued to pay third party invoices received by the Business up to and including December 31, 2006. Sam knows this full well.

63.     With respect to the alleged removal of USD$2.6 Million from one of the DSouza Companies' Singapore bank accounts, I believe that the USD$2.6 Million were used to pay the Business' expenses between December 14, 2006 and February 2, 2007 [sic]. I can and will, in the goodness of time, provide substantiating records that these payments were made on behalf of the Business and for no nefarious purpose.

64.     With respect to paragraph 63 of Sam's affidavit, I deny that Daniel had any expenditure approval authority for the Business for most of 2006. Generally

speaking, Sam has deliberately mischaracterized what he suggests were only his own and Daniel's authority to approve or reject any requests for approval of Business expenditures. I and several other people in the Business (e.g. Kristy and Andriy) had the ultimate authority to approve or reject the request for expenditures. At no point in time was it only Sam and Daniel who had such authority. There never was any agreed upon "hierarchy" for the approval of expenditures by the Business.

**Alleged Flight Risk**

65. Neither my father or I had or have any intentions to "flee" Canada.

66. My parents have resided in Toronto (or Thornhill) for almost twenty years. My mother is a teacher with the Toronto Catholic School Board and has no intentions of leaving her employment. My father has long standing ties to Toronto and has no intention to sever these ties. Exhibit "KK" shows, inter alia, a Bahrain Temporary Population Card for my father. However, that Temporary Population Card expired on October 23, 2oo5 and has not been renewed.

67. My 15 year old sister resides with my parents in Thornhill, and attends grade 10 at Hawthorne School for Girls, a private school in North York. My sister intends to complete her high school education at Hawthorne School for Girls.

68.  Neither I, my father, nor any of the DSouza Companies intend to secret or misappropriate funds.  We all welcome a proper accounting and ultimate adjudication as to how the funds are to be divided between Sam, Daniel, Kristy, myself and the DSouza Companies.  Any suggestion that we intend to place ourselves beyond the reach of this or any other jurisdiction is entirely fabricated and without justification.

69.  The very fact that I had been negotiating a fair allocation of the funds earned by the Business demonstrates that I never had the intention to abscond with any funds.

70.  In fact, San Francisco legal counsel for Sam and Daniel were to meet with my Toronto legal counsel and myself on February 19, 2007 in an attempt to reach a consensual agreement with respect to the division of funds.  That meeting was thwarted as a result of the service of the within statement of claim and motion record within a couple of hours prior to the scheduled commencement of such settlement meeting.

**Daniels Affidavit**

71.  With respect to Daniel's affidavit, I note that, generally speaking, he, too, grossly mischaracterizes his role in IMI and the Business.

72.    I was unaware of Daniel's title of "Chief Technology Officer" of IMI until January 20, 2006. Shortly after January 2006, Daniel effectively absented himself from IMI's business, apparently due to some emotional stress.

73.    When Daniel, in paragraph 3 of his affidavit describes his areas of specialty to include consumer software design, e-commerce payment platforms and web analytics, he omitted to mention that his business, prior to IMI's association with our Business had failed financially, or that his other specialty was and indeed continues to be in the adult e-commerce business.

74.    It is entirely inaccurate to state, as Daniel does in paragraph 6 of his affidavit, that he and Sam were to take the "lead roles" in the "new business venture" (i.e. the Business). Daniel never performed any "lead role" in the Business. Only Sam and I did.

75.    Paragraph 8 of Daniel's affidavit fails to confirm that IMI "adopted" the Interim Agreement. I believe that the true reason for such omission is that the "adoption" of the Interim Agreement by IMI is a complete fabrication.

76.    In paragraph 14 of his affidavit, Daniel states that Exhibit "E" shows the growth in IMI's profits over the course of 2004 through 2006. I note that some of the products shown on that Exhibit have nothing to do with IMI (e.g. VIPFARES, mp3u, HomeCS, ESD International), but instead were products developed and

marketed by the Business. I further note that some of the products shown on this Exhibit (e.g. Hotlivegirls and Best Generic Prices) were not processed by the DSouza Companies (as were all the other products shown on this Exhibit).

77.   Paragraph 16 of Daniel's affidavit is grossly misleading. Daniel and I never had any discussions regarding my "deal" with Sam or my involvement with IMI. Paragraph 16 is intended to mislead the reader into believing that he had personal knowledge of these matters.

78.   As for the allegations of forgeries made by Daniel in paragraphs 21 to 26 of his affidavit, I always and only signed documents on behalf of Daniel with his specific knowledge and approval. As Daniel knew full well, these documents were required for internal compliance purposes of the DSouza Companies.

79.   I do not have a specific recollection for the existence of Exhibit "K" to Daniel's affidavit, except that I can categorically state that none of the signatures on that Exhibit were ever used.

SWORN before me, at the City      )
                                  )
of Toronto, in the Province of    )
                                  )
Ontario, this 20th day of February, )      _____
                                  )        Marc Gerard DSouza
2007.                             )

A COMMSSIONER, etc

**Attachment H**          24