# EXHIBIT

# 21

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | |
|---|---|
| Federal Trade Commission<br><br>               **Plaintiff,**<br><br>    v.<br><br>Innovative Marketing, Inc., *et al.*<br><br>               **Defendants.** | **CIVIL NO.** |

**CERTIFICATION AND DECLARATION OF PLAINTIFF'S COUNSEL
ETHAN ARENSON IN SUPPORT OF PLAINTIFF'S *EX PARTE* MOTION
FOR: (1) TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE;
AND (2) ORDER TEMPORARILY SEALING ENTIRE FILE**

I, Ethan Arenson, pursuant to 28 U.S.C. § 1746, declare as follows:

1.    I am one of the attorneys representing Plaintiff, Federal Trade Commission ("FTC" or

"Commission"), an agency of the United States government, in this action against Defendants

Innovative Marketing, Inc., also d/b/a Billingnow, BillPlanet PTE Ltd., Globedat, Innovative

Marketing Ukraine, Revenue Response, Sunwell, Synergy Software BV, Winpayment

Consultancy SPC, Winsecure Solutions, and Winsolutions FZ-LLC; ByteHosting Internet

Services, LLC; James Reno, d/b/a Setupahost.net, individually and as an officer of Bytehosting

Internet Services, LLC; Sam Jain, individually and as an officer of Innovative Marketing, Inc.;

Daniel Sundin, d/b/a Vantage Software and Winsoftware, Ltd., individually and as an officer of

Innovative Marketing, Inc.; Marc D'Souza, d/b/a Web Integrated Net Solutions, individually and

as an officer of Innovative Marketing, Inc.; and Kristy Ross, individually and as an officer of

Innovative Marketing, Inc. ("Defendants"); and Maurice D'Souza.

2.    I am a member in good standing of the bar of the District of Columbia.

3.    I submit this certification pursuant to Rule 65(b)(2) of the Federal Rules of Civil Procedure in

      support of the Commission's request that this Court issue, without notice to Defendants, the

      accompanying proposed *Ex Parte* Temporary Restraining Order and Order to Show Cause

      ("TRO"). I also submit this Declaration in support of the Commission's accompanying *Ex Parte*

      Motion for Order Temporarily Sealing Entire File.

4.    Under Rule 65(b) of the Federal Rules of Civil Procedure, the Court may issue a TRO without

      notice to Defendants only if the plaintiff's attorney "certifies to the court in writing the efforts, if

      any, which have been made to give the notice and the reasons supporting the claim that notice

      should not be required." The following facts are known to me, and if called as a witness I could

      competently testify thereto.

5.    For the reasons set forth below, the Commission has not provided Defendants notice of its *Ex*

      *Parte* Motion for TRO and Order to Show Cause ("TRO Motion"). No Commission employee has

      communicated with Defendants. I further certify that the necessity for this emergency hearing has

      not been caused by a lack of diligence on the Commission's part, but it has been brought about

      only by the circumstances of this case.

6.    The evidence set forth in the Plaintiff's Memorandum of Law in Support of *Ex Parte* Motion for

      TRO and Order to Show Cause ("TRO Memo"), along with the supporting exhibits, demonstrates

      that Defendants have engaged activities that are deceptive in violation of Section 5(a) of the FTC

      Act, 15 U.S.C. § 45(a). These activities are designed not only to trick consumers into purchasing

      computer security software, but also to conceal Defendants' identities so they cannot be held

      accountable for their unlawful actions.

7.    As described in more detail in the Commission's TRO Memo, Defendants masquerade as Internet advertising agencies seeking to place ads on behalf of legitimate companies. Although the ads placed by Defendants appear legitimate, they are in fact trojan horses that contain hidden code capable of involuntarily redirecting consumers away from the websites they are viewing and transporting them to one of the Defendants' websites. After hijacking consumers, Defendants display a convincing but utterly bogus "system scan" that purports to scan consumers' computers for harmful and illegal files. Invariably, these bogus scans falsely report that consumers' computers are filled with viruses, spyware or pornography. To cure the security problems "detected" by the bogus scanner, Defendants instruct consumers to purchase their computer security software, which costs \$39.95 or more.

8.    Relief Defendant Maurice D'Souza has received ill-gotten funds or otherwise benefitted from funds that are the proceeds of the Defendants' unlawful acts.

9.    Defendants have used several techniques to frustrate consumers' and law enforcement authorities' attempts to link Defendants to their deceptive advertising scheme, which are discussed in more detail in Section III.D and V of the TRO Memo. First, Defendants rely on false or incomplete information when registering their Internet domains or use a proxy domain registration service to shield their identities, change their false domain registration information frequently to frustrate efforts to connect Defendants to their various websites, and discard their domain names in the face of consumer complaints or negative media attention. Moreover, none of the Defendants' websites contain a name or physical address that could be used to link the websites to the Defendants. Second, Defendants use various shell companies in their dealings with third parties, including customers and vendors. Third, as stated in Marc D'Souza's sworn affidavit in the Canadian

Litigation (see TRO Memo for more detail) Defendants moved much of their business offshore for the stated purpose of escaping regulation from the Federal Trade Commission and State Attorneys who were shutting down similar operations. Fourth, Defendants rely on a series of sham advertising agencies to dupe ad networks and websites into accepting their exploitive advertising.

11.    Relief Defendant Maurice D'Souza has also attempted to avoid detection by disgruntled consumers. He created and maintained the merchant account processing facilities used to process consumers' credit card payments for Defendants' computer security products. These merchant accounts were opened overseas to minimize consumer complaints and chargeback rates.

12.    Despite significant attention from the Internet security community and both the mainstream and technical press focused on their unlawful activities – as well as a private lawsuit brought against defendants Sundin, Reno and Bytehosting – Defendants have continued their unlawful conduct unabated.

13.    Defendants have knowingly and willfully engaged in a fraudulent scheme to dupe consumers into purchasing their computer security software, and have gone to considerable lengths to conceal their identities from consumers and law enforcement. Based on these actions, it is highly likely that, absent prompt action by this Court, Defendants will continue to violate the Federal Trade Commission Act and continue to cause substantial injury to consumers.

14.    As described more fully in the accompanying TRO memo, the evidence establishes that the Commission is likely to prevail on the merits of its action against Defendants and that Defendants will be held liable for the consumer injury resulting from their unlawful scheme. Because of the nature of the Commission's action against Defendants and Defendants' use of aliases, evasion, and pervasive fraudulent practices, there is a likelihood that without immediate *ex parte* injunctive

relief, Defendants will destroy documents, conceal evidence of their wrongdoing and dissipate assets, frustrating this Court's ability to grant effective final relief.  In fact, given the nature of this computer-centric case, many, if not most, of Defendants' records likely are stored electronically; thus, such records are highly susceptible to easy destruction by electronic deletion.  Therefore, there is good cause to grant the requested relief without notice to Defendants, and for temporarily sealing the docket and entire file until Defendants are served.

15.  As illustrated by the following examples (provided on information and belief), it has been the Commission's experience that defendants who receive notice of the filing of an action by the Commission or of the Commission's intent to file an action alleging consumer fraud, often attempt to undermine the Commission's efforts to preserve the status quo by immediately dissipating or concealing assets and/or destroying documents.  Often the defendants or their affiliates, who have been served with a temporary restraining order, attempt to remove assets from their financial institutions or conceal offshore assets:

a. In FTC v. Connelly, SACV-06-701 DOC (RNBx) (C.D. Cal. 2006) the court issued on August 9, 2006 an ex parte TRO with an asset freeze against one defendant, but provided notice to the other two individual defendants by issuing an Order to Show Cause as to why their assets should not be frozen.  After receiving notice of the court's ruling, all three defendants withdrew at least $800,000, some of which was clearly already subject to the asset freeze.

b. In FTC v. Universal Premium Services, Inc., CV-06-849 SJO(OPx) (C.D. Cal. 2006), a defendant and his wife withdrew over $45,000 from their joint personal bank account, which the bank had not yet frozen, hours after he was personally served with an *ex parte* TRO that included an asset freeze.

c. In FTC v. Physicians Healthcare Development, Inc., CV02-2936 RMT (JWJx) (C.D. Cal. 2002), the FTC informed defendants on Monday, April 8, 2002, that the FTC would be filing a complaint and seeking a TRO against them on Wednesday, April 10, 2002. On Wednesday, after filing the case and obtaining the TRO, the FTC faxed a copy of the signed and entered TRO to the defendants at their offices. Upon receiving notice of the TRO, the defendants removed or shredded most of their records and documents, including all customer files.

d. In FTC v. J.K. Publications, Inc., Civ. No. 99-00044 ABC (AJWx) (C.D. Cal. 1999), the FTC obtained an *ex parte* TRO with an asset freeze. The defendants maintained several bank accounts in the Cayman Islands. The defendants did not disclose these assets on sworn financial statements ordered by the court in its TRO and transferred money to these accounts in violation of the TRO.

e. In FTC v. Intelinet.Com, Inc., CV-98-2140 CAS (C.D. Cal. 1998), the FTC obtained an *ex parte* TRO with an asset freeze. The FTC served the TRO on banks where the defendants were known or suspected to have accounts. While the person who was serving the TRO for the FTC was at one of the banks and speaking to a branch manager about the TRO, one of the defendants came into the bank, after having been served with the TRO, and attempted to withdraw money from his account there. He was unsuccessful.

f. In FTC v. Intellicom, 97-4572 TJH (Mcx) (C.D. Cal. June 23, 1997), a telemarketing investment fraud case, the FTC obtained an *ex parte* TRO with an asset freeze and knew of 20-30 banks with potential assets. The FTC served the banks as fast as possible with the order, but one defendant, before he could be served, removed $40,000 one hour before the FTC arrived at the bank. Another defendant called his bank that the FTC managed to serve. The defendant asked the

manager to wire out the contents of one account frozen by the order. The manager caught the red flag in the system and refused to release the requested $100,000.

g. In <u>FTC v. World Class Network, Inc.</u>, No. SACV97-162 AHS (Eex) (C.D. Cal. 1997), after the court issued an *ex parte* TRO with an asset freeze, two of the defendants withdrew from the bank, spent, and/or hid $202,000 in assets after being served with the court order and asset freeze. The spouse of another defendant withdrew over $100,000 and left the state to open and to deposit funds into an out-of-state account.

h. In <u>FTC v. Fortuna Alliance, LLC</u>, Civ. No. C96-799M (W.D. Wash. 1997), the FTC obtained an *ex parte* TRO with an asset freeze in May 1996 against the defendants. After service of the order, one employee called to inform other employees located at another office of the order. Representatives from the other office immediately tried to escape with all of the cash and money orders on site. Over one million dollars and business records were found in an employee's station wagon.

i. In <u>FTC v. Chierico</u>, No. 96-1754-Civ-Moore (S.D. Fla. 1996), the court issued an *ex parte* TRO with asset freeze. Within hours of service upon the defendant, he and his wife requested issuance of a $500,000 certified check from their joint brokerage account, made payable to her alone. The couple then deposited the certified check into a bank account in the wife's sole name. The Commission learned of the withdrawal from the brokerage firm and presented the bank with sufficient evidence for it to freeze the wife's account.

j. In <u>FTC v. Lopinto</u>, No. CV S-93-561 (LDG) (D. Nev. 1993), a case involving the telemarketing of prize promotions, the district court issued an *ex parte* TRO with an asset freeze in June 1993. The order was served on a bank where one of the defendant businesses maintained an

account. However, before the bank could implement the freeze, an agent of the defendant business (who knew of the freeze) withdrew $12,300 from defendant's account.

k. In FTC v. American National Cellular, Inc., No. CV 85-7375 WJR (C.D. Cal. 1985), a case involving the fraudulent telemarketing of investments, the court issued an TRO with an asset freeze on November 12, 1985. A defendant learned of the court's ruling, and he immediately withdrew $1.2 million from his bank accounts before the banks were served with a copy of the freeze order. The defendant fled California and dissipated the money while living overseas.

l. In FTC v. Osborne Precious Metals, Inc., No. CV 92-4194 AWT (C.D. Cal. 1992), an investment fraud case, the court issued an *ex parte* TRO on July 15, 1992. The receiver and his representatives effected service of the order the following day, first at defendants' offices in Los Angeles and an hour later at defendants' offices in Las Vegas. The receiver discovered that a number of business records in the Las Vegas offices had been destroyed shortly before his representatives arrived to secure the premises.

m. In FTC v. O'Day, No. 94-1108-CIV-ORL-22 (M.D. Fla. 1994), a telemarketing fraud case, a district court denied the Commission's request to issue an *ex parte* TRO with asset freeze, and scheduled a noticed hearing on the relief sought. Several days later, the Commission served notice of its action and the upcoming hearing. Within hours, an individual defendant withdrew approximately $200,000 from one of his bank accounts, thereby making it difficult for the Commission to preserve those funds for consumer redress.

n. In FTC v. Academic Guidance Services, No. 92-3001 (AET) (D.N.J. 1992), a case involving the fraudulent telemarketing of business opportunities, the defendants discovered that the Commission intended to file its case against them (and seek an *ex parte* TRO) the following

week. An informant told the Commission that the defendants then leased a document shredder and spent the weekend destroying documents. The Commission verified that a shredder had been leased, and one of defendant's employees confirmed that documents had been shredded.

o. In <u>FTC v. Applied Telemedia Engineering and Management, Inc.</u>, No. 91-635 (S.D. Fla. 1991), another telemarketing fraud case, the defendants were advised, pursuant to an agreement with the Commission, that the Commission had filed its complaint and intended to seek a TRO with an asset freeze from the court. When the Commission's agents went to defendants' offices to serve process, they observed defendants removing boxes of documents from the premises. The Commission moved for, and received, an *ex parte* TRO the following day.

16. For the above reasons, as contemplated by Federal Rule of Civil Procedure 65(b), there is good cause to believe that immediate and irreparable damage will result from the concealment or transfer of Defendants' assets, and from the concealment, transfer, or destruction of Defendants' records, if Defendants receive advance notice of the Commission's application for a TRO. Thus, it is in the interests of justice that such application be granted without notice.

17. For the same reasons, there is good cause to believe that immediate and irreparable harm will result to consumers if any of the Defendants receive premature notice of the filing of this action. Thus, the interests of justice would be served if the Commission's application to file papers under seal were granted.

I declare, under penalty of perjury, that the foregoing is true and correct.
Executed on November 26, 2008, in Washington, D.C.


Ethan Arenson, Attorney
Federal Trade Commission