# ATTACHMENT A

Case 1:08-cv-03233-RDB   Document 20-1   Filed 12/17/08   Page 2 of 22

# 1OPERATING AGREEMENT OF
# BYTEHOSTING INTERNET SERVICES, LLC,
## an Ohio limited liability company

BY THIS OPERATING AGREEMENT (the "Agreement"), made and entered into on August 23, 2004, those individuals whose names, addresses and signatures are set forth below, being the Members of Bytehosting Internet Services, LLC, an Ohio limited liability company (the "Company"), hereby represent and agree that they have filed, on behalf of the Company, Articles of Organization with the Secretary of State for the State of Ohio, and that they desire to enter into an operating agreement in accordance with the laws of the State of Ohio.

NOW, THEREFORE, the Members agree as follows:

## ARTICLE I
## DEFINITIONS

When used in this Agreement, the following capitalized terms shall have the meanings provided below:

Section 1.1 "Act." "Act" means Chapter 1705 of the Ohio Revised Code (Ohio Rev. Code §§ 1705, *et seq.*), which governs the formation and operation of limited liability companies in the State of Ohio, as amended from time to time.

Section 1.2 "Affiliate." "Affiliate of a Member or Manager" means any Person under the control of, in common control with, or in control of a Member or Manager, whether that control is direct or indirect. The term "control," as used herein, means, with respect to a corporation or limited liability company, the ability to exercise more than fifty percent (50%) of the voting rights of the controlled entity, and with respect to an individual, partnership, trust, or other entity or association, the ability, directly or indirectly, to direct the management or policies of the controlled entity or individual.

Section 1.3 "Agreement." "Agreement" means this Operating Agreement, in its original form and as amended from time to time.

Section 1.4 "Articles." "Articles" means the Articles of Organization filed with the Ohio Secretary of State forming this limited liability company, as initially filed and as they may be amended from time to time.

Section 1.5 "Bankruptcy." "Bankruptcy" means, with respect to any Person, being the subject of an order for relief under Title 11 of the United States Code, or any successor statute or other statute in any foreign jurisdiction having like import or effect.

Section 1.6 "Capital Account." "Capital Account" means the amount of the capital interest of a Member in the Company, consisting of the amount of money and the fair market value, net of liabilities, of any property initially contributed by the Member, as (1) increased by any additional contributions and the Member's share of the Company's profits, and (2) decreased by any distribution to that Member as well as that Member's share of Company losses.

Section 1.7 "Capital Contribution." "Capital Contribution" means the total amount of money and the fair market value, net of liabilities, of any property contributed by the Members to the Company.

Section 1.8 "Code." "Code" means the Internal Revenue Code of 1986, as amended from time to time, or any corresponding provision of any succeeding revenue law.

Section 1.9 "Company." "Company" means Bytehosting Internet Services, LLC, the entity formed in accordance with this Agreement and the Articles.

Section 1.10 "Company Minimum Gain." "Company Minimum Gain" shall have the same meaning as set forth for the term "Partnership Minimum Gain" in the Regulations section 1.704-2(d), 26 C.F.R. § 1.704-2(d).

Section 1.11 "Departing Member." "Departing Member" means any Member whose conduct results in a Dissolution Event or who withdraws from the Company in accordance with Section 4.3, where such withdrawal does not result in dissolution of the Company.

Section 1.12 "Dissolution Event." "Dissolution Event" means, with respect to any Member, one or more of the following: the death, resignation, retirement, expulsion, bankruptcy, or dissolution of any Member.

Section 1.13 "Distribution." "Distribution" means the transfer of money or property by the Company to the Members without consideration.

Section 1.14 "Fiscal Year." "Fiscal Year" means the Company's fiscal year, which shall be the calendar year.

Section 1.15 "Majority Interest." "Majority Interest" means the interest of the Members holding greater than fifty percent (50%) of the total interests held by the Members.

Section 1.16 "Member." "Member" means each Person who (1) has been admitted into membership in the Company; (2) executes or causes to be executed this Agreement and any subsequent amendments hereto; and (3) has not engaged in conduct resulting in a Dissolution Event or terminated membership for any other reason.

Section 1.17 "Member Nonrecourse Debt." "Member Nonrecourse Debt" shall have the same meaning as set forth for the term "Partnership Nonrecourse Debt" in Regulations section 1.704-2(b)(4).  26 C.F.R. § 1.704-2 (b)(4).

Section 1.18 "Member Nonrecourse Deductions." "Member Nonrecourse Deductions" means items of Company loss, deduction, or Code section 705(a)(2)(B) 26 U.S.C. § 705(a)(2)(B) expenditures which are attributable to Member Nonrecourse Debt.

Section 1.19 "Membership Interest." "Membership Interest" means a Member's rights in the Company, collectively, including the Member's economic interest, right to vote and participate in management, and right to information concerning the business and affairs of the Company provided in this Agreement or under the Act.

Section 1.20 "Negative Capital Account." "Negative Capital Account" means a Capital account with a balance of less than zero.

Section 1.21 "Net Profits" and "Net Losses." "Net Profits" and "Net Losses" mean the Company's income, loss, and deductions computed at the close of each fiscal year in accordance with the accounting methods used to prepare the Company's information tax return filed for federal income tax purposes.

Section 1.22 "Nonrecourse Liability." "Nonrecourse Liability" has the meaning provided in the Regulations section 1.752-1(a)(2).  26 C.F.R. § 1.752-1(a)(2).

Section 1.23 "Percentage Interest." "Percentage Interest" means the percentage ownership of the Company of each Member as set forth in the column entitled "Member's Percentage Interest" contained in Exhibit A attached hereto and as recalculated from time to time pursuant to this Agreement.

Section 1.24 "Person." "Person" means an individual, partnership, limited partnership, corporation, limited liability company, registered limited liability partnership, trust, estate, association, or any other entity.

Section 1.25 "Positive Capital Account." "Positive Capital Account" means a Capital Account with a balance greater than zero.

Section 1.26 "Regulations." "Regulations," as used in this Agreement, refers to the income tax regulations of the United States Treasury Department promulgated under the Code, including any temporary regulations, and any successor regulations which may be promulgated.

Section 1.27 "Remaining Members." "Remaining Members" means, upon the occurrence of a Dissolution Event, those Members of the Company whose conduct did not cause its occurrence.

Section 1.28 "Secretary of State." "Secretary of State" means the Secretary of State for the State of Ohio.

Section 1.29 "Tax Matters Member" ("Tax Matters Partner"). "Tax Matters Partner," as defined in Code section 6231(a)(7), (26 U.S.C.A. § 6231 (a)(7)), is that Person designated by the Company in Section 8.6 to serve as the Company's representative in all examinations of the Company's affairs by taxing authorities.

## ARTICLE II
## FORMATION AND ORGANIZATION

Section 2.1 Initial Date and Initial Parties. This Agreement is first entered into on the date of the Articles by and among the Company and the individuals who are Members of the Company on that date.

Section 2.2 Subsequent Parties. No Person may become a Member of the Company without agreeing to and becoming a signatory of this Agreement and any offer or assignment of a Membership interest is contingent upon the fulfillment of this condition.

Section 2.3 Name. The name of this Company is Bytehosting Internet Services, LLC.

Section 2.4 Term. The Company shall commence upon the filing of its Articles of Organization and it shall continue in existence indefinitely, unless terminated earlier under the provisions of the Act or such earlier time as determined in accordance with the provisions of this Agreement.

Section 2.5 Principal Place of Business. The Company will have its principal place of business at 1833 East Ohio Pike, Amelia, Ohio 45102, or at any other address within the State of Ohio upon which the Members agree. The Company shall maintain its principal executive offices at its principal place of business, as well as maintaining at that location all records and documents which it is required to keep under the Act.

Section 2.6 Resident Agent. The name and address of the Company's agent for service of process in the State of Ohio are James M. Reno, 1833 East Ohio Pike, Amelia, Ohio 45102.

Section 2.7 Names and Addresses of Members. The name, present mailing address, and percentage ownership of each Member is listed on Exhibit A attached hereto.

Section 2.8 Authorization and Purpose. Pursuant to the Act, the Members have formed this Company and have filed Articles with the Secretary of State. The Members intend to govern the Company in accordance with the Act, the Articles, and this Agreement, and to have their rights and liabilities in connection with the Company to be so determined. In the event of any conflict between the Act and the Articles and Agreement, this Agreement will control, to the extent permitted by the Act.

The purpose of the Company is to engage in any lawful business activity that is permitted by the Act.

### ARTICLE III
### CAPITAL CONTRIBUTIONS AND ACCOUNTS

Section 3.1 Initial Capital Contributions. The initial Capital Contribution of each Member is listed in Exhibit A attached hereto. Exhibit A shall be revised to reflect any additional contributions pursuant to Section 3.2.

Section 3.2 Additional Contributions. No Member shall be required to make any additional contribution to the Company. However, upon agreement by all of the Members that additional capital is desirable or necessary, any Member may, but shall not be required to, contribute additional capital to the Company on a pro rata basis consistent with the Percentage Interest of each of the Members. Upon receipt of such additional contributions, the Members' capital accounts shall be adjusted accordingly.

Section 3.3 Interest Payments. No Member shall be entitled to receive interest payments in connection with any contribution of capital to the Company.

Section 3.4 Right to Return of Contributions.  No Member shall be entitled to a return of any capital contributed to the Company, except as expressly provided in this Agreement in Article IX.

Section 3.5 Capital Accounts.  A Capital Account shall be created and maintained by the Company for each Member, in conformance with Regulations section 1.704-1(b)(2)(iv), (26 C.F.R. § 1.704-1(b)(2)(iv)), which shall reflect all Capital Contributions to the Company. Should any Member transfer or assign all or any part of his or her membership interest in accordance with this Agreement, the successor shall receive that portion of the Member's Capital Account attributable to the interest assigned or transferred.

Section 3.6 Failure of Member to Make Contribution.  All Members shall make timely payment to the Company of required Capital Contributions. The failure of any Member to make such a contribution will render him or her in default and may result in the loss of the Member's ability to participate in Management. Further, a Member who is in default may have his or her proportionate interest in the Company diluted, reduced, or even eliminated, depending on the extent and circumstances of the default.

## ARTICLE IV
## MEMBERS

Section 4.1 Limitation of Liability.  No Member shall be personally liable for the debts, obligations, liabilities, or judgments of the Company solely by virtue of his or her membership in the Company, except as expressly set forth in this Agreement or as required by law.

Section 4.2 Additional Members.  Additional Members may be admitted to the Company only if approved unanimously by the Company Membership. Additional Members shall be permitted to participate in management at the discretion of the existing Members. Likewise, the existing Members shall determine an Additional Member's participation in "Net Profits," "Net Losses," and distributions, as those terms are defined in Article I. Exhibit A shall be amended to include the name, present mailing address, taxpayer identification number, and percentage ownership of any Additional Members.

Section 4.3 Withdrawal from Membership.  Any Member who is under an obligation to render services to the Company may withdraw at any time after sixty (60) days' written notice to the Company, without prejudice to the

rights of the Company or any Member under any contract to which the withdrawing Member is a party. Such withdrawing Member shall have the rights of a transferee under Article VII and the Remaining Members shall be entitled to purchase the withdrawing Member's Membership interest in accordance with Section 7.6. In the event of such a withdrawal, Exhibit A shall be amended to reflect the change in ownership interests. No other Members are permitted to withdraw from the Company.

Section 4.4 Competing Activities.  The Members expressly acknowledge and agree that they, as well as any Affiliate or shareholder of a Member, are permitted to participate in other business activities that may be in competition, direct or indirect, with those of the Company. The Members further acknowledge that they are under no obligation to present to the Company any business or investment opportunities, even if the opportunities are of such a character as to be appropriate for the Company's undertaking. Each Member hereby waives the right to any claim against any other Member or Affiliate on account of such competing activities.

Section 4.5 Compensation of Members.  No Member or Affiliate shall be entitled to compensation for services rendered to the Company, absent agreement by the Members. However, Members and Affiliates shall be entitled to reimbursement for the actual cost of goods and services provided to the Company, including, without limitation, reimbursement for any professional services required to form the Company.

Section 4.6 Transactions with Company.  A Member may lend money to and transact business with the Company, subject to any limitations contained in this Agreement or in the Act. To the extent permitted by applicable laws, such a Member shall be treated like any other Person with respect to transactions with the Company.

Section 4.7 Members Are Agents.  It is the intent of each of the Members of this Company to participate actively in the management of the Company and to act as the agents of the Company, except as limited by the provisions contained in Article V.

Section 4.8 Meetings.  There will be no required regular or annual meetings of the Members. However, any Member may call a meeting at any time. Meetings of the Members shall be held at the Company's principal executive office or at any other place within the State of Ohio selected by the Member calling the meeting.

Written notice of the meeting shall be provided to all Members entitled to vote at the meeting. Notice shall be given in accordance with the requirements of the Act. Any meetings of the Members shall be conducted in accordance with all of the requirements under the Act. Unless otherwise

provided in this Agreement, approval of any matters coming before the Membership may be obtained by a majority vote of the Members.

### ARTICLE V
### MANAGEMENT

Section 5.1 Management by Members. The Company shall be managed by the Members. Each Member has the authority to manage and control the Company and to act on its behalf, except as limited by the Act or this Agreement.

Section 5.2 Time Commitments of Members. Each Member shall devote whatever time he or she reasonably believes is necessary to conduct the affairs of the Company and to attend to all matters concomitant to the business of the Company.

Section 5.3 Limitations on Power of Members. Notwithstanding any of the foregoing, the consent of all of the Members is required to incur a debt or obligation on behalf of the Company and to enter into contracts on behalf of the Company. No Member may undertake the following acts on behalf of the Company without first obtaining the consent of all the Members:

(a)    The approval of a sale, transfer, exchange, assignment, or other disposition of all or any part of a Member's interest in the Company and admission of the Assignee as a Member of the Company;

(b)    The decision to continue to operate the business of the Company after the occurrence of a Dissolution Event;

(c)    The sale or other disposition of all or a substantial part of the Company's assets, whether occurring as a single transaction or as a series of transactions, except if the same is part of the orderly liquidation and winding up of the Company's affairs upon the dissolution of the Company;

(d)    The merger of the Company with any other business entity;

(e)    The confession of a judgment against the Company;

(f)    Any act which would prevent the Company from conducting its duly authorized business; and

(g)    Any other act for which the consent of the Members is required, either in this Agreement or under the Act.

Section 5.4 Limitation on Exposing Members to Personal Liability. Neither the Company nor any Member thereof may take any action that will have the effect of exposing any Member of the Company to personal liability for the obligations of the Company, without first obtaining the consent of the affected Member.

Section 5.5 Fiduciary Duties. The fiduciary duties a Member owes to the Company and to the other Members of the Company are those of a partner to a partnership and to the partners of the partnership.

Section 5.6 Liability for Acts and Omissions. As long as a Member acts in accordance with Section 5.5, no Member shall incur liability to any other Member or to the Company for any act or omission that occurs while in the performance of services for the Company.

## ARTICLE VI
## ALLOCATION OF PROFIT AND LOSS

Section 6.1 Compliance with the Code and Regulations. The Company intends to comply with the Code and all applicable Regulations, including without limitation the minimum gain chargeback requirements, and intends that the provisions of this Article be interpreted consistently with that intent.

Section 6.2 Net Profits. Except as specifically provided elsewhere in this Agreement, Distributions of Net Profit shall be made to Members in proportion to their Percentage Interest in the Company.

Section 6.3 Net Losses. Except as specifically provided elsewhere in this Agreement, Net Losses shall be allocated to the Members in proportion to their Percentage Interest in the Company. However, the foregoing will not apply to the extent that it would result in a Negative Capital Account balance for any Member equal to the Company Minimum Gain which would be realized by that Member in the event of a foreclosure of the Company's assets. Any Net Loss which is not allocated in accordance with the foregoing provision shall be allocated to other Members who are unaffected by that provision. When subsequent allocations of profit and loss are calculated, the losses reallocated pursuant to this provision shall be taken into account such that the net amount of the allocation shall be as close as possible to that which would have been allocated to each Member if the reallocation pursuant to this section had not taken place.

Section 6.4 Regulatory Allocations. Notwithstanding the provisions of Section 6.3, the following applies:

(a)     Should there be a net decrease in Company Minimum Gain in any taxable year, the Company shall specially allocate to each Member items of income and gain for that year (and, if necessary, for subsequent years) as required by the Regulations governing "minimum gain chargeback" requirements, section 1.704-2(f), (26 C.F.R. § 1.704-2(f)), prior to making any other allocations.

(b)     Should there be a net decrease in Company Minimum Gain based on a Member Nonrecourse Debt in any taxable year, the Company shall first determine the extent of each Member's share of the Company Minimum Gain attributable to Member Nonrecourse Debt in accordance with Regulations section 1.704-2(i)(5). 26 C.F.R. § 1.704-2(i)(5). The Company shall then specially allocate items of income and gain for that year (and, if necessary, for subsequent years) in accordance with Regulations section 1.704-2(i)(4), (26 C.F.R. § 1.704-2(i)(4)), to each Member who has a share of the Company Nonrecourse Debt Minimum Gain.

(c)     The Company shall allocate nonrecourse deductions for any taxable year to each Member in proportion to his or her Percentage Interest.

(d)     The Company shall allocate Member Nonrecourse Deductions for any taxable year to the Member who bears the risk of loss with respect to the nonrecourse debt to which the Member Nonrecourse Deduction is attributable, as provided in Regulations section 1.704-2(i). 26 C.F.R. § 1.704- 2(i).

(e)     If a Member unexpectedly receives any allocation of loss or deduction, or item thereof, or distributions which result in the Member's having a Negative Capital Account balance at the end of the taxable year greater than the Member's share of Company Minimum Gain, the Company shall specially allocate items of income and gain to that Member in a manner designed to eliminate the excess Negative Capital Account balance as rapidly as possible. Any allocations made in accordance with this provision shall be taken into consideration in determining subsequent allocations under this Article, so that, to the extent possible, the total amount allocated in this and subsequent allocations equals that which would have been allocated had there been no unexpected adjustments, allocations, and distributions and no allocation pursuant to Section 6.4(e).

(f)    In accordance with Code section 704(c), (26 U.S.C.A. § 704(c)), and the Regulations promulgated pursuant thereto, and notwithstanding any other provision in this Article, income, gain, loss, and deductions with respect to any property contributed to the Company shall, solely for tax purposes, be allocated among Members taking into account any variation between the adjusted basis of the property to the Company for federal income tax purposes and its fair market value on the date of contribution. Allocations pursuant to this subsection are made solely for federal, state, and local taxes and shall not be taken into consideration in determining a Member's Capital Account or share of Net Profits or Net Losses or any other items subject to Distribution under this Agreement.

Section 6.5 Distributions.  The Members may elect, by unanimous vote, to cause the Company to make a Distribution of assets at any time that would not be prohibited under the Act or this Agreement. Such a Distribution shall be made in proportion to the unreturned capital contributions of each Member until all contributions have been paid, and thereafter in proportion to each Member's Percentage Interest in the Company.

Section 6.6 Members Bound by These Provisions.  The Members understand and acknowledge the tax ramifications of the provisions of this Article and agree to be bound by these provisions in reporting items of income and loss relating to the Company on their federal and state income tax returns.

## ARTICLE VII
## TRANSFERS AND TERMINATIONS OF MEMBERSHIP INTERESTS

Section 7.1 Restriction on Transferability of Membership Interests.  A Member may not transfer, assign, encumber, or convey all or any part of his or her Membership interest in the Company, except as provided herein. In entering into this Agreement, each of the Members acknowledges the reasonableness of this restriction, which is intended to further the purposes of the Company and the relationships between the Members.

Section 7.2 Permitted Transfers.  In order to be permitted, a transfer or assignment of all or any part of a Membership interest must have the approval of all of the Members of the Company. Each Member, in his or her sole discretion, may proffer or withhold approval. In addition, the following conditions must be met:

(a)     The transferee must provide a written agreement, satisfactory to the Members, to be bound by all of the provisions of this Agreement;

(b)     The transferee must provide the Company with his or her taxpayer identification number and initial tax basis in the transferred interest;

(c)     The transferee must pay the reasonable expenses incurred in connection with his or her admission to Membership;

(d)     The transfer must not result in the termination of the Company pursuant to Code section 708. 26 U.S.C.A. § 708;

(e)     The transfer must not render the Company subject to the Investment Company Act of 1940, as amended. 15 U.S.C.A. §§ 80a-1 *et seq.*; and

(f)     The transferor must comply with the provisions of Section 7.3.

Section 7.3 Company's Right to Purchase Transferor's Interest. Any Member who wishes to transfer all or any part of his or her interest in the Company shall immediately provide the Company with written notice of his or her intention. The notice shall fully describe the nature of the interest to be transferred. Thereafter, the Company, or its nominee, shall have the option to purchase the transferor's interest at a price equal to the amount that the transferor would receive if the Company were liquidated as of the date of the proposed transfer and an amount equal to the agreed value of the Company that was available for distribution to the Members, in accordance with Section 9.3.

(a)     The option provided to the Company shall be irrevocable and shall remain open for thirty (30) days from the date that notice is given, except that if notice is given by regular mail, the option shall remain open for thirty-five (35) days from the date that notice is given to the Company.

(b)     At any time while the option remains open, the Company or its nominee may elect to exercise the option and purchase the transferor's interest in the Company. The transferor Member shall not vote on the question of whether the Company should exercise its option.

(c)     If the Company chooses to exercise its option to purchase the transferor's interest, it shall provide written notice to the

transferor within the option period. The notice shall specify a closing date for the purchase, which shall occur within thirty (30) days of the expiration of the option period. On the closing date, the transferor shall be paid in cash the purchase price and shall deliver an instrument of title, unencumbered and containing warranties of title, conveying his or her interest in the Company.

(d)     If the Company declines to exercise its option to purchase the transferor Member's interest, the transferor Member may then transfer his or her interest in accordance with Section 7.2.

Section 7.4 Transfers Not in Compliance with This Agreement. Any transfer not in compliance with the provisions of Sections 7.2 and 7.3 or any other provision of this Agreement shall be null and void and have no force or effect.

Section 7.5 Occurrence of Dissolution Event. Upon the death, withdrawal, resignation, retirement, expulsion, insanity, bankruptcy, or dissolution of any Member (a Dissolution Event), the Company shall be dissolved, unless all of the Remaining Members elect unanimously within ninety (90) days thereafter to continue the operation of the business. In the event that the Remaining Members so agree, the Company and the Remaining Members shall have the right to purchase the interest of the Member whose actions caused the occurrence of the Dissolution Event. The interest shall be sold in the manner described in Section 7.7.

Section 7.6 Withdrawal from Membership. Notwithstanding Section 7.4, in the event that a Member withdraws in accordance with Section 4.3, and the withdrawal does not result in the dissolution of the Company, the Company and the Remaining Members shall have the right to purchase the interest of the withdrawing Member in the manner described in Section 7.7.

Section 7.7 Purchase of Interest of Departing Member. The purchase price of a Departing Member's interest shall be determined in accordance with the procedure provided in Section 7.3.

(a)     Once a value has been determined, each Remaining Member shall be entitled to purchase that portion of the Departing Member's interest that corresponds to his or her percentage ownership of the Percentage Interest of those Members electing to purchase a portion of the Departing Member's interest in the Company.

(b)     Each Remaining Member desiring to purchase a share of the Departing Member's interest shall have thirty (30) days to

provide written notice to the Company of his or her intention to do so. The failure to provide notice shall be deemed a rejection of the opportunity to purchase the departing Member's interest.

(c) If any Member elects not to purchase all of the Departing Member's interest to which he or she is entitled, the other Members may purchase that portion of the Departing Member's interest. Any interest which is not purchased by the Remaining Members may be purchased by the Company.

(d) The Company shall assign a closing date within sixty (60) days after the Member's election to purchase is completed. At that time, the Departing Member shall deliver to the Company and the Remaining Members an instrument of title, free of any encumbrances and containing warranties of title, duly conveying his or her interest in the Company and, in return, he or she shall be paid the purchase price for his or her interest in cash. The Departing Member, the Company, and the Remaining Members shall perform all acts reasonably necessary to consummate the transaction in accordance with this Agreement.

Section 7.8 No Release of Liability. Any Member or Departing Member whose interest in the Company is sold pursuant to Article VII is not relieved thereby of any liability he or she may owe the Company.

## ARTICLE VIII
## BOOKS, RECORDS, AND REPORTING

Section 8.1 Books and Records. The Company shall maintain at its principal place of business the following books and records:

(a) A current list of the full name and last known business or residence address of each Member set forth in alphabetical order, together with the Capital Contribution, Capital Account, and Membership Interest of each Member;

(b) A copy of the Articles and all amendments thereto, together with executed copies of any powers of attorney pursuant to which the Articles or any amendments thereto were executed;

(c) Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

(d) A copy of this Agreement and any amendments hereto, together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments hereto were executed;

(e) Copies of the Company's financial statements, if any, for the six (6) most recent fiscal years;

(f) The books and records of the Company as they relate to its internal affairs for at least the current and past four (4) fiscal years; and

(g) True and correct copies of all relevant documents and records indicating the amount, cost, and value of all of the property and assets of the Company.

Section 8.2 Accounting Methods. The books and records of the Company shall be maintained in accordance with the accounting methods utilized for federal income tax purposes.

Section 8.3 Reports. The Company shall cause to be prepared and filed in a timely manner all reports and documents required by any governmental agency. The Company shall cause to be prepared at least annually all information concerning the Company's operations that is required by the Members for the preparation of their federal and state tax returns. The Company shall send to each Member within ninety (90) days of the conclusion of the taxable year:

(a) All information concerning the Company's operations necessary to the preparation of the Member's individual federal and state income tax or information returns; and

(b) A copy of the Company's federal, state, and local income tax or information returns for the taxable year.

Section 8.4 Inspection Rights. For purposes reasonably related to their interests in the Company, all Members shall have the right to inspect and copy the books and records of the Company during normal business hours, upon reasonable request. The Company shall provide Members with copies of all records and documents to which Members are entitled under the Act.

Section 8.5 Bank Accounts. The Members shall maintain all of the funds of the Company in a bank account or accounts in the name of the Company, at a depository institution or institutions. The Members shall not permit the funds of the Company to be commingled in any manner with the

funds or accounts of any other Person. Any Member may endorse checks, drafts, or other evidence of indebtedness to the Company for the sole purpose of depositing them in the Company accounts. Any Member, acting alone, may sign checks, drafts, or other evidence of indebtedness obligating the Company to pay money to a third party in an amount up to Two Thousand Dollars ($2,000). All checks, drafts, and other evidence of indebtedness requiring the Company to pay in excess of the aforementioned amount must be executed on behalf of the Company by all Members.

Section 8.6 Tax Matters Member (Tax Matters Partner).  The Company designates James M. Reno as Tax Matters Member (Tax Matters Partner), as defined in Code section 6231(a)(7), (26 U.S.C.A. § 6231(a)(7)), to represent the Company, at the Company's expense, in all examinations of the Company's affairs by taxing authorities and to expend Company monies to obtain necessary professional services in connection with such examinations.

## ARTICLE IX
## DISSOLUTION, LIQUIDATION, AND WINDING UP

Section 9.1 Conditions Under Which Dissolution Shall Occur. The Company shall dissolve and its affairs shall be wound up upon the happening of the first to occur of the following:

(a)  At the time specified in the Articles;

(b)  Upon the happening of a Dissolution Event, and the failure of the Remaining Members to elect to continue, in accordance with Section 7.4;

(c)  Upon the vote of all of the Members to dissolve;

(d)  Upon the entry of a decree of judicial dissolution pursuant to the Act;

(e)  Upon the happening of any event specified in the Articles as causing or requiring dissolution; or

(f)  Upon the sale of all or substantially all of the Company's assets.

Section 9.2 Winding Up and Dissolution.  If the Company is dissolved, the Remaining Members shall wind up its affairs, including the selling of all of the Company's assets and the provision of written notification to all of the Company's creditors of the commencement of dissolution proceedings.

Case 1:08-cv-03233-RDB   Document 20-1   Filed 12/17/08   Page 18 of 22

Section 9.3 Order of Payment. After determining that all known debts and liabilities of the Company in the process of winding up have been paid or provided for, including, without limitation, debts and liabilities to Members who are creditors of the Company, the remaining assets shall be distributed among the Members in accordance with their Positive Capital Account balances, after taking into consideration the profit and loss allocations made pursuant to Section 6.4. Members shall not be required to restore Negative Capital Account Balances.

Section 9.4 Members' Receipt of Payment. Except as otherwise provided in this Agreement or by the Act, the Members are entitled to payment of their Capital Account balances only from the Company and are not entitled to recover their Positive Capital Account balance or share of Net Profits from any individual Member, except as provided in Article X.

Section 9.5 Filing of Certificates. Upon the dissolution of the Company, the Company shall file a Certificate of Dissolution with the Secretary of State. After the winding up of the Company's affairs has been completed, the Company shall file a Certificate of Cancellation of the Articles of Organization with the Secretary of State.

## ARTICLE X
## INDEMNIFICATION

Section 10.1 Indemnification of Agents. The Company shall indemnify any Member and may indemnify any Person to the fullest extent permitted by law on the date such indemnification is requested for any judgments, settlements, penalties, fines, or expenses of any kind incurred as a result of that Person's performance in the capacity of Member, manager, officer, employee, or agent of the Company, as long as the Member or Person did not behave in violation of Section 5.6.

## ARTICLE XI
## MISCELLANEOUS PROVISIONS

Section 11.1 Assurances. Each Member shall execute all documents and certificates and perform all acts deemed appropriate by the other Members and the Company or required by this Agreement or the Act in connection with the formation and operation of the Company and the acquisition, holding, or operation of any property by the Company.

Section 11.2 Complete Agreement. This Agreement and the Articles constitute the complete and exclusive statement of the agreement among the Members with respect to the matters discussed herein and therein and

they supersede all prior written or oral statements among the Members, including any prior statement, warranty, or representation.

Section 11.3 Section Headings. The section headings which appear throughout this Agreement are provided for convenience only and are not intended to define or limit the scope of this Agreement or the intent or subject matter of its provisions.

Section 11.4 Binding Effect. Subject to the provisions of this Agreement relating to the transferability of Membership interests, this Agreement is binding upon and shall inure to the benefit of the parties hereto and their respective heirs, administrators, executors, successors, and assigns.

Section 11.5 Interpretation. All pronouns and common nouns shall be deemed to refer to the masculine, feminine, neuter, singular, and plural, as the context may require. In the event that any claim is made by any Member relating to the drafting and interpretation of this Agreement, no presumption, inference, or burden of proof or persuasion shall be created or implied solely by virtue of the fact that this Agreement was drafted by or at the behest of a particular Member or his or her counsel.

Section 11.6 Company Counsel. Kenneth L. Perkins, Jr. (SBN 113531), BERRY & PERKINS, P.C., 18401 Von Karman Avenue, Suite 460, Irvine, California 92612-8551, has been initially selected to serve as Company counsel. Company counsel may also be counsel to any Member or Affiliate of a Member, if a majority of the Members who are not individually represented by such counsel agree. The Members may execute on behalf of the Members and the Company any written consents to such representation as may be required by the California Rules of Professional Conduct or the rules governing professional conduct in other jurisdictions.

Section 11.7 Applicable Law. Each Member agrees that all disputes arising under or in connection with this Agreement and any transactions contemplated by this Agreement shall be governed by the internal law, and not by the law of conflicts, of the State of Ohio.

Section 11.8 Jurisdiction and Venue. Each Member agrees to submit to the exclusive jurisdiction of the federal and state courts of the State of Ohio in any action arising out of a dispute under or in connection with this Agreement or any transaction contemplated by this Agreement. Each Member further agrees that personal jurisdiction may be effected upon him or her by service of process by registered or certified mail addressed as provided in Exhibit A attached hereto, and that when service is so made, it shall be as if personal service were effected within the State of Ohio.

Section 11.9 Specific Performance.  The Members acknowledge and agree that irreparable injury shall result from a breach of this Agreement and that money damages will not adequately compensate the injured party. Accordingly, in the event of a breach or a threatened breach of this Agreement, any party who may be injured shall be entitled, in addition to any other remedy that may be available, to injunctive relief to prevent or to correct the breach.

Section 11.10 Remedies Cumulative.  The remedies described in this Agreement are cumulative and shall not eliminate any other remedy to which a Person may be lawfully entitled.

Section 11.11 Notices.  Any notice or other writing to be served upon the Company or any Member thereof in connection with this Agreement shall be in writing and shall be deemed completed when delivered to the address specified in Exhibit A, if to a Member, and to the resident agent, if to the Company. Any Member shall have the right to change the address at which notices shall be served upon ten (10) days' written notice to the Company and the other Members.

Section 11.12 Amendments.  Any amendments, modifications, or alterations to this Agreement or to the Articles must be in writing and signed by all of the Members.

Section 11.13 Severability. Each provision of this Agreement is severable from the other provisions. If, for any reason, any provision of this Agreement is declared invalid or contrary to existing law, the inoperability of that provision shall have no effect on the remaining provisions of this Agreement, which shall continue in full force and effect.

Section 11.14 Counterparts and Facsimile Signature. This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which shall, when taken together, constitute a single document. A facsimile signature shall be treated as an original signature for all purposes.

IN WITNESS WHEREOF, all the Members of Bytehosting Internet Services, LLC, an Ohio limited liability company, have executed or caused to be executed this Agreement, effective as of the date set forth at the commencement of the document.

DATED: August 30, 2004

By: _____
James M. Reno
Member/Manager

Sheet1

Last Updated: ~~0311406~~  04/01/2003

| Member Name | Address | City | State | Zip | Intrest% | Contribution |
|---|---|---|---|---|---|---|
| 1 | ~~James Reno~~ ~~3864 McMann Rd STE A~~ | ~~Cincinnati~~ | ~~OH~~ | ~~45245~~ | ~~100~~ | ~~$10,000.00~~ |
| 2 | James Reno | 3544 Golden Meadow CT | Arnoria | OH | 44102 | 100 | $10,000.00 |
| 3 | | | | | | |
| 4 | | | | | | |
| 5 | | | | | | |
| 6 | | | | | | |
| 7 | | | | | | |
| 8 | | | | | | |
| 9 | | | | | | |
| 10 | | | | | | |
| 11 | | | | | | |
| 12 | | | | | | |
| 13 | | | | | | |
| 14 | | | | | | |
| 15 | | | | | | |