**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| Federal Trade Commission | ) | |
| | ) | Civil No.: RDB 08-CV-3233 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Innovative Marketing, Inc., *et al.* | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| AND | ) | |
| | ) | |
| Maurice D'Souza | ) | |
| | ) | |
| Relief Defendant. | ) | |

**DEFENDANT MARC D'SOUZA'S REPLY MEMORANDUM IN SUPPORT OF**
**MOTION FOR TEMPORARY STAY AND**
**MODIFICATION OF PRELIMINARY INJUNCTION**

Defendant Marc D'Souza submits this reply memorandum in support of his motion to stay this proceeding pending the resolution of a criminal investigation being conducted by the United States Attorney for the Northern District of Illinois and to narrow the asset freeze applicable to Mr. D'Souza to account for the undisputed fact that Mr. D'Souza severed his business relationship with the other Defendants on or before December 30, 2006.

**ARGUMENT**

**I.      This Proceeding Should Be Stayed for at Least Six Months.**

As set forth in the moving papers, the United States Attorneys Office in Chicago has identified Mr. D'Souza as a target of a criminal investigation based on the subject matter of the Federal Trade Commission's ("FTC's") complaint.  Thus, absent a stay of this action, there is a "special danger that the government can effectively undermine rights that would exist in a

criminal investigation by conducting a de facto criminal investigation using nominally civil means." *SEC v. Healthsouth Corp.*, 261 F.Supp.2d 1298, 1326 (N.D. Ala. 2003).   As in *Healthsouth*, this civil proceeding threatens to undermine Mr. D'Souza's Fifth Amendment right because, once Mr. D'Souza exercises his Fifth Amendment right in a testimonial context, he exposes himself to a negative inference with respect to civil liability.

Rather than addressing *Healthsouth* or the many other cases that have issued stays in similar situations,[1] the FTC criticizes Mr. D'Souza for failing to "identify the applicable legal standard or the factors that must be balanced in deciding his request" to stay the proceeding. (FTC Opp'n at 2.)  However, this is a criticism of form, not substance.  The points raised in Mr. D'Souza's moving papers and in this Reply go directly to the first four factors identified in *In re Mid-Atlantic Toyota Antitrust Litigation*, 92 F.R.D. 358, 360 (D. Md. 1981)—i.e., (i) the burden on the defendant in the absence of a stay, (ii) the harm to the plaintiff if the stay is granted, (iii) the public interest, and (iv) the interest of persons not parties to the civil litigation.  The fifth factor, the convenience to the court, requires no briefing.  Other courts have identified additional factors for stays of parallel civil and criminal matters, such as the extent to which the issues in the criminal case overlap with those presented in the civil case—a factor which also cuts in favor of a stay in this case.  *See In re Royal Ahold N.V. Sec. & ERISA Litig.*, 220 F.R.D. 246, 253 (D. Md. 2004).

With respect to the first *Mid-Atlantic Toyota* factor, the burden on Mr. D'Souza in the absence of a stay is exactly the same as the burden on the defendant in *Healthsouth*.  Like the

---

[1] *See, e.g., SEC v. Tandem Mgmt.*, 2001 WL 1488218 at *4 (S.D.N.Y. 2001) ("Where ... the SEC brings a civil enforcement action that proceeds in a parallel with a related criminal proceeding, it is often appropriate to stay the civil action pending resolution of the criminal proceedings."); *Volmar Distribs., Inc. v. New York Post Co.*, 152 F.R.D. 36, 39 (S.D.N.Y. 1993) (a stay is particularly appropriate where "a party under criminal indictment is required to defend a civil proceeding involving the same matter."); *SEC v. Pignatiello*, No. 97 Civ. 9303, 1998 WL 293988, at *2, 4-5 (S.D.N.Y. June 5, 1998); *SEC v. Mersky*, No. Civ. A. 93-5200, 1994 WL 22305, at *2-6 (E.D.Pa. Jan. 24, 1994); *SEC v. Downe,* No. 92 Civ. 4092, 1993 WL 22126, at *12, 14 (S.D.N.Y. Jan. 26, 1993).

defendant in *Healthsouth*, Mr. D'Souza has an "inherent inability to present evidence in his defense due to the ongoing criminal investigation." 261 F.Supp.2d at 1308.  As the court held in *Trustees of Plumbers and Pipefitters National Pension Fund v. Transworld Mechanical, Inc.*, 886 F.Supp. 1134 (S.D.N.Y. 1995), a stay is appropriate to avoid putting the civil defendants in the untenable position "of choosing between waiving their Fifth Amendment rights or effectively forfeiting the civil case."  *Id.* at 1140.

   To be sure, there have been no indictments yet.  However, that is not a bar to a stay, particularly when "an indictment appears to be much more than some fanciful and far-off possibility."  *Chao v. Fleming*, 498 F.Supp.2d 1034, 1040 (W.D. Mich. 2007) ("the Court declines to consider [the lack of an indictment] as weighing against a stay."); *see also Walsh Sec., Inc. v. Cristo Prop. Mgmt., Ltd.*, 7 F.Supp.2d 523, 527 (D.N.J. 1998) ("[a]lthough no indictments have been returned, this action presents a strong case for a stay . . . . the defendants have indicated that they will have to assert their Fifth Amendment privileges extensively, especially in interrogatories and depositions").

   Indeed, the government's repeated threats of an imminent indictment which have now spanned almost six months provide an additional reason for staying this action.  As the court in *In re Phillips, Beckwith & Hall*, 896 F.Supp. 553 (E.D. Va. 1995) noted:

> The balance is decidedly in favor of a stay if there is bad faith on the government's part by, for example, pursuing a civil lawsuit solely for the purpose of aiding a criminal investigation, or *threatening or delaying bringing criminal charges in order to extract an advantage in the civil case by keeping the cloud of criminal prosecution overhead*.

*Id.* at 558 (emphasis added).  Here, the timing of the U.S. Attorney's warnings and the FTC's demands for information in this case have had the effect of "extract[ing] an advantage in the civil case by keeping the cloud of criminal prosecution overhead."  Mr. D'Souza intends to take

discovery concerning the communications between the FTC and the U.S. Attorney during this time period if a stay is not granted.  Moreover, Mr. D'Souza respectfully urges the Court to require the FTC to state whether any materials obtained through this litigation, such as the bank account information that Mr. D'Souza provided to the FTC (as ordered by the preliminary injunction), have been shared with the United States Attorneys Office in Chicago.

The FTC relies on *Mid-Atlantic Toyota* for support that a stay should not be granted.  However, in that case, unlike here, none of the civil defendants had been identified as a target of a grand jury proceeding, and thus none of the defendants was "encumbered with the burden of developing simultaneously both criminal and civil defenses."  *In re Mid-Atlantic Toyota*, 92 F.R.D. at 360.

The FTC's reliance on *Avalonbay Communities, Inc. v. San Jose Water Conversation Corp.*, Civ. No. 07-306, 2007 WL 2481291 (E.D. Va. Aug. 27, 2007), is likewise misplaced.  That case, unlike this one, did not involve two simultaneous *government* actions.  Indeed, in *Avalonbay*, the court distinguished cases such as this where there are two concurrent government actions:

> Much of the case law involving motions to stay civil proceedings until the completion of criminal proceedings concerns cases where the government is opposing the same private party.  See *In re Phillips,* 896 F.Supp. at 557 (noting the dilemma surrounding use of Fifth Amendment in parallel cases can arise between private litigants but more often when the government is the opposing party).  Courts have been concerned that in these cases the government will purposely initiate parallel civil and criminal proceedings to (1) use the more liberal civil discovery rules to gain information for the corresponding criminal trial that would normally be restricted under criminal discovery rules and (2) to gain advantage in the civil trial by forcing parties to choose between exposing themselves to criminal prosecution by testifying or asserting the Fifth Amendment and, thereby, damaging their civil defense.  *See In re Phillips,* 896 F.Supp. at 558.  An adverse inference can be drawn against litigants who assert their Fifth Amendment right in a civil proceeding.  *See Baxter v. Palmigiano,* 425 U.S. 308, 318 (1976).

*Avalonbay*, 2007 WL 2481291, at *2.  Although those concerns were not present in *Avalonbay*, they are present here.

With respect to the second *Mid Atlantic Toyota* factor, the potential burden on the government if a stay were granted in this case is much less than in the cases cited by the FTC where the court declined to stay the civil action.  For example, in *United States v. Kordel,* 397 U.S. 1 (1970), there was an important public safety reason for not staying an FDA civil action: "[t]he public interest in protecting consumers throughout the Nation from misbranded drugs requires prompt action by the agency charged with responsibility for administration of the federal food and drug laws."  *Id.* at 11; *see also SEC v. Dresser*, 628 F.2d 1368, 1380 (D.C. Cir. 1980) ("[u]nlike the IRS, which can postpone collection of taxes for the duration of parallel criminal proceedings without seriously injuring the public, the SEC must often act quickly, lest the false or incomplete statements of corporations mislead investors and infect the markets.") Here, in contrast, the only potential harm from a stay would be to delay consumer redress to consumers who paid approximately $39.95 for allegedly deceptive software.  (Compl. ¶ 11).[2] Indeed, the FTC's civil action is analogous to the IRS civil action that the *Dresser* court noted was appropriate for a stay.

The FTC also expresses concern that "witnesses memories would fade, and the prospects of redressing any of the more than $100 million in consumer injury at issue in this case would grow exceedingly remote."  (FTC Opp'n to Mot. of Jain and Ross at 4.)  However, unlike the cases cited by the FTC, neither scenario is likely here where the FTC already has secured

---

[2] *Kordel* is distinguishable for a second reason as well.  The Supreme Court in *Kordel* noted that "we do not deal here with a case where the Government has failed to advise the defendant in its civil proceeding that it contemplates his criminal prosecution."  *Kordel*, 397 U.S. at 11.  Here, in contrast, the FTC did not disclose the pending Grand Jury investigation when it initiated this case and obtained a TRO compelling the defendants to produce information that could incriminate them.  (Tr. of Show Cause at 9.)  Mr. D'Souza first learned that he was the target of a criminal investigation on February 27, 2009, after he had already produced a statement of his accounts to the FTC pursuant to the preliminary injunction issued by this Court at the FTC's request.

numerous affidavits and where asset freezes are in place (subject to the limited modification

motions now pending).   Moreover, as in *Brock v. Tolkow*, 17 F.Supp.2d 523 (D.N.J. 1998),

"[t]he government does not point to any evidence that might be lost if civil discovery is stayed."

*Id.* at 527.   Nor is there any evidence that Mr. D'Souza would dissipate assets, destroy

documents, or resume "activity injurious to consumers."  (*See* Opp'n to Mot. of Jain and Ross at

5.)  Whatever the status of the other Defendants, Mr. D'Souza is not a fugitive, and the stay he is

seeking will not "last years, or longer."  In any event, Mr. D'Souza is amenable to an initial stay

of six months, subject to a renewed motion at that time if necessary.[3]

In sum, this Court should stay this proceeding for at least six months in light of the

pending criminal investigation in Chicago and the United States Attorney's warning of imminent

indictments.

**II.    The Asset Freeze Should Be Modified.**

The asset freeze was imposed by this Court on December  2, 2008, at the request of the

FTC, in an *ex parte* proceeding prior to Mr. D'Souza's retention of counsel.  Mr. D'Souza has

moved to modify the asset freeze so that it does not apply to assets that are both (i) unrelated to

the alleged misconduct of Mr. D'Souza or others under his control and (ii) exceed Mr. D'Souza's

joint and several liability exposure during the time period when he was engaged in business with

the other Defendants.  As a matter of law, those are the only two legitimate grounds for an asset

freeze.

The FTC does not dispute that, by the end of 2006, Mr. D'Souza had terminated all

business relationships with the other Defendants.  (Compl. ¶58.)  Nor does the FTC dispute that

---

[3] The FTC lacks support for its suggestion that a longer stay would be an abuse of discretion.  The FTC's reliance on *Wedgeworth v. Fibrebrand Corp.*, 706 F.2d 541 (5th Cir. 1983) is erroneous.  That case did not involve overlapping criminal and civil proceedings, but rather the affect of a bankruptcy proceeding on previously filed civil asbestos claims.

much of the alleged unlawful conduct took place after Mr. D'Souza severed his business

relationships with the other Defendants.  Indeed, the following paragraphs of the FTC's

Complaint pertain to conduct that occurred after Mr. D'Souza terminated his business

relationships with the other Defendants:  ¶¶ 15, 16,19, 20, 21,24, 25, 26, 27, 29 (note date of

May 5, 2007, on the graphic representation), 30, 37, 38, 39, 40, 41, 42, 43, 65.  Moreover, the

affidavits submitted by the FTC together with its motion for a TRO predominately concern

conduct in 2007 and 2008.  *See, e.g.,* Decls. of Cohen, Randall, Renteria, and Woerner.  In the

five volumes of declarations that the FTC filed with this court in support of its motion for a

TRO, the only facts pertaining to the time period when Mr. D'Souza had a business relationship

with some of the Defendants were innocuous and did not involve false scans, pornography, or

the any other illegal conduct.[4]

Nevertheless, the FTC asserts that Mr. D'Souza is jointly and severally liable for the

conduct of all the other Defendants in all the years the other defendants engaged in

misconduct—even in the two year period *after* Mr. D'Souza severed his business relationships

with those Defendants and when the vast majority of the alleged misconduct took place.  The

---

[4] All of the evidence gathered directly by the FTC relates to products sold in 2007 and 2008, and the FTC makes no showing that these are the same versions of the products sold in 2005 and 2006.  There are only two pieces of evidence that relate to products sold prior to 2007.  The first is excerpts from mygeek.com e-mails which did not refer in anyway to products that were alleged to conduct a fake scan of consumer computers.  (*See* FTC's Mem. in Support of *Ex Parte* TRO, Exhibit 20, Attachment BB.)  The second piece of evidence is a hodgepodge of unverified internet postings that the FTC obtained by conducting "Google searches" on the internet and printing screenshots from websites of competitors that sold similar security products and miscellaneous blog postings.  (*See* FTC's Mem. in Support of *Ex Parte* TRO, Exhibit 20 ¶¶ 28-32, 159.)  These printouts are not accompanied by any declarations that attest to their authenticity, the exact versions of the software that were tested, or the methodology employed in evaluating the programs.  The only declaration that makes any reference to 2005-2006 is the Declaration of Michael Nolet where Mr. Nolet claims to have monitored advertisements for errorsafe while at Right Media from August 2005 until August 2007.  Mr. Nolet alleges that the advertisements contained hidden code capable of redirecting consumers away form the website being viewed that redirected the consumers to errorsafe website.  (FTC's Mem. in Support of *Ex Parte* TRO, Exhibit 11)  However, Mr. Nolet does not state when he conducted his test of the advertisements and all indications are that the technical analysis of "malicious advertisements" attached to his Declaration and the test of advance cleaner that he conducted for the FTC occurred after December 31, 2006.  In sum, not only has the FTC failed to distinguish between conduct occurring before and after December 31, 2006, but it has also failed to present any reliable evidence to demonstrate that it is likely to prevail on the merits in proving that conduct that occurred prior to January 1, 2007 violated the FTC Act.

FTC is wrong as a matter of law.  For individual defendants to be jointly or severally liable for a corporation's misconduct, "the FTC must show that the individual defendants [subject to joint-and-several liability] participated directly in the practices or acts or had authority to control them."  *FTC  v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989).

Joint-and-several liability applies only "when each defendant repeatedly participated in the wrongful acts and each defendant's acts materially contributed to the losses suffered."  *FTC v. Seismic Entm't Prods.*,  441 F.Supp.2d 349, 354 (D.N.H. 2006), quoting *FTC v. GEM Merch. Corp.*, 87 F.3d 466, 468 (11th Cir.1996).   There is no dispute that, after Mr. D'Souza terminated his business relationships with the other defendants, he neither participated in any wrongful acts nor contributed to any losses suffered.[5]  None of the cases cited by the FTC in support of its joint-and several liability theory sought to impose joint-and several liability on a defendant for conduct that occurred after the defendant terminated his relationship with the other defendants.

 In support of its argument that the asset freeze is reasonable, the FTC asserts that there has been $100 million consumer injury, which exceeds Mr. D'Souza's total assets.  But that is an incorrect comparison.  The relevant comparison is to the consumer injury that occurred when Mr. D'Souza had a business relationship with the Defendants.  However the FTC has not even attempted to estimate that number.[6]  Accordingly, the FTC has not met its burden of justifying any asset freeze, much less the overbroad asset freeze now applicable to Mr. D'Souza.

---

[5] To be sure, the court can, in some circumstances, enjoin an individual from resuming discontinued conduct that has been found to be unlawful.  *See, e.g.*, cases cited at FTC Mem. in Sup of *Ex Parte* Mot. for TRO at 33 n. 12.  But there is no authority for an pre-trial asset freeze that exceeds the joint and several liability incurred during the time period when the defendant was allegedly engaged in the misconduct.  Indeed, all of the joint-and-several liability cases cited by the FTC applied such liability to conduct that took place while the defendant was participating in unlawful joint conduct.

[6] Throughout its Complaint the FTC repeatedly refers to the "Defendants" even though Mr. D'Souza was not associated with any of the other Defendants during much of the time period covered by the Complaint.  The FTC's use of the collectively "Defendants" and its failure to distinguish between Defendants creates confusion and should be avoided.  *See Vivendi S.A. v. T-Mobile USA, Inc.*, No. 606-1524JLR, 2008 WL 2345283 at *1 n. 1 (W.D. Wash. 2008).

In its Opposition, the FTC incorporates by reference its opposition to the motions of Defendants Jain and Ross to lift the asset freeze.  (*See* FTC's Opp'n at 2.)  However, Mr. D'Souza's situation is much different than that of Defendants Jain and Ross.  Unlike Jain and Ross, Mr. D'Souza terminated his business relationship with IMI and the other Defendants prior to the end of 2006.  Moreover, as a matter of law, Mr. D'Souza cannot be held jointly and severally liable for conduct that occurred when he was not there.

The asset freeze currently in effect against Mr. D'Souza is fatally overbroad for a second, independent reason:  It fails to distinguish consumer redress that the FTC is authorized to seek from consumer redress that it has no authority to seek.  As set forth in Mr. D'Souza's moving papers, the FTC only has authority to seek consumer redress for (i) injuries to U.S. consumers, or (ii) injuries to foreign consumers caused by conduct in the United States.  *See* 15 U.S.C. §45(a)(3). [7]  There is no dispute that a large part of the Defendants activities both took place outside the United States and only affected non-U.S. citizens outside the United States.  Thus, only a portion of the alleged $100 million consumer injury referenced by the FTC is actually subject to consumer redress.  Because the FTC has not even estimated that number, there is no basis for the asset freeze currently in effect against Mr. D'Souza.

The FTC also argues, without citing any cases, that it is Mr. D'Souza's burden to prove that the asset freeze is overbroad by disclosing his own business records.  (*See* FTC's Opp'n at 3.)  The law, however, requires the FTC meet its burden of showing a reasonable basis for the

---

[7] The FTC refers to the US SAFE Web Act of 2006 as the basis for the FTC's power to provide redress to foreign consumers.  (*See.* FTC's Oppo. to Jain's Mot. to Modify PI at 9.)  While the SAFE Web Act did clarify the FTC's jurisdiction to provide redress to foreign consumers, it was only in the context of conduct taking place in the United States that harmed foreign consumers.   As the FTC's own summary of the legislation states, the amendment expressly confirms, "the FTC's authority to redress harm in the United States caused by foreign wrongdoers and harm abroad caused by U.S. wrongdoers."  *See* Summary of the US SAFE WEB Act at 3, *available at http://www.ftc.gov/reports/ussafeweb/Summary%20of%20US%20SAFE%20WEB%20Act.pdf* (last visited Apr. 5, 2009).  The legislation does not give the FTC the power to seek restitution for foreign consumers for conduct occurring outside the United States.

amount of the asset freeze.  *See, e.g., United States v. Fang*, 937 F.Supp. 1186, 1194-96, 1198 (D. Md. 1996).  If, as is the case here, the FTC is basing the asset freeze calculation on joint-and-several-liability analysis, the FTC bears the burden of presenting a reasonable basis for its joint-and-several liability calculation in accordance with the law applicable to joint and several liability.  The FTC has failed to do so.  Moreover, the FTC's effort to force Mr. D'Souza to either waive his Fifth Amendment rights or subject himself to civil liability is  one of the most important reasons why this action should be stayed, as discussed above.

Finally, the FTC asserts that Mr. D'Souza does not need a modification of the asset freeze order to pay for his criminal defense, because Mr. D'Souza has income not subject to the asset freeze.  But the issue raised by Mr. D'Souza's motion does not turn on his need, but rather on the absence of any factual or legal foundation for the broad asset freeze applicable to Mr. D'Souza.

In sum, the asset freeze order directed to Mr. D'Souza should be modified to allow him to access assets either obtained (i) after December 2006, the date when Mr. D'Souza terminated his involvement with Innovative Marketing's business; or (ii) resulted from foreign conduct involving foreign consumers for which the FTC has no authority to seek consumer redress.

## CONCLUSION

For the foregoing reasons, Mr. D'Souza's motions to modify the asset freeze and to stay this action should be granted.

Dated:  April 6, 2009                        Respectfully submitted,


/s/ Michael J. Madigan
Michael J. Madigan (*pro hac vice*)
Russell D. Duncan (Bar No. 14904)
Garret G. Rasmussen (*pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
1152 15th Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 339-8400

*Attorneys for Defendant Marc D'Souza*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 6, 2009, a copy of the foregoing Defendant Marc D'Souza's Reply Memorandum in Support of Motion For Temporary Stay and Modification of Preliminary Injunction was served upon all counsel of record through the Court's ECF system.


<u>   /s/ Michael J. Madigan</u>
     Michael J. Madigan