UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | |
|---|---|
| **Federal Trade Commission**<br><br>                              **Plaintiff,**<br><br>   v.<br><br>**Innovative Marketing, Inc.,** *et al.*<br><br>                              **Defendants,**<br><br>AND<br><br>**Maurice D'Souza**<br><br>                              **Relief Defendant.** | **CIVIL NO. RDB 08-CV-3233** |

**PLAINTIFF FEDERAL TRADE COMMISSION'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO STRIKE DEFENDANT'S SUPPLEMENTAL EXPERT DISCLOSURE**

Plaintiff Federal Trade Commission ("FTC" or "Commission") hereby submits its Reply Brief in support of its Motion to Strike Defendant's Supplemental Expert Witness Disclosure.

I.   Introduction

Defendant Ross's Response to the FTC's Motion to Strike features a litany of excuses aimed at explaining why she "supplemented" her expert report nearly seven months after the deadline for expert supplementation, and a mere five business days before the FTC's Motion for Summary Judgment was due. Happily, the Court need not wade into the merits of the various excuses offered by Ms. Ross, because they simply are not relevant.

The new expert disclosure filed by Ms. Ross contains new testing and a new theory from her expert witness Scott Ellis that were never previously disclosed to the FTC. As a result, Ross's new expert disclosure does not qualify as a "supplement" under the Federal Rules of

1

Civil Procedure, but rather constitutes an entirely new expert report. As a result, the relevant deadline Ross missed is not the expert supplementation deadline, but rather Ross's original expert disclosure deadline, which passed on March 26, 2010, more than seven months before the new expert report was served upon the FTC. This deadline also predates all of the excuses offered by Ross for the late report, including her expert's health issues and his disastrous deposition. Accordingly, there is no justification for Ross's massively late expert report, and this Court should grant the FTC's Motion to Strike.

II.  Argument

Ross's Response fails to address the central argument in the FTC's Motion to Strike – that the previously undisclosed testing and conclusions in her expert's November 11, 2010 report are not a valid supplement under the Federal Rules. Indeed, Ross does not even address, much less distinguish the decisions cited throughout the FTC's motion that set forth the standard for supplementation and make clear that a party may not supplement an expert report to repair damage done during discovery, which is exactly what Ellis has done in his half-hearted and incomplete[1] "new" expert report. *See, e.g., Gallagher v. Southern Source Packaging*, 568 F. Supp. 2d 624, 630-31 (E.D.N.C. 2008).

Instead, Ross's Response offers a series of excuses for the late report and argues that striking the two-page report would be "too drastic" of a remedy. As discussed below, none of Ross's arguments withstand scrutiny.

---

[1] The Approximately Supplemental Report [*sic*] prepared by Ellis contains all of the hallmarks of a cursory analysis created in an attempt to forestall summary judgment. Indeed, the key exhibit in the Report, that purports to demonstrate Ellis's new "Software Rot" theory, is blank in both the FTC's service copy and the copy of the Report filed with Ms. Ross's Response. *See* Exhibit 1 to D.E. 190 at Exhibit A.

**A.     Ross's Last Minute Report Is Not A Valid Supplement Under Fed. R. Civ. P. 32**

In her Response to the FTC's Motion to Strike, Defendant Ross concedes that Scott Ellis's supplemental expert report was served "outside" of this Court's time frame for expert report disclosures.  Def.'s Resp. To Pl.'s Mot. To Strike ("Ross Response") at 6 (D.E. 190).  Ross nonetheless argues that the new report should be considered because Rule 26(e)(2) of the Federal Rules of Civil Procedure provides that for expert witnesses, a party's duty to supplement extends "both to information included in the [expert's] report *and to information given during the expert's deposition*.  Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." (emphasis added by Ross) *Id.* (quoting Fed. R. Civ. P. 26(e)(2)).

While Ross's recital of Rule 26(e)(2) is correct, her argument hinges on an erroneous reading of the Rules and a misunderstanding as to the proper use and purpose of supplementation.  The reason for supplementation under Rule 26(e)(2) is to protect an opposing party from unfair surprise and prejudice.  The Rule does so by requiring disclosure sufficiently in advance that the receiving party has an opportunity to investigate the disclosure and its preparer, and arrange for response and rebuttals from its own experts.  *Sullivan* v. *Glock*, 175 F.R.D. 497, 503  n. 11 (D. Md. 1997).  The supplementation rule is *not* designed to provide the discloser with an additional opportunity to bolster its case by addressing new issues.  *Gallagher* v. *Southern Source Packaging, LLC*, 568 F. Supp. at 630.  As one court explained, Rule 26(e) imposes a "duty" on experts to correct errors or omissions in their opinions; it does not create a "right" to offer new opinions.  *Reid* v. *Lockheed Martin Aeronautics Co.,* 205 F.R.D. 655, 662 (N.D. Ga. 2001).  The emphasis of supplementation is thus on correcting *previous* errors or omissions, not opening the door to new testimony and opinion.

In *Tucker* v. *Ohtsu Tire & Rubber Co., Ltd*, for instance, a case cited by Ross in her Response, an expert was permitted to supplement with newfound evidence "for the opinions *he had already disclosed*." *Ohtsu Tire & Rubber Co.,* 49 F. Supp. 2d 456, 459 (D. Md. 1999) (emphasis added). Since the opposing party was already aware of the expert's prior opinions, the new report did not present an unfair surprise, and was a permissible supplementation.[2] *Id*. It would have been improper, on the other hand, had the expert attempted to supplement with evidence about an opinion he had not previously disclosed.

The reason that supplementation is focused on correcting errors and omissions from prior opinion is straightforward. Allowing an expert to opine on issues and claims not previously considered results in unfair surprise unless the opposing party is permitted adequate time to investigate and respond in kind. *See Southern States Rack and Fixture* v. *Sherwin-Williams Co.*, 318 F.3d 592, 598 (4th Cir. 2003) (the purpose of the expert disclosure requirements is to allow the opposing party adequate time to prepare a defense, both by examining the expert report through discovery and deposition, and by developing counter testimony through a party's own experts). The result of allowing new opinions in supplemental disclosures would be never-ending supplementation, as each expert report begat a rebuttal report followed by a supplementary report followed by more rebuttal reports and supplemental reports *ad infinitum*. *Beller ex. rel. Beller* v. *United States*, 221 F.R.D. 696, 701 (D.N.M. 2003).

For this reason, federal courts should, and routinely do, reject new expert reports when they are not "true supplementation" of prior opinion, but consist instead of new claims and

---

[2] It is also worth noting that in *Ohtsu*, the party's supplementation was disclosed ten days *before* the end of discovery. In contrast, Ross's supplementation was disclosed five weeks after the end of discovery.

opinion. *See e.g., Gallagher* at 630-31; *Beller*, 221 F.R.D. at 701; *Coles* v. *Perry*, 217 F.R.D. 1, 3 (D.D.C. 2003); *Solaia Tech., LLC v. ArvinMeritor, Inc.* 361 F. Supp. 2d 797, 806 (N.D. Ill. 2005); *Akeva L.L.C.* v. *Mizuno Corp.*, 212 F.R.D. 306, 310 (M.D.N.C. 2002).

Cases cited by Ross actually demonstrate this principle. In addition to *Tucker*, cited above, the court in *Potomac Electric Power v. Electric Motor Supply, Inc.* permitted an expert to revise statements about issues he had *previously opined* about. *Potomac Electric Power*, 192 F.R.D. 511, 514 (D. Md. 2000).[3] And in *Glens Falls Insurance Co*. v. *Cher-Chris Construction Co., Inc.*, the court allowed an expert's supplementation because, although it was an "expansion of his prior opinion ... [t]he basic opinion remained the same." *Glens Falls Ins.*, 2005 WL 5994153, *4 (D. Md. 2005).

In Ross's case, a proper supplementation would have had Ellis re-examine his earlier report and conclude that the facts now support a different conclusion, or add an important element or qualification to a prior opinion that he omitted, or even additional support for his previous opinion. But Ellis's supplemental report does none of this. Instead, it presents an entirely new theory, coined "Software Rot" by Ellis, to justify why the Defendants' software products *always* detect critical security issues on every computer upon which they run. Ellis then applies this new theory to the WinFixer software product, which Ellis never previously tested. *See* Approximately Supplemental Report at 2. This last minute change of course leaves the FTC with no ability to test Ellis's dubious new "Software Rot" theory, which will undoubtedly be prominently featured in Ross's Opposition to the FTC's Summary Judgment

---

[3] It is also worth noting that before serving the opponent with a supplementation post-deadline, the Plaintiff in *Potomac Electric Power* sought permission from the court to amend the scheduling order. In Defendant Ross's case, she evidently decided it was easier to seek forgiveness than permission.

Motion.

### B. None of Ross's Excuses for the Late Report Merit Serious Consideration

Rather than focus on what constitutes a proper supplement to an expert report, Ross uses her Response to unveil a series of excuses for her massively late expert disclosure. These excuses ran the gamut from adding weekends and holidays to the calculation of how far in advance of summary judgment her surprise report was filed, to the remarkable argument that the FTC should have expected Ross to violate the scheduling order because her expert was challenged by the FTC at deposition over his decision to conduct highly selective and largely irrelevant tests at the direction of counsel.

1. Expert Health Issues

Ross uses her Response to inform the FTC, for the first time, that her expert suffered health issues immediately after his deposition, and that these health issues apparently continued until right before the FTC's deadline for filing summary judgment. Although these health issues did not prevent Mr. Ellis from attending his job each day, they apparently did prevent him from working on his surprise expert report until immediately before the FTC's summary judgment filing deadline. *See* Ross Response at 4-5.

In her Response, Ross admits that she was aware of Ellis' health issues at the time of his deposition in late September, and appears to concede that she hatched her plan to file an untimely expert disclosure immediately after the Ellis deposition. *See* Ross Response at 4-5. Yet, when the parties spoke in mid-October to agree on a summary judgment briefing schedule (see D.E. ## 179 - 180), no mention was made of either Ellis' health or Ross's intention to file an untimely expert report. Instead, Ross waited until the eve of the FTC's summary judgment deadline to serve her surprise expert report, and waited until after the FTC filed its summary

judgment motion to inform the FTC about Ellis's health issues. Ross's Response offers no explanation for these oversights.

At the end of the day, however, Ellis' health issues simply are not relevant. As explained above, expert witnesses are not free to offer new testing and new theories as "supplements" to their expert reports. As a result, the applicable deadline for Ellis's surprise report was March 26, 2010, the date of his original expert disclosure. Since all of Ellis's health issues occurred well after this date, they are irrelevant to the Court's consideration of the FTC's Motion to Strike.

    2.    The Ellis Deposition

Ross argues in her Response that the FTC should not have been surprised by Ellis's untimely report because the FTC challenged Ellis at his deposition about his rigged testing methodology. This argument fails because: 1) repairing the damage done during Ellis's deposition is not a valid basis to supplement his report; and 2) the FTC never encouraged or expected Ellis to undertake more biased and selective testing of the Defendants' fraudulent products.

As discussed in detail in the FTC's summary judgment motion, the Defendants' software products were sold via two types of deceptive advertising: Internet-based deceptive ads, and software-based deceptive ads. The software-based deceptive advertising consisted of a "trial" versions of the Defendants' software, which would falsely report system errors, malware, and other maladies, and then inform consumers' that they must purchase the "full" version of the product to remove the phantom threats.

Because the "trial" versions of the Defendants' software are a fraud, Ellis – at counsel's direction – largely avoided testing them. Instead, Ellis focused on the "full" versions of the Defendants' software, which consumers did not receive until after they were duped into

7

purchasing.  The obvious problem with this testing methodology is that it offers no useful evidence in this case.  It is the deception during the pre-purchase advertising of the Defendants' products that is the violation of Section 5 of the FTC Act alleged in his case.  The fact that the Defendants toned down (but did not eliminate) the false representations in the post-purchase versions of their software (after consumers had already been defrauded) is simply of no consequence.

As Ross points out in her Response, Ellis's refusal to test the relevant software in this case did draw a challenge from the FTC at Ellis's deposition.  However, Ross fails to accurately quote the exchange, and ends up significantly mischaracterizing what actually occurred.

In her Response, Ross claims that "Mr. Ellis perform[ed] the very test requested by Mr. Arenson [at Ellis's deposition]" in his new expert report.  This is simply false, as demonstrated by the full deposition transcript that Ross failed to cite.  In the exchange, Ellis was asked if it concerned him that Defendants' WinFixer product detects a file *that the program itself installed on the computer* as a "severe system threat."  Ellis responds that he would have to undertake "an analysis" and "find[] out how that [file] ended up there and why."  To which, the FTC responds, "I encourage you to do that analysis."  The full exchange is below:

> Q. Does it concern you at all that WinFixer is installing a file on the computer and then detecting a file that it installed as a severe system threat? Does that trouble you?
>
> A. It is not -- it is not -- it is not the best software practice to leave stuff behind and not know that it is there.   I could not speak to whether or not that was intentional, that somebody left that behind for the purpose of doing that. I couldn't speak to the motive or the reason why it is there without doing an analysis and finding out how that ended up there and why.
>
> Q. I encourage you to do that analysis.  [FTC Expert] Johnson tested this file and it is available to you on the hard drive that you have.
>
> A. Sure.

8

Had Ellis actually undertaken the analysis above – or offered an opinion that in any way relates to the fact that the Defendants' WinFixer program detects a file that it created as a "severe system threat" – the FTC would certainly have less basis to be surprised by his report.[4] But that is not what happened.

Ellis's "Approximately Supplemental Report" makes no mention of WinFixer detecting a file it creates as "severe system threat." Indeed, the report has nothing to do with the exchange above. Rather, the surprise Ellis report contains a new attack on the authenticity of the FTC's evidence, and a entirely new "Software Rot" theory that attempts to explain why WinFixer detects crippling system errors every time it runs, on every computer it runs upon, even on "fresh" installs of Microsoft Windows direct from the factory CD. This entirely new theory could and should have been contained within Ellis's original report, and as detailed in Section A above, is not a proper supplement. Accordingly, Ellis's surprise expert disclosure should be stricken.

**C.      Striking the Two Page Report Is an Appropriate and Narrowly-Tailored Remedy**

Although Ross protests that striking her roughly two-page expert disclosure would be a "drastic" remedy, the facts show otherwise. In its Motion to Strike, the FTC seeks only to prohibit Ross from introducing expert testimony about a single new software test and the new "Software Rot" theory introduced by her expert. The FTC does not seek to bar Ross from relying on any of the testing done by her expert within the confines of the Scheduling Order, or any of the conclusions reached therefrom. In other words, the FTC asks only that Ross play by

---

[4]Of course the fact that Ellis refused to commit to any future testing, and that fact that Ross's counsel stated her belief that it was inappropriate for the FTC to ask her expert to do anything, left it far from certain that Ellis would actually complete the analysis. *See* FTC's Motion to Strike at 6.

the rules, and that she not be allowed to introduce last-minute expert testimony that the FTC had no opportunity to consider, much less challenge at deposition, prior to filing its summary judgment brief.  Striking this small quantity of surprise expert testimony is hardly a "drastic" remedy, but rather a simple matter of ensuring a level playing field.

While it is true that exclusion has traditionally been considered a severe sanction for discovery abuses, it has often been deemed appropriate for failure to comply with Rule 26(a)(2), both in the District of Maryland and elsewhere.  *See e.g. Levy v. New Carrollton*, 2009 U.S. Dist. LEXIS 127062, *57-8 (D. Md. 2009); *Gallagher*, 568 F. Supp. at 632; *Beller,* 221 F.R.D. at 701.  Indeed, in the case cited by Ross for the proposition that exclusion is a drastic remedy, Judge Grimm also declares, "As a rule of thumb, if the failure to comply with the required disclosure involves a material aspect of the expert's testimony, and if the opposing party can show prejudice in connection with the lack of disclosure, then the opinion of the expert should be excluded, in whole or in part, at trial."  *Sullivan*, 175 F.R.D. at 503.

As previously noted, the purpose of the expert disclosure rules are to protect a party from being ambushed.  The facts are that without any advance notice, the Defendant served the FTC with a new disclosure, consisting of new software testing and a new theory, and did so just a few days before the FTC's summary judgment motion was due.  It is difficult to see how this would not constitute a late, unfair, and prejudicial surprise, regardless of Ross's intent or her excuses.  Accordingly, the disclosure should be stricken.

**D.    Conclusion**

For the reasons stated above and in the FTC Motion to Strike, this Court should strike the untimely expert disclosure submitted by Defendant Ross and bar her from offering testimony concerning the topics covered in his untimely report.

Dated: December 3, 2010

                Respectfully submitted:

                WILLARD K. TOM
                General Counsel

                     /s/ Ethan Arenson
                Ethan Arenson, DC #45147
                Colleen B. Robbins, NY #2882710
                Federal Trade Commission
                600 Pennsylvania Ave., NW, Rm 288
                Washington, D.C. 20580
                (202) 326-2204 (Arenson)
                (202) 326-2548 (Robbins)

Case 1:08-cv-03233-RDB   Document 191   Filed 12/03/10   Page 12 of 12


**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| **Federal Trade Commission**<br><br>                     **Plaintiff,**<br><br>v.<br><br>**Innovative Marketing, Inc.,** *et al.*<br><br>                     **Defendants,**<br><br>AND<br><br>**Maurice D'Souza**<br><br>                     **Relief Defendant.** | **CIVIL NO. RDB 08-CV-3233** |

## CERTIFICATE OF SERVICE

I hereby certify that on December 3, 2010, I caused a true and correct copy of the foregoing Reply Brief to be served via the Court's electronic filing system upon:

Tom Kirsch
Winston & Strawn
35 W. Wacker Drive
Chicago, Illinois
60601-9703

Carolyn Gurland
2731 N. Mildred Avenue
Chicago, IL 60614
*Counsel for Kristy Ross*

Garret Rasmussen
Orrick
Columbia Center
1152 15th Street, N.W.
Washington, D.C. 20005-1706
*Counsel for Marc D'Souza and Maurice D'Souza*

                                                                /s/ Ethan Arenson