RDX 1

# In the Matter of:

# FTC v. Innovative Marketing, Inc. et al.

*May 4, 2010*
*Geoffrey Gieron*

**Condensed Transcript with Word Index**



**For The Record, Inc.**
**(301) 870-8025 - www.ftrinc.net - (800) 921-5555**

**FTC v. Innovative Marketing, Inc. et al. Gieron**

1

```
 1                 FEDERAL TRADE COMMISSION
 2                      I N D E X
 3   WITNESS:                          EXAMINATION:
 4   GEOFFREY GIERON
 5       BY MS. ROBBINS                       1?
 6       BY MS. GURLAND                      161
 7
 8
 9
10
11   EXHIBITS        DESCRIPTION              FOR ID
12   Number 1    Notice of Deposition          12
13   Number 2    Declaration of Records Custodian  15
                 (FTC 021959-021960)
14
15   Number 3    Spreadsheet of Globedat accounts  34
                 (FTC 022017-022018)
16   Number 4    Edit profile pages             39
                 (FTC 021962-022015)
17
18   Number 5    Account Funding Pages          42
                 (FTC 023162-023209)
19   Number 6    CC Numbers by Account          47
                 (FTC 023159-023160)
20
21   Number 7    Email chain beginning with     50
                 7/18/05 email from Kristy Ross to
22               Geoff Gieron
                 (FTC 048015-048016)
23   Number 8    Email chain beginning with     52
                 8/5/05 email from Kristy Ross to
24               Geoff Gieron
                 (FTC 047640-047645)
25
```

2

```
 1   Number 9    Email chain beginning with     62
                 8/10/05 email from Kristy to
 2               Geoff Gieron
                 (FTC 047634-047638, 023292,
 3               023298-023299)
 4   Number 10   Email chain beginning with     67
                 10/3/05 email from Robert McDaniel
 5               to Geoff Gieron and Steve Armstrong
                 (FTC 048312-048315, 048231-048240,
 6               022272-022276, 022260-022261)
 7   Number 11   Email chain beginning with     82
                 11/2/05 email from Lilach Chetrit-
 8               Argaman to Robert McDaniel
                 (FTC 048295-048298, 022370-022374)
 9
10   Number 12   Email chain beginning with     89
                 11/18/05 email from Kristy Ross to
11               Geoff Gieron
                 (FTC 047447-047455, 023372)
12   Number 13   Email chain beginning with     92
                 12/2/05 email from Lilach Chetrit-
13               Argaman to Chad Little
                 (FTC 047424-047426, 048306-048308,
14               023377-023380, 048242-048245)
15   Number 14   Email chain beginning with     99
                 1/20/06 email from Robert McDaniel
16               to Shawn Stevens
                 (FTC 048246-048248)
17
18   Number 15   Email chain beginning with    102
                 2/2/06 email from Kristy Ross to
19               Geoff Gieron
                 (FTC 047420-047421)
20   Number 16   Email chain beginning with    108
                 3/21/06 email from Stephen Krikelis
21               to Geoff Gieron
                 (FTC 023478-023479, 023482-023483,
22               047427-047429)
23   Number 17   4/14/06 email from Kristy Ross to  114
                 Geoff Gieron
24               (FTC 022479)
25
```

3

```
 1   Number 18   Email chain beginning with    117
                 5/5/06 email from Robert McDaniel
 2               to geoff Gieron
                 (FTC 048309-048311, 023577-023582)
 3
 4   Number 19   Email chain beginning with    122
                 6/27/06 email from Kristy Ross to
 5               Ryan Maloney
                 (FTC 048195-048196)
 6   Number 20   Email chain beginning with    124
                 7/13/06 email from Robert McDaniel
 7               to geoff Gieron
                 (FTC 047368-047371, 047351-047367,
 8               047417-047419)
 9   Number 21   Email chain beginning with    130
                 7/14/06 email from Kristy Ross to
10               Ryan Maloney
                 (FTC 048180-048184, 048178)
11
12   Number 22   Email chain beginning with    134
                 7/14/06 email from Kristy Ross to
13               Ryan Maloney and Geoff Gieron
                 (FTC 048193-048194, 022905)
14   Number 23   Email chain beginning with    136
                 7/17/06 email from Ryan Maloney to
15               Kristy Ross
                 (FTC 048263-048293)
16
17   Number 24   Email chain beginning with    148
                 7/21/06 email from Kristy Ross to
18               Ryan Maloney
                 (FTC 048215-048216, 048203-048204)
19   Number 25   Email chain beginning with    153
                 7/28/06 email from Mike Romoff to
20               Robert McDaniel
                 (FTC 048249-252, 047372-047375,
21               047442-047444)
22   Number 26   Email chain beginning with    156
                 8/15/06 email from Robert McDaniel
23               to ryan@adonetwork.com
                 (FTC 047376-047378)
24
25
```

4

```
 1   KRG 4     Email chain beginning with     175
               7/29/05 email from Kristy Ross to
 2             Geoff Gieron
               (ROSS000011-000016)
 3
 4   KRG 5     Email chain beginning with     177
               7/18/05 email from Kristy Ross to
 5             Geoff Gieron
               (ROSS000009-000010, 000017-000022)
 6   KRG 6     Email chain beginning with     184
               8/9/05 email from Kristy Ross to
 7             Geoff Gieron
               (ROSS000023-000033)
 8
 9   KRG 7     Email chain beginning with     203
               8/10/05 email from Kristy Ross to
10             Geoff Gieron
               (ROSS000034-000038)
11   KRG 8     Email chain beginning with     205
               8/18/05 email from Kristy Ross to
12             Geoff Gieron
               (ROSS000043-000048)
13
14   KRG 9     Email chain beginning with     209
               8/25/05 email from Kristy Ross to
15             Geoff Gieron
               (ROSS000049)
16   KRG 10    Email chain beginning with     225
               8/31/05 email from Tim Nichols to
17             Robert McDaniel
               (ROSS000062-000063)
18
19   KRG 11    Email chain beginning with     229
               8/31/05 email from Robert McDaniel
20             to Mike Stocker and Chad Little
               (ROSS000064-000066)
21   KRG 12    Email chain beginning with     233
               9/6/05 email from Kristy Ross to
22             Geoff Gieron
               (ROSS000067-000069)
23
24   KRG 13    Email chain beginning with     235
               9/30/05 email from Kristy Ross to
25             Geoff Gieron
               (ROSS000070-000088)
```

**For The Record, Inc.**
**(301) 870-8025 - www.ftrinc.net - (800) 921-5555**

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 4 of 121

**FTC v. Innovative Marketing, Inc. et al. Gieron**

**5/4/2010**

**Page 5**

| | | |
|---|---|---|
| 1 | KRG 14    Email chain beginning with | 245 |
| 2 | 10/3/05 email from Robert McDaniel to Geoff Gieron and Steve Armstrong | |
| 3 | (ROSS000089-000092) | |
| 4 | KRG 15.5   Email chain beginning with 11/2/05 email from Lilach Chetrit- | 274 |
| 5 | Argaman to Robert McDaniel (FTC 048295-048296) | |
| 6 | KRG 16    12/2/05 email from Lilach Chetrit- Argaman to Chad Little and | 255 |
| 7 | robert@mygeek.com (ROSS000119-000121) | |
| 8 | | |
| 9 | KRG 17    Email chain beginning with 12/5/05 email from Lilach Chetrit- | 269 |
| 10 | Argaman to Robert McDaniel and Chad Little (ROSS000127, FTC 048242) | |
| 11 | | |
| 12 | KRG 18    Email chain beginning with 1/20/06 email from Mike Romoff to | 278 |
| 13 | Robert McDaniel (ROSS000136-000138) | |
| 14 | KRG 19    Email chain beginning with 2/2/06 email from Kristy Ross to | 282 |
| 15 | Geoff Gieron (ROSS000143-000148) | |
| 16 | | |
| 17 | KRG 19.5   3/20/06 email from Stephen Krikelis to Geoff Gieron | 286 |
| 18 | (ROSS000150-000151) | |
| 19 | KRG 20    Email chain beginning with 4/10/06 email from Kristy Ross to | 292 |
| 20 | Geoff Gieron (ROSS000154-000156) | |
| 21 | KRG 21    Email chain beginning with 5/5/06 email from Robert McDaniel | 293 |
| 22 | to Geoff Gieron (ROSS000171-000175) | |
| 23 | | |
| 24 | | |
| 25 | | |

**Page 6**

```
 1            UNITED STATE DISTRICT COURT
 2               DISTRICT OF MARYLAND
 3   Federal Trade Commission    ) CIVIL NO.
     600 Pennsylvania Ave. NW    ) RDB 08-CV-3233
 4   Washington, DC 20580,       )
                                 )
 5            Plaintiff,          )
                                 )
 6        v.                      )
                                 )
 7   Innovative Marketing, Inc., also d/b/a )
     Billingnow, BillPlanet PTE, Ltd.,      )
 8   Globedat, Innovative Marketing Ukraine,)
     Revenue Response, Sunwall, Synergy     )
 9   Software BV, Winpayment Consultancy    )
     SPC, Winsecure Solutions, and          )
10   Winsolutions FZ-LLC                     )
     1876 Hutson Street                      )
11   Belize City, Belize;                    )
                                 )
12   ByteHosting Internet Services, LLC  )
     3864 McMann Road, Suite A,         )
13   Cincinnati, Ohio 45245;            )
                                 )
14   James Reno, individually, d/b/a    )
     Setuphost.net, and as an officer of )
15   Bytehosting Internet Services, LLC  )
     3844 Golden Meadow Ct,            )
16   Amelia, Ohio 45102;                )
                                 )
17   Sam Jain, individually, and as an   )
     officer of Innovative Marketing, Inc. )
18   355 First Street 2801               )
     San Francisco, California 94105;    )
19                                )
     Daniel Sundin, individually, d/b/a  )
20   Vantage Software and Winsoftware, Ltd.,)
     and as an officer of Innovative     )
21   Marketing, Inc.,                    )
     107 Jermyn Street, Flat No. 1       )
22   London, UK SW1Y6EE;                 )
                                 )
23   Marc D'Souza, individually, d/b/a Web )
     Integrated Net Solutions, and as an  )
24   officer of Innovative Marketing, Inc. )
     1 King Street W.                    )
25   Toronto, Ontario CANADA M5H1A1; and )
```

**Page 7**

```
 1   Kristy Ross, individually, and as an  )
     officer of Innovative Marketing, Inc. )
 2   207 Deer Run Dr.                     )
     Walkersville, MD 21793               )
 3                                )
            Defendants              )
 4                                )
     AND                           )
 5                                )
     Maurice D'Souza                )
 6   22 Carnegie Crescent          )
     Thornhill, Ontario CANADA L3T5H1,  )
 7                                )
            Relief Defendant.      )
 8                                )
 9
10
11          DEPOSITION OF GEOFFREY M. GIERON
12                   VOLUME I
               (Pages 1 through 301)
13
14             May 4, 2010
                9:39 a.m.
15
16             Location:
                Osborn Maledon, PA
17              2929 North Central Avenue
                Phoenix, Arizona
18
19
20
21          Prepared by:
22          Carolyn T. Sullivan, RPR
23          Arizona Certified
24          Reporter No. 50528
25
```

**Page 8**

```
 1   APPEARANCES:
 2   ON BEHALF OF THE FEDERAL TRADE COMMISSION:
 3       COLLEEN B. ROBBINS, Attorney
 4       ETHAN ARENSON, Attorney
 5       Bureau of Consumer Protection
 6       Federal Trade Commission
 7       600 Pennsylvania Avenue, NW
 8       Washington, DC 20580
 9
10   ON BEHALF OF DEFENDANT KRISTY ROSS:
11       CAROLYN PELLING GURLAND, Attorney
12       2731 North Mildred Avenue
13       Chicago, Illinois 60614
14       and
15       THOMAS L. KIRSCH II, Attorney
16       Winston & Strawn, LLP
17       35 West Wacker Drive
18       Chicago, Illinois 60601-9703
19
20   ON BEHALF OF DEFENDANTS MARC D'SOUZA AND MAURICE D'SOUZA:
21       JONATHAN A. DIRENFELD, Attorney
22       Orrick Herrington & Sutcliffe
23       1152 15th Street, NW
24       Washington DC 20005-1706
25
```

2 (Pages 5 to 8)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 5 of 121

**FTC v. Innovative Marketing, Inc. et al. Gieron**

5/4/2010

9

1  APPEARANCES:
2  ON BEHALF OF ADON NETWORK AND GEOFFREY M. GIERON:
3    JEFFREY B. MOLINAR, Attorney
4    Osborn Maledon, PA
5    2929 North Central Avenue, 21st Floor
6    Phoenix, Arizona 85012-2794
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

10

1    MS. ROBBINS:  We're going to go on the
2  record.  I'd like to go around and introduce everyone
3  here for the record.
4    My name is Colleen Robbins, and I'm with the
5  Federal Trade Commission.
6    MR. ARENSON:  Ethan Arenson with the Federal
7  Trade Commission.
8    MR. DIRENFELD:  Jonathan Direnfeld from
9  Orrick, Herrington & Sutcliffe representing Mark and
10  Maurice D'Souza.
11    MS. GURLAND:  Carolyn Gurland,
12  G-u-r-l-a-n-d, representing Kristy Ross.
13    MR. MOLINAR:  Jeffrey Molinar, Osborne
14  Maledon, representing AdOn Network and Geoff Gieron.
15    MS. ROBBINS:  We're here in connection with
16  FTC vs. Innovative Marketing, Case No. 08-CV-3233, filed
17  in the District of Maryland.
18    And could you please swear the witness in.
19
20
21
22
23
24
25

11

1    GEOFFREY M. GIERON,
2  called as a witness herein, having been first duly sworn
3  by the Certified Reporter to speak the whole truth and
4  nothing but the truth, was examined and testified as
5  follows:
6
7    EXAMINATION
8  BY MS. ROBBINS:
9    Q.  Mr. Gieron, do you understand that you are
10  under oath now?
11    A.  Correct.
12    Q.  So I just want to go through some preliminary
13  questions before we get started.  So I'm going to be
14  asking you questions.  If you could wait until I finish
15  asking the question before you answer so that way the
16  court reporter can make sure to get everything down.  Do
17  you understand?
18    A.  Yes.
19    Q.  And if you could answer audibly with words
20  rather than "uh-huhs" or nodding your head so that way
21  the court reporter can take it down.
22    And if you hear the defense attorney make an
23  objection, you can go ahead and answer the question after
24  the objection has been made.
25    If you need to take a break, please tell

12

1  me.  And if later in the deposition you remember
2  something that you wanted to say, you can clarify and let
3  me know that you want to clarify that answer.
4    A.  Okay.
5    Q.  Is there any reason today that you can't
6  proceed due to some kind of medication or illness or
7  something like that?
8    A.  No.
9    Q.  And you understand the instructions I've given
10  you?
11    A.  Yes.
12    Q.  So I'd like to have the court reporter hand you
13  a copy of the deposition notice to be marked as Exhibit
14  1.
15    (Exhibit 1 was marked.)
16    Q.  BY MS. ROBBINS:  Have you been designated as a
17  corporate representative for AdOn for purposes of this
18  deposition?
19    A.  Yes.
20    Q.  And could you please give your full name and
21  your current address, please.
22    A.  Geoffrey, G-e-o-f-f-r-e-y, Martin, M-a-r-t-i-n,
23  Gieron, G-i-e-r-o-n.  Current address is 905 West Leah
24  Lane, L-e-a-h.  That's in Gilbert, Arizona 85233.
25    Q.  And I'd like to first go through briefly some

3 (Pages 9 to 12)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 6 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron

5/4/2010

13

1  of your educational background.  Did you graduate from
2  high school?
3      A.   Yes.
4      Q.   And did you go to college?
5      A.   Yes.
6      Q.   Where did you graduate from?
7      A.   Arizona State University.
8      Q.   And did you go on and get any graduate degrees?
9      A.   Yes.
10     Q.   And where is that from?
11     A.   University of Phoenix.
12     Q.   And what did you get a graduate degree in?
13     A.   Master's in business administration.
14     Q.   And what is your -- can you describe your
15  current employment.
16     A.   My current employment is with AdOn Network as a
17  VP of operations focusing on advertiser services.
18         MS. ROBBINS:  We're going to go off the
19  record for a minute.
20         (Discussion off the record.)
21         (Mr. Kirsch joined the deposition.)
22         MR. KIRSCH:  Tom Kirsch for Kristy Ross.
23     Q.   BY MS. ROBBINS:  Mr. Gieron, you just said that
24  you are the VP of -- can you repeat that?
25     A.   VP of operations.  Advertiser services is the

14

1  focus.
2      Q.   And who is that for?
3      A.   AdOn Network.
4      Q.   And how long have you been in that position?
5      A.   Two years.
6      Q.   And what was your position -- how long have you
7  been with AdOn Network?
8      A.   Seven years in July.
9      Q.   And what was your position before VP?
10     A.   Director of client services.
11     Q.   How long were you in that position for?
12     A.   A year to two years.
13     Q.   And what did you do before that at AdOn?
14     A.   Manager of client services.
15     Q.   And how long were you in that position for?
16     A.   About a year and a half.
17     Q.   And when you first started with AdOn, what did
18  you start out as?
19     A.   Business development representative.
20     Q.   And then was there any position in between
21  that, in between when you become manager or did you go
22  from business development rep to manager?
23     A.   Yes.  I moved from business development into
24  overseeing client services in a manager role.
25     Q.   And when you started at AdOn, was it called

15

1  AdOn Network at that point?
2      A.   No, at the time it was called myGeek.com.
3      Q.   And when did the name change, do you recall?
4      A.   2005, 2006, right around there.
5      Q.   How long had you been there before the name
6  changed to AdOn, do you know?
7      A.   Approximately a year and a half, two years.
8         (Exhibit 2 was marked.)
9      Q.   BY MS. ROBBINS:  I'm showing you a custodian of
10  records declaration.  Do you recognize that?
11     A.   Yes.
12     Q.   And what is it?
13     A.   It was the -- it was received when we were
14  subpoenaed or around the time we were subpoenaed by
15  Microsoft for information surrounding Globedat and
16  WinFixer.
17     Q.   And is this a true and correct copy of the
18  custodian of records declaration that you signed on
19  4/12/07?
20     A.   Yes.
21     Q.   And does this declaration cover the
22  documentation that you sent to Microsoft pursuant to that
23  subpoena that were later produced to the FTC?
24     A.   Yes.
25     Q.   And were those documents labeled MGC 00001

16

1  through 01703.
2      A.   Can you repeat that again, please.
3      Q.   Do you know if those documents were labeled
4  with an MGC Bates label that were submitted to Microsoft
5  and then later produced to the FTC?
6      A.   I don't recall the label.
7      Q.   But this custodian of records declaration
8  covered the documents that you produced to Microsoft and
9  that were later produced to the FTC?
10     A.   Correct.
11     Q.   Can you describe what does AdOn -- what does
12  AdOn Network do?
13     A.   AdOn Network is a -- it's a network that
14  connects advertisers and publishers.  Publishers
15  incorporates anything that's a direct publishing Web site
16  like, for example, eonline.com to other aggregates of
17  traffic, whether they are in search or cost per click,
18  cost per view, which is use of CPV or popunders, both
19  desktop as well as publisher based, desktop being
20  applications that are downloaded to a person's computer
21  in turn that they receive X number of adds in
22  compensation for the application, whether it's a game,
23  weather tool bar.  The publisher sites which are often
24  seen today are -- if you went to eonline.com and changed
25  pages, and you saw a popup or popunder, those would be

4 (Pages 13 to 16)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 7 of 121

**FTC v. Innovative Marketing, Inc. et al. Gieron**                    **5/4/2010**

17

1   representative of the type of people that we work with in
2   that capacity.
3          We also work with traffic sources or
4   publishers that have banner inventory. Those would be
5   more representative of strictly a direct Web site or a
6   grouping of Web sites. That's what we do.
7   **Q.   So you help to place ads on Web sites or on**
8   **consumers' computers through desktop applications?**
9   A.   We don't actually place the ad. The ad is
10  being placed and controlled at the publisher level or the
11  traffic service level since we do not control the traffic
12  directly. We are a supplier of advertiser inventory,
13  whether it was through a direct relationships with our
14  system or if someone had white labeled the system or
15  co-branded it until it appears their own and put their
16  own advertisers into the system, whether into their own
17  traffic or out into the network.
18  **Q.   And how would an advertiser sign up with you?**
19  A.   The standard registration happens through the
20  Web site, our Web site directly through a sign-in or
21  registration link where they enter in some generalized
22  profile information, address, name, company name. After
23  they fill in their profile information, they have to
24  agree to our terms and conditions prior to submitting.
25         The acquisition of the advertiser can happen

18

1   in two different ways. One is through a sales
2   representative of the company who is trying to build
3   relationships with advertisers. Or trying to -- or
4   someone who has come upon the site directly and signed
5   themselves up without assistance of sales.
6   **Q.   When you say come upon the site, you mean your**
7   **Web site, AdOn Network?**
8   A.   Correct.
9   **Q.   And what information would an advertiser need**
10  **to put into your site to sign up? What specific**
11  **information would they need to give you to sign up for an**
12  **account?**
13  A.   To sign up for an account, they would need
14  name, phone number, fax number, address, company name. I
15  think that's the primary information needed to get an
16  account opened.
17  **Q.   And when an account is opened, how do you keep**
18  **track of that account?**
19  A.   Every account is assigned an individual and
20  unique ID number. And that information is then
21  accessible through reporting where we can actually see an
22  overview of accounts currently in the system who have
23  registered. Registration does not equate an active
24  account.
25  **Q.   What does that mean?**

19

1   A.   Simply registering an account does not mean --
2   to fully become active, you would need to place money
3   into the account, information at the campaign level,
4   which would be URL keywords, things for specific data to
5   where you want to advertise. And that has to be approved
6   by an individual in-house. If the person only goes
7   through registration and ceases the activity at that
8   point, the record of the account exists, but the account
9   is not activated inside the network.
10  **Q.   So if it's not activated, is it assigned a**
11  **number?**
12  A.   Yes.
13  **Q.   So every account is assigned a number?**
14  A.   Correct.
15  **Q.   And so how would someone who was opening an**
16  **account, how would they fund that account?**
17  A.   If the person is funding the account directly,
18  they have the option of utilizing credit card through an
19  add funds link that would allow them to select either a
20  prepayment method where they could do a one-time charge
21  or they could a non-stop payment plan which would allow
22  them to have multiple charges in increments designated by
23  them to a certain cap total. So if they wanted $10,000
24  total to be spent over the course of the month but only
25  wanted to charge their card in $500 increments, they

20

1   would be allowed to set it up. Or if they wanted
2   strictly to charge $10,000 to the credit card, they'd be
3   allowed to do that as well.
4   **Q.   So the advertiser is the one that sets up how**
5   **they want to fund the account, how they want to create**
6   **the account; is that right?**
7   A.   Correct.
8   **Q.   Now, you mentioned that someone has to in-house**
9   **in myGeek or AdOn Network now has to approve that or go**
10  **through that. Can you tell me what that process is.**
11  A.   There's two points of verification. One is
12  before an account can be made active in the system after
13  even a credit card is being placed into it, we actually
14  go through a fraud verification process where the card
15  holder is communicated with directly and we can determine
16  that -- or we want to hear back from them in order to
17  ensure that the cardholder and the account are as close
18  to being synonymous as possible. The other item that is
19  required prior -- that requires an employee to take a
20  look at any keyword or URL or landing page
21  submissions have to be received prior to being activated
22  and sent into the network.
23  **Q.   And who receives those URLs?**
24  A.   My department.
25  **Q.   And is there someone specifically assigned to**

5 (Pages 17 to 20)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 8 of 121

**FTC v. Innovative Marketing, Inc. et al. Gieron**                    **5/4/2010**

21

1  an account?
2      A.   The assignment of accounts is dependent on if
3  the advertiser comes in on their own without the
4  assistance of a sales rep or if they come in through a
5  sales rep, there is an account manager that is assigned
6  to two, three, four different sales reps at any given
7  time to create more of a team environment so that they
8  handle those accounts directly.
9      Q.   And who can access the account that's opened by
10 the advertiser or -- rephrase that.
11          How does an advertiser access their account
12 that they've set up?
13     A.   Advertiser can access their account by
14 utilizing their login by using a user name and password
15 that they predetermined.  That's something that would be
16 on the registration page that I forgot is there.  So they
17 have direct access through having their own unique user
18 name and password that they've set for themselves.
19     Q.   So can anyone else other than advertiser access
20 their own account?
21     A.   Yes.  The advertiser, if given anyone access to
22 their account is permitted.  So if John Doe had handed
23 his login information to a co-worker to be able to access
24 the account, that was possible.  The only other way that
25 access to the account is possible is through the Account

22

1  Services Team, the team that I oversaw where we have
2  direct access into there so we can help ensure that --
3  say an advertiser calls in or has an issue, we're able to
4  go into the account with them and look at the issue
5  without having to request the login information.  Outside
6  of that, no one else in the company can access that.
7      Q.   So other than the person who's assigned within
8  AdOn to monitor or look at that account and the person
9  that opened the account and anyone else who they may have
10 given permission by giving their login, can anyone else
11 access their account?
12     A.   The only other people are management level
13 within the company have access to the -- have access to
14 any account as well as just the Account Services Team.
15 So should an advertiser choose not to call in or email,
16 we utilize the live chat function on the site.
17     Q.   And what is that?
18     A.   Live chat is a service where you could ask for
19 help and a chat window comes up.  It notifies an
20 individual on the Account Services Team that John Doe has
21 a question, is looking for help.  Then whoever receives
22 the message first can respond and then once again log in
23 directly into their account and assist them, if there's
24 an error in the system, if they need assistance in how to
25 set up an account correctly.  This is a preferable method

23

1  for those who do not want to have communication on the
2  phone.  Or if they're overseas, it tends to be a very
3  favorable way for them to handle it.
4      Q.   But anyone outside of AdOn Network, could
5  anyone outside of AdOn Network access an advertiser's
6  account unless they've been given the password or login
7  information by that advertiser?
8      A.   No.
9      Q.   In what form are you given advertisements by
10 the advertiser?  How are they given to you?
11     A.   Given to me?
12     Q.   Let me rephrase.  How does an advertiser give
13 AdOn Network their creative or advertisement to show on a
14 Web site?
15     A.   There's three primary ways that can be
16 handled.  One, the advertiser directly enters all the
17 information into the system themselves.  That information
18 will be campaign level settings, URL or landing page if
19 they're utilizing popunder or if they're utilizing a
20 banner, they can enter their own creative into the
21 system.  And then they can enter their own keyword system
22 and traffic sources, geographical designation, day
23 parting.  Those things can all be handled by the
24 advertiser in a self-serve capacity.
25     Q.   And when you say system, what system are you

24

1  referring to?
2      A.   The account management system or where the
3  advertisers put their information that is then utilized
4  to be able to send out to traffic sources based on what
5  it is that we're working with.
6      Q.   And when you say traffic sources, what do you
7  mean?
8      A.   Traffic sources are publisher Web sites,
9  aggregator networks, desktop providers.
10     Q.   And so the first way is then I guess an
11 advertiser to put in their own URLs and their own
12 information into their own account?
13     A.   Correct.
14     Q.   And is there another way?
15     A.   Yes.  They can submit all the information to an
16 account services rep who will handle all this for them.
17 It's utilized by those who do not want to have a hands-on
18 approach but have all the information or however they
19 want the account set up, they're looking for guidance of
20 someone who knows how to handle this correctly and will
21 utilize the individual and submit information to them via
22 email to implement into the account management system.
23          The third and final way is they can submit a
24 bulk of their information through what is known as a bulk
25 upload process.  It's a spreadsheet that has all these

6 (Pages 21 to 24)

FTC v. Innovative Marketing, Inc. et al. Gieron                    5/4/2010

25

1   areas necessary for -- to have filled in, which would be
2   the campaign detail, the URL, keywords.  That information
3   is then submitted into the system via spreadsheet, goes
4   to an account services rep to clean up and make sure
5   everything is correct before submitting into the system.
6       All three methods do result in the same end
7   point, which is a verification by someone who has to
8   approve everything that's been submitted, whether it's
9   the account services rep that's submitting it or the
10  advertiser themselves.
11      Q.   So if the advertiser puts in a URL, that has to
12  get verified and approved by someone on your team?
13      A.   Correct.
14      Q.   And you mentioned the word campaign.  Can you
15  just describe what a campaign is.
16      A.   A campaign is a -- it's like a management or a
17  high level function of the person's effort.  So if they
18  are looking to advertise or to show a popunder for travel
19  information, the campaign designates what geo location
20  they wanted to serve this ad in.
21      Q.   And what do you mean by geo location?
22      A.   U.S., Canada, New Zealand, UK.  They may have a
23  certain geographical target to advertise in front of that
24  audience.  It will also be able to at that level select
25  the traffic source.  Traffic source is designated by ID

26

1   number within our system.  That is something they can
2   select, the campaign level, day parting, which part of
3   the day they would like to run.
4       The type of campaign is determined at that
5   point, if it's going to be cost per view, which is
6   popunder, cost per view, which is click or banner, which
7   is display.  I guess display would be banner.  Those
8   things are all parent level functions.  After that, the
9   campaign is designated.  Then they can create a listing.
10  The listing is where they hold their landing page URL or
11  the creative for their banner or the cost per click
12  information, which is title, description, and URL.
13      Q.   And when you say creative, is creative another
14  word for advertisement?
15      A.   Yes.
16      Q.   And then you mentioned the keywords.  And why
17  would someone put in keywords and what does that mean?
18      A.   Keywords serve a function in search to --
19  search or cost per click to represent what someone is
20  looking for.  Easiest example of that is if you go to
21  Google.com and type in the word "travel," travel is a
22  keyword that will result in a listing of results.  In
23  cost per view or popunder, a keyword is a designation for
24  what you would like contextualized within the URL string.
25      Example is if you did that same search from

27

1   Google.com travel, if the URL stated Google.com/travel,
2   the user assistant can submit the keyword travel in order
3   to show a popunder when that event occurred.  Popunder
4   shows behind the current window that the person's
5   currently residing or look at.
6       Banners would work similar.  You would be
7   able to contextualize the URL or travel as a category.
8   So travel as a category, which would represent multiple
9   sites of travel designation by a network that we work
10  with or a group of publisher sites that the person was
11  interested in targeting for their ad.
12      Q.   Now, how would the publisher get this
13  information?  How would a publisher be able to find
14  whatever creatives they want to show on their Web sites?
15      A.   The publisher, depending on what capacity
16  they're working with us in, the type of traffic that
17  they're providing, their price points.  That they would
18  submit that information to our system, asking --
19  notifying us that they have an opportunity.  Opportunity
20  is someone who's searched for something or a URL or
21  someone who's got the application on their desktop has
22  been -- someone who -- there's an opportunity to show an
23  ad.  They would submit that to our system.  Our system
24  would then return all available inventory that is
25  designated for them to be able to select from.  Available

28

1   inventory, once again, is determined by the advertiser
2   selecting the source, the geographic location of where
3   the request is coming from, time of day, the price point.
4       Once that inventory that is available to
5   them has been submitted back to the partner for use or
6   the traffic source, the traffic source then can select
7   which they would like to show, and that may be determined
8   by bid price.  Bid price being the amount that the
9   advertiser is paying.  So if they have a threshold of
10  saying travel is worth a $20 CPM or cost per thousand,
11  but this advertiser in your system is only offering $5
12  CPM, they may select to disregard that.  They may have
13  certain exclusions as well.  The traffic source can also
14  state that they don't want certain types of advertisers,
15  and that will also limit the inventory that they have
16  available to show.
17      Q.   And is there a number or a tracking number
18  that's assigned to your publishers?
19      A.   Every publisher in the system also has its own
20  unique identifier in the system as their own number.
21      Q.   And why is it that they have a number as well?
22  What do you use that for?
23      A.   On the date of birth side, it's used for
24  identification both within our database but as well
25  inside certain XML codes or feeds that we're giving out

7 (Pages 25 to 28)

**FTC v. Innovative Marketing, Inc. et al. Gieron**

29

1  to the traffic source.
2      **Q.   Can you describe what you mean by that?**
3      A.   The way that we actually hook into a traffic
4  source when a traffic source has been approved to run in
5  our system, they're given a code.  A lot of the times
6  it's an XML code to be able to transfer data back and
7  forth between ourselves and the traffic source.
8      **Q.   And when you say transfer data, do you mean**
9  **transfer the creatives or the advertisements?**
10      A.   And the requests.  It works in two different
11  ways.  It allows them to have the requests for
12  advertisers coming into us for us to be able to respond
13  back out to them, letting them know if we have anything
14  for the request coming back, go ahead and please send it,
15  and us coming back, select what you need.
16      **Q.   And how do you keep track of the number of**
17  **impressions that are shown for any particular**
18  **advertisement?**
19      A.   That is all handled at the database level based
20  on -- once and -- an impression is limited to only cost
21  per view and banner.  Once the call to our server has
22  been made to show something and if we've returned the
23  call, that counts in our system as an impression.  So --
24  because that's as far as we can go because we do not
25  control the window that the traffic source has in several

30

1  different cases.  Some we do.  The majority of the ones
2  we do not.  So we know when the window opens and their ad
3  is being deployed, that's as far as we can take it, and
4  that's when the impression occurred.
5      That's also when the traffic source records
6  their impressions.  And the numbers are managed by a
7  traffic team in our company who ensures that there was no
8  discrepancy.  So the numbers are tied back to if they say
9  they sent us 100 impressions and we say we served 100
10  impressions, we're spot on.  Any discrepancy or variance
11  to that is then looked into and reserved and identified.
12      **Q.   And does an advertiser have access to that**
13  **information to know how many impressions are made by**
14  **their ad?**
15      A.   Yes.  Information in each advertiser account is
16  accessible for number of impressions through either
17  keyword designation Or the partner ID or the traffic
18  source identification number.  And you can actually have
19  it both.  So if you looked at -- if you wanted to look at
20  your -- how well you did on this partner with the
21  keywords you selected, that, too, is also a
22  designation.  So they can kind of customize the reporting
23  to see the information they need.  So all that
24  information is available to them in real time.
25      **Q.   So an advertiser can use that information to**

31

1  **decide whether to continue running a campaign or not**
2  **running a campaign?**
3      A.   Correct.
4      **Q.   Now, have you -- so have you heard of a company**
5  **named Globedat?**
6      A.   Yes.
7      **Q.   And what did you hear of Globedat?**
8      A.   They were an advertiser in our system, in our
9  network.
10      **Q.   And was there a particular representative of**
11  **Globedat that you dealt with?**
12      A.   Yes.
13      **Q.   And who is that?**
14      A.   Kristy Ross.
15      **Q.   And do you know when Globedat started its**
16  **business relationship with myGeek?  Rephrase that.**
17      **When did Globedat start its business**
18  **relationship with your company?**
19      A.   It started in 2004.
20      **Q.   And was your company named myGeek at the time?**
21      A.   Yes.
22      **Q.   And when did you start dealing with Kristy Ross**
23  **directly?**
24      A.   I'd say mid to -- or shortly after she had
25  started working with our company.  At that point, yes, I

32

1  would have been the primary person that worked with her
2  in general just to approve her information because I was
3  a one-person staff in 2004.
4      **Q.   So when she opened the account, you would be**
5  **the one to approve whatever information she would have**
6  **put in there?**
7      A.   Correct.
8      **Q.   And did anyone else handle her account?**
9      A.   Yes.
10      **Q.   And who else handled her account?**
11      A.   In an account management capacity, Ryan
12  Maloney.
13      **Q.   And what was his job duties?**
14      A.   He was -- he oversaw accounts for our sales
15  reps as well as high profile accounts inside the
16  company.  And that was his role -- was escalated to kind
17  of handle that around the 2006 area.
18      **Q.   So you started -- you handled Christie's**
19  **account from the beginning, and then Ryan also assisted**
20  **you?  Is that --**
21      A.   The team would assist if there were small items
22  that needed to be handled.  Ryan was placed as direct
23  overseer of the account.  He was an employee of mine who
24  then showed the capacity to be able to handle high
25  profile accounts as well as sales rep accounts or sales

8 (Pages 29 to 32)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 11 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                    5/4/2010

33

1 representative accounts. And so he was — he'd taken
2 that over at the time.
3    **Q. And do you know when that happened?**
4    A. I know 2006. I don't remember the time period.
5    **Q. So from 2004, do you remember approximately**
6 **what month — around what month in 2004 that Globedat**
7 **opened its accounts?**
8    A. I don't have a direct recollection. I know
9 that the information on the accounts that I have
10 provided, I know that they were around the April to May
11 time period is when they first came in to Best Offers as
12 well as myGeek.
13    **Q. And when you say they came into Best Offers and**
14 **myGeek, what do you mean?**
15    A. Best Offers was a co-branded version of the
16 account management system that a partner was using to
17 allow for advertisers to utilize their traffic but
18 utilize our account management system for the self-serve
19 capacity. They did not have an external or client facing
20 solution, which we were able to provide them. The
21 advertiser would only see the Best Offers company
22 branding. They would not be aware it was ours except for
23 mentions within the terms and conditions and on the page
24 that was designated for account funding. Since the
25 advertiser would see on their credit card statement our

34

1 company name, we were not able to customize. So we had
2 to make sure that they knew that we were the back end
3 solution provider for that.
4    **Q. Now, aside from you and Ryan, did anyone else**
5 **handle her account or work with her?**
6    A. Anyone on my team would be available to assist
7 or review of keyword submissions, URL submissions,
8 anything that would be designated giving the fact that as
9 my team grew, if things were coming in or my attention
10 was diverted, I'd be able to let any one of my employees
11 going on in making sure that her needs were met.
12    **Q. When you say "her," you mean Kristy Ross?**
13    A. Kristy Ross.
14       MS. ROBBINS: I'd like to have this marked
15 as Exhibit 3.
16       (Exhibit 3 was marked.)
17    **Q. BY MS. ROBBINS: Do you recognize that**
18 **document?**
19    A. Yes.
20    **Q. And what is that document?**
21    A. This is a spreadsheet that was generated to
22 display all of the accounts that were run by Globedat or
23 Kristy Ross during her time with my company.
24    **Q. And does this have a number on it, MGC number**
25 **somewhere on there?**

35

1    A. Yes.
2    **Q. And is this a true and accurate copy of a chart**
3 **that you provided to the FTC?**
4    A. Yes.
5    **Q. And was this record prepared in the ordinary**
6 **and regular course of business at or near the event, act,**
7 **or correspondence of these accounts?**
8    A. Could you repeat that?
9    **Q. Was this document — how was this document**
10 **created?**
11    A. This document was created from the information
12 within the database that I was able to pull the -- the
13 vendor ID is representative of the account number that
14 was assigned to each advertiser. The standard
15 information in regards -- that they've registered with
16 address. If a company URL was submitted at the time as
17 well. Name designation. So pretty much all the sign-up
18 information that would be utilized when someone opens an
19 account. And then a total of money and impressions
20 spent/delivered.
21    **Q. And do you know why this document was created?**
22    A. It was one of the requested items from
23 Microsoft.
24    **Q. And so was this document produced to Microsoft**
25 **pursuant to their subpoena?**

36

1    A. Yes.
2    **Q. And then was this document then turned over to**
3 **the FTC pursuant to a subpoena?**
4    A. Yes.
5    **Q. And is this a true and accurate copy of the**
6 **document that you submitted first to Microsoft and then**
7 **to the FTC?**
8    A. Yes.
9    **Q. Can you tell me on the first column what the**
10 **vendor ID is?**
11    A. Vendor ID is the advertiser ID. The individual
12 number that's associated with every account within the
13 system, whether they've gone live or not.
14    **Q. So when you were talking earlier about when an**
15 **advertiser goes in and sets up their own account and**
16 **they're assigned a number, is that number that vendor ID**
17 **number?**
18    A. Correct.
19    **Q. And then there's a column that's for email. Do**
20 **you see that?**
21    A. Yes.
22    **Q. And what do you use that email address for?**
23    A. The email address is used for communication
24 with the advertiser whether it's system automated for
25 when they sign up with the system, we send them thank you

9 (Pages 33 to 36)

FTC v. Innovative Marketing, Inc. et al. Gieron                    5/4/2010

37

1   for signing up with myGeek. Some general marketing
2   speak. If you need any help, here's who your account
3   manager is. It would also be utilized in notifying them
4   using prepayment method or if there was any problem with
5   their credit card during their run, it would let them
6   know that they're low on funds or out of funds or that
7   their card had been declined for any reason. It would
8   also be utilized by my team to communicate directly for
9   person-generated emails for notifying of keywords being
10  approved, account is now live is approved. Initial fraud
11  verification emails generated through this type of -- you
12  know.
13      Q.   And when you're looking at all of these
14  accounts, who do these accounts belong to?
15      A.   Kristy Ross.
16      Q.   And did Kristy open up these accounts under the
17  name Globedat?
18      A.   Yes.
19          MR. KIRSCH: Object to foundation of the
20  question.
21      Q.   BY MS. ROBBINS: Now, if you look at the column
22  creation date, what is that date supposed to reflect?
23      A.   The date is the reflection of the -- of when
24  the account was registered in the system. So the
25  creation date would be submitted at the same time that

38

1   the ID was selected and given to them. So if someone was
2   to go into the system and register an account for the
3   first time, once they hit submit, those two pieces of
4   information, the creation date and the account number are
5   immediately assigned, and those are not changeable. The
6   other information in between is alterable.
7       Q.   And who can alter that information?
8       A.   The account holder.
9       Q.   You mean the advertiser?
10      A.   The advertiser, sorry.
11      Q.   And do they need their user name and password
12  to be able to get into the account to alter that
13  information?
14      A.   Correct.
15      Q.   And now, in the columns total charge and total
16  impressions. Were those totals -- when were those
17  totals -- when was this chart created that reflect those
18  totals and total impressions, do you recall?
19      A.   This chart was generated in March, April of
20  2007, shortly after the subpoena was supplied to us from
21  Microsoft.
22      Q.   And so do these total charges and total
23  impressions reflect the totals as of the date that you
24  created this for -- pursuant to the Microsoft subpoena?
25      A.   Correct.

39

1          MS. ROBBINS: I would like to have this
2   marked as FTC Exhibit 4.
3          (Exhibit 4 was marked.)
4       Q.   BY MS. ROBBINS: If you could just take a look
5   at Exhibit No. 4. And do you recognize what this
6   document is -- what these documents are?
7       A.   Yes.
8       Q.   And what are they?
9       A.   These are the edit profile page or the profile
10  information of each account that Kristy had opened in our
11  system.
12      Q.   And do these documents also have an MGC number
13  on them?
14      A.   Yes.
15      Q.   And are these true and correct copies of the
16  printouts that you provided to the FTC and to Microsoft?
17      A.   Yes.
18      Q.   Now, can you describe what is this -- how would
19  an advertiser get to this page?
20      A.   This information represents what is submitted
21  upon registration of the account by the advertiser. It
22  is then -- all this information is then held within the
23  edit profile section of the system to allow them to
24  obviously alter as needed, change of address, change of
25  phone number. They would be able to access this page

40

1   once they log into their account, they're at the account
2   home tab, they're able to simply go to the manage account
3   tab at the top, and then the edit profile is one of the
4   options beneath that.
5       Q.   So the advertiser would have to have their
6   login and password information in order to access this
7   information?
8       A.   Correct.
9       Q.   And then once go get into this page, they can
10  edit their contact information?
11      A.   Correct. As you can see at the top, they're
12  also able to change their password. That would take them
13  to another page where they can go in and use their old
14  password to set a new password.
15      Q.   And when it says on the top -- if you look at
16  the first page where it says welcome, is that -- and it
17  says welcome K. What does welcome K mean, do you know?
18      A.   Welcome K is representative of what the
19  individual placed as their first name.
20      Q.   And in this particular case, what does the
21  first name line say?
22      A.   K.
23      Q.   And is there an account number on this page?
24      A.   Yes. The edit profile, it's listed at 85658.
25      Q.   And so for every account, would there be a

10 (Pages 37 to 40)

41

1   separate page that would reflect the contact information
2   depending on what information the advertiser put in for
3   that particular account?
4       A.   Yes, the contact information is the standard
5   across every account in the system.
6       Q.   And what company name is listed on this first
7   page?
8       A.   Globedat.
9       Q.   And when it says Web site address and then
10  display this URL for all listings, can you describe what
11  that means.
12      A.   The Web site address URL is if they choose to
13  enter the company URL that they're working with.  The
14  display URL for all listings is only utilized for cost
15  per click or the search if they were -- if they had
16  multiple, they wanted kind of one -- they had multiple
17  lists or campaigns in the system but wanted one standard
18  URL used in the external view of it, that would allow
19  them to place that across.  That functionality was
20  probably disabled shortly around this time.  So it's also
21  not seen across most of the information provided.
22      Q.   So you stopped using that around the time of
23  when Kristy opened her accounts in 2004?
24      A.   Right.  Because we had just moved into cost per
25  view or popunder at the time.  We had done more in

42

1   search.  So it was a much more needed function back then.
2       Q.   And from this interface, is this how an
3   advertiser would add their URL or edit a URL that they're
4   putting into the system?
5       A.   They would go to the manage campaign link.  The
6   manage campaign link would allow them to create new
7   campaigns and a new listing.
8       Q.   So in order to access that manage campaign,
9   they would have to have put in their login information
10  and password to get into that?
11      A.   Correct.
12           MS. ROBBINS:  I'd like to have this marked
13  as FTC Exhibit 5.
14           (Exhibit 5 was marked.)
15      Q.   BY MS. ROBBINS:  Do you recognize this -- these
16  printouts?
17      A.   Yes.
18      Q.   And what are these printouts?
19      A.   These printouts are of the account funding page
20  inside the account management system.
21      Q.   And what is an account funding page?
22      A.   This is where they're able to enter in their
23  credit card information and how they would like their
24  credit card charged, whether it would be as mentioned
25  before, prepayment or non-stop.

43

1       Q.   And do these documents, these printouts all
2   bear an MGC number on them?
3       A.   Yes.
4       Q.   And are these true and correct copies of the
5   printouts that you provided to Microsoft and then to the
6   FTC pursuant to the subpoenas?
7       A.   Yes.
8       Q.   And whose accounts do these funding pages
9   reflect?
10      A.   Kristy Ross.
11      Q.   And how can you tell?
12      A.   The very first one mentioned welcome Kristy,
13  which, as we discussed in the edit profile page, would
14  only be filled in if the first name was filled in on the
15  account.
16      Q.   And what other information is on here that
17  would tell you that this was Kristy's account?
18      A.   The account ID number at the top.  Account
19  information 4500140.
20      Q.   And can you get to these account funding pages
21  from one of the tabs on Exhibit 4?
22      A.   Yes.  Under the manage account tab that you're
23  seeing in edit profile, four links from the top, there's
24  account funding link.  That would also take you to this
25  page.  Also from the account home page, there would be an

44

1   account -- add funds link.  The ability to get to the
2   funding page is littered throughout the account manager
3   because it allows -- obviously keeping the account funded
4   is very important for business, so we make it very easy
5   to allow them to be able to find that information.
6       Q.   And so in order to get to this account funding
7   page to fund the account, you would have to submit your
8   login information and password to get to the main
9   interface and then click on a certain link to get to this
10  page?
11      A.   Yes.
12      Q.   Now, I'd like you to take a look at the bottom
13  of the first page.  And there's a box that's checked.
14  Can you tell me what that information is?
15      A.   The box that's checked is the information that
16  was submitted for credit card, name on card, card type,
17  American Express, and then card number.  This would be
18  submitted by the advertiser for payment of advertising.
19      Q.   So who would have filled in this information?
20      A.   The advertiser or whoever was given access to
21  the account by the advertiser.  This would not be
22  information that would be filled in by an internal
23  employee.
24      Q.   Okay.  And can you read on there it says name
25  on card.  Can you read whose card that is?

11 (Pages 41 to 44)

**FTC v. Innovative Marketing, Inc. et al. Gieron**                    **5/4/2010**

45

1    A.   MD.
2    Q.   And what is the box that's checked?  What does
3  that say?  It says at the top of that little box.
4    A.   To use existing credit card information.
5    Q.   And what does that mean?
6    A.   That means that they're -- if they enter the
7  account in once or the information in once, they can use
8  that card to continue to charge for advertising.  If they
9  check the button below, that means they would want to use
10  a new card and therefore would use a new name, new credit
11  card designation and new number.
12    Q.   And do you know who MD is?
13    A.   I do not.
14    Q.   And when you were working with Globedat, who
15  was the person that you worked with directly?
16    A.   Kristy Ross.
17    Q.   Did you work with anyone else?
18    A.   No.
19    Q.   I'd like you to flip to -- it's labeled FTC
20  023171 at the bottom.
21         And at the bottom of that page when where it
22  says existing credit card information, can you read the
23  name on that card?
24    A.   Daniel Sundin.
25    Q.   And did you ever deal with Daniel Sundin before

46

1  in terms of Globedat?
2    A.   I did not.
3    Q.   And do you know if Kristy ever used her own
4  credit card to fund her accounts?
5    A.   To my best recollection, yes, when the account
6  was initially opened, there had to be a -- in order for
7  us to proceed, there would have to be a connection
8  between the account holder and the card on file.  The
9  card that was used to make the initial charge.  Because
10  even though the charge happens, it doesn't go live until
11  we've made that verification.  As time went on and
12  amounts were growing and other individuals were used as
13  representative of using someone else in the company's
14  credit card or someone in the company who had a higher
15  limit to be able to accommodate the charges.
16    Q.   So you mean that Kristy used someone else in
17  her company Globedat, someone else's card to fund her
18  accounts?
19    A.   Correct.
20         MR. KIRSCH: Objection to foundation.
21         THE WITNESS: The -- it's not uncommon for
22  individuals to use a president's card or someone
23  associated with the company and continue the charges,
24  especially if a lower limit card was going to get
25  declined.  Or often seen is when American Express

47

1  receives numerous charges, they will immediately stop
2  allowing the charges to go through, so a new credit card
3  needs to be used.  And it's not uncommon to have happen
4  when you have someone that's doing the volume that was
5  being done through this account.
6    Q.   BY MS. ROBBINS: But in terms of this
7  particular situation, do you recall Kristy using her own
8  credit card first and then using credit cards in the
9  names of others at Globedat?
10    A.   I recall her using her credit card at the early
11  stages of our working relationship.  Beyond that, anytime
12  that a new card would come in, it was understood it was
13  someone else within the company, which is why it was
14  allowed to continue.
15         MR. KIRSCH: I want to make an objection on
16  the record at this point.  To the extent that you're
17  going to try to use these answers and questions without
18  laying any foundation as to how he knows what Kristy is
19  doing, I'm going to object.
20         MR. ARENSON: I think your objection is on
21  the record.
22    Q.   BY MS. ROBBINS:  I'd like to show you -- I'd
23  like to have this market as FTC Exhibit 6.
24         (Exhibit 6 was marked.)
25    Q.   BY MS. ROBBINS: Do you recognize this

48

1  document?
2    A.   Yes.
3    Q.   And what is this document?
4    A.   This document is a detailed pool of information
5  of the most recent credit card on file for each account
6  listed under -- that was identified as Globedat's.
7    Q.   And when you say most recent credit card number
8  on file, what do you mean by that?
9    A.   The last credit card used for any sort of
10  charge.
11    Q.   And so does that mean that there could have
12  been another credit card used but this was the last one
13  that was on file?
14    A.   Yes.
15    Q.   And do you see an MGC number on this document?
16    A.   I do.
17    Q.   And is this a true and correct copy of the
18  document that you forwarded to the Microsoft and to the
19  FTC?
20    A.   Yes.
21    Q.   And so you just mentioned that these were
22  Globedat's accounts.
23    A.   Correct. All the accounts identified.
24    Q.   And I'd like you to take a look at exhibit
25  previously marked as exhibit --

12 (Pages 45 to 48)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 15 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                    5/4/2010

49

1    A.   3.
2    Q.   3. And are the vendor ID numbers from Exhibit
3    3 on the Exhibit No. 6?
4    A.   Yes.
5    Q.   And where are the vendor IDs reflected in
6    Exhibit No. 6?
7    A.   The first column on the left-hand side.
8    Q.   So these are the accounts that you stated
9    earlier that Kristy opened with these vendor ID numbers?
10   A.   Correct.
11   Q.   And can you describe what is on this Exhibit
12   No. 6.
13   A.   The account ID number, the type of card being
14   used, the account -- the numbers from the card being
15   used, expiration date, name submitted, and address
16   associated with the card.
17   Q.   And according to this chart, were many of the
18   credit cards under the name MD?
19   A.   Yes.
20   Q.   And it is your understanding that Kristy set up
21   the original advertising accounts, though; is that right?
22   A.   Yes.
23   Q.   And again, who is the person that you dealt
24   with when you dealt with Globedat?
25   A.   Kristy Ross.

50

1    MS. ROBBINS: I'd like to show you what is
2    now going to be marked as FTC Exhibit 7.
3    (Exhibit 7 was marked.)
4    Q.   BY MS. ROBBINS: Do you recognize this exhibit?
5    A.   Yes.
6    Q.   And what is this?
7    A.   A communication between Kristy and myself.
8    Q.   And is this a true and accurate copy of an
9    email string between you and Kristy Ross?
10   A.   Yes.
11   Q.   According to this email string at the very top,
12   what email address did you use to contact -- or did
13   Kristy used to contact you?
14   A.   Kristy@Globedat.com.
15   Q.   And so according to you, what company did you
16   believe that she worked for?
17   A.   Globedat.
18   Q.   And I'd like you to take a look at the second
19   page of this document. And the second email from the
20   top, if you could read that to yourself, please.
21       Now, the email that's dated from Kristy Ross
22   to Geoff Gieron dated Friday, July 15th, 2005, at
23   5:05 p.m., what -- what is she giving you in this email?
24   A.   She's giving me a URL or landing page URL
25   for -- to drive traffic to.

51

1    Q.   And is that URL supposed to be the landing page
2    for an advertisement?
3    A.   Correct.
4    Q.   And did you view this URL when that was given
5    to you?
6    A.   Yes.
7    Q.   And was it your practice to review each URL
8    that she gave to you?
9    A.   Yes.
10   Q.   And what account did they give you this URL
11   for?
12   A.   89573.
13   Q.   And when she says -- if you could actually flip
14   now to the first page at the very top, that first email.
15   Could you read that to yourself, the first and second
16   email. Could you read that to yourself, please.
17   A.   Okay.
18   Q.   On the top, she says: I may change a few
19   bids. What does that mean?
20   A.   As the advertiser has control over the ability
21   to alter -- you know, to submit the URL, add and remove
22   keywords to the system, they have to place a bid or CPM
23   amount for the popunder that they're willing to pay for
24   the traffic based on a specific keyword.
25   Q.   And on the second email where you're writing to

52

1    Kristy, and you say: Yesterday as you will notice in
2    account 89573 (WinFixer). How did you know that 89573 --
3    what did you think WinFixer was?
4    A.   A product.
5    Q.   And how did you associate WinFixer with the
6    account number 89573?
7    A.   It was what was being advertised in the
8    account.
9    Q.   And how did you know that?
10   A.   My experience with the account and also the URL
11   is listed on the page before as where the traffic was
12   being delivered to, so it was a point of reference
13   because other campaigns she'd opened, like AmEx Travel,
14   allowed me to be able to communicate with her to help her
15   remember, since she was running multiple accounts, which
16   account we were speaking of.
17   Q.   Now, you said that you knew it because also the
18   link has WinFixer.com in it. And did you in fact go to
19   that WinFixer.com and view the advertisement?
20   A.   Yes.
21       MS. ROBBINS: And now I'D like to have this
22   marked as FTC Exhibit 8.
23   (Exhibit 8 was marked.)
24   Q.   BY MS. ROBBINS: Do you recognize this
25   document?

13 (Pages 49 to 52)

Case 1:08-cv-03233-RDB    Document 198-2    Filed 12/17/10    Page 16 of 121

**FTC v. Innovative Marketing, Inc. et al. Gieron**                          **5/4/2010**

53

1      A.   Yes.
2      **Q.   And what is this document?**
3      A.   Communication between Kristy and I.
4      **Q.   And is this a true and accurate copy of emails**
5   **between you and Kristy Ross?**
6      A.   Yes.
7      **Q.   Now, I'd like you to take a look at the last**
8   **page of this exhibit, which is FTC 047645. And could you**
9   **just read your email to Kristy Ross at the bottom of that**
10  **page. Or at the middle of the page.**
11     A.   Okay.
12     **Q.   What is the subject of this email?**
13     A.   CPV RON.
14     **Q.   And what does that mean?**
15     A.   CPV stands for cost per view or popunder.  RON
16  stands for run of network.
17     **Q.   What does run of network mean?**
18     A.   Run of network is a catch-all word at the lower
19  bid price.  So if the minimum of the system was a $5 CPM
20  for any selected keyword, like travel, run of network
21  would be they would accept anything that would come in
22  from a given traffic source at a lower amount.  So
23  they -- I'm trying to think how to explain this easily.
24  They're trying to allow for anything to come in that
25  they've got a way of monetizing a bulk of keywords.  So

54

1   instead of travel, they may receive red pink yellow
2   slippers or funny hats.  They would accept that to be
3   able to return.  It's most often used with people who
4   have products that can be monetized outside of specific
5   verticals or categories.
6      **Q.   So if she was running a product for WinFixer,**
7   **what would the example be?  Would she have keywords that**
8   **were, say, antivirus keywords or keywords that were other**
9   **than antivirus?**
10     A.   During the course of our relationship, she had
11  tried to focus on adult keywords, specific to the ad type
12  keywords.  So those -- obviously they cost a little
13  more.  But given that the advertisement was applicable to
14  anyone with a computer, it allowed for her to have a
15  lower bid price in our system and take any open inventory
16  as it came in as long as it was working for her on the
17  back end without converting.
18     **Q.   I'm not sure I understand.  So the run of**
19  **network can be any traffic source that's bidding on --**
20     A.   Any traffic.  So every time a user is on a page
21  that has a desktop app that's calling back to our system,
22  if there is nothing that's overly discemible or valuable
23  in a high bid capacity -- the word travel, for example,
24  goes for a great deal more.  But people that are going to
25  aim at travel have a specific need to get in front of an

55

1   audience.  If the information is sent back to us and
2   there's nothing that we'll really use specifically but an
3   advertiser is willing to take anything.  It doesn't
4   matter where it's coming from, it matches up with my
5   geographical location needs, my time of day, my frequency
6   cap, please go ahead and submit my ad at that time.
7   Advertisers would often use this if they have a product
8   that's applicable to a much broader audience than
9   somebody using for the example travel.
10     **Q.   So it's not specific to a particular keyword,**
11  **it could be anything?**
12     A.   It could be travel in the Poconos or pink
13  yellow green slippers.  Whatever it is.  They're looking
14  to access the user versus something specifically inside
15  the URL to contextually target.
16     **Q.   Now, I'd like you to take a look at page in**
17  **this exhibit 047642.**
18     A.   Okay.
19     **Q.   Can you please read the bottom email to**
20  **yourself and then let me know when you're ready.**
21     A.   Okay.
22     **Q.   So she mentions in this email she says:  I**
23  **noticed that my Microsoft keyword traffic has gone down**
24  **a lot.  What does that mean?**
25     A.   She was bidding on words to contextually target

56

1   different derivatives of Microsoft.  Given the product
2   was aimed at fixing errors on the Windows platform, it
3   was not uncommon for someone to utilize keywords specific
4   to Microsoft because that would create a more valuable
5   audience and potential for conversion.
6      **Q.   And what did you mean by conversion?**
7      A.   Sale of product.
8      **Q.   And at the top of this email, Kristy writes,**
9   **she says in the first paragraph -- she mentioned 4 cents**
10  **on RON and 6 to 7 cents on www.  What does that mean?**
11     A.   The www is -- it's another way for someone to
12  capture traffic very similar in a run of network capacity
13  where they're bidding on the first three components of a
14  person's URL stream.  So www.Google.com, so that www can
15  be contextually targeted because any part of the URL can
16  be broken apart and analyzed to see who can match up with
17  it.
18     **Q.   So that means that an ad can be served on**
19  **anyone who's typing in www dot whatever it is?**
20     A.   Right.  It's a weird kind of work around for
21  people who like the run of network type traffic,
22  sometimes they get better traffic when bidding on the URL
23  component to -t that comes in.
24     **Q.   Is there a price difference?**
25     A.   Initially, yes.  With Kristy, yes.  Anything

14 (Pages 53 to 56)

**FTC v. Innovative Marketing, Inc. et al. Gieron**                    **5/4/2010**

57

1  that's not RON inside the system maintains the $5 CPM or
2  .005 minimum. But as we continued to work with Kristy,
3  we allowed that minimum to be lowered on drives for
4  additional traffic under certain requests of dot-com,
5  www, generalized keywords that would generate a great
6  deal more traffic than maybe the run of network was too
7  competitive in. Because we're a bid auction system, as
8  long as we have advertisers all looking for the same
9  traffic, you start piling on top of each other. It
10  becomes expensive. This was our way of getting around
11  some of the people bidding on the same traffic, making it
12  too expensive based on the conversion results.
13     Q.   And why did you to that with Kristy?  Why did
14  you —
15     A.   Long-term advertiser, great relationship with
16  her, and the spend amount warranted it.
17     Q.   What do you mean by spend amount?
18     A.   She had spent consecutively a great deal of
19  money over a period of time, and so we spent more time
20  with her and trying to meet her needs for conversion.
21     Q.   And then I just want you to take a look at the
22  top of page 047643 in that exhibit.  It's the next page.
23  And if you could read the top email, please, to yourself.
24     A.   Okay.
25     Q.   What does domain — when you're emailing to

58

1  Kristy, what do you mean by domain based search traffic?
2     A.   This would be keyword-generated pops or
3  popunders  Based on searches of domain park sites. Domain
4  park sites are aggregated by individuals who have a great
5  deal of access to or who have gone out and actively
6  bought numerous URLs from a company like GoDaddy. They
7  would buy different various of the way something is
8  spelled. A long time ago people bought whitehouse.com
9  before the White House realized they had to buy it.
10  They would create a massive amount of domains so that way
11  when people would get lost on the Internet, mistype the
12  URL, they would land on these pages, and those pages then
13  would be able to be monetized. A great deal of those are
14  monetized through Google search listings, so these domain
15  aggregators, they would also try different methods of
16  allowing a popunder based on someone conducting a search
17  from that page. So if you went to gogle.com instead of
18  Google and landed on one of these pages, they would have
19  the option to search. That search then would be the
20  contextual element that was sent back to us to be able to
21  produce a popunder. This would not be a desktop driven
22  solution, this would be a publisher popunder traffic
23  source where they did not require someone to download the
24  thing on their computer to initiate the action.
25     Q.   And what do you mean by the desktop

59

1  application?
2     A.   The desktop application is the primary source
3  of a lot of popunders. Desktop applications are
4  applications that are placed on a person's computer when
5  they accept running a tool bar, an online flash game or
6  casual game. Once again, it comes down to someone's got
7  to pay for the development, upkeep of the application
8  itself. That is paid for through advertisements,
9  advertisements that are agreed to by the user prior to
10  accepting the download onto their computer.
11     Q.   And I'd like you to take a look at the bottom
12  of this page where you email to Kristy on Wednesday,
13  August 3rd, 2005. Can you read that to yourself.
14     A.   Yes.
15     Q.   And what is it that you're giving Kristy in
16  this email?
17     A.   Her login information for account 90448.
18     Q.   And why is it that you were giving her that
19  information?
20     A.   I believe she requested it.
21     Q.   So in this particular instance, she didn't set
22  that account up herself, she asked you to do that for
23  her?
24     A.   Correct. A lot of times I would assist her
25  with that if she was traveling or unable to get to a

60

1  computer, but she was able to communicate with me.
2     Q.   Now, I'd like you to take a look at 047641,
3  which is the second page of this exhibit. And if you
4  could read the bottom email, please, from Kristy Ross to
5  you.
6     A.   Okay.
7     Q.   You mention — or she mentions to you in the
8  fourth paragraph, it says mgwf4. Can you tell me what
9  that is?
10     A.   It's an identifier that would be used for a
11  particular URL or campaign that she had designated.
12     Q.   And so who set that name?
13     A.   She would have.
14     Q.   And so that was her naming convention, I guess?
15     A.   Yes.
16     Q.   And that's for a particular campaign?
17     A.   Yes.
18     Q.   So would that be -- where would that go? Would
19  that go on the URL?
20     A.   Correct.
21     Q.   And how would that be used?
22     A.   A lot of people who utilize any sort of
23  advertising that is URL based will have an identifier of
24  some sort, whether it's an identifier of the company that
25  they're working with, the product that they're using.

15 (Pages 57 to 60)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 18 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                                    5/4/2010

61

1  Usually a combination of both. Like in this example,
2  that would probably most likely stand for myGeek
3  WinFixer. The 4 would be if she had multiple ads
4  running. She would be able to identify and optimize on
5  her end or provide feedback to us based on her
6  optimization or results of the advertising.
7       It's a common convention, not that specific
8  make-up, but for people to put identifiers within the URL
9  to make sure that they're accurately able to track how
10 their advertising dollars are being spent.
11      Q.  And then on this same exhibit on the first
12 page, if you could just read that first email to
13 yourself, please.
14          In this email, what does Kristy mean by I
15 know how to turn the sources on and off?
16          MS. GURLAND: Objection; foundation.
17      Q.  BY MS. ROBBINS: You can answer.
18      A.  This is in reference to -- the account manager
19 has the ability for the advertiser to have complete
20 control over their account. They can select the traffic
21 sources by ID number, turn them on and off. They can --
22 as I said, they can select their geographical targeting.
23 They can fund their account. They can turn the account
24 on or off. It's completely a self-service platform. So
25 there's nothing that the advertiser can't do that we can

62

1  except for superseding a bid price on a keyword minimum.
2  Beyond that, everything is controlled by them so if
3  something's not working, they have the ability to turn it
4  off. If something is working, they have the ability to
5  expand it.
6       Q.  But they would need -- in order to get into
7  their account, though, they would need their login and
8  password; is that correct?
9       A.  Yes.
10          MS. ROBBINS: I'd like this to be marked as
11 FTC Exhibit 9, please.
12          (Exhibit 9 was marked.)
13      Q.  BY MS. ROBBINS: Can you please take a look at
14 this. Do you recognize these emails?
15      A.  I do.
16      Q.  And what are these emails?
17      A.  Communication with Kristy.
18      Q.  And are these true and accurate copies of
19 emails that myGeek retained that pertained to Kristy
20 Ross?
21      A.  Yes.
22      Q.  Now, I'd like you to take a look at page
23 047638, which looks like the fourth one from the back.
24 Actually, it starts at the bottom of the previous page on
25 047637.

63

1       A.  Okay.
2       Q.  Could you just read that -- could you actually
3  read that email out loud. It starts on 047637 where it
4  says Kristy.
5       A.  Kristy, I have suspended 89573, 90012, 90448
6  until I hear back from you on the resolve on the sudden
7  change on WinFixer's end with delivery of their ad.
8  Thank you for helping me with this, I really appreciate
9  it.
10      Q.  And what did you mean when you said that you
11 suspended accounts 89573, 90012, 90448 because of the
12 sudden change of WinFixer's delivery of their ad? What
13 did you mean by that?
14      A.  The ad would have -- the gist of this would
15 have been if the ad was causing an issue, and since the
16 WinFixer URLs were located in these three different
17 accounts, that I would have gone into her accounts, as
18 she would be able to, and immediately suspend the account
19 until hearing from her.
20      Q.  So each of these three accounts carried
21 WinFixer ads?
22      A.  Correct. And I suspended it -- I would suspend
23 it until hearing back from her so we could resolve
24 whatever we were seeing in order to move forward.
25      Q.  And why did you contact Kristy about these

64

1  three accounts?
2       A.  She was the account holder and the advertiser.
3       Q.  And did you contact anyone else at Globedat
4  regarding suspending these three accounts?
5       A.  No. I had no other information.
6       Q.  And did you contact any other advertiser about
7  suspending these three accounts?
8       A.  No.
9       Q.  And did you contact -- withdrawn.
10          And I'd like you to take a look at the email
11 above that, two emails above on page 047637. It's August
12 9th starting at 3:14 p.m. If you could read that email
13 out loud, please. But you don't have to read the URL,
14 just the email.
15      A.  Kristy, here is an example of your WinFixer ad
16 versus another one that we currently have in the
17 network. Hope this helps out a bit. Another account
18 that is working correctly. Your link with pop/auto
19 download issue.
20      Q.  So you list two links here in this email?
21      A.  Correct.
22      Q.  And the first link, what is that link that you
23 gave to her?
24      A.  The first one is a WinFixer link that we
25 identified in the system elsewhere.

16 (Pages 61 to 64)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 19 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                    5/4/2010

65

1    Q.   And the second link, what does that link
2  represent?
3    A.   The one that was currently in one of the
4  accounts that Kristy was running with the system.
5    Q.   And what did you mean by pop/auto download?
6    A.   It would create an auto download. Upon
7  initiation of the popunder, it would start initiating a
8  download, which violated our terms and conditions.
9    Q.   And I'd like you to take a look at the email
10  directly above that, where she responds to you. And can
11  you please read that out loud.
12    A.   The 12:59?
13    Q.   Yes.
14    A.   I think the issue is fixed. Please let me
15  know. I'm trying to check in Internet Explorer, but it
16  is hard for me to see popups or not as I use Safari.
17    Q.   So in this email that Kristy wrote to you on
18  Tuesday, August 9th, 2005, at 12:59 p.m., did she tell
19  you that the issue was fixed?
20    A.   Yes, she believed the issue was resolved.
21    Q.   And did she tell you -- withdrawn.
22       Now, I'd like you to take a look at page
23  047635. At the very, very bottom there's -- where it
24  says Geoff Gieron to Kristy Ross, and the date is
25  Tuesday, August 9th, and it starts at 6:58 p.m. And if

66

1  you could read that email which starts on the next page.
2  And if you could read that to yourself.
3    A.   Okay.
4    Q.   And can you tell me in this email -- actually,
5  if you could read that email out loud for the record,
6  please.
7    A.   The one starting with great news?
8    Q.   Yes.
9    A.   Great news Kristy. I just got the ok to put
10  everything back to how it was. Thank you for hanging
11  with me while I bugged them endlessly and begged for
12  forgiveness. I really enjoy working with you and
13  appreciate how responsive you are.
14    Q.   Now, what did you mean while I bugged them and
15  endlessly begged for forgiveness? Who are you referring
16  to there, do you recall?
17    A.   I don't recall unless I read the remainder of
18  the string.
19    Q.   Could you do that, please. Thank you.
20    A.   Okay.
21    Q.   So do you recall what you meant by while I
22  bugged them endlessly and begged for forgiveness?
23    A.   The traffic source, 110077.
24    Q.   And what was this in reference to?
25    A.   Trying to get her accounts back onto that

67

1  traffic.
2    Q.   And why were they off?
3    A.   Because of the information before highlighted
4  that was -- that we identified where there was an issue
5  with an auto download.
6       Is it possible that I could step out and use
7  the restroom?
8    Q.   Absolutely. We'll go off the record and take a
9  ten-minute break.
10       (A recess was taken from 11:09 a.m. to
11       11:23 a.m.)
12    Q.   BY MS. ROBBINS: I'd like to show you what's
13  going to be marked as FTC Exhibit 10.
14       (Exhibit 10 was marked.)
15    Q.   BY MS. ROBBINS: Do you recognize these?
16    A.   Yes.
17    Q.   And what are these?
18    A.   Communication between Robert McDaniel, one of
19  our traffic partners, and myself.
20    Q.   And throughout this document, are there other
21  emails as well?
22    A.   Yes. Communication between Robert and Kristy.
23    Q.   And are these true and accurate copies of
24  emails that myGeek retained that pertained to Kristy
25  Ross?

68

1    A.   Yes.
2    Q.   Now, I'd like you to take a look at 048314 at
3  the very bottom. This should be the third page. Where
4  it says from jnv@mediatraffic. Could you just read that
5  to yourself. It goes on to the next page.
6    A.   All right.
7    Q.   Now, who is this email from?
8    A.   Jean-Nicolas at Media Traffic.
9    Q.   And what is Media Traffic?
10    A.   It was a supplier of desktop cost per view
11  popunder.
12    Q.   And could you just once again -- withdrawn.
13       What percentage of Kristy's advertisements
14  were shown on desktop traffic, do you know?
15    A.   I'd say approximately about 95 percent.
16    Q.   And so can you just explain how her
17  advertisement would be displayed through desktop traffic?
18    A.   If her ad was being displayed, it would show up
19  as a popunder or behind the current screen that the user
20  was viewing.
21    Q.   Okay. And is that because something had
22  already been downloaded onto that user's machine?
23    A.   Yes.
24    Q.   And what was downloaded onto that user's
25  machine?

17 (Pages 65 to 68)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 20 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                          5/4/2010

69

1    A.   The application that contained the ad-serving
2    component.  So as mentioned before, if it was a weather
3    tool bar, a game, when they accepted the EULA --
4    Q.   And what's a EULA?
5    A.   The end user licensing agreement.  Once that's
6    accepted, then when the product is downloaded onto the
7    person's computer, that component is there as well, which
8    allows for the serving of that.
9    Q.   So in this particular instance, do you know
10   what Media Traffic, what they would download on consumers'
11   computers?
12   A.   I don't.
13   Q.   But whenever it was that was that their desktop
14   application, then the advertisements that she had would
15   be served through that desktop application; is that
16   right?
17   A.   Correct.  And as referenced, we -- to remain
18   compliant with Congressional guidelines, there has to
19   be -- we maintain a copy of the EULA on file for every
20   desktop partner to ensure that there's a double opt-in
21   process by the user that makes them aware that they're
22   receiving these ads.
23   Q.   Okay.  And could you just read No. 1 under his
24   email to -- and who did he send this email to,
25   Jean-Nicolas?

70

1    A.   He sent it to Robert McDaniel, who was the --
2    at this time he was the director of operations.
3    Q.   Okay.  And why would he send -- let me just
4    back up.  Can you please read No. 1 under that email out
5    loud.
6    A.   This morning we stopped all traffic going to
7    domain WinFixer.com because 95 percent of its
8    advertisements was a succession of at least five windows
9    appearing after closing each previous one, including an
10   ActiveX prompt and .exe download prompt.  This is a lot
11   of traffic that is stopped.  Can you please -- sorry --
12   Can you get those advertisers to display regular
13   creatives or landing pages so we can start sending again
14   those 200,000 pops per day?
15   Q.   And why would he send this email to Robert?
16   A.   Robert's role in the company was to be a
17   liaison between the engineers and traffic partners on
18   implementation of our -- of the feed that would allow for
19   our advertisers to be accessible by traffic sources.
20   Q.   Now, if you could jump up to the middle of the
21   page where it's from jnv@mediatraffic at 10:25 a.m. Can
22   you read that to yourself, please.
23   A.   Okay.
24   Q.   Just going back to the bottom email, why is it
25   that the traffic was stopped?  What was the problem here?

71

1    A.   Certain behavior that was outside of our terms
2    and conditions and guidelines where an ad that would be
3    displayed would start initiating either a prompt for
4    download, try to download something onto the person's
5    computer, and spawn additional pops.  Our guidelines do
6    not permit any sort of activity that might infringe upon
7    the user or cause issue with a user that one of our
8    traffic partners have acquired.
9    Q.   Okay.  Now, going back to the email that you
10   just read to yourself, what is it that Jean-Nicolas is
11   giving to Robert in this email?
12   A.   He's identified four accounts -- advertiser
13   accounts within our system that are currently advertising
14   the WinFixer.com ad.  Three of which are causing the
15   problems that he identified in the previous email and
16   activity, one of which is not.
17   Q.   And those three accounts that were causing the
18   problems, do you know if those three accounts -- what are
19   the account numbers that are causing the problems?
20   A.   89573, 90012, 90019.
21   Q.   And do you know whose accounts those are?
22   A.   They're Globedat accounts or Kristy Ross.
23   Q.   And what is it that he is giving you?  What's
24   that string underneath each account number, what is that
25   in that email?

72

1    A.   That is information on their side that is sent
2    back from our system that allows an ad to be run through
3    our system into theirs to display the actual end result
4    or end URL or landing page URL that's supplied by the
5    advertiser.
6    Q.   And is there a way from this URL link or
7    this -- what is this called?
8    A.   This would be a feed result.
9    Q.   So this feed result, does this tell you who the
10   advertiser is and who the traffic partner is?
11   A.   Yes.
12   Q.   And how is that displayed in this feed?
13   A.   The identifier in this that allows them to come
14   back with this information is the partner ID equals.  The
15   numerical number behind that is the individual traffic
16   source identification number within our system.  Vendor
17   ID equals.  Vendor ID equals the specific advertiser
18   identification number.  In this case, it was a five-digit
19   number.
20   Q.   And so these numbers that you're seeing here
21   under vendor ID, that vendor ID is the same vendor ID
22   that we saw on the chart in Exhibit No. 3 of the listing
23   of all Kristy's accounts; is that right?
24   A.   Yes.
25   Q.   And this partner ID in this email, what is the

18 (Pages 69 to 72)

**FTC v. Innovative Marketing, Inc. et al. Gieron**                    **5/4/2010**

73

1   partner ID?
2       A.   That's the -- the partner ID is the traffic
3   source identification number.  So for Media Traffic or
4   Jean-Nicolas, 110181 is his number of which all of his
5   impressions and revenue generation are tied to.
6       Q.   And I'd like you to take a look at the --
7   starting on page 1, going to page 2 of this -- the bottom
8   email on page 1, which is 048312.  And if you could read
9   that to yourself and look at the next page as well.
10      A.   Okay.
11      Q.   And who is this email from?
12      A.   This email is from Jean-Nicolas at Media
13  Traffic.
14      Q.   And who is it to?
15      A.   Robert McDaniel.
16      Q.   And can you read the top part of the four lines
17  of the email, please, out loud.
18      A.   I talked with programmers -- the programmers
19  and we don't limit the size of URLs.  They tell me that
20  anyway your URLs are shorter than others we use.  I
21  thought it could be because we're in Canada?  But setting
22  a US proxy gives the same results.  Maybe they filter
23  your IP to hide their behavior?  Do you have any other
24  idea?  On our side, these URLs show this succession of
25  windows and prompts.

74

1       Q.   And what is it that email is displaying to
2   you?  You don't have to read them, but if you could just
3   describe how many -- are there boxes?  What's in this
4   email?
5       A.   The notifications that come up are trying to
6   prevent the person from leaving the window.  The second
7   image with the security warning is actually the auto
8   prompt to download.  It's the attempt to go ahead and
9   push forward with a download.
10      Q.   And is there an advertisement behind that?
11      A.   Yes.
12      Q.   And what is the advertisement for?
13      A.   WinFixer.
14      Q.   Okay.  And then how many other -- what are
15  these other boxes below that?
16      A.   The third box is the same as the first one.
17  No, it's not.  Sorry.  These are once again trying to
18  prevent the person from exiting the window.
19      Q.   And so are these trying to get a consumer to
20  download a product?
21      A.   Yes.  They're trying to download the WinFixer
22  repair service or software that's associated with the ad.
23      Q.   And this string of boxes that Jean-Nicolas
24  forwards to you, this screen shot of this ad and these
25  boxes, is that what he saw from the CPV feed link that

75

1   he's talking about on the next page?
2           MS. GURLAND:  Objection; foundation.
3           THE WITNESS:  This would be indicative of
4   the result that they were being served.  More
5   specifically, the end result URL or landing page URL that
6   the advertiser was showing.  But that would be a result
7   of the feed result that he was highlighting.
8       Q.   BY MS. ROBBINS:  So if you looked at this feed
9   link, would you be able to see this ad with these --
10      A.   This association, yes.  They result in the
11  same.  The feed result was provided for identification of
12  the account number in order for us to tie down the
13  issue.  The above stated the
14  WinFixer.com/pages/scanner/index, that information is
15  what results from that string.
16      Q.   So there is a URL -- this is based on a URL
17  landing page?
18      A.   Yes.  Which is seen in the screen shot of the
19  WinFixer ad with the security warning over it.  That
20  would have been the end result of what was served to the
21  user, which they were replicating.
22      Q.   So is this how a consumer would see this ad?
23      A.   Yes.
24      Q.   And have you ever seen this ad?
25      A.   Have I seen the WinFixer ad or this succession

76

1   of prompts?
2       Q.   First have you seen this WinFixer ad?
3       A.   Yes.
4       Q.   And how is it that you've seen this WinFixer
5   ad?
6       A.   I've approved it before.
7       Q.   And have you seen the succession of boxes as
8   well?
9       A.   Yes.
10      Q.   And when did you see that?
11      A.   On a few occasions over the course of the time
12  working with Kristy.  If there was something -- if this
13  happened before something was set live, we were able to
14  notify her.  Majority of the time, I would see this
15  information coming from someone outside the company.
16      Q.   So someone like Jean-Nicolas would forward it
17  to you and say, this is what I'm seeing?
18      A.   Yes.
19      Q.   But other times, there were times when you
20  reviewed ads before you sent it out to the traffic
21  sources that you actually did see the succession of auto
22  download boxes?
23      A.   Correct.
24      Q.   And when you say that you reviewed this
25  WinFixer ad, that was a WinFixer ad that Kristy had given

19 (Pages 73 to 76)

**FTC v. Innovative Marketing, Inc. et al. Gieron**                    **5/4/2010**

77

1  you to review?
2      A.   Correct.
3      Q.   Now, if you could look at the very top of that
4  first page, there is an email. Can you tell me who that
5  email is from and to.
6      A.   From Robert McDaniel to myself and Steve
7  Armstrong?
8      Q.   And who is Steve Armstrong?
9      A.   He was the CFO at the time.
10     Q.   And can you read what he wrote to you.
11     A.   Any word yet from Globedat.
12     Q.   And why would he ask you if there was any word
13  from Globedat?
14         MS. GURLAND:   Objection; foundation.
15         THE WITNESS:   Because we had identified from
16  Jean-Nicolas's feed results the accounts were also stated
17  with Kristy and the identifiers within the URLs that were
18  being submitted over.
19     Q.   BY MS. ROBBINS:   So are you saying that there
20  were two ways in which you identified that these were
21  Kristy's ads?
22     A.   Correct.
23     Q.   And so what was the first way?
24     A.   From the feed results outlined where the
25  account number was directly referenced.

78

1      Q.   That was on page 048314, that email?
2      A.   Correct.
3      Q.   And that's the accounts 89573, 90012, and
4  90729?
5      A.   Correct.
6      Q.   Okay. And what was the second way that you
7  were able to identify?
8      A.   The second way is seen in the URL that's on
9  that first page as well as the one from the
10  advertisement, there's an AID equals, which is mgkwf2 and
11  mgwf1, those are both identifiers used by specifically
12  Kristy for her campaigns.
13     Q.   And that's like the exhibit that we looked at
14  earlier where she said to you that she was adding the
15  mgwf4, the myGeek WinFixer 4 to her URL?
16     A.   Yes.
17     Q.   So that was the naming convention she used to
18  be able to identify the URLs that she was submitting to
19  you and track them?
20     A.   Yes.
21     Q.   I'd like you to — one second. I'd like you to
22  take a look at page 022275, which is the fourth page from
23  the back. And if you could read that email that you sent
24  to Kristy, please.
25     A.   Okay.

79

1      Q.   And can you tell me in that email what you were
2  writing to Kristy. Excuse me. Withdrawn.
3         Can you tell me who this email was from and
4  to?
5      A.   It's from myself to Kristy with Robert copied.
6      Q.   And what were you telling her in this email?
7      A.   I was notifying her of what we were receiving
8  complaints about, my inability to replicate it inside my
9  office and the ability to replicate it when given to
10  individuals outside the office to click on the link.
11     Q.   And why would that be that you would not be
12  able to see it from your office but others would be able
13  to see it from outside your office?
14         MS. GURLAND:   Objection; foundation.
15         THE WITNESS:   The belief was based on
16  feedback from both clients as well as those outside the
17  office, and the pattern was that her IP was identified.
18  And, therefore, when our IP would be seen to the call to
19  deliver the WinFixer ad that it would not initiate the
20  same behavior, allowing for us to be able to approve the
21  ad based on how it should look.
22     Q.   BY MS. ROBBINS:   And do you believe based on
23  your experience that that was done intentionally?
24         MR. KIRSCH:   Objection to the question.
25         THE WITNESS:   Yes.

80

1         MR. KIRSCH:   If I could instruct the
2  witness, if we have an objection, just let us state the
3  objection before the — it's hard to talk at the same
4  time.
5         MR. ARENSON:   I think he's fine.
6      Q.   BY MS. ROBBINS:   I'd like you to take a look at
7  the email right above that, which is on page 022274. And
8  if you could read that email to yourself. It's from
9  Kristy Ross to yourself on September 30th, at 7:20 p.m.
10     A.   Okay.
11     Q.   And who is this email from and to?
12     A.   It's from Kristy to myself.
13     Q.   And what's the date of this email?
14     A.   September 30th, 2005, 7:20 p.m.
15     Q.   And is that the same date that Jean-Nicolas
16  sent you the screen shots?
17     A.   Yes.
18     Q.   And can you just tell us what Kristy was
19  telling you about trying to — withdrawn.
20         What was the subject line of this email?
21     A.   Regarding WinFixer issue.
22     Q.   And what is she telling you in this email?
23     A.   She's providing me technical information as to
24  how this may be occurring where we're unable to replicate
25  the problem with our internal IPs versus external IPs.

20 (Pages 77 to 80)

**FTC v. Innovative Marketing, Inc. et al. Gieron**

81

1   Q.   And does she tell you that she will try to fix
2   the problem?
3   A.   Yes.
4   Q.   And I'd like you to take a look at page 022272
5   at the top, which is towards the back of the exhibit.
6   Where it says it's dated October 4th, 2005.
7   A.   11:13 a.m.?
8   Q.   Yes.
9   A.   Okay.
10   Q.   And what does she tell you in the first two
11   lines of this email?
12         MS. GURLAND:  Can I just state an objection
13   to form to the methodology of this.  The email says what
14   it says.  So are you asking him to read from the email or
15   to interpret what Kristy says.  Because to the extent
16   that you're asking him to make an interpretation of what
17   she means when she was writing an email, I do have an
18   objection to it because there's lack of foundation.
19         MS. ROBBINS:  Okay.
20   Q.   BY MS. ROBBINS:  What did Kristy tell you in
21   this email on the first two pages?
22         MS. GURLAND:  Same objection.
23         THE WITNESS:  She's letting me know that
24   they have created a new link to utilize for running in
25   our system.

82

1   Q.   BY MS. ROBBINS:  So when you confronted her
2   about the WinFixer ad that you were having problems with,
3   did she tell you that it was not her ad in this instance?
4         MS. GURLAND:  Same objection.
5         THE WITNESS:  No.
6   Q.   BY MS. ROBBINS:  When you confronted her, did
7   she provide you with a new link for this ad?
8   A.   Yes.
9   Q.   And when you confronted her, did she tell you
10   that she wasn't the advertiser for this ad?
11   A.   No.
12         MS. ROBBINS:  I'd like this to be marked as
13   FTC Exhibit 11.
14         (Exhibit 11 was marked.)
15   Q.   BY MS. ROBBINS:  Do you recognize this
16   document -- these documents?
17   A.   I'm familiar with them, yes.
18   Q.   And what are these documents?
19   A.   Communication between Robert McDaniel and
20   individuals at Hotbar.
21   Q.   And if you flip back to the end of this
22   exhibit, what else is included in this exhibit?
23   A.   Are you talking about at the back page of it?
24   Q.   If you flip back to page 022370, starting
25   there.  What are these?

83

1   A.   Communications between myself and Kristy.
2   Q.   And so are these true and accurate copies of
3   emails that myGeek retained that pertained to Kristy
4   Ross?
5   A.   Yes.
6   Q.   Now, I'd like you to take a look at the first
7   page, 048295, and if you could read the bottom, the email
8   that's dated November 2nd, 2005.
9   A.   11:54?
10   Q.   Yes.  And then take a look at the second page
11   as well.  So the bottom of the first page and the second
12   page?
13   A.   What did you --
14   Q.   If you could read the bottom email of the first
15   page and then look at the second page as well.
16   A.   Okay.
17   Q.   And this email at the bottom of the first page
18   of this exhibit, who is this email from?
19   A.   The first one?
20   Q.   The bottom of the first page.
21   A.   It's from Lilach at Hotbar.
22   Q.   And who is Lilach?  What is Hotbar?
23   A.   Hotbar is a desktop application provider of
24   popunders.
25   Q.   And what was -- and who did Lilach send this

84

1   email to?
2   A.   Robert McDaniel.
3   Q.   And what was the date of this email?
4   A.   November 2nd, 2005.
5   Q.   And what was Lilach sending to Robert in this
6   email?
7   A.   Notification of WinFixer trying to install
8   ActiveX on a computer and that they don't -- they no
9   longer will allow that.
10   Q.   And what -- did she provide you with an
11   advertisement to go with it?
12   A.   Yes.
13   Q.   And what is that advertisement for?
14   A.   WinFixer 2005.
15   Q.   Do you recognize this ad?
16   A.   Yes.
17   Q.   And did you review this ad?
18   A.   I'm not sure.
19   Q.   Did you review all of the ads that Kristy
20   submitted into her accounts?
21   A.   Myself or members of my team.
22   Q.   So either yourself or a member of your team
23   reviewed this ad?
24   A.   Yes.
25   Q.   Do you recall specifically ever seeing this ad?

21 (Pages 81 to 84)

**FTC v. Innovative Marketing, Inc. et al. Gieron**                    **5/4/2010**

85

1     A.   The format of it, yes.
2     Q.   And what do you mean by the format of it?
3     A.   As in the WinFixer 2005 rebooting due to
4   Windows errors.
5     Q.   So you recall seeing an ad that said WinFixer
6   2005 rebooting due to Windows errors?
7     A.   Yes.
8     Q.   And do you recall seeing that ad when you were
9   looking as an ad that Kristy had given you to review?
10    A.   The ad was similar, yes.
11    Q.   And is this how a consumer would view this ad?
12    A.   Correct.
13         MR. DIRENFELD:  Objection just for this
14   whole exhibit.  This ad is cut off halfway through.
15         THE WITNESS:  The ad is cut off?  The window
16   size is the window size that the ad was opened in.
17    Q.   BY MS. ROBBINS:  So can you describe what -- on
18   this ad why is it that you can only see the top part of
19   this ad?
20    A.   Distribution of the ads is dependent on the
21   traffic source provider.  While some will open a window
22   in an 800 X 600 size window, this window appears to be
23   closer to the 720 X 300, which is another standard pop
24   form.  The window can also be truncated not due to
25   anything else other than the previous window that was

86

1   viewed.  Sometimes if there's no controls put in place to
2   how to size the window, the previous size of the browser
3   window that you had opened, the system will revert back
4   to that.  The purpose of this was to show the prompt
5   right below the bar.
6     Q.   And what is that prompt?
7     A.   An ActiveX is trying to get initiated.  And
8   windows has stopped it based on the security settings of
9   the person's Internet Explorer browser.
10    Q.   Now, I'd like you to flip back in this exhibit
11   to 022371.
12    A.   Okay.
13    Q.   And if you could read that email, it actually
14   starts on 370, the to, from.  And then the body of the
15   email is on 371.  If you could read that email to
16   yourself, please.
17    A.   The 11/3/2005, 7:55.
18    Q.   No, the November 3rd, 2005, 11:36 a.m.  There's
19   actually two emails.  There's one from Kristy to Geoff
20   Gieron, and the next one is Kristy to -- to Kristy from
21   Geoff Gieron.  So actually, it starts on --
22    A.   It's a forward.
23    Q.   Right.
24    A.   Okay.
25    Q.   So in the email in the center of the page on

87

1   022371, there's an email from you to Kristy dated
2   November 3rd at 7 p.m.  And what are you telling Kristy
3   in this email?
4     A.   Identifying URLs from her specific account that
5   have initiated behavior or initiated installs.
6     Q.   And is that what you're talking about?  Is that
7   what Lilach was describing to you when she showed you
8   this picture on 048296?
9     A.   Yes, or they were initiating other prompts.
10   But that would be in line with anything as simple as an
11   ActiveX prompt from a user's browser to the initiation of
12   the multiple windows that Jean-Nicolas pointed out.
13    Q.   Well, this email was from Lilach at Hotbar.
14    A.   Right.  So that one would strictly be an
15   ActiveX prompt.  But because it was stopped, it may not
16   have done the same thing as what other computers would.
17    Q.   And so in this email on 11/3, you say:  We are
18   getting reports that the links in your account initiating
19   installs.  I do not see this again from our IP, but we
20   had a few outside people use those links and got the
21   install initiated.
22         Is that what you were talking about where
23   you were getting information from your traffic sources
24   saying that they were seeing particular installs but you
25   were not seeing that?

88

1     A.   Correct.  With this, we took a link from
2   multiple accounts to give to individuals outside the
3   office.  Where they were employees and had to remove
4   themselves from the CPN or the access to utilizing our
5   network IP on their computer to using their own at home.
6   And those were all tested and came back with the behavior
7   that we needed to address with Kristy.
8     Q.   Okay.  And then if you could -- and then what
9   was -- if you could look at the top of page 022370, which
10   is the page right before that.  If you could read that
11   top email dated November 7, 2005, at 4:33 p.m.
12    A.   Okay.
13    Q.   And what did Kristy tell you in this email that
14   she would do?
15    A.   She was having the links reviewed and fixed.
16   That they had identified and repaired a few things.
17   However, she did not believe that the overall solution
18   would resolve the issue at that time.  But as soon as she
19   received the new -- the link, she would forward them to
20   me.  But she would also have a new advertisement to try
21   in the interim.
22    Q.   So she was telling you that she was going to
23   fix the links but also give you a new advertisement?
24         MS. GURLAND:  Objection.  Same objection.
25   I'll just say "same objection" each time, which is that

22 (Pages 85 to 88)

**FTC v. Innovative Marketing, Inc. et al. Gieron**                    5/4/2010

89

1  the email says what it says, and I don't want him to
2  interpret what he thinks it means when she says something
3  in an email that we see.
4      Q.   BY MS. ROBBINS:  And when she's responding to
5  you about giving you new links, that was in response to
6  you listing out the links on page 022371, under the
7  accounts 89573, 900448, 50014, and 90012?
8      A.   Those would be the links that we're requesting
9  to have fixed, yes.
10     Q.   And did she tell you in this email that she was
11  not the person that created -- that gave you these URLs?
12         MS. GURLAND:  Same objection.
13         THE WITNESS:  I don't see where she would
14  state otherwise.
15     Q.   BY MS. ROBBINS:  And did you contact anyone
16  else about these accounts and these URLs on page 022371?
17     A.   No.
18     Q.   And did you only contact Kristy about these
19  accounts and these URLs?
20     A.   Yes.
21         MS. ROBBINS:  I'd like to have this marked
22  as FTC Exhibit 12.
23         (Exhibit 12 was marked.)
24     Q.   BY MS. ROBBINS:  Can you review this exhibit
25  and do you recognize this?

90

1      A.   Yes.
2      Q.   And what are these documents in this exhibit?
3      A.   Communication between Kristy and myself.
4      Q.   And are these true and correct copies of emails
5  that myGeek retained that pertained to Kristy Ross?
6      A.   Yes.
7      Q.   Now, I'd like you to take a look at -- I'd like
8  you to take a look at page 1 or the first page of this.
9  And if you could just read that email to yourself where
10  it says Kristy Ross to Geoff Gieron at 3:48 p.m.
11     A.   Okay.
12     Q.   So these account numbers and links that she's
13  giving you, I'd like you also to just refer back to
14  Exhibit 11, which we were just looking at.  Are those the
15  same account numbers from page 022371?  And are those --
16  is that -- is she referring to that email that you had
17  sent her on November 3rd, 2005, at 7 p.m.?
18         MR. KIRSCH:  Objection to what she's
19  referring to.  Again, without a foundation, this witness
20  has no basis of knowing that.
21         THE WITNESS:  Yes, these are the same
22  accounts and referenced URLs that are being asked to have
23  changed from the Exhibit 11 to Exhibit 12.
24     Q.   BY MS. ROBBINS:  And so is this email on
25  Exhibit 12, who was this email from and to?

91

1      A.   From Kristy to myself.
2      Q.   And what date was that?
3      A.   November 18th, 2005.
4      Q.   And what does she say in the first line of that
5  email?
6      A.   Finally I have the new links.
7      Q.   And so these are the links that she replaced
8  for you; is that correct?
9      A.   Correct.  The link had the new variations of
10  the current one that we were supposed to implement and
11  then replace the keyword being used for each of these
12  where the indication that she made for the equals all or
13  equals all IDs, that's where we would install the keyword
14  so she'd be able to see on her end.  But the variation is
15  the up after each of the identifiers.
16     Q.   And for each of these account numbers, are
17  these all Kristy's account numbers?
18     A.   Yes.
19     Q.   And when you asked for the new links, you
20  contacted Kristy, correct?
21     A.   Correct.
22     Q.   And when she sent you this email listing these
23  account numbers and these URLs, did she ever say in this
24  email that she couldn't provide you these URLs because
25  they weren't hers?

92

1      A.   No.
2      Q.   And, in fact, she offered to fix these links,
3  didn't she?
4      A.   Correct.
5      Q.   You'd like to show you what's going to be
6  marked as FTC Exhibit 13.
7         (Exhibit 13 was marked.)
8      Q.   BY MS. ROBBINS:  And do you recognize what's in
9  this exhibit?  If you could just flip through and see if
10  you recognize what's in this exhibit.
11     A.   Yes.
12     Q.   And what are these?
13     A.   Communications between Hotbar and myGeek.
14     Q.   And are these true and accurate copies of
15  emails that myGeek retained that pertained to Kristy
16  Ross?
17     A.   Yes.
18     Q.   Now, can you please read the first page, the
19  first email to yourself and review the second page as
20  well.
21     A.   All right.
22     Q.   Now, who was this email from and to?
23     A.   It's from Lilach to Chad Little and Robert
24  McDaniel.
25     Q.   And who is Chad Little?

23 (Pages 89 to 92)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 26 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                    5/4/2010

93

1    A.   At the time he was the CEO of the company and
2    founder.
3    Q.   Is this the same Lilach that we just referred
4    to in Exhibit 11?
5    A.   Yes.
6    Q.   And Lilach is with Hotbar; is that correct?
7    A.   Right.
8    Q.   And what is Lilach telling Chad Little and
9    Robert in this email?
10       MS. GURLAND:  Same objection.
11       THE WITNESS:  It's notification of the
12   ActiveX complaints deriving from the WinFixer ad that's
13   being served.
14   Q.   BY MS. ROBBINS:  And do they provide a link of
15   where the WinFixer ad is coming from?
16   A.   They're providing the destination URL and line
17   and page URL that they're seeing this activity from, yes.
18   Q.   And also in this email, do they provide screen
19   shots of what they saw when we went to that URL?
20   A.   Yes.
21   Q.   And I'd like you to take a look at page 047425,
22   which is the second page of this.  Do you recognize this
23   ad?
24   A.   Yes.
25   Q.   And what is this ad for?

94

1    A.   For WinFixer.
2    Q.   And is this one of the ads that you reviewed?
3    A.   Yes, because the URL is one of the ones that
4    was sent directly to me to replace in her accounts.
5    Q.   And do you recall seeing ads similar to this
6    that have a scanning bar that goes across it where you
7    see that green system scanning bar?
8    A.   I've seen it in other ads, not WinFixer, yes.
9    Q.   And in other ads, who sent you ads that looked
10   like that with the scanning bar?
11   A.   Companies that were specializing in registry
12   cleaning, STOPzilla, PC Security Shield.
13   Q.   And did you ever see these ads through Kristy
14   Ross?
15   A.   The WinFixer ones, yes.
16   Q.   And did you also see other ads that have a
17   typical -- or a system scan bar in Kristy's ads?
18   A.   Yes.
19   Q.   And did you review the WinFixer ad
20   specifically?
21   A.   This one especially, yes.
22   Q.   And is this how a consumer would see this ad?
23   A.   Correct.
24   Q.   And is this how you saw this ad when you
25   reviewed it?

95

1    A.   No.
2    Q.   How did you see it when you reviewed it?
3    A.   I would see the pages displayed here at the top
4    of 047425.  This would be the standard view of the page
5    sans the ActiveX prompt.
6    Q.   So you would see -- what you're saying is that
7    you would see the WinFixer ad as it's displayed here
8    without that yellow line going across underneath the tool
9    bar that says:  This site might require the following
10   ActiveX control?
11   A.   Yes.
12   Q.   So you would see everything else in this ad but
13   that yellow line?
14   A.   And the subsequent captured images.
15   Q.   And by that, you mean the subsequent popups
16   below this advertisement?
17   A.   And prompt for download, yeah.
18   Q.   So what you would see was just the WinFixer ad
19   with the system bar going across with no ActiveX bar and
20   no other popups?
21   A.   Correct.
22   Q.   Now, I'd like you to take a look at page 048306
23   of this exhibit, which is the fourth page.  And if you
24   could read the email at the top.
25   A.   Okay.

96

1    Q.   And if you could just -- who is that email from
2    and to?
3    A.   From Robert McDaniel to myself with Steve
4    Armstrong and Chad Little copied.
5    Q.   And why was this email sent to you?
6        MS. GURLAND:  Objection; foundation.
7        THE WITNESS:  The email was sent because of
8    the ongoing complaints about WinFixer.
9    Q.   BY MS. ROBBINS:  And can you read the email
10   into the record, please.  Just that top portion.
11   A.   WinFixer problem again.  Need this resolved as
12   soon as possible.  With the nature of it appearing
13   correctly to some people and incorrectly to other people,
14   it will be difficult to ensure it is completely fixed,
15   but we need to get it fully resolved so this stops
16   happening in our clients networks, especially after we've
17   told them it has been fixed.
18   Q.   And why did Robert send this to you?
19       MS. GURLAND:  Objection; foundation.
20       THE WITNESS:  Robert was sending it as a
21   genesis of the complaints and potential loss of traffic
22   and revenue from impact to the clients.
23   Q.   BY MS. ROBBINS:  And was he sending it to you
24   because you were on Kristy's account?
25       MS. GURLAND:  Objection; foundation.

24 (Pages 93 to 96)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 27 of 121

**FTC v. Innovative Marketing, Inc. et al. Gieron**                    **5/4/2010**

97

1     THE WITNESS: I was being sent it because I
2  oversee -- I oversaw all advertiser accounts and,
3  therefore, given who was copied, I was being held
4  responsible for handling the situation on the
5  advertiser's side as Robert's role in the company at the
6  time was to work with the traffic sources. So I was
7  the other half of that equation.
8     Q.  BY MS. ROBBINS: And who did you -- the
9  advertisement that we were just talking about on 047425,
10  who did you connect this WinFixer advertisement to, which
11  account?
12    A.  This would be the account -- if I was using
13  this as a record, it would be probably 90448.
14    Q.  And where do you get that from?
15    A.  Association based strictly on the identifier in
16  the AID equals field.
17    Q.  And can you tell me what page you're on?
18    A.  047425.
19    Q.  Oh, it's on the actual URL?
20    A.  Yes. The mgkron2up.
21    Q.  And what does that mean to you?
22    A.  It's the identifier and the variation of the
23  identifier as changed on November 18th, 2005, which
24  Kristy sent her information to have the accounts
25  updated. The variable that changed was up after each one

98

1  of the identifiers.
2     Q.  So you're referring to Exhibit 12 when you talk
3  about that?
4     A.  Yes.
5     Q.  And the account number you said was 90448?
6     A.  Right. Based on this outline, that would be
7  the one that I would associate back to it.
8     Q.  And when you specified the aid=mgkron2, that is
9  an identifier that Kristy put into her URLs to identify
10  her URLs that she was submitting to you? Is that what
11  you mean?
12    A.  Correct. And the varied version of the -- all
13  of the changes were the same across the board when the
14  URLs were changed to the AID.
15    Q.  The AID you're talking about?
16    A.  Right.
17    Q.  So in the account numbers on Exhibit 12, she
18  changes the AID in 90448, it's mjkron?
19    A.  mg.
20    Q.  I'm sorry, mgkron.
21    A.  2.
22    Q.  2. And that's what you see on this
23  advertisement on 047425?
24    A.  Yes.
25    Q.  And that's how you know that this was an ad

99

1  that Kristy placed?
2     A.  Correct.
3     MS. ROBBINS: I'd like to have this marked
4  as FTC Exhibit 14.
5     (Exhibit 14 was marked.)
6     Q.  BY MS. ROBBINS: Do you recognize these emails?
7     A.  Yes.
8     Q.  And what are these?
9     A.  Communication between Robert McDaniel and Mike
10  Romoff of 360i.
11    Q.  And are these true and accurate copies of
12  emails that myGeek retained that pertained to Kristy
13  Ross?
14    A.  Yes.
15    Q.  So I'd like you to take a look at page 048247,
16  the second page of this exhibit. Do you recognize --
17  what is on this page? What picture is on this page?
18    A.  A picture of the WinFixer 2005 landing page
19  URL.
20    Q.  And do you recognize this ad?
21    A.  Yes.
22    Q.  And did you review this ad?
23    A.  Yes.
24    Q.  And is this how you saw this ad?
25    A.  Yes.

100

1     Q.  And do you know who sent this ad -- withdrawn.
2     Can you read that email on that second page
3  to yourself, please.
4     A.  Okay.
5     Q.  And who is this email from and to?
6     A.  From Mike Romoff to Robert McDaniel and Shawn
7  Stevens.
8     Q.  And who is Mike Romoff?
9     A.  Mike Romoff is the technical contact over at
10  360i in regards to the integration of our feed results to
11  them.
12    Q.  And what is 360i?
13    A.  It's another company that they utilized the
14  desktop application for distribution of ads.
15    Q.  So it's the same thing as Hotbar and with Media
16  Traffic?
17    A.  Correct.
18    Q.  Where they would install something on users'
19  computers with their consent in exchange for delivering
20  advertisements?
21    A.  Right.
22    Q.  And what is Mike telling Robert in this ad?
23    MS. GURLAND: Same objection.
24    THE WITNESS: He's notifying him that they
25  are seeing the WinFixer ad, but it was -- it wasn't

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 28 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                    5/4/2010

101

1  targeted. And he was in a shopping category of keywords
2  and saw the ad displayed because the -- more likely the
3  use of RON was being utilized by the account or a generic
4  term versus something specific. So he's trying to
5  eliminate complaint by users by seeing it all the time.
6      Q.  BY MS. ROBBINS: So what you're saying is that
7  if a user was being untargeted instead of targeted? Were
8  there keywords specifically being targeted for
9  distribution of these ads or was it --
10     A.  This would probably be more of a result of the
11 run of network. What I explained before, where someone
12 was willing to take anything. I think where they had the
13 problem was seeing the WinFixer ad when someone was
14 looking at Macys.com. It didn't necessarily fall in the
15 shopping category, so it wasn't textually relevant. So
16 they were concerned that they were seeing several
17 WinFixer ads coming through because WinFixer was
18 purchasing traffic in a broad scope versus very targeted.
19     Q.  And he says in this email that he saw this ad
20 come a few times. This is Mike telling you. So is this
21 how a consumer would then see this ad if this is how Mike
22 would see it when he's reviewing it?
23     A.  Yes.
24         MS. GURLAND: Objection; foundation.
25         THE WITNESS: That's a direct screen shot

102

1  from his desktop.
2      Q.  BY MS. ROBBINS: So if a user had their
3  application on their own computer, this is how the ad
4  would be displayed on their desktop?
5          MS. GURLAND: Objection; foundation.
6          THE WITNESS: Yes.
7          MS. ROBBINS: I'd like this to be marked as
8  FTC Exhibit 15.
9          (Exhibit 15 was marked.)
10     Q.  BY MS. ROBBINS: Do you recognize this
11 document?
12     A.  Yes.
13     Q.  And what is this?
14     A.  Communication between Kristy and myself.
15     Q.  And are these true and accurate copies of
16 emails that myGeek retained that pertained to Kristy
17 Ross?
18     A.  Yes.
19     Q.  And I'd like you to take a look at from the
20 second page to the first page and read the entire email
21 to yourself, please.
22         So looking at page No. 2, what is on page
23 No. 2?
24     A.  Page No. 2 is an example of the ActiveX prompt.
25     Q.  And that's on page 047421 of this document?

103

1      A.  Right.
2      Q.  And an ActiveX prompt as a part of what? What
3  is the bigger picture of this picture?
4      A.  The ad that's being displayed is causing the
5  potential for install.
6      Q.  And so is this a WinFixer ad that you're
7  looking at?
8      A.  Yes.
9      Q.  And do you recognize this ad?
10     A.  Yes.
11     Q.  Did you review this ad?
12     A.  This one in particular, I could not confirm. I
13 don't know if this is an exact one I've reviewed.
14     Q.  But have you reviewed ads that look --
15     A.  Yes.
16     Q.  -- almost identical to this?
17     A.  Yes.
18     Q.  Can you look at page 047420. And that bottom
19 email. Who is that bottom email from and to?
20     A.  From Robert McDaniel to myself.
21     Q.  And what is he telling you in this email?
22         MS. GURLAND: Same objection.
23         THE WITNESS: He is notifying me that the --
24 of the pop trying to request download of the product and
25 that an ActiveX is initiated on the window.

104

1      Q.  BY MS. ROBBINS: So what you mean is that
2  this -- does this popup come up at the same time as you
3  see the advertisement?
4      A.  Yes. It's what prevents the person from
5  leaving the page with a simple close or X out of the
6  window.
7      Q.  So can you explain that. So if this
8  advertisement is shown on someone's computer and they
9  would like to exit out of that, what would happen?
10         MS. GURLAND: Objection; foundation. It
11 depends on the user and the computer.
12         THE WITNESS: Actually, the browser window
13 that's initiated always must carry an X at the top.
14 Regardless of any other information that was been pulled
15 away, the frame of the window remains the same with an X
16 at the top right-hand corner of the browser window. And
17 this is specific to Internet Explorer. I believe it's
18 common across all browsers, but in this case specific to
19 Internet Explorer.
20         What would happen is the prompt would
21 overlay the open popunder window, allowing the -- it to
22 remove the functionality to be able to close the current
23 window without answering the question that's currently
24 being posed.
25     Q.  BY MS. ROBBINS: And when you say the popunder

26 (Pages 101 to 104)

Case 1:08-cv-03233-RDB    Document 198-2    Filed 12/17/10    Page 29 of 121

**FTC v. Innovative Marketing, Inc. et al. Gieron**                    **5/4/2010**

105

1    window, you mean the advertisement that's displayed?
2        A.   Yes.
3        Q.   Now, I would like you to take a look at the
4    email directly above on the first page where you are
5    emailing Kristy.
6        A.   Uh-huh.
7        Q.   And can you please just read the first
8    paragraph out loud.
9        A.   Kristy, one of our team noticed the WinFixer ad
10   doing the prompt issue again through 89573.  It happens
11   sporadically, but thankfully we have caught this before
12   any of the partners in our network have.  Any way to
13   resolve this?  Let me know so we don't run into problems.
14       Q.   So when you say one of your team noticed this
15   ad, how did your team notice this ad?
16       A.   Either through periodic checking of URLs,
17   either specific to Kristy or other accounts inside the
18   system, or of similar nature.  Or through approval.
19       Q.   Okay.  So before you run an ad, allow your
20   traffic sources to run an ad, you said earlier that you
21   have to approve the ad?
22       A.   Right.  Manual approval for every URL, correct.
23       Q.   But then also, and aside from manual approval
24   that has to be done, you also periodically check ads?  Is
25   that what you mean?

106

1        A.   Yes.  If there are any accounts or types of ads
2    in the system that can create high risk or any problems
3    for traffic sources, we would conduct periodic checking
4    at random just to try to see if we can catch a problem
5    before it's caught externally because there was no other
6    way to identify it.
7        Q.   And did you do that with Kristy's accounts?
8        A.   Yes.
9        Q.   And why did you do that with Kristy's accounts?
10       A.   Specifically due to complaints that were
11   generated previously and behavior that as mentioned was
12   sporadic.  But at the same time, referring back to the
13   email where I'm being held liable internally for the
14   results of the ads and the impact potentially of
15   partnerships and revenue opportunity.  That I would have
16   my team have a checklist that they would go through.
17       Q.   And how did you know to contact Kristy about
18   this particular ad that Robert sent you?
19       A.   The ad is identified through the mgk1 AID
20   designation inside the URL.
21       Q.   And that AID you associated with Kristy Ross
22   because that was her naming convention?
23       A.   Yes.
24       Q.   And can you read the very top email where it's
25   from Kristy Ross to you, please.  To yourself.  Did you

107

1    already read it?
2        A.   Okay.
3        Q.   And if you could just read the first paragraph
4    out loud, please.
5        A.   Geoff, thanks for letting me know about this, I
6    am in Europe, but will be back in the US for awhile as of
7    Monday.  Sorry for not getting back to you sooner.  I
8    haven't heard of many other issues lately as we were
9    before, but I will try to send you some new links for
10   this and hopefully it will resolve the problem.
11       Q.   And in this email that she sent to you on
12   February 2nd, did she say to you that this wasn't her ad?
13       A.   No.
14       Q.   The ad that is shown on this exhibit, did she
15   say to you that this ad was not hers?
16       A.   No, she did not.
17       Q.   And did she say that she didn't approve this ad
18   that's in this exhibit?
19       A.   No.
20       Q.   And did she ever say that she didn't know
21   anything about this particular advertisement in this
22   exhibit?
23       A.   No.
24            MS. ROBBINS:  We'll go off the record.  Do
25   you want to take a five-minute break?

108

1            MR. KIRSCH:  Sure.
2            (A recess was taken from 12:27 p.m. to
3            1:12 p.m.)
4        Q.   BY MS. ROBBINS:  Mr. Gieron, you're still under
5    oath.
6        A.   Okay.
7            (Discussion off the record.)
8            BY MS. ROBBINS:  I'd like to show you what's
9    going to be marked as FTC Exhibit 16.
10           (Exhibit 16 was marked.)
11       Q.   BY MS. ROBBINS:  Do you recognize these
12   documents?
13       A.   Yes.
14       Q.   And what are these documents?
15       A.   Communication between myself and Stephen -- I
16   can't pronounce his last name -- at Direct-Revenue.
17       Q.   So this is an email between you and Stephen
18   Krikelis at Direct-Revenue?
19       A.   Yes.
20       Q.   Are these true and accurate copies of emails
21   that myGeek retained that pertained to Kristy Ross?
22       A.   Yes.
23       Q.   And I'd like you to take a look at page 047427,
24   which is the third page from the back.
25       A.   426?

27 (Pages 105 to 108)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 30 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron

5/4/2010

109

1    Q.   Sorry, the email on 047427.
2    A.   Okay.
3    Q.   And if you could just read that to yourself,
4    please.
5    A.   Okay.
6    Q.   And so what is this email from and who is it
7    to?
8    A.   It's from Stephen at Direct-Revenue to myself
9    and Robert McDaniel.
10   Q.   And what is the subject?
11   A.   WinAntiVirus.
12   Q.   And what is Steven writing to you about?
13   A.   An issue with -- an identified issue with an ad
14   coming through our system under the title of
15   WinAntiVirus.
16   Q.   And can you just read where he starts off
17   saying "First off" down to "creative" for the record,
18   please.
19   A.   First off it makes users think it is a message
20   from the Windows Security Center.  It also leads users to
21   believe they have a malicious virus on their PC.
22   Finally, its title bar is moved up so it is neither
23   visible nor clickable.  I've attached a pic of the
24   creative.
25   Q.   And where did he receive this ad from?

110

1        MS. GURLAND: Objection; foundation.
2    Q.   BY MS. ROBBINS: According to the email?
3    A.   It was received through our feed of
4    advertisers.
5    Q.   And when he says that he received it from the
6    RON feed, can you just tell me what that is?
7    A.   Run of network feed.  The way the
8    Direct-Revenue was set up with our system was they had a
9    feed that was dedicated for run of network advertising
10   versus keyword targeted.
11   Q.   And was Direct-Revenue a desktop application?
12   A.   Yes.
13   Q.   So a consumer would download a Direct-Revenue
14   desktop application, and then see any ads that would come
15   up in that run of network feed?
16   A.   Yes.
17   Q.   And if you can flip to the next page, what did
18   he attach to this email?
19   A.   This page is a copy of the ad that he was
20   complaining about.
21   Q.   And so is this the ad that he saw from his run
22   of network feed?
23        MS. GURLAND: Objection; foundation.
24        THE WITNESS: Yes.
25   Q.   BY MS. ROBBINS: And have you ever seen this ad

111

1    before?
2    A.   I can't recall.  I've seen something with
3    WinAntiVirus PRO 2006 on it.  I can't recall the
4    structure of this ad.
5    Q.   And did Kristy ever submit creatives with the
6    name WinAntiVirus PRO?
7    A.   Yes.
8    Q.   And did you review those creatives that she
9    submitted to you?
10   A.   I did.
11   Q.   And is this how a consumer would view this ad
12   if this was come through -- if they had the
13   Direct-Revenue desktop application on their computer, is
14   this how the ad would be displayed?
15        MS. GURLAND: Objection; foundation.
16        THE WITNESS: I actually can't recall if
17   this was the structure of the ad that was approved or if
18   this was post what happened that Stephen identified, if
19   there was any change to it that resulted in this.  I
20   can't recall the exact structure of the WinAntiVirus PRO.
21   Q.   BY MS. ROBBINS: So do you recall Kristy
22   submitting similar advertisements to this for your
23   review?
24   A.   Specifically for the WinAntiVirus PRO, yes, but
25   not -- as I say, I can't recall the structure.

112

1    Q.   So you can't recall if this particular ad
2    you've seen this before?
3    A.   Right.
4    Q.   And I'd like you to take a look at page -- let
5    me just go back.  But you do recall Kristy submitting
6    WinAntiVirus PRO advertisements for you to review?
7    A.   Correct.
8    Q.   And do you recall -- withdrawn.
9        If you could look at page 023482, which is
10   the third page from the front.  And if you could just
11   read to yourself the top two emails, one from Stephen to
12   Geoff Gieron and one from Geoff to Stephen.
13   A.   Okay.
14   Q.   Okay.  And if you could just read out loud for
15   the record what you wrote to Stephen on that second
16   string where it starts "all right."
17   A.   Alright.  I think we have found it.  Please let
18   me know if it pops up again.  It appears the advertiser
19   turned you on without us knowing.
20   Q.   And what did you mean by that when you said the
21   advertiser turned you on without us knowing?
22   A.   Because the ability to select traffic sources,
23   it would affect their ability to select traffic source
24   without us being aware.
25   Q.   And when you say "they," the advertisers?

28 (Pages 109 to 112)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 31 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                    5/4/2010

113

1     A.   Correct.
2     Q.   But an advertiser could only select or deselect
3   traffic sources if they had the login and password to get
4   into their account?
5     A.   Right.
6     Q.   And when you said "I think we found it," who
7   did you find that this ad belonged to, do you recall?
8     A.   I would say based on the context of the email,
9   it would lean towards the WinAntiVirus that was specific
10   to Kristy's account. However, I don't have the URL to
11   support that or the account designation.
12     Q.   And when you talk about -- when you talked
13   about that this came through the run of network feed,
14   would an advertiser know when or where their
15   advertisement was actually running if it was run of
16   network? Would they know at any given time and moment
17   where exactly their advertisement would go?
18     A.   No, because there's no control from the
19   advertiser to know who has the desktop application. The
20   only thing that they would be able to know is the source
21   that was generating the traffic by the identification
22   number and the geographical designation. So if there
23   were looking for US, they would know it was in the US
24   under that one partner. As to where in the US, they
25   wouldn't have that information.

114

1     MS. ROBBINS:  Okay. I'd like to have this
2   marked as FTC Exhibit 17.
3     (Exhibit 17 was marked.)
4     Q.   BY MS. ROBBINS:  Do you recognize this?
5     A.   Uh-huh.
6     Q.   And what is this?
7     A.   It's a note from Kristy to myself regarding
8   several of her accounts.
9     Q.   And is this a true and accurate copy of an
10   email that myGeek retained that pertained to Kristy Ross?
11     A.   Yes.
12     Q.   And can you read this email to yourself,
13   please, and let me know when you're ready.
14     A.   Okay.
15     Q.   So in this email, who is this email from and
16   who is it to?
17     A.   From Kristy to myself.
18     Q.   And what in this email is she listing in this
19   email?
20     A.   She's giving direction for me to make charges
21   on the credit card on file for these specific accounts in
22   certain designations as outlined not to do them in a
23   total of 5,000, for example. I think there was
24   possibility if it was hit for 5,000 that it would be
25   declined or caught by AmEx. It's a common problem with

115

1   AmEx. So she was designating charges in smaller
2   increments to have me initiate for her. Whether or not
3   she was out of town or what the reason was, I can't
4   recall.
5     Q.   So if she had access to her computer, she could
6   do this herself, you mean?
7     A.   Correct.
8     Q.   And in this email, does she list her specific
9   account numbers?
10     A.   Yes.
11     Q.   And are these her account numbers?
12     A.   Yes.
13     Q.   And next to each account, there is a
14   parentheses where it lists a name. For example, the
15   first one says winantivirus3. Do you know what that
16   designation means?
17     A.   The designation was given based on the -- well,
18   it's how I knew which account she was referring to based
19   on how she and I had designated them. So if WinAntiVirus
20   3, 4, and 5 were these accounts, they were the ones who
21   were currently running WinAntiVirus, WinFixer 1 and 2,
22   and then the other additional ones that were listed
23   there.
24     Q.   So what this email says is that for each
25   account, this is the corresponding product or ad that

116

1   was -- that corresponded to that account?
2     A.   Correct.
3     Q.   So for account 87056, WinAntiVirus was the ad
4   that she was running on that account?
5     A.   Correct.
6     Q.   So she sent this to you so you could charge her
7   account so she could run advertisements it looks like
8   over the weekend because she emailed this on a Friday and
9   she said until Monday?
10     A.   Correct.
11     MS. GURLAND:  Objection; foundation.
12     Q.   BY MS. ROBBINS:  And the bottom where it says
13   account 90448 and it says in parentheses winfixerron,
14   what does that mean?
15     A.   It is the designation of the account. I
16   believe the 90448 was the account that we did most of the
17   run of network traffic on versus the other two WinFixer
18   accounts may have been keyword targeted or set up in a
19   different way that was not associated with run of
20   network.
21     Q.   And she was the one that was directing you
22   to -- Kristy was the one that was directing you to do
23   this for her specific accounts; is that right?
24     A.   (Witness nodded in the affirmative.)
25     Q.   When an account is designated as a run of

29 (Pages 113 to 116)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 32 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron          5/4/2010

117

1   network account, does that include US consumers?
2       A.   Yeah, it can include consumers for anywhere.
3   Wherever the advertiser geographically designates the
4   campaign or account to point to.
5           MS. ROBBINS:  Okay.  I'd like to have this
6   marked as exhibit -- FTC Exhibit 18.
7           (Exhibit 18 was marked.)
8       Q.   BY MS. ROBBINS:  Do you recognize these
9   documents?
10      A.   Yes.
11      Q.   And what are these documents?
12      A.   Communication between Robert and myself and
13  Robert and netster.com.
14      Q.   And what is Netster?
15      A.   Netster is a domain aggregator.  They are one
16  of the largest holders of domain properties on the
17  Internet.  They were testing out utilizing popunder
18  traffic at this particular time.  So non-desktop
19  popunder.
20      Q.   And are these true and accurate copies that
21  myGeek retained that pertained to Kristy Ross?
22      A.   Yes.
23      Q.   Now, I'd like you to look at page 1 and 2 of
24  this document.  And if you could read from the bottom of
25  page 2 to the top of page 1 to yourself, please.

118

1       A.   Okay.
2       Q.   Okay.  Now, I'd like you to take a look on the
3   second page 048310.  On the bottom there's a picture of
4   an advertisement.  Do you recognize this advertisement?
5       A.   It's similar to the one before.  As I stated,
6   for some reason I can't recall.  That one is easy, but I
7   do know that the WinAntiVirus PRO, I'm familiar with that
8   name.
9       Q.   So do you recall specifically reviewing this ad
10  or no?
11      A.   I don't.
12      Q.   And in this email, who is Lee Tankersley?
13      A.   The representative from Netster that Robert was
14  associating with.
15      Q.   And at the bottom of this email, can you tell
16  me who the email is from and to?
17      A.   It's from Lee to -- Lee Tankersly to Robert
18  McDaniel.
19      Q.   And what is he sending to Robert?
20      A.   He's highlighting behaviors seen on a
21  WinAntiVirus PRO 2006 ad.
22      Q.   And does he -- did he want this type of ad on
23  his traffic?
24      A.   No.
25          MR. KIRSCH:  Objection; foundation.

119

1       Q.   BY MS. ROBBINS:  And when he -- so if you could
2   take a look at the first page where it says the third
3   email down where it says from Robert to Lee.  Could you
4   tell me what is Robert sending to Lee in this email?
5       A.   Robert is sending to Lee a sample of the XML
6   record or feed result that is a sample of what he was
7   wanting Lee to send back in order to identify the
8   problem-causing account.
9       Q.   So when Lee sent this advertisement to Robert,
10  was it clear it Robert at the time based on the ad alone
11  whose ad this was?
12      A.   No.
13          MS. GURLAND:  Objection; foundation.
14      Q.   BY MS. ROBBINS:  And so what did Robert ask for
15  from Lee in order to figure out whose ad this was?
16      A.   He utilized the sample to try to get Lee to
17  send him the information that would allow us to identify
18  the vendor ID or advertiser that was associated with the
19  ad that he was having an issue with.
20      Q.   So is this the same as that CPV feed that we
21  had discussed in the previous exhibit?
22      A.   Right.
23      Q.   Where it had the vendor ID and the partner ID?
24      A.   Yes.
25      Q.   So in this email, is it evident who the partner

120

1   ID is and who the vendor is from this email?
2       A.   That Lee sent back or what Robert was sending
3   as a sample?
4       Q.   Did Lee send Robert the CPV feed?
5       A.   Right.  After sending the sample, Lee was able
6   to return with a feed result that identified the partner
7   ID or traffic source ID as 110386 and the vendor ID or
8   advertiser ID 87712.
9       Q.   And whose account is 87712?
10      A.   Kristy Ross.
11      Q.   And so the advertisement that's on 048310 page,
12  that advertisement is what he was seeing from -- let me
13  rephrase this.
14          So this CPV feed indicates that this
15  advertisement that he sent to you came from account
16  87712?
17      A.   Yes.
18      Q.   And can you please read the top email into the
19  record, please.
20      A.   The one from Robert to myself?
21      Q.   Yes.
22      A.   The winantivirus ad coming from 87712 is doing
23  a pop when the client tries it but no pop when I try it
24  here.  It looks like it is a similar issue we had with
25  winfixer before.  Can you turn off all winantivirus

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 33 of 121

**FTC v. Innovative Marketing, Inc. et al. Gieron**                    **5/4/2010**

121

1   accounts from their traffic source 110386 today so they
2   can start sending traffic?  If Kristy is able to get the
3   ad fixed, we can reintroduce, but we don't get it on by
4   5 p.m. Eastern Standard Time today, it won't run all
5   weekend.
6       Q.   So in this email that Robert sends to you, he
7   refers to Kristy being able to get the ad fixed?
8       A.   Correct.
9       Q.   And why did he refer to Kristy when he was
10  referring to this ad?
11          MS. GURLAND:  Objection; foundation.
12          THE WITNESS:  The identifier of the 87712
13  allowed Robert to know that it was an account under
14  Kristy's control.  And given our past history with the
15  WinFixer issues similar in nature, Kristy was able to
16  reintroduce new URLs or provide us revised links that
17  would not have the issue that we would then be allowed to
18  run with our partners or traffic sources.
19      Q.   BY MS. ROBBINS:  So just so I can just be
20  clear, so this CPV feed shows that the ad that Lee sent
21  to Robert was displayed to the publisher that he
22  complained about it, and that based on this record, you
23  can tell which account that ad was come from?
24      A.   Right.
25      Q.   I'd like to hand you what will be marked as FTC

122

1   Exhibit 19.
2           (Exhibit 19 was marked.)
3       Q.   BY MS. ROBBINS:  Do you recognize this?
4       A.   Yes.
5       Q.   What is this?
6       A.   Communication between Kristy Ross and Ryan
7   Maloney.
8       Q.   And is this a true and accurate copy of an
9   email that myGeek retained that pertained to Kristy Ross?
10      A.   Yes.
11      Q.   And if you could just read the first page to
12  yourself, please.
13      A.   Okay.
14      Q.   Now, the second email from the top where
15  it starts -- it's from Ryan and says:  Hi Kristy.  Can
16  you tell me what Ryan is asking Kristy?
17      A.   The creation of the account below, the notice
18  is to notify someone that their account has hit zero.
19  The account would be 555192 as referenced.
20          This is an auto-generated email that happens
21  when someone who's on a prepay has -- so, for example,
22  they put $500 into their account, it hits the zero point,
23  we do some prenotices prior to that, but then this one is
24  stating that their account has dropped below zero.  And
25  because of this and Ryan's overseeing the account around

123

1   that time and/or under my direction, had followed up to
2   say -- because the account manager will also receive
3   copies of this as well of the account.  So Ryan was then
4   in charge of it this time.  Followed up with her directly
5   to try to ensure that the account did not discontinue.
6   But because of the end designation and the Globedat 2, he
7   wasn't certain if it was reaching her or not.
8       Q.   What do you mean?  Because the email was sent
9   to marketing2@globedat.com?
10      A.   Yes.  Because the previous ones were
11  marketing1@globedat, I believe.  And also because it
12  didn't say dear Kristy.  So because he was uncertain who
13  it was going to reach.  So he sent her a note because
14  she's our primary contact and we have her email address
15  directly, and then she responded.
16      Q.   So this email states that -- so for 555192,
17  there was a zero balance.  It was dropping below a zero
18  balance.  So there's an automatic message sent to
19  marketing2@globedat.com because that was the email on the
20  account?
21      A.   Yes.
22      Q.   And how did Kristy respond to Ryan?  What did
23  she say in the email?
24      A.   Thanks, I do get them all.  I will fund the
25  account.

124

1       Q.   So Kristy was telling Ryan that she gets the
2   emails that were sent to marketing2@globedat.com?
3           MS. GURLAND:  Same objection.
4           THE WITNESS:  Right.
5           MS. ROBBINS:  I'd like to have this exhibit
6   marked as FTC Exhibit 20.
7           (Exhibit 20 was marked.)
8       Q.   BY MS. ROBBINS:  Do you recognize these
9   documents?
10      A.   Yes.
11      Q.   Okay.  And what are these documents?
12      A.   Communication between Robert McDaniel -- well,
13  communication between Robert to Ryan Maloney, myself, and
14  Steve Armstrong in response to communication between
15  Robert McDaniel and Mike Romoff of 360i.
16      Q.   And if you could first take a look at the first
17  page and -- sorry, the first three pages.  If you
18  could -- the first four pages.  If you could read from
19  the fourth page to the first page and review the
20  advertisements that are on there.
21      A.   From the fourth page to --
22      Q.   Yeah, because it starts the bottom of the
23  fourth page and working up.
24      A.   Okay.
25      Q.   Now, before I get to my questions, are these a

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 34 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                        5/4/2010

125

1    true and accurate copy of emails that myGeek retained
2    that pertained to Kristy Ross?
3        A.   Yes.
4        Q.   Now, could you please -- on the page 047370, do
5    you recognize that ad?
6        A.   WinAntiVirus PRO ad, yes.
7        Q.   Did you review that ad?
8        A.   This one, yes.
9        Q.   And is this how you saw the ad --
10       A.   Yes.
11       Q.   -- when you reviewed it?
12       A.   Yes.
13       Q.   I'd like you to flip to the first and second
14   page where there are some more advertisements.
15       A.   Okay.
16       Q.   And do you recall seeing those ads?
17       A.   No.
18       Q.   And that's on page 047368 and 047369.
19       A.   No.  These were actions that were being
20   reported to us.
21       Q.   And what was Mike -- who was telling you -- who
22   is the email from on page 1 -- at the bottom of page 1,
23   who is that from and to?
24       A.   From Mike Romoff to Robert McDaniel.
25       Q.   And what is attached to his email?

126

1        A.   He's showing behavior seen specifically in this
2    case to WinAntiVirus PRO 2006 ad.  But it was referring
3    anything that would have to do with antivirus or
4    registered cleaner at that time.
5        Q.   So on page -- on the 047370, on that page where
6    it shows the WinAntiVirus PRO ad, do you recall also
7    seeing that popup box on top of the ad when you reviewed
8    it?
9        A.   No.
10       Q.   So when you reviewed the ad, what did you see?
11       A.   I saw everything as demonstrated in this image
12   sans the download prompt.
13       Q.   So do you recall reviewing ads and approving
14   ads that stated your current antivirus protection is not
15   effective?
16       A.   Yes.
17       Q.   And was this ad that you reviewed placed by
18   Kristy?
19            MS. GURLAND:  Objection; foundation.
20       Q.   BY MS. ROBBINS:  This ad that you particularly
21   reviewed, was this placed by Kristy?
22       A.   The content of the ad, yes.  I couldn't tell
23   you specifically if the URL designation was coming from
24   her.
25       Q.   So this particular ad, though, from looking at

127

1    this ad, you have seen ads that Kristy has placed that
2    said:  Your current antivirus protection is not
3    effective?
4        A.   Correct.
5        Q.   And is this how -- so this email was forwarded
6    by Mike Romoff at 360i.  So do you know if this is how
7    Mike would have seen it, the ads on page 047370 and then
8    the popup boxes on 047368 and 69?
9        A.   It looks like a result of that ad with Robert
10   requesting Mike to run the URL and seeing the behavior
11   that we were not seeing internally.
12       Q.   Okay.  And do you know if consumers would have
13   seen it this way?
14       A.   The assumption is yes, based on the complaints.
15       Q.   And what do you mean by that, based on the
16   complaints?
17       A.   Noted by -- that Mike was receiving complaints
18   that we were not seeing the activity internally.  And
19   when we gave him a specific URL to run for WinAntiVirus,
20   he was seeing this behavior and captured it for us to
21   relate back.
22       Q.   Now, I'd like you to flip back to the very end
23   on the last three pages of this exhibit.  And if you
24   could just review -- if you could review 047418 and
25   047417.  And if you could review the email string.

128

1        A.   Okay.
2        Q.   Now, at the bottom of the 047417, Ryan is
3    sending Kristy an email, and he's attaching what appears
4    to be the popup boxes that were on page 047368 and 369;
5    is that correct?
6        A.   Correct.
7        Q.   And can you read into the record what Ryan
8    wrote to Kristy.
9        A.   With respect to the antivirus tags running in
10   account 555192, we had to deselect traffic sources 110182
11   and 110077 due to the activex spawn.  Our network
12   partners have received numerous complaints and had to
13   take us out of the feed until we removed the ads.  It is
14   possible to adjust the URL?
15       Q.   And what else did he write?
16       A.   This is what they're seeing.
17       Q.   And that was sent to Kristy?
18       A.   Correct.
19       Q.   Now, how did Kristy respond to Ryan?  Did she
20   respond to him?
21       A.   Her response was her looking into it and
22   because it was a Firefox window possibly suggested that
23   that may be the cause.
24       Q.   When she responded to Ryan after he attached
25   these screen shots, did she say that this was not her ad?

32 (Pages 125 to 128)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 35 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                    5/4/2010

129

1   A.   No.
2   Q.   Did she say that she didn't place the ad?
3   A.   No.
4   Q.   And do you know how Ryan knew that these were
5   from her account 555192?
6   A.   From what I'm able to see, he was able to
7   associate back the URL that was listed on 047370 with a
8   URL that was running in account 555192.
9   Q.   And so let me just ask you, how would he have
10  been able to do that?  Was there a list of URLs for each
11  account?
12  A.   There was -- there's two ways that that could
13  be done.  There's an internal report that would show all
14  URLs and keywords for any given account ID number or
15  advertiser ID number, or he would go into the account
16  directly and search it.  Search for it by going by
17  campaign by campaign, listing by listing, looking for a
18  match.
19  Q.   And do you know, did he search for that or did
20  you?
21  A.   He would have.
22  Q.   In this particular case?
23  A.   Correct.
24  Q.   And do you know -- when he said, "we had to
25  deselect traffic sources 110182," is he referring to Mike

130

1   Romoff?
2   A.   Yes.
3   Q.   Do you know if anyone else -- any other
4   advertiser was running that particular URL on page 047370
5   other than Kristy?
6   A.   When you say URL, are you talking about the
7   full URL string or WinAntiVirus.com?
8   Q.   The full URL string.
9   A.   I'm not familiar enough to know that that full
10  URL, who it belongs to.  But given the trail of emails,
11  it would lend it back to the 555192 account.  But was he
12  familiar with this ad and ad type, yes.
13  Q.   You were familiar with that ad and that ad
14  type?
15  A.   Yes.
16  Q.   And 555192 is an account that Kristy opened?
17  A.   Correct.
18  MS. ROBBINS:  I'd like to have this exhibit
19  marked as Exhibit 21.
20  (Exhibit 21 was marked.)
21  Q.   BY MS. ROBBINS:  Do you recognize these
22  documents?
23  A.   Yes.
24  Q.   And what are these documents?
25  A.   Communication between Ryan and Kristy.

131

1   Q.   And are these true and accurate copies of
2   emails myGeek retained that pertained to Kristy Ross?
3   A.   Yes.
4   Q.   And I'd like you to -- if you could read to
5   yourself the first two pages.  So starting with 048181 to
6   048180, from the bottom of 181 up to the top of 180,
7   please.
8   A.   Okay.
9   Q.   Okay.  On page 048181, there's an email from
10  Kristy Ross to Ryan Maloney.  It starts -- it's time
11  2:23 p.m.  Do you know when Kristy Ross says:  I would
12  like to get the US RON account up to date for
13  WinAntiVirus.  Do you know what she means when she says
14  US RON?
15  A.   It's US.  The geographical designation.  RON
16  equals the run of network capacity in which she wanted to
17  run the account.
18  Q.   So does this mean that she wanted to set up a
19  WinAntiVirus account that was to only be run in the
20  United States?
21  A.   Yes.
22  MS. GURLAND:  Objection; foundation.
23  Q.   BY MS. ROBBINS:  And when -- so for a run of
24  network account, it would be for consumers who are in the
25  United States and it would be run of network?

132

1   A.   Correct.
2   Q.   And if you go to page 048180, at the very
3   bottom, she says -- there's an email from Kristy Ross to
4   Ryan Maloney at 5:28 p.m.  She states:  Also is it
5   possible to change one of the other US accounts into
6   another RON account?
7   Does that mean that there were specific
8   accounts that she had designated as US only?
9   A.   Yes.  At this time in the development of the
10  account management system, country settings were not done
11  at the campaign level, they are done at the account
12  level.
13  Q.   What does that mean?
14  A.   That means if you were looking back at Exhibit
15  5, there's reference to country settings.  That means the
16  entire account was going to be multiple countries or one
17  country.  It wasn't until 2007 -- early 2007, 2008 when
18  it was brought to the campaign level.  Campaign level
19  means that you could have five campaigns, two of them
20  running in the US, two in France, and one in Australia.
21  At this point in the development of our system, the
22  country settings were done at the account level.
23  Q.   So if you had ten campaigns running on one
24  account --
25  A.   It would all be under one country or multiple

33 (Pages 129 to 132)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 36 of 121

**FTC v. Innovative Marketing, Inc. et al. Gieron**                    **5/4/2010**

133

1  countries as selected.
2      Q.   Okay. So if she had – so in this email, he
3  says – if you go to the email above where Ryan writes:
4  Yes, we can one of the other US accounts into a RON
5  account. What is the Drive Cleaner account number?
6          Was the Drive Cleaner account at that point,
7  do you know if it was a US account only?
8      A.   I don't recall.
9      Q.   But what you're saying, though, is that if she
10  had ten campaigns in one account and she had designated
11  it US, then all of those campaigns would only run in the
12  US, she didn't say one would run in the US and one in
13  Canada?
14      A.   Yes. That's the reason it's noted lower where
15  Ryan has to create multiple accounts, that's the reason
16  why there are so many accounts under Kristy Ross and
17  Globedat is because there were -- based on what the
18  country need was. We had to create a new account at that
19  time, which led us to doing it at the campaign level to
20  avoid multiple records inside the database.
21      Q.   Okay. And does Kristy in this email at the
22  top, does she respond to Ryan and tell him what account
23  numbers are running specifically the Drive Cleaner
24  advertisements?
25      A.   Yes.

135

1      A.   The reference to this would be one account
2  specific to Drive Cleaner and one account specific to
3  WinAntiVirus, both running run of network on US.
4      Q.   Okay. And so under that account for Drive
5  Cleaner and under that account for WinAntiVirus, she
6  could have multiple campaigns?
7      A.   She could, yes.
8      Q.   And if you look down to the next sentence, it
9  says: This should be for Drive Cleaner RON account I
10  would like. And it says: This will be in the cognac6
11  account. What is cognac6?
12      A.   It's a designation.
13      Q.   And is that similar to what you were referring
14  to before when it was mgwf, that kind of designation? So
15  before we were talking about designations that were going
16  onto the URLs. And do you know – do you recall what
17  cognac6, what that designation is?
18      A.   I believe it may have been the password used.
19  But the 6 was coinciding with the 6 used as the
20  designation within the URL inside the account. So the
21  cognac6 had the mgcg6, and cognac7 had the mgcg7.
22      Q.   So mgcg, is that myGeek cognac6?
23      A.   It may be.
24      Q.   But you're not sure?
25      A.   I don't set the designations.

134

1      Q.   And what accounts are those?
2      A.   555630 and 555632.
3          MS. ROBBINS: I'd like to have this marked
4  as FTC Exhibit 22.
5          (Exhibit 22 was marked.)
6      Q.   BY MS. ROBBINS: Do you recognize – what is
7  this? What are these documents?
8      A.   Communication between Kristy Ross and myself
9  and Ryan Maloney.
10      Q.   And are these true and accurate copies of
11  emails that myGeek retained that pertained to Kristy
12  Ross?
13      A.   Yes.
14      Q.   And I'd like you to take a look at the bottom
15  on the first page, 048193. There's an email from Kristy
16  Ross to Geoff Gieron and Ryan Maloney. Can you just read
17  that to yourself for a moment.
18      A.   Okay.
19      Q.   So in the email, she states in her first
20  paragraph, the last sentence: I would like 1 RON for
21  Drive Cleaner and 1 account for WinAntiVirus for US
22  traffic ONLY.
23          So does that mean that she would have one
24  account that she could have multiple campaigns in there
25  or was that a campaign?

136

1      Q.   And who does that?
2      A.   She does.
3      Q.   So in her own URLs, she sets whatever naming
4  convention she wants to designate that those are her
5  accounts?
6      A.   Right. Those are completely set by her.
7      Q.   I'd like to hand you what's been marked as --
8  will be marked as FTC Exhibit 23.
9          (Exhibit 23 was marked.)
10      Q.   BY MS. ROBBINS: Do you recognize these
11  documents?
12      A.   Yes.
13      Q.   And what are these documents?
14      A.   Communication with Ryan, Kristy, and myself as
15  well as Rachel Greenberg.
16      Q.   And who is Rachel Greenberg?
17      A.   At this point in 2006, she's overseeing traffic
18  and publisher solutions.
19      Q.   And are these true and accurate emails that
20  myGeek retained that pertained to Kristy Ross?
21      A.   Yes.
22      Q.   Now, I'd like to have you look at the first
23  page at the bottom. And who is that email from and to?
24      A.   From Rachel Greenberg to Ryan Maloney.
25      Q.   And what is she sending to Ryan Maloney in that

34 (Pages 133 to 136)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 37 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                                5/4/2010

137

1  email?
2    A.   Screen shots.
3    Q.   And can you review the next two pages, what are
4  these screen shots of?
5    A.   The screen shots are of a Drive Cleaner ad with
6  the pop associated with it.
7    Q.   And do you recall seeing these Drive Cleaner
8  ads?
9    A.   Yes.
10   Q.   And did you review these Drive Cleaner ads?
11   A.   I've reviewed them. I was not the one who
12 approved them.
13   Q.   But do you recall -- and were these Drive
14 Cleaner ads placed by Kristy Ross?
15   A.   Yes.
16   Q.   And do you recall -- seeing these ads displayed
17 this way as they are shown on these two pages, do you
18 recall seeing those?
19   A.   I've seen them how the page should look. I was
20 not a recipient of them, so I would not see it on a user
21 standpoint. But how I saw it should be how the user sees
22 it.
23   Q.   So on page 048264 and 048265, these are ads for
24 Drive Cleaner that you have seen before?
25   A.   Yes.

138

1    Q.   And these ads for Drive Cleaner were placed by
2  Kristy Ross?
3          MS. GURLAND: Objection; foundation.
4          MR. KIRSCH: Objection; foundation.
5          THE WITNESS: Yes, the designation of the
6  mgcg6 as identified before within this URL string
7  identifies that it was her URL.
8    Q.   BY MS. ROBBINS: And what about on 048265?
9    A.   Mgcg7, once again another designation by
10 Kristy.
11   Q.   Okay. Now, I'd like you to take a look at the
12 top email on the first page on 048263. And can you tell
13 me who is that email from and to?
14   A.   From Ryan Maloney to Kristy Ross.
15   Q.   And can you just read it out loud. What does
16 Ryan say to Kristy?
17   A.   Did you say read it out loud?
18   Q.   Yes, thank you.
19   A.   Kristy, See the attached. Even with making
20 sure the 6 and 7 are included at the end of the URL,
21 we're still getting pops. We'd really like to get this
22 going today. Is there any way to adjust the URLs.
23   Q.   So when he says even with the 6 and the 7 at
24 the end, does he mean the -- on page 048264, the mgcg6?
25 Is that what he's referring to when he says 6?

139

1          MS. GURLAND: Objection; foundation.
2          THE WITNESS: He is referring to the 6 at
3  end and the 7 on 65. The URL that was submitted to
4  us is listed above the screen shot, which is different
5  than what the end result URL is after that is placed. So
6  it's a redirect URL.
7    Q.   BY MS. ROBBINS: So the URL that's on the top
8  of each of these pages, 048264 and 265, is the URL that
9  Kristy put into her account?
10   A.   Correct.
11   Q.   Okay. And then the URL that's listed on the
12 actual advertisement --
13   A.   Is where the ad redirects to. At this point,
14 she was -- adfarm.mediaplex.com was understood to be a
15 service used for tracking.
16   Q.   Tracking what?
17   A.   Tracking impressions and clicks and activity
18 that ties back to conversions. It's not uncommon to have
19 the destination URL. Sorry. The URL that was given is a
20 common form of way that people kind of redirect to be
21 able to capture the information they need for tracking
22 purposes, optimization, calculation of sale and
23 performance. Yes, the end result URL was not the
24 destination URL that we approved but knew where it was
25 going.

140

1    Q.   Okay. Now, I'd like you to go to page 048266,
2  which is the fourth page from the front. And do you see
3  in the middle there's -- at the bottom is the email you
4  just read, the Ryan Maloney to Kristy email that you just
5  read into the record. And then above that, do you see
6  the email above that, it says Kristy Ross to Ryan Maloney
7  at 11:01 a.m. Who is that email from and to?
8    A.   It's from Kristy Ross to Ryan mall.
9    Q.   And are you cc'd on that email?
10   A.   I am.
11   Q.   And can you read into the record what she
12 states to Ryan Maloney.
13   A.   Ryan okay I see that. This is not a popup, it
14 is a flash in the website. I had no idea that -- no idea
15 that is what you were talking about, this is an example
16 of the scanner. If it is really a problem I can change
17 the page. The conversion is not as high. But this is
18 certainly not a popup or ActiveX.
19   Q.   And then when Ryan -- up above that email, does
20 Ryan respond to Kristy?
21   A.   Yes.
22   Q.   And when he says: I think we're ok with this.
23 I just need to check one more thing. Was he okay with
24 this because it was not a popup or ActiveX?
25        MS. GURLAND: Objection; foundation.

35 (Pages 137 to 140)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 38 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                                    5/4/2010

141

1    THE WITNESS: Correct. It was because the
2  notification, the warning was actually inside the page.
3  It did not disrupt the activity of the user, he was able
4  to get it approved. The view from Rachel was that she
5  was seeing it and immediately was concerned that it might
6  be representative of previous behavior, but this one was
7  actually embedded within the page so the page would still
8  be closable and not disrupt the process.
9    Q. BY MS. ROBBINS: So you're saying on 048264 and
10  265 that Rachel was seeing those popups on top of the
11  advertisement?
12    A. She's seeing it, assuming that it was on top
13  of. Kristy was explaining that it was within the course
14  of the ad.
15    Q. So Kristy was saying that this box that says —
16  so we're looking at 048264. And there's a box on top of
17  the advertisement that says: Warning. Drive Cleaner
18  found 948 dangerous files in your system. Get rid of
19  threat? Yes or no.
20    MR. KIRSCH: Objection. I think that
21  mischaracterizes the testimony.
22    MS. ROBBINS: I haven't asked the question
23  yet.
24    MR. KIRSCH: I know. But your long lead-in
25  mischaracterizes the testimony.

142

1    Q. BY MS. ROBBINS: So where that warning box is,
2  where it says: Drive Cleaner found 948 dangerous files
3  in your system. You're saying that Kristy says that's
4  not a pop up, that's actually flash in the Web site?
5    A. Correct.
6    Q. And that this is an example of their scanner?
7  Is that what Kristy said in her email?
8    A. That's what she's stating. But that popup
9  window would not be allowed to leave the confines of the
10  ad itself, which proved to be true, which is why it
11  was -- Ryan was able to give it the okay.
12    Q. So he was able to give it the okay because that
13  box on top of the ad was not actually a popup, it was
14  just a flash?
15    A. Correct.
16    Q. And can you tell us what that means, what flash
17  means?
18    A. What that means, it's there for viewing but
19  it's not disrupting the behavior. The page was still --
20  the window was still closable. You would not be able to
21  pull that window outside the frame of the browser. So
22  because it emulated activity but didn't actually disrupt
23  or cause any malicious behavior, he was able to get that
24  approved.
25    Q. Meaning that that Drive Cleaner found 948

143

1  dangerous files, what you're saying is that was just a
2  part of the entire ad, it was just a flash window on the
3  ad itself and not actually an active popup?
4    A. Correct. Similar to previous behavior, it was
5  not -- it looked the same, which was what caused the
6  initial alert. It was not behaving the same.
7    Q. So it wasn't the malicious behavior that you
8  had seen earlier where it was the popups coming up and
9  you're not actually able to X out of the big window
10  behind it?
11    A. Right.
12    Q. Which is what you were talking about before?
13    A. Right. So after Kristy gave this example and
14  this was able to go back to the partner, the partner
15  believed that that was not going to cause the same
16  problems that we're concerned that they would cause, so
17  it was able to proceed.
18    Q. Now, if you look at page 048268, which is two
19  pages after what we were just talking about, can you just
20  read that top email to yourself, please, where it says
21  Ryan Maloney to Kristy Ross at 12:51 p.m.
22    A. Okay.
23    Q. Now, just going back to when she responded to
24  Ryan saying, this isn't a popup, it's flash in the Web
25  site, in that email, did she anywhere deny that this

144

1  Drive Cleaner ad was her ad?
2    A. No.
3    Q. Did she anywhere in that email deny that she
4  approved this Drive Cleaner ad?
5    A. No.
6    Q. And in the email -- so who is this email from
7  and to on the top of 048268?
8    A. From Ryan Maloney to Kristy Ross copying me.
9    Q. Okay. And what is Ryan telling Kristy in this
10  email?
11    MS. GURLAND: Objection.
12    THE WITNESS: He's notifying her that the
13  two accounts set up specifically for run of network in
14  the US, each account specified to a different traffic
15  source, the bid price for the campaign running in each
16  account and the URL associated with it.
17    Q. BY MS. ROBBINS: And the two URLs that are
18  listed, the first one is account 555630; is that right?
19    A. Correct.
20    Q. And that landing page, is that the same landing
21  page that you see on page 048264, the Drive Cleaner ad
22  that we were just talking about?
23    A. Yes.
24    Q. And on the next account number, 555632, the
25  landing page, is that the same as the ad we've just

36 (Pages 141 to 144)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 39 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                5/4/2010

145

1  talked about on 048265?
2      A.  Yes.
3      Q.  And are both of those accounts set up to be run
4  in the US only?
5      A.  Correct.
6      Q.  And is this -- the two screen shots on page 264
7  and 265, is that how a consumer then would see that
8  advertisement?
9          MS. GURLAND:  Objection; foundation.
10         THE WITNESS:  Yes.
11     Q.  BY MS. ROBBINS:  And so US consumers would
12  then -- if these accounts were set up to only run in the
13  United States, then US consumers would have seen these
14  two ads; is that correct?
15         MS. GURLAND:  Objection; foundation.
16         THE WITNESS:  In theory, yes.  But
17  considering the URL was a redirect URL, I couldn't give
18  you 100 percent guarantee that that's the page that
19  anyone saw all the time.
20     Q.  BY MS. ROBBINS:  I'm not sure what you mean.
21  Because you saw this page, didn't you?
22     A.  This would be the page that was seen and
23  captured by Rachel.  I'm just saying given the course of
24  a redirect URL, if anything changed, we wouldn't have any
25  knowledge of it.  So what a US consumer saw, where, and

146

1  when, I couldn't give you a guarantee.  This was what was
2  approved.
3      Q.  But the two ads that are on 048264 and 265, you
4  approved these ads?
5      A.  Those would have been the ones that were
6  approved based on the communication with Kristy, yes.
7      Q.  And those were the two URLs that were put into
8  accounts 555630 and 555632?
9      A.  Right.  The adfarm.mediaplex.com.
10     Q.  Yes.
11     A.  Correct.
12     Q.  Those two links were the ones that were put
13  into those two accounts?
14     A.  Right.
15     Q.  And those two accounts were the ones that were
16  set up to run in the US only?
17     A.  Correct.
18     Q.  And before we leave this exhibit, I want you to
19  look at 048286, which is towards the back.  And if you
20  could just read that page, please.
21     A.  Okay.
22     Q.  At the bottom of that email, of that page
23  048286, Ryan sends an email to Kristy at 1:45 p.m.  And
24  what is he sending her in that email?
25     A.  He's giving her the login information for an

147

1  account that was created on her behalf.
2      Q.  And what's the login information for that
3  account?
4      A.  For the account number 555633, the login was
5  cognac8, password globedat1.
6      Q.  And so this is the login and password
7  information that he gave to Kristy for her 555633
8  account?
9      A.  Yes.
10     Q.  And cognac8, again, that was her naming
11  convention that she used at the end of those Drive
12  Cleaner ads when she put CG --
13     A.  The 8 would be associated with the mgcg8.
14     Q.  And when you look above that where Kristy is
15  sending an email to Ryan, is she sending him a link using
16  that naming convention?
17     A.  Yes.
18     Q.  And what is the link for, what account, do you
19  know?
20     A.  The link is for the 555633 cognac8.
21     Q.  And is that -- what product is that for?
22     A.  Drive Cleaner.
23     Q.  I'm handing you what's marked as FTC Exhibit
24  24.
25         (Exhibit 24 was marked.)

148

1      Q.  BY MS. ROBBINS:  Do you recognize these
2  documents?
3      A.  Yes.
4      Q.  And what are these?
5      A.  Communication between Kristy Ross and Ryan
6  Maloney with myself copied.
7      Q.  Okay.  And are these true and accurate copies
8  of emails that myGeek retained that pertained to Kristy
9  Ross?
10     A.  Yes.
11     Q.  I'd like you to take a look at the very last
12  page of this document.  The to and from is actually on
13  048203, and then the body of the email is 048204.  Can
14  you just read that, please.
15     A.  Okay.
16     Q.  Now, this email, what is he -- Ryan is emailing
17  to Kristy.  And what is he tell her in this email?
18         MS. GURLAND:  Objection.
19         THE WITNESS:  On the --
20     Q.  BY MS. ROBBINS:  The very last page.
21     A.  That he received a complaint from one of our
22  traffic providers on account 555192.
23     Q.  And is that one of the Kristy's accounts?
24     A.  Yes.  He was identifying that the URL or the
25  link that was used in that account differed from the

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 40 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                    5/4/2010

149

1 other ones that we had set up with her for the Drive
2 Cleaner effort with the AID equaling mgcg6, mgcg7, and
3 mgcg8.
4    Q.   Like the ones we were just talking about?
5    A.   Correct. So he suggested that we get some sort
6 of naming convention with those to help identify issues
7 or perhaps that being a cause of the complaint.
8    Q.   Okay. If you look towards the top of the page
9 before that, 048203, Ryan then emails Kristy again, and
10 he attaches a screen shot. Can you read that into the
11 record, that email that he says to Kristy.
12    A.   This is in support of the request that was
13 earlier. In that he believes that the behavior that was
14 causing the complaint was happening because there was no
15 reference to the AID equals whatever naming convention
16 she was using. Given that he has limited technical
17 knowledge, it was probably a best guess as in we were
18 seeing behavior on one URL that was not represented on
19 another, and that may resolve the problem perhaps because
20 of a missing element to the URL.
21    Q.   And what was the problem? What did he attach
22 to show her what the problem was?
23    A.   What was happening with the URL that did not
24 have the AID equals component.
25    Q.   Yes. And what was happening?

150

1    A.   A pop was initiating and it was redirecting to
2 amaena security worm.
3    Q.   And had you ever seen the amaena security worm
4 link?
5    A.   I had seen reference to it mainly through
6 partner complaints.
7    Q.   And so he says in his email: It appears that
8 the newest URLs with the aid=mgcg6 suppress the pops.
9    A.   Right.
10    Q.   So he was asking her if she could add that to
11 her URL so that way there would not be these popups; is
12 that right?
13    A.   Correct. Because the URLs were not direct URLs
14 as they had been in the past. They were running through
15 mediaplex or adfarm.mediaplex being redirected. He felt
16 that it was possible that missing this component was
17 causing it to have this type of behavior versus if it had
18 it, it was not having the type of behavior and complaints
19 that were being generated from this ad.
20    Q.   And when you say that they were partner
21 complaints, who were those partner complaints about?
22    A.   Traffic sources that would report complaints
23 coming from their user base.
24    Q.   And were those complaints particularly about
25 Kristy's URLs?

151

1    A.   It was particularly about the URL that was
2 only -- that ended at the CACHEBUSTER.
3    Q.   And were those CACHEBUSTER URLs submitted by
4 Kristy?
5    A.   Initially, yes.
6    Q.   And so Ryan sends Kristy an email saying in
7 your account 555192, with the older version of the URLs
8 we're getting pops, but with the ones that have the mgcg
9 on the end, we're not getting pops?
10    A.   Correct.
11    Q.   And then how does Kristy respond to him?
12    A.   She understood what he -- Okay I understand
13 your meaning now. I will try to get some new links by
14 tomorrow.
15    Q.   And this was an email that was sent by Kristy
16 to Ryan Maloney in response to his email below?
17    A.   Correct.
18    Q.   And in that email that she responds to Ryan,
19 does she say, this is not my ad? Does she deny that ad?
20    A.   No.
21    Q.   And did she ever say, I didn't approve this ad?
22    A.   No.
23    Q.   And I'd like you to take a look at page 1 and 2
24 of this exhibit, 048215 and 216. And if you could just
25 read that to yourself quickly. And do you see the email

152

1 on the bottom of 048215 where Ryan Maloney is emailing to
2 Kristy, saying: Just following up on yesterday's email.
3 Do you see that?
4    A.   Uh-huh.
5    Q.   And he states in the email that he had to pause
6 the 555192 account because -- was that because of this
7 problem with popups that he hadn't gotten the any links
8 from her yet?
9    A.   It was in regards to the complaints in the
10 email -- following that one that Ryan had sent her. And
11 it looks like he sends two consecutive emails prior to
12 her response. Because of increased complaints,
13 especially from new sources that were testing our -- new
14 traffic sources that we were testing with. So he had to
15 respond by suspending it until we heard back from her on
16 a change on those URLs.
17    Q.   When you say "her," you mean Kristy?
18    A.   Yes.
19    Q.   And did Kristy respond to Ryan on the first
20 page?
21    A.   On the first page? Yes.
22    Q.   And what did she say when she responded to him?
23    A.   She responded to him with the URL with an
24 aid=mgcog4.
25    Q.   And this email was from Kristy Ross to Ryan

38 (Pages 149 to 152)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 41 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                     5/4/2010

153

1   Maloney and it cc'd you on Friday, July 21st, 2006, at
2   1:08 p.m.?
3       A.   Correct.
4       Q.   And she says in her first line: Hopefully it
5   won't be too late to get this in, I finally got the link
6   from them. Correct?
7       A.   Correct.
8       Q.   And so in this email that she sent to Ryan and
9   to you, she didn't say that this wasn't her ad to begin
10  with, did she?
11      A.   Right.
12      Q.   And she in fact provided you with a new link
13  for that?
14      A.   Correct.
15           MS. ROBBINS: Take a five-minute break.
16           (A recess was taken from 2:25 p.m. to
17           2:33 p.m.)
18      Q.   BY MS. ROBBINS: I'd like to hand you what's
19  being marked as FTC Exhibit 25.
20           (Exhibit 25 was marked.)
21      Q.   BY MS. ROBBINS: Do you recognize these
22  documents?
23      A.   Yes.
24      Q.   And what are these?
25      A.   Communication between Robert McDaniel and Mike

154

1   Romoff of 360i.
2       Q.   And are these true and accurate copies of
3   emails that myGeek retained that pertained to Kristy
4   Ross?
5       A.   Yes.
6       Q.   I'd like you to take a look first at 047443,
7   which is two pages from the back. And also -- so 047443
8   and 047444. If you could just read that page to yourself
9   and look at the ad on the last page, 047444.
10      A.   Okay.
11      Q.   Do you recall seeing this ad on page 047444
12  before?
13      A.   Yes.
14      Q.   And is this an ad that Kristy Ross placed with
15  myGeek that you reviewed?
16      A.   Yes.
17      Q.   And do you recall seeing ads similar to this
18  that also had that scanning bar going across the middle
19  part where it says scan in progress?
20      A.   Yes, previous ads like the WinFixer.
21      Q.   And those are ads also that Kristy placed?
22      A.   Correct.
23      Q.   And is this how you saw the ad when you
24  reviewed it?
25      A.   Yes.

155

1       Q.   And do you know if this is how a consumer would
2   also view this ad?
3       A.   Yes.
4       Q.   And how do you know that?
5       A.   Because we can initiate the ad the same way the
6   consumer should see it.
7       Q.   And Mike emails Robert on the page on 047443,
8   and he says -- what does he mean by when he says: These
9   guys are throwing auto downloads. If you can please
10  could make sure you are not running them, I would
11  appreciate it. And he gives the link, and that link is
12  to this advertisement, right?
13      A.   He's saying that the link that he submitted to
14  us below is initiating an auto download of the product
15  without the user consent.
16      Q.   And if you could look at 047372, which is the
17  fourth page from the front -- fifth page from the front.
18  Can you just read that page to yourself, please.
19      A.   Okay.
20      Q.   So Mike emails Robert and says, these guys are
21  throwing auto downloads and gives the URL. And then what
22  does Robert do?
23      A.   Robert's inquiring if we are running that type
24  of ad.
25      Q.   And who is he inquiring that of?

156

1       A.   Me.
2       Q.   And what do you tell him?
3       A.   I claim that we have found the ad. It was
4   associated with one of Kristy's accounts and that that
5   account was removed immediately from Mike Romoff's
6   traffic source ID number.
7       Q.   So you reviewed this ad and you were able to
8   determine that this was one of Kristy's ads that she
9   placed; is that right?
10      A.   Yes, I was able to locate the ad to replicate
11  it before I could confirm.
12      Q.   So you replicated the ad, saw it was from
13  Kristy's account, and confirmed that it was her ad?
14      A.   Right.
15      Q.   I'd like to show you what's marked as FTC
16  Exhibit 26.
17           (Exhibit 26 was marked.)
18      Q.   BY MS. ROBBINS: Do you recognize these
19  documents?
20      A.   Yes.
21      Q.   And what are these documents?
22      A.   Communication internally from -- between Robert
23  McDaniel, Ryan Maloney, Geoff Gieron, and Steve Armstrong
24  and communication between Mike Romoff of 360i and Robert
25  McDaniel.

39 (Pages 153 to 156)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 42 of 121

**FTC v. Innovative Marketing, Inc. et al. Gieron**                    **5/4/2010**

157

1  Q.  And are these true and accurate copies of
2  emails that you retained that pertained to Kristy Ross?
3  A.  Correct.
4  Q.  Now, if you could look at page 047377 and 378,
5  have you seen these ads before?
6  A.  Only in result of complaints or on times that
7  we were able to replicate.
8  Q.  And was Mike Romoff -- what was Mike -- who
9  sent these ads?
10  A.  Mike Romoff.
11  Q.  And who did he send them to?
12  A.  Robert McDaniel.
13  Q.  And what was he complaining about with these
14  ads?
15  A.  The functionality of the ad upon initiating on
16  a user's desktop in a popup window.
17  Q.  And on page 047377, there is a smaller box on
18  top of a larger pox that says:  Searching for viruses in
19  your computer.  Virus infected files found: 180.  Do you
20  see that?
21  A.  Yes.
22  Q.  And there's a scanning bar across.
23  A.  Yes.
24  Q.  Have you seen that window before?
25  A.  I have not.

158

1  Q.  And do you recall — at the bottom of that page
2  where it says Security Administer and has the
3  drivecleaner URL, do you recall ever seeing that before?
4  A.  I've seen it as a screen capture back to me.
5  Q.  Did you ever review this ad and approve it?
6  A.  Not that format of the ad, I do not recall ever
7  approving.
8  Q.  Okay.  But you saw this in response to
9  complaints that you had from your traffic partners?
10  A.  Correct.
11  Q.  And were these ads — do you know, were these
12  ads ads that Kristy had placed?
13  A.  I believe they were associated back to her
14  account.
15  Q.  And do you know if — since Mike is the one
16  that sent these to Robert McDaniel as seeing them on his
17  network, do you know if this is how a consumer would have
18  seen them?
19  MS. GURLAND:  Objection; foundation.
20  THE WITNESS:  The assumption is that that
21  would be the indication.  I believe he has the
22  application on his computer, which he saw it again with
23  the use of Yahoo, but how he initiated it is -- I can't
24  be certain.  However, that would be the assumption.  It
25  was just why the concern came up.

159

1  Q.  BY MS. ROBBINS:  Now, as a result of all of the
2  problems and complaints that you had with Kristy's
3  accounts, did AdOn Network do anything to change your
4  policies once your relationship was terminated with
5  Kristy Ross and Globedat?
6  A.  Yes.  Upon receipt of the subpoena from
7  Microsoft and the further evaluation of what was
8  transpiring or being claimed to have transpired and
9  reflection of the previous working relationship, we felt
10  it was necessary that these types of ads should all be
11  extracted from the network in any capacity and allowed in
12  on a case-by-case basis.
13  Q.  When you say these types of ads, what do you
14  mean?
15  A.  Anything that would touch a person's computer,
16  whether legitimate or not.  So immediately anything from
17  a Norton Antivirus to a WinFixer ad, if anyone was
18  running any type of ad that looked similar, acted
19  similar, claimed to do something, all of them would be
20  immediately terminated from the network.
21  Q.  You mean any ad that claimed to —
22  A.  Fix, repair, scan.
23  Q.  Scan your computer, repair your computer,
24  things that had to do with your computer and its
25  functions?

160

1  A.  Correct.  And then in order to move forward
2  with anyone who had a known legitimate offering to a user
3  that would not result in a Microsoft subpoena, we would
4  review them one by one, do extensive research on them,
5  identify if they've had any business complaints, whether
6  or not they're ranked on CNET, CNETdownload.com.  Ensure
7  that every T was crossed and every I was dotted to ensure
8  that we did not have any potential harm to the network.
9  And we actually stated that in the Ts & Cs, terms and
10  conditions of the -- that the advertisers agree to that
11  those ads are not permitted unless permitted through out
12  of network.
13  Q.  And did you — in your terms and conditions
14  that you made once your relationship ended with Kristy,
15  did you actually add in certain product names into your
16  terms and conditions?
17  A.  Yes.  Every product name I believe probably
18  except for free repair.
19  Q.  Every product name of who?
20  A.  That came through Kristy Ross that was under
21  the guise of the subpoena from Microsoft.
22  Q.  So can you just give —
23  A.  Drive Cleaner, WinFixer, WinAntiVirus.  I think
24  we even included registry cleaners.  Anything that was
25  similar in nature, we wanted to put on the list to ensure

40 (Pages 157 to 160)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 43 of 121

**FTC v. Innovative Marketing, Inc. et al. Gieron**                      **5/4/2010**

161

1   that we took the necessary steps to move away from those.
2         MS. ROBBINS: Okay. We're done with our
3   portion.
4         MR. ARENSON: With the stipulation that we
5   can do authentication tomorrow, we will turn it over to
6   the defense.
7         (Discussion off the record.)
8         MS. GURLAND: Now defense, the defense
9   attorney -- I'm defense attorney Carolyn Gurland, and I
10  represent Kristy Ross. And I would like to start asking
11  Mr. Gieron some questions.
12
13        EXAMINATION
14  BY MS. GURLAND:
15      Q.  Mr. Gieron, I won't go through a lot of the
16  same background, but the same rules would apply. The
17  most important one for me is that if there's anything
18  that you don't understand that I'm asking or I haven't
19  been clear, then please tell me, and I'll rephrase it
20  before you answer.
21        So we went through some of your background.
22  Could you describe, though, for me AdOn or myGeek's
23  business.
24      A.  Our business is to be able to connect
25  advertisers with traffic that they're looking for in

162

1   search cost per click, popunder, both publisher initiated
2   or desktop initiated, and banners.
3       Q.  And what types of businesses are AdOn's
4   clients? And if I can use the convention, I'll just
5   refer to your company as AdOn, even though I appreciate
6   at one point and during the time that we were talking
7   about it was myGeek, but I'll just use AdOn for ease.
8   What type of business clients are AdOn's clients?
9       A.  Clients in the advertisers' side or the
10  publisher?
11      Q.  Either. Do you have two different types?
12      A.  Yes. We -- to kind of reiterate, since we do
13  not own any of our own traffic, we work with several
14  aggregators, networks, direct publishers out there to
15  supply traffic to advertisers. Our initial business
16  model had us not only either side, advertiser or
17  publisher, but were an in-between point with the
18  technology solution.
19        The clients that we work with on the traffic
20  side are those who aggregate traffic, whether directly
21  through people coming to them naturally, which is a
22  direct publisher relationship, aggregator of search
23  traffic, which would be companies like Adknowledge, Miva,
24  where they have hundreds upon hundreds of small search
25  sites that -- and domain parked sites that would drive

163

1   cost per click traffic.
2         And then on the pop side, we have the
3   publisher popunders, which runs through exchanges like
4   Yahoo's Yield Manager or zedo.com or direct publisher
5   relationships. Or on the other side, it would be desktop
6   application providers, those who supplied an application
7   to a user who had agreed to then receive ads.
8         Banner inventory is only sold to direct
9   publishers and publisher networks. Those are, you know,
10  actual living pages on the Internet.
11      Q.  So you have advertising clients on one hand; is
12  that right?
13      A.  Yes.
14      Q.  And you have publishing clients on the other
15  hand; is that correct?
16      A.  Correct.
17      Q.  And do the interests -- the business interests
18  of the advertising clients ever conflict with the
19  interests of the publishing clients?
20      A.  Yes.
21      Q.  And how do those interests sometimes conflict?
22      A.  Interests are advertisers want specific
23  traffic, whether it's at a low cost/high volume access to
24  their users. But at the same time, the traffic source
25  may not want the advertiser due to previous experience,

164

1   not willing to pay enough to be shown to their user base.
2         So there's a lot of managing between the
3   needs of both sides. And we give a great deal of
4   flexibility to both sides. I think as highlighted, we
5   allow advertisers to select traffic and geo. We also
6   allow publishers or traffic sources to deselect
7   advertisers based on the wants and needs of both
8   businesses.
9       Q.  So is it fair to say that one of the challenges
10  of your business at AdOn is to balance the client -- the
11  business interests between the advertising clients and
12  the publishing clients?
13      A.  Yes. And then we have salespeople, too, so
14  that's even worse.
15      Q.  Another layer of complexity. We don't go into
16  that one today.
17      A.  Not on the record at least.
18      Q.  So I want to talk to you first about -- and
19  I'll go back to the naming convention from the FTC's
20  Exhibit FTC 4 already in evidence. And that was the
21  account manage accounts document that we looked at
22  earlier.
23      A.  Right.
24      Q.  And I wanted just to talk to you briefly about
25  the way in which accounts are opened. Now, you had said

41 (Pages 161 to 164)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 44 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                    5/4/2010

165

1    that your primary contact with Globedat was Kristy Ross;
2    is that right?
3        A.   Correct.
4        Q.   And was there anyone else from Globedat that
5    you knew of that you talked to from Globedat other than
6    Kristy Ross?
7        A.   No.
8        Q.   But we talked also about this system of
9    managing accounts before; is that right?
10       A.   Correct.
11       Q.   Now, when a person would open up — I mean, if
12   after Kristy Ross opened up -- just take the first one on
13   FTC 021962, the first page of FTC 4, which shows account
14   85658. If Kristy Ross were to have been the one that
15   opened that account, would she get a login and a password
16   specific to that account number?
17       A.   She would create her own login and password
18   specific to that account.
19       Q.   And Kristy Ross opened up more than one
20   account. In fact, we saw an exhibit that showed dozens
21   of accounts that she opened; is that correct?
22       A.   Right.
23       Q.   And for each of those accounts, would Kristy
24   Ross be able to set a different login and a different
25   password if she wanted to?

166

1        A.   Yes.
2        Q.   And would she be able to give those logins and
3    those passwords to anyone within -- any one of the other
4    employees that worked at her company that she wanted to?
5        A.   Absolutely.
6        Q.   And did AdOn have any policy against that or
7    was that something that was common that people did?
8        A.   It's very common. If you have a media buyer,
9    they usually are -- they can be -- tend to be lower on
10   the chain. They may have other people working for them
11   or with them. So the utilization of the user name and
12   password is up to the account creator. Should the
13   person, whether it was Kristy or anyone else, lose it,
14   they have got a lost password link so they can request a
15   new one. Or they can go into the system and change the
16   password at any time.
17          So it's also not uncommon for an advertiser
18   who no longer wants other people to access a certain
19   account or someone else in the company gives the person
20   who created the account is no longer there, will go in
21   and have all the passwords changed in order to protect
22   the information in their account.
23       Q.   And the only thing that the person on, if you
24   take each specific account, then would need in order to
25   change things would be to have that initial login and

167

1    password; is that right?
2        A.   That was specific to the account.
3        Q.   To that one account?
4        A.   Right.
5        Q.   And after they had that information, they could
6    change it to anything they wanted; is that right?
7        A.   Correct.
8        Q.   So it would be within your system, it would be
9    possible if there was, say, account 85658, if Kristy Ross
10   were to have given this account -- the login and the
11   password for this account to another employee, could that
12   employee go in and change the login and password so that
13   Kristy Ross herself couldn't even get back into that
14   account?
15       A.   Yes.
16       Q.   Now, we were looking at an exhibit -- the same
17   exhibit actually on the next page, 021963, shows Marc
18   Cohen. Do you know whether or not Marc Cohen worked also
19   as an employee at the same company as did Kristy Ross?
20       A.   I do not.
21       Q.   Okay. And then on the same exhibit, there's
22   a — on 021971, there's an M D'Souza. Do you know
23   whether or not an M D'Souza worked also as an employee at
24   the same company that Kristy worked at?
25       A.   I do not.

168

1        Q.   Now, taking — I guess we could take any of
2    these. Take FTC 021974. Do you have that page of FTC 4
3    in front of you?
4        A.   Uh-huh.
5        Q.   And it says at the top account 90448. Do you
6    see that?
7        A.   Correct.
8        Q.   And you see that the account holder it says
9    Kristy Ross?
10       A.   Uh-huh.
11       Q.   And down lower it says company Globedat and
12   address 2800 Western Avenue, Seattle, Washington. Do you
13   see that?
14       A.   Correct.
15       Q.   Now, were you aware from conversations or
16   emails from Kristy that she was in fact living in
17   Seattle, Washington?
18       A.   Early on in our relationship -- our working
19   relationship, I was familiar with the Seattle address
20   until she had moved to Virginia or Maryland because I
21   know that there was communication where we'd sent her
22   some things that way.
23       Q.   So you sent her things to the address that —
24       A.   Not this one. To the Maryland or Virginia
25   address.

42 (Pages 165 to 168)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 45 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                                    5/4/2010

169

1    Q.   So you were aware that she was residing in
2  Seattle during a portion of your business relationship?
3    A.   That was my understanding.
4    Q.   And did you do recognize it says the primary
5  phone number is 206-730-2606 that she offered as the
6  primary phone? Do you recognize that as a Seattle,
7  Washington, exchange?
8    A.   I don't. I recognize the 206 number from other
9  times where we've scheduled phone calls together.
10   Q.   Were you aware that an individual Conrad
11 Raphael had dealings with AdOn separate from Kristy?
12   A.   The name is familiar to me.
13   Q.   What does the name suggest to you or what did
14 you know about Conrad Raphael?
15   A.   I don't have a great deal of knowledge since my
16 primary focus was always on the advertiser side of the
17 business. But I have heard that name before.
18   Q.   In what context?
19   A.   In regards to information on the traffic side
20 of the bids.
21   Q.   And was he — your recollection is what was
22 Conrad review doing with AdOn, if anything?
23   A.   I only heard the name.
24   Q.   Just vaguely?
25   A.   Right. It was one of the things that my plate

170

1  was growing rapidly.
2    Q.   Was this when you were managing 16?
3    A.   Yes.
4    Q.   So we were up to 16 already through your
5  trajectory through AdOn?
6    A.   Yes.
7    Q.   So I want to look then briefly at the — what
8  was FTC 5, which is the account funding information. Or
9  a group of documents about account funding information.
10   A.   Right.
11   Q.   And we had looked at — take the first page,
12 023162, it had an American Express name on card MD. And
13 you talked about this a bit during the examination with
14 Ms. Robbins, you were talking about — I don't want to
15 put words in your mouth. Was it common for the
16 individual, the employee who was opening up accounts, to
17 give you a different credit card than that which was in
18 their own name? Was that a common occurrence?
19   A.   It's not common, but it's known to happen and
20 understandable as long as the pattern of funding is not
21 disrupted. Usually if someone's using a card unbeknownst
22 to the cardholder, we'll be notified by the bank within
23 due time. And obviously the length of time. When the
24 account is initially set up with the account holder and
25 the cardholder, those two have to match because we do a

171

1  standard fraud verification, which is trying to make sure
2  that the address information, name information matches,
3  that the person that — should it be Kristy that signed
4  up an account that Kristy Ross was aware that her credit
5  card was used to open up the account.
6         After that, you start building up a
7  relationship, and volume increases as I mentioned before
8  with American Express, it's not uncommon to have multiple
9  cards used from individuals in the company to sustain
10 because AmEx has as a very stringent fraud department
11 where they start seeing activity, and they'll start
12 shutting off the card, and it's terrible on a weekend
13 when no one is around.
14   Q.   So they're focused on spending limits from
15 American Express?
16   A.   Correct.
17   Q.   So that we had talked about Kristy Ross gave
18 you her credit card initially when she opened up the
19 account; is that right?
20   A.   Yes.
21   Q.   And is it fair to say that when she first
22 opened up the account she wasn't doing as much volume and
23 the charges weren't as large as they were later on over
24 time?
25   A.   Correct.

172

1    Q.   And when the charges came much larger over
2  time, is that when these different American Express cards
3  in the name of MD or — let's see. On page —
4    A.   Daniel Sundin.
5    Q.   Daniel Sundin is on page 023171. So when
6  Daniel Sundin's Visa card was used, is that in a time
7  period when the charges were larger on American Express?
8    A.   Yes. Or if a new account is being opened.
9  There could be various reasons. Given the nature of the
10 communication between Kristy and myself and employees
11 within the company, we were very familiar that she had to
12 utilize additional cards in order to sustain spending at
13 that volume.
14   Q.   And you had talked when you were speaking to
15 Ms. Robbins about that there are times when a lower level
16 employee uses a card of a president of a company.
17   A.   Right.
18   Q.   In your experience, why is it that the low
19 level employee has to use the president's credit card?
20   A.   If you were using my company as an example,
21 there's one company credit card in our entire company
22 that's in the president's name. And if I choose not to
23 expense an item and it's preferred that I use that,
24 especially if I'm purchasing equipment for the company,
25 they prefer to keep it on company cards versus — I

43 (Pages 169 to 172)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 46 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                                    5/4/2010

173

1  prefer my own for the miles, but --
2     Q.  But the president would be the one who had to
3  approve the charges if they're larger?
4     A.  Right.  The card would come through them and
5  how they handle it internally.
6     Q.  And the lower level employee in some instances
7  wouldn't have authority to approve larger charges?
8     A.  Correct.
9     Q.  There were some of the billing accounts that
10 showed a Bahrain address.  Are you familiar with that?
11 Some of the account opening statements?
12    A.  Right.  That were out of country with a PO box?
13    Q.  Correct.
14    A.  Yes.  That's on Exhibit 3.
15    Q.  And you didn't believe that Kristy Ross was
16 living in Manama, Bahrain, during your business
17 relationship, did you?
18    A.  No.
19    Q.  And is the reason that Manama, Bahrain, was
20 listed there, is that because that's where some of the
21 billing information for some of the accounts went?
22    A.  Right.  The system that we have has a few items
23 that have to be confirmed.  The address, the zip code,
24 the card number all have to match exactly in order for
25 the charge to go through.  So if the card that needed to

174

1  be used from Kristy or someone in her organization who
2  was funding the account, that information was not
3  negotiable in having to be placed into the system.  MD,
4  yes, because there's so many variations of a name that
5  the name field isn't necessary, so that was not a
6  sustained field.
7     Q.  So the address of the cardholder had to match
8  the billing information or it's game over?
9     A.  Right.
10    Q.  So you didn't think for a minute that Kristy
11 Ross was trying to convince you that she lived in Manama,
12 Bahrain, right?
13    A.  No.  But I also knew that she did a lot of
14 internal travel, so it kind of went with the program.
15    Q.  Did you ever open new accounts for Kristy in
16 which you would prefill some of the account information?
17    A.  Yes.
18    Q.  Did that ever happen?
19    A.  Yes.
20    Q.  And in those instances if she was going to use
21 another person's credit card that had a Bahrain address,
22 would that be the address that was put in the address
23 field?
24    A.  We would -- if we were requested to open
25 additional accounts on her behalf because if she was

175

1  traveling, if we wanted to prep for something that was
2  coming based on what she was stating, we would use a
3  standard account to model everything after.  More than
4  likely ones with the Seattle or Maryland address.  The
5  funding then would have to come from her because we don't
6  allow access to the credit card information to anybody.
7  It's buried very keep inside our database so all that
8  information has to be entered by her, but we would try to
9  get the easy legwork done.
10    Q.  Okay.  Understood.
11       Looking at -- looking under my naming
12 convention here, has been marked as Exhibit KRG 4 P 1
13 through P 6.  I'd ask you just to look at that.  And it
14 will be the same question.
15       (Discussion off the record.)
16    Q.  BY MS. GURLAND:  Same litany of questions.  Do
17 you recognize the entirety of this exhibit as emails that
18 AdOn had with -- correspondence with Kristy kept in the
19 regular course of business at AdOn?
20    A.  Yes.
21    Q.  Directing your attention to page 4 of that
22 exhibit, it's -- I'm looking at the top a July 29th, '05,
23 1:56 p.m. email from Kristy Ross to you.  Do you see
24 where she provides right before her sign-off, my number
25 to contact me is 206-730-2606?

176

1     A.  Uh-huh.
2     Q.  And do you recognize that as the number that
3  you did use to contact Kristy Ross?
4     A.  Yes.
5     Q.  Was that her cellphone number, do you know?
6     A.  I don't know, but I did not believe it was.
7     Q.  Okay.  And when you needed to get in touch with
8  Kristy, did you ever have problems finding her or
9  contacting her?  Would she return calls from you?
10    A.  It could take a few days.
11    Q.  If she was traveling?
12    A.  If she was traveling primarily, yes.  The
13 easiest way we were able to get ahold of her was email.
14 I pushed probably more so for phone communication to make
15 sure that she felt comfortable enough to call me,
16 especially if I was going to be out of the office or if
17 she needed something immediately.  Once again, for a
18 period of time, she was one of the top ten spenders of
19 the company, and she had no salesperson associated with
20 her, so it was my direct relationship that I had to make
21 sure I kept nurturing, so I would constantly give her
22 reference to myself to get ahold of me.
23    Q.  And did you find her to be responsive either
24 through email or telephone when you needed to speak with
25 her?

44 (Pages 173 to 176)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 47 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                          5/4/2010

177

1    A.  Absolutely.
2    Q.  Looking at page 5 and under my mark of 5 on
3  this exhibit, a July 29th, '05, email from Kristy Ross to
4  you at 1:01 p.m.  Do you see that?
5    A.  Uh-huh.
6    Q.  And Kristy writes:  Thanks we've added some.
7  Conversion has been really low yesterday/today so we're
8  trying to figure out what the issue may be.  Do you see
9  that?
10    A.  Yes.
11    Q.  What does conversion mean?
12    A.  A conversion in traditional sense is a
13  completion of a goal or sale.  So if someone's on the
14  Internet -- say Amazon is trying to sell books, a
15  conversion to them would be someone completing the sale
16  of the book.  It allows you to calculate your return on
17  investment on advertising dollars.  So whatever the
18  success metric is that they're either being paid on,
19  she's being paid on, the company is making money on, that
20  would be the success metric that she was looking for.
21    Q.  Now I want to direct your attention to exhibit
22  marked Exhibit KRG 5 pages 1 through 8, a premarked
23  exhibit.  And same question for all this exhibit pages 1
24  through 8.  Do you recognize these as correspondence
25  between Kristy Ross and you kept in the ordinary course

178

1  of AdOn's business?
2    A.  Yes.
3    Q.  Looking at page 7 of that exhibit, I'm looking
4  at in the middle of the page a Wednesday, August 3rd,
5  2005, at 1:08 p.m. email from you to Kristy Ross.  Do you
6  see that?
7    A.  Uh-huh.
8    Q.  And you identify -- well, sorry.  Go first to
9  the email directly below that.  Wednesday, August 3rd,
10  2005, 9:59 p.m., Kristy writes:  We were just looking at
11  the low numbers and conversion on the traffic today.
12  Please let me know when it's fixed and what the problem
13  was.
14          Then you respond to Kristy August 3rd, 2005,
15  1:08 p.m.  The issue was a backend tag that had to be
16  changed.  This has been done now and you should see the
17  volume start to pick up.
18          What does that mean, a backend tag that had
19  to be changed?
20    A.  More than likely it was referring to something
21  on the engineering side where the traffic could be
22  referred to as a traffic tag, but the feed information
23  that was being placed by the traffic source.  This is --
24  2005, this was fairly early in our time period with cost
25  per view advertising.  So something was preventing the ad

179

1  from going out.  So once that resulted and we also placed
2  500 of credit in her account, it -- once it picked up,
3  everything was fine.
4    Q.  Is the tag referring to a URL in any way?
5    A.  The tag -- we often refer to traffic tags.
6  Those could be -- if it's a publisher site, it's a
7  JavaScript tag placement.  But the XML feed would more
8  than likely be the reference that would be used if she
9  was utilizing cost per view.  We would have been fairly
10  new and only working with a handful of partners.
11    Q.  And is it a link when you're talking about --
12    A.  It's a -- do you remember the feed result
13  information from a previous exhibit?  There was a great
14  deal of code that goes with it, and that's given to the
15  partner where they're able to place to allow
16  communication between our servers and their servers.
17    Q.  And if there's even -- I saw many, many digits
18  and ampersand and a dash and a zero.  If one of those or
19  a couple of those gets dropped or screwed up, can that
20  cause problems with getting to the right place?
21    A.  It would cause communication problems between
22  us and them, correct.  So, for example, if something had
23  been altered, then one -- you would start seeing
24  discrepancies in the tracking between the two parties.
25  And we have a team of people that is dedicated to

180

1  watching that to ensure that if 100 impressions are
2  called for and 100 are returned that each side comes back
3  with 100.  If any variance happens, then the engineers
4  immediately pause everything to look at what variation
5  could have happened.  Could there have been a change in
6  the tag.  But it would disrupt communication between the
7  two sides.
8    Q.  And sometimes are the engineers the ones who
9  are responsible for a change in the tag?
10    A.  The implementation, whether it's the tag or the
11  implementation on either end, correct.
12    Q.  So if there was a change in the tag, would it
13  necessarily mean that it was you who changed it?
14    A.  No.
15    Q.  Because are there other people that you work
16  with who have access to the code who could screw it up
17  all on their own?
18    A.  The code stays standard across.  The only
19  variables are the ones that we've highlighted, which
20  would be like the account number of the traffic source,
21  like the 110077.  As the -- as time goes on and
22  technology is being refined or developed, yes, there is a
23  potential always --
24    Q.  For human error?
25    A.  Anytime you're pushing anything in a technical

45 (Pages 177 to 180)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 48 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                    5/4/2010

181

1    environment, whether you're Google or us, when something
2    gets pushed, something completely unrelated can break,
3    yes.
4        Q.   And just because you were head of a team of 16
5    people, because of the fact that there would be a problem
6    with some kind of code, it wouldn't necessarily be
7    because it was your key stroke that was the error?
8        A.   No. The reference here was there was something
9    in the backend, which means beyond the control of what
10   myself or my team has access to and what we work with.
11   We emulate our environment exactly as the advertiser
12   would see it. So whatever Kristy Ross dealt with, I
13   would deal with. Everything was set correctly in the
14   account, and it wasn't going anywhere. So whether there
15   was minimums set in place that weren't low enough or rev
16   shares were unaccounted for so it was preventing the
17   traffic from coming into her account specifically.
18       Q.   And that same question, sort of off the topic
19   of this particular page, but same thing with when you're
20   talking about a URL, if there's one or two segments of
21   the code that are dropped or changed, even if it's a dash
22   or an ampersand or a zero, could that have an effect on
23   what that user could be seeing? Could that change
24   everything?
25       A.   Absolutely. Which is what we were referencing

182

1    before when we believed that the missing AID number off
2    of one of the missing URLs in her account was potentially
3    causing the issues that were being seen.
4        Q.   Okay. So even something as small as a dash or
5    a zero could change completely the ad that the user sees?
6        A.   Changes it to a certain degree. More than
7    likely, it will render the ad invalid or it will break
8    the ad where there's nothing to be seen. You'll receive
9    a broken -- an error from Microsoft or something like
10   that. To completely change the behavior from innocent to
11   malicious, not likely. That's a different type of
12   change. Usually what happens is you're breaking the
13   connection between the server that the ad is being sent
14   from, not changing the overall behavior. So would it
15   change what they're seeing? Yes. Would it change to
16   where they're receiving something that was a variation of
17   what was there? It's unlikely. There's always a
18   possibility for anything. But it's highly unlikely.
19   More likely you would see the break because it wouldn't
20   be able to communicate. No different than what I was
21   saying before between our company and the traffic
22   source. Any slight change would cause a break and not be
23   able to communicate to each other.
24       Q.   But it is fair to say that when you're looking
25   at a URL, every character has a significance?

183

1        A.   Yes. I don't understand code, but yes.
2        Q.   In the same exhibit, page 4 to 5 in KRG 5, you
3    see at the very, very bottom of the page August 4th,
4    2005, 4:47 p.m., an email from you to Kristy. The
5    subject is CPV RON. And you're telling her about a
6    number of things -- I see the words conversion, RON,
7    converting closer to where you wanted to. You say: I'm
8    watching this daily. And at the end, you say, Thank you
9    for being so great to work with, before you sign off.
10            Did you find Kristy Ross to be great to work
11   with? Did you mean that when you wrote that to Kristy?
12       A.   Yes, absolutely.
13       Q.   And what about Kristy made her great to work
14   with such that you would have written that to her?
15       A.   We were -- the level of communication was
16   strong between her and I. And eventually between her and
17   Ryan. The times we got to speak on the phone, they were
18   pleasant. When you deal with advertisers and people
19   spending their own money, their money or their company's
20   money, there's different ranges. You either have the
21   ones that they feel like you're their slave or the ones
22   that when they come across a problem, especially since
23   this was kind of early in our foray into the cost per
24   view environment, she was patient. She pushed for things
25   that they needed but not pushed for things that they

184

1    needed in a way that was damaging or irritating.
2        Q.   Directing your attention now to what I have
3    marked as KRG 6 pages 1 through 11. It's been
4    premarked. If you could take a look at that. And same
5    question you'll hear a lot. Do you recognize these to be
6    emails between you and Kristy Ross that AdOn kept in the
7    ordinary course of its business?
8        A.   Yes.
9        Q.   And looking at an August 9th, 2005, 2:46 p.m.
10   email from you to Kristy, you write that you've suspended
11   certain account numbers. And you write: Until I hear
12   back from you on the resolve on the sudden change on
13   WinFixer's end with delivery of their ad. Do you see
14   that?
15       A.   Uh-huh.
16       Q.   And Kristy writes back at 11:47 a.m. on the
17   same day: Thanks it seems like they lost the code or
18   something on them. I'm trying to contact the company to
19   fix them. I'm not sure what happened. Appreciate the
20   heads up. Do you see that?
21       A.   Yes.
22       Q.   Now, these accounts that are listed here, 89573
23   I think we've seen and the other two, were those accounts
24   that you associate with Kristy Ross because she was the
25   person listed who opened them with you?

46 (Pages 181 to 184)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 49 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                    5/4/2010

185

1    A.  And she was the one who I communicated directly
2  with about these accounts.
3    Q.  So you associate them with Kristy because she
4  was sort of the face that you had when you were dealing
5  with the accounts?
6    A.  Right.
7    Q.  But as you look at the accounts, do you know
8  whether or not there was somebody else besides Kristy
9  Ross who was accessing these accounts?
10   A.  I do not.
11   Q.  And do you know as of that time in light of
12  what we spoke about before about how an individual who
13  was working with you could share their login and password
14  with anyone, do you have any assurance that there was not
15  someone else at the company who, albeit Kristy would have
16  had to given her password to, who wouldn't have changed
17  something in the company?
18   A.  No.  There was never any indication that we
19  would need to research the login access.  Anytime we've
20  had any sort of complaint where someone believes that
21  that's occurring in the company, we have a report that
22  shows the last 30 days of IPs who have logged into the
23  account and allows us to kind of -- I'll start hunting
24  down where the IP originated from to get a sense of if
25  something was happening --

186

1    Q.  You mean like an unauthorized user?
2    A.  Even if someone who was authorized based on
3  having the password and login information.  If we can
4  identify that someone else has been in there, usually
5  that's the route we take if there was concern over that.
6  Based on Kristy's response, I think she believed that
7  there was something going on downstream that wasn't
8  necessarily coming from the URL inside the account but
9  something on the side of where WinFixer was coming from.
10   Q.  And what type of things could occur on the
11  account side that would cause concern or that would cause
12  a sudden change on WinFixer's end with delivery?
13        MR. ARENSON:  Objection; foundation.
14        THE WITNESS:  Inside the account, for
15  someone to go into each of them to alter them to have the
16  same result?  I don't know what exactly could change.  As
17  you stated before, anything can happen.  The change that
18  was seen was not indicative of a slight alteration to the
19  URL because it didn't break communication, it altered
20  functionality.  So based on what she's saying --
21   Q.  BY MS. GURLAND:  So the lost code?
22   A.  It appears that they lost the code.  She's
23  referring to WinFixer, and she's trying to contact the
24  company referring to WinFixer outside of Globedat and to
25  see what was going on.  There were several instances, and

187

1  I'm sure we'll come across them, where she's referring
2  back to something on the WinFixer side altered.
3    Q.  And something on the WinFixer side is the
4  programmer who's responsible for the links?  Is that what
5  we're talking about?
6        MR. ARENSON:  Objection; lacks foundation.
7        THE WITNESS:  Whoever it is that --
8  whoever's controlling the WinFixer at -- the URL calls to
9  the WinFixer servers.  If they do an update, they could
10  change the functionality of the ad.  If they choose to
11  change it themselves based on what they're trying to
12  accomplish, anything could be handled back at that point.
13   Q.  BY MS. GURLAND:  When you say that point, you
14  mean the point of the server, right?
15   A.  Right, the place where WinFixer exists.  All we
16  have is a URL that sendS a note back that says, hi
17  WinFixer, this is so-and-so.  We'd like to have the ad,
18  please.  They can return it.  Earlier than this in the
19  Internet stage, there were people who changed the URL if
20  you wanted to change the behavior.  Then they realized
21  you didn't need do that.  You just need to change what
22  happens on the server to change the behavior, whether
23  it's intentional or not.
24   Q.  So if somebody has access to the server, and
25  we're talking about someone within the company, somebody

188

1  dealing with WinFixer, and they're creating ads -- is
2  that how it works, that the people within the company are
3  the people who create ads; is that right?
4        MR. ARENSON:  Objection; lacks foundation.
5        THE WITNESS:  They're creating the result of
6  what the ad activity is supposed to be.
7    Q.  BY MS. GURLAND:  Did you -- was it your -- in
8  dealing with Kristy and based on your experience, did you
9  have the belief that she was herself making up and
10  creating ads, the actual content of the ads?
11   A.  For a great deal of my time working with her, I
12  believe that she was a funded individual to go out and
13  purchase traffic for affiliate-based advertising.  Just
14  on the communication.  And utilizing things like iPod
15  Premium, AmEx Travel, WinFixer, I just thought she
16  happened to find something that happened to work very
17  well for her.
18   Q.  And when you say affiliate ads, what are those?
19   A.  Affiliate ads are companies and ads that are
20  submitted by a given advertiser who has no intention of
21  spending their own money to generate traffic.  They in
22  turn put these onto networks, a company like a Neverblue,
23  a Commission Junction.  What's where eBay goes, Apple
24  store.  They prefer other people to go spend their money,
25  and they will give a bounty for a conversion or a sale or

47 (Pages 185 to 188)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 50 of 121

**FTC v. Innovative Marketing, Inc. et al. Gieron**

**5/4/2010**

189

1  a completion of an activity.
2      Q.   So is the motivation for the affiliates in your
3  experience to have the greatest amount of sales?  Would
4  that be a simple --
5      A.   Sales, volume, access to traffic, absolutely.
6      Q.   And in your experience, do affiliates ever work
7  with the content of the ad itself?
8      A.   No.
9      Q.   Okay.  Now, we talked earlier about the fact
10  that before you would ever run an ad at AdOn, you would
11  either yourself or somebody on your team would check the
12  content of that ad; am I correct about that?
13      A.   Correct.
14      Q.   In fact, AdOn had a system in which before the
15  account could be a live account, somebody would have to
16  go and check the URL of each and every ad that an
17  advertising client wanted to run on your network; is that
18  right?
19      A.   Correct.
20      Q.   Okay.  And if you found any ad when you looked
21  at it that violated your policies or your guidelines,
22  would you let that ad run or would you tell them no way?
23      A.   Oh, we would immediately keep it inactive and
24  identify the advertiser right away.  It depended on what
25  type of activity was being seen and obviously who the

190

1  advertiser was.  If it was completely malicious and
2  started infecting the customer service rep's computer --
3      Q.   Shut it down right away?
4      A.   It wouldn't even go live.  It would be deleted
5  from the system and notified.  But a lot of it was we
6  wanted to make sure we could reference it back.  The
7  system would keep it inactive and away from our partners
8  until we heard from the advertiser.  If needed to, we
9  would suspend the account.
10      Q.   And you mentioned the other thing that played
11  into this was the individual with whom you were dealing,
12  correct?
13      A.   Correct.
14      Q.   And if at a point in time you came to the
15  belief that there was somebody with whom you were
16  working, an advertising client with whom you were working
17  that was intentionally placing malicious ads on your
18  system, would you continue to work with that individual
19  or would you not continue to work with that individual?
20      A.   Not continue to work with that individual.
21      Q.   And that's because you have other clients to
22  protect; is that right?
23      A.   Correct.  We balance both sides of the house.
24      Q.   In the same email or the same chain, KRG 6, 1
25  through 11, I am look at page 3 of my copy.  It's your

191

1  page 3.  An August 9th, 2005, 12:13 p.m.  Do you see that
2  at the top?
3      A.   Uh-huh.
4      Q.   So I'm going on the one below that to start, an
5  email from you to Kristy Ross, August 9th, 2005, at
6  3:05 p.m.  And I think that what we were -- this is the
7  same chain in which we were discussing a change in the
8  behavior of WinFixer ads just to orient you.  And you
9  write at 3:05 p.m. to Kristy:  Looks like it started
10  today.  I looked at the ad yesterday showing it off as an
11  example of how to correctly submit an ad with a download
12  on the second page.
13          What were you talking about there?  Did you
14  show somebody the ad that Kristy had sent you the day
15  before?
16      A.   Uh-huh.
17      Q.   And that was in a positive light; is that
18  right?
19      A.   Yes.
20      Q.   And can you just explain what you were trying
21  to --
22      A.   The guidelines of the -- of those advertising
23  on our cost per view traffic or popunder traffic are very
24  clearly laid out to everybody.  We -- if you have a
25  download associated with your ad because you are showing

192

1  a landing page, you're showing your actual page, not a
2  static image or something that leads into it, if there is
3  a prompt for a download, free scan, download now, any of
4  these items, when the user clicks on it, it must take
5  them to a second page, which then they're allowed to go
6  ahead and move forward with the download process.  The
7  fear is, you let a user inadvertently hit the page,  and
8  now something is downloading without them realizing that
9  they've agreed to it, it just made the process easier
10  because we wanted to make sure that we protected the user
11  base of these desktop providers because especially the
12  desktop providers spend a great deal to market out these
13  products to get these bundled in with.  However, their
14  attrition rate is very difficult to manage on their end.
15      Q.   Okay.  So when you told her that you showed off
16  her ad as an example of how to correctly submit an ad,
17  you said that because it was correct?
18      A.   Correct.
19      Q.   Was it a URL that you had sent to her, you
20  checked at or about the same time the same day as she
21  sent it to you?
22      A.   Yes.
23      Q.   And you saw that that ad behaved properly?
24      A.   Yes.
25      Q.   In fact, in an exemplary fashion?

48 (Pages 189 to 192)

**FTC v. Innovative Marketing, Inc. et al. Gieron**                    **5/4/2010**

193

1    A.   Yes.
2    Q.   **And Kristy writes back to you at 12:13 p.m.:**
3    **Thanks. They're always updating their software it seems**
4    **they overwrote everything. Trying to get them to roll**
5    **the version back. Appreciate the help.**
6         **Is this what we were talking about a few**
7    **minutes ago about programmers, if a programmer changed**
8    **something on the server of a company in your experience,**
9    **is this something that could affect an ad?**
10        MR. ARENSON:  Objection; lacks foundation.
11        THE WITNESS:  Based on her response, she's
12   stating that as a -- as what occurred.  And it's a
13   reasonable item to believe that that's why that would
14   occur.
15   Q.   **BY MS. GURLAND:  And in your experience, I**
16   **don't want to draw any foundation objections, but if you**
17   **can answer it in your experience, why is that the case**
18   **that that's a reasonable statement to have made and one**
19   **that didn't cause you alarm?**
20        MR. ARENSON:  Objection; lacks foundation.
21        THE WITNESS:  From my experience, and I've
22   worked in the Internet for about 12 years now, as I
23   stated, you can try to predict every variation of what's
24   going to happen when you push new code or updates into
25   the system.  But there are a million things you can't

194

1    test for that once they hit a live environment can have a
2    positive or a negative impact.  So what she was stating
3    is once again, it was a reasonable response that didn't
4    require any further push except for please get it fixed.
5    Q.   **BY MS. GURLAND:  Okay.  And when you say a**
6    **reasonable response, again, it's plausible that the**
7    **explanation is that updating software could cause a**
8    **change; is that right?**
9         MR. ARENSON:  Objection; lacks foundation.
10        THE WITNESS:  Absolutely.
11   Q.   **BY MS. GURLAND:  I think when you were**
12   **testifying before about your monitoring of ads, you have**
13   **people — you have people monitor — I don't know how**
14   **frequently, but is it daily sometimes that you monitor**
15   **the different ads that are on your system?**
16   A.   For certain types of ads, around the 2005 to
17   2006 range, we would have a hit list that would be
18   divided up amongst the group that everyone would go into
19   every few days just to periodically check and make sure
20   that the ad was not potentially going to cause complaints
21   from end users or traffic clients.
22   Q.   **And some of the ads that Kristy ran were on**
23   **your list to look at?  You talked about that?**
24   A.   Yes.
25   Q.   **But those weren't the only ads on your hit**

195

1    list, were they?
2    A.   No.  They were ads coming from those who were
3    using redirect URLs that had either similar type things
4    in a short time period come through or not.  We just had
5    to make sure anything that was along the same area of the
6    generalized complaint.  Anything that looked like a
7    registry cleaner, a WinAntiVirus, anything that could
8    potentially behave the same way, but it was also to make
9    sure that those who were rotating ads followed the
10   guidelines as well.
11        So there were two different sets.  One is
12   for behavior that's been seen, another one for making
13   sure that we're not showing an inappropriate dating ad on
14   someone who is coming into the system and rotating ads
15   but is targeting things like Yahoo.com or children's
16   sites.  You always try to make sure everything you can do
17   because as long as there's that much control outside of
18   our arena, it makes it hard to monitor, but you have to
19   do it manually.
20   Q.   **And there's a reason then that you continued to**
21   **do the monitoring.  Was it the case that you would see**
22   **ads not just from Kristy but from other advertising**
23   **clients change from time to time?**
24   A.   Content related, yes, absolutely.
25   Q.   **And did you have occasion with respect to other**

196

1    **advertising clients other than Kristy to draw their**
2    **attention to problems when their ads would change?  Did**
3    **that happen from time to time?**
4    A.   We would notify them.  Yes, we found those to
5    be also very intentional based on the type of ads.  Once
6    again, it came down to content.  So it was a dating ad
7    where women might be covered up would not be covered up
8    later in the evening or weekends.  Those type of things.
9    And those were intentional changes.
10   Q.   **And when you say intentional, though, do you**
11   **know who intentionally made a change?**
12   A.   The source of where the advertiser URL was
13   pointing to.
14   Q.   **Is that source a person or is that source a**
15   **place?**
16   A.   Both.  I couldn't -- a person has to be located
17   in a place where that information exists.
18   Q.   **But just to be clear, so if you're dealing**
19   **with, say, Kristy Ross, for example, who's placing ads**
20   **for WinFixer and WinAntiVirus and other things, when you**
21   **sea that an ad changes, are you able in any sense to**
22   **determine Kristy Ross herself changed that ad personally?**
23   A.   No.
24   Q.   **And when an ad changes, who would be the people**
25   **in your experience — or I guess what categories of**

49 (Pages 193 to 196)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 52 of 121

**FTC v. Innovative Marketing, Inc. et al. Gieron**                    5/4/2010

197

1  people because I don't expect names, but categories of
2  people who might be able to effect the behavior of an ad?
3         MR. ARENSON:  Objection; lacks foundation.
4         THE WITNESS:  Primarily engineers, those who
5  are capable of coding.  At that point, those would be the
6  only ones I could really identify.
7     Q.  BY MS. GURLAND:  Okay.  And when you dealt with
8  Kristy, just taking your correspondence with her, some of
9  that we've talked about today where she's waiting for
10  code, asking for code, going to get you links.  Based on
11  those communications with her, did you form the belief
12  that she was making the code herself or that she was
13  getting the code from someone else or somewhere else?
14     A.  The only thing to believe, especially in 2005,
15  was she was no different than myself.  We were conduits
16  between technology.  So the code would come from
17  somewhere else.
18     Q.  And that she would then communicate the code to
19  you?
20     A.  Yes.
21     Q.  And when you wanted her to change the code, she
22  would make contact with the --
23     A.  The engineers, same thing I would do.
24     Q.  And then she would get back to you and give you
25  the changed code?

198

1     A.  Or let me know that everything was okay to test
2  and move forward.
3     Q.  Looking at the same Exhibit 6 now on page 5.
4  And I think we've actually talked about this exchange,
5  August 9th, 2005, 3:14 p.m., where you write and give
6  Kristy an example of your WinFixer ad versus another one
7  we currently have in the network.  Do you see that?
8     A.  Uh-huh.
9     Q.  And what was the source of the other account in
10  the network?  It was not Kristy?  It was some other
11  person?
12     A.  The WinFixer ad was coming through another
13  source, another advertiser account that was not hers.
14     Q.  And what advertiser accounts did myGeek have
15  that were not Kristy's?  Or I'm sorry, was it not an AdOn
16  account at all?
17     A.  It would be AdOn's -- if it was the one similar
18  to a previous one, it was actually run through Lycos,
19  which she had a relationship with and admitted to.  But
20  this one, I don't have any identifier that tells me where
21  this one initially came from.
22     Q.  When you said another account that is working
23  correctly; is that right?
24     A.  Yes.
25     Q.  So that winfixer.com/pages/scanner/

199

1  ?aid=mgp=3ax=0, that was not an ad that Kristy placed on
2  your network; is that right?
3         MR. ARENSON:  Objection; misstates the
4  testimony.
5         THE WITNESS:  To my knowledge.  However,
6  the -- yeah, if I looked at it now, I would state that
7  the AID would be indicative that it was coming through
8  something she was working with.
9     Q.  BY MS. GURLAND:  When you say something that
10  she was working with, what's the basis of saying that she
11  was working with herself?
12     A.  Just the naming convention.  She was always
13  very good when she named her items with the MG component.
14     Q.  But you don't know --
15     A.  Right.
16     Q.  I mean, do you know who she talked with at her
17  company about her naming conventions?
18     A.  No.  Based on what we've seen before.  With
19  this one, however, I can't -- given when it was written
20  and everything else, I can't point back to the account or
21  where we found that particular URL.  We just noticed that
22  the behavior was different.
23     Q.  And is it then fair to say that there were ads
24  that you saw for products for WinFixer, for example, that
25  you would see an ad but you couldn't connect it to

200

1  Kristy?
2     A.  This would be a rare case of a WinFixer ad.
3  The only other time I think we had a situation where I
4  saw an ad of something she was running, a company by the
5  name of Elite Street was running it, and she requested we
6  have them stop it.
7     Q.  And you don't know whether or not she ever
8  dealt with Elite Street herself, do you?
9     A.  I think she stated in information that we
10  passed on that she had worked with them in the past,
11  which is why she didn't want them running it with us if
12  she was running it through them.  She didn't want the
13  traffic bought.  She'd be basically paying twice for the
14  same thing.
15     Q.  Do you know whether or not there were other
16  employees at her same company that also worked in
17  advertising?
18         MR. ARENSON:  Objection; lacks foundation.
19         THE WITNESS:  No.
20     Q.  BY MS. GURLAND:  Do you know?
21     A.  No.  My only -- I was only associated with
22  Kristy.
23     Q.  Okay.  And we're still in 6.  If you can look
24  at page 7 of that email.  We talked about this, also.
25  August 9th, 2005, Kristy emails to you at 12:59 p.m.:  I

50 (Pages 197 to 200)

FTC v. Innovative Marketing, Inc. et al. Gieron

201

1  think the issue is fixed. Please let me know. I am
2  trying to check in Internet Explorer, but it is hard for
3  me to see popups or not as I use Safari. Do you see
4  that?
5     A.  Uh-huh.
6     Q.  Is it possible that an ad looks different using
7  one browser like Internet Explorer than it does with
8  another browser?
9     A.  Absolutely.
10    Q.  And why is that?
11    A.  Every browser has its own individual
12 functionality. Safari is a browser specific to Apple and
13 the MacIntosh line. Those do not always function the
14 same way as Internet Explorer and a PC would. I know
15 there's also reference to Firefox. Any browser type,
16 every ad on the Internet should be tested against all of
17 them. Any code needs to be tested against multiple
18 browser types to ensure that the intended action remains
19 intact.
20    Q.  Okay. And so when we saw various ads before,
21 and I was over there objecting foundation, and it was
22 lawyer talk, but do you -- I mean, when the question is
23 asked, is this how the consumer saw the ad and we were
24 looking at a screen shot, can you say with certainty how
25 a consumer saw the ad precisely without knowing what

202

1  computer or browser setting that consumer had?
2     A.  No, because every one of our sources, our
3  traffic sources, were able to report back to us the
4  amount -- the percentage of browser types. Most of their
5  products were dependent on the Internet Explorer, which
6  is why today I only use Internet Explorer on my computer
7  and everyone else uses something else. It's the way that
8  the majority of US population and world population view
9  the Internet. Safari, especially Firefox, at this point
10 in time were very small in usage. And even had much
11 better protection measures against certain activities.
12    Q.  But leaving aside what percentages and who has
13 most or who has least, if we're looking at a series of
14 screen shots and trying to say, this is the behavior of
15 an ad or this is how an ad would appear, in order to
16 really know how an ad would appear and whether or not the
17 screen shots match with how someone would see it, would
18 you actually need to know what their browser was and what
19 their browser settings were?
20    A.  Absolutely.
21    Q.  And again, just page 9 of the same exhibit,
22 August -- page 10 of this exhibit, August 9, 2005,
23 6:58 p.m. This is where you report to Kristy, great
24 news. Just got the okay to put everything back. And you
25 write to her in this email: I really enjoy working with

203

1  you and appreciate how responsive you are.
2     A.  You.
3     Q.  And did you write that to her because it was
4  true, that you did appreciate her responsiveness to you?
5     A.  Absolutely.
6     Q.  Looking at Exhibit 7. Or KRG 7, pages 1
7  through 5. I'll show it to you. Same question
8  foundation with these. Do you recognize this set of
9  emails pages 1 through 5 as exhibits AdOn kept in the
10 ordinary course dealing with Kristy Ross?
11    A.  Yes.
12    Q.  Look at page 2 of this exhibit, this is August
13 10th, which was actually the very next day from the
14 August 9th that we were talking about earlier when the
15 issue with WinFixer got resolved. And at 2:37 p.m. on
16 August 10th, 2005, you write to Kristy that your
17 marketing guy put together a "Geek Kit" and you wanted to
18 send it because -- you write: I would normally -- it's a
19 "Geek Kit" for distribution clients and I wanted to send
20 you one since you have been so great to work with. Do
21 you see that?
22    A.  Yes.
23    Q.  And did you write that to her because it was
24 accurate in your mind?
25    A.  Yes.

204

1     Q.  And she was an advertising client; is that
2  right?
3     A.  Yes.
4     Q.  So you were sending her something that was for
5  distribution clients special even though she wouldn't
6  have gotten it because --
7     A.  Yes. There were a handful of other advertisers
8  that were given to. Once again, I'm a big proponent of
9  that kind of thing.
10    Q.  And then looking at page 1 of the exhibit,
11 there's an August 10, 2005, 12:22 p.m. email from Kristy
12 to you saying -- she gives you an address in Arlington,
13 Virginia, so great memory. You recalled either Maryland
14 or Virginia. Is that the address that she had given you
15 to send something?
16    A.  Yes.
17    Q.  And she writes to you: Also when I leave town,
18 I will only be unavailable during my plane flight. Other
19 than that I will be around the same as usual. Do you see
20 that?
21    A.  Uh-huh.
22    Q.  Okay. And again, was that accurate in your
23 experience that she was around when you needed to talk to
24 her, she was there?
25    A.  Yeah. She would be often let us know if there

51 (Pages 201 to 204)

Case 1:08-cv-03233-RDB    Document 198-2    Filed 12/17/10    Page 54 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                    5/4/2010

205

1  was anytime that we couldn't get ahold of her in case
2  there was any problem.
3      Q.   Bear with me. I'm just trying to see if I can
4  skip through some things that we've seen before.
5          Showing you what's been previously marked as
6  KRG 8, 1 through 6. Do you recognize this group exhibit
7  as documents maintained in the ordinary course of AdOn's
8  business?
9      A.   Yes.
10     Q.   Looking first at page 1 of this exhibit, August
11 18th, 2005, email from you to Kristy at 2:17 p.m. And
12 you tell her: Good morning. I hope your trip is going
13 well. And alert her: We have to remove WinFixer from
14 source 110077. I am hoping this is temporary, but the
15 volume is causing some issue for the partner and so they
16 have asked us to remove this ad from their source. Do
17 you see that?
18     A.   Yes.
19     Q.   And that source, was that Best Offers? Was
20 that the source 110077?
21     A.   Yes.
22     Q.   Now, in this instance, the issue was with
23 volume; is that right?
24     A.   It appears so, yes.
25     Q.   And looking at page 2 of that exchange in

206

1  August 9th, 2005, 9:44 a.m. email, you explain that it's
2  about volume. Do you see that?
3      A.   On which page?
4      Q.   On page 2.
5      A.   Yes.
6      Q.   And then you see on page 4 of the same exhibit,
7  you write to Kristy at 3:47 p.m., August 19th, 2005:
8  Wanted to update you briefly. We have been asked to
9  remove WinFixer ads for the weekend. And it's again on
10 the volume issue; is that right?
11     A.   Where is this?
12     Q.   The middle on page 4.
13     A.   That's the email. Okay.
14     Q.   And this is the same volume issue; is that
15 right?
16     A.   Correct.
17     Q.   Okay. And you email to her: I am confident a
18 different approach will get us back in to normal rather
19 quickly. I am appreciative of your working with us while
20 we settle this with distribution partnerships and I
21 assure you we are advocating your quick return. Does it
22 say that?
23     A.   Yes.
24     Q.   And did you write that to her because it was
25 accurate that you were advocating her quick return —

207

1      A.   Yes.
2      Q.   — with your distribution partners?
3      A.   The volume issue was only because of annoyance
4  factor. It depends on the traffic partner at the time,
5  the level of maybe scrutiny they were getting out in the
6  industry. But primarily, seeing an ad over and over
7  again can cause issue with their user base. So at that
8  point when they were pulling back, it wasn't due to — at
9  that time had no malicious overtone, it was just simply
10 that they were seeing too much of it and wanted to pull
11 it out.
12     Q.   And when we talked before about run of network,
13 do you remember that, and you were explaining and
14 hopefully I'll get it right, you were explaining that run
15 of network, you could bid slower because it was the pink
16 and yellow slippers example because it would go
17 indiscriminately to anyplace.
18     A.   Right.
19     Q.   But what would be the one thing that would
20 unite all the people that were seeing it, what would they
21 sitting in front of?
22     A.   A computer.
23     Q.   A computer; is that right?
24     A.   Correct.
25     Q.   And if a person was advertising things that

208

1  were, I don't know, registry cleaners or virus cleaners,
2  what would in your experience those products have in
3  common? Would those relate to computers?
4      A.   They would be all computers. The relevancy
5  would only be different if they were looking for — if a
6  source was more sensitive to it being people who were
7  looking for those products versus people who were sitting
8  on the product.
9      Q.   Right. But by —
10     A.   The run of network solution made sense for her
11 because of that exact.
12     Q.   Because of the fact that as long as the person
13 was sitting in front of a computer, they might have a
14 need for her product?
15     A.   Correct.
16     Q.   And different from the travel example wherein
17 not everybody travels, some people are afraid of
18 airplanes, some people don't have the money, things like
19 that?
20     A.   Correct. When you're looking at Victoria's
21 Secret, you're not thinking about taking a plane flight
22 somewhere.
23     Q.   But you have a computer?
24     A.   Correct.
25     Q.   Directing your attention to Exhibit 9. And you

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 55 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                5/4/2010

209

1  see that page, is that email correspondence kept in the
2  ordinary course of AdOn's business?
3      A.  Yes.
4      Q.  Okay.  And in this, looking at the bottom of
5  the page, there's an August 24th, 2005, 4:33 p.m. email
6  in which Kristy writes to you:  Geoff, also will I be
7  able to submit another link to you?  I think I can get
8  that set up in the morning.  Do you see that?
9          MR. ARENSON:  Just put an objection on the
10  record this is a partial document.
11     Q.  BY MS. GURLAND:  And then she writes:  I have
12  to get them to put the proper code on it, so I'll let you
13  know when I get it.  In the meantime, we can go ahead and
14  use whatever links we are currently using.  Do you see
15  that?
16     A.  Yes.
17     Q.  And do you see that at 11:11 a.m. on August
18  25th, you write asking her to send a new link.  Do you
19  see that?
20     A.  Yes.
21     Q.  And do you see above that August 25th at 2005
22  at 2:39 p.m., kristy sends you over some specific links.
23  Do you see that?
24     A.  Yes.
25     Q.  And at the end of the links, it says:  AX

210

1  equals zero on each.  Do you see that?
2      A.  Yes.
3      Q.  And do you know what AX equals zero signifies
4  in a link?
5      A.  Directly or based on what we've currently gone
6  over and what's being highlighted by other partners in
7  previous exhibits?  Directly, I do not.  I know that has
8  association with activity.  The way that it functions, I
9  don't know specifically.
10     Q.  And when you talk about in light of other
11  things, is one of the other things the back and forth
12  between Lilach Chetrit from Hotbar with Robert McDaniel?
13     A.  Correct.
14     Q.  And so she in one of those emails, is it your
15  recollection that she says that AX equals zero means no
16  ActiveX; is that right?
17     A.  Correct.
18     Q.  And AX equals 1 means yes ActiveX, right?
19     A.  Correct.
20     Q.  So based on that, when you say AX equals zero
21  in the emails Kristy sends to you, would that suggest to
22  you that the link she's sending to you, she's sending it
23  to you with no ActiveX; is that correct?
24     A.  Correct.  And even based on that example, the
25  good link then turned bad.

211

1      Q.  Okay.
2      A.  Because Lilach was able to show that the AX
3  equals zero changed, as did some other variables inside
4  the URL, which turned into what happened.
5      Q.  But if we're looking at the actual links when
6  Kristy is sending you a link and she's saying, I'm Kristy
7  and here's a link from me, AX equals zero meaning no
8  ActiveX; is that right?
9      A.  Correct.
10     Q.  And by the way, ActiveX itself, what exactly is
11  ActiveX?
12         MR. ARENSON:  Objection; lacks foundation.
13         THE WITNESS:  ActiveX is -- ActiveX is
14  limited to Microsoft and Internet Explorer.  It's a
15  component of what's needed to be able to download,
16  whether it's an application or if it's a plug-in of some
17  sort.  So if you were on other browsers, you would not
18  see a need for ActiveX.  It doesn't exist.  That's
19  strictly an Internet Explorer/Microsoft component.
20     Q.  BY MS. GURLAND:  And what was, if you know, and
21  based on your -- nine years of experience or -- how many
22  years?
23     A.  Seven years with this company.  Four and a half
24  years in the online advertising industry.
25     Q.  11 years of your experience in Internet

212

1  advertising, do you know what ActiveX did or was supposed
2  to do, either?
3      A.  If you are a standard user, you should not be
4  receiving ActiveX unless you're requesting it, which is
5  why you get those prompts.  However, what it does, it
6  initiates some sort of download or plug-in to start
7  activating, whether or not you have given it permission.
8  Those permissions can be set at the Internet options
9  level.  So you can have no ActiveX ever, you can have a
10  prompt for it, you can allow ActiveX to install by
11  trusted parties or have free rein and destroy my
12  computer.
13     Q.  So sometimes when there were some exhibits that
14  we looked at that there was a prompt that asked if you
15  wanted to have -- that you needed to click on it in order
16  to get ActiveX; is that correct, because it blocked it?
17     A.  Right.  The setting of this person taking the
18  screen shot would have had a level where you would have
19  seen the prompt, not move forward.  Same thing if you
20  need flash updated, there's multiple reasons that ActiveX
21  can be either a good thing or a bad thing.
22     Q.  And for users whose computers didn't block the
23  ActiveX coming through, is that because of a change that
24  their browser was set differently than another useder?
25         MR. ARENSON:  Objection; lacks foundation.

53 (Pages 209 to 212)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 56 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                    5/4/2010

213

1       THE WITNESS: Yes. The standard -- the
2   default setting inside the browser would allow ActiveX
3   most likely to continue.
4       Q.   BY MS. GURLAND: And is it the case that -- you
5   were talking about desktop traffic. Is it the case that
6   desktop traffic could ask the user to sign -- to get a
7   game or to get some tool bar that they want, they have to
8   agree to a EULA, an end user license agreement; is that
9   correct?
10      A.   Correct.
11      Q.   And in that end user license agreement, do they
12  agree to get certain advertising content onto their
13  computers by agreeing to do that?
14      A.   Correct.
15      Q.   And are there instances in which that action of
16  dealing with an adware company and taking the opportunity
17  to have a tool bar or a function, can that agreement
18  cause the browser -- the settings in the browser to
19  change? I mean, can the adware company that they're
20  dealing with?
21      MR. ARENSON: Objection; lacks foundation.
22      THE WITNESS: Anything that you download on
23  your computer can create altered settings.
24      Q.   BY MS. GURLAND: I'd like to go through in the
25  same order some of the exhibits that you were already

214

1   asked about and then maybe I'll take a break and see what
2   I can cut out of my outline. Because what I would like
3   to do is really go over and ask you about some of the
4   same things that you spoke with Ms. Robbins about this
5   morning.
6       So I have the same exhibit, but I'm going to
7   go to her exhibits for ease. So do you have still the
8   exhibits in front of you that you were asked about this
9   morning?
10      A.   I do.
11      Q.   Okay. Can we go to FTC 10.
12      A.   Do you know what number it is?
13      Q.   FTC 10 is their number. Do you have that?
14      I'm looking at the second page of that
15  exhibit, which is at the bottom marked FTC 048313. Do
16  you see that?
17      A.   Yes.
18      Q.   And just to orient ourselves, what we had
19  talked about this morning was that this was an ad that
20  you were receiving a complaint from Jean-Nicolas from
21  Media Traffic; is that right?
22      A.   Yes.
23      Q.   And I just want to talk about the URL that he
24  sends to you. Now, when you reviewed the ad, was the ad
25  in this form when you reviewed and approved the ad?

215

1       A.   In which form?
2       Q.   With the several popups.
3       A.   No.
4       Q.   And if you had seen it like this, is it
5   accurate to say it wouldn't have been approved; is that
6   right?
7       A.   Correct.
8       Q.   And is this one of the ads that people or that
9   Jean-Nicolas referred to as having an auto download
10  problem? Is that what you said?
11      A.   Yes.
12      Q.   He calls it -- going to the third page in,
13  048314, in paragraph 1, a September 28, 2005, 1:05 p.m.
14  email, Jean-Nicolas emails that the issue is an ActiveX
15  prompt and an executable download prompt. Do you see
16  that?
17      A.   Yes.
18      Q.   Now, when he says an ActiveX prompt and an
19  executable download prompt, what does in that context the
20  word prompt mean to you?
21      A.   Prompt is coming up and asking you to -- in
22  this case open, save, cancel, or more information. It's
23  a prompt letting you know it's going to happen.
24      Q.   Or is it a prompt asking the user to do
25  something?

216

1       A.   Yes. Either open, save, cancel, or more
2   information.
3       Q.   So in order for the next step to occur, the
4   user has to click on something; is that right?
5       A.   They either have to click or inadvertently hit
6   the return button on their computer. Because it's
7   predispositioned to sit on the open. So the problem --
8   the reason why we try to prevent any sort of download
9   problems like this from the ad when initiating is because
10  usually it's set and ready to go. So if the user didn't
11  know what happened and hit their keyboard, it could start
12  the process without their actually saying okay because
13  it's sitting ready to go on open.
14      Q.   Got it. So the user can either intentionally
15  click yes? Is that one thing that could happen?
16      A.   Open or save, correct.
17      Q.   Or the user can could, as you say, make a
18  mistake, click the return button when they didn't mean to
19  or click the return button when they did mean to?
20      A.   Correct.
21      Q.   And then another action would happen; is that
22  right?
23      A.   Yes, the process would start.
24      Q.   And is that what you're referring to -- is that
25  what you understand by people talking about auto download

54 (Pages 213 to 216)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 57 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                    5/4/2010

217

1  or is auto download something else?
2      A.  In this case, it's -- the auto download
3  would -- the auto download would be trying to initiate it
4  without the user clicking the first part, which would be
5  the click here.
6      Q.  When you say trying to, what do you mean trying
7  to?
8      A.  I'm a user.  I think the WinFixer product is
9  great, I'd like to learn more.  I press click here to
10  start my scan.  What is happening -- the reason they're
11  saying auto download is because it's prompting without
12  the user making that determination.  So they're not even
13  trying to go to the second page.  They're not even
14  clicking on the ad itself.  The WinFixer ad would
15  populate, and immediately it would start trying to push
16  you into a download.
17      Q.  And when you say trying to push you into a
18  download, the trying to push you is having — at the
19  dialogue boxes that we're looking at 48313, is that the
20  pushing you into?
21      A.  Right.
22      Q.  And the pushing you into is what you said yes,
23  no, or save —
24      A.  Open, save, cancel, more information.
25      Q.  But the confusion, and the thing I want to be

218

1  absolutely clear about, is that in order for the user to
2  download something, the user does either advertently or
3  inadvertently have to click on something that says yes or
4  return or says something; is that right?
5      A.  To a certain degree, yes.  There is a variable,
6  and it's not something I've seen.  People can initiate
7  activity without you having to even take that step.
8      Q.  And is that what we're talking about with --
9      A.  That's not something that was seen specific to
10  this.
11      Q.  And when you say specific to this, I want to --
12  I mean, can we broaden that to talk about what we're
13  looking at today?  Because I think we've seen a series of
14  these things today where it's a series of successive
15  pops, and it shows a dialogue box, a dialogue box, a
16  dialogue box.  Is that what you're talking about?
17      A.  Yes.  You can state that the majority of what
18  we've talked about today is not focused on a full blown
19  auto download versus trying to push a user towards
20  inadvertently or advertently saying yes.
21      Q.  And so trying to push the user is to popup
22  another time and another time and another time and
23  another time; is that right?  Not allowing them to close
24  the window, not allowing them to easily escape the
25  process?

219

1      A.  Yes.
2      Q.  And there are users who would find that
3  annoying; is that right?
4      A.  Extremely so, and that's the reason why the
5  traffic partners were very angry about it.
6      Q.  And that's why you have a policy against it; is
7  that right?
8      A.  Correct.
9      Q.  Okay.  And that policy is born of a business
10  decision; is that right?
11      A.  Yes.  Conglomerate of many business decisions
12  that we put into a unified decision.
13      Q.  And that business decision is that this
14  behavior is annoying; is that right?
15      A.  Absolutely.
16      Q.  And that you would like not to have your
17  publishers' traffic exposed to this type of annoying
18  behavior; is that right?
19      A.  Right.
20      Q.  And that is a business decision; am I right?
21      A.  Yes.
22      Q.  Because I understand that we're talking about
23  advertently trying to have someone do inadvertent.  And
24  as you look at these successive popup boxes, and you can
25  take 48313 as an example because I represent that I find

220

1  them similar.  We can go through them all if you'd like
2  or not.  But when you look at this, is there anything
3  that you see that's transpiring here that you would term
4  not just annoying but false?
5          MR. ARENSON:  Objection; lacks foundation.
6          THE WITNESS:  The initiating scan on the
7  primary image, there's no possibility without the user
8  downloading that the statement could be 100 percent
9  accurate as to the number of errors being found.
10      Q.  BY MS. GURLAND:  Okay.  But on this one — we
11  don't actually see it.
12      A.  We see the end of the scan, right.
13      Q.  So we don't actually see that.  We don't know
14  if what we've seen before, and we can go through it, you
15  see typical system scan.  Is that that language?
16      A.  Right.
17      Q.  And so it says typical system scan, and to the
18  extent that somebody would believe that it was actually
19  saying that it was scanning something, that would not be
20  true.  Is that —
21      A.  Correct.  It's marketing.
22      Q.  Okay.  But that's not what we're looking at
23  here, and we'll get to that.  What we're looking at here
24  are successive popup boxes.  And I'm trying to get to
25  when you make a decision that you at AdOn are going to

55 (Pages 217 to 220)

FTC v. Innovative Marketing, Inc. et al. Gieron                    5/4/2010

221

1   have a policy that says, we will not subject the traffic
2   of our publishers to successive boxes, is that because
3   it's bad business because it's annoying or is that
4   because there's something about these popups that you can
5   tell me that is false?
6       A.   The immediate policy is to prevent the end user
7   who belongs to the traffic partner from immediately
8   removing that application and access to that user. So if
9   it's the weather tool bar that initiates the pops,
10  they're being annoyed because they're on
11  WallStreetJournal.com and they're trying to read
12  something, and all of a sudden all this starts
13  happening. Likelihood that they'll eventually figure out
14  where it's originating from, if they remember that they
15  agreed to that on the EULA or they just start removing
16  any access program on their computer that would cause a
17  loss of their end user, which means money out of their
18  pocket, which means lack of access on our part.
19      Q.   Bad business, right?
20      A.   Right.
21      Q.   But again, is there anything that you see
22  within these popups -- and you can look at them each
23  individually. Is there anything in these popups that is
24  a statement which is false?
25      A.   On this series of pops? No. On others that we

222

1   have looked at, yes.
2       Q.   We'll talk about those in a little bit. But
3   here -- I just want to -- because I do want to be clear
4   and make a distinction on things that are annoying and
5   it's a business decision not to have them and things that
6   you would say are wrong, inaccurate. There's a
7   difference between those two things. Would you agree
8   with me?
9       A.   Based on what's on here, there's nothing that's
10  inaccurate other than what we've talked about potentially
11  the scanner number, what they're showing. But beyond
12  that, that those are generalized Windows-oriented
13  statements. Clean your registry, defragment your
14  computer kind of things.
15      Q.   And do you see that -- and again, I'm still
16  looking at 48313. Do you see where the boxes that say
17  okay are highlighted? It looks to me on my copy anyway
18  as if when you get from the one that says Notice, you've
19  not completed the error scan. If your computer has
20  errors files, system or Windows registry it could cause
21  erratic behavior. You need to install WinFixer 2005 to
22  scan. Recommended.
23          And then it looks like you could click okay
24  or cancel, but the okay looks like it has a darker blue
25  around it. Do you see that?

223

1       A.   Uh-huh.
2       Q.   Is that because the person who was taking you
3   through the series of steps clicked okay, do you know, or
4   do you know why it appears like that?
5       A.   It would be both. The box would open with
6   the -- almost like if you tab across certain buttons
7   you'll see that they get highlighted. The box would open
8   with the intent of -- the darkened being around the one
9   they want you to pick.
10      Q.   They want you to pick.
11      A.   Right. Which is why the inadvertent agrees
12  happened because if you hit another button on your
13  computer or -- you could inadvertently cause that because
14  they're wanting you to go that direction.
15          With this one, the cancel would have led you
16  to the second box. So both boxes, if you hit cancel,
17  they're going to try to get you to go with another okay,
18  which tries to get you to that final one. Same thing
19  with this. Either way, it was trying to push the user
20  towards not having a choice but to download or cancel.
21      Q.   Trying to push them into making an action
22  advertently or inadvertently that would do that?
23      A.   Correct.
24          MS. GURLAND:  Is it a good time to take a
25  five-minute break?

224

1           THE WITNESS:  Sure.
2           (A recess was taken from 4:10 p.m. to
3           4:27 p.m.)
4       Q.   BY MS. ROBBINS:  Does AdOn do business with
5   companies that use adware?
6       A.   Yes. Adware is a term for any company that
7   utilizes an application download to a person's computer
8   that in turn serves apps.
9       Q.   And it's 360i or Exact, is that the same --
10      A.   Yes.
11      Q.   Do they have adware?
12      A.   At that time they did. I don't recall if they
13  do now. We don't work with them in that capacity.
14      Q.   How about Hotbar, do they have adware?
15      A.   Yes.
16      Q.   Sun 80 Solutions, do they have adware?
17      A.   Yes.
18      Q.   And from time to time the fact that certain
19  publishers, publishing clients, ran adware would cause
20  issues in which customers would complain; is that right?
21      A.   Yes.
22      Q.   And what did these customers complain about
23  when they complain?
24      A.   Customers as in the ad users?
25      Q.   No, a computer user complaining to their

56 (Pages 221 to 224)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 59 of 121

**FTC v. Innovative Marketing, Inc. et al. Gieron**                    5/4/2010

225

1  publishing traffic or complaining to you about something
2  that happened because of a publisher.
3       MR. ARENSON: Objection to the extent that
4  you're asking what consumers were telling publishers.
5       THE WITNESS: The complaints that would come
6  in to us would be, we're seeing pops on our computer,
7  don't understand why, how do I get them removed.
8       Q. BY MS. GURLAND: And I'm showing you what's
9  been premarked as KRG 10, pages 1 and 2. And same
10 question. Do you recognize that as emails AdOn kept in
11 the ordinary course of its business?
12      A. Yes.
13      Q. And starting with that one on pages 1 and 2,
14 I'm looking at the bottom, an email from Robert McDaniel
15 Wednesday, August 31st, 2005, 12:59 p.m. to Tim, who is
16 tim@admedian. Do you see that?
17      A. Uh-huh.
18      Q. And the email says -- the email from Robert
19 says: Tim, From time to time our Advertiser Services
20 group receives calls or emails from irate users who want
21 us to remove the 'spyware/adware' we've installed on
22 their computer. As you know, we don't distribute the
23 application, just the advertising. And through the
24 advertising, the users often find their way to us. So,
25 for all of our desktop application partners, we maintain

226

1  uninstall instructions and/or an uninstaller that we can
2  provide to these users when they contact us. I don't
3  think I ever requested this from you, so I need to get
4  that from you now. Would you send me what you have? Do
5  you see that?
6       A. Uh-huh.
7       Q. And do you see that on page 1 of the same
8  exhibit, Tim Nichols responds to Robert McDaniel August
9  31, 2005, at 11:52 a.m.: Hi Robert, Thanks. Yes, the
10 uninstall application can be found at the following URL.
11 We just ask for you not -- for you to please not mention
12 AdMedian. Do you see that?
13      A. Yes.
14      Q. And then there's a URL provided. And then do
15 you see right above that, August 31st, 2005, at 2:15
16 where Robert McDaniel writes back to Tim Nichols: Thanks
17 for the quick response. We won't mention AdMedian. Do
18 you see that?
19      A. Yes.
20      Q. And right above that, Tim Nichols, August 31st,
21 2005 at 12:22, sends an email to Robert McDaniel:
22 Excellent, thanks, how's WinFixer looking? Do you see
23 that?
24      A. Yes.
25      Q. And then in the successive emails above that,

227

1  Tim Nichols agrees to run WinFixer at $200 again and
2  increase it to 300 or 400 tomorrow. Do you see that?
3       A. Yes.
4       Q. And so it was Tim Nichols who asked you not to
5  mention AdMedian to the customers? Would it be the user
6  who complained to AdOn?
7       A. To the end user that may have contacted us
8  because they were able to identify the ads were being
9  served from myGeek at the time or AdOn.
10      Q. And the truth was that AdOn wouldn't serve ads
11 themself; is that right?
12      A. Correct.
13      Q. You weren't the -- you were the messenger, you
14 weren't the culprit?
15      A. We were the in-between guy.
16      Q. So if -- he -- so if you made an ad appear that
17 people found objectionable, you needed to go to the
18 publishers to deal with that; is that right, publishers
19 like AdMedian and ask them for uninstall instructions
20 like Robert McDaniel did here?
21      A. If the complaint from the user was more to the
22 functionality of why am I receiving pops, so whether it
23 was seeing WinFixer four times or seeing anything, they
24 didn't quite understand. A lot of that is because people
25 don't read before they click yes. That's --

228

1       Q. That's the -- either on purpose or
2  unintentionally?
3       A. And that's different because the acceptance of
4  an application that has the adware component, they have
5  to have a double opted. The end user license agreement,
6  the EULA, specifically outlines all of this. People are
7  more interested in what they're getting and will hit yes
8  and yes again. That's a Congressionally forced mandate
9  that we have to make sure that everyone is compliant with
10 on anything that they bundle with.
11      Now, a lot of these -- the reason -- and
12 let's get off with this is speculation. AdMedian may not
13 wanted it mentioned because they may be bundling with
14 several partners' other applications. They may be
15 strictly in charge of the relationship on the
16 distribution of ads. They may not own necessarily the
17 game, the weather tool bar.
18      But a double opt-in, you don't inadvertently
19 bounce into a double opt-in. Because it's one screen and
20 then a second screen saying, are you certain? Have you
21 read this?
22      Q. But just like the user complains to AdOn
23 because that's where they perceive that it's coming from;
24 is that right?
25      A. Correct.

57 (Pages 225 to 228)

**FTC v. Innovative Marketing, Inc. et al. Gieron**                          **5/4/2010**

229

1    Q.   But AdOn, because they're not serving the ad,
2    they didn't do it; is that right?  I mean, the place
3    where the ad is formulated is with whoever is serving the
4    ad; is that correct?
5    A.   Yeah, the complaint of the ad is origin from
6    the desktop application itself and behavior, not
7    necessarily any of the ads specifically when we would
8    receive these phone calls.  Usually they're from once
9    again people who didn't read, older individuals who don't
10   quite understand the Internet or perceive things to be
11   wrong that maybe are not wrong.  And so they would
12   threaten to kill the receptionist and things like that.
13   Q.   It's a good thing to avoid?
14   A.   It was nice when we worked at Regus and they
15   provided their own receptionist.
16   Q.   Showing you what has been marked as KRG 11,
17   pages 1 through 3.  Do you see that?
18   A.   Uh-huh.
19   Q.   And are these emails kept in the ordinary
20   course at AdOn?
21   A.   Yes.
22   Q.   Directing your attention to page 2, and do you
23   see at the bottom of the page a Wednesday, August 31,
24   2005, 5:18 p.m. email from Mike Stocker to Chad Little
25   copying Robert McDaniel?

230

1    A.   Right.
2    Q.   And he writes: Guys, My tech team is telling
3    me they are only seeing winfixer ads.  Is that true or
4    something we have set up wrong in our end?  Are we buying
5    a lot?  Blanket buy?  Do you see that?
6    A.   Yes.
7    Q.   And then turning to the first page of that
8    exhibit, at the top, August 31st, 2005, 7:52 p.m.  Do you
9    see that?
10   A.   Uh-huh.
11   Q.   Robert McDaniel writes back: I took a look at
12   the feed and did see some other ads in the rotations.  Do
13   you see that?
14   A.   Yes.
15   Q.   As Chad mentioned, WinFixer is doing a couple
16   of different buys in our network.  One is targeted on a
17   wide range of keywords, the other is for RON.  Therefore,
18   they can end up being displayed a lot depending on the
19   keywords found and our current coverage.  Do you see
20   that?
21   A.   Yes.
22   Q.   And you tell him: We can block that advertiser
23   from our feed.  Do you see that?
24   A.   Yes.
25   Q.   You say: What we've done for other traffic

231

1    partner was to cap a certain amount of WinFixer ads in
2    their traffic per day (we started around 400 per day cap
3    and are inching it up to find a good level at which to
4    run it in that traffic.  That could reduce the
5    frequency/aggressive nature of it.  Do you see that?
6    A.   Yes.
7    Q.   And do you see that what Robert McDaniel was
8    writing in response to was Mike Stocker saying that the
9    WinFixer ad was -- and I'm looking at August 31st, 2005,
10   5:32 email from Mike Stocker to Chad Little.  He calls
11   the WinFixer ad an aggressive and bad ad.  Do you see
12   that?
13   A.   Yes.
14   Q.   And so Robert McDaniel's response that we've
15   just seen is to say, we can run it less.  Is that right?
16   A.   Correct.
17   Q.   His response is not to say, we can take it off
18   our system and never see it again.  That's not what he
19   says, is it?
20   A.   He does say we can block that out.
21   Q.   We can block it, but he --
22   A.   We can block it or we can --
23   Q.   Or we can run it.
24   A.   -- reduce it to make sure it's not too much.
25   Q.   But it's not -- that it's not being shown so

232

1    much that it's annoying, in other words; is that right?
2    A.   Right.  We wanted to make sure is that there
3    was a middle area between on and off.
4    Q.   In your experience, was aggressive Internet
5    advertising common or uncommon during this period of time
6    if we're talking about '05?
7    A.   It was not --
8        MR. ARENSON:  I'm going to object as
9    ambiguous as to the term aggressive, which has not been
10   defined.
11       THE WITNESS:  I would say it was not overly
12   common in 2005 because 2005 was around the time that
13   Zango/180 Solutions was hit with I think their first
14   major fine.  2007 is around the time that a lot of these
15   started dying under the guise of Spitzer in New York.
16       But predominantly, they were very sensitive
17   to things that were done before.  They had already lost,
18   due to several erroneous lawsuits, name brand
19   advertisers, Expedia, Amazon, all those people that
20   benefited greatly from the contextual traffic were
21   immediately attacked and sued to get them off of this
22   type of traffic.  So it was a shift.
23   Q.   BY MS. GURLAND:  Paradigm shift?
24   A.   Yeah.
25   Q.   So it raised awareness of issues like this

58 (Pages 229 to 232)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 61 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                    5/4/2010

233

1  right at this period of time; is that right?
2      A.  Yes.
3      Q.  And so when you were dealing with complaints
4  from publishers during this time period, the background
5  is that there was a sensitivity to the appearance of ads;
6  is that right?
7      A.  And the impact on the user base.  It was just
8  trying to keep them off the radar, so to speak.
9      Q.  Directing your attention to what's been
10  previously marked as Exhibit KRG 12, pages 1 through 3.
11  Same foundation question.  Are these emails kept in the
12  ordinary course at AdOn?
13      A.  Okay.  And directing you first to page 3 of
14      Q.  Okay.  And directing you first to page 3 of
15  that exhibit, actually it starts on the bottom of page
16  2.  It's an email from you to Kristy Ross September 1,
17  2005, at 1:41 p.m.  The next page, page 3, you write:
18  Good morning.  Wanted to check in real quick with you to
19  see how things were looking.  The new account we have
20  been ok'd to increase to $400 a day off source 250.  We
21  have a new source coming on that might want this account
22  to access — might want this account to access this
23  account as well due to our being a bit more targeted.  Do
24  you see that?
25      A.  Uh-huh.

234

1      Q.  And do you see that Kristy responds to you
2  September 1, 2005, on page 2 I am now at 11:47 that yes,
3  it's fine, we can increase it to 400.  Do you see that?
4      A.  Right.
5      Q.  And on page 1, you — in the middle of the
6  page, you email Kristy September 1, 2005, at 6:56 p.m.:
7  We are still waiting on word from them.  They actually
8  pushed out all registry cleaners, spyware and adware
9  removal ads.  This has fortunately decreased their user
10  churn rate, but I know they want to run like this for a
11  bit before allowing these ads into the system again.  Do
12  you see that?
13      A.  Yes.
14      Q.  And in that, you're referring to — looking at
15  the email below, we know you're referring to source
16  110077; is that right?
17      A.  Yes.
18      Q.  And that's Best Offers, right?
19      A.  Best Offers and Direct-Revenue, correct.
20      Q.  Because Best Offers made a decision that they
21  didn't want to have any registry cleaners or spyware
22  running, the ads for those running at all; is that
23  correct?
24      A.  Correct.
25      Q.  So in these emails that we've talked about,

235

1  you're bringing a new potential source to Kristy's
2  attention as a new potential source to advertise; is that
3  right?
4      A.  Yes.
5      Q.  And you've dealt with Kristy, this is not the
6  first exchange between you and Kristy?  We've seen some
7  more chronologically?
8      A.  Yes, up until 2007.
9      Q.  And during the time that you're bringing new
10  traffic sources to Kristy's attention, you maintained the
11  belief that you are working with Kristy and she is
12  working with you in good faith; is that right?
13      A.  Absolutely.
14      Q.  Because otherwise, you wouldn't bring other
15  sources to her attention, would you?
16      A.  No.
17      Q.  In fact, if you thought that she was
18  intentionally messing up links and changing things, I
19  would assume you would have terminated your relationship
20  with her, would you not?
21      A.  Correct.  And keeping in mind, that was in
22  2005.
23      Q.  Right.  Now, directing your attention to what's
24  been marked as KRG 13, 1 through 19 for identification.
25  And same question with these.  Are these emails kept in

236

1  the ordinary course of AdOn's business?
2      A.  Yes.
3      Q.  And looking first at page 1, a September 30th,
4  2005, email at 11:43 p.m. from you to Kristy.  Do you see
5  that?
6      A.  Uh-huh.
7      Q.  I think we've talked about it before today.
8  You're alerting her to a problem with WinFixer ads.  Do
9  you see that?
10      A.  Yes.
11      Q.  And the problem that you identify, you say:  We
12  are seeing your links spawn the prompts to download and
13  extension pop to get the user to download.  However
14  inside our office we're seeing the ad correctly.
15      A.  Right.
16      Q.  And Kristy responds back to you September 30th,
17  2005, at 7:20 talking about:  We have had the issue a few
18  times.  Sometimes it seems the ISP caches an ad from
19  another source and it displays it for a day or two before
20  the NDS refreshes.
21      Can you explain the technical components of
22  those things?  The ISP is Internet service provider; is
23  that right?
24      MR. ARENSON:  Objection; lacks foundation.
25      Q.  BY MS. GURLAND:  Based on your 11 years of

59 (Pages 233 to 236)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 62 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                    5/4/2010

237

1   experience in Internet advertising.
2       A.  ISP means Internet service provider, correct.
3       Q.  And based on your experience, and answer only
4   if your experience dictates that you can, do you
5   understand what the comment is that the ISP caches an ad
6   from another source and displays it for a day or two
7   before the DNS refreshes?
8       MR. ARENSON:  Objection to the extent you're
9   asking what Kristy meant.
10      MS. GURLAND:  I would like to ask him what
11  his understanding of that is if he can answer based upon
12  his 11 years of experience in Internet advertising.
13      THE WITNESS:  What it's trying to state is
14  that the ad is being held without being refreshed in a
15  cache.  Cache is where information is held in order to be
16  accessed quickly.  A lot of the times because a call from
17  one server to another to another can exceed the amount of
18  time needed or allowed for an ad to be displayed and
19  quickly populated.  So everything in our company is
20  cached.  It's just -- it's being held.  The information
21  is being held for easy access.
22      What they're stating is that -- and how
23  they're trying to cross the ISP and DNS, I wouldn't be
24  the right person to answer, but the overall concept is
25  stating that this information is old, and that's the

238

1   reason why someone may be seeing it because it's being
2   held for two days because a cache refreshes -- is time
3   interval refreshing.
4       What she's stating is that it's been stale
5   for two days, and that's why some people are seeing one
6   thing and others are seeing another.
7       Q.  BY MS. GURLAND:  And is there anything about
8   that that caused you to think that what she was saying to
9   you was false?
10      A.  I believe this wasn't the first time we had
11  brought this to her attention.  The belief internally was
12  we were intentionally seeing something different.
13      Q.  But I'm not talking about the belief internally
14  formulated in the fullness of time and in subpoenas and
15  in conversations with lawyers.  I'm talking about --
16      A.  I was talking about back then that was the
17  honest belief.  That's the reason why we were testing
18  outside the system and stated that we'd give it to people
19  outside the office.  She was justifying it with this.  Is
20  that possible?  Of course.
21      Q.  That's my question.  What I'm trying to get to,
22  if we were corresponding with her, I assume if there was
23  something that she was going to tell you that you decide
24  immediately is obviously false, you're not going to deal
25  with her anymore, correct?

239

1       A.  Correct.
2       Q.  So when she says to you that it seems that the
3   ISP caches an ad from another source and displays it for
4   a day or two before the DNS refreshes, that that's at
5   least in the realm of not what she means, but in the
6   technical world that that is a possibility; is that
7   right?
8       A.  Yes.  She was giving responses that had a
9   possibility of occurrence.  Therefore, it allowed me to
10  relay that information and let the people decide what
11  they needed to decide on the publishers' side.
12      Q.  And the last issue that we've seen with an ad
13  was in August of 2005; is that right?  The last issue
14  that we talked about that was where you brought it to
15  Kristy's attention a problem with an ad?  I don't know if
16  you have that information in front of you, but we're in
17  September 30th of '05.
18      A.  Right.  I can't recall if there was anything in
19  between without having every email right in front of me.
20      Q.  But --
21      A.  To the extent of it, based on what you've shown
22  me.  If everyone's pulling out both on our side and their
23  side.
24      Q.  And how many ads at any given time were run by
25  WinFixer or WinAntiVirus on -- at AdOn?  I mean, is it --

240

1   just a neighborhood.  Is it one or two ads?  Is it more
2   like 10 or 15?  Is it in the hundreds?
3       A.  Can you restate your question.
4       Q.  The number of different ads at any given time.
5       A.  So one of each kind?  So you're saying if you
6   have one WinFixer, one WinAntiVirus, and one Drive
7   Cleaner?
8       Q.  At any given time, how many different types or
9   appearances of that ad would be running on your system?
10  And I'm not looking for an exact number, just an
11  approximation.
12      A.  Over the time period at maximum maybe two to
13  three different types of ads.  The number of ads running
14  and accounts were dependent on her settings.  So she had
15  one account set at one traffic source in one geo
16  location, another set at another geo location.  I could
17  have a hundred links running at the same time not all
18  going to the same spot.  Does that make sense?
19      Q.  If it's the case that each -- if there was a
20  hundred different links running, are there a hundred
21  different possibilities of how the ad appears?
22      A.  The same URLs most likely were used unless they
23  had a variable at the end, which would be a designator.
24  But because of account limitations, there had to be -- so
25  she would -- when referencing the 250 thing, she had one

60 (Pages 237 to 240)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 63 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                                    5/4/2010

241

1   account that was aimed at traffic source 110250. That's
2   all she could do in that account unless we added a
3   traffic source which would prevent her from being able to
4   discern in her reporting between the two. It wasn't be
5   until 2007, 2008 where we had a more granular approach to
6   it at a campaign level so she could have all those
7   variations in the same account. So each account was set
8   up because of limitations based on geo designation and
9   partner designation.
10      Q. But each account had different ads; isn't that
11   right? Each account had different codes in the URL?
12      A. Yes.
13      Q. And we've already established that when you
14   have a different code in a URL, it at least leads to the
15   possibility that the ad appears differently?
16      A. Yes.
17      Q. So if we're talking about the different -- all
18   of the different URLs in the different accounts, I mean,
19   for example, we had a spreadsheet with, I don't know,
20   tens of different accounts; is that right, that were
21   running at any given time?
22      A. Correct.
23      Q. And that would be tens or dozens of different
24   URLs, also; is that right?
25      A. Right. At minimum, one per account.

242

1   Maximum --
2      Q. Sometimes more than one per account?
3      A. Right.
4      Q. And then on page 13 of this same group exhibit,
5   KRG 13, at the top, October 4th, 2005, at 11:13, Kristy
6   emails you: Geoff, I actually seem to be in luck today.
7   They have created a new link for me. And she gives you a
8   link underneath it for WinFixer. And that has an MGK,
9   which you had postulated was her way of saying myGeek; is
10   that right?
11      A. Yes.
12      Q. And then at the end, it says AX equals zero; is
13   that right?
14      A. Yes.
15      Q. And we've talked about how AX equals zero, at
16   least according to Lilach at Hotbar, means no ActiveX; is
17   that right?
18      A. Correct.
19      Q. And that was the link that Kristy provided to
20   you; is that right?
21      A. Correct.
22      Q. Okay. And do you know if you would have looked
23   at that -- it would have been your practice to look at
24   that link immediately that same day or within a day or
25   two or how soon after she would send it would you look at

243

1   it?
2      A. Upon my opening the email, I would have checked
3   that link.
4      Q. And is there a reason you would have done it
5   right when you opened the email other than that you
6   wanted to see if you could okay it and get it running?
7      A. Yes. That would be the primary cause of it and
8   want to make sure everything looked okay based on her
9   response. And two, to get those accounts back live and
10   running and back into the system.
11      Q. And when accounts were not live and running,
12   would it also mean for Kristy that her ads wouldn't be
13   appearing; is that right?
14      A. Correct.
15      Q. If the account's not live, people aren't seeing
16   it, correct?
17      A. Correct.
18      Q. And so to the extent that her -- and you don't
19   know what her motivations were, but if her motivations
20   were to have people actually view the ads that she was
21   sending to you, if you assume that that is correct, then
22   her motivation would be to keep those accounts running,
23   also. Is that accurate?
24      MR. ARENSON: Objection; calls for
25   speculation.

244

1      Q. BY MS. GURLAND: If you can answer.
2      A. The goal, of course, would be to run if you
3   wanted to have people see your advertising.
4      Q. And when the links don't work, then the account
5   is -- there was no one seeing your ads; is that right?
6      A. Right. All the functionality is inactivated on
7   the front end. She never went in and reactivated
8   something until we said it was okay to go in and do so.
9   We didn't have a full-blown solution to stop an account
10   until later on.
11      Q. Okay. So during the time that if -- so there
12   were times that you said that you wanted to stop all
13   traffic during this time period; is that right?
14      A. Uh-huh.
15      Q. And but it would have been theoretically
16   possible for Kristy, she could have gone in and
17   reactivated it herself, technically she could have done
18   that?
19      A. At that time, yes.
20      Q. And she did not ever do that, did she?
21      A. No. We also would have noticed.
22      Q. Well, that's good. I expect that you would
23   have noticed. But the important thing from my
24   perspective is that she did not do so; is that right?
25      A. No.

61 (Pages 241 to 244)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 64 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                    5/4/2010

245

1    Q.   Okay. I'm showing you what's been marked as
2 KRG 14, pages 1 through 4. Same question. AdOn emails
3 kept in the ordinary course?
4    A.   Yes.
5    Q.   And I think this is the same one that we've
6 talked about a few minutes ago, so I'm going to be
7 brief. This is the Jean-Nicolas, the one that we spoke
8 about that was multiple pops and was annoying?
9    A.   Yes.
10   Q.   But not false?
11   A.   Correct.
12        MR. ARENSON: Objection. Misstates the
13 testimony.
14        MS. GURLAND: I think it's more asked and
15 answered.
16   Q.   BY MS. GURLAND: And on page 3 of this group
17 exhibit, do you see in the middle of the page, it doesn't
18 actually have a date and time stamp, and I don't know
19 why, but it's maybe the -- it's after the long one and
20 it's just Robert McDaniel wrote more toward the bottom.
21 It says: Jean-Nicolas, We've gone through every Winfixer
22 account currently in our system and are not seeing the
23 problems. So far as we know the problem is resolved and
24 you can turn back on those ads. Do you see where it says
25 that? Thanks, Robert.

246

1    A.   What page?
2    Q.   3.
3    A.   Oh, I apologize. I was looking at page 1.
4 Yes.
5    Q.   Okay. Then on the email right above that,
6 September 30th, 2005, 10:25 a.m., an email to Robert
7 McDaniel from Jean-Nicolas. He emails: We've started it
8 again for 5 minutes and the problems were the same. And
9 then he provides the different vendor IDs. Do you see
10 that?
11   A.   Yes.
12   Q.   And this is when you testified earlier some of
13 those vendor IDs were accounts that you in your system
14 had identified with Kristy Ross has a person who was your
15 contact for those accounts; is that right?
16   A.   The top three, yes. The fourth account was
17 running her ad through a company called Lycos.
18 L-y-c-o-s. Or account 511143, I believe, in the account
19 list. It was one that she was running with them. They
20 were testing us before we had come together as previously
21 identified in emails.
22   Q.   And how would you know that there are other
23 like WinFixer ads or other ads that are running in other
24 places? How is it that you can identify that?
25   A.   How is it I can?

247

1    Q.   Yeah.
2    A.   For this particular advertiser ID?
3    Q.   Right. Just -- is it because that the fourth
4 advertiser ID was not one through AdOn?
5    A.   Correct. It was an account in our system. It
6 was being run by a company called Lycos, who was running
7 pop inventory as a test prior to our coming together and
8 us handling all their advertiser accounts. The WinFixer
9 ad coming through at that time was Kristy's that she had
10 with them at the time.
11   Q.   But you were aware, weren't you, that AdOn --
12 or that some ads for products that Kristy was running
13 also ran through other companies, too, right?
14   A.   Right.
15   Q.   Like Innovation Interactive. Do you know that
16 sometimes different ads were placed by people other than
17 Kristy that ran on that network?
18   A.   I don't.
19   Q.   We'll get to that.
20   A.   Right. We did see that there.
21   Q.   Now, you see that the links that -- the links
22 that are provided by Jean-Nicolas in this same email with
23 the ITs, these are the -- are these the CPVs or -- these
24 that he's providing are the code that the publisher is
25 getting; is that right?

248

1    A.   The feed results that would initiate the ad.
2    Q.   Okay. And obviously Jean-Nicolas is seeing
3 something different from the ads that you saw when Kristy
4 provided you the links; is that right?
5    A.   Correct.
6    Q.   Okay. And when one user sees something
7 differently from another user, there are various possible
8 explanations for that; is that right?
9    A.   There could be. This one was seeing the exact
10 same result on three different accounts. Fourth account
11 not having the same activity.
12   Q.   Okay. So he's seeing it different as how you
13 saw it?
14   A.   Yes. We were unable to see it from the office.
15   Q.   And what you were talking to me about earlier
16 is one of the reasons that you came about later and
17 internally is that one of the reasons could have been
18 that there was something in the code that prevented you
19 from seeing it the way that other people were seeing it.
20 Is that what you testified to earlier?
21   A.   Yes.
22   Q.   Okay. And that would be a code that would
23 understand what, just your IP address; is that right? It
24 would block how something looks from different IP
25 addresses?

**FTC v. Innovative Marketing, Inc. et al. Gieron**

249

1    A.   Yes.  It's called IP spoofing.  It's giving a
2  false appearance of something based on knowing the origin
3  of the IP looking at it.
4    Q.   And in order to do this IP spoofing, what would
5  you need to know other than the IP address of the person
6  who you want to spoof?
7       MR. ARENSON:  Objection; lacks foundation.
8       THE WITNESS:  To my knowledge, that's all
9  you would need to know.
10    Q.   BY MS. GURLAND:  So if – hypothetically if
11  somebody knew Kristy's IP address, would Kristy – if she
12  had a computer, would she have an IP address, too, just
13  like you did?
14    A.   Depends on how you're asking on the computer an
15  IP.  Are you asking if she has a stationary computer that
16  never moves with her?  Are you stating that she has one
17  that goes with her that she utilizes a VP and to be able
18  to access a company IP or if she's using an ISP provider
19  from wherever she's traveling.  There's so many variables
20  that if you knew where you were --
21    Q.   Is there a variable under which Kristy has an
22  IP address?
23    A.   At her home she'd most likely have one.  If she
24  was traveling, it would probably change too much for her
25  to be spoofed.

250

1    Q.   Okay.  But if she's looking at it from a
2  certain location?
3    A.   Yes.
4    Q.   Then she has an IP address; is that right?
5    A.   Uh-huh.
6    Q.   And if she has an IP address, since we've
7  established that all you have to do to spoof someone is
8  to know their IP address, then there's a technical
9  possibility that a person could block her IP address from
10  seeing things, from seeing ads as they see them?
11    A.   Yeah, if she had a stationary one or she had
12  the ability to only access one IP.  If it was a known IP,
13  then yes, that would be a much more likely scenario than
14  if she was someone who took a laptop and every airport
15  and every hotel and everywhere she went, a different IP
16  would be assigned to her because of where she is and
17  where she's located.
18    Q.   Got it.  What we were talking about earlier is
19  that you would have better luck being in touch with
20  Kristy when she was not traveling I think you testified?
21    A.   Or when she had finished landing, right.  If
22  she was not in the plane, she was checking her email.
23    Q.   Okay.  You know that, that she was –
24    A.   She would state in emails we've gone over where
25  she was currently in France and she would touch base with

251

1  me.  She would touch base and answer emails usually
2  outside of just being in the Virginia-Maryland area.  If
3  she got off the plane flight and was meeting with someone
4  overseas, she would contact me.
5    Q.   But you would not have any knowledge about the
6  computer where she was when she contacted you, right?
7    A.   No.  I had no knowledge if she was sitting in a
8  hotel room with a laptop or sitting in someone's
9  office --
10    Q.   Using their computer?
11    A.   Correct.
12    Q.   So all you would know is that she was
13  somewhere, and there was a computer involved somehow; is
14  that right?
15    A.   Correct.
16    Q.   So page 3 of 14.  Or maybe not.  Let's see.
17  Yes.  Okay.  Looking at the bottom of page 2 and top of
18  page 3.  This is Robert McDaniel writing to Jean-Nicolas
19  that he tried to click for the links.  Is this the URL
20  you get.
21       Now I'm on top of page 3 where Robert
22  McDaniel writes:  We had a similar problem with these ads
23  with another partner.  Same type of thing where we
24  internally would always see the acceptable winfixer ad,
25  but he would get aggressive pops.  The problem he was

252

1  having was the URL was getting truncated (the conversion
2  cpvfeed.com URL, like the ones you included below).  Some
3  kind of character limit he had in his desktop
4  application.  When these WinFixer ad URLs get changed, it
5  does start the aggressive pops.  For example, take off
6  the last part of the URL above.  And:  The link takes me
7  to the same ad, but tries to do an ActiveX install.  Do
8  you see that?
9    A.   Uh-huh.
10    Q.   We had talked about earlier that if there was
11  just a minor change to a URL, it can change the behavior
12  of an ad; is that right?
13    A.   Correct.
14    Q.   And is that what Robert McDaniel is suggesting
15  to Jean-Nicolas in this email?
16    A.   Yes.  He's giving the suggestion that this
17  could be the cause because, once again, I think we had
18  no -- it was only in theory that there was a possible IP
19  spoofing.  But the truncating was refuted in the email on
20  page 1.
21    Q.   Oh, the email on page 1 in which -- oh, right.
22  He says that:  I think it was -- in his case --
23    A.   The programmers didn't limit the size of the
24  URL.
25    Q.   And it also didn't work that he was in Canada;

63 (Pages 249 to 252)

Case 1:08-cv-03233-RDB    Document 198-2    Filed 12/17/10    Page 66 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                     5/4/2010

253

1  is that right?
2      A.  He thought the Canadian versus US might have
3  been an issue.  However, they used a US proxy to confirm
4  that the behavior was the same in the US --
5      Q.  In the US as in Canada?
6      A.  Right.
7      Q.  So if a person wanted to postulate that
8  aggressive ads were only going to the US and never to
9  Canada, that would be wrong, right?
10     A.  In that particular URL, yes.
11     Q.  Because it was in the Canada and not the US,
12 right?
13     A.  Correct.
14     Q.  And he saw it aggressively?
15     A.  Yes, based on that one particular URL and the
16 activity that he was --
17     Q.  What I was going to say is that Robert
18 McDaniel, of your company, did propose the solution of a
19 truncation of a URL leading to a change in the appearance
20 of an ad, a substantive change; is that right?
21     A.  Yes.
22     Q.  And then we've been going through and talking
23 about predominantly ads in which there's some kind of
24 complaint or problem.  That's most of the things we've
25 been discussing; is that right?

254

1      A.  Correct.
2      Q.  But there were other – numerous other emails,
3  correspondences between – email correspondence between
4  you and Kristy; is that right?
5      A.  Yes.
6      Q.  Other things that you talked about other than
7  when there was a problem; is that right?
8      A.  Opportunity, personal items back and forth.  If
9  there was just mentioned of when my sister was getting
10 married or --
11     Q.  Well, you brought new advertising opportunities
12 to her attention, like we said?
13     A.  Uh-huh.
14     Q.  There were issues in which there were some
15 times she needed your help getting into her system to
16 fund her accounts, you had back and forth about that?
17     A.  Correct.
18     Q.  There was back and forth where you and she were
19 getting their conversion rates up; is that correct?
20     A.  Right.
21     Q.  There were times that she and you corresponded
22 about frequency capping; is that right?
23     A.  Correct.
24     Q.  And those emails, there was back and forth in
25 which she suggested that she wanted frequency capping; is

255

1  that right?
2      A.  Uh-huh.
3      Q.  And she wanted frequency capping because she
4  was telling you that she didn't want the WinFixer ads
5  appearing to the same users time and time again because
6  it did no good; is that right?
7      A.  Uh-huh.
8      Q.  And you helped her to sort that out and to
9  prevent the same users from seeing the ads so many times,
10 right?
11     A.  Right.
12     Q.  That's because it wouldn't be effective if you
13 annoyed people; is that right?
14     A.  Right.
15     Q.  Because annoying people who you want to buy
16 things from you and give you money is seldom effective;
17 is that right?
18     A.  From what I understand, yes.
19     Q.  Okay.  Now, I want to talk about Lilach on
20 page – from Hotbar.  And this is my Exhibit 16.  I'm
21 skipping 15.  Showing you what's been marked as KRG 16.
22 And are these emails kept by AdOn in the ordinary course?
23     A.  Yes.
24     Q.  Okay.  And I think we've talked about this
25 precise thing before, a – this is on the first page, an

256

1  email in which Lilach of Hotbar is informing Chad and
2  Robert of traffic informing her of a situation.  Do you
3  see that?
4      A.  Uh-huh.  Yes.
5      Q.  And this is where we learned that ActiveX, AX
6  equals zero on the tag doesn't show the ActiveX and AX
7  equals 1 does show it; is that right?
8      A.  Correct.
9      Q.  And that's where we went through some of the
10 URLs that Kristy sent to you, at least the ones that she
11 sent to you directly, and it shows that AX equals zero;
12 is that correct?
13     A.  Yes.
14     Q.  And the screen shots that Lilach includes, it
15 says: Screen by screen – this is the email from
16 Lilach.  Screen by screen the user is getting 4 screens
17 to get him to install.  Do you see that?
18     A.  Yes.
19     Q.  And when we get to the second page of that ad,
20 you see the WinFixer ad there?
21     A.  Yes.
22     Q.  And we were talking about – you were
23 mentioning before this is something that had been hidden
24 at that time, the part that said typical quick system
25 error scan.  Do you see that on page 2 of this exhibit?

64 (Pages 253 to 256)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 67 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                    5/4/2010

257

1    A.   Yes.
2    Q.   And the verbiage above that scanning bar says
3    typical quick system error scan.   Is that what it says
4    there?
5    A.   Yes.
6    Q.   And below that, there's a place where you could
7    click?
8    A.   Yes.
9    Q.   And if you click, is that -- is the ad -- one
10   is speaking of trying to get the -- trying to get the
11   user to download or trying to trick or cajole the user
12   into downloading by popping.   What is it that is trying
13   to be downloaded, if you know, when they're trying to get
14   the user to download something?
15   A.   They're trying to have the user download a
16   scanning application to notify you of actual errors in
17   your computer, and then they will offer you a fix for it,
18   and that's usually where the cost comes into play.
19   Q.   And so when the -- if a person downloads the
20   software, if they either do it intentionally or
21   inadvertently and they download the software for this
22   application, when they download it, is it the case that
23   what is downloaded is actual software onto their
24   computer?
25       MR. ARENSON:   Objection; lacks foundation.

258

1    Q.   BY MS. GURLAND:   To the extent that you know?
2    A.   My belief is that it's an uneducated software.
3    Q.   Okay.   And so what we're talking about and what
4    people are -- what the complaint is that they're trying
5    to trick them into downloading actual scanning software
6    onto their computer; is that right?
7        MR. ARENSON:   Objection; lacks foundation.
8    Q.   BY MS. GURLAND:   If you know.
9    A.   They're trying to take an uneducated user to
10   have fear that their computer is ruined and needs
11   assistance.
12   Q.   Well, fear that their computer is ruined and
13   needs assistance because they download software that
14   tells them so; is that right?
15   A.   Downloaded the software intentionally, which
16   would be out of the realm of how that was set up.   But
17   yes, if they clicked there, they'd want the scanner to
18   see what was wrong with their computer.   Then based on
19   that response list, they could say they could remove it
20   for X number of dollars.
21   Q.   Okay.   And do you have any information as you
22   sit here that that software that could be downloaded and
23   people are complaining automatically or otherwise, do you
24   have any information as you sit here that that software
25   that conducted a trial scan on people's computers didn't

259

1    work?   Do you have any information about that whatsoever?
2    A.   No.   I did not police the -- at that time,
3    before I put the policy in place in 2007, we did not look
4    into the overall validity of the product offering.
5    Q.   Okay.   So nothing that you know would tell you
6    that if they did manage to download this software onto a
7    user's computer that nothing that you know would tell you
8    that that software didn't do exactly what it wanted to do
9    or what it said it would do, which is to scan that user's
10   computer, is that right?
11   A.   Correct.
12   Q.   And, in fact, what some of the problem that you
13   talked about later happening was that policies were put
14   in place because users didn't want people to touch their
15   computer; is that right?
16   A.   Policy was put in place against these products
17   because Microsoft started to subpoena everybody that
18   touched these products.
19   Q.   Okay.   And the aggressive -- was it --
20   A.   The aggressiveness and stating that they were
21   tired of people claiming there was problems with their
22   software that there really weren't problems.   So people
23   were benefiting off of taking a lower echelon of educated
24   computer users and pushing them towards purchasing a
25   product they didn't need.

260

1    Q.   Because there's never been any problems with
2    Microsoft software, right?
3    A.   I don't want to speak towards that.
4    Q.   Never once, right?
5    A.   As I stated, the policy went into place because
6    of the elements of the subpoena.   And we're a company of
7    40 people.   We can't really take on Microsoft if they
8    decided they wanted to annihilate our existence.   But
9    given the information that they had in the subpoena, we
10   followed it.   We followed it and put the policy in place
11   to ensure that we move forward in compliance and out of
12   the way of the giant.
13   Q.   Are you aware one way or another as to whether
14   Microsoft and PC Tools and other major software companies
15   have registry cleaner products of their own or have
16   antivirus software of their own?   Is there such a thing
17   as a Norton antivirus product?
18   A.   Yes.
19   Q.   Do you know of a Microsoft product, which is
20   sort of a security product of any kind?   Do they have
21   one?
22   A.   That you pay for outside of what they currently
23   have downloaded onto our Windows program?   I don't know
24   of a paid one.   There are ones that are authenticated and
25   authorized by Microsoft.   There are several out there who

65 (Pages 257 to 260)

**FTC v. Innovative Marketing, Inc. et al. Gieron**                    5/4/2010

261

1  steal the logo that claim they are and are false, which
2  is also why that protective measure and the terms and
3  conditions remains in place. I'd have to research it.
4      Q.   So some of the entities, and without saying
5  anything bad about Microsoft because no one should,
6  without getting into that, is it fair to say that some of
7  the products that Microsoft would be complaining about
8  would be competitors of Microsoft?
9          MR. ARENSON: Objection; lacks foundation.
10         THE WITNESS: Not directly.
11     Q.   BY MS. GURLAND: Not direct competitors.
12     A.   I wouldn't necessarily say so. I know that
13 some of these products, the WinFixer may have aimed
14 directly at Windows because --
15     Q.   At a Microsoft product?
16     A.   Right. But drive cleaners, registry cleaners
17 are not necessarily indicative of a particular platform.
18 I would say anyone who builds a PC would be more angry
19 because -- because there's a tie-in to the operating
20 system and the PC itself.
21     Q.   I guess initially when you're talking about
22 what sort of spurred on the cautiousness and the
23 sensitivity, we're not talking at that time about a
24 governmental entity that has independent interest, but
25 we're talking about a company that has business

262

1  interests. Is that fair to say?
2      A.   Yes. But that could also be said for the White
3  House when it tried to get its URL back from a porn
4  company because that's where it was pointed to. That
5  wasn't necessarily a government interest, that was more
6  of a people going to whitehouse.com should see White
7  House. Madonna.com should go to Madonna, it should not
8  go to porn. Those are the kind of things that people up
9  on it can usually push the small guys around.
10     Q.   People with --
11     A.   Money.
12     Q.   Like Microsoft. Not unlike Microsoft?
13     A.   Right.
14     Q.   I'm going to direct your attention if I can for
15 a minute to the same exhibit that we were just talking
16 about or some of the same pages, but now I want to go to
17 FTC 13, which is just the -- I think the identical pages
18 but those that you talked about this morning with
19 Colleen?
20     A.   Okay.
21     Q.   So if you could go to the second page of FTC
22 13, which is FTC 047425. Tell me when you're there.
23     A.   I'm there.
24     Q.   And is that the same page that we were just
25 talking about that was in my Exhibit --

263

1      A.   Yes.
2      Q.   -- 16.
3          And if you can, would you look at the top
4  part where it says -- above the ad where it says: This
5  site might require the following ActiveX control:
6  WinFixerScannerInstall.cab from WinSoftware Corporation,
7  Inc. Click here to install. Do you see that?
8      A.   Yes.
9      Q.   And is cab another name for an executable? Is
10 a cab an executable file?
11         MR. ARENSON: Objection; lacks foundation.
12         THE WITNESS: I actually can't answer that.
13 I don't know. Sorry. I can't answer.
14     Q.   BY MS. GURLAND: Do you know what .cab, what
15 that extension is?
16         MR. ARENSON: Objection; lacks foundation.
17         THE WITNESS: I don't know.
18     Q.   BY MS. GURLAND: And if you see, it says click
19 here to install?
20     A.   Yes.
21     Q.   And so would that not suggest that the person
22 would have to take some action like clicking there in
23 order for it to enable the ActiveX; is that right?
24         MR. ARENSON: Objection; lacks foundation.
25     Q.   BY MS. GURLAND: You can answer.

264

1      A.   To my understanding, the ActiveX install and
2  the EXE file are different in that one is trying to I
3  think initiate the communication between the two devices,
4  the other one is trying to download the software. But I
5  don't have enough knowledge to speak very detailed in
6  that respect.
7      Q.   Okay. Were you able to -- looking at the URL I
8  think it is above the ad, the part where it says -- is
9  that a URL where it says http..winfixer.com/pages/
10 scanner/index. Do you see that?
11     A.   Yes.
12     Q.   And do you see that entire URL?
13     A.   Yes.
14     Q.   Okay. And is that exactly the same as the URL
15 that Kristy sent to you? Is that the same as any URL
16 that Kristy ever sent to you? I should ask that.
17     A.   That exact URL, no.
18     Q.   If you want me to ask you, is it -- do you see
19 some naming conventions of hers within it?
20     A.   Yes.
21     Q.   But it remains the case that that precise URL
22 is not one that Kristy Ross ever sent to AdOn to your
23 knowledge; is that right?
24     A.   No. But she could also have sent
25 KristyRoss.com, and it could result in the exact same

66 (Pages 261 to 264)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 69 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                    5/4/2010

265

1    URL.
2        Q.    I don't follow.
3        A.    A URL is strictly a call that's in our system.
4    It will call their server. Their server, which populates
5    the browser window with the ad can be a completely
6    different URL. That's seen heavily with her
7    adfarm.mediaplex.com.
8        Q.    Where it sends to you a different --
9        A.    It's a redirect -- correct. Because she
10   submitted that URL to us. Where it goes to, we have no
11   control over it. However, that's being designated after
12   the call to the server is placed. This particular URL
13   was the version from 90448 as outlined in FTC 047447, it
14   turned into this URL. So the additions to it happened
15   after the time that the page loaded. So what she
16   submitted and what it turned out to be are, yes,
17   different. But they are directly related as of -- it's
18   only her account based on that naming convention.
19       Q.    Only her account that she and whoever she gave
20   the login and password could have had access to; is that
21   right?
22       A.    But the URL -- yeah, someone could have access
23   to it all day, that URL wasn't changed. It was what was
24   populated was changed.
25       Q.    And does that happen at the server level?

266

1        A.    Yes. However it's designated to populate based
2    on the initial URL that's given.
3        Q.    But at the server level, so it means that a
4    computer somewhat that is making the ad is what is
5    responsible for the content of that?
6        A.    It's returning the content, correct.
7        Q.    And do you have any information whatsoever or
8    knowledge that Kristy Ross was the person who was in
9    control of a server for the WinFixer product?
10       A.    I do not.
11       Q.    Do you have any information whatsoever that
12   Kristy Ross was an individual in charge of a server for a
13   WinAntiVirus product?
14       A.    No.
15       Q.    Ever at any time?
16       A.    No.
17       Q.    When you were speaking to Ms. Robbins earlier
18   this morning, you told her that this WinFixer ad as it
19   appeared here was something that you had approved and
20   that you saw except without the ActiveX controls; is that
21   right?
22       A.    Correct.
23       Q.    Okay. So the part that has WinFixer and the
24   click here part and the typical quick system error scan
25   with the scan bar, that's the part that you did see; is

267

1    that right?
2        A.    Correct.
3        Q.    And the part you didn't see were the prompt
4    windows that were below it; is that right?
5        A.    The prompt windows and the ActiveX alert,
6    correct.
7        Q.    Okay. The ActiveX alert that would try to get
8    the user to download software onto their computer with
9    their --
10       A.    It would have to be installed. The software
11   comes from the two prompts.
12       Q.    Where it would say search for errors now free,
13   click here?
14       A.    Yes.
15       Q.    And where it says: Please read the following:
16   Clicking the button above confirms you agree to the End
17   User License Agreement of this software. Do you see
18   that?
19       A.    These prompts?
20       Q.    No, I was actually talking about the box in the
21   part that you did approve.
22       A.    Yes.
23       Q.    And that's where it says Click Here. Please
24   read the following: Clicking the button above confirms
25   you agree to the End User License Agreement of this

268

1    software. Do you see that?
2        A.    Right. And the approved ad would have taken me
3    to a secondary page before anything could have happened.
4        Q.    And then you would — at least if this is true,
5    if you clicked on it and you went, there would be an end
6    user license agreement where you would agree to various
7    things before you were able to download that software; is
8    that correct?
9            MR. ARENSON: Objection; lacks foundation.
10           THE WITNESS: The end user license
11   agreement, if the person clicked and agreed to it and
12   moved forward that that was acceptable.
13       Q.    BY MS. GURLAND: And that is the downloading of
14   software?
15       A.    Correct.
16       Q.    And you have no information to provide to us
17   that there is anything about that software, should they
18   have done that, that would have been false?
19       A.    Correct.
20       Q.    Okay.
21       A.    But those other elements, if the person had
22   done the other route with the pops, they would not have
23   agreed to that end user license agreement; therefore,
24   they would not have agreed to any terms under that
25   umbrella. Only should they have clicked on that button.

67 (Pages 265 to 268)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 70 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                                    5/4/2010

269

1    Q.   So the pops that result in the link that came
2    from a server that Kristy Ross didn't control, those
3    pops?
4    A.   Yes.
5         MR. ARENSON: Objection. Misstates the
6    testimony. He doesn't know what Kristy Ross controls.
7    Q.   BY MS. GURLAND: The server for which you have
8    no information that she ever controlled; is that right?
9    A.   Correct.
10   Q.   And I'm directing your attention to KRG 17,
11   which is a two-page -- maybe it's not. Yeah, a two-page
12   exhibit.
13        MR. ARENSON: I don't have KRG 17.
14   Q.   BY MS. GURLAND: After you've finished looking
15   at that, can you tell me if it's AdOn emails kept in the
16   ordinary course?
17   A.   Yes.
18   Q.   Looking at the first page of that email from
19   Lilach of Hotbar, December 5, 2005, at 10:35 a.m. to
20   Robert McDaniel. Hi Robert, I hope you had a nice
21   weekend. If we remove Winfixer, what daily volume will
22   you be able to fill with minimum defaults? If we keep
23   WinFixer would you be able to monitor they[sic] actions
24   more carefully and if so what volume would we expect
25   then? Do you see that?

270

1    A.   Yes.
2    Q.   And this email from Lilach from Hotbar, this is
3    in December, December 5 of 2005; is that right?
4    A.   Correct.
5    Q.   And December 5 of 2005 is three days after the
6    previous email that we looked at where Lilach attached
7    for you the screen shots that she was complaining about
8    of WinFixer; is that right?
9    A.   Correct.
10   Q.   And so even after looking at those screen shots
11   and having voiced her complaints, her question to you is
12   what would it cost her to remove WinFixer; is that right?
13   A.   Yes.
14   Q.   And if you look at the next page in the middle,
15   I understand that ultimately as per the December 5th,
16   2005, 1:15 email from Robert McDaniel to Lilach, Robert
17   writes: The problem we've had with those WinFixer ads is
18   that we see them correctly in our network as you do in
19   yours. Since the ads do seem to work correctly when we
20   first get the new URL from them, it's difficult to know
21   when they 'break' and whether or not it is intentional or
22   unintentional. Do you see that?
23   A.   Yes.
24   Q.   And based on that information, we see above
25   that Lilach, December 5, 2005, 2:24, decides to run her

271

1    ads without WinFixer; is that right?
2    A.   Correct.
3    Q.   Ultimately she decides that.
4         When Robert McDaniel writes, though, that
5    it's difficult to know when these ads from WinFixer break
6    and whether or not it's intentional or unintentional. Do
7    you see that?
8    A.   Yes.
9    Q.   So as of that -- and do you have any reason to
10   doubt that what Robert was emailing to your publisher
11   client at Hotbar, Lilach, was incorrect?
12   A.   No. I think he was absolutely correct in that
13   we had really no control over when these things would
14   happen and when they wouldn't.
15   Q.   And also correct when he said that you don't
16   know whether or not it's unintentional or intentional; is
17   that right?
18   A.   Correct.
19   Q.   You just don't know?
20   A.   It's speculation. You can't prove someone's
21   doing something. You can only put enough dots together
22   to create a certain level of suspicion.
23   Q.   And I just want to go back for a second. This
24   is in -- related to the first interchange with Lilach.
25   And I'm in FTC 11. This is the November exchange. And I

272

1    am on page FTC 022370, which is a May -- November 7,
2    2005, email from Kristy Ross to you. Do you see that?
3    A.   Uh-huh.
4    Q.   And she's talking about the same issue that we
5    have discussed about problems with the WinFixer ad
6    elsewhere in this exhibit, correct?
7    A.   Correct.
8    Q.   Okay. And Kristy emails to you: Unfortunately
9    the person who makes my links was out of town. Do you
10   see that?
11   A.   Yes.
12   Q.   And do you have any information as you sit here
13   by which you could tell me that that statement that
14   someone else beside her made her links? Any information
15   to offer that that information was false?
16   A.   No.
17   Q.   She writes: I believe they will be back
18   tomorrow, so I do not yet have new links. And then she
19   writes: I know they looked into the issue and fixed a
20   few things, but I don't think it is fixed overall. Do
21   you see that?
22   A.   Yes.
23   Q.   Where she writes to you it's not fixed?
24   A.   Correct.
25   Q.   And if she would have -- well, withdrawn.

68 (Pages 269 to 272)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 71 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                    5/4/2010

273

1       So in this email, Kristy Ross, at least by
2   these words, is just letting you know that she doesn't
3   believe that the ads would have been repaired to AdOn's
4   satisfaction; is that right?
5           MR. ARENSON: Objection; lacks foundation.
6       Q.  BY MS. GURLAND: Is that what it says: I don't
7   think it's fixed overall.
8       A.  She's aware enough to know what has been fixed,
9   and she has enough knowledge to not believe that the
10  overall solution is in place.
11      Q.  Whether or not she has enough knowledge to
12  believe, she actually does communicate to you that she
13  doesn't think it's fixed overall; is that right?
14      A.  Right.  And that's what I mean when I say the
15  knowledge.  I'm basing that strictly on the fact that she
16  used the word "think."  Whether she was told it's overall
17  fixed or not, she has enough knowledge to make that
18  statement to me.  So she -- yeah, she's identified that
19  something has been done.  It's not done all the way,
20  whether it's up to her liking or someone else is stating
21  that to her.  So she's going to wait to give me anything
22  new to work with.
23      Q.  But if -- then the effect of her telling you
24  that it's fixed would be to move things along.  But she's
25  telling you, but wait, hold on.  I'm not sure it's fixed;

274

1   is that right?
2       A.  Correct.
3       Q.  Turning your attention to -- I think this is
4   something that we've seen, but it's my KR 15.5.  Two-page
5   exhibit.  KRG 15.5, I should say.  And again, it's back
6   to the November interchange between Robert McDaniel and
7   Lilach.  Do you see that?
8       A.  Correct.
9       Q.  And on the second page, Lilach is writing to
10  Robert McDaniel.  Can you fix this.  You can see it's
11  trying to install an ActiveX.  Do you see that?
12      A.  Yes.
13      Q.  And is there anything about this what you see
14  here with an attempt to install ActiveX that is false?
15  Would you describe it as a false ad or would you describe
16  it as a potentially annoying ad?
17      A.  Are you saying how I viewed the ad itself?
18      Q.  How you view the ad.  And I understand it's
19  saying that something stopped it from installing
20  ActiveX.  But I'm wondering if there's something in this
21  ad that you see that's false.
22      A.  Nothing overly false inside the marketing speak
23  on the ad itself.
24      Q.  I'm sorry, when you say --
25      A.  Nothing that I would sit there and -- I mean,

275

1   if you have errors and you have to reboot, it's common.
2   The pain points that they're identifying are known.
3       Q.  Okay.  You mean that WinFixer -- that Windows
4   does these things, documents and profile settings lost?
5       A.  Slow down, freeze, makes you lose money and
6   time.  It's marketing speak around identifying pain
7   points that would be appealing to an end user.
8       Q.  And then it says WinFixer 2005 fixes all kinds
9   of damaged files, repairs hard drive surface errors,
10  recovers accidentally erased files.  Is that what it
11  says?
12      A.  It states that, yes.
13      Q.  And you have no information whatsoever that
14  WinFixer 2005 didn't do exactly that; is that right?
15      A.  I never installed it to identify the end
16  result, no.
17      Q.  Okay.  So you don't know if it did it one way
18  or the other?
19      A.  (Witness shook head in the negative.)
20      Q.  We had just spoken a minute ago about what
21  Robert McDaniel emailed that he didn't know whether or
22  not the breaking was intentional or unintentional.  Do
23  you remember that?
24      A.  Yes.
25      Q.  What are some of the reasons that it would be

276

1   hard to determine if it was intentional or unintentional,
2   the breaking of the ad?
3       A.  It all comes down to what proof you have of
4   what they're trying to accomplish.
5       Q.  What?
6       A.  What proof you have of what's intended to
7   occur.  Since we're not in control of the server, what ad
8   is being shown as the end result of the calls.  All we
9   can do is make sure that what we have is as clean as
10  possible.  What someone's intent -- whether or not
11  someone's lying to me every single day or someone's
12  trying to submit something onto the Internet is no one
13  want, there's no way of stating 100 percent either
14  direction.  All we can do is present the partner with the
15  possibility that it can be or can't be an intentional
16  activity.
17      Q.  And what we've already discussed is that at a
18  point in time at least as you were dealing with Kristy
19  Ross, if there had come a point in time in your business
20  relationship with Kristy Ross that you had absolutely
21  formulated the belief that what she was telling you was
22  false, you would have not done business with her anymore,
23  right?
24          MR. ARENSON: Objection; asked and answered.
25          MS. GURLAND: We're in a different time

69 (Pages 273 to 276)

**FTC v. Innovative Marketing, Inc. et al. Gieron**

277

1  frame. Last time he pointed out that that was earlier so
2  I want to ask if that continues to be true.
3  **Q.   BY MS. GURLAND:  Would you have stopped doing**
4  **business with her if you thought what she was telling you**
5  **was --**
6      A.   If I thought that anything she was doing was
7  malicious, as her being a representative of Globedat and
8  not knowing her relationship with WinFixer or these
9  products, yes.  Over time, you'll so that the products
10 change, and I don't know if that was adaptive to the
11 environment or people identifying issues with those
12 particular products in general.  But the succession would
13 lead you -- would keep us going because she would have
14 two or three new products to try.
15          And I was an advocate of hers internally.  I
16 had to be.  I mean, advertisers of what --
17     **Q.   You had to be, but --**
18     A.   No, no.  As long as I felt comfortable.  I
19 mean, I have a -- as anyone should hopefully have a moral
20 come pass that's involved and where you sense people
21 that -- I kick people out all the time of our network
22 that are blatantly doing malicious things.  Was I able to
23 make that determination and stand by that conviction to
24 both her and to my management?  No.  I didn't see
25 anything that would cause me to run up and down and

278

1  scream this.  Did I make sure we handled every issue as
2  it came up?  Absolutely.
3     **Q.   Okay.  That's fair.  And was Mike Romoff of**
4  **360i another advertiser who emailed you -- I mean, a**
5  **publishing client who emailed with AdOn about WinFixer**
6  **ads?**
7      A.   Yes.
8     **Q.   Showing you what's been premarked as KRG 18.**
9  **If you could take a look at that exhibit.  I think we've**
10 **talked about this earlier.**
11     A.   Yes.
12    **Q.   You see on the second page, Friday, January**
13 **20th, 2006, Robert McDaniel writes:  Hi Guys, Is it**
14 **possible that this is WinFixer ad still coming through to**
15 **us from you guys?  It might not be coming to us direct**
16 **from you but, if you could please verify that these types**
17 **of ads are not coming through to us untargeted (or at all**
18 **if need be)?  Do you see that?**
19     A.   Yes.
20    **Q.   And when he says:  It may not be coming to us**
21 **direct from you, what other possibility would there be**
22 **other than if he's seeing the ad and if he's seeing the**
23 **ad and it didn't come direct from you, what other**
24 **possibility in your experience could there be about why**
25 **he's seeing it?**

279

1     A.   The only other -- another explanation of that
2  would be if we gave our feed to -- I'll use an erroneous
3  name.  AdMedian.  So they have an application.  They may
4  broker that feed out to 360i.  Basically creating a tier
5  of revenue share down to them because they may not be
6  able to fill the traffic.  They may need additional -- as
7  long as there's a feed of advertisers we're providing and
8  the person has gotten the apps approved and verified to
9  be legitimate, there was a possibility that they may have
10 been able to receive the ad still from our system but
11 through another party that they're working with that
12 we're also working with.  So it's incestual in a way.
13 And that's across almost every platform that people are
14 buying and reselling traffic and advertisers across the
15 board.
16    **Q.   And do you have any understanding about whether**
17 **or not Kristy Ross had a working relationship with any**
18 **other -- I mean, like a -- that she was putting ads on**
19 **other systems other than yours?**
20     A.   Yes.
21    **Q.   Okay.  The one instance that you talked about,**
22 **about --**
23     A.   The Lycos?
24    **Q.   Lycos.**
25     A.   No, there's statements directly from her in

280

1  email correspondence with me where she states, we work
2  with several other CPV networks.
3     **Q.   But the "we" versus "I."  Not "we" company, but**
4  **we "I."  So I guess the distinction between Kristy Ross**
5  **herself working directly with another company or someone**
6  **from Kristy Ross's company?  Does that distinction make**
7  **sense to you?**
8      A.   Yes.  Whether it's I or we work with several
9  other CPV networks, she references whether it's her or
10 someone in her company working with other networks,
11 that's referenced somewhere within the confines of these
12 emails.  So I do know that she had working relationships
13 in some capacity.
14    **Q.   Instead of saying she would, would it be better**
15 **to say that her company had relationships with other --**
16     A.   Either/or.  Unless I see the phrase where she
17 stated, I can't remember if she said "I" or "we."  But --
18 so okay.  In this capacity she's representing Globedat,
19 then her organization.
20    **Q.   Her organization.  Okay.**
21     A.   Has multiple relationships according to that
22 statement with other CPV networks.  In regards to this,
23 that scan URL that is highlighted is from our system.
24    **Q.   Okay.  And looking at the ad itself on 18, the**
25 **second page, is there anything about -- I think we've**

70 (Pages 277 to 280)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 73 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                    5/4/2010

281

1    already talked about, there's nothing about that ad
2    that's false, is there?
3         MR. ARENSON:  Objection.  This is now the
4    third time for this ad.
5         Q.   BY MS. GURLAND:  It's maybe a slightly
6    different ad.
7         A.   Nothing in the statements on the site are false
8    in nature.  But once again, it's marketing.  So however
9    they need to present it in order to get someone to buy
10   their goods or services.
11        Q.   And, in fact, this one doesn't even have any
12   popups that are shown, does it?  It's just the one page.
13        A.   Correct.
14        Q.   And, in fact, Mike Romoff on the first page now
15   January 20th, 2006, writes to Robert McDaniel:  Hey
16   Robert, Thanks for the followup.  Let me check if there
17   is anything that we can do on our end to take care of
18   this.  If we -- if not we may want to do that block.  But
19   since only a few publishers really have a problem, I
20   don't want to go overboard and lose those advertisers if
21   we don't have to.  Is that what it says?
22        A.   Yes.
23        Q.   And who is those advertisers?  Is those
24   advertisers WinFixer in the context of this?
25        A.   Those advertisers are anyone who was bidding on

282

1    run of network based on the previous email at 4:34 p.m.
2    Now, when I say untargeted, I'm specifically referring to
3    advertisers that are bidding on run of network.  His
4    concern was targeted versus untargeted.  WinFixer having
5    a great deal of volume made up a greater portion of that,
6    which is probably why they were being highlighted.  But
7    this was in general to anyone who's --
8         Q.   So when he's saying, I don't want to go
9    overboard and loses to advertisers, he means WinFixer and
10   others who --
11        MR. ARENSON:  Objection; lacks foundation.
12        MS. GURLAND:  I think it's what he just
13   said.
14        MR. ARENSON:  Still lacks foundation.
15        THE WITNESS:  It says Internet Windows
16   software -- he doesn't want to lose the -- yeah, the
17   WinFixer ads based on the communication with Robert in
18   general, but he doesn't want to lose any of the ads.  He
19   just wants them to be a little bit more targeted.
20        Q.   BY MS. GURLAND:  He doesn't want to lose
21   WinFixer and others?
22        A.   Anyone who's using the run of network capacity.
23        Q.   WinFixer and others?
24        A.   Right.
25        Q.   Directing your attention to 19, Exhibit KRG

283

1    19.  Pages 1 through 6.  Do you see that?
2         A.   Uh-huh.
3         Q.   And are those AdOn emails kept in the ordinary
4    course?
5         A.   Yes.
6         Q.   And I'm going to start with -- in the middle of
7    the page, it says February 2nd, 2006, 2:14 a.m.  Geoff
8    Gieron wrote: Kristy, One of our team noticed the
9    winfixer ad doing the prompt issue again through account
10   89573.  It happens sporadically.  Do you see that?
11        A.   Yes.
12        Q.   And this is the same thing that we talked about
13   earlier with Colleen, right, and that was FTC Exhibit 15;
14   is that right?
15        A.   Yes.
16        Q.   And someone from your team was checking the
17   URLs periodically?
18        A.   Correct.
19        Q.   Okay.  And what you're telling them is that
20   someone from your team either means it's someone from
21   your team at AdOn; is that right?
22        A.   Yes.
23        Q.   And so someone at AdOn noticed the WinFixer ad
24   and the prompt issue, right?
25        A.   Yes.

284

1         Q.   Now, when they noticed the WinFixer ad and the
2    prompt issue, they did work at AdOn; is that right?  I
3    mean, that's how they did it, in their capacity as an
4    AdOn employee; is that right?
5         A.   Correct.
6         Q.   And so I guess in that instance, capable of
7    seeing the ad, were they not, at AdOn?
8         A.   Yes.
9         Q.   So here we see that whatever spoofing
10   postulation that we have elsewhere wouldn't have worked
11   here, right, because here, someone from your team
12   actually was able to view the WinFixer ad and observe
13   it doing the prompt issue; is that right?
14        A.   Right.  And what they were stating is that it
15   wasn't happening consecutively as seen with complaints,
16   it was happening --
17        Q.   Sporadically?
18        A.   Right.  So they would try the ad ten times, and
19   on the tenth time, it would do it.
20        Q.   And I guess for our purposes here is that they
21   were able to view the ad doing the objectionable thing,
22   right, as an AdOn employee from the IP address that's at
23   AdOn?
24        A.   Now, let me preface, I don't know if the person
25   was sitting in my office.

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 74 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                    5/4/2010

285

1  Q.  Okay.  You don't know where they were?
2  A.  No.  Because anyone who's on my team --
3  actually at 2006, I had three to four employees working
4  outside of the Phoenix metropolitan area.
5  Q.  Okay.  So you don't know?
6  A.  I could have requested that they take
7  themselves off the office VPN and check it --
8  Q.  But it doesn't say that, it just says that
9  someone from your team noticed the WinFixer ad doing the
10  prompt issue.  It doesn't say where that individual was?
11  A.  Correct.  Now, I also want to point out that
12  she was located in Europe at this time.  So whether or
13  not she was stationed at a particular computer versus a
14  changing IP is also unknown.
15  Q.  She Kristy?
16  A.  Yes.
17  Q.  So you want to note that Kristy was in Europe?
18  A.  Right.  We were having the conversation before
19  as to where a static IP of hers at home might have been
20  blocked, but -- and you said -- I usually didn't talk to
21  her when she was back in the states.  This was an example
22  of when she was traveling in Europe with that
23  specification.  So her ability to see something on a
24  changing IP would have been much higher than if she was
25  stationed at home with --

286

1  Q.  But she was not saying anything about seeing an
2  IP, is she?  She was just saying, thanks for letting me
3  know.  The person that's saying something about seeing
4  something from an IP, all we know of them is that that is
5  somebody on your AdOn team, right?
6  A.  Right.  She also says that she didn't test the
7  link to see if there was a problem.  I'm just stating --
8  before you weren't sure if she was speaking to me only
9  from her computer in the US.  I was just stating that
10  that --
11  Q.  Yes, I know --
12  A.  -- her and I would talk back and forth when she
13  was traveling.
14  Q.  Right.  And if we get to the point that there
15  was an email in which she's talking about being in Europe
16  and testing things, we will look for that.
17          Direct your attention to 19.5, which is
18  right here.  And I think we've seen this one before,
19  too.  This is the guy whose name you didn't want to
20  pronounce.  Krikelis.  And 19.5, pages 1 and 2, are those
21  both AdOn emails in the ordinary course?
22  A.  Yes.
23  Q.  Okay.  And in this email exchange, Stephen
24  writes and says:  Geoff, There seems to be a very
25  misleading ad from WinFixer.  He writes that on Monday,

287

1  March 20th, 2006, at 1:15.
2          MR. ARENSON:  Carolyn, read that again.
3  It's not WinFixer.
4          MS. GURLAND:  From WinAntiVirus.  Thank you,
5  Ethan.
6  Q.  BY MS. GURLAND:  Do you see that?
7  A.  Yes.
8  Q.  And then on the second page, he attaches a
9  screen shot of this.  Do you see that?
10  A.  Correct.
11  Q.  And you said -- I think that you said that you
12  weren't sure whether or not -- what you knew about this
13  was that Kristy had submitted an ad for WinAntiVirus PRO
14  2006, that product; is that right?
15  A.  Correct.
16  Q.  But you don't know whether or not -- you don't
17  know whether or not this was an ad that she ran?  I mean,
18  you don't remember seeing this as an ad that she ran?
19  A.  I don't remember this particular landing page
20  per se.  I remember very clearly the one that most likely
21  followed it, which was the neat little red one.  But this
22  one, I just can't remember.
23  Q.  And was this something that -- would you have
24  approved this ad?
25  A.  If it followed the -- with the prompt, no.

288

1  Without the prompt, possibly.  I can't see the whole
2  thing.  But I believe if it followed the rules of
3  download, which went to a secondary page to complete, as
4  far as I can see, yes.
5  Q.  So from looking at this, there's nothing that
6  you can see in the -- and now I can tell you it's FTC
7  page 047428 that would indicate to you that there was
8  something about this ad that would prevent you from
9  approving it?
10  A.  Outside of the prompt that's sitting above it,
11  the security worm?
12  Q.  Right.
13  A.  That would be the one thing that would prevent
14  me.
15  Q.  Because that's an ActiveX-type pop, right?
16  A.  As far as I can tell, yes.
17  Q.  But is the statement on there, this ad that we
18  don't even know that Kristy ran, but the statement:
19  There is a security vulnerability from the BlackWorm
20  virus.  Is that statement false?
21          MR. ARENSON:  Objection; lacks foundation.
22  There's no way he could know that.
23  Q.  BY MS. GURLAND:  If you know.  If you know
24  if --
25  A.  I don't know the individual security

Case 1:08-cv-03233-RDB    Document 198-2    Filed 12/17/10    Page 75 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron

5/4/2010

289

1 vulnerability of multiple computers and multiple browsers
2 of multiple users, so I can't state that. I do know that
3 BlackWorm was a virus.
4    Q.  **Because this doesn't say anything about the**
5 **computer, does it?**
6    A.  It does.
7    Q.  **It doesn't say you have one. It says there is**
8 **a security vulnerability.**
9    A.  Right.
10    Q.  **There is a vulnerability. Does it say on your**
11 **computer?**
12    A.  It doesn't, but it highlights the computer OS
13 and PC information right from behind where that little
14 prompt is. I don't see all that information, so I can't
15 tell how much they're trying to aim it. Once again, if
16 they're marketing against BlackWorm, it was a known virus
17 around at the time. Whether or not the person was
18 susceptible, I don't know.
19    Q.  **Okay. And BlackWorm, if BlackWorm was a virus**
20 **that -- I mean, the BlackWorm virus that was around, was**
21 **the BlackWorm virus a security vulnerability?**
22    A.  It was an infection. If the computer had it,
23 if the computer had the virus on it, the computer
24 vulnerability would exist. That's all. I think what
25 they're trying to do is protect it.

290

1    Q.  **And this is — looking at the FTC Exhibit 16**
2 **that I think is the same chain. I don't know if you have**
3 **that, FTC 16. I had basically -- this is where you said**
4 **that you believed it was a Kristy Ross account, but you**
5 **did not have a URL to support that. Is that right? It's**
6 **just the same.**
7    A.  Yes.
8    Q.  **The thread that you —**
9    A.  Correct. I didn't have something -- I know
10 that there was later items that connect it to this. I
11 just -- I didn't have anything immediately I can tie this
12 back to them.
13       There is a false statement here, though.
14 Your current security software is not able to stop this
15 sensitive information from being transmitted. That's a
16 statement that is not incorrect because it wouldn't be
17 able to know what security software you had loaded on the
18 computer at the time that this was displayed. Besides
19 that, everything looks --
20    Q.  **Oh, your current security software is not able**
21 **to stop this sensitive information from being**
22 **transmitted.**
23    A.  Right. That's the only thing that I would be
24 able to say --
25    Q.  **But you don't know if you approved this ad or**

291

1 **you didn't?**
2    A.  This one, I just literally cannot recall.
3    Q.  **You don't remember if you approved it or**
4 **didn't?**
5    A.  I remember various versions of WinAntiVirus
6 PRO, but I just do not remember --
7    Q.  **So it's possible that you approved this very**
8 **one?**
9    A.  Yeah.
10    Q.  **And what we see, though, is that there's two**
11 **places where you could download WinAntiVirus PRO 2006 or**
12 **WinAntiSpyware. Do you see that?**
13    A.  Yes.
14    Q.  **And presumably you would download that**
15 **software; is that right?**
16       MR. ARENSON: Objection; lacks foundation.
17       THE WITNESS: The person could download --
18 click the link and be taken to a page where they could
19 continue with the download of a specific product if that
20 was what their interest was.
21    Q.  **BY MS. GURLAND: Like we spoke about before,**
22 **with an end user license agreement, yes, I agree?**
23       MR. ARENSON: Objection. He's talking about
24 an ad that he's not even sure he's seen, and you're
25 asking about what the user experience would be. Lacks

292

1 foundation.
2    Q.  **BY MS. GURLAND: But as you look at this ad,**
3 **you don't have any information that the WinAntiVirus PRO**
4 **2006 or WinAntiSpyware 2006 scanner versions of the**
5 **software didn't work, do you? You don't have any**
6 **information about that?**
7    A.  No.
8    Q.  **Directing your attention to Exhibit KRG 20.**
9 **Pages 1 through 3. Are these AdOn emails kept in the**
10 **ordinary course?**
11    A.  Yes.
12    Q.  **Okay. And page 2 of that exchange, there's an**
13 **April 4th, 2006, you write — 9:19 p.m., you write to**
14 **Kristy: Kristy, we have gained access to publisher CPV**
15 **traffic and one of the publishers has agreed to run**
16 **Winantivirus and WinFixer in a limited capacity at .0037**
17 **it is of a —**
18    A.  $3.70 CPM. So .0037 per impression.
19    Q.  **This will be RON based traffic but is initiated**
20 **without a desktop app and from a page a user is**
21 **visiting. If you would like to try this out, I can open**
22 **an account tomorrow for you. All I could need is an ad**
23 **tag that doesn't initiate a download or one of those**
24 **forced to act pops. One for each product would work. Do**
25 **you see that?**

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 76 of 121

**FTC v. Innovative Marketing, Inc. et al. Gieron**                              **5/4/2010**

293

1    A.   Yes.
2    Q.   And that was information that -- and if you
3    look at page 1, Kristy writes back April 5, 2006:  Geoff,
4    We would definitely be interested in running this.  Do
5    you see that?
6    A.   Yes.
7    Q.   And that's a business opportunity that you
8    brought to Kristy as of April 2006; is that right?
9    A.   Yes.
10   Q.   Okay.  Showing you KRG 21.  These pages 1
11   through 5, are these emails kept in the ordinary course?
12   A.   Yes.
13   Q.   Okay.  And looking at page 3, May 4th, 2006,
14   1:51 p.m. Lee Tankersley of Netster emails to Robert
15   McDaniel:  For reference, here is an ad that is causing
16   the issue.  And he shows a pop.  And on the next page, he
17   shows an ad.  Do you see that?
18   A.   Yes.
19   Q.   And then he says:  Any ads that behave that way
20   should be disabled from our traffic.  Do you see that?
21   A.   Yes.
22   Q.   And is it your position that -- do you know for
23   a fact that Kristy Ross was the source of this ad?  I
24   understand her account.
25   A.   Yes.

294

1    Q.   You know that her account was the source of
2    this ad; is that right?
3    A.   Correct.
4    Q.   Do you know that she personally was the person
5    who came up with this ad?  Do you know that?
6    A.   She was the one who provided the link.  That's
7    all I know.
8    Q.   And where did she provide the link?
9    A.   Into the account management system of account
10   87712.
11   Q.   And where do you see that?
12   A.   On page 1.  From Lee to Robert McDaniel on
13   Friday, May 5th, 2006, at 11:56 a.m.  He was able to
14   deliver the result from the feed that identified the
15   account in question that was causing the activity.
16   Q.   Okay.  Oh, so you -- right.  You identified the
17   account number; is that right?
18   A.   Yes.
19   Q.   And that's one of Kristy's accounts?
20   A.   Yes.
21   Q.   And that's the basis for saying it's Kristy's
22   ad; is that right?
23   A.   Yes.
24   Q.   But do you have an actual URL that Kristy sent
25   you that has an identical link to the URL that you see of

295

1    this ad?  Do you have a link where Kristy sent www.amaena
2    man.com/securityworm --
3    A.   No, because that would not be the URL that we
4    approved.
5    Q.   So it's a different URL than the one that
6    Kristy would have sent you?
7    A.   Correct.
8    Q.   Okay.
9        MR. MOLINAR:  Go off the record a second.
10       (Discussion off the record.)
11   Q.   BY MS. GURLAND:  And then looking now at FTC
12   18, which is the same Lee Tankersly exchange.  And it's
13   on page FTC 048309.
14   A.   On which -- is this one of yours?
15   Q.   No, this is theirs.  FTC 18.  This is the CPV
16   feed.  Right?
17   A.   Correct.  And you're on the first page?
18   Q.   Yes.  I'm on the first page.  So this is what
19   we're looking at.  We see the account number.  87712.
20   Right?
21   A.   Uh-huh.
22   Q.   So we can tell that that's the account that you
23   identified of Kristy Ross; is that right?
24   A.   Correct.
25   Q.   But that's -- that and that alone is the basis

296

1    of your identifying the content of the ad to Kristy,
2    right, that it's her account?
3    A.   Right.
4        Quick question.  There's further information
5    on subsequent pages that identify it does come from a
6    WinAntiVirus.com URL that spawned the amaena security
7    worm on FTC 023580.
8    Q.   023580.  Okay.
9    A.   There's more information in that feed result
10   where it identifies the domain that's being served.
11   Q.   Which is?
12   A.   WinAntiVirus.com.  So those two elements were
13   what would be -- allowed us to tie it back to Kristy's
14   account.
15   Q.   Because WinAntiVirus.com is a product that you
16   know that she advertised with you; is that right?
17   A.   The domain is what's pulled from the system.
18   So the first part of the domain.  The remainder of the
19   tracking URL is in the encoded area.  So just like the
20   example that was given below from Robert to Lee to be
21   able to follow WinFixer.com is inside the account 89573.
22   The two parts of information just allowed us to know what
23   account and what ad spawned the change.  But --
24   Q.   The ad being WinFixer.com?
25   A.   And the 87712, it would be the WinAntiVirus ad,

74 (Pages 293 to 296)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 77 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                    5/4/2010

297

1  which shows the image correctly as in this is the
2  WinAntiVirus ad, but the URL amaena, a-m-a-e-n-a, was a
3  different destination URL than what was supplied to us.
4  So I know you want to -- with the route you're going with
5  the we don't know what happened post, just want to make
6  sure you know why we were able to associate that back to
7  what was submitted by Kristy and her account, not just
8  the account number.
9      Q.  Because it was sent to you with that amaena
10  address or --
11     A.  WinAntiVirus is the root domain of what was
12  supplied.
13     Q.  And the ad that we're talking about is pictured
14  at 48310?
15     A.  Correct.
16     Q.  And that's the ad that we talked about that you
17  don't know if you would have -- or you don't know if you
18  did or you didn't approve it?
19     A.  Right.  Whether or not I approved it or one of
20  my employees did.
21     Q.  Okay.  But somebody --
22     A.  Whether or not -- I just can't recall it
23  directly.
24     Q.  But when I look at it, nothing from it jumps
25  out at you to tell you that you would absolutely not have

298

1  approved it.  You can't tell me that you did not approve
2  it?
3      A.  I can't tell you either way what I did with it.
4      Q.  Okay.
5      A.  I just wanted to let you know how it was
6  associated back to that.
7      Q.  Thank you.
8          MS. GURLAND:  I'm at a good stopping place
9  if that's what people would like to do.  And I'm happy to
10  press on or stop.  I'm happy to go on, but I think that
11  if I regroup --
12         MR. ARENSON:  Can we go off the record.
13         (Discussion off the record.)
14         MS. GURLAND:  We are recessing for tonight
15  to reconvene tomorrow at 8 a.m.
16         (The deposition recessed at 6:10 p.m.)
17
18
19
20
21
22
23
24
25

299

1          C E R T I F I C A T I O N  O F  R E P O R T E R
2  DOCKET/FILE NUMBER:  RDB 08-CV03233
3  CASE TITLE:  FTC V. INNOVATIVE MARKETING, ET AL.
4  DATE:  MAY 4, 2010
5
6          I HEREBY CERTIFY that the transcript
7  contained herein is a full and accurate transcript of the
8  notes taken by me at the deposition on the above cause to
9  the best of my knowledge and belief.
10
11         DATED:  5/16/2010
12
13
14         _____
14         CAROLYN T. SULLIVAN, RPR
15
16
17
18
19
20
21
22
23
24
25

300

1          CERTIFICATE OF DEPONENT
2
3          I hereby certify that I have read and
4  examined the foregoing transcript, and the same is a true
5  and accurate record of the testimony given by me.
6          Any additions or corrections that I feel are
7  necessary, I will attach on a separate sheet of paper to
8  the original transcript.
9
10
11         _____
11         GEOFFREY M. GIERON
12
13         I hereby certify that the individual
14  representing himself to be the above-named individual,
15  appeared before me this _____ day of _____,
16  2010, and executed the above certificate in my presence.
17
18
19         _____
19         NOTARY PUBLIC IN AND FOR
20
21  MY COMMISSION EXPIRES:
22
23
24
25

75 (Pages 297 to 300)

**FTC v. Innovative Marketing, Inc. et al. Gieron**                    **5/4/2010**

301

1   WITNESS:  GEOFFREY M. GIERON
2   DATE:  MAY 4, 2010
3   CASE TITLE:  FTC V. INNOVATIVE MARKETING, ET AL.
4
5       Please note any errors and the corrections
6   thereof on this errata sheet.  The rules require a reason
7   for any change or correction.  It may be general, such as
8   "To correct stenographic error," or "To clarify the
9   record," or "To conform with the facts."
10  PAGE   LINE   CORRECTION       REASON FOR CHANGE
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**For The Record, Inc.**
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

# In the Matter of:

# FTC v. Innovative Marketing, Inc. et al.

*May 5, 2010*
*Geoffrey Gieron*
*Vol. 2*

**Condensed Transcript with Word Index**



**For The Record, Inc.**
**(301) 870-8025 - www.ftrinc.net - (800) 921-5555**

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 80 of 121

**FTC v. Innovative Marketing, Inc. et al. Gieron**                    5/5/2010

302

```
 1              FEDERAL TRADE COMMISSION
 2                   I N D E X
 3   WITNESS:                          EXAMINATION:
 4   GEOFFREY GIERON
 5        BY MS. GURLAND                    310
 6        BY MR. DIRENFELD                  400
 7        BY MR. ARENSON                    446
 8
 9   EXHIBITS      DESCRIPTION          FOR ID
10
     Number 27    Email chain           410
11                Re:  Copy of mygeekcampaigns.xls
                  (FTC 048017 - FTC 048019)
12
     Number 28    Email dated Friday, April 9, 2010   413
13                Subject:  Follow-up with attachments
                  (FTC 047337 - FTC 047344)
14
     Number 29    Complaint for Injunctive and   441
15                Other Equitable Relief
16
17             OTHER EXHIBITS REFERENCED
18
     EXHIBITS                            PAGE
19
     KRG 24    6/13/06 email chain from Kristy   313
20             Ross to Geoff Gieron
               (ROSS000196 - 000197)
21
     KRG 25    Email chain beginning with    314
22             7/13/06 from Geoff Gieron
               to Rachel and Robert McDaniel
23             (ROSS000201 - 000220)
24
25
```

304

```
 1   KRG 39    Email chain beginning 4/11/06    387
           to Ross Lehrman from Dana Bennett
 2         (ROSS000335 - 000337)
 3   KRG 40    Email chain beginning 4/24/06    390
           to LeShena Huddleston from
 4         Dana Bennett
           (ROSS000340 - 000352)
 5
     FTC 3     Spreadsheet of Globedat accounts   407
 6         (FTC 022017 - 022018)
 7   FTC 4     Edit profile pages        404
           (FTC 021962 - 022015)
 8
     FTC 5     Account Funding Pages     404
 9         (FTC 023162 - 023209)
10   FTC 6     CC Numbers by Account     407
           (FTC 023159 - 023160)
11
     FTC 10    Email chain beginning with    417
12         10/3/05 email from Robert McDaniel
           to Geoff Gieron and Steve Armstrong
13         (FTC 048312 - 048315, 048231 - 048240,
           022272 - 022276, 022260 - 022261)
14
     FTC 13    Email chain beginning with    417
15         12/2/05 email from Lilach
           Chettit-Argaman to Chad Little
16         (FTC 047424 - 047246, 048306 - 048308,
           023377 - 023380, 04242 - 048245)
17
     FTC 14    Email chain beginning with    417
18         1/20/06 email from Robert McDaniel
           to Shawn Stevens
19         (FTC 048246 - 048248)
20   FTC 15    Email chain beginning with    417
           2/2/06 email from Kristy Ross to
21         Geoff Gieron
           (FTC 047420 - 047421)
22
     FTC 16    Email chain beginning with 3/21/06   423
23         email from Stephen Krikelis to
           Geoff Gieron
24         (FTC 023478 - 023479, 023482 - 023483,
           047427 - 047429)
25
```

303

```
 1   KRG 26    Email chain beginning 7/13/06    327
           from Robert McDaniel to
 2         ryan@mygeel.com
           (ROSS000204 - 000207)
 3         (FTC 047359, FTC 047362, FTC 047365)
 4   KRG 27    Email chain beginning 7/13/06    334
           to Ryan Maloney from Kristy Ross
 5         (ROSS000189 - 000190)
           (ROSS000200 - 000239)
 6
 7   KRG 28    Email chain beginning 7/27/06    357
           to Robert McDaniel from
 8         Mike Romoff
           (ROSS000193 - 000194)
 9         (ROSS000241 - 000243)
           (FTC 047372)
10   KRG 29    Email chain beginning 8/25/06    366
           to Robert McDaniel from
11         Mike Romoff
           (ROSS000249 - 000259)
12         (ROSS000256 - 000264)
           (FTC 047376, 047397 - 047398)
13
14   KRG 30    Email chain beginning 9/5/06    375
           to Robert McDaniel from
15         Mike Romoff
           (ROSS000266 - 000270)
16   KRG 32    Vendor Listing      377
           (ROSS000279)
17
     KRG 33    Email chain beginning 3/29/07    379
18         to Ryan Maloney from Kristy
           (ROSS000282 - 000283)
19
     KRG 37    Email chain beginning 7/31/06    382
20         to Ross Lehrman from Rachel
           Klausner
21         (ROSS000318 - 000321)
22   KRG 38    Email chain beginning 5/5/06    384
           to Dana Bennett and Ross Lehrman
23         from LaShena Huddleston
           (ROSS000324 - 000332)
24
25
```

305

```
 1   FTC 18    Email chain beginning with    423
           5/5/06 email from Robert McDaniel to
 2         Geoff Gieron
           (FTC 048309 - 048311, 023577 - 023582)
 3
     FTC 20    Email chain beginning with    430
 4         7/13/06 email from Robert McDaniel
           to Geoff Gieron
 5         (FTC 047368 - 047371, 047351 - 047367,
           047417 - 047419)
 6
     FTC 23    Email chain beginning with 7/17/06   432
 7         email from Ryan Maloney to Kristy
           Ross
 8         (FTC 048263 - 048293)
 9   FTC 25    Email chain beginning with 7/28/06
           email from Mike Romoff to Robert
10         McDaniel
           (FTC 048249 - 048252, 047372 - 047375,
11         047442 - 047444)
12
           REQUESTED INFORMATION
13
             Page  Line
14
             395....7
15
16
17
18
19
20
21
22
23
24
25
```

1 (Pages 302 to 305)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 81 of 121

**FTC v. Innovative Marketing, Inc. et al. Gieron**

**5/5/2010**

### 306

```
 1        UNITED STATES DISTRICT COURT
 2         DISTRICT OF MARYLAND
 3   Federal Trade Commission    ) CIVIL NO.
     600 Pennsylvania Ave. NW    ) RDB 08-CV-3233
 4   Washington, DC 20580,       )
                                 )
 5         Plaintiff,            )
                                 )
 6     v.                        )
                                 )
 7   Innovative Marketing, Inc., also )
     d/b/a Billingnow, BillPlanet PTE )
 8   Ltd., Globedat, Innovative  )
     Marketing Ukraine, Revenue  )
 9   Response, Sunwell, Synergy Software )
     BV, Winpayment Consultancy SPC, )
10   Winsecure Solutions, and    )
     Winsolutions FZ-LLC,        )
11   1876 Hutson Street          )
     Belize City, Belize;        )
12                               )
     ByteHosting Internet Services, LLC )
13   3864 McMann Road, Suite A,  )
     Cincinnati, Ohio 45245;     )
14                               )
     James Reno, individually, d/b/a )
15   Setupahost.net, and as an officer )
     of Bytehosting Internet Services, )
16   LLC                         )
     3844 Golden Meadow Ct,      )
17   Amelia, Ohio 45102;         )
                                 )
18   Sam Jain, individually, and as an )
     officer of Innovative Marketing, )
19   Inc.                        )
     355 First Street 2801        )
20   San Francisco, California 94105; )
                                 )
21   Daniel Sundin, individually, d/b/a )
     Vantage Software and Winsoftware )
22   Ltd., and as an officer of  )
     Innovative Marketing, Inc.  )
23   107 Jermyn Street, Flat No. 1 )
     London, UK SW1Y6EE;         )
24                               )
     Marc D'Souza, individually, d/b/a )
25   Web Integrated Net Solutions, and )
```

### 307

```
 1   Marketing, Inc.             )
     1 King Street W.            )
 2   Toronto, Ontario CANADA M5H1A1; and )
                                 )
 3   Kristy Ross, individually, and as )
     an officer of Innovative Marketing, )
 4   Inc.                        )
     207 Deer Run Dr.            )
 5   Walkersville, MD 21793      )
                                 )
 6         Defendants            )
                                 )
 7     AND                       )
                                 )
 8   Maurice D'Souza             )
     22 Carnegie Crescent        )
 9   Thornhill, Ontario CANADA L3T5H1, )
                                 )
10         Relief Defendant.     )
                                 )
11
12
13
         DEPOSITION OF GEOFFREY M. GIERON
14
              VOLUME II
15        (Pages 302 through 468)
16           May 5, 2010
             8:19 a.m.
17
18
19        Location:
          Osborn Maledon, PA
20        2929 North Central Avenue
          Phoenix, Arizona
21
22        Prepared by:
          Shelley E.D. Pearce, RPR
23        Arizona Certified Reporter
          Certification No. 50301
24
25
```

### 308

```
 1   APPEARANCES:
 2   ON BEHALF OF THE FEDERAL TRADE COMMISSION:
 3        ETHAN ARENSON, Attorney
 4        Bureau of Consumer Protection
 5        Federal Trade Commission
 6        600 Pennsylvania Avenue, NW
 7        Washington, DC 20580
 8
 9   ON BEHALF OF DEFENDANT KRISTY ROSS:
10        CAROLYN PELLING GURLAND, Attorney
11        2731 North Mildred Avenue
12        Chicago, Illinois 60614
13        and
14        THOMAS L. KIRSCH, II, Attorney
15        Winston & Strawn, LLP
16        35 West Wacker Drive
17        Chicago, Illinois 60601-9703
18
19   ON BEHALF OF DEFENDANTS MARC D'SOUZA AND MAURICE D'SOUZA:
20        JONATHAN A. DIRENFELD, Attorney
21        Orrick Herrington & Sutcliffe
22        1152 15th Street, NW
23        Washington DC 20005-1706
24
25
```

### 309

```
 1   APPEARANCES:
 2   ON BEHALF OF THE WITNESS, GEOFFREY MARTIN GIERON:
 3        JEFFREY B. MOLINAR, Attorney
 4        Osborn Maledon, PA
 5        2929 North Central Avenue, Suite 2100
 6        Phoenix, Arizona 85012-2794
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 306 to 309)

**FTC v. Innovative Marketing, Inc. et al. Gieron**

310

1        P R O C E E D I N G S
2           ---oOo---
3        GEOFFREY M. GIERON,
4    called as a witness herein, having been previously duly
5    sworn by the Certified Reporter to speak the whole truth
6    and nothing but the truth, was examined and testified as
7    follows:
8
9           EXAMINATION
10   BY MS. GURLAND:
11       Q.  All right.  We're back on the record.  It is
12   May 5th at 8:19 p.m. [sic].  I'm Carolyn Gurland, attorney
13   for Kristy Ross, and still examining Geoff Gieron at AdOn
14   Network.
15          Good morning, Mr. Gieron.
16       A.  Morning.
17       Q.  I want to start out -- I don't want to go
18   through all of these other emails, but just -- I saw in
19   the documents, and it's accurate, is it, sir, that from
20   the time back months and months ago, you've been emailing
21   back and forth with people from the Federal Trade
22   Commission just about the case and documents and things
23   like that.  Is that right?
24       A.  Responding to document requests, yes.
25       Q.  Okay.  And you were also, as we saw from -- I

311

1    think it was Exhibit -- the first or -- the second exhibit
2    that Colleen Robbins introduced yesterday, that you were
3    the point person when there was a big document production
4    to Microsoft as well --
5        A.  Correct.
6        Q.  -- is that right?
7           So you've been steeped in document productions
8    and legal cases for some period of time now; is that
9    right?
10       A.  In regards to this, yes.
11       Q.  In regards to this, yes.
12          About how long?  How many -- is it years or
13   months?
14       A.  I've been the point person on this since 2007.
15       Q.  Okay.  So three years, approximately?
16       A.  Yes.
17       Q.  Okay.
18       A.  On and off.
19       Q.  On and off.
20       A.  It never seems to go away.  It comes right back.
21       Q.  All right.  But there's information that you
22   have learned and things that you've become aware of or
23   things that you have read about, anyway, that you now know
24   that you didn't know at the time that you were dealing
25   with Kristy in 2004 and -5 and -6; is that fair to say?

312

1        A.  Read in regards to specifics on this?
2        Q.  Anything.  No, just things that you -- for
3    example, have you read the FTC complaint in this matter?
4    Is that one of the things that you would have done, just
5    because myGeek was a named in a...
6        A.  I don't believe I've read the entire complaint.
7        Q.  Okay.  Have you read any parts of it?
8        A.  No.  I just got this -- the subpoena for it.
9        Q.  Okay.  Do you know, generally, what the case is
10   about from either -- any kind of reading that you were
11   doing or conversations?
12          MR. MOLINAR:  And make sure, Geoff, you don't
13   talk about anything you've discussed with your lawyers,
14   me, or anybody else about the case, too.
15          MR. KIRSCH:  That's not what she's asking.
16   BY MS. GURLAND:
17       Q.  No, I'm not asking for -- I'm just asking about your
18   awareness based on things that you've read, things you've
19   heard, things you've seen.
20       A.  No.
21       Q.  Okay.  Well, just to be very clear, what --
22   what's relevant for our purposes here and what I'm asking
23   you about are things that you -- you're a fact witness.
24   So the things that you knew and things that you did and
25   things that you were aware of in 2004 and -5 and -6; not

313

1    things that you've learned from other sources later on
2    down the road.
3           Does that make sense?
4        A.  Yes.
5        Q.  Okay.  So I think where we left off yesterday
6    was at 22.  And I was going to not introduce 22 or 23, and
7    we're going to start with KRG24.  And that's my naming
8    convention we have for each, KRG and the number.
9           (Exhibit KRG24 referenced.)
10   BY MS. GURLAND:
11       Q.  Take a look at that.  Do you recognize that as
12   emails that AdOn kept in the ordinary course of its
13   business?
14       A.  Yes.
15       Q.  And I would direct your attention to the top of
16   the page in -- actually, we'll start -- start at the
17   bottom of the page is how these things work.  June 13,
18   2006, 7:25 p.m., you write [as read]:  Kristy, Great to
19   hear from you.  I swear Robert and I were just discussing
20   you when your email came through.  And then that's an
21   emoticon, like a smiley face on the side; is that right?
22       A.  Uh-huh.
23       Q.  And then you -- [as read] Here is the testing
24   and Vendor ID.
25          And so is what's going on here, are you setting

3 (Pages 310 to 313)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 83 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                    5/5/2010

314

1   up a new -- a new campaign? I mean, a new account for
2   Kristy? Is that right?
3        I guess we can -- I'll just direct you to the
4   one at the top of the page: 6/13/06, 7:37 p.m., you write
5   to Kristy [as read]: Kristy, you caught me. I was just
6   getting to the activations when you sent your email. I
7   have activated all four new accounts for you. I will have
8   Ryan touch base tomorrow. Again, the smiley face, Geoff
9   Gieron.
10       Is that what you emailed to her?
11   A.   The accounts, yes, it looks like they were set
12   up on her behalf.
13   Q.   Okay. And that's all for this.
14       (Exhibit KRG25 referenced.)
15   BY MS. GURLAND:
16   Q.   Directing your attention to KRG25, and that is
17   an eleven-page exhibit. And the same question for that.
18   If you look through that, are these all emails that AdOn
19   maintained in the ordinary course of its business?
20   A.   Yes.
21   Q.   Okay. I direct your attention first to page 2
22   of that document. And, there, you would find an email,
23   June 28, 2006, 11:44 a.m., from Kristy Ross to you. And
24   it says, "Additional Questions."
25       Kristy writes [as read]:  I don't have landing

315

1   pages from some of the people yet. Some of the ones I
2   have given -- I have -- I guess it says, I have given, use
3   the home page itself. Some don't have a download. Some
4   are just a signup page.
5        And then she provides to you a -- she writes in
6   the next paragraph [as read]: The below page currently
7   does not have a second page download type option. There
8   aren't -- they aren't with any advertisers currently that
9   require this. We can certainly have them make this page,
10   or maybe you find also their popup that requires them to
11   read about what it does and hit "okay," also acceptable,
12   question mark.
13       And then she provides a link for System Doctor,
14   and then another link for -- the last one for Free Repair.
15   Do you see that?
16   A.   Uh-huh, yes.
17   Q.   Okay. And is the -- the part where she's asking
18   you about the second page download type option, she's
19   telling you that this ad currently doesn't -- doesn't have
20   it; is that right?
21   MR. ARENSON:  Objection, lacks foundation.
22   BY MS. GURLAND:
23   Q.   Oh, well, what she says is [as read]: The page
24   below currently does not have a second page download type
25   option. That's what the email states. Can you see that?

316

1   A.   Yes.
2   Q.   Okay. And, yesterday, we were speaking about
3   the second page download option as one of AdOn's
4   requirement; is that right?
5   A.   Yes.
6   Q.   And from -- it was your understanding of this
7   email that this link -- it's a question. She's seeking
8   information from you as to whether or not this link is
9   going to be okay or whether it's not going to be okay.
10   A.   Right. She's asking --
11   Q.   Okay.
12   A.   -- knowing what our...
13   Q.   Right. Knowing what your policies are and
14   asking a question, "Is it all right?"
15       So, then, looking at page 1 of this document,
16   what you -- looks like on July 13, 2006, at 3:50 a.m.,
17   which might be -- I don't know. I don't know if you were
18   really sending that at 3:50 a.m.
19       But Rachel at myGeek sends an email to you
20   saying [as read]: Geoff, Hey, we would not be allowed to
21   run this ad (it was the one that you had originally sent),
22   because it brings you into pop hell. I got two exit pops,
23   then a download Active X bar opened. And then she gave
24   the link right below it. Do you see that?
25   A.   Yes.

317

1   Q.   She said [as read]:  The other two on this email
2   are okay, but not this one. Do you see that?
3   A.   Okay.
4   Q.   And if you take a look at the link -- that link
5   that Rachel sends to you for the Free Repair link that she
6   checked and --
7   A.   Yes.
8   Q.   -- you lay it down next to the one that appears
9   on the next page, what you can see is that it's absolutely
10   identical, character to character identical. So Rachel
11   tested the exact link -- or the link that Rachel refers to
12   that she tested is the exact link that Kristy sent to you.
13       Do you see that --
14   A.   Yes.
15   Q.   -- if you look at page 1 and then page 2?
16   A.   Yes.
17   Q.   Now, looking at page 8 of the same document --
18   A.   Oh, the season for the 3:50 a.m., she's located
19   on the East Coast. So when it comes through on any
20   computer, it's 3:50 a.m., and she sends it at 6:50.
21   Q.   Oh, okay. I thought it had to be something like
22   that. Although people work odd hours, too, right?
23   A.   Sometimes.
24   Q.   Okay. So looking at page 8 of this document,
25   I'm looking at the July 13, 4:41 p.m. Ryan Maloney wrote

4 (Pages 314 to 317)

Case 1:08-cv-03233-RDB    Document 198-2    Filed 12/17/10    Page 84 of 121

**FTC v. Innovative Marketing, Inc. et al. Gieron**                                    **5/5/2010**

318

1  [as read]: Hi, Kristy. We're not going to be able to run
2  **the following tag due to excessive pops. Do you see that?**
3      A. Yes.
4      **Q. And he includes two links that he's telling her**
5  **he's not going to be able to run. Do you see that?**
6      A. It's one link.
7      **Q. Oh, okay.**
8      A. The one with the --
9      **Q. Bracket?**
10     A. Yes. That's sometimes how it looks when you put
11  a link in. Email will sometimes put a variation of it
12  with the brackets around it.
13     **Q. Okay. But so it's --**
14     A. Anytime you see that, yeah, it's usually
15  indicative of formatting from a transfer.
16     **Q. Okay. Now, if you do the same exercise, though,**
17  **with this link that we did before, which was to take**
18  **this -- this whole string and to lay it down next to the**
19  **exact link that Kristy sent to you and the same exact link**
20  **that Rachel Greenberg checked, if you're with me --**
21     A. Yes.
22     **Q. -- this link doesn't match up character per**
23  **character as we saw that it had before.**
24     **And so if you would look at page 1, next to page**
25  **8, the link for Free Repair on page 1 compared to the link**

319

1  for Free Repair on page 8. And, specifically, the
2  **differences that I see are on the -- on the link on page 1**
3  **that Kristy -- that Kristy sent to you and also the one**
4  **that Rachel tested, there was after "FRL/?p=," there was**
5  **on ampersand "w"; and the one on page 8 that Ryan emails**
6  **Kristy about, there was not an ampersand.**
7      **And then there's a -- on the one that Kristy**
8  **sent to you, the next thing after the "w" is "1&id1," but**
9  **the one that Ryan has is "lid1." And, then, even in the**
10  **next character, after "equals," the one that Kristy sent**
11  **is "1m&id2," but the one that Ryan writes about is**
12  **"1mid2=id." So there's at least -- I count three**
13  **different character changes between these two URLs.**
14     **Do you see those things I'm showing you?**
15     A. Yes. There's something with the formatting
16  between different people's emails, because her -- Rachel's
17  and Kristy's match on pages 1 and 2. Ryan and Kristy's
18  match on page 8 on the -- the primary URL. The one in the
19  brackets, as I say, I would probably disregard.
20     The standard URL matches verbatim on page 8 on
21  both Kristy and Ryan; and on pages 1 and 2, the URL
22  matches exactly for Rachel.
23     **Q. No. I saw that 1 and 2, that they matched,**
24  **but --**
25     A. Right. There's something -- there's a

320

1  transference of where that ampersand is being imported in
2  that's not the same on both emails.
3      Q. Okay.
4      A. Does that make sense? There's -- instead of
5  "lid," it's stating 1 and...
6      **Q. Well, I saw three -- yeah, I saw three different**
7  **changes mostly that are relating to the placement of the**
8  **ampersand three different -- three different times.**
9      A. Yeah, the "amp" one, to me, is -- I believe that
10  it strictly just a -- sometimes when you put a URL into --
11  into Outlook and send it, they usually send a variation
12  behind it, which is supposed to take you to the same
13  location. That's not what was being checked. It was
14  being -- the one that Ryan and Kristy had talked about and
15  the one that Rachel matched up with what Kristy sent, but
16  I...
17     **Q. Well, I know that what Rachel and -- I know that**
18  **Rachel matched up something with what Kristy sent, but --**
19     A. Right. But they're both from the same email,
20  which is -- I don't have an answer for, so I don't know if
21  it's a formatting item. I just don't have an answer for
22  it. But they, oddly enough, both match Kristy, but
23  both -- from the same exact email, but both are different.
24     **Q. But they both appear differently?**
25     A. Right.

321

1      **Q. And we had talked about yesterday that if -- the**
2  **way that something's -- a whole URL string, that it's**
3  **possible that any -- a small character adjustment changes**
4  **things in a URL string. Is that right? We had spoken**
5  **about that yesterday.**
6      A. Yes.
7      **Q. Okay.**
8      A. But given that the one that was tested and found
9  the problem matched exactly what was here and these two
10  matched, I just couldn't tell you unless I went back and
11  looked at the origin emails and saw if there was anything
12  that was...
13     **Q. Okay. Well, you don't know which computer -- I**
14  **mean, wouldn't it depend upon which computer ran it and**
15  **tested it?**
16     **I mean, if -- if it -- if the computer that ran**
17  **and tested it was -- if the computer that generated the**
18  **URL was different from the computer that tested it,**
19  **then -- and characters got switched three different times,**
20  **is there no possibility that there could be some**
21  **alteration?**
22     A. Given that they're -- if Rachel's was different
23  than Kristy's or Ryan's was different than Kristy's, then
24  I would say yes. But the fact that they're the same,
25  that's the only part that I'm having --

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 85 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                    5/5/2010

322

1    Q.  The fact that when you say --
2    A.  -- an issue getting past.
3    Q.  -- they're the same, you mean on page 8, that
4  Kristy looks the same as Ryan's on that page?
5    A.  Right.  And then -- right.  On page 8 and page 1
6  and 2.  It would be different if Kristy's remained the
7  same as it did on page 8.
8    Q.  Right.  However --
9    A.  And then Rachel turned hers would mean either
10  that that would be the result URL that she saw.  But, as I
11  said, there's something weird about the formatting on both
12  of these.
13    Q.  Okay.  But the fact of the matter, though, is
14  that these are printed off an AdOn computer --
15    A.  Correct.
16    Q.  -- is that right?  They weren't printed off of
17  Kristy's computer?
18    A.  Correct, but they're both from two different
19  people's email strings, most likely.  Yes, it was from
20  mine and from Ryan's file, and there's -- I don't know
21  without looking at the original.
22    Q.  Okay.  So you don't know what happened with the
23  URL precisely in terms of this email string?  I mean why
24  it appears --
25    A.  In appearance.

323

1    Q.  -- differently and which exact one was tested?
2    MR. ARENSON:  Objection, misstates the
3  testimony.
4    MS. GURLAND:  It's a question, so I didn't mean
5  to misstate anything.
6  BY MS. GURLAND:
7    Q.  Could you say precisely the one that was tested,
8  whether the one that was tested had the ampersand or
9  didn't have the ampersand in that particular computer when
10  it was tested; do you know?
11    A.  I don't know.
12    Q.  And I just want to direct your attention also to
13  another matter on page -- on document 25.  If you look at
14  page 2 and page 3 of G25 [sic], -- and I'm looking at --
15  I'm looking at the -- I'm looking, again, at the link for
16  a Free Repair that Kristy sends on June 28, 2006.  I'm
17  looking at that link of Free Repair.
18    And, then, looking at the next page, it appears
19  to be the same email.  Again, another form of it.  This
20  one is June 28, 2006, at 11:44 a.m., and it has a link for
21  Free Repair also, except it has some other links
22  underneath it.
23    Do you see that?
24    A.  Uh-huh.
25    Q.  Do you have any idea why an email that purported

324

1  to be the same email at exactly the same time with exactly
2  the same verbal content would contain three different
3  additional lines in one that it didn't have in the other?
4    A.  I don't have the answer.  That was not the focus
5  of what was being sent to her.
6    Q.  Oh, I know.  The focus that I have is -- is a
7  document issue, is a document production issue.  It's not
8  a --
9    A.  I would -- I would recommend, then, calling
10  Microsoft.  I don't have an answer as to things that are
11  replicated when they're sent than when you're sending
12  items through Instant Messenger and they -- they send both
13  versions of the same URL through.
14    Q.  Okay.  Well, this is not both versions, because
15  it's not as if there's -- so, for the record, it's clear,
16  we're talking about G25, and then we're talking about
17  page -- page 2.  And on page 2, there's a Wednesday, June
18  28, 2006, 11:44 a.m. email from Kristy Ross to Geoff
19  Gieron, and it has one link for Free Repair.
20    And, then, if you go to the very next page, it
21  purports to be exactly the same email -- same time, same
22  date stamp, same words.  But, now, when you look at the
23  Free Repair link, it's not just that it repeats itself; it
24  has -- oh, I see, it's picking up from -- no, it has
25  additional characters even.  It has -- the first one has

325

1  the characters, and then it has freerepair.org/FRL and it
2  has "p=1&amp" "w=1&amp."  Those -- those "amp" characters
3  don't appear at all in the URL on page 2.
4    Do you see that they don't?
5    A.  Right.  No, that's not what was being -- I
6  would -- honestly, I would have a conversation with
7  Microsoft based on settings, because it does the same
8  thing to her email.  So it was probably the settings in
9  Ryan's computer that -- that caused the brackets, but
10  those were not ever in question.
11    Q.  When you say "those were not ever in question,"
12  I'm asking --
13    A.  I'm saying -- I'm saying, then, you're calling
14  to question it was even sent to Kristy, because the same
15  thing happens up there.  So she probably didn't -- I'm
16  just confused.  Sorry.  I guess I don't understand.
17    Q.  No, I'm just asking why it appears different.
18  Because, to me, if you looked at one email on one date
19  that was supposed to be exactly the same as another one,
20  and then there were changes to one of them, I'd be curious
21  about that.
22    A.  Right.  So they're just -- they're repeating the
23  same URL over and over again.  That could be a system of
24  forwarding, just as her email address is repeated multiple
25  times.

6 (Pages 322 to 325)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 86 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                    5/5/2010

326

1    Q. But it's not repeating. I mean, not to put too
2    small of a point in, but it's not a reputation. This
3    "p=1&amp" is not a repetition. It's something that was
4    never there before. It was never -- it wasn't in Kristy's
5    original Free Repair link. That's new characters, new
6    letters.
7    A. Correct. But that wouldn't have been what was
8    being tested.
9    Q. No, I wasn't asking about that. I'm asking you
10   about why two emails that purport to be the same in two
11   different document productions are --
12       MR. ARENSON: Objection. He said he doesn't
13   know. I'm not sure why we keep asking him.
14       MS. GURLAND: Because I want to make it clear
15   I'm not talking about what Kristy tested, which he
16   answered. I'm talking about -- I'm just trying to
17   understand why they look different.
18       MR. ARENSON: He indicated that he doesn't know.
19       THE WITNESS: I believe it's a -- it's a
20   formatting of Outlook. The person was forwarding it from
21   web mail versus desktop mail. There's -- it's the same --
22   I have no answers to the same, as to why her email address
23   shows up with the space symbol of "%5d" behind her name.
24   BY MS. GURLAND:
25   Q. There's just not an answer that you can give?

327

1    A. I just do not have an answer.
2    Q. Moving on to -- I'm going to skip ahead of 25.5
3    that I'm going to skip. So moving on to Exhibit 26, which
4    is a 22-page exhibit.
5        (Exhibit KRG26 referenced.)
6    BY MS. GURLAND:
7    Q. If you take a look at that. And the same
8    question for that, then, for all of them, are these emails
9    that AdOn kept and maintained in the ordinary course?
10       MR. ARENSON: Counsel, excuse me. We're on
11   Exhibit --
12       MS. GURLAND: 26.
13   BY MS. GURLAND:
14   Q. Did I hand you 26 or 27? 'Cause there shouldn't
15   have been that many pages.
16   A. 26.
17   Q. That solves the mystery.
18       Okay. So 26, I meant to say that it is a
19   seven-page exhibit. That will clear things up.
20       All right. Do you have -- you have that in
21   front of you?
22   A. Yes.
23   Q. Directing your attention to page 4, at the
24   bottom, there's a July 11, 2006, 7:42 a.m. email from Mike
25   Romoff to Robert McDaniel. And Mike Romoff, is the

328

1    individual from 3601 that we spoke about?
2    A. Yes.
3    Q. The email says [as read]: Hey, Robert, if you
4    can please block any ErrorSafe and RedOrbit ads from the
5    feed, I would appreciate it. The ErrorSafe ads are
6    spawning multiple pops, and we have gotten a number of
7    complaints about RedOrbit for a variety of reasons. If
8    you can, please confirm that these ads are not coming to
9    us from you. That would be great.
10       Do you see that?
11   A. Yes.
12   Q. Okay. And, then, July 11, 2006, right above
13   that, 12:45 a.m., Robert McDaniel sends an email to Mike
14   Romoff saying [as read]: Mike, they are looking for these
15   ads now. Do you happen to have the URLs that will
16   generate the ads or the advertiser's landing URLs?
17       Do you see that?
18   A. Uh-huh.
19   Q. Okay. And when Mike writes -- and when Robert
20   writes that they are looking for these ads now, would that
21   be the people on the AdOn team that we're going to try
22   to --
23   A. Yes.
24   Q. -- check them out?
25       Okay. And, then, looking at the email above

329

1    that, July 12, 2006, at 7:12 a.m., Mike Romoff writes [as
2    read]: Hey, Robert, got another complaint about
3    ErrorSafe. This is the URL. And he provides the URL
4    from -- he provides an entire http site -- or http link, I
5    should say. Is that correct?
6    A. Correct.
7    Q. And, then, right above that, there's email
8    July 22, 2006, at 12:25 p.m. from Robert McDaniel to Mike
9    Romoff where Robert writes [as read]: Thanks, Mike. I'm
10   following up with Advertiser Services to see if they have
11   been able to find the account.
12       Do you see all that?
13   A. Yes.
14   Q. Okay. Now, what was RedOrbit? Was RedOrbit
15   anything that Kristy placed through you, or is that a
16   different advertiser?
17   A. It was a different advertiser in the system.
18   Q. Okay. So, then, going to page 3 of the
19   document, July 12, 2006, at 8:40 p.m., Mike Romoff writes
20   to Robert McDaniel [as read]: Mike, we're still looking
21   to find either of these vendors, but can't find them in
22   our system. We've had our DBA scan all landing URLs for
23   either of the domains, but don't see it.
24       What's "our DBA"?
25   A. Database analyst.

7 (Pages 326 to 329)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 87 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                           5/5/2010

330

1    Q.  Okay.  And so what is going on here is that you
2    have not been able to find the ad in your system that Mike
3    Romoff is complaining that he sees; is that correct?
4    A.  Correct.  When he's referencing that the DBA
5    scans -- scanned all landing page URLs, he's stating that
6    the system went to look for, you know, something that
7    would state the URL itself.  You know, AntiVirus,
8    ErrorSafe, whatever it is.  If they're using a redirect --
9    adfarm.mediaplex.com, any redirect URL would not be caught
10   in a scan because he's strictly looking for a set -- set
11   item within the system.  So he's looking for the root
12   domain of any sort of ad in the system.
13   Q.  Okay.  So he's looking for URLs that Kristy
14   would have maybe sent to you?
15   A.  Yeah, any one in the whole entire network,
16   correct.
17   Q.  He's looking through every URL that anybody in
18   the network would have sent?
19   A.  Yeah, any advertiser account.  'Cause, once
20   again, when you're -- when we're trying to replicate a
21   probable as being stated, we have to go in and click
22   through them numerous times to try to replicate it
23   ourselves.  If we're not seeing the ad or the behavior,
24   then we try to scan above and beyond where we are
25   currently looking.

331

1    Q.  Okay.  Got it.
2        Now, if we look on page 3 at the top -- and this
3    is in the -- in the URL that you can actually see at the
4    top of the screen shot.
5    A.  Uh-huh.
6    Q.  The http, and it's www.antivirus.com?lid, do you
7    see that?
8    A.  Yes.
9    Q.  Okay.  And is that -- is there any way that you
10   can determine with any kind of certainty that that is a
11   link that Kristy ever sent to you?  Did she send you that
12   link?
13   A.  With certainty, no.
14   Q.  Okay.  Then we go to page 7 of this document,
15   the last page.  On July 12th, you write to Robert -- you
16   write to Robert McDaniel, July 12th, 2006, at 5:32 p.m.
17   [as read]:  I have no idea where this is coming from.  I
18   had Vimal look and no luck.  Is this on pub or desktop
19   traffic?  Any idea what spawned it?  I want to get it out
20   of there, if possible.
21       Do you see that?
22   A.  Right.
23   Q.  And, then, immediately above that, Robert
24   McDaniel writes to you, July 12, 2006, 8:38 p.m., and
25   writes [as read]:  It's in desktop 182 traffic.  No idea

332

1    what spawned it.  I haven't been able to get it either.
2        Do you see that?
3    A.  Yes.
4    Q.  Okay.  Does that mean, as of the time that you
5    stopped the continuous investigation to try to find this
6    ad, that you never did find it in your system; is that
7    right?
8    A.  Never?  I don't have an answer to that without
9    -- at that point, we were unable to identify and
10   replicate.
11   Q.  So you don't know where it came from; is that
12   right?
13   A.  At that point, no.
14   Q.  Okay.  Do you have information at sometime that
15   you did that you have -- I mean, as you sit here, do you
16   think that you know now?
17   A.  I can't be certain unless I go through and
18   continue down the string of events.  But, at that point,
19   when we were answering, we were unable to identify the URL
20   strictly by view, which Vimal was the person who was
21   looking for just the URL in the system.
22   Q.  Oh, Vimal is an individual?
23   A.  Yes.
24   Q.  I thought it was a technical --
25   A.  He's a database analyst in India.  But he -- so

333

1    that's why we state we asked him for very specific things.
2    He has to follow very specific tasks.
3        So, at that point, when this email is sent, we
4    were having a difficulty (1) identifying the ad in the
5    system.
6    Q.  Okay.  Great.
7        And I -- I believe that that was the -- I would
8    represent to you that it's my good faith brief that that
9    is the end of that chain, because it was my good faith
10   attempt that that was the last word on that exchange.  But
11   I don't have any more documents to show you.
12   A.  Okay.
13   Q.  Okay.  And before we leave that one, I think
14   there's one other issue, separate issue, but in the same
15   email chain.
16       If you look at the first page of the exhibit,
17   and you'll see Mike Romoff writes to Robert McDaniel [as
18   read]:  Hi, Robert.  These are now spawning ActiveX.
19   Please block all antivirus registry cleaner ads coming
20   through your feed.  We can't have these happening.  I am
21   getting a lot of complaints, and it's coming from your
22   feed.  Please confirm when blocked.  I'm going to have to
23   take your feed down from some traffic until you can pull
24   these.  Thanks, Mike.
25       Do you see that?

8 (Pages 330 to 333)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 88 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                              5/5/2010

334

1    A.  Uh-huh.
2    Q.  And that was at 3 -- that email was 3:17 p.m. on
3  July 13, 2006.
4    A.  Correct.
5    Q.  You see that?
6       Okay.  And, then, on page 2 of -- are we on 26?
7  Yes.  Page 2 of this same exhibit, at the bottom, Mike --
8  on July 13, 2006, 6:09 p.m. email writes -- Mike Romoff
9  writes to Robert McDaniel [as read]:  Robert, we see this
10  ad a lot.  Usually, it's fine.  But, now, it seems to be
11  spawning pops and forcing ActiveX downloads.  Can you take
12  a look for me, please?
13       Can you -- do you see that?
14    A.  Yes.
15    Q.  Okay.  Now, do you -- have I already -- yes, I
16  handed it to you.  Okay.  Keep those exhibits there.
17       (Exhibit KRG27 referenced.)
18  BY MS. GURLAND:
19    Q.  You may refer back, but I'm handing you what's
20  been marked KRG27.  And that is, indeed, the 22-page
21  exhibit, 1 through 22.  Can you look at that.
22    A.  Yes.
23    Q.  All right.  And same question for that as for
24  the others.  So these are all documents maintained in the
25  ordinary course of AdOn's business?

335

1    A.  Yes.
2    Q.  Okay.  And on -- I'm on page 2 of this exhibit.
3  July 13, 2006, 6:42 p.m., email from Ryan Maloney to
4  Kristy in which he writes [as read]:  Hi, Kristy.  With
5  respect to the antivirus tags in various accounts, we had
6  to deselect traffic due to ActiveX spawn.
7       Do you see that?
8    A.  Yes.
9    Q.  And then he gives her a number of screen shots.
10  Do you see that?
11    A.  Yes.
12    Q.  Kristy emails back.  Immediately above it, you
13  can see July 13, 2006, at 7:06 p.m., to Ryan and to you
14  saying [as read]:  Ryan will check this out.  May be
15  something to do with Firefox.  Not sure.  We'll try to get
16  you a response.
17       Do you see that?
18    A.  Yes.
19    Q.  Okay.  And we talked about -- is Firefox a
20  browser?
21    A.  Yes.
22    Q.  Okay.  And, then, going to page 4 of this
23  exhibit, there is a July 14, 2006, 5:14 p.m. email from
24  Ryan Maloney to Kristy [as read]:  Hi, Kristy.  I have
25  Firefox loaded on my system and Geoff uses IE.

336

1       Is that Internet Explorer?
2    A.  Correct.
3    Q.  [As read] When we both click on the links below,
4  all appears fine.  However, another mG employee works out
5  of state, who also uses Firefox, received several pops
6  when she loaded.  Perhaps it is a Firefox issue.
7       Do you see that?
8    A.  Yes.
9    Q.  So Ryan Maloney, at least he's -- I don't know
10  what -- what he's writing to Kristy at that time is that
11  he believes it's possible that it is a Firefox issue.  Do
12  you see that?
13    A.  That he's -- he believes -- yes.  I mean,
14  he's -- without any major technical knowledge, he's just
15  supporting what she had stated before.
16    Q.  Okay.  Did you form your own belief as to
17  whether it was or was not a Firefox issue at that time?
18    A.  No.
19    Q.  Okay.  So you didn't offer an opinion to anybody
20  that he was wrong and it wasn't a Firefox issue based on
21  any kind of superior knowledge, did you?
22    A.  I don't see where I was copied on that specific
23  email.  However --
24    Q.  Okay.  Well, you're involved in --
25       MR. ARENSON:  Let him finish his answer.

337

1       MS. GURLAND:  I'm sorry.  Go ahead.
2       THE WITNESS:  But in regards to us testing the
3  Firefox/IE in the office versus an employee outside of the
4  office using -- who is strictly on Firefox, it could lend
5  itself one way or the other.
6  BY MS. GURLAND:
7    Q.  It could?
8    A.  Lend itself one way or the other.  There's not
9  enough -- if I'm not even able to re-create it, I can't
10  have a full-blown opinion on it.
11    Q.  Okay.  Now, I believe that this is the same --
12  if you went to page -- if we're in 27, if you want to
13  page 6 at the bottom, are these the same -- what happens
14  is that some screen shots are sent to -- Ryan Maloney asks
15  Rachel Greenberg to do some screen shots for him,
16  eventually, because on July 17th at 10:38 a.m., she writes
17  [as read]:  Your screen shots, here they are.
18    A.  Yes.
19    Q.  Do you see that?
20       And are those screen shots -- if you went to
21  pages 20 and 21 of this exhibit --
22    A.  Yes.
23    Q.  -- are those the screen shots that Rachel
24  Greenberg -- I mean, is it your belief that those are the
25  screen shots that Rachel Greenberg sent back?

9 (Pages 334 to 337)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 89 of 121

**FTC v. Innovative Marketing, Inc. et al. Gieron**                    **5/5/2010**

338

1    A.  They are.
2    Q.  Okay.
3    A.  For some reason, some image files don't carry
4  over when all the data collection was handled, so --
5    Q.  Right.  And they --
6    A.  -- they were asking for me to hunt them --
7    Q.  -- so you were --
8    (Court reporter admonition.)
9    THE WITNESS:  When the information was initially
10  gathered, some just image files wouldn't carry over.  So
11  when Colleen and Ethan requested me to request from these
12  individuals the original files, I was able to capture the
13  images again.
14  BY MS. GURLAND:
15    Q.  Okay.  And when you captured -- so when you
16  captured the images again, does that mean that this was
17  the image that was viewed on that link at the date that
18  you called it up again?
19    A.  Yes.
20    Q.  Does that make sense?
21    A.  It was the original email was captured rather
22  than forwarded, finding the origin email --
23    Q.  Okay.
24    A.  -- and forwarding, which I believe was the cause
25  of the loss of the image.

339

1    Q.  Okay.
2    A.  I simply took the entire email in whole and gave
3  it to them so it stayed intact.
4    Q.  Oh, okay.  Because there was -- so was this -- I
5  guess what I'm trying to figure out is, was this picture
6  in hardcopy in your files?
7    A.  I didn't -- I don't have hardcopy of that.  It's
8  in our digital files, yes.
9    Q.  So it wasn't -- it wasn't as if you --
10  did you -- if you were to try to recreate the picture
11  again, did you go and find that picture as the link was
12  today, or would it have been as the link was at exactly
13  the day that it was sent?
14    A.  Exactly the day it was sent.
15    Q.  Okay.  That's what I was trying to ask.
16    And if you look at page 5 of the same -- of the
17  same chain -- I think 5.  No, 6.  6, rather.  At the top
18  of the page, July 17, 2006, at 11:00 a.m., Kristy writes
19  [as read]:  Ryan, okay, I see that.  That is not a popup;
20  it is a flash in the web site.  I had no idea that is what
21  you were talking about.  This is an example of the
22  scanner.
23    Do you see where she says that?
24    A.  Yes.
25    Q.  [As read]  If it's really a problem, I can change

340

1  the page.  The conversion is not as high, but this is
2  certainly not a popup or ActiveX.
3    Is that what it says?
4    A.  Yes.
5    Q.  Okay.  And do you know precisely what was sent
6  to Kristy?
7    A.  The screen shots.
8    Q.  Do you know that the screen shots -- do you know
9  for -- to a certainty, that the screen shots that were
10  sent to Kristy were precisely the screen shots that
11  Rachel -- precisely the screen shots that appear at 20 and
12  21?
13    A.  Yes.
14    Q.  And what she's writing in this email is, she's
15  saying this is an example of the scanner; is that right?
16  It doesn't say this is a scanner, does it?
17    A.  Yes.
18    Q.  Example of, right?
19    A.  Correct.
20    Q.  In addition, I just want to go back to 19 and --
21  or I guess it's now 20 and 21, where these screen shots
22  are for a minute and to look at this box in the middle
23  that we talked about as being not a pop but imbedded.
24    A.  Correct.
25    Q.  Okay.  And if you -- if a person were able to

341

1  see this as a live ad, is it not accurate that this little
2  box that says "Warning" in it, would have been -- would
3  have had more screens than that, would have been kind
4  of -- would have had several screens, not just --
5    MR. ARENSON:  Objection, lacks foundation.
6  BY MS. GURLAND:
7    Q.  Do you know -- did you -- did you look at -- at
8  the time, did you look at the screen shots that -- did you
9  look at the screen shots that Rachel sent or did you look
10  at an actual ad?
11    A.  Both.
12    Q.  You looked at both.  Okay.
13    A.  Yes.
14    Q.  And when you looked, at the time, at the actual
15  ad, do you remember how this imbedded box appeared?  Did
16  it appear as one -- one flat screen only or as a flash
17  which was capable of changing into not just this, what we
18  see, but other -- other pictures as well?
19    A.  At the time, the functionality was that box
20  could be moved anywhere in the window, just not outside of
21  it.  So it was able to -- the appearance initially looked
22  negative.  The actual -- once Kristy gave that
23  explanation, we were able to confirm that that box did not
24  move out.  It did not inhibit the activity of the ad in
25  that view.

10 (Pages 338 to 341)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 90 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                    5/5/2010

342

1    I could still close the window at the top
2 right-hand corner. The little box itself was not separate
3 of its own window. It was part of that window, and that's
4 why it was able to continue on.
5    Q. Yeah, no, I know that. And that's where we
6 talked about yesterday, focusing on ActiveX. But I want
7 to focus for a minute on just this box itself that talks
8 about DriveCleaner --
9    A. Right.
10    Q. -- and what that was like. Was that a flash --
11 was that a flash?
12    A. Yes.
13    Q. Is that what that's called?
14    And what does that term mean?
15    A. It's -- it's a type of creative formatting
16 within a web page.
17    Q. Okay. And within -- and in that type of
18 creative formatting, is it a flat -- is it a flat image
19 that doesn't change, or is it an image that has more than
20 one picture with it?
21    A. It can change.
22    MR. ARENSON: Objection, lacks foundation.
23    MS. GURLAND: Well, he said that --
24    THE WITNESS: It can change.
25 BY MS. GURLAND:

343

1    Q. It can change.
2    Okay. Can you explain just --
3    MR. ARENSON: Are we talking about flash in
4 general, or are we talking about this ad?
5    MS. GURLAND: No. We're talking about -- we're
6 talking about this ad in which he said it's flash. And so
7 in this format -- and he said it could change, and I just
8 want to try to understand that.
9 BY MS. GURLAND:
10    Q. Can you explain that to me?
11    A. Flash is not 100 percent safe. It has the
12 capability of changing whenever. That's all controlled by
13 the creator of the flash file.
14    Q. Okay.
15    A. I state that that's the big problem with any
16 distributor of malicious content on the Internet
17 currently.
18    Q. Currently?
19    A. Right. Which is why Apple doesn't accept Adobe
20 anymore.
21    Q. Okay. But going back to this -- this timeframe
22 and this ad that -- with this content, if the -- if what
23 you're telling me is that this box that you found not to
24 be an ActiveX pop but, rather, a flash was, indeed, a
25 flash with respect to the functionality of that box in

344

1 that ad, what does that mean that it would do?
2    MR. ARENSON: Objection, ambiguous, lacks
3 foundation.
4    THE WITNESS: I don't know what it would do. I
5 think it was strictly made to be part of the ad to create
6 the same, you know, warning method without -- with being
7 able to still run inside the network. It didn't have the
8 same personality or issues that would put it against a
9 relevancy guideline.
10 BY MS. GURLAND:
11    Q. Well, if you look at the box, it says that
12 DriveCleaner found files, right? Is that right? Does it
13 say that?
14    A. (No oral response.)
15    Q. Okay. And you know that there's not -- I mean,
16 does this -- can a flash scan things?
17    A. No.
18    Q. Okay. So when -- and you know that -- I mean,
19 you're not amazed by that, right? You know a flash can't
20 scan things, can it?
21    A. To my knowledge, I wouldn't believe it could.
22    Q. Okay. So when you were reviewing this -- I
23 mean, you have guidelines. You're not supposed to put
24 anything -- even if it -- ActiveX isn't the only issue you
25 have, is it? I mean, you have other issues in your

345

1 network. I mean, other kinds of ads you have to protect
2 against besides popups, right?
3    A. What are you stating? That we don't allow
4 flashing?
5    Q. No, no, no, not that you don't allow flash, but
6 you don't allow things that aren't true. I mean, you
7 don't allow ads that you know are not true in your
8 network, do you?
9    A. To my knowledge, yeah. I mean, we don't usually
10 state that we try to place anything that's not true. But,
11 again, it comes down to marketing. If you can state that
12 all marketing is true, then we have a different
13 conversation.
14    Q. Okay. No, but that's what I'm -- that's what
15 I'm trying to get to, because I'm trying to talk about the
16 behavior of this flash picture in this ad. Because if you
17 look --
18    A. And I have to go back and state, I never stated
19 it's flash. It was stated by Kristy. So the
20 assumption -- I don't have the inner-workings at that
21 point in time to have known what was exactly flash. I
22 know what the functionality acted like. As I said, I was
23 able to drag the box back and forth. I didn't know the
24 makeup of it.
25    Do I know about flash today? Yes, but --

11 (Pages 342 to 345)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 91 of 121

**FTC v. Innovative Marketing, Inc. et al. Gieron**                    **5/5/2010**

346

1    Q. No, I want to talk about your knowledge then.
2    But mostly what I want to talk about is what you saw then
3    when you looked at this ad, because was it you that
4    approved it? I mean, we'll see later --
5    A. No.
6    Q. -- if it was approved.
7    It was Ryan?
8    A. Correct.
9    Q. It was Ryan who -- but it gets approved at
10   AdOn --
11   A. Correct.
12   Q. -- is that right?
13   A. Correct.
14   Q. Okay. So what I just wanted to make sure that I
15   was testing is not -- not knowledge now about flashes, but
16   your knowledge about how this -- how this box and this ad
17   appeared at the time that AdOn approved it to run on its
18   network.
19   MR. ARENSON: Is there a question?
20   MS. GURLAND: Yes. I want to ask him about what
21   this -- what the functionality was of that box, and did it
22   change pictures at the time that AdOn approved this ad to
23   run in its network?
24   MR. ARENSON: Objection, lacks foundation.
25   Objection, asked and answered.

347

1    THE WITNESS: I don't know if it ever changed.
2    I'm not in control of the creative -- of that page. And
3    what the function of it did, I don't recall.
4    BY MS. GURLAND:
5    Q. Okay. When I talk about change, though, I'm not
6    talking about a change that it appears one way one time
7    and it appears another way to somebody else another
8    time --
9    A. Okay.
10   Q. -- like we were talking about the -- trying
11   to -- I mean, some kind of trickery or something. I'm not
12   talking about that.
13   What I'm talking about is that the way that it's
14   made is to be a flash movie. That's what I'm talking
15   about. That they're right within functionality. No
16   tricks or anything. But that it doesn't just have one
17   flat image, that there's more than one image. It shows
18   one thing and then another and another.
19   MR. ARENSON: Objection, asked and answered.
20   Objection, lack of foundation.
21   BY MS. GURLAND:
22   Q. You can answer, 'cause I think it's clear.
23   A. I'm confused about the multiple image component.
24   I just know that there was a dual -- you know, that was a
25   layer above what I was -- above the page, but it was

348

1    within the frame of the page.
2    Q. Okay. And when you say you're confused about
3    the multiple image component --
4    A. Yeah, are you asking if, all the sudden, a bunch
5    of them started showing up?
6    Q. No, no, no. I'm asking that within this image,
7    the thing that says "DriveCleaner" in it --
8    A. Right.
9    Q. -- just that little box that we've talked about
10   is a flash or at least --
11   A. It was a --
12   (Court reporter admonition.)
13   THE WITNESS: I just said yes, that I was a
14   agreeing with what she was stating.
15   BY MS. GURLAND:
16   Q. Or it might have been a flash?
17   A. It could have been.
18   MR. ARENSON: Objection. Again, lacks
19   foundation. The only one who said it was flash was Kristy
20   Ross. He's already testified that he doesn't know.
21   BY MS. GURLAND:
22   Q. Okay. Then I just want to talk to you only,
23   Geoff, about what you do know.
24   And so we have talked about that you've looked
25   at the ad at the time, and you looked at the ad at the

349

1    time with the box. And you looked at the ad at the time
2    that AdOn approved it to run on its network?
3    A. Correct.
4    Q. And so at the time that you looked at it, when
5    AdOn approved it to run, do you know whether or not this
6    flash was the only picture that was contained in the
7    flash, or whether or not it could have -- whether or not
8    there were other pictures also?
9    I mean, you know, meant to be there. Not any
10   kind of redirection, but other pictures that were part of
11   this, integral to this box.
12   MR. ARENSON: Objection, lacks foundation,
13   compound, asked and answered.
14   THE WITNESS: I only know what I -- what I see
15   here and from memory is similar to what I saw there. What
16   other functionality it was able to provide, I couldn't
17   tell you.
18   BY MS. GURLAND:
19   Q. Okay. So looking at page -- page 7 of this, and
20   this is the three -- a string where AdOn is approving this
21   ad; is that right?
22   If you look at the bottom email from you to
23   Kristy, re: Your screen shots, you write -- I think it's
24   a mistake, but you write [as read]: Confirm with Rachel
25   that she sees that the pop is imbedded in the page. I

12 (Pages 346 to 349)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 92 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                    5/5/2010

350

1  have no problem with that since the browser window can
2  close. See if she is okay. Feel free to call her and
3  look at it with her to discuss. Geoff.
4      Do you see that?
5  A. Yes.
6      Q. And then you write to Kristy, July 17th, '06, at
7  3:58 p.m. [as read]: Kristy, sorry I sent the
8  instructions below to you. They were meant for Ryan and
9  our media buyer. Just trying to get everything working
10 okay for you. Sorry for the incorrect email.
11     Do you see that?
12 A. Yes.
13     Q. Okay. So this shows that you were -- actually,
14 I don't know if you were the final one that approved it.
15 But you were, fair to say, involved in the process of
16 approving it; is that right?
17 A. I was involved in the process of connecting the
18 person overseeing traffic and my senior account manager to
19 go through and have the final say. I did verify that it
20 was -- I think I still state it was a pop versus flash,
21 but the functionality, as well as highlighting, was within
22 our standards of my set.
23     Q. No, no, no. I know that's what you were focused
24 on.
25     And July 17, 2006, at 1:50, Kristy writes [as

351

1  read[: Geoff, no problem. Let me know the response.
2      And that's no problem that she got the errant
3  instruction; is that right?
4      MR. ARENSON: Objection, lacks foundation.
5      THE WITNESS: Right.
6  BY MS. GURLAND:
7      Q. Then, turning to page 9 of this exhibit,
8  7/17/06, 7:17 p.m., Ryan Maloney writes to Kristy [as
9  read]: Hi, Kristy. I think we're okay with it. I just
10 need to check one more thing. We should be good to go by
11 the morning. Thanks for your patience. Ryan.
12     Do you see that?
13 A. Yes.
14     Q. Okay. Then, on page 11 of this exhibit -- and
15 this is 7/18/06, 12:51 p.m., Ryan writes to Kristy [as
16 read]: Hi, Kristy. Okay. We're ready to launch. To
17 reiterate -- and then he puts -- he lists several links
18 that -- are these, then, the ads that you had approved and
19 now these ads are ready to run; is that correct?
20 A. The first landing page link is what was being
21 referenced, yes.
22     Q. Okay. For each --
23 A. The one and the --
24     Q. -- the 6 and 7?
25 A. Right. The duplicates or the variations you see

352

1  in the brackets are -- once again, that's a formatting
2  item, that I can't -- I can't speak to.
3      Q. Okay. Well, I was just -- if you were to, then,
4  look at this page. So these links -- well, if you compare
5  them to on page 5 of the same exhibit, page 5 purports to
6  be the emails that Kristy sent to Ryan with the
7  adfarm.mediaplex.com link.
8      Do you see at the bottom she has one --
9  A. Correct.
10     Q. -- for adfarm.mediaplex 6 and one for 7?
11 A. Correct.
12     Q. And if you -- they match up with the ones that
13 you're going to launch, if you look at -- if you compare 5
14 and 11 --
15 A. Correct.
16     Q. -- is that right?
17     But if you look at pages 20 and 21 and match up
18 those links, I mean, they should -- it should be the same,
19 right? It should be the same ads; should they be?
20 A. Yeah.
21     Q. Okay. But if you look -- if you compare -- now,
22 I'm at page 5 where Kristy's sending the links for the
23 Cognac6 account for adfarm.mediaplex, and I'm comparing
24 them to what's on page 20, which is -- 20 and 21, which
25 are the screen shots from Rachel Greenberg.

353

1  A. Yes.
2      Q. Those -- those links don't match, do they?
3  A. Which links?
4      Q. The link that Kristy sent and the link that Ryan
5  confirmed that he was going to run. So the links that are
6  the links that Kristy sent, page 5, and the links that you
7  activated at page 11, what I'm saying is that those links
8  are the same, but they don't match with the screen shot
9  that Rachel sent at pages 20 and 21.
10 A. Of course, they wouldn't.
11     Q. Of course, they?
12 A. Would not.
13     Q. Would not.
14 A. The intention was not for them to match. She
15 was sending the screen shot URL, but it has to track
16 through adfarm.mediaplex.
17     Q. Well, they're the same except for one digit --
18 A. The question mark?
19     Q. -- or two. There's a -- there's an
20 additional -- right. So I'm not sure I understand.
21 They're not supposed to be the same. I don't really
22 understand that.
23 A. I thought you were talking about the screen shot
24 versus -- the drivecleaner.com versus that.
25     Q. No, no. I'm talking about -- if you look at

13 (Pages 350 to 353)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 93 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                    5/5/2010

354

1  page 5 at the bottom, the link for Cognac6 and 7 that
2  Kristy sends to you --
3      A. Uh-huh.
4      Q. -- and if you compare that to pages 20 and 21,
5  the links for the screen shots that Rachel Greenberg of
6  AdOn tested, those links don't match.
7      A. Right. There's a dash instead of a question
8  mark.
9      Q. There's a dash and there's a -- in the one that
10 Kristy sent and in the one that you activated on your
11 network, there was an extra "0?" before the "mpt."
12     Do you see that?
13     A. Yes.
14     Q. Okay.
15     A. I can't tell you which one was activated on the
16 network, though.
17     Q. What do you --
18     A. So you're asking me to be able to see into my
19 database the time that this all happened, which was
20 linked, without accounting for human error and passing
21 information on a -- on anything else.
22     Q. Okay.
23     A. If it was incorrect, then she would have
24 contacted us and stated there was a discrepancy or a
25 problem.

355

1      Q. Who would have done that?
2      A. Kristy. She had complete access to her account,
3  so for verification of all URLs was constant.
4      Q. Leaving aside what she would maybe have done and
5  would maybe have not have done, I think what we can say
6  that we do know is that there is -- there are two links
7  for adfarm.mediaplex, Cognac6 and Cognac7 account, and
8  there are -- there's a link that Kristy sent you on page
9  5; is that right? There are two links she sends on you
10 page 5?
11     A. Correct.
12     Q. And there is -- on page 11, there wasn't human
13 error on at least Ryan Maloney's side, because he -- the
14 strings that he sends, those are exactly the same,
15 character by character, as the one that Kristy sends.
16     A. Right, which would have been put into the
17 system, correct.
18     Q. So there wasn't any human error there. But
19 where I am is the screen shots that Rachel Greenberg did,
20 and there's an extra zero and there's an extra question
21 mark that Rachel doesn't have in her screen shot.
22     See, I don't know that Kristy ever got precisely
23 these two pages, but I don't see the -- I don't see the
24 "0?" on Rachel's screen shot.
25     A. Rachel wasn't testing inside the system. She

356

1  was simply looking at a link and sending over some
2  information of what she saw, because that's her job.
3      Q. Okay. A link that she got from AdOn; is that
4  right?
5      A. A link that she got from an email forward that
6  was provided from Kristy and Ryan, correct.
7      Q. But the fact remains that this link, the
8  link that is in Rachel's screen shot, doesn't match
9  exactly with what Kristy sent you and with what Ryan
10 activated?
11     MR. ARENSON: Objection, asked and answered.
12     THE WITNESS: But Kristy confirmed the behavior
13 that was seen and knew exactly what was being referenced.
14 BY MS. GURLAND:
15     Q. Okay. But I'm not asking about that. I'm
16 asking -- what I'm asking --
17     MR. ARENSON: Objection, asked and answered.
18 Just because you don't like his answer --
19     MS. GURLAND: No, I didn't get an answer. I
20 didn't.
21     MR. ARENSON: You've asked him three times now,
22 the links don't match, and he's answered you.
23     THE WITNESS: Yes. The link that Rachel put on
24 top of a screen shot did not match. That was not the link
25 taken from the system. So how she lost those two symbols,

357

1  I can't tell you.
2      (Exhibit KRG28 referenced.)
3  BY MS. GURLAND:
4      Q. Okay. Directing your attention to -- I'm done
5  with this one. G28, which is a six-page exhibit. And
6  same question, are these AdOn emails maintained in the
7  ordinary course?
8      A. Yeah.
9      Q. Okay. And I direct your attention to page 1 of
10 the exhibit where Mike Romoff, who we've seen before of
11 360I, writes to Robert McDaniel [as read]: Hey, Robert.
12 It's confusing. There are a few separate issues here:
13 ActiveX obviously causes a lot of problems, so we can't
14 have those. Often, these ads will have some multiple pops
15 or aggressive exit pop (2); (3) RON registry ads cause a
16 number of complaints from publishers because of the
17 perception of 1 and 2. So even clean ads get roped into
18 the same camp as the bad apple.
19     Do you see that?
20     A. Yes.
21     Q. And he writes [as read]: I've also seen a lot
22 of regular ads that become ActiveX at night or on the
23 weekends.
24     Do you see that?
25     A. Correct.

14 (Pages 354 to 357)

**FTC v. Innovative Marketing, Inc. et al. Gieron**                    **5/5/2010**

358

1    Q.  And, then, skipping down to a couple of lines
2  before the bottom, he -- Mike Romoff writes [as read]:  If
3  I weren't getting so many complaints, I'd be fine with it.
4  But because of all the issues these ads cause, we may have
5  to implement that policy.
6    Do you see that?
7    A.  Yes.
8    Q.  Okay.  And when he is talking in the, you know,
9  1 and 2 and 3, about the three separate issues, number 3
10  is that RON registry ads cause complaints from publishers
11  because of the perception of 1 and 2.
12    Do you know, just based on your experience --
13  and if you don't, you can tell me you don't -- but do you
14  know what he means about the perception of 1 and 2, the
15  perception of the aggressive ads or the perception of
16  ActiveX?
17    A.  The same reason we stated our terms and
18  conditions.  To rope all of them into the same bucket is
19  because the behavior that was identified on the ad in the
20  subject line, it taints those that are actually out and
21  providing -- you know, the Norton antivirus would fall
22  into the same category.  So everyone would have been
23  looked at at the same.
24    Q.  And that's RON registry ads?
25    A.  That's people who are running those types of ads

359

1  in a RON network capacity.
2    Q.  Okay.  Well, who did -- I mean, WinFixer falls
3  into that category, too, right?  WinFixer were run on a
4  RON capacity?
5    A.  Right.  And they were gone by that point, and
6  this is freerepair.org.
7    Q.  Oh, okay.  What Free Repair is -- when we're
8  talking about free repair, we're talking about a link that
9  Kristy sent you, right?
10    A.  It's those type, yes.
11    Q.  So Free Repair is also a registry ad?
12    A.  However they say -- it's repair of, more likely,
13  a registry, drive, whatever.
14    Q.  Okay.  So Free Repair would be run registry ad?
15    A.  Correct.
16    Q.  Okay.  And Robert McDaniel sent -- Mike Romoff
17  sent Robert McDaniel a screen shot of the Free Repair ad
18  that he's complaining about.  If you look at page 2 of --
19  actually, if you look at page 3 -- well, it's the same.
20  Page 2 or page 3 at the bottom is an email from Mike
21  Romoff to Robert McDaniel, July 25, 2006, at 11:53 a.m.
22  It has a link for Free Repair; do you see that?
23    A.  Which page?  Sorry.
24    Q.  It's the same.  You can look at the bottom of 2
25  or the bottom of 3.  It's the exact same email.

360

1    A.  Yes.
2    Q.  Okay.  And if you were, though, to compare those
3  links to -- and I know you'll not like me about this, but
4  I want to go back to Exhibit 25 that we previously have
5  talked about.  And if you were to look at page 2 of page
6  25 [sic], which is a link with Free Repair that Kristy
7  sends you --
8    A.  Yes.
9    Q.  -- that Free Repair link that Kristy sends you
10  to you run for Free Repair doesn't match the link that
11  Mike Romoff complains about, does it?
12    A.  On this one, no.
13    Q.  And, then, if you look at page -- also on page
14  3 --
15    A.  Noticed that those links are the ones that were
16  on our system?
17    Q.  I'm sorry.
18    A.  The links that -- that we're comparing would not
19  match because they're not the ones that were on our
20  system.
21    Q.  Okay.
22    A.  The ones that were on our system would be
23  adfarm.mediaplex.com at the time that these were
24  occurring.  So the end result URL could have changed every
25  single day.  That was all determined on the side of

361

1  Globedat.  Even the -- so that landing page URL that
2  you're seeing --
3    Q.  Right.
4    A.  -- we wouldn't be seeing that.  Those variables
5  would change at their will, not at ours.
6    Q.  Okay.  Well, if you look at page 4, which is the
7  screen shot that Mike Romoff sends to you --
8    A.  Correct.
9    Q.  -- that has the freerepair.org, and that code,
10  which appears to be -- it's hard to see for me, but it
11  appears to be the same as the link that he said that it
12  was.
13    A.  Correct.
14    Q.  That that link doesn't -- I mean, could you tell
15  with certainty that that is the same link that was
16  provided to you from Kristy Ross or that the link would
17  result in the same...
18    A.  Yes.
19    Q.  You could?
20    A.  Yes.
21    Q.  Okay.  And how is it that you would know that?
22    A.  We were able to re-create it, and she was the
23  only person running that product in our system.
24    Q.  Do you know if there were other people running
25  the product in any other systems; do you know?

15 (Pages 358 to 361)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 95 of 121

**FTC v. Innovative Marketing, Inc. et al. Gieron**                    **5/5/2010**

362

1    A. No.
2    Q. Okay.
3    A. But I believe we identified it in the course of
4 the string.
5    Q. Yeah, I was going to get to that.
6       So July 25, 2006, at 1:19 p.m., Robert McDaniel
7 writes to you [as read]: Are you running freerepair.org
8 ads?
9       And, then, July 25, 2006, you write to Robert
10 [as read]: Found it. Removed from 182. It's Kristy's.
11 Having Ryan notify her.
12       Do you see that?
13    A. Which is page was that again? Sorry. I saw it
14 before. I just lost it.
15    Q. Yeah, page 3.
16    A. Yes.
17    Q. Okay. And when you identified it being as
18 Kristy's, I think it's your testimony that it's the type
19 of ad that she was running?
20    A. No. The account, I believe, actually, was
21 stated -- was actually opened as freerepair.org.
22    Q. Okay. So there was an account. So what you're
23 saying, though, is that it was her product?
24    A. Yes.
25    Q. And that she was advertising at that exact same

363

1 time she was advertising that exact same product on your
2 network?
3    A. Correct.
4    Q. Okay.
5    A. And the -- it was -- the URL at the time was
6 replicated. So that was how it was determined to be
7 turned off.
8    Q. When you say the "URL was replicated"?
9    A. As in the end -- the URL that Mike Romoff
10 sent --
11    Q. Right.
12    A. -- was seen in her account when Ryan made his
13 check, and I would check it as well. That's when we make
14 the determination. We don't -- you know, we always try to
15 make sure we don't just randomly turn things off, because
16 there are different variables. So we make sure things
17 match as the complaint.
18    Q. Okay. And -- but so, to be clear, what we're
19 saying is that this is how her Free Repair ad looked as of
20 the time that someone complained about it at that time?
21    A. Yes. The results of it, yes.
22    Q. Okay. And so what is not possible to say with
23 certainty is that that's exactly and precisely how it
24 looked when she initially sent it to you; is that right?
25    A. Correct. She would not have sent me that URL.

364

1 The link would have directed me to that URL.
2    Q. Okay. Well, when she initially sent the link
3 over -- I mean, was it approved?
4    A. Yeah.
5    Q. Okay. And did it -- did it look just like the
6 one that Mike complained about when it was approved?
7    A. No. She was giving us that to -- several
8 different offers to look at and then forward. None of
9 those were intended to go directly to the system.
10    Q. Okay. So this ad, the ad that you're looking at
11 that you said was hers, I mean, it was -- it was not
12 approved?
13    A. When she sent me the information on page 2 of EX
14 KRG25 --
15    Q. Right.
16    A. -- she was giving me some additional potential
17 offers that she would like to run. Those would not have
18 been the URLs that were placed into the system. She was
19 notifying me of her iPod Premium, her Free Repair, and the
20 System Doctor download. We were testing these to make
21 sure which ones we'd want to move forward which, at which
22 time she would return with an adfarm.mediaplex.com
23 redirect URL --
24    Q. I see.
25    A. -- because that's where they were handling all

365

1 their tracking.
2    Q. I see.
3    A. So that's why I want to make sure that -- that's
4 why they would look different, because one was just given
5 to us to say, "Hey, would you guys be interested in
6 these?"
7    Q. Right.
8    A. We would test them, go back to her and tell her
9 which ones we would or if there would be changes that
10 would need to be made. And then she would give us the
11 tracking URL that she used for tracking on her end.
12    Q. And what is -- what is the mediaplex adfarm URL,
13 what is it?
14    A. It's a redirect URL.
15       The way it was explained to me from her is, it's
16 what was needed -- the redirect would allow them to be
17 able to better track their number of times they were
18 shown, the conversions when they occurred, anything else
19 that they needed stats on on their end.
20    Q. And do you know where it was redirected to? I
21 mean, in terms of not a person, but in terms of a
22 technical piece of information? Like, was it redirected
23 to a server?
24       MR. ARENSON: Objection.
25       What was redirected to?

16 (Pages 362 to 365)

Case 1:08-cv-03233-RDB    Document 198-2    Filed 12/17/10    Page 96 of 121

**FTC v. Innovative Marketing, Inc. et al. Gieron**                    **5/5/2010**

366

BY MS. GURLAND:
1
2    Q.  When a person would click on the URL for adfarm
3    and mediaplex and there was a redirection --
4        MR. ARENSON:  Objection.  People didn't click on
5    a URL.
6        THE WITNESS:  The URL in the system would be
7    what would be populating the page, the browser page when
8    it opened.  What populated that page would result from
9    adfarm.mediaplex would send back what it needs to send
10   back.
11   BY MS. GURLAND:
12   Q.  Okay.
13   A.  But the user would never see adfarm.mediaplex.
14   Q.  Is something like adfarm.mediaplex, could it be
15   described as a server?
16   A.  It's a -- of course, it would be an ad server.
17   Who it was controlled by, I couldn't tell you.
18   Q.  And you don't have any information, as you sit
19   here, that -- that adfarm.mediaplex was controlled by
20   Kristy Ross, do you?
21   A.  I don't know who was it was controlled by.
22   Q.  August -- okay.  I think we're okay.
23       (Exhibit KRG29 referenced.)
24   BY MS. GURLAND:
25   Q.  Moving to KRG29, which is an 18-page document,

367

1    and same question.  Are the documents maintained in the
2    ordinary course of AdOn's system?
3    A.  Yes.
4    Q.  And looking at the web address in the first
5    window, that says emaena.com --
6    A.  Yes.
7    Q.  -- is this what we were talking about, about at
8    least emaena being the place that it -- well, what is
9    "emaena"?
10       MR. ARENSON:  Objection, lacks foundation.
11       THE WITNESS:  I don't know.  It was associated
12   with a bunch of virus infection on the Internet a while
13   back.  That's all I know about it.
14   BY MS. GURLAND:
15   Q.  Okay.  And looking at this URL string at page 1
16   of the screen shot, it's not -- it's not a whole -- it's
17   not a whole string, is it?  It's just a partial string; is
18   that right?
19   A.  Correct.
20   Q.  It's cut off.
21       Okay.  Now, when you were going through this --
22   this screen shot that -- and it appears that Friday,
23   August 25, 2006, at 9:19 a.m., it's from Mike Romoff again
24   from 360 to Robert McDaniel and he attaches this screen
25   shot on page 1 and it looks like also the one on page 2;

368

1    is that right?
2    A.  Correct.
3    Q.  Okay.  And when you were talking -- when you
4    were talking with Colleen about it yesterday, what -- I
5    think you were asked about whether or not what -- what
6    Mike Romoff saw on his network.  I mean, so I just wanted
7    to be clear.  I mean, we have these shots in front of us.
8    But do you know with certainty what Mike Romoff saw, as
9    you sit her?  Do you know exactly what he saw?
10   A.  I can't -- I can't say exactly what he saw.  I
11   wasn't able to see it.  I know he was complaining about
12   certain behavior of certain kinds of ads.  I believe it's
13   not connected.  This screen shot and these screen shots
14   are two different issues.
15   Q.  Okay.  And when you look at the screen shots
16   that Mike Romoff sent, if -- I mean, I assume these are
17   the screen shots they sent if this was what was together
18   with this email.
19   A.  Uh-huh.
20   Q.  Are these ads that you approved?
21   A.  No, I wouldn't approve anything that had this
22   type of behavior.
23   Q.  Okay.  And are these ads for which Kristy Ross
24   sent you a URL?  Is there a URL in your system that would
25   make this ad that Kristy sent?

369

1    A.  Possibly.
2    Q.  But you don't know one way or another?
3    A.  No, I wasn't the -- I wasn't the receiver of
4    the -- of the multiple pop.
5    Q.  And, as you said, if the ad looked like this,
6    you wouldn't have approved it; is that right?
7    A.  Correct.
8    Q.  Looking at page 6 of the string, directing your
9    attention to a Thursday, August 31, 2006, 12:50 p.m. email
10   from Robert McDaniel to Mike Romoff, do you see that?
11   A.  What time -- what time was it?
12   Q.  12:50 a.m.
13   A.  Okay.
14   Q.  [As read]:  Another question.  Any possibility
15   you or your -- some of your pubs lose some of the last
16   characters in the URL string you send to receive the ad?
17   If those URLs get truncated/changed at all, it will
18   trigger the downloads and other nefarious behaviors.  Just
19   a thought.  We had one partner who had a character limit
20   for the URL that was smaller than the amount of characters
21   in the URL, and this was causing some problems.  Wondering
22   if that might be happening as well.  Thanks, Robert.
23       Do you see that?
24   A.  Yes.
25   Q.  And this was -- Robert had the suggestion, I

17 (Pages 366 to 369)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 97 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                    5/5/2010

370

1   believe, that was the same suggestion with John Nicholas,
2   the guy who was in Canada, who said, "Nah, that's not the
3   problem"?
4      A. Correct.
5      Q. But, again, this is later, but this is Robert
6   McDaniel suggesting the same thing, that if the URL string
7   is an incomplete string, then that could cause problems;
8   is that right?
9      A. Absolutely.
10     Q. Okay. Directing your attention to page 9 of
11  this exhibit, which is a Thursday, August 31, 2006, 9:07
12  a.m. email from you to Ryan Maloney. It says [as read]:
13  Can you see below? It may be Kristy's ad. Send her the
14  link Mike lists below and ask Kristy, is there -- is there
15  any way they are changing this at night or during weekends
16  away from the way we see the ad. And you provide a link
17  that says adfarm.mediaplex. And you write [as read]: I
18  don't want to lose your momentum, but the traffic sources
19  will cut us off.
20     Do you see that?
21     A. Correct.
22     Q. And why do you say -- you write to Ryan, the
23  word that -- the word choice that you have is "It may be
24  Kristy's ad." You don't write, "It is Kristy's ad"; is
25  that correct?

371

1      A. Correct.
2      Q. Okay. That's 'cause you're not sure 100 percent
3   one way or another if it is Kristy's ad, are you?
4      A. Depends on where you're asking. Was it the only
5   product that we were running of hers that would put us
6   towards Kristy? Yes. Was it the behavior I could see
7   inside my office? No.
8      Q. Okay. Yeah, that's what I'm asking. Whether or
9   not the particular things that you see in the ad, whether
10  or not you know that that was sent to you from Kristy
11  Ross?
12     A. The behavior -- yeah, behavior, we were not able
13  to replicate, which is why we needed to ask her if they
14  were changing things on the back end.
15     Q. So you don't know if it was her or not. Okay.
16     So in response to that, Ryan -- because Ryan
17  worked for you, is that right, at that time?
18     A. Correct.
19     Q. Okay. And, as instructed by you, if we look at
20  page 16 at the bottom, he does as you asked him. At
21  August 31, 2006, at 3:17 p.m., Ryan Maloney writes to
22  Kristy [as read]: Hi, Kristy. Wanted to check with you,
23  see if your system might be changing the link blow at
24  night or during the weekend in a way different than what
25  we see.

372

1      And then there's four -- well, there's -- you
2   tell me that there's just one link and then it repeated
3   itself three times; is that right?
4      A. Yeah. And whether that's -- yeah.
5      Q. Okay. Then, if you look immediately above that,
6   Thursday, August 31, 2006, at 12:45 p.m., Kristy writes
7   back to Ryan Maloney, copying you [as read]: Ryan, I am
8   not sure. What do you mean? There should not be any
9   changes to my links in general, although it is possible if
10  someone has them mixed up with another ad serving
11  campaign. We have been working with mediaplex to have
12  more consistent ad serving (they are part of the
13  ValueClick company), they have had some issues with
14  adserving the past week or so between all the campaigns we
15  run. I'm getting more links this week as well. Should
16  have them shortly to change out the older links to a new
17  format. Kristy.
18     Do you see that?
19     A. Uh-huh, yes.
20     Q. Okay. And if you look at page 15 at the bottom,
21  September 1, 2006, 1:56 p.m., Ryan Maloney writes [as
22  read]: Hi, Kristy. We just saw similar ads, and some of
23  the traffic partners were complaining. So we just wanted
24  to make sure that the ads we originally loaded remained
25  without any changes. No worries. When you have the new

373

1   links ready, just send them over, and I'll get them loaded
2   into the feed.
3      Do you see that?
4      A. Yes.
5      Q. And then immediately above that, Kristy writes
6   to Ryan Maloney, copying you, Friday, September 1st, 2006,
7   at 12:17 p.m. [as read]: I think there are a few other
8   partners who are running ads via myGeek. And, of course,
9   we advertise directly with a lot of people who are on
10  myGeek as well. It could always be a problem with those
11  as well.
12     Do you see that?
13     A. Yes.
14     Q. Okay. Then, September 1, 2006, 5:41 p.m., you
15  write to Kristy. [As read]: Kristy, we do believe that
16  this is the case. And we are going to get you back into
17  the source we closed down first thing next week, once the
18  traffic source parses out the sources that were okay with
19  those ads and places the ones that we do not want -- that
20  do not want spyware removal, registry cleaner, antivirus
21  ads running on their traffic. Thank you for being so
22  responsive and know that Ryan and I are big advocates of
23  yours in any situation like this.
24     Do you see that?
25     A. Correct.

18 (Pages 370 to 373)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 98 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                    5/5/2010

374

1    Q. Okay. So if you -- if you're answering as of --
2  as of this time period when you're corresponding with
3  Kristy when you wrote to her, "We do believe that that is
4  the case," is that false? Did you write that falsely?
5    A. I don't believe I wrote falsely, no.
6    Q. Okay. And when -- the case, to find out what
7  you're referring to, is what you're referring to what
8  she's said below, which is "I think there are a few
9  partners who are running ads via myGeek. It could always
10 be a problem with those as well," is that -- is that what
11 you were referring to when you say that "we believe that
12 this is the case"?
13   A. That there are other partners who are running
14 ads via myGeek?
15   Q. Right. 'Cause you write, "We do believe that
16 this is the case," and you don't specify what "the case"
17 is, but what she had immediately -- what she had sent to
18 you was -- was that.
19   A. Obviously, in this -- in that line of -- that I
20 would be agreeing with.
21   Q. Okay. And, of course, as of that time, you
22 didn't terminate Kristy from -- Kristy from your network,
23 did you?
24   A. No.
25   Q. And I think we had talked about yesterday, if

375

1  there was a point in time that you had come to an absolute
2  belief that Kristy was changing behavior of ads and she
3  was responsible for it herself, you wouldn't have
4  continued to work with her, would you?
5    A. If we believed that she was --
6    Q. That she was doing something herself.
7    A. Or her and her company, yes. If we believed
8  that there was something bad going on that could not be
9  explained or taken care of in a quick -- you know, a quick
10 timeframe --
11   Q. Then you would have?
12   A. Then we would have ended the relationship.
13      (Exhibit KRG30 referenced.)
14 BY MS. GURLAND:
15   Q. Now, directing your attention to 30, which I
16 will say for everyone is a great relief, will be the last
17 email chain -- I think the last. Is it the last email
18 chain? Well, the last of the email chains for a bit here
19 that we'll talk about. And I'll give you -- KRG 30 is a
20 five-page exhibit. Just have a couple of questions about
21 it.
22      And I'll start -- I'm looking at, first, page 4
23 of this exhibit. I guess I should ask first. Are these
24 emails kept in the ordinary course of AdOn's business?
25   A. Yes.

376

1    Q. Okay. And I'm at page -- at page 4, I'm looking
2  at an email from Kristy to Ryan and to Geoff. Do you --
3  September 13, 2006, at 4:34 p.m. So it's to Ryan, but
4  copying you. And Kristy writes [as read]: I think Geoff
5  was mentioning one of the partners was concerned about ads
6  and that they were possibly from another advertiser that
7  advertises our products. I never heard back on this
8  issue.
9       Do you see that?
10   A. Sorry. What page are you on?
11   Q. Page 4 at the top.
12   A. Okay.
13   Q. It starts, "I think Geoff was mentioning..."
14   A. Sorry.
15   Q. And so you see that it says that?
16   A. Right.
17   Q. Okay. Do you recall that particular issue where
18 you -- I mean, was it -- did you mention to her that, as
19 she states, that one of the partners was concerned about
20 ads and they were possibly from another advertiser?
21   A. Possibly.
22   Q. And do you recall if those were the same ads
23 referred to in the same chain on page 1 by Mike Romoff?
24 And that's -- I won't read it, but it says September 5,
25 2006, 9:37 a.m. email with Mike Romoff talking about

377

1  ActiveX and the feed.
2       Do you happen to know if it's the same -- that's
3  the same issue that she was talking about on page 4?
4       MR. ARENSON: Objection, lacks foundation.
5       MS. GURLAND: If he knows.
6       THE WITNESS: I don't know if that was along the
7  same lines or if it was just in conversation.
8  BY MS. GURLAND:
9    Q. Okay.
10   A. Just 'cause there's eight days between, eight
11 days is a lifetime on the Internet.
12      (Exhibit KRG32 referenced.)
13 BY MS. GURLAND:
14   Q. Okay. Now, I'm directing your attention to a
15 one-page exhibit, KRG32. So I'm not going to talk about
16 31. No, there's no 31. And I'm going to 32.
17      Okay. And this is just a one-page -- one page
18 of a -- I guess, a printout that you would have created,
19 part of a vendor Id printout of amounts sent; is that
20 right?
21   A. Of charges to the account, yes.
22   Q. Okay. And I think that there were many pages
23 that followed this. This is just one account. This is
24 account 85658.
25   A. Correct.

19 (Pages 374 to 377)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 99 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                                    5/5/2010

378

1    Q.  And there were many pages that were afterwards
2  with different accounts and different amounts; is that
3  right?
4    A.  Yes, I believe.
5    Q.  Okay.  But the top of this page has a total of
6  3,460,261.45.  Does that total the amount of money that
7  Kristy spent running ads at AdOn during the period that
8  she had worked?
9    A.  From 2004 to 2007, yes.
10   Q.  And so do you know what that equates to
11  in terms of how many times an ad was shown?  I mean, do
12  you know how many times?
13   A.  I don't have an impression total.
14   Q.  If we look at the Exhibit 3 — and I'll just
15  give you mine, 'cause I only have the one that you talked
16  about with Colleen yesterday.  Is the last column of that
17  total impression in that -- in that document?
18   A.  Yes.
19   Q.  Okay.  And so it doesn't have a total for every
20  campaign, right?  It just has a total, like, for -- it
21  doesn't have a global total.  It just has a total per
22  account; is that right?
23   A.  Correct.
24   Q.  Okay.  So if one were to add up all of those
25  numbers, that would be the number of times that an ad ran?

379

1    A.  Yes.
2    Q.  And is it fair to say, without causing
3  any of us to do math, that it's in the many, many
4  millions?
5    A.  Yes.
6    Q.  The total would be in the millions.  I don't
7  know how many.  Maybe a hundred million?  I don't know.
8  Hundreds of millions?
9    A.  There's some big numbers.
10   Q.  Okay.  Thank you.
11      All right.  Directing your attention to
12  Exhibit —
13   A.  Do I keep this over here or...
14   Q.  No, I'll take it back.  Thanks.
15      (Exhibit KRG33 referenced.)
16  BY MS. GURLAND:
17   Q.  KRG 33, it's a two-page exhibit.  Get a chance
18  to look at that.
19      And are these emails maintained in the ordinary
20  course?
21   A.  Yes.
22   Q.  Okay.  So I want to direct your attention first
23  to — it starts at the bottom of -- the bottom of page 1
24  into page 2.  May — I mean, March 29th, '07, 6:19 p.m.,
25  Ryan Maloney writes to Kristy [as read]:  Unfortunately, I

380

1  have news to share that will undoubtedly affect the great
2  relationship Globedat and myGeek/AdOn have benefitted from
3  for the last few years.  The official word has come down
4  from management that we will no longer be running ads from
5  any advertiser that sells products in the area of spyware,
6  antivirus, registry cleaner, system doctor, evidence
7  eraser, and the like.
8      It was a difficult decision, but it was made to
9  support the health and growth of our network.  We've had
10  too many incidents where the relationships with our
11  traffic partners have been threatened and we just can't
12  afford the risk any longer.
13      Let me be clear and state that we will, of
14  course, run any other products you have to offer.
15      Do you see that?
16   A.  Yes.
17   Q.  Okay.  And when you wrote to Kristy that you
18  would — that although you weren't running the products
19  that you mentioned there, the type of software products,
20  that if she had other things, you would continue to work
21  with her on a — with her personally.  You would work with
22  Kristy Ross.
23   A.  We would continue working with, yeah, Kristy
24  Ross or Globedat if they were having the Amex trial iPod
25  offers.

381

1    Q.  Okay.  Other products?
2    A.  Right.
3    Q.  Okay.  And, again, I asked you that — if she
4  came — if there was a particular individual that you had
5  formed a belief was lying to you or was tricking you, a
6  particular individual, would you continue to work with
7  that individual?
8    A.  No.
9    Q.  Okay.  And directing your attention to Kristy's
10  response, March 29, 2007, 3:28, she writes that it's
11  unfortunate and goes on.  I won't read the whole string.
12     And then Ryan Maloney writes, May — I keep
13  saying May — March 29, 2007, 6:43 p.m., Ryan writes to
14  her [as read]:  Kristy, again, I want to reiterate that
15  the decision was not made because of a specific issue we
16  have with Globedat.  We are also not unaware of the
17  financial loss.  Your accounts and our relationship with
18  you were actually a big point of contention before
19  proceeding with this directive.
20     Do you see that?
21   A.  Uh-huh.
22   Q.  And do you have any reason to doubt that when
23  Ryan wrote that, that AdOn's relationship with Kristy was
24  a big point of contention before proceeding, do you have
25  any basis to think that he was writing something that was

20 (Pages 378 to 381)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 100 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                    5/5/2010

382

1  inaccurate when he wrote that to her?
2     A. I believe he was -- he was kindly breaking up
3  with Kristy based on the fact that we had been subpoenaed
4  from Microsoft.
5     Q. Okay. But -- but, I mean, I received the -- to
6  ask the same question. Do you think that it was not true?
7     MR. ARENSON: Objection, asked and answered.
8     MS. GURLAND: I don't believe it was answered.
9  BY MS. GURLAND:
10    Q. If you can answer it. Do you think it was
11 untrue that -- that the relationship with Kristy was a
12 point of contention before proceeding?
13    A. I believe that Kristy and Globedat were all
14 determined that we could not continue with. However, you
15 know, it was -- it was an easy way of saying good-bye.
16    Q. Okay. So that would end, then, obviously, that
17 email -- the chain. And I just have a couple more -- a
18 couple more email strings that are not -- that are not
19 AdOn, that are not directly from AdOn, but that's where
20 we're going and it will be brief.
21    So directing you first to -- and I'm not
22 introducing any KRG34 or KRG35 or KRG36. So I'm at KRG37.
23 Take a look at that.
24    (Exhibit KRG37 referenced.)
25 BY MS. GURLAND:

383

1     Q. And I guess I can't ask you if it's kept in the
2  ordinary course here, because it's not -- I mean, when I
3  say "here" at AdOn, it's not. But do you see -- do you
4  see in that email that it says -- do you see at the bottom
5  a July 27th, '06, email from Conrad Raphael to Ross
6  Lehrman. Do you see that?
7     A. Yes, uh-huh.
8     Q. And do you see that Conrad's email address is
9  Conrad@Globedat.com?
10    A. Yes.
11    Q. And do you know if this is the same Conrad
12 Raphael that you -- I think when I first asked you about
13 him, you said you might have heard of this individual but
14 you weren't sure where?
15    MR. ARENSON: Objection. Lacks foundation.
16 You're asking him based on an email address?
17    MS. GURLAND: No, I'm asking him based on our
18 conversation yesterday when I asked him --
19    THE WITNESS: The name is familiar, but not in
20 association with Globedat.
21 BY MS. GURLAND:
22    Q. You didn't know he was with Globedat or you
23 don't know?
24    A. (No oral response.)
25    Q. And do you see, though, that what -- what there

384

1  is, there is a Conrad at Globedat is sending to Ross
2  Lehrman and Rachel Klausner -- by the way, do you know
3  those individuals, Ross or Rachel? I mean, do you know --
4     A. No. No, I don't immediately.
5     Q. Okay. Do you see what Conrad Raphael is sending
6  to them are creatives for adult channel targeted campaign
7  and creative for WinAntivirus campaign on BE?
8     Do you see that?
9     A. On BE?
10    Q. Antivirus.
11    A. No.
12    Q. And below that, Conrad Raphael sends to Ross and
13 Rachel, a link with an adfarm.mediaplex.com link; is that
14 right?
15    A. Correct.
16    Q. And the link that -- this adfarm.mediaplex link,
17 that's not -- that's not the same link as you recognize as
18 anything that you've ever run, is it?
19    A. I would have to take a look. The
20 adfarm.mediaplex is similar, yes.
21    Q. The server, right?
22    A. The server.
23    Q. Okay. All right. That's it with that one.
24    (Exhibit KRG38 referenced.)
25 BY MS. GURLAND:

385

1     Q. Directing your attention to KRG 38, which is a
2  nine-page exhibit.
3     Oh, sorry. One more question on the last one on
4  KRG37. July 27, 2006, that time period, that's a time
5  period that Kristy was running WinAntiVirus ads with you,
6  wasn't it?
7     A. Which time period?
8     Q. July '06.
9     A. It was that or DriveCleaner, around the same
10 time.
11    Q. Well, do you know if she was -- do you know that
12 she was -- do you know whether or not she was running
13 WinAntiVirus also in July of '06?
14    A. I couldn't without going back.
15    Q. Okay. Well, if you were to look at KRG25 --
16 sorry, withdrawn.
17    I think I -- I think that's a Free Repair ad.
18 I'd have to go back and look. I won't do it now.
19    So looking at page 1, do you recall yourself
20 personally corresponding with these folks, with LaShena
21 Huddleston of 360I? I'm looking at the second page.
22    A. LaShena, yes, I conversed with her quite a bit.
23    Q. Okay. And what -- on page 2, do you see your --
24 are you -- did you attach the screen shot that appears on
25 page 2 that says there's a security vulnerability from

21 (Pages 382 to 385)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 101 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                          5/5/2010

386

1  Mytob virus. We recommend you download one of the
2  security software programs to prevent -- it looks like
3  malware infection? And then you write [as read]: I get
4  this, as do network partners, which differs from what you
5  see. I attached a full window shot as well.
6      Do you see that?
7  A. Yes.
8  Q. Okay. And why were you sending that to LaShena?
9  A. LaShena, she had -- she had to have submitted a
10 link to run in our system for this. She had a
11 cobranded -- cobranded interface to run traffic both into
12 our system as well as back into their.
13 Q. Okay. And so you were telling her that an ad
14 that came from her was objectionable to you?
15 A. Correct.
16 Q. Okay. And do you know who Dana Bennett is?
17 A. I don't.
18 Q. And so -- and do you know or did you know at
19 that -- do you know now or have you ever known who was the
20 individual who was responsible for this ad that you found
21 objectionable?
22 A. I don't.
23 Q. And you don't know -- do you know?
24 A. Right. LaShena would be the one who placed the
25 ad with us or into our system. We would go through the

387

1  same verification process.
2      (Exhibit KRG39 referenced.)
3  BY MS. GURLAND:
4  Q. Okay. Okay. Looking at the second-to-last
5  exhibit that I have, which is Exhibit KRG39, which is a
6  four-page exhibit, do you see that?
7  A. Uh-huh, yes.
8  Q. And is that -- do you know who Ross Lehrman is?
9  A. The name sounds familiar. Not someone -- I
10 don't believe I worked with directly.
11 Q. And you see, there's an April 11, 2006, email
12 from Ross Lehrman to Dana Bennett answering the question
13 below, "What is ActiveX?"
14     And he writes [as read]: A technology developed
15 by Microsoft for sharing information among different
16 applications. ActiveX supports new features that enable
17 it to take advantage of the Internet. For example, an
18 ActiveX control can be automatically downloaded and
19 executed by a Web browser. ActiveX is not a programming
20 language, but rather a set of rules for how applications
21 should share information. It allows you to create
22 cross-platform, language-independent controls.
23     In this case, once we serve the landing page for
24 the client, the ActiveX component might automatically
25 download the application onto a user's computer without

388

1  them knowing it.
2      Do you see that?
3  A. Yes.
4  Q. And do you agree with the description of -- that
5  Ross Lehrman had of the functionality of the ActiveX?
6      MR. ARENSON: Objection, lacks foundation.
7      THE WITNESS: I couldn't give you -- if he had
8  a -- if he has a background in this, then he would have a
9  better statement as to what it is.
10 BY MS. GURLAND:
11 Q. Okay. But based on your experience from -- I
12 think you told me yesterday -- eleven years of working in
13 Internet and Internet advertising, just within the --
14 within the confines of your knowledge and not beyond it,
15 is that -- does that comport with what you -- how you
16 would describe the functionality of the ActiveX?
17 A. It would coincide with my understanding.
18 Q. Okay. Now, in light of the fact that we've
19 seen -- at least it appears that these documents are valid
20 business records from somebody, that a Conrad Raphael at
21 Globedat is placing WinAntiVirus ads through Innovation
22 Interactive. Would that -- if the records were authentic
23 and valid and that was accurate, that there was an
24 individual Conrad Raphael placing those ads in that same
25 time period, would that -- would that cause you to revise

389

1  any answers that you gave yesterday when I asked you about
2  whether or not you were -- well, whether or not other ads
3  out there from other people could be part of the problem
4  with some of the issues that you saw with ads in your
5  system?
6      MR. ARENSON: Object to the question. This is
7  an email that he's never seen and you're asking a
8  hypothetical.
9      THE WITNESS: Do I know where everything --
10 where it all originated from?
11 BY MS. GURLAND:
12 Q. No, no, not where it all originated from. But
13 would the additional fact that if -- if it were accurate,
14 that there were other individuals placing ads for the same
15 products for which Kristy was placing ads with you, if
16 that were correct, if that happened, if there were other
17 people -- other Globedat people placing ads other places,
18 would there be any possibility, I guess, within -- within
19 your experience that somehow those ads that don't belong
20 to Kristy but to others could make its way into your
21 publisher traffic? Is that possible, within your
22 experience?
23 A. From the same origin point, yes.
24 Q. The same origin point being the same server,
25 that mediaplex?

22 (Pages 386 to 389)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 102 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                    5/5/2010

390

1    A.  Or Globedat.
2    (Exhibit KRG40 referenced.)
3    BY MS. GURLAND:
4    Q.  Okay.  And, finally, the very last exhibit that
5    I will ask you about is Exhibit KRG40.  And, again, it's
6    Innovation Interactive records that I can't ask you to
7    authenticate, but I have a question, which is just -- can
8    you look at the second -- well, the first page of that
9    document shows it's an April 24, 2006, email from Dana
10   Bennett to LaShena Huddleston and Ross Lehrman.
11   And on the next page it says that there's a
12   performance report from the client -- or it says [as
13   read]:  After receiving a performance report, I have a few
14   requests.  And, then, on the next page, there's a
15   WinAntiVirus Domestic Delivery Report from myGeek, which
16   is your company, from --
17   A.  What page are you on?
18   Q.  2 of KRG40.
19   And then it shows that from April 1st to
20   April 24th, it shows -- it's a Delivery Report.  And I
21   guess I don't know exactly what that means, but it appears
22   to be a Delivery Report of what's delivered to myGeek.
23   So do you know what this signifies?
24   A.  This is more than likely a report that's
25   generated from the system with the campaign name, listing

391

1    name, keyword.  And even though it says "clicks," that
2    would be the number of impressions that were served for
3    each keyword.
4    Q.  Okay.  And you see the listing name and the
5    campaign name all the way down, it's WinAntiVirus?
6    A.  Correct.
7    Q.  Okay.  And that WinAntiVirus -- that's not a
8    WinAntiVirus campaign that you ran on your network but,
9    rather, one that was run on another network but delivered
10   to your network?
11   A.  It was input into our network by 360I/Innovation
12   Interactive, same company.
13   Q.  Right.  So is it -- when these listings -- are
14   these -- where is -- where these appear -- where would
15   these ads be approved?  Would these ads be approved with
16   you or with them?
17   A.  They would come from them.  Whether or not their
18   approval --
19   Q.  You don't know what their process is?
20   A.  Right.  I can only speak to ours.  And they
21   would follow suit with the same way we handle every ad in
22   our system.
23   Q.  Okay.  So the ads came from them, and then came
24   to you?
25   A.  Correct.

392

1    Q.  Okay.  And if -- if Kristy Ross was not the
2    contact person for Innovation Interactive but, rather,
3    another person at Globedat, then a person at Globedat or a
4    server at Globedat was the source and not Kristy Ross; is
5    that right?
6    MR. ARENSON:  Objection, calls for speculation,
7    lacks foundation.
8    THE WITNESS:  If a different individual had
9    provided the link, then it was coming from a different
10   individual but from the same --
11   BY MS. GURLAND:
12   Q.  Server?
13   A.  -- source.
14   Q.  From the same server, right?
15   A.  Right.
16   Q.  Okay.  Because when we looked at -- when we
17   looked at the page where Conrad Raphael of Globedat sent
18   over the ad, which was KRG37, the first page, it actually
19   says adfarm.mediaplex, doesn't it?
20   A.  Yes.
21   Q.  And that's a server, right?
22   A.  Yes.
23   Q.  Okay.  Do you recall the main products that
24   Kristy Ross -- switching gears again, back from Innovation
25   Interactive, but just a few final questions.

393

1    Do you have some a list or do you know every
2    product that Kristy -- that Kristy advertised with you on
3    your network?
4    A.  Off the top of my head, no.
5    Q.  Okay.  Do you know -- WinFixer is one that we've
6    talked about?
7    A.  WinFixer, DriveCleaner, ErrorSafe.
8    Q.  WinAntiVirus?
9    A.  WinAntiVirus.  Yeah, I think there was -- Free
10   Repair.
11   Q.  Free Repair?
12   A.  There was a handful.
13   Q.  Do you ever -- do you have any association in
14   your mind -- I mean, ever recall Kristy ever advertising a
15   product called "Antivirus XP" with you?
16   A.  I can't recall.
17   Q.  How about "XP Antivirus"?
18   A.  I can't recall.
19   Q.  Or "Antivirus XP 2008"?
20   A.  I don't recall.
21   Q.  "PC Turbo Pro"?
22   A.  Yes, that one sounds familiar.
23   Q.  Familiar, but do you know if she --
24   A.  I can't -- I can't, right now, put it together.
25   If I looked at the information, I probably could.

23 (Pages 390 to 393)

**FTC v. Innovative Marketing, Inc. et al. Gieron**

394

1    Q. And "Anti-Malware Guard," do you know about
2  that?
3    A. No.
4    Q. Is there a -- would there be -- would it be
5  possible for you to put together -- just because we've
6  looked at a lot of emails over the course of the last
7  two days and we've seen some of the products. I mean,
8  I -- is there a way for -- that wouldn't be too burdensome
9  for you to put together, just a list of every product that
10  Kristy advertised and then we'd know which one she did and
11  which one she did not?
12    A. I don't think it would be an easy task to
13  accomplish.
14    Q. Okay.
15    A. Mainly, because anything that was entered into
16  our system with the adfarm.mediaplex.com could have served
17  every one of those ads with me knowing or not knowing. So
18  I wouldn't be able to do that. And, plus, I don't have
19  the URLs still capable to check and verify. At the
20  service, if we named an account, a specific name --
21    Q. Right.
22    A. -- because we're using an identifier or there
23  was other identifiers that Kristy and myself --
24    Q. Right.
25    A. -- or Ryan and Kristy had put into place, that

395

1  would be the easiest ones, which is why I remember some --
2    Q. Okay.
3    A. -- and probably not others.
4    Q. Okay.
5    A. But she may have tested out numerous, over the
6  course of time, that I was not familiar with.
7    Q. I would like to ask for that, just the second
8  one that you mentioned. Not the one that's impossible,
9  but the one that's less difficult to have a list of
10  products that you see --
11    A. Okay.
12    Q. -- that she was responsible for --
13    A. All right.
14    Q. -- so then I'll know which ones that she did not
15  advertise with you.
16    MR. ARENSON: Are you going to issue a subpoena
17  for that, or are you just going to be asking --
18    MS. GURLAND: I'll issue a subpoena.
19  BY MS. GURLAND:
20    Q. And with respect to the -- do you have the
21  hash -- do you have all of the screen shots or the HTMLs
22  that was ever affiliated with a list from Kristy?
23    MR. ARENSON: Objection to HTMLs.
24  BY MS. GURLAND:
25    Q. Do you know what "HTML" is?

396

1    A. Yes.
2    Q. What is it?
3    A. It's -- "HTML" is a coding of, you know, the
4  page. It's speak for what's used for the generation of
5  visual creative on a page.
6    Q. Do you have all of the visual creatives, screen
7  shots of every visual creative that Kristy ever ran with
8  you? Do you have that?
9    A. No.
10    Q. Okay. And when -- in order to know how those
11  screen shots looked, would it be necessary to look at the
12  time, or would it be -- or would you be able to just go
13  back today and go to a link and see how they looked, or is
14  it a live content that can differ?
15    MR. ARENSON: Objection. The question is
16  nonsensical and I'm not even sure what you're asking.
17    THE WITNESS: If you looked at a link today, you
18  would not be able to see what happened back then, no.
19  And, then, I did check one of the links for this, and they
20  don't exist anymore.
21  BY MS. GURLAND:
22    Q. Okay. So is it accurate to say that in order to
23  know how a link appeared to somebody at a particular time,
24  then, it would -- you'd need to -- you'd need to be within
25  that timeframe?

397

1    A. Or screen shot, as was done in the course of
2  these emails, yes.
3    Q. Okay. So you can't -- all right.
4    And do you have hash numbers for software that
5  Kristy advertised? Do you have any hash numbers for
6  software, or that wasn't something that you, you know,
7  the precise identifiers for software that she advertised?
8  Have you ever had such a thing?
9    A. I don't understand what you're asking about
10  "hash number."
11    Q. It's my understanding a hash number is a -- it's
12  a precise code that identifies a unique piece of software.
13  I mean, were you ever given for any reason --
14    A. No.
15    Q. -- codes for that?
16    Okay. And is there something called a "flash
17  banner" ad that -- was there such a thing as a "flash
18  banner" ads at the time that Kristy was advertising with
19  you in --
20    A. Was there such a thing? Yes.
21    Q. -- 2006, flash banner adds?
22    And did you have -- did she ever have flash
23  banner ads on --
24    A. My recollection, we did not run banners.
25    MS. GURLAND: That is the end of my questions.

24 (Pages 394 to 397)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 104 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                    5/5/2010

398

1  Thank you very much.
2        MR. ARENSON:  Off the record.  Take a break?
3        (Recess taken from 10:02 to 10:07 a.m.)
4        MR. DIRENFELD:  We're going back on the record.
5        THE WITNESS:  The one thing I noticed was on EX
6  KRG29, page 15, an email from Kristy that stated something
7  that -- sorry, it kind of just -- I wanted to point out.
8        [As read] Also, something to consider is that
9  many of the sources who do not want to run antivirus,
10  et cetera, is because they are spyware/adware companies.
11  We are 100 percent able to keep their product out of the
12  database if they're willing to run their advertisements.
13  You might consider presenting that.  I can do that with
14  all software sources we run.
15        The reason I just want to bring that up was, it
16  created a stronger association from Kristy to the products
17  that she was running, rather than being a conduit, as
18  previously believed, with her being a -- as these ads were
19  coming from an affiliate company, as explained before, as
20  she had more control -- she/we looked at, had more control
21  and input into how the behavior of the ad would work based
22  on what sources they would -- that they were running it
23  on.
24        Just something that I just...
25  BY MS. GURLAND:

399

1        Q.  When you say input into how the ad would — or
2  you mean input into things that the ad might be able to do
3  or input —
4        A.  Right.
5        Q.  — into how the ad would appear visually?
6        A.  What it would be able to do.
7        Q.  Okay.
8        A.  So as I said --
9        Q.  Okay.  And what's the date —
10       A.  -- it's not standard with the affiliate.
11       It was September 1st, Friday, 2006, at 3:49 p.m.
12       Q.  Okay.  And you worked with her -- I think the
13  last, the last email that we saw was — was in March of
14  '07; is that correct?
15       A.  Right.
16       Q.  That the relationship continued until March of
17  '07?
18       A.  Right.  The reason I just wanted to state that
19  was because standard affiliate relationships would not
20  have any sort of access to how something would function.
21  This had created just -- as I was reading it, has a better
22  association between her and her company and the product
23  that was being delivered, because they were able to alter
24  something in the database to make it function differently
25  by partner.

400

1        Q.  The product versus the visual of the ads, right?
2        A.  Correct.
3        MS. GURLAND:  Okay.  Thank you.
4
5        EXAMINATION
6  BY MR. DIRENFELD:
7        Q.  All right.  Good morning, Mr. Gieron.  My name
8  is Jonathan Direnfeld.  I represent Marc and Maurice
9  D'Souza.  I'll remind you that you're still under oath.
10       A.  Yes.
11       Q.  I won't go through the instructions that we went
12  through at the beginning of yesterday.  I'll just only
13  ask:  Did you take any medication this morning or are you
14  suffering from any medical condition that prevent you from
15  giving truthful testimony?
16       A.  No.  I wish, though.
17       Q.  I'm sure, at this point.
18       So I won't go back through what -- and I'll try
19  and use "AdOn Network" to refer to the company.  But if I
20  use "myGeek," I'm using it interchangeably.
21       So as you stated yesterday, AdOn reviews every
22  ad before allowing it on its service; is that correct?
23       A.  Correct.
24       Q.  And AdOn will continue to monitor the ads once
25  they are run on the service to make sure they comply with

401

1  their terms and conditions?
2        A.  They're periodic checks, correct.
3        Q.  And if a party was repeatedly violating AdOn's
4  terms and conditions, AdOn would sever its relationship
5  with the company?
6        A.  If it was able to provide malicious intent.
7  But, usually, the response of the company is to stop the
8  ad until we have a chance to address it with the
9  advertiser to identify and isolate and stop the problem
10 before turning it back on.
11       Q.  Between 2004 and 2006, did AdOn sever its
12  relationship with parties that violated its terms and
13  conditions?
14       A.  There were instances, yes.
15       Q.  And, then, if AdOn thought a customer was
16  running false or misleading ads, would it continue to do
17  business with that company?
18       A.  No.
19       Q.  Did AdOn sever its relationship with companies
20  for running false and misleading ads in 2004 to 2006?
21       A.  False and misleading, no.
22       Q.  Did AdOn do business with other companies that
23  advertised computer security products in 2004 to 2006?
24       A.  Yes.
25       Q.  And apart from -- apart from Globedat, did AdOn

25 (Pages 398 to 401)

FTC v. Innovative Marketing, Inc. et al. Gieron                                    5/5/2010

402

1  sever its relationship with any of these other computer
2  security software companies between 2004 and 2006 for
3  violating its terms and conditions?
4      A.  No.
5      Q.  And isn't it true that AdOn did not sever its
6  relationship with Globedat prior to January 1, 2007?
7      A.  Correct.
8      Q.  And it didn't sever its relationship until March
9  of 2007 after it received the Microsoft subpoena?
10     A.  Correct.
11     Q.  And this was due to an overall shift in policy
12 not to run ads for any security software; is that correct?
13     A.  Right, without explicit exception.
14     Q.  And that would include all security products
15 including Norton antivirus?
16     A.  The statement of the policy would state that all
17 of them were a "no" until thoroughly reviewed for
18 validation in order to receive "yes."
19     Q.  So that would include Norton Antivirus?
20     A.  That would have been removed and then allowed
21 back if they were interested based on complete review.
22     Q.  Okay.  All right.  Prior to January 1, 2007 --
23 strike that.
24         You were responsible for overseeing the Globedat
25 account; is that correct?

403

1      A.  Up until mid 2006, yes.
2      Q.  And after mid 2006, who was responsible?
3      A.  Ryan Maloney.
4      Q.  Prior to January 1, 2007, did you have any
5  communication with Marc D'Souza about the Globedat
6  accounts?
7      A.  Did not.
8      Q.  To your knowledge, did anyone at AdOn Network
9  have communication with Marc D'Souza about the Globedat
10 accounts?
11     A.  No.
12     Q.  Did Marc D'Souza contact AdOn directly to
13 discuss advertising placement for the Globedat accounts?
14     A.  No.
15     Q.  Did Marc D'Souza send any advertising links to
16 the AdOn Network for the Globedat accounts?
17     A.  Not that I'm aware of.
18     Q.  Did you receive any credit card authorizations
19 that purported to have Marc D'Souza's signature for
20 advertisements for the Globedat accounts?
21     A.  Online ads do not require signature, no.
22     Q.  To your knowledge, did Marc D'Souza have any
23 role in the advertising campaigns run by Globedat -- run
24 by Globedat on the AdOn network?
25     A.  To my knowledge, no.

404

1      Q.  Okay.  Yesterday, you stated that -- I'll refer
2  back now to Exhibits 4 and 5 -- FTC Exhibits 4 and 5, just
3  for reference.
4         (Exhibits FTC 4 and 5 referenced.)
5         THE WITNESS:  Yes.
6  BY MR. DIRENFELD:
7      Q.  Yesterday, you were testifying as to the
8  registration procedure for a Globedat account; is that
9  correct?
10     A.  Correct.
11     Q.  And you testified that the only check that was
12 performed when someone signed up for the account was to
13 match the credit card address on the card, correct?
14     A.  Right.
15     Q.  Isn't it true that if someone in a business had
16 access to a card that paid expenses for the business, they
17 could create an account in that person's name without
18 their direct involvement?
19     A.  Yes.
20     Q.  And once the person had created the account,
21 they would receive the login password; is that correct?
22     A.  The account creator would be the one who set the
23 username and password, correct.
24     Q.  And they could -- and they can manage the
25 account without limitation regardless of any involvement

405

1  of the person whose name was on the account?
2      A.  Correct.
3      Q.  Also, yesterday, you testified that it was not
4  uncommon for an account holder to use a credit card of
5  someone else in the business to pay for advertisements
6  once the account was created; is that correct?
7      A.  Correct.
8      Q.  And you stated that this wasn't surprising,
9  because usually once the account was created, usually
10 other credit cards would be substituted in; is that
11 correct?
12     A.  Right.
13     Q.  In your experience, when a different credit card
14 was substituted in an account with the person whose credit
15 card was substituted in, not the account holder, would
16 that person be involved in the creation and day-to-day
17 management of the advertising accounts?
18     A.  There would be no need for direct correlation,
19 no.
20     Q.  And in your experience with the person whose
21 card was substituted in, would that person be involved in
22 the creation and management of the creatives on the
23 account?
24     A.  No.
25     Q.  I now want to turn your attention to FTC

26 (Pages 402 to 405)

**FTC v. Innovative Marketing, Inc. et al. Gieron**                    **5/5/2010**

---

406

1   Exhibit 6. And you can look at this, actually, in
2   connection with FTC -- I believe it's Exhibit 3.
3       (Exhibits FTC 3 and 6 referenced.)
4       THE WITNESS: I don't have a 3.
5       MR. DIRENFELD: Exhibit 3 would be the --
6       MR. MOLINAR: Here it is.
7       THE WITNESS: Sorry about that.
8   BY MR. DIRENFELD:
9       Q.   All right. Turning your attention to FTC
10  Exhibit 6, could you state -- well, strike that.
11       You testified yesterday that these were the last
12  credit card numbers that were associated with various
13  Globedat accounts; is that correct?
14       A.   Correct.
15       Q.   So these would be the credit card numbers that
16  were charged for the last -- last creative or advertising
17  campaigns run on that account; is that correct?
18       A.   Correct.
19       Q.   Turning your attention to FTC Exhibit 3, you
20  testified yesterday was that a chart that you created
21  in response to the Microsoft subpoena that gave the total
22  account usage for the Globedat accounts; is that correct?
23       A.   Correct.
24       Q.   And on the total, on the second-to-last column
25  on the right, there is a column that says, "Total Charge."

---

407

1       A.   Correct.
2       Q.   And that was the total charge on the account; is
3   that correct?
4       A.   Correct.
5       Q.   Over the entire usage of the account; is that
6   correct?
7       A.   Yes, from creation date to end date, correct.
8       Q.   Looking at these two charts in connection, is
9   it -- is it accurate to state that that -- and we'll look
10  at -- actually, move and we'll look at the first line,
11  88568 --
12       A.   Uh-huh.
13       Q.   -- which lists an American Express card with the
14  name M.D.
15       A.   Correct.
16       Q.   Would it be -- based on looking at these charts,
17  is it correct to say that M.D. paid for the total charge
18  of $62,000 on the account?
19       A.   I couldn't tell you the total amount that was
20  placed against that specific account.
21       Q.   Because this chart only refers to the last
22  charge in that account; is that correct?
23       A.   Right. It was the most recent entry in the
24  database for a credit card number.
25       Q.   So FTC Exhibit 6 credit card numbers by account

---

408

1   does not have any relation to the total charge for the
2   account in FTC Exhibit 3; is that correct?
3       A.   Correct.
4       Q.   Thank you.
5           Yesterday, you testified that AdOn Network
6   allowed country targeting for advertisements; is that
7   correct?
8       A.   At some point during the course of 2005, yes.
9       Q.   Could you explain how the country targeting
10  worked?
11       A.   The selection of the country would be at the
12  account level during that time period, so that they would
13  have a choice -- they were defaulted into U.S. and all of
14  eastern -- western Europe -- western Europe as known
15  English-speaking countries. They would be able to alter
16  that based on the needs of their advertising. So given it
17  was at the account level, they could only select one or
18  multiple countries to run for all the advertisements
19  within the confine of the account.
20       Q.   So the default setting for the accounts provided
21  for advertisement in Europe; is that correct?
22       A.   Yes.
23       Q.   And it was at the account level, but the person
24  could change the defaults to more countries, less
25  countries; is that correct?

---

409

1       A.   Correct.
2       Q.   Would it be possible for people to run
3   internationally only campaigns?
4       A.   Yes.
5       Q.   And could people run mixed U.S. and
6   international campaigns?
7       A.   Yes.
8       Q.   During the course of the account life, could the
9   person change the country settings within the account?
10       A.   Yes.
11       Q.   Did Globedat run internationally only campaigns?
12       A.   Did it run only? No.
13       Q.   Did it -- rephrase that.
14           Did Globedat run campaigns that were targeted
15  only at non U.S. countries?
16       A.   Yes.
17       Q.   Did Globedat run campaigns that were targeted at
18  both U.S. and international audiences?
19       A.   I can't recall if there was ever a combination
20  versus U.S. versus specific international countries.
21       Q.   When a person runs a -- yesterday, we discussed
22  Run-On Networks --
23       A.   Right.
24       Q.   -- known as RON. When a person runs a Run-On
25  Network campaign, is that targeted just to the U.S., or is

27 (Pages 406 to 409)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 107 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                              5/5/2010

410

1    that targeted both to U.S. or international?
2        A.  Whatever they choose to designate.
3            MR. DIRENFELD:  I'm going to introduce -- this
4    will be D'Souza Exhibit 1 --
5            (Discussion held off record.)
6            (Exhibit 27 marked.)
7    BY MR. DIRENFELD:
8        Q.  So this is a -- can you describe what this, what
9    this email is?
10       A.  This email was an overview of accounts that was
11   created between Kristy and Ryan or, specifically, Ryan for
12   Kristy's reference that would designate the account, the
13   country targeted, the URL that was decided to be run; and
14   then a campaign name, which was an identifier --
15   DriveCleaner Adult CPV keywords was in reference to the
16   fact that the DriveCleaner was targeting adult keywords in
17   the network, versus WinAntiVirus France, WinAntiVirus
18   Germany, WinAntiVirus U.K., and WinAntiVirus Australia,
19   and WinAntiVirus Canada.
20       Q.  This was maintained -- this information was
21   maintained in the ordinary course of business --
22       A.  Yes.
23       Q.  -- of AdOn?
24           Just looking down on these and looking at the
25   country target, the first one is DriveCleaner Adult CPV,

411

1    it says, "Country Target:  U.S. only."
2        A.  Correct.
3        Q.  Is it possible that that could have been changed
4    at any point in time from U.S. only to international, from
5    international to U.S. only?
6        A.  Could it have been?
7        Q.  Yeah.
8        A.  Yes.
9        Q.  Do you know whether it was?
10       A.  It was not.
11       Q.  Now, looking down at the country target for the
12   next one, it says for WAV -- and that means
13   WinAntiVirus France, "Country target:  France."  Does that
14   mean that that advertisement was only targeted to people
15   within France?
16       A.  Correct.
17       Q.  Moving down, the next one, WinAntiVirus Germany,
18   "Country target:  Germany."  Does that mean that that was
19   only targeted to consumers within Germany?
20       A.  Correct.
21       Q.  And moving down, WinAntiVirus U.K., "Country
22   Target:  United Kingdom," does that mean it was only
23   targeted to people within the United Kingdom?
24       A.  Correct.
25       Q.  And then moving down, WinAntiVirus AU --

412

1    assuming AU, does that mean Australia?
2        A.  Correct.
3        Q.  And it says, "Landing page:  Australia," does
4    that mean that it was -- and under "Country target" -- on
5    this one, does it just -- is this just an edit mistake
6    where the landing page was flipped with the country
7    target?
8        A.  Yes.
9        Q.  So this was targeted to consumers in Australia
10   only?
11       A.  Correct.
12       Q.  And, then, finally, WAV CA, "CA" meaning Canada,
13   and this was only targeted to consumers only in Canada; is
14   that correct?
15       A.  Correct.
16       Q.  Do you know what percentage of advertisements
17   run by Globedat were targeted only internationally?
18       A.  I do not have a percentage map, no.
19       Q.  So you don't know how many -- what percentage of
20   the advertisements were -- ran by Globedat on AdOn were
21   targeted at consumers outside the United States?
22       A.  No, I do not.
23       Q.  And do you know what percentage of
24   advertisements run by AdOn were targeted at consumers both
25   within the United States and internationally within the

413

1    same campaign?
2        A.  I do not.  I don't believe we had any crossover,
3    but I don't have any data to support.
4        Q.  Yeah.  I'm going to enter in as Exhibit 28 --
5            (Exhibit 28 marked.)
6    BY MR. DIRENFELD:
7        Q.  I'm just going to turn your attention to the
8    email, cover email.
9        A.  Okay.
10       Q.  Now, this is an email from you to Colleen
11   Robbins, attorney for the Federal Trade Commission; is
12   that correct?
13       A.  Correct.
14       Q.  Can I turn your attention to the last sentence
15   in the email.
16       A.  Okay.
17       Q.  Could you please read that into the record.
18       A.  Starting with "Please note?"
19       Q.  Yes, please.
20       A.  [As read] Please note - GEO data is only
21   available in records in our database from 2008 until
22   current.  It appears that data was not stored historically
23   until that point.
24       Q.  Can you please state what that -- what you meant
25   by that sentence?

28 (Pages 410 to 413)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 108 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                5/5/2010

414

1    A.  Going back and pulling information for this,
2  that in raw logs within the database or the databases that
3  are maintained, that information was not stored until
4  2008, which is when we brought the functionality to a
5  campaign level.
6    Q.  And that information that you're referring to
7  is?
8    A.  Is GEO code data, geographical designation of
9  the advertising at that point.
10    Q.  So that means the targeting of the advertisement
11  for the campaign; is that correct?
12    A.  Correct.
13    Q.  So AdOn Network does not have in its records
14  where advertising campaigns were targeted prior to 2008?
15    A.  Geographically, no.
16    Q.  So for the period prior to 2007, AdOn Network
17  could not state whether an advertisement was targeted to a
18  consumer in the United States or internationally?
19    A.  Outside of documented conversations between
20  individuals or records kept outside the system, the
21  database was not able to do that at that point.
22    Q.  Thank you.
23    Referring back now to FTC Exhibit 3 — and you
24  had discussed this with Ms. Gurland not too long ago about
25  the total impressions run, and there is no total number

415

1  here for the total impressions run by Globedat on AdOn; is
2  that correct?  But it was determined that it was somewhere
3  in the hundreds of millions; is that correct?
4    A.  Whatever was determined by Carolyn.
5    Q.  All right.  And what were the percentage of
6  complaints for the number of Globedat ads run on the
7  network?
8    A.  I don't have an actual percentage.
9    Q.  Would you say, generally, was it more or less
10  than normal than other advertisers on your network?
11    A.  More.
12    Q.  And this was more than other security software
13  vendors on your system?
14    A.  It was the only security software vendor one
15  that we received the volume of complaints against or any
16  complaint.  Other complaints were due to other behaviors
17  of different advertisers.
18    Q.  But despite the complaints, AdOn did not cut
19  Globedat off from advertising on its network prior to
20  January 1, 2007; is that correct?
21    A.  Correct.
22    Q.  How much money did AdOn Network make from its
23  relationship with Globedat?
24    A.  20 percent, 25 percent of the total.
25    Q.  Of the total amount paid?

416

1    A.  Yes.
2    Q.  Did Globedat have campaigns that ran on AdOn
3  Network that did not generate complaints?
4    A.  Yes.
5    Q.  And did AdOn track conversion rates for the ads
6  that were run on its network?
7    A.  Only when and if Kristy was able to place a
8  conversion pixel, which I believe was maybe one out of all
9  campaigns run.
10    Q.  So outside of that one campaign, AdOn did not
11  track conversion rates for the ads run on its network?
12    A.  No.
13    Q.  So you -- AdOn could not provide what the
14  conversion rate was for the supposedly aggressive
15  advertisements that we've been discussing over the past
16  couple of days?
17    A.  Correct.  That information was communicated only
18  back by Kristy.
19    Q.  And you wouldn't be able to provide the
20  conversion rates for the advertising complaints that
21  campaigns that did not generate any complaints?
22    A.  No.  Those were never placed with the original
23  network, no.
24    Q.  Okay.  I think, right now, I'm going to walk
25  through some of these advertisement screen shots that

417

1  we've seen before.  So, right now, I'd like to turn your
2  attention to FTC exhibits, if you can group together 10,
3  13, 14, and 15?
4    A.  10, 13, 14, 15?
5    Q.  Yeah.
6    (Exhibits FTC 10, 13, 14, and 15 referenced.)
7  BY MR. DIRENFELD:
8    Q.  I'd like you to just briefly take a look back
9  through the screen shots within there.  We'll go through
10  them in more detail in a second, but just — so these are
11  all WinFixer advertisements that were placed on your
12  system by Globedat; is that correct?
13    A.  Correct.
14    Q.  All right.  I just want to walk through -- walk
15  through the separate prompts here.
16    So looking at the first -- looking at the first
17  prompt, isn't it true that it states that if your computer
18  has errors in the registry database or file system, it
19  could cause unpredictable or erratic behavior, freezing
20  and crashes.  Fixing these errors can increase your
21  computer's performance and prevent data loss.  Would you
22  like to install WinFixer 2005 to check your computer for
23  free (Recommended).
24    MR. ARENSON:  What exhibit are we on?
25    MR. DIRENFELD:  10.

29 (Pages 414 to 417)

**FTC v. Innovative Marketing, Inc. et al. Gieron**                    **5/5/2010**

418

1      MR. ARENSON: My --
2      MR. DIRENFELD: First page, first prompt.
3      MR. ARENSON: Oh, sorry.
4  BY MR. DIRENFELD:
5      Q.  Isn't it true that this first prompt does not
6  purport to scan a person's computer?
7      A.  Correct.
8      Q.  There's nothing false in this prompt; is that
9  correct?
10     A.  No.
11     Q.  I'd like to turn to the second page. And
12  leaving aside the -- leaving aside the download, we can't
13  see on this page in Exhibit 10 what this advertisement --
14  the full entirety of this advertisement. But if we
15  turn -- if we turn to Exhibit 13, does this appear to be
16  similar -- a similar advertisement to the WinFixer one
17  that's underneath the prompt in Exhibit 10?
18     A.  Yes.
19     Q.  All right. And this ad -- and we can turn,
20  maybe it'd be better to state, turning to Exhibit 14 --
21  I'm sorry for making you go back and forth.
22     A.  That's okay.
23     Q.  But this ad here in Exhibit 14, without the
24  prompt, is the advertisement that you approved; is that
25  correct?

419

1      A.  Yes, that would be the one we approved.
2      Q.  All right. Now, turning back -- and this is the
3  same -- this is the same advertisement as the one in
4  Exhibit 15 and Exhibit 10; is that correct?
5      Did I say -- sorry. I meant Exhibit 13.
6      A.  Same prompt or same ad?
7      Q.  Same ad.
8      A.  Appearance-wise, yes.
9      Q.  Appearance-wise.
10     I just want to turn to this -- to this ad and
11  talk about this, if you want to look at either Exhibit 13
12  or Exhibit 14. And isn't it true that within this ad, it
13  states above where it says, "Scanning progress" and
14  "System errors," it says, "Typical quick system error
15  scan"?
16     A.  Yes.
17     Q.  Doesn't this mean that this ad is not purporting
18  to scan the computer?
19     MR. ARENSON: Objection, lacks foundation.
20     THE WITNESS: It would be my assumption based on
21  the wording, yes.
22  BY MR. DIRENFELD:
23     Q.  Okay. Is there a prompt on this page for a
24  person to purchase a paid version of this, of the WinFixer
25  software?

420

1      A.  No, there's not.
2      Q.  A person would have to click on the link first,
3  on the link within the box that says "Search for errors
4  now free. Click here for a free scan"; is that correct?
5      MR. ARENSON: Objection, lacks foundation. He's
6  already testified he never did that.
7  BY MR. DIRENFELD:
8      Q.  Go ahead.
9      A.  The assumption is yes. If they clicked on the
10  button, that they would be prompted for a download of a
11  scanner, a free scanner, not a purchased item.
12     Q.  And do you know what happened when a person
13  clicked on that link?
14     A.  I do not.
15     Q.  You never personally clicked on the link?
16     A.  No.
17     Q.  So you have no knowledge of whether a scan
18  actually took place when a person clicked on the link?
19     A.  Correct.
20     Q.  Turning back now to FTC 10, in the prompts, does
21  this -- and looking at the prompt right below the
22  advertisement that says, "Begins with notice" --
23     A.  Yes.
24     Q.  -- can you read that?
25     A.  [As read] Notice you have not completed the

421

1  error scan. If your computer has errors in file or
2  Windows registry, it could cause unpredictable or erratic
3  PC behavior, freezes, crashes, and loss of data. You need
4  to install WinFixer 2005 to scan for and, if found, fix
5  system errors now. Recommended, question mark.
6      Q.  Does this -- does this prompt purport to scan a
7  person's computer?
8      A.  No.
9      Q.  Now, turning now to the next prompt, which
10  prompts a person to install WinFixer on their computer, do
11  you know if a person installed WinFixer on their computer
12  and ran the scan, what the scan found?
13     A.  I do not.
14     Q.  Do you know how -- what the scan -- how the scan
15  performed?
16     A.  I do not.
17     Q.  In your opinion, if a consumer ran a free scan
18  and the scan found actual registry and system errors,
19  would you consider that to be misleading?
20     MR. ARENSON: Objection, lacks foundation.
21     THE WITNESS: If it's -- based on my opinion, if
22  it was able to do that, as stated, that's how the product
23  should run.
24  BY MR. DIRENFELD:
25     Q.  All right.

30 (Pages 418 to 421)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 110 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                    5/5/2010

422

1    A. But, you know, whether or not it could remove
2 it, I can't tell you that either.
3    Q. Right. But you have no knowledge what the scan
4 ran and found or whether it could actually remove it?
5    A. Correct.
6    Q. But if it could actually scan and find it and
7 remove it and advertised for the paid version, which would
8 remove it, would you find that to be misleading?
9    A. No.
10    Q. Turning your attention to -- we can move on, off
11 these. I just want to run -- I'll just run through, real
12 quick, the ones that we have and --
13    A. Are you done?
14    Q. Yeah, just on FTC Exhibit 15, which I do not
15 believe we have -- does this similarly appear to you to be
16 the same advertisement that we were just discussing in FTC
17 Exhibits 10, 13, and 14?
18    A. Similar except a different version. If you
19 notice the difference between 14 and 15, 15 is WinFixer
20 2006; 14 is WinFixer 2005; WinFixer 2005 is in 14, and I
21 can't tell you the version number of WinFixer on number
22 10.
23    Q. But, similarly, this one has the same language
24 which states "Typical quick systems error scan"; is that
25 correct?

423

1    A. Yes.
2    Q. And contains the same box which states "Search
3 for errors now free, click here"; is that correct?
4    A. Correct.
5    (Exhibits FTC 16 and 18 referenced.)
6 BY MR. DIRENFELD:
7    Q. Okay. Turning your attention now to FTC
8 Exhibits 16 and 18, in Exhibit 16, turning your attention
9 to the second-to-last page, which it's the screen shot.
10    A. Oh, okay.
11    Q. And, then, if we turn your attention -- we'll
12 take a look at 18 also. If you turn to the next page and
13 have those kind of side by side. Now, you testified
14 earlier that this is an advertisement for WinAntiVirus
15 that ran -- that Globedat ran on AdOn Network; is that
16 correct?
17    A. To my knowledge, yes.
18    MR. MOLINAR: You guys are looking at a
19 different page. Are you talking about Exhibit 18 or 16?
20 BY MR. DIRENFELD:
21    Q. Start with Exhibit 16.
22    You testified earlier that this is a -- well,
23 strike that. Rephrase.
24    Did you testify earlier that this advertisement
25 was an advertisement run by Globedat for WinAntiVirus on

424

1 AdOn Network?
2    A. To my knowledge, but without my personally
3 remembering this exact page.
4    Q. All right. And turning to -- well, let me --
5 let me follow up on that. You are here as a
6 representative of AdOn Network. So it is AdOn Network's
7 testimony that this ad was run by Globedat on AdOn
8 Network's system?
9    A. I would say yes.
10    Q. All right. Turning now to FTC Exhibit 18, is it
11 your testimony that this was an ad run by Globedat for
12 WinAntiVirus on AdOn Network?
13    A. Yes.
14    Q. Did you approve this ad?
15    A. I did not.
16    Q. Okay. Now, turning to the actual content of the
17 ad, if you look at the top of the ad -- turning your
18 attention to the top of the ad, it states [as read]: Your
19 system may be vulnerable to BlackWorm. We recommend you
20 download one of these security software programs to
21 prevent further malware infections.
22    Does this -- does this ad purport the system is
23 infected with the BlackWorm virus?
24    A. It does not.
25    Q. Isn't it true that the ad only states that your

425

1 system may be vulnerable to the BlackWorm virus?
2    A. Yes.
3    Q. Looking down now to the box within the
4 advertisement, which you cannot -- which is obscured in
5 FTC Exhibit 16, so I'll turn your attention to FTC 18.
6 Here, it states that -- it states that [as read] your PC
7 may send private information and documents to a remote
8 computer. One of the processes Win32res.exe has just sent
9 this information. It contains a box. It says [as read]:
10 IP Address, Browser, Computer OS, and PC location.
11    Is it possible that the server site code
12 delivering this ad detected these sendings?
13    MR. ARENSON: Objection, lacks foundation.
14    THE WITNESS: Is it possible? Yes.
15 BY MR. DIRENFELD:
16    Q. How is that possible?
17    A. Each individual user has a designated IP address
18 which gives approximate PC location, Computer OS, and
19 browser settings or the browser image that's being
20 displayed. Any Computer OS is -- is also -- it can be
21 something identified in a user agent.
22    However, the browser that 18 is claiming to
23 identify does not match the browser in which the ad's
24 being displayed upon. It's being -- the actual
25 advertisement is on an Internet Explorer. They're

31 (Pages 422 to 425)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 111 of 121

**FTC v. Innovative Marketing, Inc. et al. Gieron**                    5/5/2010

426

1  claiming the browser is on Mozilla, which is Firefox.
2      **Q.  Right.**
3      A.  There's a conflict there.  So I don't know if
4  that was -- whether or not that was something that was
5  able to be determined or pre-populated.
6      **Q.  But it is possible, technology speaking, that**
7  **this could be determined and displayed within an**
8  **advertisement?**
9      A.  If they're able to retrieve the user agent and
10 return the results at the exact same time that they're
11 populating that page, it is possible.
12     **Q.  Earlier, yesterday, you testified that the**
13 **advertisements were delivered by the server on the**
14 **client's side; is that correct?  And when I say "client**
15 **side," I mean on the advertiser side.**
16     A.  Yes.
17     **Q.  So that a command would be sent to the server of**
18 **the advertiser and then the ad would be delivered off of**
19 **there; is that correct?**
20     A.  Correct.
21     **Q.  So it's possible, then, that this could have**
22 **been -- there could have been logic on the server side**
23 **code to determine certain information, such as IP address?**
24     A.  If that information was sent.
25     **Q.  If that information was sent?**

427

1      A.  And I can't -- I can't speak to whether or not
2  that was.
3      **Q.  But this -- this ad says that [as read], Your**
4  **current security software is not able to stop this**
5  **sensitive information from being transmitted.  So would it**
6  **be possible, then, that if this information was out there**
7  **and being transmitted, that this ad could be displayed**
8  **with this information?**
9      MR. ARENSON:  Objection, calls for speculation.
10     THE WITNESS:  As I said, if they were able to
11 see certain information that they would be able to
12 probably respond to some of that being populated, but the
13 sensitive information that's being transmitted, I don't
14 think is what's stated there, but it's possible.  There's
15 a conflict in what's being shown on 18 --
16 BY MR. DIRENFELD:
17     **Q.  Right.**
18     A.  -- that makes me curious.  But an IP address is
19 not uncommon, but also is not accurate.  When I say
20 "uncommon" and "accurate," there could be other variables
21 that would cause false information to come back that
22 may -- have nothing to do with the ad, just based on the
23 IP address that's being used.
24     **Q.  All right.**
25     A.  But it is stating it committed a scan of some

428

1  sort or created detection of security vulnerability,
2  right?
3      **Q.  Where are you pointing to?**
4      A.  [As read] Attention:  Security center has
5  detected potential vulnerabilities on your PC that may
6  send private information.
7      **Q.  That would be -- well, wouldn't that be the case**
8  **if someone were sending out an IP address, browser, and PC**
9  **location over the Internet while based on their browser**
10 **settings?**
11     A.  Actually, I would prefer that you speak to
12 someone who's familiar with the Win32res.exe that has just
13 sent this information.  So something has sent the
14 information to them.  I'm not familiar with that exe.
15     **Q.  But possible -- would you consider that to be a**
16 **security possibility if someone -- if there was a program**
17 **on someone's computer that was sending out IP address,**
18 **computer operating system, and PC location?**
19     MR. ARENSON:  Objection --
20     THE WITNESS:  -- no.
21     MR. ARENSON:  -- vague.
22     THE WITNESS:  The information there, however,
23 no, I do not perceive that as a security threat since it's
24 used every day for identification, for ad delivery by
25 Google, and everyone else.  IP address designates

429

1  geographical location.  It doesn't create a security risk.
2  BY MR. DIRENFELD:
3      **Q.  And certain information, though, is it your**
4  **knowledge that IP address is considered personally**
5  **identifiable information?**
6      MR. ARENSON:  Objection, lacks foundation.
7      THE WITNESS:  Depends.  That's a privacy policy
8  conversation.
9  BY MR. DIRENFELD:
10     **Q.  Move on to FTC 20 -- oh, actually, can I just**
11 **kind of move back one final question on these last**
12 **exhibits.**
13     A.  18?
14     **Q.  16 and 18.**
15     A.  Okay.
16     **Q.  Do these pages contain a prompt for a user to**
17 **purchase a -- to purchase a version of the paid**
18 **WinAntiVirus PRO 2006 or WinAntiSpyware 2006?**
19     A.  To pay for?
20     **Q.  Yeah.**
21     MR. ARENSON:  Objection.  He's never seen this
22 ad before, so I don't know how you can determine that.
23 Lacks foundation.
24     THE WITNESS:  Based on that, there is no mention
25 of purchase or price.

32 (Pages 426 to 429)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 112 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                    5/5/2010

430

BY MR. DIRENFELD:
 2    Q.  And could -- looking at this screen shot, could
 3  a consumer purchase the paid version off of this page?
 4        MR. ARENSON:  Objection, lacks foundation.
 5        THE WITNESS:  Directly, no.  But stated, 1
 6  wouldn't know what happened when they hit the download
 7  link.  It could take them to a purchase page, if that's
 8  falling in line.
 9  BY MR. DIRENFELD:
10    Q.  Or it's possible that by clicking the download
11  page, it would simply just take them to a free version of
12  the software?
13    A.  Potentially.
14        (Exhibit FTC 20 referenced.)
15  BY MR. DIRENFELD:
16    Q.  Go on to FTC 20 now.  If you can just read the
17  first three dialogue boxes.
18    A.  Read them out loud?
19    Q.  You can read them to yourself.
20    A.  Okay.
21    Q.  Do any of these three dialogue boxes purport to
22  scan a consumer's computer?
23    A.  No.
24    Q.  Turn to page 3.
25        Now, you testified yesterday that you -- this

431

 1  WinAntiVirus PRO 2006 advertisement was an advertisement
 2  that you approved, except for not having the popup box
 3  within it; is that correct?
 4    A.  I don't recall if I stated I approved it.  I'm
 5  aware of it and had seen it, and I had no issue with it.
 6    Q.  And was it approved by AdOn?
 7    A.  Yes.
 8    Q.  Now, we can't see the entire advertisement here
 9  because it's obscured by the --
10    A.  Screen shot.
11    Q.  -- screen shot.  But based on what you recall,
12  did this ad purport to scan a consumer's computer?
13    A.  Not to my knowledge, no.
14    Q.  Does the statement [as read] Your current
15  antivirus protection is not effective, does it purport to
16  scan a consumer's computer?
17        MR. ARENSON:  Objection, lacks foundation.
18        THE WITNESS:  No.  But it's stating to the user
19  that they're aware of what their antivirus protection is,
20  which that's not possible.
21  BY MR. DIRENFELD:
22    Q.  But does it purport to actually scan the
23  consumer's computer?
24        MR. ARENSON:  Objection, asked and answered.
25        THE WITNESS:  No.

432

 1  BY MR. DIRENFELD:
 2    Q.  Does this page contain a prompt for a consumer
 3  to purchase a paid version of the WinAntiVirus PRO 2006?
 4    A.  I can't --
 5        MR. ARENSON:  Objection, the page is obscured.
 6  There's no way you can determine that.
 7        THE WITNESS:  I can't say conclusively, because
 8  I can't see the page.
 9        (Exhibit FTC 23 referenced.)
10  BY MR. DIRENFELD:
11    Q.  All right.  Turn now to FTC Exhibit 23.  And if
12  you turn to the screen shot on pages 2 and 3, earlier
13  today, you testified that this was an ad that was
14  eventually approved by AdOn Network; is that correct?
15    A.  Correct.
16    Q.  Now, if a -- now, does this advertisement
17  contain a prompt for a person to purchase a paid version
18  of DriveCleaner?
19    A.  No.
20    Q.  If a person clicked on the free scan now link or
21  clicked on the dialogue box, do you know what happened?
22    A.  I do not.
23    Q.  You do not know -- I'll move on.
24        (Exhibit FTC 25 referenced.)
25  BY MR. DIRENFELD:

433

 1    Q.  I'll go to FTC Exhibit 25.  Now, if you look at
 2  this advertisement for Free Repair, did you testify -- is
 3  it correct that you testified earlier that this was an
 4  advertisement run by Globedat on AdOn Network?
 5    A.  Yes.
 6    Q.  Does this advertisement contain a prompt for a
 7  person to buy the paid version of Free Repair?
 8    A.  No.
 9    Q.  If I direct your attention to the scan -- the
10  box that says "Scan in progress" --
11    A.  Yes.
12    Q.  -- under the time elapsed, what does it state
13  there?
14    A.  Zero.
15    Q.  And time remaining?
16    A.  Zero.
17    Q.  And it states up top, "Scan in progress.  Please
18  wait"?
19    A.  Correct.  So you would assume a scan was in
20  progress.
21    Q.  Is this a type of normal advertisement sample
22  scan that you usually prepare on pages?
23        MR. ARENSON:  I'm sorry.  What --
24        THE WITNESS:  Can you repeat that?
25  BY MR. DIRENFELD:

**FTC v. Innovative Marketing, Inc. et al. Gieron**                                5/5/2010

---

434

1    Q.  Is it possible that this is similar to what we
2  see before is a sample scan that was used as part of the
3  advertisement?
4    MR. ARENSON:  Objection to the term "sample
5  scan," undefined.
6    THE WITNESS:  In reference to the ones that you
7  identified before where it said "Typical scan," the
8  verbiage here is different and doesn't use the "typical"
9  component to allow for it to say it's a sample.
10  BY MR. DIRENFELD:
11    Q.  Regardless of that, the only link on this page
12  is at the bottom, which is the "Start free can scan now"
13  link; is that correct?
14    A.  I don't know if there were any other links on
15  the page.  The identifiable link is right there.
16    Q.  And if a consumer clicked on the "Start free
17  scan now" link, are you aware of what happened?
18    A.  I'm not.
19    Q.  All right.  Turn back now to FTC Exhibit – I'm
20  done with the impressions.  Turn back to FTC Exhibit --
21  the impression charts FTC Exhibit 3.
22    A.  Yes.
23    Q.  All right.  I just want to run through some
24  questions on some of these, starting with -- if you go
25  down -- if you go down to the first entry, which states --

---

435

1  it's account number 87712.
2    A.  Yes.
3    Q.  You see that – if you look all the way across,
4  what was the -- what were the total number of impressions
5  run on this one?
6    A.  33,195,465.
7    Q.  And per AdOn's policy, all these impressions
8  were reviewed prior to being sent out; is that correct?
9    MR. ARENSON:  Objection, misstates testimony.
10    THE WITNESS:  Impressions are not reviewed.  The
11  URL being advertised would be.
12  BY MR. DIRENFELD:
13    Q.  Which would generate the impression; is that
14  correct?
15    A.  Correct.
16    Q.  And what percentage of these impressions were
17  from only international traffic?
18    A.  I do not have a way of telling you that.
19    Q.  And, as you testified earlier, AdOn does not
20  have --
21    A.  Wait.  We didn't offer non U.S. until after that
22  point, so there would be a percentage of that, but I would
23  have to identify when or to give you a better idea of when
24  international traffic was introduced.  I believe that's in
25  information that was turned over, discussion between

---

436

1  Kristy Ross and myself in regards to anxious to be able to
2  access the international traffic.
3    Q.  But this would have contained a portion of
4  the -- at least a portion of this would have been -- would
5  have contained -- could have possibly contained
6  international traffic; is that correct?
7    A.  Correct.
8    Q.  And based on your testimony earlier, based on
9  AdOn's recordkeeping, they don't have records to determine
10  what portion of that was from only international; is that
11  correct?
12    A.  Yeah.  A definitive database record, no, there
13  is not a definitive database record.
14    Q.  And do you know, based on the campaigns ran on
15  this -- on these impressions, did some of these
16  impressions not receive any complaints?
17    A.  Yes, some impressions did not receive
18  complaints.
19    Q.  And, as you testified earlier, you do not know
20  what the conversion rates were for the ads that did not
21  receive any complaints; is that correct?
22    A.  Correct.
23    Q.  Did any of these ads that were run under this
24  account purport to perform a system scan?
25    A.  I do not know.

---

437

1    Q.  Do you know if they purported to actually
2  perform a system scan?  Do you know if it performed a scan
3  before it prompted the user to buy a paid version of the
4  software?
5    A.  I do not.
6    Q.  All right.  Let me move down to account 55192.
7    A.  Okay.
8    Q.  And on this one, the creation date of this
9  account was June 21, 2006; is that correct?
10    A.  Correct.
11    Q.  And was AdOn offering international traffic at
12  that point in time?
13    A.  Yes.
14    Q.  And do you know what percentage of the total
15  impressions on this account were -- were directed towards
16  international traffic?
17    A.  I do not.
18    Q.  And, as you testified earlier, as AdOn does not
19  maintain -- does not maintain -- does not have records to
20  show what percentage work directed towards international
21  traffic?
22    A.  Correct.
23    Q.  Did some of these impressions not receive any
24  complaints for the advertising campaigns?
25    A.  Some of the impressions did not, correct.

---

34 (Pages 434 to 437)

**FTC v. Innovative Marketing, Inc. et al. Gieron**                    5/5/2010

438

1    Q. And, as you testified earlier, you don't know
2  what the conversion rate was for the ads that did not
3  receive any complaints?
4    A. Do not know, right.
5    Q. And did any of these ads purport to perform a
6  systems scan?
7    A. I do not know.
8    Q. And did the ad actually scan the system before
9  it prompted the user to buy a paid version of the
10  software?
11    A. I do not know.
12    Q. And would it be your testimony, if we were to
13  run through all of these -- all of these advertisements --
14  all these accounts on this list, would you be able to
15  state for each one what the percentage of the impressions
16  were from only international traffic, apart from --
17  after -- this chart was created in 2007; is that correct?
18    A. Right.
19    Q. And, by that time, AdOn -- and AdOn began
20  allowing international traffic when?
21    A. Mid 2005, we let international -- allowed
22  international traffic.
23    Q. So these impressions would have included the
24  time period when international traffic was being provided
25  by AdOn; is that correct?

439

1    A. By our traffic partners, correct, yes.
2    Q. And for all these, would you be able to state
3  what the percentage of the impressions were -- if we went
4  account by account, would you be able to state what
5  percentage of the impressions were from only international
6  traffic?
7    A. With 100 percent certainty, no. But we have
8  those charts that would reference certain accounts that
9  were 100 percent. Those would be the ones referenced
10  previously WAVs, you know, Canada --
11    Q. Right.
12    A. Those ones were designated.
13    Q. Apart from those accounts that we discussed
14  earlier, would you be able to state if we went --
15    A. No.
16    Q. And if we went line by line through each one of
17  these accounts, could some of the impressions not receive
18  any complaints for each of these accounts?
19    A. Some of the impressions, correct, did not
20  receive complaints.
21    Q. And AdOn Network did not have records for what
22  the conversion rate was for ads that did not receive any
23  complaints?
24    A. Correct.
25    Point of clarification?

440

1    Q. Yeah.
2    A. When you're saying ads that did not receive
3  complaints, are you referring to Freerepair.Org and that
4  is the ad, or you're referring to "ad" as in the
5  impression or the times it was shown? I just want to be
6  clear because the ads that did not receive complaints ever
7  were limited to non-software associated products. That
8  would be your Amex Travel, the iPod Premium, anything that
9  was run outside of those. That's why I want to make sure.
10    Q. Well, I'm not actually talking about ads not
11  receiving any complaints. I'm talking about advertising
12  campaigns, because for each product, there was multiple
13  campaigns; is that correct?
14    A. There could be, correct.
15    Q. And were there campaigns for the software
16  products that did not receive any complaints?
17    A. Yes.
18    Q. And so when I said, did some of the impressions
19  not receive any complaints, what I was referring to --
20  I'll clarify and start back.
21    Were there any advertising campaigns included
22  within this total number of impressions that did not
23  receive any complaints?
24    A. Yes.
25    Q. And if we were to go -- again, I'm talking to

441

1  alleviate the need from going and asking questions
2  along -- ID number by ID number. So if we were to go ID
3  number by ID number, AdOn Network does not have records
4  for what the conversion rate was for the advertising
5  campaigns that that did receive any complaints?
6    A. Correct.
7    Q. And if we were to go line by line between vendor
8  ID, did any of the advertisement campaigns included within
9  the total impressions purport to perform a systems scan?
10    A. I couldn't tell you the percentage.
11    Q. And do you know whether the ad actually -- would
12  actually scan the system before it prompted the user to
13  buy a paid version of the software?
14    A. No.
15    MR. DIRENFELD: All right. Can we take a brief
16  five-minute break and get it together? I don't have that
17  much more.
18    Off the record.
19    (Recess taken from 11:18 to 11:21 a.m.)
20    MR. DIRENFELD: Go back on the record. Put this
21  in as Exhibit 29.
22    (Exhibit FTC 29 marked.)
23  BY MR. DIRENFELD:
24    Q. This is the FTC's Complaints in this case.
25  While it starts on page 2, I'll represent to you that page

35 (Pages 438 to 441)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 115 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                                    5/5/2010

442

1   1 is simply a continuation or the beginning of the caption
2   that you see at the top of this -- top of this page.
3       Have you seen this document before?
4   A. Can't recall if I have.
5   Q. All right. I want to turn your attention --
6   A. Actually, no, I haven't because I would have
7   seen that.
8   Q. Well, I'll turn your attention now to paragraph
9   24, if you could look at paragraph 24 through 26 --
10  through 25.
11  A. Okay.
12  Q. Looking at the screen shot in paragraph 24, to
13  your knowledge, was this ad ever run on the AdOn Network?
14  A. This illegal porn one?
15  Q. Yeah.
16  A. No.
17  Q. Did you run any advertisements for Globedat
18  prior to 2007 that contained pornographic images, as
19  you've seen in this advertisement?
20  A. Not that I'm aware of.
21  Q. And turning your attention, then, to the screen
22  shot on page 9 of the complaint, right above paragraph
23  26 --
24  A. Okay.
25  Q. -- was this advertisement ever run on the AdOn

443

1   Network?
2   A. Not to my recollection or knowledge, that we
3   ever ran AdvancedClear, no.
4   Q. Turning your attention to paragraph 29 --
5   A. Okay.
6   Q. -- looking at the screen shot in paragraph 29,
7   was this specific ad ever run on the AdOn Network?
8   A. The very specific way it's being displayed in
9   the screen shot?
10  Q. Yeah.
11      MR. ARENSON: Object. Just, Geoff, so I'm
12  clear, do you mean displayed in the screen shot with the
13  redactions or displayed in the screen shot intact?
14  Because this is a redacted version of the ad that's been
15  put into this complaint, just so we're clear.
16      THE WITNESS: I'm familiar with the antivirus
17  ads of the Security Center and the Help Protect Your PC.
18  I just don't recall the content.
19  BY MR. DIRENFELD:
20  Q. So is it your testimony that this WinAntiVirus
21  ad that you see here, you don't recall whether this one
22  was ever run on the AdOn Network?
23  A. Correct. I can't tell you whether or not that
24  specific formatted ad was.
25  Q. All right. Just turn your attention to

444

1   paragraph 30.
2   A. Uh-huh.
3   Q. Look at the screen shot. Was this advertisement
4   of DriveCleaner ever run on the AdOn Network?
5   A. Yes.
6   Q. Was it run on the network prior to January 1,
7   2007?
8   A. Yes.
9   Q. This specific advertisement?
10  A. Yes. This is the one since the animated or the
11  integrated popup.
12  Q. All right. I just want to turn your attention
13  now to paragraph 39.
14  A. Okay.
15  Q. Did AdOn Network, to your knowledge, do business
16  with Burn Ads?
17  A. I know of the group listed, that we had either
18  previous accounts under those names or -- I don't remember
19  if there was any current at the time we received the
20  subpoena to close all of those off. We had no idea that
21  there was an association.
22  Q. All right.
23  A. I'm familiar with AdTraff. I can't -- Burn Ads
24  sounds familiar, I just cannot tell you. I haven't -- I'd
25  have to sweep our system to find out if there was anyone

445

1   that opened a Burn Ads account, because I can't oversee
2   all of the accounts.
3   Q. Do you have any knowledge that any of these
4   accounts were in use prior to January 1, 2007?
5   A. AdTraff, A-d-T-r-a-f-f. Uniqads sounds familiar
6   as well.
7   Q. Finally, turning your attention to paragraph
8   23 --
9   A. Okay.
10  Q. -- did you receive complaints about Globedat's
11  products, that they were running false scans?
12  A. Did we receive directly from users?
13  Q. Yes.
14  A. No.
15  Q. Isn't it true that the complaints that you
16  received were related to the use of ActiveX?
17  A. The complaints that we have were a result of the
18  functionality of the ad, not to the -- not in regards to
19  the end user functionality of the product.
20  Q. So your complaints were not related to,
21  quote/unquote, bogus scams that falsely detect the
22  presence of dangerous or illegal files and programs on
23  consumers' computers?
24  A. Correct.
25      MR. DIRENFELD: Thank you. 1 am done. Thank

36 (Pages 442 to 445)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 116 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                    5/5/2010

446

1  you, Mr. Gieron.
2       THE WITNESS:  Thank you.
3       MR. ARENSON:  Let's go off the record.
4       (Discussion held off record.)
5       (Recess taken from 11:28 to 11:41 a.m.)
6       MR. ARENSON:  Ready?
7
8            EXAMINATION
9  BY MR. ARENSON:
10      Q.  Let's go back on the record.
11      Mr. Gieron, just a few questions for you and you
12  will finally be done.  Thank you very much for your
13  patience.
14      My name is Ethan Arenson.  As you know, I'm
15  representing the FTC in this matter.  I've asked you at
16  the break to review documents that have been Bates labeled
17  047336 through 048315.  And I should say, they've been
18  Bates labeled FTC 047336 and FTC 048315.
19      I've asked you to review those documents, and
20  I'd like you to answer the following questions:  (1) Are
21  those true and accurate copies of the emails maintained by
22  the AdOn Network and produced to the FTC?
23      A.  Yes.
24      Q.  (2) Are those emails kept in the ordinary course
25  of AdOn's business?

447

1      A.  Yes.
2      Q.  And (3) Were those emails created at or near the
3  time of the events described in the emails?
4      A.  Yes.
5      Q.  Thank you very much.
6      Now, I want to switch gears and just ask you a
7  few questions about your conversations with Ms. Gurland
8  and Mr. Direnfeld.
9      First topic, Ms. Gurland asked you about a
10  theory that maybe others were accessing Kristy Ross's AdOn
11  accounts, and I want to talk to you a little bit about
12  that.  Did you ever deal with anyone else at Globedat
13  other than Kristy Ross?
14      A.  No.
15      Q.  Did you ever get an email from anyone else at
16  Globedat other than Kristy Ross?
17      A.  No.
18      Q.  Did you ever talk on the phone with anyone at
19  Globedat other than Kristy Ross?
20      A.  No.
21      Q.  Do you have any evidence that you're aware of
22  whatsoever that anyone else accessed Kristy Ross's
23  accounts at myGeek?
24      A.  To my knowledge, no.
25      Q.  Next question:  Ms. Gurland also postulated that

448

1  perhaps someone could have changed the password to Kristy
2  Ross's account and blocked her out of her own accounts at
3  myGeek.  Did Kristy Ross ever tell that you someone else
4  had changed the password to her accounts?
5      A.  No.
6      Q.  Do you have any evidence that you're aware of
7  that someone else at Globedat would have locked Kristy
8  Ross out of her own accounts?
9      A.  No.
10      Q.  Now, I want to talk about the term "malicious
11  ads," which was used quite a bit in your discussion with
12  Ms. Gurland.
13      Now, at the time -- I want to talk about what
14  you thought "malicious ads" were.  And I want to start
15  with ActiveX.  So if ActiveX were in an ad, would that be
16  malicious?
17      A.  It wouldn't be as much malicious as it would be
18  not -- activity that would not -- was not asked for by the
19  providers of the traffic.
20      Q.  Let's put it this way:  If a client refused to
21  remove ActiveX from their ad, would you ban them from your
22  network?
23      A.  Yes.
24      Q.  Same question as to multiple popup windows.  If
25  a client refused to remove multiple popup windows from

449

1  their ad, would you ban them from your network?
2      A.  Yes.
3      Q.  Now, the content of the ad or, as you talked
4  about, marketing speak, I think, would the content of the
5  ads be a basis to throw someone off your network if the
6  ActiveX issue and the popup issue did not exist?
7      A.  Depends on the content.
8      Q.  Okay.  At any time -- actually, 2006 forward,
9  have you ever thrown anyone off the network based on
10  content of the ad as opposed to ActiveX and popups?
11      A.  Yes.
12      Q.  What kind of cases were those?
13      A.  Content surrounding pornography, anything that
14  was potentially harmful to children while on the Internet,
15  as well as any illegal substances being sold.
16      Q.  Okay.  Any other examples that you kicked people
17  off the network for?
18      A.  Changes in law over pharmaceuticals.  So I guess
19  that falls under illegal substance.
20      Q.  What about representations to consumers about
21  scanning your computer, were there ever a cause to throw
22  people off the network?  Have you ever, from 2006 forward?
23      A.  No, we did not get into the habit of monitoring
24  marketing speak.  When I say that, if Expedia and
25  Travelocity came to us both saying they were the number

37 (Pages 446 to 449)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 117 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                    5/5/2010

450

1   one online traffic resource, it wasn't our place to
2   validate that statement.
3       Q.  Understood.
4           I'm going to drive back into the exhibits, and I
5   apologize for this, but just very briefly.  So I want you to
6   take a look at FTC 23, FTC 13, and FTC 18.
7       A.  18, 13, and 23.
8       Q.  Actually, you can put 13 aside for now.  Let's
9   just talk about 18, 23, and I'll add one more, the Kristy
10  Ross 28 exhibit.  Okay.  I've got my act together, so
11  let's start with FTC Exhibit 23.  And turning to pages 2
12  and 3 —
13      A.  Okay.
14      Q.  Now, you said previously that these were ads
15  that ran on your network, right?
16      A.  DriveCleaner ads, yes.
17      Q.  And this exact ad, actually.  This exact ad ran
18  on your network, right?
19      A.  Yes.
20      Q.  And you were able to track this ad back to
21  Kristy's account, correct?
22      A.  At the time, yes.
23      Q.  Now, when this ad says 948 dangerous files found
24  in your system, is there any way that an advertisement
25  could know about the files on your system?

451

1       A.  Not to my knowledge.
2       Q.  Okay.  On to Exhibit 18.  And, actually, I'm
3   sorry, I've got one follow-up question.  If your knowledge
4   is correct, your understanding of how ads work is correct,
5   then that statement that 948 dangerous files found on your
6   system, that's false, correct?
7       A.  That would be false, yes.
8       Q.  Thank you.
9           Now, on to Exhibit 18, looking at the bottom of
10  page 2 with the WinAntiVirus PRO ad —
11      A.  Correct.
12      Q.  — and I think you testified that this specific
13  ad, you didn't review, but it definitely ran on the AdOn
14  Network; is that correct?
15      A.  Correct.
16      Q.  Now, I apologize.  The print is small.  But
17  under the — kind of the purple box where it says,
18  "Attention Security Center," see that?
19      A.  Yes.
20      Q.  The last sentence of that says [as read]:  One
21  of the processes has just sent this information.  And it
22  identifies it as Win32res.exe, which I think we talked
23  about a little bit prior.
24      A.  Right.
25      Q.  Now, is it possible for an ad to know what kind

452

1   of processes or exe files are running on your computer?
2       A.  I don't have that information.
3       Q.  Okay.  And when you talked about before the IP
4   address and the browser information in this box, is it the
5   case that all consumers when they search the Internet,
6   that this kind of information is transmitted by their
7   browser; do you know?
8       A.  A user agent is transmitting, correct.
9       Q.  Can you tell me what the "user agent" is?
10      A.  User agent is a string of information that
11  identifies browser type, computer operating system, and IP
12  address.  This allows for ad networks to be able to target
13  advertising based on these perimeters, as well as it's
14  standard information that would be used for — that
15  coincides with cookies to be able to customize
16  information.  If you're living in Washington DC and you go
17  to the same web site, it will tend to look at it being
18  Washington DC that has that information.
19      Q.  So everyone surfing the Internet transmits this
20  type of information?
21      A.  Unless they're blocked, right.
22      Q.  Tell me how they would be blocked.
23      A.  Applications are out there that would filter
24  everyone through a proxy IP to allow for anonymity —
25      Q.  Huh-uh.

453

1       A.  — on the Internet.  However, the majority of
2   the U.S. has this information available.
3       Q.  So unless you went out and obtained a proxy IP
4   to hide your Internet protocol address —
5       A.  Or you use AOL.  Sorry.
6       Q.  Explain that one to me.
7       A.  AOL all run through proxies.
8       Q.  Okay.
9       A.  Their entire mail service and everything else is
10  filtered through a proxy IP, which does not give an
11  accurate depiction of where you're located.  The other
12  information would be available.
13      Q.  Okay.  So other than the AOL example and someone
14  affirmatively reaching out and getting a proxy, every user
15  in the United States certainly, and probably around the
16  world, would transmit this same information?
17      A.  Correct.
18      Q.  Okay.  So when this ad says it's detected a
19  potential security vulnerability on your PC and indicates
20  that the private information below has been transmitted,
21  do you view that as a misleading statement?
22          MR. KIRSCH:  Objection, foundation.
23          THE WITNESS:  Can you read that one more time?
24  BY MR. ARENSON:
25      Q.  Sure.

38 (Pages 450 to 453)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 118 of 121

FTC v. Innovative Marketing, Inc. et al. Gieron                                    5/5/2010

454

1    The ad says [as read], Security Center has
2 detected potential security vulnerabilities. Maybe let's
3 just start there. Is this ad capable of detecting
4 securely vulnerabilities?
5    A. Not to my --
6    MR. KIRSCH: Objection, foundation.
7 BY MR. ARENSON:
8    Q. You can answer.
9    A. Not to my knowledge.
10    Q. And when it says [as read]: Private information
11 and documents have been sent to a remote computer, is
12 there any way this ad could know that?
13    MR. DIRENFELD: Objection, foundation.
14    THE WITNESS: Not to my knowledge.
15 BY MR. ARENSON:
16    Q. And if your knowledge is correct, then is this
17 ad false?
18    MR. DIRENFELD: Objection, calls for
19 speculation.
20    THE WITNESS: 1 would, once again, refer back to
21 someone who understands the Win32res.exe and what its
22 function is.
23 BY MR. ARENSON:
24    Q. I get that issue and we'll have someone take a
25 look at that. But as to the part about detecting

456

1 previously that this was an email that ran on your
2 network?
3    A. The ad.
4    Q. I'm sorry. Getting tired.
5    This is an ad that ran on your network, correct?
6    A. Correct.
7    Q. And you were able to find this exact URL in
8 Kristy's account; is that what you testified to earlier?
9    A. The exact URL, no. The resulting URL that's
10 displayed there, yes. When I say that, because at the
11 time, the adfarm.mediaplex URL was being used. So that
12 would have been what was stored in our system.
13    Q. Uh-huh.
14    A. The resulting URL from -- that would have
15 returned to the populated window would have been the
16 freerepair.org URL.
17    Q. Just so I'm clear, you went to the adfarm URL,
18 which then redirected you to this exact URL pictured here?
19    A. Correct.
20    Q. Gotcha.
21    So that's how you were able to confirm that this
22 was Kristy's ad?
23    A. Right.
24    Q. Because that adfarm URL that redirected you to
25 this exact URL was contained within Kristy's accounts?

455

1 potential security vulnerabilities, this specific ad --
2    MR. DIRENFELD: Objection, asked and answered.
3 BY MR. ARENSON:
4    Q. -- is that a false statement?
5    MR. KIRSCH: Calls for foundation.
6    THE WITNESS: The ability for it to populate as
7 quickly as it would need to with the ad being deployed, 1
8 would say its likelihood is minimal.
9 BY MR. ARENSON:
10    Q. So it's likely false; is that what you're
11 saying?
12    MR. DIRENFELD: Objection.
13    THE WITNESS: I'd say it's more likely false
14 than true.
15 BY MR. ARENSON:
16    Q. Okay. Now, on to a document that has been
17 marked Kristy Ross 28, which is a duplicate of an FTC
18 document, but we'll use the one that you talked with
19 Ms. Gurland about.
20    A. Am I keeping the 18, 13, and 23 out?
21    Q. You can put those aside, hopefully, forever.
22 KRG -- KRG28.
23    A. Okay.
24    Q. So KRG28, and we're going to go page 4, which
25 you've seen before. And I believe you testified

457

1    A. Yes.
2    MR. KIRSCH: Object to the characterization of
3 "Kristy's ad and Kristy's account."
4 BY MR. ARENSON:
5    Q. Now, this ad which says, "Scan in progress" and
6 says, "Items processed and objects found," that's false,
7 right? There's no way this ad could detect that.
8    MR. KIRSCH: Objection, foundation.
9    THE WITNESS: To my knowledge. I would have to
10 defer to someone who has full understanding of it. But,
11 to my knowledge, it would difficult.
12 BY MR. ARENSON:
13    Q. Fair enough.
14    So if your knowledge is correct, would this ad
15 be false?
16    MR. KIRSCH: Objection.
17    THE WITNESS: If that's the case, then yes.
18 BY MR. ARENSON:
19    Q. Okay. Now, I think you testified previously
20 that based on the impressions charted, that Kristy spent
21 more than -- or directed to be spent more $3 million with
22 myGeek. Is that about right?
23    MR. KIRSCH: Objection, characterization.
24    THE WITNESS: Correct.
25 BY MR. ARENSON:

39 (Pages 454 to 457)

458

1    Q.  And during the history of your relationship with
2   Kristy -- business relationship with Kristy, did she ever
3   tell that you she needed to obtain approval from someone
4   else to spend money?
5    A.  No.
6    Q.  So is it correct to say that Kristy spent more
7   than $3 million with AdOn Network without ever telling you
8   that she needed approval from someone else to do so?
9        MR. KIRSCH:  Objection, characterization of
10  "Kristy spent money."
11       THE WITNESS:  In regards to credit card funding,
12  there was never any discussion.  In regards to sending
13  wires when we transferred method of payment, someone else
14  had to deploy the wire, but she would coordinate it.
15  BY MR. ARENSON:
16   Q.  Let me give you another example.  At several
17  points, you developed business opportunities that you
18  would present to Kristy?
19   A.  Right.
20   Q.  When you presented those to Kristy, did she ever
21  say to you, "I need to check with someone else to see if
22  we can do this"?
23   A.  No.
24   Q.  She just said, "Go ahead"?
25   A.  Or funding would be coming.

459

1    Q.  Perfect.
2        MR. KIRSCH:  Objection, foundation.
3   BY MR. ARENSON:
4    Q.  Now, I want to talk a little bit about this IP
5   spoofing issue.  Is it fair to say that on numerous
6   occasions, you would view ads from inside of AdOn that
7   would appear differently than they would to people outside
8   of AdOn?
9    A.  Yes, based on the information that we retained,
10  yes.
11   Q.  And those ads you were able to trace back to
12  Kristy's accounts?
13   A.  Correct.
14       MR. Kirsch:  Objection, characterization.
15  BY MR. ARENSON:
16   Q.  Now, you said to Carolyn that if you were able
17  to prove that Kristy was knowingly changing these ads or
18  knowingly engaging in IP spoofing, you would have
19  terminated her from the network; is that correct?
20       MR. KIRSCH:  Objection, characterization.
21       THE WITNESS:  Correct.
22  BY MR. DIRENFELD:
23   Q.  Is that an easy or difficult thing to prove?
24   A.  I do not know how to prove it.
25   Q.  I guess that maybe answers the question.

460

1        Did you know how to prove that Kristy was IP
2   spoofing?
3    A.  No.
4        MR. ARENSON:  Objection to characterization and
5   also misstates the testimony.
6        THE WITNESS:  It was all educated guessing based
7   on what we were able to see.  I mean, taking several
8   points and coming up with a theory.  But without having a
9   definitive answer, I would not be able to say that she --
10  I knew how to identify it per se.
11       Sorry.  Let me correct myself.  I have seen
12  examples where I could show you how it's being done.  In
13  this case, I did not have anything that would -- that was
14  concrete outside of speculation.
15  BY MR. ARENSON:
16   Q.  But I think what you told me is that you didn't
17  know how to prove it --
18   A.  Right.
19   Q.  -- one way or the other?
20   A.  Right.  In regards to this, yes.
21   Q.  It would have been impossible for you to prove
22  that Kristy was engaging in IP spoofing?
23   A.  In regards to this, yes.
24       MR. ARENSON:  Objection, characterization.
25  BY MR. ARENSON:

461

1    Q.  Thank you.
2        You talked briefly with Ms. Gurland about Conrad
3   D'Souza [sic] and how you didn't really know who that was?
4    A.  Conrad Raphael or --
5    Q.  I'm sorry.  Conrad Raphael, also known as Conrad
6   Raphael D'Souza.
7        Conrad Raphael, according to the documents
8   Ms. Gurland showed you, had placed ads with other
9   advertising networks.  Is that the understanding that you
10  got from those documents?
11   A.  The understanding from what was being displayed,
12  the ads were submitted to Innovation Interactive, which is
13  the same as 360I.  A representative from there placed that
14  URL into our system.
15   Q.  Does anything about Conrad Raphael placing ads
16  change any of your certainty about tracing the ads that
17  you talked to Ms. Robbins about yesterday to Kristy Ross's
18  accounts?
19       MR. ARENSON:  Objection, characterization.
20       THE WITNESS:  Can you repeat the question?
21  BY MR. ARENSON:
22   Q.  Sure.
23       Yesterday, you were able to trace various ads to
24  Kristy Ross's account with Ms. Robbins, correct?
25       MR. KIRSCH:  Same objection.

40 (Pages 458 to 461)

Case 1:08-cv-03233-RDB   Document 198-2   Filed 12/17/10   Page 120 of 121

**FTC v. Innovative Marketing, Inc. et al. Gieron**      **5/5/2010**

462

1    THE WITNESS: Correct.
2  BY MR. ARENSON:
3    Q. Now, the introduction of the documents from
4  Ms. Gurland talking about Conrad Raphael placing ads, does
5  that change any of your answers from yesterday about being
6  able to trace those specific ads you and Ms. Robbins
7  talked about to Kristy's accounts?
8    MR. KIRSCH: Same objection.
9    THE WITNESS: No, because we were able to do the
10  same as demonstrated in the documents given to me by
11  Carolyn this morning, that we were able to trace back to
12  Conrad's placed URLs, if that's who placed them.  We were
13  able to place -- we do enough due diligence to make sure
14  we know who to address the issue with.
15  BY MR. ARENSON:
16    Q. So the documents shown about Conrad Raphael
17  didn't change any of your answers to Ms. Robbins about
18  tracing the ads to Kristy's accounts?
19    A. No.
20    MR. KIRSCH: Objection, characterization.
21  BY MR. ARENSON:
22    Q. My last and, I think, the final question:  You
23  talked a little bit about end user complaints with
24  Mr. Direnfeld.  Did you typically get end user complaints?
25  And let me define that term.  "End user" being the

463

1  individual who saw the ad on their computer.
2    A. We did not receive complaints directly from any
3  end user specific to ad behavior.
4    Q. Would it be difficult for an end user to track
5  an ad through the software on their desktop back to
6  myGeek?
7    MR. KIRSCH: Objection, foundation.
8    THE WITNESS: Repeat that again.
9  BY MR. ARENSON:
10    Q. Sure.
11    Would an average user sitting on their computer
12  watching an ad that was sent from myGeek through a piece
13  of adware, would it be easy or difficult for them to track
14  that ad back to myGeek and say, "This ad came from
15  myGeek"?
16    MR. KIRSCH: Same objection.
17    THE WITNESS: The end user complaints that we
18  have received are because someone was able to identify our
19  feed being distributed through that adware product.
20  BY MR. ARENSON:
21    Q. How would you do that?  How would you identify
22  the feed?
23    A. If the person was able to see the feed results
24  as listed -- for example, the CPCfeed.com, they would do a
25  URL search.  The URL search then would allow to give them

464

1  information as to who -- we own the URL.  We don't hide
2  that information.  They would then contact us, ask us how
3  to remove popups from their computer, at which time we
4  have to assist them with uninstall or identification
5  within their add/remove programs to remove the popup
6  issue.
7    Q. And my very simple question is:  Do you think
8  that process, looking at the CPC feed, looking up the URL,
9  tracing it back to myGeek, contacting you, do you think an
10  unsophisticated user, that's something they would be able
11  to do?
12    MR. KIRSCH: Objection, foundation.
13    THE WITNESS: Not typically.
14  BY MR. ARENSON:
15    Q. I'm going to cheat and ask you one more
16  question, and then I promise I'm done.
17    Exhibit 29, which you were shown by
18  Mr. Direnfeld, this was the FTC Complaint.
19    A. Okay.
20    Q. This ad at paragraph 30 –
21    A. Okay.
22    Q. -- is that the exact same ad that is displayed
23  in Exhibit FTC 23?
24    A. Yes, minus the integrated popup.
25    Q. And that's an ad that has run on your network,

465

1  run on the AdOn network?
2    A. Yes.
3    Q. And is traceable back to Kristy Ross's accounts?
4    A. Yes.
5    MR. KIRSCH: Objection, characterization.
6  BY MR. ARENSON:
7    Q. And ran prior to January 1st, 2007, as you've
8  testified previously?
9    A. Yes.
10    MR. ARENSON: Mr. Gieron, thank you very much.
11  You've been very, very cooperative, and we very much
12  appreciate your time.  And with that, we'll go off the
13  record.
14    (12:02 p.m.)

41 (Pages 462 to 465)

Case 1:08-cv-03233-RDB    Document 198-2    Filed 12/17/10    Page 121 of 121

**FTC v. Innovative Marketing, Inc. et al. Gieron**                    **5/5/2010**



466

1    C E R T I F I C A T I O N   O F   R E P O R T E R
2    DOCKET/FILE NUMBER:
3    CASE TITLE:  FTC v. INNOVATIVE MARKETING, INC., ET AL.
4    DATE:  MAY 5, 2010
5
6        I HEREBY CERTIFY that the transcript contained
7    herein is a full and accurate transcript of the notes
8    taken by me at the deposition on the above cause before
9    the FEDERAL TRADE COMMISSION to the best of my knowledge
10   and belief.
11           DATED:  5/17/2010
12
13           SHELLEY E.D. PEARCE, RPR
                 Arizona Certified Reporter
14               Certification No. 50301
15
                 ---oOo---
16
17   C E R T I F I C A T I O N   O F   P R O O F R E A D E R
18
19       I HEREBY CERTIFY that I proofread the transcript for
20   accuracy in spelling, hyphenation, punctuation and format.
21
22           DATED:  5/17/2010
23
24           JENNY KOPACEK, Proofreader
25               ---oOo---

468

1    WITNESS:  GEOFFREY M. GIERON
2    DATE:  MAY 5, 2010
3    CASE TITLE:  FTC v. INNOVATIVE MARKETING, INC., ET AL.
4
5        Please note any errors and the corrections thereof
6    on this errata sheet.  The rules require a reason for any
7    change or correction.  It may be general, such as "To
8    correct stenographic error," or "To clarify the record,"
9    or "To conform with the facts."
10   PAGE LINE   CORRECTION              REASON FOR CHANGE
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

467

1            CERTIFICATE OF DEPONENT
2
3        I hereby certify that I have read and examined the
4    foregoing transcript, and the same is a true and accurate
5    record of the testimony given by me.
6        Any additions or corrections that I feel are
7    necessary, I will attach on a separate sheet of paper to
8    the original transcript.
9
10
11           GEOFFREY M. GIERON
12               ---oOo---
13
14       I hereby certify that the individual representing
15   himself/herself to be the above-named individual, appeared
16   before me this_____day of_____, 2010, and
17   executed the above certificate in my presence.
18
19
20           NOTARY PUBLIC IN AND FOR
21
22
23
24   MY COMMISSION EXPIRES:
25

42 (Pages 466 to 468)