# RDX 22

**From:** Kristy Ross
**Sent:** Tuesday, August 09, 2005 11:47 AM
**To:** Geoff Gieron
**Subject:** Re: Account Update

Geoff,

Thanks it seems like they lost the code or something on them.. I'm trying to contact the company to fix them.  I'm not sure what happened.

Appreciate the heads up!

Kristy

----- Original Message -----
From: Geoff Gieron
To: 'Kristy Ross'
Sent: Tuesday, August 09, 2005 2:46 PM
Subject: Account Update

Kristy,

I have suspended 89573. 90012, 90448 until I hear back from you on the resolve on the sudden change on Winfixer's end with delivery of their ad.

Thank you for helping me with this, I really appreciate it!

Geoff Gieron

Director, Advertiser Management Services

myGeek.com

AdOn Network

602-265-5242

602-297-4219 (fax)

geoff@mygeek.com


!DSPAM:42f8f9fa22724702310458!

MGC00199
ROSS000023

EX KR G 6 p1

| | |
|---|---|
| **From:** | Kristy Ross |
| **Sent:** | Tuesday, August 09, 2005 11:49 AM |
| **To:** | Geoff Gieron |
| **Subject:** | Re: Account Update |

Geoff,

Im not sure if you have any indication as to when this may have happened?  I'm trying to offer them information to look at when it may have occurred.  Do you think it was just today or earlier?

Thanks,
Kristy

----- Original Message -----
From: Geoff Gieron
To: 'Kristy Ross'
Sent: Tuesday, August 09, 2005 2:46 PM
Subject: Account Update

Kristy,

I have suspended 89573. 90012, 90448 until I hear back from you on the resolve on the sudden change on Winfixer's end with delivery of their ad.

Thank you for helping me with this, I really appreciate it!

Geoff Gieron

Director, Advertiser Management Services

myGeek.com

AdOn Network

602-265-5242

602-297-4219 (fax)

geoff@mygeek.com


!DSPAM:42f8f9fa22724702310458!

MGC00200
ROSS000024

p 2

**From:**           Kristy Ross
**Sent:**           Tuesday, August 09, 2005 12:13 PM
**To:**             Geoff Gieron
**Subject:**       Re: Account Update

Geoff,

Thanks.. theyre always updating their software it seems they overwrote everything.. trying to get them to roll the version back.  Appreciate the help.

- Kristy

----- Original Message -----
From: Geoff Gieron
To: 'Kristy Ross'
Sent: Tuesday, August 09, 2005 3:05 PM
Subject: RE: Account Update


Looks like it started today - I looked at the ad yesterday showing it off as an example of how to correctly submit an ad with a download on the second page.  .


Geoff Gieron

myGeek.com


From: Kristy Ross [mailto:kristy@globedat.com]
Sent: Tuesday, August 09, 2005 11:50 AM
To: Geoff Gieron
Subject: Re: Account Update


Geoff,


Im not sure if you have any indication as to when this may have happened?  I'm trying to offer them information to look at when it may have occurred.  Do you think it was just today or earlier?


Thanks,

Kristy

----- Original Message -----

From: Geoff Gieron

To: 'Kristy Ross'

Sent: Tuesday, August 09, 2005 2:46 PM

Subject: Account Update

ROSS000025

p3

Kristy,

I have suspended 89573. 90012, 90448 until I hear back from you on the resolve on the sudden change on Winfixer's end with delivery of their ad.

Thank you for helping me with this, I really appreciate it!

Geoff Gieron

Director, Advertiser Management Services

myGeek.com

AdOn Network

602-265-5242

602-297-4219 (fax)

geoff@mygeek.com

!DSPAM:42f8fe8445442048921300!

ROSS000026

P4

From:        Kristy Ross
Sent:        Tuesday, August 09, 2005 12:34 PM
To:          Geoff Gieron
Subject:     Re: Account Update


Geoff,

Thanks this is helping.. theyre going through all the links now.  Apparently they did some database
upgrade and messed up all their links.  Hopefully it will all be fixed shortly.  I'll keep you updated.

Thanks a bunch,
Kristy

----- Original Message -----
From: Geoff Gieron
To: 'Kristy Ross'
Sent: Tuesday, August 09, 2005 3:14 PM
Subject: RE: Account Update


Kristy - here is an example of your winfixer ad vs. another one that we currently have in the network.
- hope this helps out a bit.


http://winfixer.com/pages/scanner/?aid=mgp=3ax=0   (another account that is working correctly)


http://www.winfixer.com/pages/scanner/?aid=mgwfron3lid=RONp=3ax=0   (your link with pop/auto download
issue)


Geoff Gieron

myGeek.com




_____


From: Kristy Ross [mailto:kristy@globedat.com]
Sent: Tuesday, August 09, 2005 11:50 AM
To: Geoff Gieron
Subject: Re: Account Update


Geoff,


Im not sure if you have any indication as to when this may have happened?  I'm trying to offer them
information to look at when it may have occurred.  Do you think it was just today or earlier?


Thanks,

Kristy

----- Original Message -----

MGC00203
ROSS000027

p 5

From: Geoff Gieron

To: 'Kristy Ross'

Sent: Tuesday, August 09, 2005 2:46 PM

Subject: Account Update

Kristy,

I have suspended 89573, 90012, 90448 until I hear back from you on the resolve on the sudden change on Winfixer's end with delivery of their ad.

Thank you for helping me with this, I really appreciate it!

Geoff Gieron

Director, Advertiser Management Services

myGeek.com

AdOn Network

602-265-5242

602-297-4219 (fax)

geoff@mygeek.com

!DSPAM:42f9009455524376618803!

MGC00204
ROSS000028
p6

**From:**          Kristy Ross
**Sent:**          Tuesday, August 09, 2005 12:59 PM
**To:**            Geoff Gieron
**Subject:**       Re: Account Update


Geoff,

I think the issue is fixed.  Please let me know.  I am trying to check in Internet Explorer, but it is hard for me to see popups or not as I use Safari.

Thanks,
Kristy

----- Original Message -----
From: Geoff Gieron
To: 'Kristy Ross'
Sent: Tuesday, August 09, 2005 3:14 PM
Subject: RE: Account Update


Kristy - here is an example of your winfixer ad vs. another one that we currently have in the network. - hope this helps out a bit.


http://winfixer.com/pages/scanner/?aid=mgp=3ax=0   (another account that is working correctly)


http://www.winfixer.com/pages/scanner/?aid=mgwfron3lid=ROMp=3ax=0   (your link with pop/auto download issue)


Geoff Gieron

myGeek.com


-----


From: Kristy Ross [mailto:kristy@globedat.com]
Sent: Tuesday, August 09, 2005 11:50 AM
To: Geoff Gieron
Subject: Re: Account Update


Geoff,


Im not sure if you have any indication as to when this may have happened?  I'm trying to offer them information to look at when it may have occurred.  Do you think it was just today or earlier?


Thanks,

Kristy

----- Original Message -----

ROSS000029
p. 7

From: Geoff Gieron

To: 'Kristy Ross'

Sent: Tuesday, August 09, 2005 2:46 PM

Subject: Account Update

Kristy,

I have suspended 89573. 90012, 90448 until I hear back from you on the resolve on the sudden change on Winfixer's end with delivery of their ad.

Thank you for helping me with this, I really appreciate it!

Geoff Gieron

Director, Advertiser Management Services

myGeek.com

AdOn Network

602-265-5242

602-297-4219 (fax)

geoff@mygeek.com

!DSPAM:42f9009455524376618B03!

ROSS000030

P. 8

**From:**       Kristy Ross
**Sent:**       Tuesday, August 09, 2005 02:06 PM
**To:**         Geoff Gieron
**Subject:**    Re: Account Update

Great thanks.. whats the holdup on the opening the other account? Don't they check the links at the same time or?

Thanks a bunch for this.. unfortunately this company seems to change their product all the time and we've had quite a few issues with them in the past.. and unfortunately lost advertisers because of it as well.  We've warned them numerous times, but it continues to occur .. less than it used to though.

What about the new source of ROW traffic.. did that ever start?

Thanks,
Kristy

----- Original Message -----
From: Geoff Gieron
To: 'Kristy Ross'
Sent: Tuesday, August 09, 2005 5:00 PM
Subject: RE: Account Update

Kristy - 90012 was just opened back up to 110077 as a source.  Looks like tomorrow will be when we can open back up 89573 to that source. Just wanted to update you as soon as I got off the phone with them.

Thanks

Geoff Gieron

myGeek.com

From: Kristy Ross [mailto:kristy@globedat.com]
Sent: Tuesday, August 09, 2005 12:59 PM
To: Geoff Gieron
Subject: Re: Account Update

Geoff,

I think the issue is fixed.  Please let me know.  I am trying to check in Internet Explorer, but it is hard for me to see popups or not as I use Safari.

Thanks,

Kristy

----- Original Message -----

From: Geoff Gieron

To: 'Kristy Ross'

ROSS000031

P. 9

From:           Kristy Ross
Sent:           Tuesday, August 09, 2005 04:10 PM
To:             Geoff Gieron
Subject:        Re: Account Update

Geoff,

Thanks for the help really. We have lost people in the past, so I know what incidents like this can create. Your team at Mygeek is definitely the best we have dealt with.. and we advertise everywhere. Usually it's hours and days for a response :)

Thanks.. hope the weather is treating you well out there.. it's pouring over here.

Kristy

----- Original Message -----
From: Geoff Gieron
To: 'Kristy Ross'
Sent: Tuesday, August 09, 2005 6:58 PM
Subject: RE: Account Update

Great news Kristy - just got the ok to put everything back to how it was. Thank you for hangin with me while I bugged them endlessly and begged for forgiveness!

I really enjoy working with you and appreciate how responsive you are!!

Geoff Gieron

myGeek.com

        _____

From: Kristy Ross [mailto:kristy@globedat.com]
Sent: Tuesday, August 09, 2005 3:17 PM
To: Geoff Gieron
Subject: Re: Account Update

Sure if we can add it. I figured it was a main source since most of the traffic came from them other places :)

Thanks a bunch for all the help.

Kristy

----- Original Message -----

From: Geoff Gieron

To: 'Kristy Ross'

Sent: Tuesday, August 09, 2005 6:08 PM

ROSS000032

p. 10

Subject: RE: Account Update


This traffic source doesn't pick up traffic at that rate – though a handful of clicks make it through.
I just did that because though because there is no threat there I can go ahead and turn it on if you'd
like.


I might be able to get this source back up for 89573 before I leave tonight – I am waiting for word
from the team.


Geoff Gieron

myGeek.com


---------


From: Kristy Ross [mailto:kristy@globedat.com]
Sent: Tuesday, August 09, 2005 2:14 PM
To: Geoff Gieron
Subject: Re: Account Update


Geoff,


It also looks like the ron account winfixerron2 (90448) is still not marked as having traffic from
110077.  Is this one still on hold also or it just has not been turned back on?

Thanks,

Kristy

----- Original Message -----

From: Geoff Gieron

To: 'Kristy Ross'

Sent: Tuesday, August 09, 2005 5:00 PM

Subject: RE: Account Update


Kristy – 90012 was just opened back up to 110077 as a source.  Looks like tomorrow will be when we can
open back up 89573 to that source. Just wanted to update you as soon as I got off the phone with them.


Thanks


Geoff Gieron

myGeek.com

ROSS000033

P. 11

RDX 23

**Page 1**

1   UNITED STATES DISTRICT COURT
2   FOR THE DISTRICT OF MARYLAND
    NORTHERN DIVISION
3   FEDERAL TRADE COMMISSION,   Civil No.  RDB-08-3233
4       Plaintiff,              Baltimore, Maryland
5       v.                      June 9, 2009
6   INNOVATIVE MARKETING, INC.,   2:00 p.m.
    et al.,
7
8       Defendants.
    -------------------------------/
9   TRANSCRIPT OF MOTIONS HEARING
    BEFORE THE HONORABLE RICHARD D. BENNETT
10  UNITED STATES DISTRICT JUDGE
11  APPEARANCES:
12  For the Plaintiff:      Federal Trade Commission
                            By:  ETHAN R. ARENSON, ESQUIRE
13                          COLLEEN ROBBINS, ESQUIRE
                            600 Pennsylvania Avenue, NW
14                          Washington, D.C. 20580
15  For the Defendants:     Orrick Herrington and Sutcliffe LLP
                            By:  MICHAEL J. MADIGAN, ESQUIRE
16                          GARRETT RASMUSSEN, ESQUIRE
                            JONATHAN DIRENFELD, ESQUIRE
17                          1152 15th Street, NW
                            Washington, D.C. 20005
18
                            Winston and Strawn LLP
19                          By:  DAN K. WEBB, ESQUIRE
                            35 W. Wacker Drive
20                          Chicago, Illinois 60601
21                          Patton Boggs LLP
                            By:  BENJAMIN WOOD, ESQUIRE
22                          2550 M Street, NW
                            Washington, D.C. 20037
23
24
25

1

**Page 2**

1   Court Reporter          Lisa K. Bankins RMR
                            101 West Lombard Street
2                           Room 5515
                            Baltimore, Maryland 21201
3
4   Proceedings recorded by mechanical stenography,
    transcript produced by notereading.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

2

**Page 3**

1                   P R O C E E D I N G S
2       THE COURT:   Madam Clerk, if you'll call the case,
3   please?
4       THE CLERK:   The case pending before this court is Civil
5   Action Number RDB-08-CV-3233, Federal Trade Commission v.
6   Innovative Marketing, Inc., et al. for pending motions hearing.
7       THE COURT:   Good afternoon, everyone.  If you'll
8   identify yourselves for the record?  On behalf of the Federal
9   Trade Commission, if counsel would introduce themselves for the
10  record, please?
11      MR. ARENSON:   Good afternoon, Your Honor.  Ethan
12  Arenson on behalf of the Federal Trade Commission.
13      MS. ROBBINS:   And Colleen Robbins on behalf of the
14  Federal Trade Commission.
15      THE COURT:   Mr. Arenson and Ms. Robbins, nice to see
16  you as always and I believe you have Jennifer Obenhausen, a law
17  clerk, behind you.  Is that Ms. Oberhausen?  Nice to see you.  On
18  behalf of the defendants?
19      MR. MADIGAN:   Michael Madigan, Your Honor.
20      THE COURT:   Mr. Madigan, nice to see you as always.
21      MR. MADIGAN:   And I represent Mr. D'Souza.
22      THE COURT:   And you represent?
23      MR. MADIGAN:   Marc D'Souza.
24      THE COURT:   And you represent the defendant, Marc
25  D'Souza.  Let me just get a little score card here ready.  Wait a

3

**Page 4**

1   minute.  Hold on one second.  Wait a minute.  All right.  And
2   Mr. Daniel Webb.  Is that correct?
3       MR. WEBB:   Dan Webb, yes, on behalf of the individual
4   defendant, Kristy Ross, Your Honor.
5       THE COURT:   Yes.  Kristy Ross.  Hold on one second.
6   All right.  Thank you.  And Mr. Wood?
7       MR. WOOD:   Good afternoon, Your Honor.  Ben Wood on
8   behalf of defendant, Sam Jain.
9       THE COURT:   All right.  All right.  Thank you very
10  much.  And then we have Garrett Rasmussen?
11      MR. RASMUSSEN:   Yes.  Good afternoon, Your Honor.
12      THE COURT:   Good afternoon.
13      MR. RASMUSSEN:   Representing Maurice D'Souza, the
14  relief defendant.
15      THE COURT:   All right.  Hold on one second.  All right.
16  Thank you.  And then we have Jonathan Direnfeld and Carolyn
17  Gerland.  You all are lawyers also with the respective firms
18  here.  Are you summer associates or --
19      MR. DIRENFELD:   Lawyers, Your Honor.
20      THE COURT:   Lawyers.  Both of you.  So you've hit the
21  road of reality.  You're not summer associates.  Is that correct?
22      MR. DIRENFELD:   Yes, I have.
23      THE COURT:   All right.  Well, it's nice to see you all.
24  Welcome.  Okay.  We have a series of, quite a few motions here
25  pending and I apologize for some of these piling up, counsel.  As

4

**Page 5**

1  some of you may or may not know, I was involved in an eight-week
2  death penalty case which took up a lot of my docket. The end
3  result of which was as exactly people knew it would be some nine
4  weeks before the case started, but that's another matter. So it
5  fouled up my docket a little bit. But I'm catching up now. And
6  we have a lengthy series of motions here. What I would propose
7  to do if I can is I've divided this into six categories. The
8  motions to stay, the contempt motion will be the second category,
9  motions to strike for extension of time is the third category,
10  motion to modify the preliminary injunction, the fourth category,
11  motion to dismiss for failure to join necessary and indispensable
12  party is essentially the fifth category, a motion and then a
13  motion for lack of personal jurisdiction, which you have filed,
14  Mr. Madigan, on behalf of -- I'm sorry -- Mr. Rasmussen on behalf
15  of Mr. Maurice D'Souza.
16          MR. RASMUSSEN:   Correct.
17          THE COURT:   Okay. That's fine. All right. So that
18  they are the categories in which I propose to address these
19  motions. Is there any objection by anybody to my --
20          MR. MADIGAN:   No, Your Honor.
21          MR. WEBB:   --
22          THE COURT:   -- categorizing in that fashion? Okay. So
23  we're going to start first with the motions to stay which have --
24  there are three motions. There's Sam Jain's motion to stay,
25  paper number 45, Kristy Ross' motion to stay, temporary stay,

**Page 6**

1  paper number 48, and then the first section of Marc D'Souza's
2  motion for temporary stay and modification of preliminary
3  injunction, which is paper number 71 and I'll be glad to hear
4  from counsel on that and we can proceed. Whoever wants to go
5  first. It would be good if I could first hear from you,
6  Mr. Wood. You represent Sam Jain. Is that correct?
7          MR. WOOD:   I do, Your Honor.
8          THE COURT:   Is it correct that he is a fugitive?
9          MR. WOOD:   There's a bench warrant for his arrest in
10  California. He missed a required court hearing in that action in
11  California.
12          THE COURT:   All right. He's yet to be here in this
13  court and I gather he's not been in the United States District
14  Court for the Northern District of Illinois.
15          MR. WOOD:   He's not been in the court in Illinois and
16  he's also not missed any appearances in Illinois. As you know,
17  Your Honor, he voluntary waived service in this matter --
18          THE COURT:   Yes.
19          MR. WOOD:   -- and he submitted to the --
20          THE COURT:   Yes. So he's accepted service of process
21  here. But according to my review, it appears that he, that a
22  federal judge -- is that in the Central District of California?
23          MR. WOOD:   It is, Your Honor.
24          THE COURT:   All right. A United States District judge
25  for the Central District in California has issued a bench warrant

**Page 7**

1  for his arrest and he's a fugitive under federal law, is he not?
2          MR. WOOD:   There is a bench warrant for his arrest,
3  Your Honor.
4          THE COURT:   All right. Okay. And can you tell me how
5  long has that bench warrant been issued?
6          MR. WOOD:   My understanding it was at the end of
7  January. I believe maybe January the 26th.
8          THE COURT:   Um-hum. So we're looking on five months.
9  Four and a half months.
10          MR. WOOD:   And I understand that might have
11  implications for our request for --
12          THE COURT:   Well, it may. I'm just saying that it
13  certainly appears that one thing if it's four or five days, even
14  a bad week, but after four and a half months, I'd say he's in the
15  fugitive category.
16          MR. WOOD:   I don't represent him in that action, Your
17  Honor, but --
18          THE COURT:   Richard Kimball was out as the fugitive for
19  nine years on television. So I would certainly think that four
20  and a half months would constitute your client as a fugitive.
21          MR. WOOD:   There's been some implication that that
22  renders the request for a stay indefinite.
23          THE COURT:   Sure.
24          MR. WOOD:   I don't think it is. I think there's some
25  things that can be built into the order.

**Page 8**

1          THE COURT:   Right.
2          MR. WOOD:   To account for that, there could be a
3  provision, a standard provision in stay orders. The department
4  can petition for modification or lifting of the stay. The stay
5  could initially be for a definite period of time with the
6  possibility that the parties could petition for an extension or
7  for a lifting --
8          THE COURT:   All right. Why don't I -- you all can
9  decide who wants to go first on the three motions for stay. But
10  I just wanted to confirm that we have a situation on one of the
11  defendants here is a fugitive and there's a federal -- has there
12  been an indictment returned in this case yet in either Illinois
13  or California?
14          MR. WOOD:   He had been indicted in California.
15          THE COURT:   He has been indicted in California. Okay.
16          MR. WOOD:   Not in Illinois, although he was told back
17  in September that his indictment was imminent in the Illinois
18  investigation.
19          THE COURT:   All right. We'll have to defer to Mr. Webb
20  or Mr. Madigan I guess in terms of how the politics are working
21  out between the respective U.S. Attorney's Offices in terms of
22  who's going first and second in these cases.
23          MR. WOOD:   That's a good question.
24          THE COURT:   I'm sure they're coordinating very well.
25  I'm sure. So all right. Well, thank you. Whoever wants to go

1  first then. I just wanted to confirm then that your client is a
2  fugitive in certainly my eyes, Mr. Wood. But I wanted to make
3  sure I wasn't pulling the trigger too quickly on that. Mr.
4  Madigan, I'd be glad to hear from you, sir. And you're free to
5  stay behind the table or use the podium, whatever you want to do,
6  sir.
7          MR. MADIGAN:   I'll try the podium, Your Honor. I drew
8  the short straw or long straw, whichever the case may be to go
9  first. Let me start, Your Honor, by telling you a little bit
10  about Marc D'Souza who I represent.
11         THE COURT:   Right.
12         MR. MADIGAN:   He is neither a citizen nor resident of
13  the United States and never has been. He's never been in the
14  great State of Maryland. He's a 30-year-old individual
15  entrepreneur who formed and operated his own Internet business
16  under the DBA trade name, Integrated Net Solutions. He's a
17  graduate of the University of Toronto and he's a graduate of
18  Boston College Law School and he's never been in trouble in his
19  life. He's never been accused of any illegal conduct and he's
20  certainly, he's never been convicted of anything. This case
21  began, Your Honor, as you know on an ex parte basis back in
22  December. On December 2nd, the Federal Trade Commission came to
23  the court and obtained a temporary restraining order.
24  Mr. D'Souza was not represented at that time. We were not
25  retained to represent him. He was without counsel. The case

9

1  then proceeded before Your Honor for the first time on
2  December 12th I believe it was.
3          THE COURT:   Chief Judge Legg had already entered a
4  temporary restraining order. It came before me for a hearing on
5  preliminary injunction.
6          MR. MADIGAN:   Yes. And Mr. D'Souza at that time was
7  not represented. We were not retained. He was not served at
8  that time either and so we were not obviously able to be heard on
9  that date. Subsequently, we were retained. We did accept
10  service on behalf of Mr. D'Souza and we're here today to tell you
11  what we would have told you had we been here on the day that the
12  preliminary injunction hearing occurred.
13         THE COURT:   And I will certainly address your pending
14  motion to dismiss for lack of personal jurisdiction later this
15  afternoon or later in this hearing. If you'll just stay focused
16  on the motion to stay initially, Mr. Madigan?
17         MR. MADIGAN:   Yes, Your Honor. We moved to stay here,
18  Your Honor. The vast majority of the and I think this is
19  relevant and I will get to the case law in a moment on the motion
20  to stay. The vast majority of the allegations in the complaint
21  have nothing whatsoever to do with Mr. D'Souza. The FTC concedes
22  that Mr. D'Souza who operated under the Net Solutions moniker, so
23  to speak, as I mentioned, left any sort of business relationship
24  having to do with the matters before the Court on December of
25  '06. And if Your Honor looks at the complaint that was filed,

10

1  Your Honor will see that all of the allegations in the complaint
2  deal with conduct in '07 and '08 and that the consumer complaints
3  that are filed, there's one by Mr. Latent, Mr. Church, Mr. Davis,
4  Mr. Heard, Mrs. Marcelyn, Ms. Mullin, Pritchard, Randall,
5  Rituals, Thompson, the school teacher one Your Honor is familiar
6  with. Every single one is in '07 and '08. There is no evidence
7  other than conclusory statements that the Supreme Court has just
8  made clear in the Ashcroft case is not nearly enough that are
9  made against Mr. D'Souza in the complaint. And interestingly, at
10  that time, at the time of the hearing, Your Honor asked, it was
11  not volunteered by the commission, but Your Honor asked whether
12  there was any companion criminal investigation going on. And the
13  answer and I quote, well, Your Honor, we know a search warrant
14  has been executed at the offices of ByteHosting and beyond that,
15  I'd refer you to D.O.J. Now we have filed and the commission has
16  asked for an extension of time.
17         THE COURT:   ByteHosting being a company that's
18  registered in Ohio. Correct?
19         MR. MADIGAN:   Yes. And that's a company associated
20  with a person named Reno who is not presently before the Court.
21  And the fact of the matter is that the FTC had received or soon
22  did receive, we don't know exactly when, all of the documents
23  from the search warrant and we filed both an interrogatory and a
24  document request that they have requested an extension of time on
25  to document all of the context between the criminal U.S.

11

1  Attorney's Office in Chicago, Illinois and --
2          THE COURT:   You mean the criminal division of the U.S.
3  Attorney's Office.
4          MR. MADIGAN:   Yes. The Criminal Division of the U.S.
5  Attorney's Office in Chicago. Now I have met personally with
6  Mr. Ferrara who was heading the investigation and for the first
7  time in February, I must say that as soon as we were retained and
8  I learned of that which was not until January, we requested a
9  meeting and didn't get one until February. At which time, I was
10  told that my client was a target of the investigation, that
11  indictments were imminent and I have been told since that time
12  that there will be an indictment and that my client will be -- as
13  Your Honor knows with Your Honor's experience they can't say, you
14  know, what a grand jury will do, but they indicate that it's
15  their belief that my client will be named in the indictment.
16         THE COURT:   Did you ask when the last time the grand
17  jury returned a non-true bill in that district?
18         MR. MADIGAN:   No, Your Honor, I did not, which of
19  course they do have the power to do.
20         THE COURT:   It's been 30 years or 35 years here in
21  Maryland I believe.
22         MR. MADIGAN:   I think it's probably been the same in
23  Chicago. But in any event, we also know recently that on
24  information and belief that there was a search warrant executed
25  over in the Ukraine and that the Chicago F.B.I. agents were

12

1  present at that search. I don't know what the FTC may know about
2  that or what information it has --
3  THE COURT:  A search warrant executed in the Ukraine on
4  whom?
5  MR. MADIGAN:  On whatever facility was over -- I have
6  very sketchy information other than the fact that there were
7  F.B.I. agents from Chicago there indicating once again that this
8  is a very active and serious criminal investigation. And that is
9  the reason, Your Honor, that we are seeking a stay of this
10 action. We have asked for it to be stayed for six months. It's
11 obviously in the complete discretion of this Court. We have
12 submitted a series of cases that support our position to grant
13 that stay. I might say that the FTC's position in its brief if I
14 may quote it is that the defendant's argument has been soundly
15 rejected by courts across the country. And that of course is
16 flatly untrue and is not supported even by the cases cited by the
17 FTC which I will get to.
18 We have cited I think some key cases such as the
19 Healthsouth case which and the Chow case that are in the papers
20 before Your Honor and the Brock v. Toklow case, all of which say
21 that it is of great concern when our government and we only have
22 one government is bringing a case, cases simultaneously involving
23 identical facts, one criminal and one civil and this case would
24 be a poster child for that principle. There's absolutely no
25 question but that the investigation is precisely the same and

13

1  indeed in my conversations in Chicago with the criminal
2  investigation when we were discussing fines, the suggestion was
3  made, well, that could be taken care of by FTC damage pool.
4  There's no question that these are parallel investigations that
5  is being done intentionally. And under the case law of the Chow
6  case and the Healthsouth in particular, the court goes out of its
7  way to talk about the danger of this kind of proceeding. And in
8  the Healthsouth case relevant to this case, the defendant there,
9  Mr. Scrushy had not yet been indicted and that was one of the
10 government's arguments. Well, he hasn't been indicted yet. So,
11 you know, no problem here. We don't know whether he will be. As
12 Your Honor pointed out, it's up to the grand jury to decide. But
13 the court held that although the Defendant Scrushy has not yet
14 been indicted, no one has represented to the Court that such
15 indictment is anything but an eventuality. And the court went on
16 to say there's a special danger, there's a special danger to this
17 kind of catch 22 situation where the defendant is forced to give
18 up his Fifth Amendment rights, the defendant is forced to do, to
19 provide discovery for the government with respect to the criminal
20 proceeding that it would not under our rules ever have to provide
21 and is put in this catch 22 situation by having two different
22 proceedings on the identical situation and obviously closely
23 coordinated.
24 THE COURT:  What discovery does the defendant
25 necessarily have to produce in a criminal case that he or she

14

1  would not produce in a civil case? .
2  MR. MADIGAN:  Well, in the civil case already we have
3  seen the FTC attempt to take Maurice's deposition. They could
4  attempt to take our deposition or all the people's depositions --
5  THE COURT:  And there can be an assertion of the Fifth
6  Amendment privilege. Correct?
7  MR. MADIGAN:  And we would then have to assert at our
8  peril, we would have to assert the Fifth Amendment. We're
9  already being --
10 THE COURT:  And where would there be the peril if your
11 client asserted the Fifth Amendment in this civil context?
12 MR. MADIGAN:  Well, it would be, it would damage the
13 civil claim because there would be an inference that would arise
14 that would be detrimental to the claim --
15 THE COURT:  That would only be if it was deemed to be
16 admissible in the civil action ultimately. Isn't that correct?
17 MR. MADIGAN:  Yes. But I think that there is some case
18 law out there that's quite dangerous that if in a civil
19 proceeding, you take the Fifth Amendment whether it can be
20 introduced in terms of an inference against the person and --
21 THE COURT:  It's not an absolute that it is admissible,
22 is it, Mr. Madigan?
23 MR. MADIGAN:  Well, I don't know. I certainly have
24 seen a number of cases over the years where it certainly was
25 admissible. In fact in the FTC context, I have been involved in

15

1  numerous cases where they have hauled the witness in and told
2  him, in fact the court stopped it through a motion to stay.
3  Hauled the witness in who was the putative criminal defendant and
4  asked him, you know, when have you stopped beating his wife and
5  isn't it true that he's the biggest crook in the world and didn't
6  you steal $200 million, each of which he took the Fifth Amendment
7  to and then they tried to use inferences in the civil proceeding
8  and so the courts have said that that's why we have our terrific
9  district court judges to look at this with discretion and see if
10 there's any reason for this kind of thing. We have a very good
11 defense to the FTC action and we want to provide that defense.
12 But we cannot do it in the present circumstances with the
13 criminal prosecution hanging over our heads and having been told
14 that it's an almost certainty that we're going to be indicted and
15 the government is the one that has put us in this position, Your
16 Honor. And the cases I might say with respect to the FTC cases
17 and its broad statement that there's no law out there whatsoever.
18 If Your Honor looks at all of the cases they've cited, none of
19 them even stand for that proposition. The Arden case doesn't
20 even involve two cases brought by the government. The Avalon Bay
21 case says that courts have been very concerned about gaining an
22 advantage in the civil case by forcing the party to choose
23 between exposing themselves to criminal prosecution by testifying
24 or asserting the Fifth Amendment. The Mid-Atlantic Toyota case
25 that they cite in Hartbon, the defendants are not even identified

16

1   as targets. And in the Phillips case that they cite if the court
2   held that it's within the court's discretion and attempt to
3   balance this, that the court must make "some attempt to
4   accommodate the civil litigant's Fifth Amendments right. So what
5   we're asking for, Your Honor, is a limited stay. As I said, we
6   are anxious to defend this case. We would like to defend it and
7   we're not able to defend it. And the reason we're not able to
8   defend it is because the government in our view in a misuse of
9   its power is bringing intentionally these two separate
10  enforcement actions, one civil and one criminal, to put us in
11  this catch 22 situation.
12          Now that is our argument with respect to the motion to
13  stay, Your Honor. We also have arguments on the modification.
14  I'll leave those until later --
15          THE COURT:   Why don't you wait for those? That's sort
16  of what I put in in terms of Category 4 of the six items here.
17          MR. MADIGAN:   Yes.
18          THE COURT:   Your position is that you've asked for a
19  limited stay. I have noted that at least in this district, Judge
20  Young previously dealt with the standard to at least have been
21  applied in this district in the Mid-Atlantic Toyota Antitrust
22  litigation case, a Federal Rules Decision from 1981 and it seems
23  to be very much a litmus test here in this district, in this
24  courthouse with respect to determining whether to stay a civil
25  proceeding in respond to a pending or a potential criminal

17

1   proceeding and essentially, Judge Young's factors were the
2   interest of the plaintiffs in proceeding expeditiously with a
3   civil action as balanced against the prejudice to the plaintiffs
4   if delay; two, the burden on defendants; three, the convenience
5   to the Court; four, the interest of person who is not party to
6   the civil litigation; and five, the public interest and I'll
7   certainly be glad to hear from your co-counsel here. We do have
8   a situation here, do we not, Mr. Madigan, where essentially it's
9   alleged, is it not, that we have millions of people who suffered
10  from this alleged fraud. Isn't that correct?
11          MR. MADIGAN:   Well, Your Honor, when you look through
12  the papers that were filed, most of them ex parte when we were
13  not able to be here, you'll see all kinds of wild numbers, 40
14  million, 50 million and higher. But what you'll see and what is
15  the fact is that there were 1,000, only 1,000, exactly 1,000
16  complaints made to the FTC and they're all complaining about a
17  particular piece of software which is only one small part of
18  certainly of the business that my client was involved in and so
19  that takes you to 37,000, Your Honor, if all of those thousand
20  people, you know, suffered the damages. These other numbers are
21  taken out of the air and many of them are taken out of this
22  Canadian lawsuit that you will hear about and you've heard about
23  in the papers that I'd be happy to address whenever the time is
24  appropriate. If I might say about that Maryland case, the
25  Mid-Atlantic, there were corporate defendants there who didn't

18

1   have a Fifth Amendment right and they were not targets of a
2   criminal investigation. So I think that makes that case
3   inapposite with respect to our case. Obviously, the standards
4   are what we believe we can meet.
5          THE COURT:   All right. Thank you very much,
6   Mr. Madigan. Also the defendant, Kristy Ross, has also filed a
7   motion for temporary stay, paper number 48. Mr. Webb, I'll be
8   glad to hear from you.
9          MR. WEBB:   Yes, Your Honor. Dan Webb on behalf of the
10  defendant, Kristy Ross. I don't want to repeat what my friend
11  and co-counsel just told the Court. But let me try to be just to
12  the point. Here's why I'm here on behalf of Kristy Ross.
13          THE COURT:   Has your client been indicted in
14  California?
15          MR. WEBB:   No.
16          THE COURT:   But she's about to be indicted in Chicago?
17          MR. WEBB:   They told us in Chicago they're going to
18  indict her. It's real and they took -- this is a 29-year-old
19  woman that's never had any problem with the law. She's got her
20  whole life ahead of her and they say they are going to indict her
21  and the reason I'm here, Your Honor, is because they've never
22  served her. Just so you know, she's never been served with
23  process in this case today. I have agreed on her behalf and with
24  her permission to come before the Court. Right now if I did not
25  do that, I do not believe under the case law there's personal

19

1   jurisdiction over here. She's here because of what I told her.
2   We're going to bring this in front of a federal judge because she
3   believes right now the government, the FTC before she's indicted
4   wants her to be held in contempt of court for having done nothing
5   wrong and then they want you to put her in jail. And so I'm
6   going to tell you concisely why I think she's entitled to a stay
7   under the particular facts of this case.
8          THE COURT:   Has she consented to the jurisdiction of
9   this court?
10          MR. WEBB:   Yes. She has. We've consented. We're
11  here.
12          THE COURT:   I thought she had, but I wasn't --
13          MR. WEBB:   I'm sorry. I should have made that clear.
14  We're here and we've consented to the jurisdiction of the court
15  and we're not challenging jurisdiction because we actually want
16  to be here to present our position including the stay motion
17  because she doesn't want to be held in contempt and she doesn't
18  want to be put in jail on a contempt before she even gets a
19  criminal trial. So here we go. The case law is clear that if
20  you decide based on specific facts involving Kristy Ross that
21  she's entitled to a stay because of the interest of justice, you
22  can do that. Number two, the case law is very clear when you cut
23  through it all that this issue of interfering with a defendant's
24  Fifth Amendment rights in a criminal case is a really important
25  factor to consider when trying to do the balancing test Your

20

Honor just articulated. The real, the real balance is between
the defendant's prejudice and the government's right to an
expeditious proceeding and I'll talk about the other factors.
But I think those are the two big ones. So let's talk about
Kristy Ross. We've been told by the government in Chicago, the
U.S. Attorney's Office, that she will be indicted. So I'm not in
here in some hypothetical case. They said she's going to be
indicted within weeks. She could be indicted now and there could
be some seal order. I don't know, but I'm not in here
hypothetically. They told us she's going to be indicted. Number
two, what she's going to be indicted on is the exact same fraud
case that's before you, which the cases point out that's pretty
important because if it's the same fact scenario and the
defendant's Fifth Amendment rights are being interfered with,
that's a pretty big deal. So we know that that's --

    THE COURT:   Does that amount to a constitutional
infringement if the defendant has to weigh self-incrimination
issues in a parallel proceeding, Mr. Webb?

    MR. WEBB:   Yes, it is, Your Honor.

    THE COURT:   It's a constitutional infringement.

    MR. WEBB:   It is and let me go to the cases.

    THE COURT:   All right. There are cases that have held
to the contrary.

    MR. WEBB:   There are and let me talk about that. Let
me talk specifically what the government is trying to do to her,

21

    THE COURT:   Corporate position with which company?

    MR. WEBB:   With this company called I.M.I.

    THE COURT:   Innovative Marketing, Incorporated.

    MR. WEBB:   Yes.

    THE COURT:   All right.

    MR. WEBB:   Here's what the facts I think would come out
in the hearing. That she did have a position of marketing and
sales with that company before the P.I. in this case. So by the
time the P.I. came down, she did not have that position. She was
not even working for the company and she has no authority on
behalf of the company to do anything. And yet, the reason we're
here and asking you to send her to jail, they're saying that she
cannot take the Fifth Amendment. They're saying that in response
to the P.I. because of the way they drafted it and because they
say two years ago she held a corporate position, she has to
because as a corporation, as a corporate officer, she has to give
up her Fifth Amendment and she has to incriminate herself in this
proceeding.

    THE COURT:   Well, I think the government is saying that
as a corporate officer, Innovative Marketing, the corporation,
Innovative Marketing cannot assert a Fifth Amendment privilege
and the government takes the position that with respect to any
documents or any information they're seeking, they're just
seeking corporate information from her if she has any as a former
corporate official. I think essentially that's the position of

23

which is different than Mr. D'Souza, which is why she is going to
suffer so much prejudice in this case and I want to kind of slow
down and make sure that this is clear. The normal case where you
have a parallel civil case and a criminal case, the normal
prejudice which some cases say is not enough and some say it is,
but the normal prejudice is the Hobson's choice where a defendant
has the freedom to choose between exercising the Fifth Amendment
in a civil case, but suffering an adverse inference if you decide
or the government decides to use it or waiving the Fifth
Amendment, incriminating yourself in a criminal case, but
avoiding a huge civil liability. I've got all kinds of cases
that say that in and of itself is enough to get a stay. But I
have something much worse here and I want to make sure -- it's
ten times worse with Kristy Ross because if the government were
to say that she can just take her Fifth Amendment because she's
going to incriminate herself and we're not going to use the
adverse inference, we'll go ahead and give you a trial in this
case, in this case before Your Honor in which we've looked into
the facts and I'm not going to get into it, but we can prove her
innocence. If they would say that, I'd be happy to not even have
a stay. We'd just go forward before you right now if that could
be the case. Here's what they're saying. They're actually
saying because of their -- they allege that because they say two
years ago, she held a corporate position with this company and
because of that, they're saying today she cannot --

22

the government.

    MR. WEBB:   And she doesn't have it. So she has nothing
in her possession whatsoever. They're saying more than that.
They're trying to say right now, for example, that she ought to
be able to go out and make sure that the corporation complies
with seven different provisions of the P.I. that she has no
ability or control over whatsoever. But my only point, Your
Honor, as far as prejudice to Kristy Ross, the government is not
saying just let her take the Fifth Amendment and we'll try to
argue an adverse inference or let her take the Fifth and we won't
argue the adverse inference. They are saying that she cannot
take the Fifth. Because she's a corporate officer, she will
incriminate herself. But because she has to do this in order to
bring the corporation into compliance, she has to do it. And if
she doesn't do it, she goes to jail. And so that's why we're
here for a stay. I'm not looking -- sixty days, ninety days, a
hundred twenty days, come back and talk to Your Honor. I've been
in this game all my life. Maybe she won't get indicted. Okay.
I mean I've been told before my client is going to be indicted
and they didn't. That could happen. Right? That will remove
that problem. Number two, she gets indicted, but we get a short
trial date because, Your Honor, we've looked into this. We've
got experts. We can have a quick -- we've got experts that can
testify that what the government --

    THE COURT:   A short trial date in the criminal case?

24

MR. WEBB:   In the criminal case. Let's get a short
trial -- and then you decide to let us go ahead and try the case
because if we do try that case and I know Your Honor's background
and experience, I've never seen a civil case that was parallel
like this. If the criminal case goes forward first, this case
will never end up going to trial because what will happen is that
if my client is convicted, should there be a restitution order
and this case is over because there's nothing left in this case.
Or, number two, she'll be acquitted and a compromise will get
worked out somewhere. So as far as judicial economy waiting for
a few months to see what happens in the criminal case will save
everyone including the judiciary the duplicative nature of dual
proceedings and --
THE COURT:   Mr. Webb, it sounds like if there's a
resolution of the Fifth Amendment issue, that there may or may
not even be a need from your point of view of a stay for your
client if there's a resolution of the Fifth Amendment issue.
MR. WEBB:   By the way, if the government decides that
they're not going to use her invocation against her as an adverse
inference and they won't make her give up her Fifth Amendment,
just let her invoke the Fifth Amendment and let this case proceed
in front of Your Honor, we're here. I'm here. I mean I've --
THE COURT:   I guess my point is ultimately that's what
I have to address today. It's up to the Court to decide whether
or not there's an appropriate assertion of the Fifth Amendment

25

privilege and if the Court determines that she's entitled to
assert a Fifth Amendment privilege on an individual basis and it
really is kind of a -- if I determine that it's a moot point as
to her status as a former corporate official of I.M.I. if I have
the acronym correct, then there really isn't any great issue from
your point of view in terms of a need for a stay.
MR. WEBB:   Right. But the adverse inference. In other
words, the cases out there that -- if you took that away, yes.
If you make that ruling, then I'd get rid of one huge problem.
Okay. I still have the classic Hobson's choice issue which
Mr. D'Souza is basically arguing which is that if I'm compelled
to choose between taking the Fifth or having an adverse inference
against me in this case, then I still have an issue of a stay
because if the government would agree not to use the adverse
inference or if you enter in some kind of order that no adverse
inference can be used against Kristy Ross, then I think my motion for
a stay does not have any basis any longer. If those two issues
are gone, the adverse inference as well as being forced to give
up her Fifth Amendment right, then I don't need a stay and we can
continue to proceed in this case in front of Your Honor and I
don't need the stay under those circumstances if those two things
go away. And so that's basically and by the way, as far as
prejudice to the government, balancing my prejudice against the
prejudice to the government, I don't get it. We've agreed --

26

just so you know, Kristy Ross has notified the government and
we've set forth in our papers, the preliminary injunction is in
place. She is barred from ever engaging in this kind of conduct.
She's agreed to it. The government doesn't even allege that
she's violating any of the provisions of the injunction. All
they're contending is that she's not trying to get the
corporation to comply. And so we agree, if we agree, if we agree
which we have that the conduct is over, that's what the FTC is
all about is to make sure that consumers, somehow or not, they
say that there's a bad fraud scheme that went on out there.
We'll show not. But we've stopped it. It's gone. And so
there's no prejudice to the FTC. Consumers are fully protected
and I get my stay for ninety days or so so we can report back to
Your Honor on what's going on in Chicago as far as Kristy Ross
being indicted.
THE COURT:   All right. Thank you very much, Mr. Webb.
MR. WEBB:   Thank you.
THE COURT:   There's also a third defendant, Sam Jain,
has moved to stay paper number 45. And Mr. Wood, I'll be glad to
hear from you.
MR. WOOD:   Thank you, Your Honor. Your Honor, as
Mr. Madigan mentioned, the subject matter of the FTC's claims in
this action and the Chicago criminal investigation are identical.
That criminal investigation has also substantially advanced and
nine months ago, Mr. Jain was told that his indictment was

27

imminent in that proceeding.
THE COURT:   What is the difference between the
California indictment and the potential Chicago indictment?
MR. WOOD:   The California indictment, Your Honor,
relates to criminal copyright infringements unrelated to the
allegations of the FTC's complaint.
THE COURT:   So the identical action is not the
California action in which your client has been indicted. It is
the pending Chicago indictment.
MR. WOOD:   The pending Chicago indictment. That's
correct, Your Honor. The balance of prejudice here which is the
most important of the Mid-Atlantic Toyota factors strongly is in
favor of a stay --
THE COURT:   What about the public interest with respect
to the number of people who have allegedly been harmed in the
public?
MR. WOOD:   As Mr. Madigan mentioned, the number of
people who have actually complained to the FTC is only a
thousand.
THE COURT:   But is that dispositive in terms of people
who actually complained? Usually, there's an acknowledged ripple
effect for each person who complains. There's an indefinite
degradation in terms of those who haven't complained who have
been victimized.
MR. WOOD:   And I think as Mr. Webb mentioned, that most

28

1  likely would be encompassed in any restitution order in the
2  criminal case. Your Honor, and so if the criminal investigation
3  is allowed to proceed and ultimately there is a finding against
4  these defendants and there's an order of restitution, that can
5  certainly would be rectified --
6       THE COURT:   Mr. Wood, it's interesting from your point
7  of view because given that your client is a fugitive, I guess the
8  question is how long a stay.
9       MR. WOOD:   Well, Your Honor --
10      THE COURT:   Mr. Webb has indicated that he doesn't
11 really even need a stay if we had resolved the matter of adverse
12 inference and the right or lack thereof to assert the Fifth
13 Amendment. Mr. Madigan on behalf of Marc D'Souza suggested that
14 a six-month stay. It seems to me you're in a position of asking
15 for an indefinite stay.
16      MR. WOOD:   Well, I don't think it is indefinite, Your
17 Honor. And there's no telling, I think at this point it's pure
18 speculation what Mr. Jain would do in Chicago. Clearly, he is
19 appearing in this proceeding. As I said, he's accepted service
20 --
21      THE COURT:   Well, he's got a lawyer appearing. He
22 isn't appearing actually.
23      MR. WOOD:   That's right.
24      THE COURT:   Actually, if he appeared, it would be of
25 some interest to the U.S. Marshal here I suspect.

29

1       MR. WOOD:   It does, Your Honor.
2       THE COURT:   Is your law firm representing him
3  nationwide?
4       MR. WOOD:   No, Your Honor. Only in this particular
5  case.
6       THE COURT:   All right.
7       MR. WOOD:   As I mentioned, the balance of harms, the
8  balance of prejudices favors the stay. As Mr. Webb mentioned,
9  the defendants have agreed that the substantive provisions of the
10 P.I. would remain in place during the period of the stay
11 minimizing any prejudice to the FTC. On the other hand, Mr. Jain
12 is substantially prejudiced by forfeiting his chance of
13 adequately defending this action, choosing between asserting his
14 privilege and getting adverse inferences here or waiving that
15 privilege by testifying here and putting on a defense.
16      THE COURT:   Do you agree with Mr. Webb that if there's
17 some indication by the Court with respect to the matter of the
18 admissibility of an adverse inference and addressing with respect
19 to individual assertions of the Fifth Amendment privilege as
20 opposed to assertions that may be within the corporate umbrella,
21 that that would resolve most of those issues?
22      MR. WOOD:   Those are the primary prejudices --
23      THE COURT:   It seems to me that those arguments that
24 Mr. Webb has made and Mr. Madigan made apply to all the
25 defendants, individual defendants in this case.

31

1       MR. WOOD:   I suspect that's probably right, Your Honor.
2  And without --
3       THE COURT:   I guess the point is is that you're really
4  stuck in a difficult situation. Here, Mr. Webb talks about
5  Hobson's choices as to his client. You've got the ultimate
6  Hobson's choice because you're essentially here asking for me to
7  give an indefinite stay for a client who is a fugitive.
8       MR. WOOD:   I don't think it's indefinite, Your Honor.
9       THE COURT:   Well, give me a timeframe.
10      MR. WOOD:   If there were a definite period, 60, 90,120
11 days to come back and report --
12      THE COURT:   How do I know that your client is going to
13 get religion with respect to the importance of the federal
14 criminal process in sixty days or ninety days?
15      MR. WOOD:   I don't think anybody can predict what his
16 individual decisions would be or what his status with the marshal
17 service --
18      THE COURT:   Well, is this Court supposed to be captive
19 to that?
20      MR. WOOD:   Well, without disputing his decisions in the
21 California case, Your Honor, at a minimum it compounds the
22 incrimination problem and only heightens his Fifth Amendment
23 problem here.
24      THE COURT:   It's even a greater challenge as to his
25 lawyers I suspect.

30

1       MR. WOOD:   I think they do, Your Honor. I think that
2  that is -- if those were admitted, there would be no prejudice
3  here on the side of the defendant.
4       THE COURT:   All right. Well, thank you, Mr. Wood.
5  Anything further on this?
6       MR. WOOD:   No. Thank you, Your Honor.
7       THE COURT:   All right. Thank you very much. Let me
8  hear now if I can from you, Mr. Arenson, on your behalf. In
9  terms of on the issue of the stay. Let me just quickly if I can,
10 Mr. Arenson, I don't want to cut you off. Certainly, I want you
11 to address the arguments that you want to present to the Court.
12 But with respect to the matter of an adverse inference, it seems
13 to me a quick resolution of this from the point of view of an
14 effort to stay as I've read your papers in terms of the public
15 interest involved here. You've already had the chief judge of
16 this court determine there's a likelihood of success on the
17 merits with respect to the granting of the temporary restraining
18 order and ten days later, I essentially reached the same
19 conclusion granting a preliminary injunction. And you clearly
20 noted the irreparable harm to the community at large in terms of
21 the allegation here. But in terms of the matter of the adverse
22 inference, clearly, there is case law that would support a ruling
23 on a motion in limine not to permit reference to one's assertion
24 of a Fifth Amendment privilege. Isn't that correct?
25      MR. ARENSON:   Your Honor, let me actually take issue

32

**Page 33**

1   with that point.

2        THE COURT:   Because I want you to address that because

3   quite frankly, there are cases, Mr. Arenson in which the

4   government yields on that issue because the government feels it's

5   got a strong enough case, it doesn't even need to introduce that.

6        MR. ARENSON:   Your Honor, we have as you've seen

7   overwhelming evidence that these defendants were thoroughly

8   involved in every aspect of this gigantic fraud --

9        THE COURT:   And if that's the case, aren't there cases

10  which clearly indicate that in this kind of posture, courts have

11  ruled that in balancing the need for the evidence and under Rule

12  403 and the matter of prejudice and accumulation of evidence,

13  that there are -- courts have cut right through this and said

14  fine, there's not going to be any reference to an assertion of a

15  Fifth Amendment privilege and allowed the case to move on.  Isn't

16  that a fact?

17       MR. ARENSON:   Your Honor, in this case that would be

18  unfair to the FTC --

19       THE COURT:   All right.  Well, I'll be glad to hear from

20  you on that.

21       MR. ARENSON:   -- to allow the defendants to use the

22  Fifth Amendment as both a sword and a shield.  It would

23  effectively refuse to participate in discovery and at the same

24  time refuse to accept the adverse inference resulting from their

25  Fifth Amendment invocation.

33

**Page 34**

1        THE COURT:   Well, it remains to be seen if they're

2   going to be permitted to refuse to engage in discovery.  That's

3   something we'll have to address here today.

4        MR. ARENSON:   Your Honor, by invoking the Fifth

5   Amendment and refusing to testify in a deposition, refusing to

6   respond to interrogatories and document requests by asserting the

7   Fifth Amendment, they will effectively stonewall us in learning

8   anything about the details of the nature of this fraud, the huge

9   number of consumer victims and our efforts to redress those

10  consumers that have been harmed by the defendants' conduct.  Your

11  Honor, we cited in our papers the Brown case, which nicely

12  summarizes the law on this point.  And I'm going to quote just a

13  paragraph briefly from that case which summarizes cases from

14  across the country.  "The contention of being forced to choose

15  between the compulsion to testify in a civil suit in order to

16  avoid an adverse result on the merits undermines the right to

17  remain silent in a criminal matter while having served its appeal

18  will not stand analysis.  While this choice between testifying or

19  invoking the Fifth Amendment may be difficult, it does not create

20  the basis for a stay."  And, Your Honor, that case cites cases

21  from across the country that have reached this same conclusion.

22  This as I remind, Your Honor, is a civil case.  If the defendants

23  choose to take the Fifth Amendment in this civil case, there

24  are --

25       THE COURT:   The case you just read from, I've got tons

34

**Page 35**

1   of cases stacked up here and I read through a lot of them.  Which

2   case did you just cite?

3        MR. ARENSON:   That's the Brown case, Your Honor, from

4   the Central District of California.

5        THE COURT:   What is the citation on it?  You can just

6   give me the cite.

7        MR. ARENSON:   IBM v. Brown, Your Honor.  857 F.Sup. 13

8   --

9        THE COURT:   F Sup. 2nd. or F. Sup.?

10       MR. ARENSON:   F. Sup.

11       THE COURT:   All right.  857 F.Sup.

12       MR. ARENSON:   1384.

13       THE COURT:   1384.

14       MR. ARENSON:   Central District of California, 1994.

15  Quoting the Supreme Court in Standard Sanitary Manufacturing v.

16  United States.

17       THE COURT:   All right.  Go ahead.

18       MR. ARENSON:   And, Your Honor, I'd like to stress

19  that's one of many cases that have reached this same conclusion.

20  That asserting the Fifth Amendment in a civil case comes at a

21  cost.  And if these defendants elect to do that, they have to pay

22  that price, Your Honor.  Now we've heard a lot today --

23       THE COURT:   Do they pay the price in the criminal case?

24       MR. ARENSON:   They do not, Your Honor.  They've

25  asserted their Fifth Amendment right.  It absolutely does not

35

**Page 36**

1   prejudice them whatsoever in any future and let's stress that

2   there is no criminal case at this point that anyone here --

3        THE COURT:   Well, do you concur that there probably is

4   going to be a criminal case?

5        MR. ARENSON:   Your Honor, I think it's just fair to say

6   that based on the representations from counsel, I have not heard

7   them, but based on the representations from counsel, it appears

8   that it is likely if what they tell me is true that there will be

9   a criminal case here against some or all of these defendants.

10  But we cannot know that at this point, Your Honor, and this case

11  illustrates exactly why pre-indictment stays are such a bad idea.

12  They originally approached this Court and said they had a

13  conversation with the U.S. Attorney back in September of 2008 and

14  in that conversation, the U.S. Attorney told them that

15  indictments are imminent.  They then file papers with this Court,

16  explain to the Court that these indictments are imminent, this

17  Court should immediately stay this case.  It's now nine months

18  later, Your Honor, and there's been no indictment.  And we have

19  no one to tell you when that indictment will ever occur if it

20  does occur.  That's the reason courts routinely reject

21  pre-indictment stay requests because no one can determine when

22  the indictment will be issued or if it will indeed be issued and

23  that's certainly the case here, Your Honor.  Nine months since

24  the imminent indictment that we've heard about and no indictment.

25       THE COURT:   Let me ask you this, Mr. Arenson.  What if

36

1  the Court determined that the matter of the adverse inference or
2  the admissibility of that would be a matter that would be left
3  open to question depending upon how this case plays out?
4           MR. ARENSON:   Your Honor, let me answer that this way.
5  The FTC strongly wishes to proceed here.
6           THE COURT:   I understand.  Let's just say that I deny
7  the motion to stay, that I let this case proceed for the reasons
8  you've noted.  But with respect to the assertion of the Fifth
9  Amendment when we get there in terms of as to what the defendants
10 can and cannot assert as to a Fifth Amendment privilege, it
11 remains open as to whether or not I'm going to permit that to be
12 admissible in a civil action depending upon how the case plays
13 out.  It may or may not -- the Court may balance the factors
14 under Rule 403 and make a determination that it may or may not be
15 admissible.
16          MR. ARENSON:   Your Honor, that would certainly be
17 within the Court's discretion.  I can answer that that way.  My
18 concern, of course, is that we seek to depose the defendants and
19 they erect the Fifth Amendment barrier to every question we ask
20 which I fully expect given the amount of culpable conduct here.
21 And then the FTC is in the position of not being able to locate
22 consumers who have been harmed by this conduct, locate the
23 software that has harmed the consumers involved in this conduct.
24 And, Your Honor, one point that I want to make sure I make before
25 I sit down on this.  This 1,000 complaints issue is a complete

37

1  got out of this fraudulent scheme.  So that's an important point,
2  Your Honor.
3           A couple of other small points.  Counsel has alleged
4  that Marc D'Souza was not served prior to the preliminary
5  injunction.  I believe that is incorrect.  In fact Marc D'Souza
6  was served in Canada with our pleadings.  Counsel made the
7  strategic decision whoever counsel was at the time not to appear
8  before this court.  The same is certainly true with Mr. Jain.  I
9  had a long conversation with Mr. Jain's attorney encouraging
10 him --
11          THE COURT:   Mr. Jain has acknowledged the jurisdiction
12 of this Court.  Correct, Mr. Wood?
13          MR. WOOD:   That's right, Your Honor.
14          THE COURT:   And so has Ms. Ross.  Correct, Mr. Webb?
15          MR. WEBB:   I have.
16          THE COURT:   And Marc D'Souza has not yet and I have to
17 address a motion to dismiss filed by Mr. Madigan as to that.
18          MR. ARENSON:   At least Maurice D'Souza, Your Honor.
19          THE COURT:   I'm going to get to that, the matter of the
20 jurisdiction later on.
21          MR. ARENSON:   Marc D'Souza actually has submitted to
22 the jurisdiction of the Court.  His father, Maurice has
23 challenged it.
24          MR. MADIGAN:   That's right, Your Honor.  We have.
25          THE COURT:   Oh, you have.  I'm sorry.  You've moved to

39

1  red herring and I want to explain why.  Even in traditional
2  telemarketing fraud cases that the FTC sees, there are a small
3  fraction of complaints --
4           THE COURT:   I recognize that, Mr. Arenson.  You don't
5  have to even explore that.  There's no question.  The fact that
6  there are a thousand complaints is very telling to this Court in
7  terms of the normal ripple effect without question.
8           MR. ARENSON:   By FTC standards, it is a huge,
9  absolutely --
10          THE COURT:   I recognize that.
11          MR. ARENSON:   -- gigantic number.  The other issue that
12 was raised was the amount of injury here and the FTC continues to
13 pull numbers out of thin air, I want to address that allegation
14 because it simply isn't true.  Defendant Sam Jain in the Canadian
15 proceeding which defendants have referenced attaches a profit and
16 loss statement to his own affidavit in which he explains exactly
17 how much money Innovative Marketing makes.  And according to that
18 profit and loss statement, in the year 2006 alone, Innovative
19 Marketing made $57 million.  In 2005, the total was 24 million.
20 In 2004, it was $10.5 million.  These are huge numbers, Your
21 Honor, and that doesn't even conclude 2007 and 2008 in which
22 these defendants were very, very active.  So when Marc D'Souza
23 says that our complaint addresses conduct post 2006 only, that's
24 simply wrong, Your Honor.  We're looking at more than $92 million
25 in injury prior to December of 2006 when Marc D'Souza allegedly

38

1  dismiss.  That's right.  But you haven't challenged -- so there's
2  no question of the jurisdiction of this Court here including --
3  and how about the father, Maurice D'Souza, Mr. Rasmussen?
4           MR. RASMUSSEN:   The father who is the relief defendant
5  is the only one asserting a jurisdictional --
6           THE COURT:   Okay.  Thank you.  Thank you very much.
7  Thank you.
8           MR. ARENSON:   Your Honor, a couple more notes.  The
9  defendants rely heavily over and over again on this FTC v.
10 Healthsouth case and Your Honor, I would encourage you to take a
11 close look at this case because it could not be more unlike the
12 facts here.  In Healthsouth, the FTC essentially took a guilty
13 plea from a defendant and turned it into a complaint, typos and
14 all and submitted it to a court.  The court found that the FTC
15 had not conducted its own independent investigation unlike the
16 case here involving an FTC investigation of more than a year.  At
17 that point, the Department of Justice intervened in the case
18 because it did not want the FTC releasing its evidence to the
19 defendant.  And in fact, the government in that case requested
20 the stay.  Not only that, Your Honor, but the FTC refused to turn
21 over to the defendants the evidence that they were going to use
22 in the case against the defendants because D.O.J. wouldn't let
23 them.  Now under those circumstances, the court said enough.  A
24 stay is appropriate here.
25          THE COURT:   I think also in that case as I recall, I've

40

1  got to read through this again, as I recall, if I'm not mistaken,
2  Judge Johnson in that case also made a finding that the
3  government had manipulated the process somewhere in these facts.
4        MR. ARENSON:  Absolutely, Your Honor.
5        THE COURT:  I have to look through it again.  But I
6  seem to recall he made a finding that the government had
7  manipulated the process.
8        MR. ARENSON:  Absolutely right, Your Honor.  And there
9  is absolutely nothing before this Court that would indicate any
10  type of activity here.  Although defense counsel have made
11  completely unsubstantiated accusations that the FTC is somehow
12  behaving improperly here, they have absolutely nothing to back
13  that up.  And I want to address the accusation aimed specifically
14  at me that I did not inform this Court of the criminal proceeding
15  which is absolutely false.  What I told the Court at the
16  preliminary injunction hearing is that a search warrant had been
17  executed at their U.S. headquarters --
18        THE COURT:  You don't need to address that, Mr.
19  Arenson.  I was very comfortable with the fact, I had no doubt
20  that there was going to be a criminal proceeding in this case.
21        MR. ARENSON:  Very good, Your Honor.
22        THE COURT:  It was perfectly obvious to me that there
23  was going to be a criminal proceeding and you in fact even
24  referenced a search warrant.  That's fine.  I was comfortable
25  with that.  You don't need to worry about that.

41

1  Court determines that you don't need to have the evidence of
2  someone asserting their Fifth Amendment privilege and it's not
3  going to be admissible against a defendant and if the Court makes
4  that determination, it seems like a lot of things are cut right
5  to the core in terms of trashing through this because, you know,
6  obviously from your point of view, the government is worried for
7  I guess right now until Mr. Sam Jain decides he wants to appear
8  somewhere, the government faces the danger of an indefinite stay
9  of proceedings which would really be a nightmarish prospect for
10  the Federal Trade Commission.
11        MR. ARENSON:  And, Your Honor, not just for the Federal
12  Trade Commission, but for the consumers that have been injured
13  here --
14        THE COURT:  I understand.
15        MR. ARENSON:  We're talking about probably more than a
16  million consumers that have been victimized here and the prospect
17  of not seeing any type of redress for an indefinite period while
18  Sam Jain runs from the U.S. Marshal Service does not seem to be
19  an accurate balance of the harm here.
20        THE COURT:  All right.  So your point of view on the
21  Fifth Amendment and we're going to get to this in more detail
22  later is that and the matter of the assertion must bear the
23  analysis of whether or not you're asking for items in the context
24  of just being a corporate representative as opposed to individual
25  questions.

43

1        MR. ARENSON:  Very good, Your Honor.
2        THE COURT:  Let me just address the matter on the --
3  we're going to get to the matter of the assertion of the Fifth
4  Amendment privilege probably in the context of the motion to
5  modify the preliminary injunction.  But the government isn't
6  disputing that these defendants have a right to assert an
7  individual Fifth Amendment privilege, are you, Mr. Arenson?
8        MR. ARENSON:  Absolutely not, Your Honor.  Of course,
9  they do.
10        THE COURT:  The only question is is that what adverse
11  inference can be drawn from it and whether or not the Court would
12  permit any evidence as to an adverse inference being drawn in
13  this case.
14        MR. ARENSON:  That is one issue, Your Honor.
15        THE COURT:  And that's an issue that you may have to
16  address.  Quite frankly, I certainly recognize that government
17  counsel always want to make sure they put in every item of
18  evidence to meet their perception of burden.  But sometimes these
19  battles are really unnecessary battles because the evidence
20  really isn't necessary.  And so when you note the great public
21  concern and the number of consumers, if we're just going to get
22  tied up over whether or not, if you have the strength of the case
23  that Chief Judge Legg found that you had and I've already made a
24  finding you have in terms of likelihood of success on the merits,
25  it may well be that in the balancing of the equities here, the

42

1        MR. ARENSON:  Your Honor, we have never disputed that
2  the defendants are entitled to assert the Fifth Amendment in
3  individual capacity.  There's one important point before I sit
4  down, Your Honor, and that's this corporate issue which the
5  defendants have, their counsel have testified that these
6  defendants are no longer involved in Innovative Marketing.
7  Absolutely zero evidence.
8        THE COURT:  They haven't testified.  They have
9  proffered.
10        MR. ARENSON:  They have proffered without any support,
11  Your Honor.  No evidence before this Court that these defendants
12  have ceased their relationship, an admitted relationship with
13  Innovative Marketing.  And in fact the only evidence in the
14  record is the FTC's evidence in which as of May 2008, months
15  before we filed our case, both Sam Jain and Kristy Ross were
16  engaging in Internet chats back and forth directing Innovative
17  Marketing activities and Sam Jain was living in a condominium in
18  San Francisco with a lease that indicated it was Sam Jain on
19  behalf of Innovative Marketing.  Again the only evidence before
20  this Court is that these defendants continued to be associated
21  with Innovative Marketing and as such, they should be required to
22  take actions on behalf --
23        THE COURT:  I gather the corporation was paying the
24  rent on his apartment in San Francisco.  Is that right?
25        MR. ARENSON:  Your Honor, exactly right, Your Honor,

44

Case 1:08-cv-03233-RDB   Document 198-9   Filed 12/17/10   Page 25 of 49

and it's certainly an odd situation if indeed the story counsel
tells is true that these defendants have washed their hands of
Innovative Marketing.  That the corporation continues to pay his
rent.

THE COURT:  All right.  I understand.  Thank you very
much, Mr. Arenson.  Just addressing in terms of rebuttal on the
motions of Sam Jain, Kristy Ross and Marc D'Souza, in no
particular order, whichever counsel want to address this, Mr.
Webb or Mr. Madigan, if you want to take the lead on this, I
don't really care.  Here's the point on this as I analyze this
matter of an adverse interest and the right to assert a Fifth
Amendment privilege.  It seems to me that as a practical matter,
as a practical matter, I could be misreading your argument,
Mr. Webb, but I don't understand you to be saying that Kristy
Ross can assert her Fifth Amendment privilege to every question
she's asked if her deposition is taken.  If she's asked were you
ever a corporate officer of Innovative Marketing, Incorporated
and there are corporate documents that reflect that she was, she
doesn't incriminate herself to say yes, I was a corporate officer
and if she's asked do you have any corporate records and she says
I don't have any corporate records, did you ever have access to
any, I did or I didn't, at some point in time I recognize that
you in your judgment have to assert a Fifth Amendment privilege
if she's asked about individual culpability.  But I don't know
that there's a blanket, there can be a blanket assertion of a

Fifth Amendment privilege.  Now some counsel disagree with that
and even state their name that there's a Fifth Amendment
privilege.  I'm curious as to how you interpret that when you
talk about the right to assert the Fifth Amendment privilege.

MR. WEBB:  I agree with Your Honor.  It's under the
law, it's my belief that you cannot just take a blanket assertion
to anything that could possibly be asked under any circumstance,
number one.  Number two, the case law seems clear that what is
being required has to be testimonial in nature.  Okay.  That's
the second --

THE COURT:  Crawford v. Washington.  Clearly --

MR. WEBB:  It has to be testimonial in nature and
number three, it actually has to be compelled.  So that it
depends on the questions and it depends on the circumstance.  But
you can't just blanket -- and by the way, I can see the seeds of
a resolution here if we could -- if the government feels so
strongly about this case which they said they do and they've got
all this evidence and they want to go forward, if, if there could
be an understanding that they don't need and won't offer into
evidence the invocation of the Fifth, that would then mean that
we -- that takes away the adverse inference issue that we've been
talking about.  And when we get to the contempt motion, we got to
flesh this out because there's paragraphs in the preliminary
injunction that they appear to be saying my client must waive her
privilege --

THE COURT:  We'll address --

MR. WEBB:  -- and we'll address that later.  So I'm
going to leave that behind.  If we could get that resolved.  What
would not be fair to Kristy Ross would be to leave it up in the
air because then or let me just, I'm going to quote one case to
Your Honor if I might and I'm going to sit down.  Okay.

THE COURT:  That's all right.

MR. WEBB:  It's the Dresser case which is out of the
D.C. Circuit, okay, which is cited in the briefs.  But the
Dresser case --

THE COURT:  And that's the case in which certiorari was
denied by the Supreme Court.

MR. WEBB:  That is correct.  That's correct.  Your
Honor is exactly correct.  The quote I'm just going to read real
carefully here is that what the D.C. Circuit said is the
strongest case for deferring civil proceedings is where a party
under indictment for a serious offense is required to defend a
civil or administrative action involving the same matter because
the noncriminal proceeding might undermine the party's Fifth
Amendment privilege against self-incrimination and expand rights
of criminal discovery.  If we got rid of both those problems here
which is that the adverse inference will be taken away so that
she's not put in that Hobson's choice and she's allowed to just
take the Fifth Amendment on things that actually will incriminate
her, then that will get rid of the two problems that I've raised

and which means -- so anyway, I'm repeating myself and I don't
want to do that.  But if we don't get rid of those problems, I
strongly believe we're entitled to a stay.

THE COURT:  All right.  Thank you very much.  Do you
want to add anything on this, Mr. Madigan --

MR. MADIGAN:  Yes.

THE COURT:  -- because I want to see if your
interpretation of the Fifth Amendment is the same as Mr. Webb's.
Your client just is not free to just sit down and say I take the
Fifth Amendment, I decline to answer any questions.  He can only
assert it if it's asked in the context of individual culpability
perhaps in terms of what did you say to whom about X.  But in
terms of an inquiry in terms of Innovative Marketing,
Incorporated corporate documents, you know, mailing lists or
whatever, where the documents are, it seems to me that as a
corporate representative, if he was a corporate representative,
he's got to respond to those.

MR. MADIGAN:  Well, Your Honor is going to find out a
lot more about this case if it goes forward.  I do agree with
counsel with regard to the Fifth Amendment.  But there's no big
corporation, Innovative Corporation.  You have these individuals,
my client and the other individuals who had relationships with
each other.  Innovative is a single --

THE COURT:  It's alleged that your client was an
officer of Innovative Marketing.

1  MR. MADIGAN:   He was not an officer of Innovative --
2  THE COURT:   It's alleged that he was.
3  MR. MADIGAN:   Well, it may be alleged.  The counsel
4  here has stated all kinds of things and I think if Your Honor --
5  THE COURT:   But my point is that the government is
6  entitled if the case proceeded forward at a deposition of your
7  client to ask if he was ever an officer of Innovative Marketing.
8  Your client is going to say no, I wasn't.  I was never an officer
9  of Innovative Marketing and the government is free to confront
10  him if there is such evidence, saying here's a corporate filing
11  document listing you as an officer.  And as to that, I don't
12  think there's a Fifth Amendment privilege there for your client
13  to respond and say well, that's incorrect or it is correct or
14  whatever.
15  MR. MADIGAN:   I agree with Mr. Webb with regard to
16  question by question as Your Honor knows from Your Honor's
17  experience.  It depends on what the question is, how it's asked
18  and then how it's answered.  But I think you're starting to get a
19  flavor for the master of exaggeration over here who continues to
20  throw out these numbers.  $92 million of injury is complete
21  nonsense.  And I think where he's going is when he says stonewall
22  us from learning the details of the fraud by taking our clients'
23  depositions.  Well, by the way, you're supposed to have evidence
24  of the fraud before you file a case.  Not from our clients.  Our
25  clients are not obligated to come in and testify in depositions.

49

1  modify the preliminary injunction.  And then the first section of
2  Marc D'Souza's motion for temporary stay and modification for
3  preliminary injunction, paper number 71, addresses the matter of
4  the motion to stay.  This case certainly does raise Fifth
5  Amendment issues with respect to the criminal investigation being
6  conducted by the U.S. Attorney's Office for the Northern District
7  of Illinois and the Court finds it's clearly, it has at least
8  been represented to counsel that there is going to be a criminal
9  indictment handed down by the grand jury and it remains to be
10  seen what the reason is for the delay in that process.  Counsel
11  has mentioned the FTC v. Dresser Industries case.  I would note
12  that the United States Court of Appeals for the District of
13  Columbia noted in that case that ordinarily the Constitution does
14  not require a stay of civil proceedings pending the outcome of
15  criminal proceedings and that was an en banc decision of the D.C.
16  Circuit and certiorari was denied in that case.  In the absence
17  of substantial prejudice to the rights of the parties involved,
18  parallel proceedings are unobjectionable under our jurisprudence.
19  And that's also a quote of the D.C. Circuit Court of Appeals.
20  Obviously, the decision to grant a stay under these circumstances
21  rests within the discretion of this court and the United States
22  Court of Appeals for the Fourth Circuit has specifically noted
23  that subject to an abuse of discretion standard on appeal and
24  that's United States v. Georgia Pacific Corporation, 562 F.2nd.
25  294, a Fourth Circuit opinion, 1977.  I'm also guided by one of

51

1  They have a Fifth Amendment right with respect to this and as
2  Your Honor will find out, these entities had other business and
3  there's all this reference to this Canadian lawsuit which I won't
4  bore you with at the moment.  But there were at least with my
5  client, music websites, career website, travel stuff.  There were
6  a lot of activities that generated revenue.  And so yes, I agree
7  with my colleague that it's a question by question and if there's
8  no inference, I think Your Honor could tailor something that
9  might work here.
10  THE COURT:   All right.  Thank you very much.  Mr. Wood,
11  do you want to be heard any further on this in terms of a motion
12  for the stay?
13  MR. WOOD:   I don't, Your Honor.  Thank you.
14  THE COURT:   Well, thank you very much.  I'm prepared to
15  rule on the motion to stay now as we proceed on on this.  With
16  respect to the three motions to stay, Sam Jain's motion to stay,
17  paper number 45, I will just note that Sam Jain is currently a
18  fugitive from the order of the federal court in California and
19  proposes no timeframe with respect to a motion to stay.  Kristy
20  Ross -- that's paper number 45.  Kristy Ross' motion for a
21  temporary stay, paper number 48, has been crystallized out in
22  terms of the Court's view of the matter of an adverse inference
23  and the matter of the right to assert the Fifth Amendment
24  privilege as to just personal matters that we're going to address
25  and I'm going to address those in the context of the motion to

50

1  my predecessors on this court, Judge Young's opinion, In Re:
2  Mid-Atlantic Toyota Antitrust Litigation, 92 Federal Rules
3  Decision 358, opinion in 1981 in which Judge Young addressed the
4  factors being, one, the interest of the plaintiff in proceeding
5  expeditiously with the civil action as balanced against the
6  prejudice to the plaintiff if there is a delay; two, the burden
7  on the defendants; three, the convenience to the courts; four,
8  the interest of persons not parties to the civil litigation and
9  five, the public interest.  Here, the factors weigh in favor of
10  denying the motions to stay.  But I'm going to make sure I
11  carefully note certain rulings that are almost certainly going to
12  follow particularly with respect to an adverse inference because
13  the simple fact is the chief judge of this district court has
14  determined that there's a likelihood of success on the merits
15  when he granted the temporary restraining order.  I've already
16  found that there's a likelihood of success on the merits with
17  respect to my granting of the preliminary injunction.  And I'm
18  not going to have this case be held up indefinitely and
19  interwoven with a criminal case in which apparently the lead
20  defendant has decided that he still is not willing to grace his
21  presence in a federal court in this country all over the matter
22  of the government feeling like it has to introduce evidence of
23  assertion of a Fifth Amendment privilege.  Without ruling
24  finally, I will say it's almost a given that the government is
25  not going to be able to introduce evidence of the assertion of a

52

1  Fifth Amendment privilege in this case.  Now there may be some
2  tweaking of that.  But the basis of my ruling and taking away an
3  issue that Mr. Webb and Mr. Madigan certainly raised were the
4  matter of an adverse inference and there being evidence that can
5  be introduced as to an adverse inference.  If the government has
6  the strength of the case that I believe it has, certainly I've
7  made a finding on that.  To put that final nail in the coffin
8  before a jury in this case at the trial is not necessary and
9  we're not going to have a whole case be tied up in knots just
10  over the government's desire to introduce that evidence.  So it's
11  almost certainly there's not going to be an adverse inference
12  that's going to be drawn.  These defendants are entitled to
13  assert a Fifth Amendment privilege on individual matters and
14  we'll go over that in a moment.
15      When I weigh the factors noted by Judge Young which is
16  consistent with the Dresser Industries case and the Fourth
17  Circuit's standards, it seems clear to me that first, the
18  interest of the plaintiff as proceeding expeditiously with the
19  civil action as balanced against the prejudice to the defendants
20  if there is a delay.  Certainly, an indefinite stay would
21  significantly prejudice the Federal Trade Commission in this case
22  as the Defendant Sam Jain has essentially rendered the criminal
23  proceedings potentially indefinite.  I suspect that there will be
24  other motions filed if there is a criminal case in Chicago with
25  respect to one defendant not being present and counsel for the

53

1  co-defendants noting the absence of that defendant and that's
2  another issue of another day in another case for another judge.
3  But in the Mid-Atlantic Toyota Antitrust Litigation, there was a
4  denial of a stay where the defendant sought a stay pending
5  completion of any criminal actions which might arise.  The delay
6  in this case would be significant because memories fade over
7  time.  What my colleague down in Virginia, Judge Ellis, has noted
8  in the In Re:  Phillips, Beckwith and Hall case, 896 F.Sup. 553,
9  an Eastern District of Virginia case, that a party is not
10  entitled to delay resolution of a civil action even to
11  accommodate her Fifth Amendment interest if her adversary's case
12  will deteriorate as a result of this stay.  I sense there's a
13  real danger of that in this case as to the government.  And
14  moreover, the interest of the Federal Trade Commission in my
15  opinion are quite strong.  The action here seeks to redress
16  millions of dollars in alleged consumer injury.  And the Supreme
17  Court has long ago recognized that parallel investigations and
18  enforcement proceedings may be necessary to protect the public
19  interest and that deferring either proceeding could jeopardize
20  that interest.  That goes back to the Stanford case back in 1912.
21  The Stanford Sanitary Manufacturing case reiterated in United
22  States v. Kordell, 397 U.S. 1, a 1970 opinion.
23      The second of the five factors to be analyzed here is
24  the burden on the defendants.  As another colleague of mine here
25  in the Fourth Circuit, Judge Lee, of the Eastern District of

54

1  Virginia noted in Avalon Bay Communities, Inc. v. San Jose Water
2  Conservation Corp., an opinion at 2000 Lexus 63773, an opinion on
3  August 27, 2007.  "While the choice between testifying or
4  invoking the Fifth Amendment may be difficult, it does not create
5  the basis for a stay.  Certainly, defendants have to make
6  difficult decisions about legal strategy, but a motion to stay is
7  unwarranted simply because of that choice."  And it has been
8  noted by another district court judge.  "Forcing an individual to
9  risk non-criminal disadvantage by remaining silent for fear of
10  self-incrimination in a parallel criminal proceeding does not
11  rise to the level of an unconstitutional infringement."  Quite
12  frankly, the Fourth Circuit has clearly ruled previously that a
13  party seeking a stay must show by clear and convincing evidence
14  that a party's hardship outweighs the prejudice to the opposing
15  party and that is Walther v. Armstrong World Industries,
16  Incorporated, 715 F.2nd. 124, a Fourth Circuit opinion in 1983
17  and that burden has simply not been met.
18      The third of the five factors to analyze is the
19  convenience to the Court.  It's not a factor with me one way or
20  the other in terms of my convenience or my docket in comparison
21  with the docket of a federal judge in Chicago in terms of the
22  priority of the pace of that litigation under the Speedy Trial
23  Act, although it seems to me these kinds of cases very rarely are
24  brought to trial within 70 days of the appearance of defendants.
25  That's really not a factor here.

55

1      The fourth and fifth factors are very important to this
2  Court.  That is the interest of persons not parties to this civil
3  litigation and the public interest is the fifth factor.  And the
4  allegations here are precisely the reason in my opinion that the
5  Federal Trade Commission was created and the very reason for the
6  Federal Trade Commission Act with respect to a resolution of the
7  serious issues in this case with respect to public interest.
8  Public interest is very much involved here as I have previously
9  noted back in December in the issuing of the preliminary
10  injunction.  There is enormous public interest involved here in
11  terms of the allegation and it's significant enough that I'm not
12  going to have a litigation be stopped just over one over the
13  potentiality of a criminal investigation although I find it's
14  probably in light of what I've seen of this case, it's probably
15  almost certainty that there's going to be a criminal indictment.
16  But again, as I've said before, Mr. Arenson and Ms. Robbins,
17  we're not going to have it get tied in knots just over the
18  government feeling that it's got to introduce evidence that
19  somebody asserted their Fifth Amendment privilege if there's an
20  adverse inference to be drawn.  So that will wait another day.
21  But and counsel can get a copy of this transcript when the time
22  comes on a motion in limine.  It is almost an absolute guarantee
23  to these defendants that we're not going to have an adverse
24  inference drawn as to clients that assert an individual
25  privilege.  The question becomes the legitimacy of that assertion

56

1 and I sense that I'm going to have to monitor that and make
2 myself available. So that the question becomes the scope of the
3 assertion of the Fifth which we'll address. But for those
4 reasons, as to Sam Jain's motion to stay, he's a fugitive from
5 justice and it has not even been suggested what the time period
6 will be. So for those reasons as set forth on the record, an
7 order will be entered denying the motions to stay as to Sam Jain,
8 paper number 45, Kristy Ross, paper number 48 and Marc D'Souza's
9 motion for temporary stay, which is paper number 71. So that's
10 the Court's ruling on the motions to stay.
11          Moving on here with respect to the contempt motion.
12 There is one motion, the Federal Trade Commission's motion for an
13 order holding Sam Jain and Kristy Ross in contempt of court and
14 requiring the repatriation of their assets, which is paper number
15 49. And I'll be glad to hear from you, Mr. Arenson, on the
16 government's motion. Let me cut to the core of this if I can
17 with respect to an issue that you probably need to address that I
18 noted was addressed by Mr. Luskin, Mr. Woods' partner in
19 representing Sam Jain and that is essentially a phrase that has
20 been raised as to the matter of testimonial compulsion as opposed
21 to document compulsion here. Essentially, the point that's been
22 raised here on the contempt motion, Mr. Arenson, is the matter of
23 the disclosure requirements essentially. The defendants have
24 noted the matter of certain disclosure requirements independent
25 of document production and I think you are going to need to

57

1 address this right away in terms of seeking to have me hold Sam
2 Jain or Kristy Ross in contempt. I'll be glad to hear from you.
3          MR. ARENSON: Absolutely, Your Honor. As we pointed
4 out in our pleadings, there are really two issues here and one of
5 them is not individual assertions by the defendants. The FTC
6 does not seek to prevent individual defendants in this case from
7 properly asserting their Fifth Amendment rights as to information
8 tailored toward them. The problem here, Your Honor, is that the
9 defendants are asserting Fifth Amendment rights on behalf of the
10 corporation, Innovative Marketing. These are corporate officers
11 of Innovative Marketing who refuse to force the corporation to
12 comply with this order refusing to turn over corporate records.
13 And Your Honor --
14          THE COURT: Now clearly, there is a definitive decree
15 which I've issued, but it has been noted in the motion to modify
16 the preliminary injunction that there's certain aspects of that
17 decree which essentially would infringe on a number of the
18 defendant's rights and through the advice of counsel, totally
19 apart from Sam Jain's absence, as to Kristy Ross, she has raised
20 those issues. So how does the government propose me to find her
21 in contempt? I find there may be some merit as to her position.
22          MR. ARENSON: Because, Your Honor, she is free to
23 assert her Fifth Amendment privilege as to portions of the
24 preliminary injunction that require her in her individual
25 capacity to produce evidence that would incriminate her. And

58

1 that's not the purpose of the contempt motion. It's about Kristy
2 Ross and Sam Jain's complete failure to act on the part of the
3 corporation to produce documents. I would cite to the Court the
4 Dunlap case in which the defendant refused to produce documents
5 of the corporation despite the fact that he was in control of the
6 corporation and the Fourth Circuit affirmed the trial court
7 judge's decision to incarcerate the defendant for exactly those
8 actions. That's exactly what we got here, Your Honor. But we've
9 got two officers who refuse to on behalf of the corporation to
10 comply and one officer of the corporation who refuses to even
11 show up, Your Honor, and it's denying the FTC the information
12 that it is entitled to under the preliminary injunction and this
13 is a hugely important issue for the FTC because the FTC needs the
14 records of the corporation to establish consumer injury.
15          THE COURT: Well, isn't the safer process, Mr. Arenson,
16 as we deal with this preliminary injunction which was too broadly
17 worded, to have an understanding since everyone is here now and
18 they've got lawyers here in terms of what is expected and how
19 quickly it's expected and then there may be grounds if someone
20 willfully just refuses to disclose corporate documents. I
21 suspect in light of the bench warrant that's out for Jain in
22 California, it's not particularly a concern.
23          MR. ARENSON: I agree with Your Honor.
24          THE COURT: But in terms of Ms. Ross to hold her in
25 contempt and seek to incarcerate her over issues in terms of the

59

1 breadth of the preliminary injunction --
2          MR. ARENSON: Fair enough, Your Honor.
3          THE COURT: You would agree that it is within this
4 Court's discretion, would you not --
5          MR. ARENSON: Absolutely, it is, Your Honor.
6          THE COURT: -- in terms of what the scope of the
7 production is and what is not and how quickly the discovery is
8 going to proceed in this case and the availability of the court
9 to resolve disputes. It seems to me that's a far safer process
10 than to hold someone in contempt --
11          MR. ARENSON: Your Honor, the FTC has no interest here
12 in seeing people thrown in jail. As to Kristy Ross, there has
13 been absolutely no evidence whatsoever submitted by Kristy Ross,
14 not an affidavit, not a document, not nothing from Kristy Ross
15 indicating when it is that she allegedly washed her hands of this
16 corporation. But that's a hugely important point because that's
17 the same thing that happened in Dunlap. The defendant was
18 ordered to take action on behalf of the corporation and the
19 defendant in that case said you know what, I don't control the
20 corporation anymore, I can't do anything and the court said no,
21 that's not good and you can't just wash your hands of the
22 corporation when you get caught. You have an obligation to take
23 action on behalf of the corporation and --
24          THE COURT: Doesn't it require a factual determination
25 of exactly who controls the accounts for Innovative Marketing and

60

1  who's on the accounts, who signs the checks, who authorizes the
2  actions?
3  　　　　MR. ARENSON:   I would propose to you what you're
4  raising is the impossibility defense.  That defendants cannot
5  comply because they do not have the ability to do so.  But as
6  we've briefed in our proceeding, this rests solely with the
7  defendants and not the plaintiff and the defendants are obligated
8  to show to the Court why it is they cannot comply and they have
9  failed to do so.  They have introduced no evidence why they can't
10  comply.
11  　　　　THE COURT:   But it seems to me that we are a tad early
12  here to be holding people in contempt it seems.
13  　　　　MR. ARENSON:   Your Honor, I understand where you're
14  coming from.  But this is the second time that these defendants
15  have refused to comply.  They didn't comply with the T.R.O.  This
16  court entered a show cause and at the last minute the defendants
17  appeared.  So this would be the second time the defendants are
18  refusing to comply.
19  　　　　THE COURT:   But this is a little bit premature.
20  　　　　MR. ARENSON:   The defendants have certainly had a long
21  time to think about what their obligations are.  They've been
22  given the opportunity and they've not done it.  We have Internet
23  chats.  We got the defendant, Reno, one of the participants in
24  this scheme, talking back and forth with Sam Jain and Kristy Ross
25  about this corporation and its actions.  In late May of 2008,

61

1  are withdrawn and are now moot.  We don't need to worry about
2  that topic.
3  　　　　MR. ARENSON:   Your Honor, one point of clarification.
4  Is there going to be further guidance from the Court as to what
5  the defendants should do regarding the preliminary injunction?
6  　　　　THE COURT:   Oh, yeah.  We're going to get there.  We're
7  about to get to a major category here, Mr. Arenson, on the motion
8  to modify the preliminary injunction.  I have for modification of
9  the preliminary injunction one motion, Sam Jain's motion to
10  modify the preliminary injunction, paper number 58.  Is there a
11  motion on behalf of Mr. Marc D'Souza, Mr. Madigan?
12  　　　　MR. MADIGAN:   Yes.  It's part of the motion to stay.
13  　　　　THE COURT:   Right.  Paper Number 71 from your client.
14  All right.  And that's all part of your motion to stay and it's
15  the second half.  All right.  All right.  Thank you very much.
16  I'm sorry.  Thank you, Mr. Madigan.  Is there a motion on behalf
17  of Kristy Ross also, Mr. Webb?
18  　　　　MR. WEBB:   We would like to orally join in the motion,
19  Your Honor, on behalf of Kristy Ross.
20  　　　　THE COURT:   I'm going to treat it as a joinder as to
21  the defendant, Kristy Ross.  That's fine.  All right.  So I'll be
22  glad to hear from you, Mr. Wood.  You take the lead on this.
23  Essentially, you're addressing the preliminary injunction here.
24  Why don't we print out exactly what was filed as a matter of
25  record?  I note that you have essentially addressed specifically

63

1  there's an email from an individual to Mr. Jain and to Ms. Ross.
2  They're not emails.  They are internet chats.  But essentially
3  the same thing.
4  　　　　THE COURT:   Well, that may or may not indicate the
5  corporate involvement of Jain or Ross or it may just indicate the
6  belief by someone as to the corporate status of Jain or Ross.  It
7  remains to be seen.
8  　　　　MR. ARENSON:   Fair enough, Your Honor.  But again the
9  burden is on them.
10  　　　　THE COURT:   All right.  I understand.  Thank you very
11  much, Mr. Arenson.  Counsel, on this, I don't have any intention
12  right now of holding either Mr. Jain or Ms. Ross in contempt.  I
13  will deny FTC's motion, which is paper number 49.
14  　　　　The third category of the six motions is the
15  motion to strike or in the alternative, motion for extension of
16  time.  There's essentially two motions here.  There is Kristy
17  Ross' motion to strike or in the alternative, motion for
18  extension of time, paper number 51 and Sam Jain's motion for
19  extension of time, paper number 52.  These motions seem to strike
20  the FTC's motion for order holding them in contempt, which is
21  paper number 49 which I have just denied.  So it certainly seems
22  to me that papers number 51 and 52 are now moot.
23  　　　　MR. WEBB:   I'll withdraw 51.
24  　　　　MR. WOOD:   And I'll withdraw 52.
25  　　　　THE COURT:   The record will reflect that those motions

62

1  certain categories here, Mr. Wood, of the preliminary injunction.
2  All right.  You'll need to address defining your client's
3  obligations as an officer of Innovative Marketing, Incorporated
4  as opposed to his response as an individual because it is alleged
5  here that your client was an officer and director of Innovative
6  Marketing, the corporate defendant here.  I'll be glad to hear
7  from you.
8  　　　　MR. WOOD:   Sam Jain was the C.E.O. of Innovating
9  Marketing in February of 2007 according to Canadian affidavit
10  from the Canadian litigation.  They've also entered into evidence
11  Internet chats indicating that he was discussing I.M.I.'s
12  business.  Those chats are dated March 2008 and May 2008.
13  There's no evidence in the record, Your Honor, that Sam Jain had
14  any connection to I.M.I. whatsoever at the time that the
15  preliminary injunction was entered in December of 2008.  And
16  Mr. Arenson speaks about an impossibility defense.  It's not an
17  impossibility defense, Your Honor.  It relates back to FTC's
18  initial burden of showing that Sam Jain was the control person
19  for I.M.I. on December 12, 2008.  And if you look, Your Honor,
20  the impossibility defense applies when the alleged control person
21  was shown to have been bound by the court order at the time that
22  the order was entered.
23  　　　　THE COURT:   Let me just go over your motion to modify.
24  Section 5, essentially, with respect to financial reporting and
25  accounting.  It is further ordered that if they have not done so

64

1   already in compliance with the temporary restraining order
2   previously issued in this matter, each individual defendant, the
3   relief defendant and each corporate defendant, shall serve upon
4   counsel for the commission, no later than three business days of
5   receiving notice of this order, completed financial statements,
6   verified under oath and accurate as of the date of entry of this
7   order, on the forms provided as Attachment A for individuals and
8   Attachment B for businesses for the ex parte temporary restraining
9   order, signed under penalty of perjury.   Certainly that may be
10  overbroad there in terms of your client's personal Fifth
11  Amendment privilege and as would be the case perhaps with Ms.
12  Kristy Ross.   But with respect to any corporate capacity or
13  access to corporate records, where is there an assertion of the
14  Fifth Amendment Privilege there?   He's clearly a corporate
15  representative of Innovative Marketing and can be required to
16  complete financial statements.
17          MR. WOOD:   Well, Your Honor, in his individual
18  capacity, I think that the law is very clear on that.   The Fourth
19  Circuit addressed that in the Dunlap case --
20          THE COURT:   Can not Sam Jain, an officer and/or
21  director of Innovative Marketing, be required to prepare
22  documents with respect to Innovative Marketing, Incorporated?
23          MR. WOOD:   Your Honor, the FTC's evidence establishes
24  at most that Sam Jain had an officer-type relationship with
25  I.M.I.   It does not say that he was a C.E.O.

65

1   each individual defendant shall serve upon counsel for the
2   commission no later than three business days completed financial
3   statements and I'll hear from the government in a moment, but it
4   seems to me that language does not need to be modified.   There's
5   really nothing further for me to address as to the language as to
6   the corporation because there isn't a Fifth Amendment privilege
7   and I've got information before me indicating that your client is
8   a corporate officer.
9           The next objection you have is not as to Section 6, but
10  as to Section Roman Numeral 7(A).   Provide the Commission with a
11  full accounting, verified under oath and accurate of all funds,
12  documents, and assets outside of the United States which are
13  titled in the name, individually or jointly of any corporate
14  defendant, individual defendant or relief defendant.   Again, it
15  seems to me that the same principle applies, Mr. Wood.   That as
16  to the corporate defendant, there is no basis for it.   There
17  should be some modification as to individual defendants.
18          Your next objection was as to Section 12,
19  identification of affiliates, compelling your clients to prepare
20  and deliver to the commission a completed statement, verified
21  under oath identifying by name all of the affiliates that have
22  worked with the I.M.I. defendants.   As to that, it certainly
23  seems to me that as a representative of the corporate defendant,
24  that is not overly broad.   That as to individual defendants, it
25  may be overly broad and I'm certainly going to consider modifying

67

1           THE COURT:   Well, but doesn't his affidavit in and of
2   itself acknowledge that he performs the function of the CEO,
3   qualify him as having ability to answer for the corporate
4   defendant?
5           MR. WOOD:   Well, that affidavit is dated February 2007
6   and as, you know, Your Honor the preliminary injunction was
7   entered on December the 12, 2008.   And so at most, at most that
8   establishes that Sam Jain was a former officer.   It's FTC's
9   initial burden of showing that he was a control person --
10          THE COURT:   They've met their initial burden.   You're
11  asking me to conjecture that he's no longer an officer.   And I
12  have an affidavit that his former function was that of a C.E.O.
13  in February of 2007.   So why shouldn't he be required to respond
14  to items of corporate financial records?   Well, here's the point.
15  Here's the point.   Let me just indicate where I am on this.
16  There's no evidence from which I could find that he's anything
17  other than an officer of the corporation.   He isn't required to
18  have a month-by-month update of his status with the corporation.
19  It's not up to the government to disprove a negative.   It's as
20  simple as that.
21          MR. WOOD:   I disagree, Your Honor.
22          THE COURT:   I'm sure you disagree.   But that's my
23  ruling.   I don't see any need to modify Section 5 as to your
24  client.   I'm going to note that with respect to a motion to
25  modify, that essentially it seems to me that the language that

66

1   the injunction.   Anything further you want to be heard on this
2   point?
3           MR. WOOD:   I would only say, Your Honor, that there was
4   some effort by the FTC to preclude the assertion of individual
5   Fifth Amendment privilege with respect to each of these.
6           THE COURT:   I'm just trying to go line by line.
7   Section 13, we have the same issue here in terms of
8   identification of products and websites.   Someone is going to
9   have to respond on behalf of Innovative Marketing, Incorporated.
10  But again it's the same analysis under Section 13, is it not,
11  Mr. Wood?
12          MR. WOOD:   Same analysis.
13          THE COURT:   All right.   Okay.   The same analysis is
14  applying here through these sections you've raised.   In terms of
15  14(A) and 14(B) and then Section 15, all the same arguments
16  apply.   All right.   Unless there's anything further on that, let
17  me hear from Mr. Webb or Mr. Madigan.   And then I'm going to
18  address here in terms of whether there's some overbreadth in some
19  of this language.   So thank you very much, Mr. Wood.   Mr. Webb,
20  anything further on this?
21          MR. WEBB:   Very quickly, Your Honor.   My only point for
22  Kristy Ross is that if you go through those same paragraphs you
23  just mentioned, just the same ones, those paragraphs, the only
24  modification I'm asking for Kristy Ross, you know, Your Honor,
25  she was involved in marketing and sales for this company.   That's

68

1  what she did.  She didn't run this company.  She didn't control
2  the company.  They got to show that before Kristy Ross is ordered
3  to do something that she can't possibly do.  The case law is very
4  clear.  You are not supposed to order someone be in contempt if
5  the fact is they don't have the ability to comply with the order.
6  So that's all I'll say is we need to modify this so that it's
7  clear that whoever is being asked to respond has to have the
8  control and the authority to answer on behalf of the corporation.
9  That's all.
10      THE COURT:  It doesn't require me to change all the
11  language.  Just with respect to individual defendants being
12  compelled to do certain things.
13      MR. WEBB:  That's correct.  I just want to make clear
14  only that someone who is not a control person who does not have
15  the authority can't be ordered to do it.  That's all I'm asking.
16      THE COURT:  All right.  Thank you, Mr. Webb.  Mr.
17  Madigan, anything further on this?
18      MR. MADIGAN:  Briefly, Your Honor.  I'd just join with
19  my co-counsel with respect to the individual Fifth Amendment
20  rights.  I do want to talk whenever Your Honor wants to hear
21  about modifying the freeze.
22      THE COURT:  I'm going to get to that in a minute.  All
23  right.  Mr. Arenson or Ms. Robbins, I'll hear you on this.
24      MS. ROBBINS:  Thank you very much.  Your Honor, I'd
25  like to just point out to the Court that in terms of the

69

1  financial statements, those individual financial statements not
2  every single question --
3      THE COURT:  Let me address that if I can.  With respect
4  to the individual financial statement, not corporate statements,
5  individual financial statement, hypothetically, if an individual
6  has $6 million parked in a Swiss bank account which are not as
7  anonymous or are not going to be much longer, is that not an
8  element of incrimination perhaps to a defendant who is asked to
9  provide discovery information?
10      MS. ROBBINS:  It may be a point that there are
11  questions on that financial statement.
12      THE COURT:  I know.  But my point is that in terms of
13  trying to comply with this order, right, there may be clearly
14  items that are compelled.  And your point is that they can just
15  assert the privilege as to each item.
16      MS. ROBBINS:  And that's what the cases have said.
17  That you cannot make a blanket assertion.  In that document, that
18  financial document that's attached to the preliminary injunction
19  that was attached to the T.R.O., not every single one of those
20  questions the defendants are going to be able to assert their
21  Fifth Amendment.  They should have to assert their Fifth
22  Amendment privilege to do so.
23      THE COURT:  Do you have one of those forms with you?
24      MS. ROBBINS:  Yes, Your Honor.
25      THE COURT:  It might be helpful if we have identified

71

1  corporate control and corporate status of each of these
2  individuals, Kristy Ross in the Canadian pleadings talks about
3  there's evidence that she was actually the V.P.  That she took
4  over for Daniel Sundin.  The pleadings also said she was the
5  Director of Sales and Marketing.  So there is evidence that she
6  is a control person in this corporation.  In addition, as the
7  Court has noted, Jain was the acting C.E.O.  In terms of the
8  Court's issue about modifying this order --
9      THE COURT:  The specific language here, Section 5, if
10  they have not done so already in compliance with the temporary
11  restraining order previously issued in this matter, each
12  individual defendant, the relief defendant and each corporate
13  defendant shall serve upon counsel for the commission no later
14  than three business days of receiving notice of this order,
15  completed financial statements, verified under oath and accurate
16  as of the date of entry of this order.
17      MS. ROBBINS:  The defendants are free to assert their
18  Fifth Amendment privilege and it's not the Court compelling them
19  to do so.  It's their right to assert the Fifth Amendment
20  privilege and it's not the Court should just strike these
21  provisions or strike that language.  It's the defendant's right
22  to assert that Fifth Amendment privilege and under the case law,
23  they must do so.  And it can't be a blanket assertion and in
24  those financial statements not every single question is going to
25  lend itself to a Fifth Amendment privilege.  And so those

70

1  which questions may not be covered by Fifth Amendment privilege.
2      MS. ROBBINS:  Yes, Your Honor.  Your Honor, I also want
3  to point out that in light of the fact that the Court has already
4  indicated that it may not issue an adverse inference for invoking
5  the Fifth, that gives us, you know, even more reason to not
6  strike that provision, but allow the defendants to answer it and
7  assert their Fifth Amendment privilege since there is not going
8  to be that danger of the adverse inference.
9      THE COURT:  So your point is as to all of these
10  sections, none of them should be modified.
11      MS. ROBBINS:  Absolutely.
12      THE COURT:  That an individual defendant may have to
13  respond to some financial inquiry and that there's no reason to
14  modify it per se.
15      MS. ROBBINS:  Absolutely.
16      THE COURT:  All right.  Well, thank you very much, Ms.
17  Robbins.  We'll address the freeze motion in a moment.  Let me
18  hear from you, Mr. Wood or Mr. Webb or Mr. Madigan, whoever wants
19  to go on this.  Is it your view that any information on a
20  financial statement that your client can claim a Fifth Amendment
21  privilege on this, Mr. Wood?
22      MR. WOOD:  Well, Your Honor, in FTC v. FEMA, the case,
23  1981, out of the Northern District of California, the court there
24  did determine that the entire form violated the Fifth Amendment
25  and they struck the entire form out of the preliminary

72

injunction.

THE COURT:   On what basis? On the Fifth Amendment basis?

MR. WOOD:   On the Fifth Amendment basis, Your Honor.

THE COURT:   Any other cases other than California in 1981?

MR. WOOD:   That's the only case that I have, Your Honor, and I would only add we raised this in our pleading that the certification on the end of the form recognizes that all of the evidence is produced and all of the information is given. The FTC has said that they would allow a modification to the certification. But I don't think they can make that representation on behalf of someone looking at that for a --

THE COURT:   So your view is that your client cannot be required to fill out any financial form of any kind at all on an individual basis?

MR. WOOD:   Well, in this case, Your Honor, where they're alleging a massive financial fraud, which is the overwhelming majority and I think even the FTC recognizes in the pleading that they've referenced that the overwhelming majority of these questions do in fact implicate the Fifth Amendment and only a very small number don't.

THE COURT:   Actually, that's a good point, Mr. Wood. One second. Ms. Robbins, if I can ask you one question?

MS. ROBBINS:   Sure.

73

---

may be entitled to do, but then to turn around and say well, but there's an unfair freezing of the assets.  So it's a two-edged sword as to both sides unless I misinterpreted or reading into something.  It seems to me as I read through the papers here that there's a two-edged sword as to both.

MS. ROBBINS:   Right.

THE COURT:   Now you benefit from that side of the sword as to the matter of the freezing of financial assets.  So I'm not sure if it helps you in terms of the nature of the assertion of a privilege because they're essentially arguing that anything they fill out has a Fifth Amendment aspect to it.

MS. ROBBINS:   And I think that's true.  But I think that the argument still stands that the defendants, that there's really no basis to completely strike those provisions.  That the defendants can assert on a question-by-question basis.  But that the asset freeze argument is separate.  And I think I mean the one thing though that in the Butler case which is in the Fourth Circuit where the Court said, you know, the defendants can't assert an inability to comply with the Court's order based on Fifth Amendment and refuse to answer further questions on that by invoking the Fifth Amendment.  I mean they can't refuse and not comply at the same time.  I mean and I think -- I don't know that --

THE COURT:   So your point just is basically there's no reason to change the language here.  It's just a matter of how --

75

---

THE COURT:   Given that we're about to get to a topic that I know defense counsel have a very keen interest in and that is the matter of the freezing of assets and the government's position with respect to freezing of all assets in terms of ill-gotten gains as well as the need for financial remuneration to the members of the public, the validity of that argument perhaps in the context of opposing any lifting of the freeze order which certainly seems to me cut the other way in terms of providing some basis for a defendant on an individual basis not providing any financial information other than what's already known to the government because the government has taken the position that all of this may be reflective of ill-gotten gains and essentially, the government's position in a nutshell as I interpret your papers is that it's not up to the government to have to prove each and every item in terms of where the money came from.  You're alleging a massive fraud here and, you know, huge bank accounts and people that have put money away and it seems to me that the issue becomes, the very thrust of that argument it seems, the flip of it is that there may be some Fifth Amendment privilege.  I noted when I was reading through these papers that the flip as to the defendants is that to the extent that they allege there's a Fifth Amendment privilege as to these counts, the flip is it also weakens their argument that there shouldn't be any freeze issued because they're asserting a Fifth Amendment privilege as to all of these accounts which they

74

---

MS. ROBBINS:   Right.  Absolutely.

THE COURT:   All right.  Thank you.  Go ahead, Mr. Wood. I didn't mean to interrupt your argument, but I wanted to get the thrust of the government there.  You recognize that to the extent that your client asserts the total Fifth Amendment privilege as to a financial document, it also I think falls over into the area of freezing of assets.

MR. WOOD:   I don't have much to add to that, Your Honor.

THE COURT:   All right.

MR. WOOD:   The only thing that I would add is that Mr. Jain given his unique circumstance probably has some Fifth Amendment objections to this form that other defendants might not have.

THE COURT:   All right.  Mr. Webb, let me hear from you on this if I can.

MR. WEBB:   Your Honor --

THE COURT:   Do you think there's really a need to change the language?  It's just a matter of how your client responds to it.  Your client is entitled to it as I've indicated.

MR. WEBB:   Kristy Ross will respond to this questionnaire.  She'll take the fifth on questions that she has a bonafide right to take the Fifth on and if she doesn't have a right to take the Fifth, she'll answer.  She's going to do it because it should not affect the freeze order.

76

1    THE COURT:   I'll get to that in a moment.

2    MR. WEBB:   She's got no money to pay lawyers right now.

3    THE COURT:   I'll get to that in a moment. But the

4 point is that you have nothing further to add about my needing to

5 strike language or change language here.

6    MR. WEBB:   On paragraph 5, no.

7    THE COURT:   On any of these paragraphs because it's the

8 same issue that was woven through all of them I think.

9    MR. WEBB:   I told you my only question is the factual

10 issue about whether Kristy Ross has any ability --

11    THE COURT:   I understand. I understand. All right.

12 Mr. Madigan, do you want to be heard further on this?

13    MR. MADIGAN:   No, Your Honor. I agree with Mr. Webb.

14 As long as the personal Fifth Amendment is preserved and there

15 will be and is a distinct disagreement about whether somebody is

16 a corporate officer or more importantly with my client who left

17 in '06 which is undisputed by the FTC and the preliminary

18 injunction is issued in '08. That certainly was not at that time

19 in any way associated with the so-called corporation.

20    THE COURT:   All right. That's fine. And to the extent

21 that your client says I don't have any access to information, I

22 can't respond to it, I don't know is fine and it may be that

23 ultimately at the deposition of your client that your client is

24 asked in deposition questions about the corporate structure and

25 who had access to the accounts, who had signature authority. As

77

---

1 to that, he can be asked in his former capacity as a corporate

2 official what knowledge he has at that time in his corporate

3 status. But again that doesn't I think go into the Fifth

4 Amendment and it's just a matter of if it's a Fifth Amendment

5 issue on a personal basis, you can assert it at that time and

6 I'll certainly make myself available if necessary to weave

7 through these Fifth Amendment issues individual as opposed to

8 current and or past corporate executives and the questions that

9 are asked. So it seems to me that as to the matter of the motion

10 to modify the preliminary injunction as to the striking of

11 provisions of the preliminary injunction, there's no need for

12 that and I'm going to address this entire motion in a moment.

13    Now the motion to modify the asset freeze because of

14 Sixth Amendment right to counsel, I'll be certainly glad to hear

15 from you, Mr. Wood, and then from Mr. Webb and Mr. Madigan. So

16 Mr. Wood, if you would like to address the Court on that, please?

17    MR. WOOD:   Thank you, Your Honor. The total asset

18 freeze in Section 4 of the P.I. is overbroad here because the FTC

19 has not established any nexus to the alleged fraud or to

20 redressable consumer injuries. Because this is not a forfeiture

21 action unlike the cases cited by the FTC in their briefs in which

22 forfeiture statutes vest title to forfeitable assets in the

23 government as of the time of illegal conduct, the FTC must

24 establish a nexus here between the assets frozen and the ultimate

25 relief available if it succeeds on its claim. The Fourth Circuit

78

---

1 considers that nexus essential to the Court's authority to enter

2 a preliminary injunction freezing assets. And without evidence

3 of any such nexus, the FTC simply refers to Jain's frozen assets

4 as his ill-gotten gains and were the freeze limited to ill-gotten

5 gains, Your Honor, Mr. Jain would not be seeking modification,

6 but the freeze currently is not so limited. The FTC has not only

7 failed to establish a nexus between the assets frozen in the

8 alleged fraud, but it's failed to provide any non-speculative

9 measure of redressable consumer injury here to which frozen

10 assets could be applied. Even if the FTC is not obligated to

11 trace every dollar of funds frozen to specific fraud proceeds, it

12 nevertheless must establish that the total amount frozen

13 reasonably approximates the amount of redressable consumer

14 injury. Now the FTC's supposed $100 million consumer injury

15 here, Your Honor, consists of nothing more than a 2004 through

16 2006 total corporate sales figure with an additional 25 million

17 arbitrarily tacked on for calendar years 2007, 2008 with no

18 evidentiary basis whatsoever and there's no attempt to correlate

19 that figure, the hundred million dollars or the $74 million

20 figure to a nexus to fraud, to specific products or even to any

21 individual defendant. And moreover, as was mentioned earlier,

22 that $74 million figure disclosed the Canadian litigation

23 specifically included sales transactions with no connection

24 whatsoever to the United States and are left outside the FTC's

25 jurisdiction and beyond the scope of equitable relief in this

79

---

1 action. Now the FTC's jurisdiction to provide restitution to

2 foreign consumers exists, but it's limited only to transactions

3 that either cause or are likely to cause reasonably foreseeable

4 injury within the United States or involve material conduct

5 occurring within the United States. That cannot apply to foreign

6 consumers engaged in foreign transactions with a Belizean company

7 based in the Ukraine particularly when those transactions are

8 perfectly legal in the foreign jurisdictions in which they're

9 consummated. By freezing all existing assets without any nexus

10 to the alleged fraud or to an amount of redressable consumer

11 injury, the asset freeze is not only overbroad, but it violates

12 the individual defendants' Sixth Amendment right to retain their

13 chosen counsel. Without that nexus, Your Honor, the freeze

14 breaks the rule that a criminal defendant's constitutional right

15 to counsel is simply more important than the government's

16 interest --

17    THE COURT:   But your client is not a criminal defendant

18 in this case.

19    MR. WOOD:   Your Honor, he's been advised that his --

20 well, he is a criminal defendant in California --

21    THE COURT:   Not in this case, he's not.

22    MR. WOOD:   In this case he's been advised that his

23 indictment is imminent.

24    THE COURT:   In this case before this Court, your client

25 is not a criminal defendant.

80

1    MR. WOOD:   That's right, Your Honor, but that doesn't
2  mean that he doesn't have Sixth Amendment rights with respect to
3  those cases in which he is a criminal defendant.  And his Sixth
4  Amendment right --
5    THE COURT:   But this case is an action by the Federal
6  Trade Commission with respect to harm to public consumers.  It's
7  not a criminal case.
8    MR. WOOD:   Right, Your Honor.  But where the asset
9  freeze in this civil case interferes with the Sixth Amendment
10  right to pay counsel of his choice by freezing all existing
11  assets without reference to the alleged fraud or to redressable
12  consumer injury, it's freezing untainted assets and that
13  interferes with the Sixth Amendment right to counsel.  Even
14  though he's not a criminal defendant in this proceeding, Your
15  Honor, he does have the right.  He is a criminal defendant and
16  that right is being interfered with by a complete existing asset
17  freeze that's not tied to any fraud or --
18    THE COURT:   I mean I'm looking at a slew of Fourth
19  Circuit cases that have absolutely rejected this argument,
20  Mr. Wood.  I mean I'm looking through -- there's a series of
21  cases the government has cited and there's a series of cases --
22  I'll just look through here in terms of this whole Sixth
23  Amendment issue here with respect to the freezing of assets and
24  start back within the last, you know, almost 20 years ago.
25  There's Kemp v. Peterson, 940 F.2nd. 110, Fourth Circuit opinion,

81

1  1991, upholding the district court's preliminary injunction
2  freezing assets to preserve the status quo.  And the Fourth
3  Circuit specifically stated that freezing of funds may be proper
4  without respect, without respect to whether these moneys are
5  traceable to the proceeds or profits and income from the
6  proceeds.  There is a case in 1988, the Federal Trade Commission
7  World Travel Vacation Brokers.  Well, that's not a Fourth Circuit
8  case.  There's the SEC, the Securities Exchange Commission v.
9  CHIRP.  No.  I'm sorry.  The Kaplan Drysdale case is a Fourth
10  Circuit case.  I mean we have an action by the Federal Trade
11  Commission here alleging massive losses on the part of the public
12  and seeking and alleging that these defendants are part of that
13  process and the claim well exceeds perhaps the assets of these
14  defendants.  So it seems to me that the case law is against you
15  and certainly here in the Fourth Circuit, the case law is against
16  you on this.
17    MR. WOOD:   Well, there's a couple of points that can be
18  made, Your Honor.  One is that the total injury here
19  exceeds the assets of the defendants and there's been no showing
20  of that.  There's been no showing of the amount of assets frozen.
21  There's been no showing of any non-speculative consumer injury
22  figure here other than that pulled from a total corporate sales
23  figure that's not part of the fraud, that's not part of the
24  specific products that may be alleged to have been fraudulent and
25  are not tied to any of the individual defendants.  And so as far

82

1  as tracing, Your Honor, the cases do say that you don't have to
2  trace every dollar frozen specifically to a dollar of fraud
3  proceeds.  But there has to be some correlation between freezing
4  of the amount and the amount of the consumer injury and the point
5  that we've made here is that the consumer injury alleged by the
6  FTC is a fiction.  It's a number pulled out of the Canadian
7  filing that has to do with total sales.  It's not tied in any way
8  to the fraud and so they haven't made any showing that these are
9  tainted assets that have been frozen.  And the cases that you
10  mentioned in the Sixth Amendment right to counsel were found not
11  to trump the assets frozen are all cases and they all say if I'm
12  not mistaken that you don't have a right as a criminal defendant
13  to spend somebody else's money on your criminal defense counsel.
14  And that all turns on whether the assets are somebody else's
15  money.  Whether they're tainted, whether that means that there
16  was tracing to fraudulent proceeds or whether that means that as
17  many of those cases are forfeiture cases, the title vest in the
18  government at the time of the alleged misconduct rather than
19  here, where these assets remain Mr. Jain's until there's been
20  some showing that he owes ultimate relief in the case.
21    THE COURT:   Is there a constitutional right under the
22  Sixth Amendment to counsel in a civil lawsuit?
23    MR. WOOD:   The Sixth Amendment right applies only to
24  criminal counsel, Your Honor.
25    THE COURT:   So your argument then is is that there's

83

1  been infringement by the freeze of your client's right to
2  criminal counsel in the action in California and in Chicago.
3    MR. WOOD:   I think our argument is that there's a Sixth
4  Amendment component to why the asset freeze here is overbroad.
5  But there's also --
6    THE COURT:   In the context of the criminal cases in
7  other districts.
8    MR. WOOD:   In the context of the criminal case in other
9  districts, Your Honor.
10    THE COURT:   There's no Sixth Amendment issue in this
11  litigation because there's no constitutional right to counsel
12  under the Sixth Amendment as to your client.  Correct?
13    MR. WOOD:   As to fees in this case, yes, that's right.
14  The Sixth Amendment.  But Mr. Jain does have criminal counsel in
15  this criminal matter and the total freeze of all existing assets
16  precludes him from compensating his criminal counsel which does
17  implicate his Sixth Amendment right.  But, Your Honor, we've also
18  argued that the asset freeze is overbroad, not just based on the
19  Sixth Amendment, but based on this lack of nexus to either fraud
20  or to redressable consumer injury.  And so we've argued that the
21  asset freeze is overbroad for two reasons.  Sixth Amendment.  But
22  also just the FTC's failure to satisfy its burden of showing a
23  need for a complete total existing asset freeze without any sort
24  of a tie to defraud persons.  And as a result, all that we've
25  asked for in our motion to modify, Your Honor, is a very simple

84

**Page 85**

1  nine-word modification and that would be to add the derived from

2  conduct prohibited in paragraph 1 and 2 condition that exists in

3  the P.I. as to acquired assets to the provision freezing existing

4  assets. And that's the only modification that we seek on behalf

5  of Sam Jain.

6  THE COURT:  All right. Thank you very much, Mr. Wood.

7  Mr. Webb or Mr. Madigan, I suspect you definitely want to be

8  heard on this one I'm sure.

9  MR. MADIGAN:  Yes, Your Honor.

10  THE COURT:  All right.

11  MR. MADIGAN:  On behalf of Mr. D'Souza, we have a

12  somewhat different argument. Our argument centers upon the fact

13  that it is undisputed that Mr. D'Souza left whatever kind of

14  relationship the FTC wants to claim that he had with the other

15  defendants in December '06. As I mentioned in one of my earlier

16  arguments, the complaint when it details specifics, not

17  broad-based claims of oh, there were millions and millions of

18  dollars of fraud. Specific allegations in the FTC complaint.

19  They all deal with '07 and '08 and I thought that there was

20  agreement and there may be from the FTC. But the language is a

21  little fuzzy which I wanted to clear up. That therefore, that

22  any funds and I'll quote here from the FTC's pleading in response

23  to ours. They say "provided that funds are not tied to the

24  activity prohibited in the temporary restraining order or the

25  preliminary injunction which appears to be the case given Mr.

**Page 86**

1  D'Souza's --"

2  THE COURT:  I am looking at the government's response.

3  Where is this in the government's response?

4  MR. MADIGAN:  This is on page 3. At the bottom of page

5  3. I believe was this reply? I think it's the reply. Let

6  me read the whole thing. "Provided these funds are not tied to

7  the activity prohibited by --"

8  THE COURT:  I'm sorry. I'm looking at the plaintiff's

9  opposition to Defendant Sam Jain's motion to modify the

10  preliminary injunction and I'm addressing the section where they

11  say "you should not deny the request to modify the asset freeze

12  because he has failed to demonstrate that it is necessary or

13  appropriate."

14  MR. MADIGAN:  This is the response to Mr. D'Souza's

15  motion.

16  THE COURT:  Okay. I'm sorry. Okay. I'm having

17  trouble finding where you're reading from, Mr. Madigan. I'm

18  sorry.

19  MR. ARENSON:  Your Honor, it's from the FTC's

20  opposition to Marc D'Souza's motion to stay preliminary

21  injunction.

22  THE COURT:  Okay. Hold on.

23  MR. MADIGAN:  I don't think we have the number though.

24  THE COURT:  The opposition to the motion for temporary

25  stay --

**Page 87**

1  MS. ROBBINS:  71.

2  MR. MADIGAN:  71 counsel says, Your Honor. I can just

3  paraphrase it if you want.

4  THE COURT:  Yes. I've got it. I'm looking at Document

5  86 as the plaintiff's opposition to Mark D'Souza's motion for

6  temporary stay and modification of preliminary injunction is

7  paper number 86 according to what I've got here.

8  MR. MADIGAN:  86. Is that right? I don't know the

9  number.

10  THE COURT:  What page are you quoting from?

11  MR. MADIGAN:  Page 3 and 4, carrying over to 4.

12  THE COURT:  All right. I'm with you.

13  MR. MADIGAN:  I'm focused on this two-year absence.

14  THE COURT:  Right. I understand.

15  MR. MADIGAN:  Okay. And the FTC document says

16  "provided these funds are not tied to the activity prohibited by

17  the temporary restraining order, preliminary injunction which is

18  clear and this is going to be the problem and were obtained after

19  the entry of the preliminary injunction which appears to be the

20  case given D'Souza's departure from I.M.I. in 2006. These funds

21  are exempt from the asset freeze and are available to pay

22  D'Souza's attorney.

23  THE COURT:  All right.

24  MR. MADIGAN:  Now they add in there it should be the

25  entire period from December 31, '06 to the present because we

**Page 88**

1  had --

2  THE COURT:  Do you agree with that, Mr. Arenson and Ms.

3  Robbins? I'm looking at the response you have here and I'm

4  trying to see if there's any issue with Mr. Marc D'Souza on it.

5  Do you agree with that? Do you agree with the representations

6  being made by Mr. Madigan?

7  MR. ARENSON:  Your Honor, let me just speak to that

8  briefly. I think the confusion there is the confusion about the

9  asset freeze itself. This actually applies to all the

10  defendants. What the asset freeze says is any money earned after

11  the date of the preliminary injunction forward that is not tied

12  to illegal conduct is theirs to keep and use as they want and the

13  answer to all of these issues is that Mr. Jain and Ms. Ross are

14  free to go seek employment and get a job and pay for their own

15  lawyers. Not use the funds that they stole from consumers to pay

16  their lawyers.

17  THE COURT:  But precisely on Mr. Madigan's point that

18  there doesn't appear to be any dispute of Mr. Marc D'Souza's

19  departure from Innovative Marketing in 2006 and so Mr. Madigan's

20  point is as to there's an agreement as to a date certain. After

21  which, you're not seeking to freeze any assets which have been

22  procured after that date. Is that correct?

23  MS. ROBBINS:  Well, I think we just need to clarify

24  something though. First of all, up until the end of 2006, I.M.I.

25  had made over $74 million. So Marc D'Souza is responsible for

1  the $74 million. They're jointly and severally liable. So to
2  the extent that he has assets that are more than $74 million, up
3  to $74 million should be frozen because he is jointly and
4  severally liable for that amount from the time that he was in
5  that business and he was in the business until the end of 2006
6  and the profit and loss statement that was submitted to the Court
7  from the Canadian pleadings in Exhibit 3, Volume 3, page 213
8  clearly states that I.M.I. made over $74 million until the end of
9  2006. So because the defendants are jointly and severally
10  liable, he is responsible for that amount of money.
11        THE COURT:    All right.
12        MR. MADIGAN:    May I say, you know, I've heard about
13  this Canadian litigation. There is a two-year litigation in
14  which numerous pleadings were filed with these people suing each
15  other with regard to who owed what for perfectly legitimate
16  business, nonlegitimate business. They were not part of a
17  corporation. They were, the two of them had -- my client had
18  never even met the other two until '06 and met them one time.
19  You had -- as Your Honor is going to hear all of this ultimately.
20  You had these individuals doing all this. And the Court in that
21  case after receiving the brief, struck the briefs because there
22  were so many arguments of counsel, the same arguments that Your
23  Honor routinely instructs the jury is not evidence. Now the fact
24  that Mr. D'Souza is by their own admission had nothing whatsoever
25  to do with whatever they want to call the corporation or the

89

1  activity, in '07 and '08 which just happened to be the periods
2  that they allege all the activities in the complaint, they cannot
3  come back and say oh, well, you know, that money is not tainted.
4  But by the way, since we could hypothetically get him, hold him
5  to 500 million, let's freeze all 500 million. Let's make sure he
6  doesn't have a lawyer and he can't defend this case which I
7  believe Your Honor this is all about.
8        THE COURT:    Well, you would agree, Mr. Madigan, that in
9  the context of this case, there is no Sixth Amendment right to
10  counsel in this case. It relates to your client's Sixth
11  Amendment rights in other cases impacted by this case in the
12  freezing of assets.
13        MR. MADIGAN:    Yes. I take the same position as my
14  co-counsel.
15        THE COURT:    But you agree that there's no Sixth
16  Amendment issue in this case. The context of the Fifth Amendment
17  issue is in, with respect to the criminal case in Chicago, an
18  alleged chilling effect on your client's ability to retain
19  counsel of his choosing because of a freeze order entered in this
20  case.
21        MR. MADIGAN:    Right. My position is that you cannot
22  freeze -- I mean this is still the United States of America. You
23  cannot freeze as a government or freeze a man's assets to prevent
24  him from defending himself based upon a piece of paper that is
25  filed in a civil proceeding, not by my client, who had nothing to

90

1  do with it. A piece of paper actually by the people that he was
2  suing and they were suing him in a fight over money. And to say
3  that we'll freeze -- why don't you freeze $200 million and make
4  sure he could never have a dime to defend himself? No. The law
5  is that they have to make some showing and with respect to the
6  two-year period where he wasn't there, it's impossible. They
7  have to have some showing that he had some involvement in illegal
8  activities during that period of time.
9        Now in addition to that, I want to draw your attention
10  to the recent Supreme Court Ashcroft case with respect to that.
11  That conclusory statement --
12        THE COURT:    You're not talking about the Fourth Circuit
13  Ashcroft case that I cited. There's a recent Ashcroft case.
14  What is the cite of that case? It's the second time you've
15  mentioned that. I want to make sure I read that. The recent
16  Supreme Court case. In fact I have it right here.
17        MR. MADIGAN:    We're saying in addition to the period of
18  '07 and '08, that in addition to that, in order to freeze a man's
19  assets and prevent him from defending himself in our country, you
20  have got to make some showing that these assets are taken. You
21  can't just throw out some number. You have to present some
22  evidence that there is a connection to taint during this period
23  of time. And this business, as Your Honor will learn later, the
24  vast majority of it took place outside of the United States. The
25  FTC has no jurisdiction outside of the United States. As counsel

91

1  referred to and a large portion of what we're talking about here
2  is all outside the United States. They have made no effort
3  whatsoever in coming in here to show the Court any evidence that
4  tied specific amounts of moneys to activity in United States.
5  They can't just throw out a large figure like they continually do
6  and say well, that's the amount of damage.
7        THE COURT:    What assets have been frozen in this case
8  as to your client thus far?
9        MR. MADIGAN:    Marc D'Souza filed the financial
10  statement that we've been talking about earlier. And the way we
11  read the order, it freezes the assets up to that period of time.
12  It's this debate that I was referring to when they try to tie it
13  to the date of the preliminary injunction and not the two years
14  earlier when they admit that they have no evidence whatsoever
15  that Mr. D'Souza had any connection to anybody during that period
16  of time.
17        THE COURT:    Well, I'm trying to clarify, as we speak
18  right now, what is the status of any freezing of any assets of
19  your client? What assets of your client have been frozen? Have
20  any assets been frozen?
21        MR. MADIGAN:    Well, I'm not sure that I'm following,
22  Your Honor. We're subject to the order.
23        THE COURT:    Right. And I guess my question is is that
24  what is the status of his assets? How many accounts are we
25  talking about?

92

1    MR. MADIGAN:   Your Honor, I can address that. He did
2  submit some of his assets to the FTC. He had about five or six
3  accounts. I think total amount of money was four or five million
4  dollars in the personal account. So although Marc D'Souza is
5  under an obligation not to spend that money, each of those banks
6  as it is with Sam Jain and Kristy Ross in fact have refused to
7  honor this Court's asset freeze and they are free to walk into
8  those banks at any time and take their money out.
9    THE COURT:   These are foreign bank accounts.
10   MR. MADIGAN:   They are, Your Honor.
11   MR. RASMUSSEN:   We are not taking advantage of that --
12   MR. MADIGAN:   And our client is not in the United
13 States, does not live in the United States and never lived in the
14 United States and neither does Maurice, his father, as you will
15 hear. This is not somebody who has fled somewhere. These people
16 conducted these activities outside of the United States. A lot
17 of the transactions were in Bahrain, in Singapore. They were not
18 in the United States and the FTC who only has jurisdiction in the
19 United States has shown the Court nothing with regard to
20 connecting a specific figure that they want frozen to some
21 alleged tainted monetary activity.
22   THE COURT:   All right. Thank you, Mr. Madigan.
23   MR. MADIGAN:   And we think they do.
24   THE COURT:   Thank you, Mr. Madigan. Mr. Webb, will be
25 glad to hear from you.

93

1  deny someone their Sixth Amendment right to counsel in a criminal
2  case because all they have to do is the FTC can file a complaint,
3  allege anything they want. They can plead a billion dollars
4  here. All they got to do is put it on paper and everything is
5  frozen and that defendant cannot hire a lawyer at all. Now that
6  cannot be the law in America. In fact what I think the cases
7  say, if there was no parallel criminal proceeding, then the
8  government, the FTC under the case law, some of which you read
9  off, has the right to go out and basically seize assets so that
10 they have a fund to help victims later on. Essentially can do
11 that. Okay. When you bring in a criminal case, you bring in a
12 constitutional right. The Sixth Amendment to counsel. And what
13 the government is saying is even though they understand the Sixth
14 Amendment right to counsel, they don't have to modify their
15 conduct. They can freeze every asset the defendant has, deprive
16 them of right to counsel and it's okay. You just heard Mr.
17 Arenson say, she can wait tables and if she just earns enough
18 money, she can pay me or pay Ms. Derwin who's here in the
19 courtroom who is her criminal counsel. That's not the law, Your
20 Honor. What the law is that if there's a right to -- if
21 there's a criminal case and therefore, the Sixth Amendment right
22 to counsel comes up, the government has to go forward with some
23 showing that her assets, all of her assets are connected to the
24 wrongdoing. We need to have some kind of evidentiary hearing
25 here. Because without that, if you just deny this motion right

95

1    MR. WEBB:   Yes. I'm going to be brief.
2    THE COURT:   All right.
3    MR. WEBB:   I can probably -- but it is a critical
4  issue. Okay. And I'm just not going to minimize. I got Kristy
5  Ross. Just bear with me, Your Honor.
6    THE COURT:   Mr. Webb, I don't think I've ever heard of
7  a lawyer in any case involving the bank accounts of their client
8  to have indicated that it was not a critical issue. I think this
9  is probably the most acute issue that lawyers always address in
10 these kinds of matters, both civil and criminal.
11   MR. WEBB:   Fair enough. I agree. But I'm going to be
12 concise because you've heard the arguments and you'll make a
13 decision. My point is as follows. Kristy Ross. The freeze
14 order freezes everything she has. Every asset she has as of the
15 date of the P.I., every single asset she has and I told her that
16 she cannot -- that's number one. Number two, she is under
17 criminal investigation and is going to be indicted in Chicago and
18 has lawyers working for her right now, not me. Okay. But she
19 has a Sixth Amendment right to counsel in that criminal case and
20 no one can deny that. That's point two. Point three. I told
21 her she cannot use any assets that she has as of the date of the
22 P.I. to pay her lawyers in the criminal case even though the
23 assets have nothing to do with any wrongdoing. She can't do it.
24 Everything she owns is frozen. I went and looked to see if I
25 could find a case. That means the government has the power to

94

1  now and she can't use her assets at all to hire a lawyer in a
2  criminal case, then she is being deprived of her right to counsel
3  and that can't be the law and I don't think it is the law. Thank
4  you.
5    THE COURT:   All right. Thank you very much, Mr. Webb.
6  Do you want to be heard on this, Mr. Wood, any further on this?
7    MR. WOOD:   Briefly, Your Honor.
8    THE COURT:   All right.
9    MR. WOOD:   To the Sixth Amendment point, Your Honor,
10 the FTC has sent a notice to Mr. Jain's criminal counsel that the
11 money in their client trust fund for Mr. Jain that has not been
12 spent is frozen and so the Sixth Amendment threat here is very
13 real. It's not speculative at all.
14   THE COURT:   All right. Ms. Robbins, I'll be glad to
15 hear from you.
16   (The court reporter conferred with the Court:)
17   THE COURT:   All right. Counsel, the Court staff has
18 requested that we take a ten-minute recess. We're going to take
19 a ten-minute recess and then we're going to continue to plow
20 through this. I suspect that we're probably going to go until
21 5:30 or quarter to 6. We'll take a ten-minute recess. We'll try
22 to start as promptly as we can in ten minutes.
23   (Recess.)
24   THE COURT:   All right. Ms. Robbins, will be glad to
25 hear from you.

96

1       MR. MADIGAN:   Your Honor, I found the slip opinion.

2       THE COURT:   Okay.  Yes.  Certainly, Mr. Madigan.

3  Thank you very much.

4       MR. MADIGAN:   Apparently, it's not printed yet.  But

5  it's May of this year.

6       THE COURT:   This is the Ashcroft v. Epol case?

7       MR. MADIGAN:   Yes.

8       THE COURT:   The May 18, 2009 opinion.  Yes.  I'm

9  familiar with this.  A little bit higher standard under Rule 8A

10  in terms of pleading.  Correct?  Isn't that essentially what it's

11  saying?  I mean as I recall it, it's got to raise a right to

12  relief above the speculative level and the matter of the

13  plausibility standard under Twombley was explained in a little

14  more detail.

15       MR. MADIGAN:   And it specifically talks about

16  conclusory statements like the ones we've found in the FTC

17  complaint being not enough.

18       THE COURT:   Yes.

19       MR. ARENSON:   And for the record, we are going to

20  forcefully address this in our --

21       THE COURT:   Oh, absolutely.  Yeah.  We're going to

22  address this.  Okay.  All right.  Thank you very much,

23  Mr. Madigan.  Go right ahead, Ms. Robbins, if we can on this, the

24  issue of the freezing of accounts.

25       MS. ROBBINS:   Okay.  So, Your Honor, I just want to be

97

---

1  clear that in the P.I., the asset freeze provision does not cover

2  after acquired assets and I just want to make that perfectly

3  clear.  Now the Court at the P.I. stage found that the FTC and at

4  the TRO stage found that the FTC was likely to succeed on the

5  merits based on the volumes and volumes of exhibits that the FTC

6  submitted and that this is a restitution case.  That there are

7  over one million consumer victims and that gives this Court the

8  authority to freeze the defendants' assets.  We know from the

9  profit and loss statement that I referred to earlier in Volume 3,

10  that was prepared by Sam Jain, the company CEO, in a Canadian

11  litigation where they were fighting over the profits from I.M.I.

12  That was the basis of the litigation, was fighting over who gets

13  that money from I.M.I. and in that litigation, the CEO submitted

14  a profit and loss statement that they made over $74 million.  Any

15  number above that, the FTC doesn't know because the defendants

16  have refused to give us any more information.

17       THE COURT:   Well, let me ask you this, Ms. Robbins.

18  The key language in the asset freeze is with respect to assets

19  that are derived resulting from the conduct prohibited in

20  paragraphs 1 and 2.  Correct?  That's the key phrase, is it not?

21       MS. ROBBINS:   Yes.  But I'm also referring to paragraph

22  F --

23       THE COURT:   Yes.

24       MS. ROBBINS:   -- which says that assets acquired after

25  the effective date of this order that are derived.  Absolutely.

98

---

1       THE COURT:   Yes.

2       MS. ROBBINS:   That's absolutely right.

3       THE COURT:   And you would acknowledge that there are

4  Sixth Amendment, that because of what appears to be -- well,

5  apart from whether or not the defendants have been indicted,

6  counsel for the Defendant Jain, the Defendant Ross and the

7  Defendant Marc D'Souza have clearly represented that they've all

8  been advised that their clients are going to be indicted by a

9  federal grand jury in the United States District Court for the

10  Northern District of Illinois and that is the indication they've

11  made.  So there is definitely a Sixth Amendment issue the Court

12  has to address here, is there not?

13       MS. ROBBINS:   Your Honor, as the Kaplan case said, the

14  right to counsel of choice belongs only to those with legitimate

15  assets.  As of right now --

16       THE COURT:   And does not the matter of the legitimate

17  assets require a factual finding by the Court?

18       MS. ROBBINS:   Well, Your Honor, we have submitted

19  evidence to the Court that the defendants have made in excess of

20  $74 million.  The defendants have submitted no affidavits, no

21  evidence of any kind.

22       THE COURT:   I understand.  But my point is is that does

23  this not require some determination of whether or not assets are

24  derived from certain conduct.  For example, it may or may not be

25  that the defendants present evidence of an inheritance on the

99

---

1  part of one of these defendants.  It may be that there's a

2  subsequent, a job unrelated to Innovative Marketing,

3  Incorporated.  There may or may not be assets.  Does not in terms

4  of the importance of this issue does not require some factual

5  finding by me because Mr. Webb has suggested the need for perhaps

6  an evidentiary hearing on this point?

7       MS. ROBBINS:   Well, Your Honor, that's correct.  But

8  they have to submit evidence showing that they have the need.

9  They have to submit evidence that they don't have access to

10  non-frozen funds.  They have to submit evidence that they don't

11  have a job that they can actually afford to pay their attorneys

12  now.  And to be clear, as the Court points out, there is no right

13  to an attorney in a civil case.  No constitutional right to an

14  attorney in a civil case and courts frequently deny defendants

15  the asset freeze money to pay for those civil attorneys and in

16  this case, number one --

17       THE COURT:   Well, again, but that's a separate issue.

18  The issue is here, the issue is here before the Court strictly

19  because of the fact that there is a certainty -- when the

20  preliminary injunction was entered in December, there was an

21  indication of some criminal investigation.  It wasn't clear to

22  me -- I had no doubt there was a criminal investigation.  I had

23  no doubt there would be.  And Mr. Arenson I think aptly noted

24  there was reference to a search, execution of a search warrant.

25  But the question is the extent of the criminal investigation.

100

And now that we know the extent of it and the need to determine
whether or not it's derived from unlawful activity or not,
there's a Sixth Amendment issue here because of the criminal
case. It seems to me that there's some factual findings I need
to make and the record is really not complete before me to make
those findings.

MS. ROBBINS: Absolutely right. The defendants have
submitted no evidence that they do not have access to non-frozen
funds. They have submitted no evidence that they have not gotten
out and gotten a job and can afford to pay their attorneys now.

THE COURT: Well, it's bigger than that. It also has
to be evidence I have to address in terms of whether frozen funds
include other assets or whether these assets are derived from the
conduct prohibited in the preliminary injunction.

MS. ROBBINS: And those are the very documents, the
corporate documents that they have refused to turn over to us.

THE COURT: Well, perhaps they'll be more anxious to
turn them over now if we have to schedule an evidentiary hearing
on this point.

MS. ROBBINS: That's correct. And I'd like to just
point out as to Marc D'Souza, that he has said on his financials
that he is making $1.2 million a year right now from an exempt
business. That is not covered by the asset freeze and he even
said in his papers that this is not an issue of monetary need.
That he just doesn't want to spend his own money. And he should

not be allowed to spend consumers' money, money that was
ill-gotten when he is already making $1.2 million a year.

And, Your Honor, I would just like to point out as the
Court did in the Kemp case that the FTC is not required to trace
at the preliminary injunction stage and that the very idea that
the defendants have not -- we cannot trace because the defendants
have deprived us of any documents allowing us to do so. And just
to point out in the U.S., we have frozen $174,000. We don't have
any idea how much money that the defendants have because they
have not given us any indication and but what we do know is we
have in excess of $74 million in consumer redress.

THE COURT: So the sum total of assets frozen in the
United States right now is $174,000.

MS. ROBBINS: That's correct.

THE COURT: And no compliance by any bank outside of
the United States on a freeze order.

MS. ROBBINS: That's correct.

THE COURT: Okay. Well, thank you very much,
Ms. Robbins. Thank you very much. I'll be glad to hear from
you, Mr. Madigan --

MS. ROBBINS: Oh, and actually, you know what? I'm
sorry. I would like to address the foreign --

THE COURT: Yes. Go right ahead.

MS. ROBBINS: -- victim, foreign consumer because that
was raised.

THE COURT: Go ahead.

MS. ROBBINS: And I'd just like to note that the FTC
Act under the safe web amendments allows the FTC to redress
foreign victims and also allows the FTC to redress victims in the
U.S. caused by foreign entities. And in this case and we've
submitted this in one of our pleadings, there was a document that
was attached to Defendant Sundin's affidavit that states that 59%
of I.M.I. sales was derived from the United States. So --

THE COURT: I don't have any about the impact in the
United States, Ms. Robbins.

MS. ROBBINS: And I would just also like to point out
that the I.M.I. as the Court found at the P.I. stage is a common
enterprise and part of that common enterprise is based in the
U.S. in Ohio and that's ByteHosting.

THE COURT: All right. Thank you very much, Ms.
Robbins. Will be glad to hear from any counsel in rebuttal on
this.

MR. WEBB: I'm going to be very brief. I just want to
make two quick points because Your Honor just asked counsel two
questions which were the right questions. You asked counsel
right now to the government would you at least agree with me that
there's a Sixth Amendment right to counsel that we have to deal
with now because of the criminal case. She didn't answer that
question. The answer is yes. I don't see -- that's like saying
Red China doesn't exist. Okay. I mean it exists. There's a

criminal case in Chicago. My client is going to be indicted. My
client needs lawyers now --

THE COURT: I think you might be dating yourself, Mr.
Webb. We don't refer to China anymore as Red China.

MR. WEBB: I know. I go back -- I'm old.

THE COURT: We refer to Red Korea in light of the last
two or three days. I don't think we call China Red China
anymore.

MR. WEBB: I always wondered why we said it didn't
exist when as a kid, I could see it on the map. So it looked
like it was there. But that's the first question counsel didn't
answer and the answer is obviously yes. The second question is
don't you need an evidentiary hearing before you allow the
government to freeze all of the assets of Kristy Ross and counsel
didn't even answer that question which is the answer is yes.
Here's what I heard counsel say and I'd like to focus on this.
Counsel said that there's a profit and loss statement that they
have showing through 2006 that I.M.I. had total profits of $74
million and the government alleges every penny of that is tainted
illegal gotten gains. Okay. But neither counsel say, but we
can't prove that unless Kristy Ross gives us the security
software or we can't prove that unless we get the corporate
documents. I want an evidentiary hearing. I want to know what
if -- according to Your Honor and that they filed a P.I. in which
they now have a substantial likelihood to succeed on the merits.

1  I don't think they've even tested the security software to show
2  that the software doesn't do what it's supposed to do. That's
3  what I say on information and belief. I could be wrong. We come
4  to an evidentiary hearing and I could find that I'm wrong and I'd
5  admit it. But I don't think they have. I don't think they have
6  the evidence that a fraud has occurred here and yet, they want to
7  freeze every asset my client has. All I respectfully ask is a
8  fair evidentiary hearing. I want to know what their evidence is.
9  Not what they want to get from Kristy Ross. What is their
10  evidence today that that $74 million is all ill-gotten gains.
11  That would be a starting point of a evidentiary hearing to at
12  least have a factual record to prove that my client, all of her
13  assets should be frozen and she can't hire a lawyer --
14      THE COURT:  Well, I agree with you, Mr. Webb, that we
15  may need an evidentiary hearing in terms of what assets are to be
16  frozen, what assets are not. We're not going to have a mini
17  preliminary examination on the matter of the allegations of the
18  government. There's nothing I've heard that causes me to change
19  my view that there is a strong likelihood of success in this
20  courthouse before this jury and this courtroom and I believe
21  there's a strong likelihood of success on the part of the
22  government and so there's nothing that causes me to change my
23  view having issued the preliminary injunction. But I am
24  concerned with respect to trying to identify what assets we're
25  talking about and you've certainly struck a nerve with me with

105

1  respect to the matter of now freezing all assets until we try to
2  allocate some analysis here of what assets we're talking about to
3  be frozen.
4      MR. WEBB:  Fair enough.
5      THE COURT:  Mr. Madigan, anything further on this?
6  Apparently, again in an evidentiary hearing we'll have to
7  determine assets of your client and also not only that, but in
8  terms of the effect on present assets that are apparently gained
9  independent of any activity with Innovative Marketing,
10  Incorporated and that will have to await a hearing it seems to
11  me.
12      MR. MADIGAN:  Just to echo what Mr. Webb said. The
13  government is telling you that they throw out this $74 million
14  figure that they picked out of one piece of paper filed in a
15  two-year civil proceeding where people are cross-examined and
16  affidavits were submitted and now they're saying that they want
17  our clients to come in and prove up the fraud. That's what
18  they're saying. They at the evidentiary hearing have the burden
19  of making some showing, some showing if not prima facie, some
20  showing to connect the $74 million figure. Now they've used
21  about 18 figures. But let's take 74 --
22      THE COURT:  Actually, the Fourth Circuit law says that
23  they do not have to make it traceable to the proceeds of profits.
24  And I'm going to give everyone an opportunity to address it. The
25  Fourth Circuit has specifically -- from what I can tell,

106

1  Mr. Madigan, the Fourth Circuit has rejected that argument. The
2  Fourth Circuit has specifically said in the context of a
3  preliminary injunction, freezing assets to preserve the status
4  quo, the freezing of funds may be proper without respect to
5  whether these moneys are traceable. But that is in the context
6  of a pure civil action. It remains to be seen the overlay of the
7  criminal case in Chicago. There's clear Fourth Circuit authority
8  that says the Federal Trade Commission can do exactly as it
9  suggested here to freeze assets to create a fund for injured
10  members of the public. The problem here is that it's
11  overlaying the Sixth Amendment right to counsel in Chicago.
12      MR. MADIGAN:  That's right. And I think there's also
13  they have to make some showing. They can't just pick it out of
14  the air.
15      THE COURT:  Well, I mean you're getting to the matter of
16  the figure. You're getting to the matter of the figure. But the
17  point is is that the Fourth Circuit has held that the freezing of
18  the assets is to preserve the status quo and it may be proper
19  without respect to whether these moneys are traceable to the
20  proceeds or profits or income from the proceeds in terms of any
21  wrongdoing. That's Fourth Circuit law in the civil context.
22      MR. MADIGAN:  And I'll sit down, but the last thing I
23  have to say is to come back. They're doing a complete circle.
24  The two years where our client, Mr. D'Souza, had nothing
25  whatsoever to do with this business and yet, under the literal

107

1  reading of the order which we would like modified says not when
2  he left which is January 1, '07. But at the time of the signing
3  of the order which is two years later when he couldn't have had
4  anything to do with it and they admit that he didn't have
5  anything to do with it. So with that caveat, so to speak, for
6  our client, that's what we would --
7      THE COURT:  All right. Thank you very much,
8  Mr. Madigan. Anything further you want to add on this, Mr. Wood?
9      MR. WOOD:  I don't have anything --
10      THE COURT:  All right. Thank you. With respect to
11  this, the pending motion, paper number 58, as well as a portion
12  of paper number 71 as well as the oral joinder of the motion by
13  Mr. Wood on behalf of the defendant, Kristy Ross, here in court,
14  the Court is going to withhold ruling on that. I'm going to deal
15  with a scheduling matter in a few moments with counsel on this
16  because of the need for an evidentiary record and I'll come back
17  to you all on this.
18      We're in Category 5 of the six categories to be
19  addressed today. The next category is the motion to dismiss for
20  failure to join a necessary and indispensable party. There are
21  three motions here. The motion of Sam Jain to dismiss under
22  12(b)(7) and (19), paper number 60. The motion of Kristy Ross to
23  dismiss under 12(b)(7) and 19, paper number 61. And the motion
24  of Marc D'Souza, paper number 70. The defendants here seek a
25  complete dismissal of the case and the arguments proceed in two

108

parts. Basically, first that Innovative Marketing, Incorporated
was never properly served in this case. It seems to me if I find
that Innovative Marketing was served, then the Inquiry stops
right there and then second, that Innovative Marketing, Inc. is a
necessary and indispensable party. Just to cut to the core of
this, the government has not disputed that Innovative Marketing,
Incorporated is a necessary and indispensable party. Correct?
The government's position is yes, they are an indispensable
party. You don't dispute that and you're saying they've been
served. Correct?

MS. ROBBINS:   Absolutely.

THE COURT:   All right. So the Court doesn't need to
address that. Innovative Marketing, Inc. is a necessary and
indispensable party. And so we don't need to go into the
language that I've previously utilized in a 2007 opinion because
there's no dispute over it. The question becomes the matter of
the service of process of Innovative Marketing, Incorporated.
And the simple question here is the matter of the service. And
essentially, the government's position is is that the government
need comply with international law under the Hague Convention
with respect to the service of process by a private process
server and that's permitted. That's essentially the argument of
the government. Correct?

MS. ROBBINS:   That's permitted under the Hague
Convention.

THE COURT:   Yes. So you're not trying to say there's
been compliance with law within the United States under the
federal rules because you can comply with international law in
terms of how you serve a corporation headquartered outside of the
United States.

MS. ROBBINS:   That's correct. Under 4F because they
are part of an international agreement under the Hague
Convention, we followed the Hague -- there is no reservation.
And serving by a private process server is allowed and that's
what we --

THE COURT:   All right. Thank you. I'll be glad to
hear from you, Mr. Wood or Mr. Webb or Mr. Madigan. Whoever
wants to go forth on this in terms of the attack of the service
of process on Innovative Marketing, Incorporated.

MR. WOOD:   Thank you, Your Honor. And I'll be brief.

THE COURT:   All right.

MR. WOOD:   As you know the factual basis for this
motion has evolved substantially from its initial filing. The
FTC has effectively conceded that its initial service attempt on
I.M.I. was insufficient through I.M.I.'s attorneys' private
investigator and then re-attempted service a month later down in
Belize through I.M.I.'s registered agents. The FTC didn't inform
the Court or the defendants this second service attempt and so
that was not addressed in Jain's opening motions. And the FTC
still at the point of Jain's reply brief had refused to file that

amended proof of service. It's done so now and so I think the
sole legal issue for determination here is whether that
January 6th service attempt in Belize was effective under Federal
Rule 4F to join I.M.I.'s --

THE COURT:   Does not Rule 4F of the Federal Rules of
Civil Procedure specifically provide that unless federal law
provides otherwise, an individual other than a minor and
incompetent person or persons whose waiver has been filed may be
served at a place not within any judicial district of the United
States by any internationally agreed means of service that is
reasonably calculated to give notice such as those authorized by
the Hague Convention on the service abroad of judicial and
extrajudicial documents?

MR. WOOD:   It does, Your Honor. And the record here
confuses more than clarifies the issue of whether Belize is a
party to the Hague Convention. And the FTC after initially
claiming that the Hague Convention did not apply to Belize now
concludes and apparently with the concurrence of the U.S. State
Department that Belize is in fact a party to the convention and
that service was effective under Rule 4F1. However, at the same
time, the FTC concedes that the official Hague Conference
Registry does not list Belize as a contracting state and so
argues alternatively that if the Hague Convention does not apply,
I.M.I. was served in accordance with Belizean law and thus
effectively under Rule 4F2. But to reach that conclusion, the

FTC had to bury evidence that Belize and the U.S. had agreed that
international service would proceed through the designated
central authority, which is common for states that accede to the
Hague Convention, but object, Your Honor, to Article 10. The FTC
doesn't dispute that the Belizean authorities gave that
instruction or that U.S. authorities received and acknowledged
it. Instead it asserts only that the State Department Office of
Treaty Affairs does not have a record of that instruction. And
based on that, the FTC had the state department remove reference
to the instruction from its website and then discounts that
evidence as now defunct. But directing the state department to
remove the evidence doesn't affect whether Belize gave that
reference instruction in the first instance and it doesn't
alleviate more importantly the sovereignty and comity concern
that require that Rule 4F2 apply only when Rule 4F1 does not.
And so the bottom line, Your Honor, is that the record I think is
sort of hopelessly unclear as to whether I.M.I. has been served
effectively. And though the defendants bear the ultimate burden
on this motion of proving a failure to join a necessary and
indispensable party where service is contested as part of that
motion to dismiss, the FTC actually bears that initial burden of
proving effective service on I.M.I. and with all of the confusion
and directly contradictory and mutually exclusive theories of
service here, I don't think it can be said that the FTC has
carried that burden and so that's --

1      THE COURT:   Thank you, Mr. Wood. Anything further you
2  want to add, Mr. Webb or Mr. Madigan, on this point?
3      MR. WEBB:   No.
4      THE COURT:   All right. The Court finds that this
5  motion is without merit and will be denied, the motion to dismiss
6  or failure to join a necessary and indispensable party. All
7  counsel, both for the government and defendants agree that
8  Innovative Marketing, Incorporated is a necessary and
9  indispensable party. With respect to the issue of service of
10  process, the Court finds that I.M.I., Innovative Marketing,
11  Incorporated has been properly served in this case. And so paper
12  numbers 60, 61 and 70 will be denied for these reasons. The
13  government has provided sufficient evidence here to note that
14  under Rule 4, there was proper service effectuated in Belize.
15  The Court notes that with respect to the applicability of Rule
16  4F1 of the Federal Rules of Civil Procedure that under the Hague
17  Convention, service of process by private process server was
18  permitted in 1980. The United Kingdom stated in a letter to the
19  prominent bureau of the Hague Conference on private international
20  law that under the Hague Convention, a person may effectuate
21  service directly, i.e., not through a central government
22  authority, but through a competent person other than a judicial
23  officer or official. The evidence before the Court is that
24  Belize adopted this statement in its 1982 letter and I've noted
25  the affidavit submitted by April D. Haines of the state

113

1  department indicating that there have been no subsequent
2  communications from Belize about this issue. The provisions of
3  4F1 apply. There was sufficient service of process based on the
4  record in this case. And so those motions will be denied and
5  there has been effective service of process upon Innovative
6  Marketing, Incorporated. And Innovative Marketing, Incorporated
7  is a necessary and indispensable party and is in this litigation.
8      So the next issue to address though, I think the last
9  motion is a motion to dismiss for lack of personal jurisdiction
10  and that is a motion of the defendant, Maurice D'Souza, the
11  father of the defendant, Marc D'Souza, and Mr. Rasmussen,
12  obviously, we've saved the best until last. So it's nice to have
13  you here and you now get an opportunity to address the Court.
14      MR. RASMUSSEN:   Thank you, Your Honor.
15      THE COURT:   Thank you.
16      MR. RASMUSSEN:   Although Maurice D'Souza is only a
17  relief defendant, not alleged to be a wrongdoer himself, there
18  still needs to be personal jurisdiction over him. Although I
19  don't think the FTC has contested the point, I did want to give
20  you one cite to make very clear that we didn't have in our brief,
21  but I think it would be helpful to know. Just have a cite that
22  personal jurisdiction is indeed required for a relief defendant.
23  And that case is CFTC v. IBS, Inc., 113 F.Sup. 2nd. 830, which is
24  in the Western District of North Carolina. That was affirmed on
25  other grounds by the Fourth Circuit. I don't have the Fourth

114

1  Circuit cite, but it was --
2      THE COURT:   What year is that?
3      MR. RASMUSSEN:   That was 2000, Your Honor.
4      THE COURT:   All right. Thank you.
5      MR. RASMUSSEN:   There is an issue on subject matter
6  jurisdiction. Because it's a relief defendant, you don't always
7  need subject matter jurisdictions. But the court is clear you do
8  need personal jurisdiction. So the issue is then have they
9  alleged personal jurisdiction adequately with or without the
10  Ashcroft higher standard for our allegation. I don't think
11  they've alleged either with or without Ashcroft.
12      There are two ways you can have personal jurisdiction
13  as we all know. One is general jurisdiction which means that the
14  defendant, the relief defendant has to have enough presence in
15  the district from offices or paying taxes or being a registered
16  agent. None of that applies here. And indeed, I would point out
17  in another case that we didn't put in our brief, but I think it's
18  very important. A Fourth Circuit case, 1997, ESAB Group at 126
19  F.3rd. 617. That's 126 F.3rd. 617, Fourth Circuit, which said
20  that and as I read the Fourth Circuit cases this weekend on
21  personal jurisdiction, the court is quite strict on personal
22  jurisdiction both in terms of general jurisdiction and specific.
23  In fact, surprisingly strict. The ESAB Group is an example. It
24  says that it quotes Moore. It says threshold contacts must be
25  substantial indeed before there can be general jurisdiction. And

115

1  that case, Your Honor, involved a foreign corporation, a New
2  Hampshire corporation formed there with South Carolina. The New
3  Hampshire Corporation had customers in South Carolina and it
4  advertised in South Carolina. But it was a mail order company.
5  So it wasn't actually present in the state except that it had
6  customers there from its mail order and it did advertise. And
7  the Fourth Circuit said that wasn't enough for general
8  jurisdiction. The allegations with respect to Maurice D'Souza
9  are much less than that. As I understand the allegations, they
10  are that he has a bank account in Hawaii, a $50,000 bank account
11  in Hawaii, a personal bank account. But we know from the
12  American Express case which is the First Circuit case we did cite
13  in our brief, that that's not enough. And that some of the
14  corporations in which he is a shareholder have listed clients in
15  the United States. But that's one step removed from actually
16  having contacts, having customers in the United States which the
17  Fourth Circuit said in ESAB was not enough showing. So I don't
18  think there's enough basis for general jurisdiction.
19      The other way you can get personal jurisdiction, of
20  course, is specific jurisdiction. Even if someone is outside the
21  jurisdiction, if you purposely directs activity into the district,
22  hurt someone in the district, then there can be specific
23  jurisdiction. But the Fourth Circuit recently spoke to this
24  issue as well in another case which we didn't put in our brief,
25  but probably should have and I'll give you the cite for that as

116

---

**Page 117**

1  well.  That was last March by the Fourth Circuit in Consulting
2  Engineers, which is 561 F.3rd. 273, at 280.  And it says a couple
3  of things that are very interesting in that case.  It says, first
4  of all, that the effects test does not supplant the minimum
5  contacts analysis, but rather informs it and that there still
6  must be minimal contacts within the jurisdiction even if you are
7  directing some activity into the United States.  For the purposes
8  of this case, United States is the relevant jurisdiction because
9  the FTC has nationwide service of process.  But there's no
10  allegation that Maurice D'Souza directed anything into the United
11  States and --
12          THE COURT:   What about the transfer of $18 million from
13  I.M.I. revenues that were transferred to your client allegedly?
14          MR. RASMUSSEN:   No allegation that that transfer took
15  place in the United States and I don't think there can be any
16  allegation that that happened in the United States because it
17  didn't.  What happened, Your Honor, is that he -- Maurice
18  D'Souza's business is a merchant account processer.  He has other
19  clients besides his son.  But his business, he's in Singapore and
20  he has relationships with banks in both Bahrain and Singapore in
21  which he's like an insurance broker in insurance.  He puts
22  together clients with banks.  So that if they have credit card
23  authorizations, he packages them, gives them to the bank.  If the
24  bank is willing to take them, pays a fee to the bank and the bank
25  puts it into the electronic system to go through.  If it's the

---

**Page 118**

1  Bahrain bank may send it to Citicorp in the United States if it's
2  a United States customer.  If the United States customer gets his
3  credit card bill, sees it on there.  If he objects, then the
4  Citicorp Bank will say no, it's not valid and send it back and
5  will pay it.  So Maurice D'Souza is not collecting any money in
6  the United States.  All he is doing is offering a service which
7  many small businesses need, which is compiling the already
8  authorized credit card receipts and these were receipts from all
9  across the world.  He had no idea what they were from, what
10  countries they were from.  He simply did the brokerage.  He
11  simply arranged and found the banks that were willing to process
12  the credit card applications, negotiated the terms of that deal
13  and did it.  Now that's passive -- I mean it's not even really
14  receipt of money.  It's providing a service.  Much like a lawyer
15  or other some service provider in Bahrain providing a service to
16  a company.  And yes, he's a relative of Marc D'Souza who is
17  accused of much more.  But, you know, we have that Kirschenbaum
18  case, Your Honor, in which the government brought a case against
19  the husband.  The husband said well -- and then it tried to go
20  after the wife because they said the wife had some of the money
21  and the court said I think it was the Seventh Circuit, it was the
22  Seventh Circuit said and however, convenient it may be for the
23  government and however sincere the government might believe that
24  the money should be forfeited, it's not enough that -- that's not
25  enough.  There's got to be a party and there's got to be a

---

**Page 119**

1  legitimate party and it's just got to be personal jurisdiction.
2          Now it's important here, Your Honor, I mean because
3  otherwise you say was there a big loophole here.  Money just be
4  sent outside the United States and never recovered.  No, because
5  this issue doesn't come up very often.  This is a case, there's
6  nationwide jurisdiction.  So if he had any contacts if the person
7  who's received the money had any contacts with the United States,
8  any substantial contact or directed any activity into the United
9  States or participated in the marketing or even conspired to
10  participate in the marketing, he's fair game.  But --
11          THE COURT:   Did your client maintain any bank accounts
12  in the United States?
13          MR. RASMUSSEN:   One account, personal account in
14  Hawaii, which as the American Express case that we cite in our
15  brief says is an inadequate basis for both general jurisdiction
16  and certainly not for specific jurisdiction because it has
17  nothing to do with the allegations --
18          THE COURT:   In connection with his business in the
19  United States, has he ever before been involved in litigation in
20  the United States?
21          MR. RASMUSSEN:   Never been involved in litigation,
22  never had an office, never paid taxes.  Only been here on
23  vacations.  Never solicited business.  He basically helped his
24  son out by allowing his services to be used to process receipts,
25  credit card authorizations that his son gives him.  Now I mean

---

**Page 120**

1  what difference does that, a lawyer or anyone else who provide
2  services.  Yes, it's the son, but so it was the wife in the
3  Kirschenbaum case.  I mean it's a lot better than the wife in the
4  Kirschenbaum case.  It wasn't that they just gave him the money
5  and said stick it in your pocket and hide it.  He was providing a
6  legitimate service not just to these guys, but to other people
7  and Marc D'Souza decided to involve him to provide the service
8  and there's no allegation that this happened in the United
9  States.  He didn't just transfer anything.  No transfer took
10  place in the United States.  No allegation that Maurice D'Souza
11  knew what these credit card receipts were for or whether the
12  marketing was fair or not fair.  He knows nothing about the
13  marketing.  Yes, it's convenient for the FTC to say, okay well,
14  maybe he's got the money.  But as we know from the Kirschenbaum
15  case, that isn't quite enough.  And then we have the Ashcroft
16  case coming after the Twombley case where the Supreme Court says
17  yes.  You know, you can't have -- the only allegation we have is
18  he has money that came from the United States.  It doesn't say
19  where he got the money.  It doesn't say how much money, doesn't
20  even say whether he still has it.  And in fact the FTC knows he
21  still doesn't have it, Your Honor, because he knows that in that
22  Canadian litigation that was about the money and the money that
23  he had that belonged to the I.M.I. was transferred to the I.M.I.
24  and he doesn't even have it.  So that makes things even harder
25  for the FTC to make any allegation that there's any wrongdoing on

1  his part.
2  THE COURT: So the evidence is is that the money he had
3  was transferred to I.M.I.?
4  MR. RASMUSSEN: Yes. There was a settlement -- all
5  this Canadian case that we've been hearing about was resolved,
6  Your Honor, and a large payment was made. I mean it was made to
7  defendant, I.M.I., and to Mr. Jain. I mean in retrospect, it
8  would be better if that money had been kept where it had been so
9  it could have been salvaged, but that was well before the, well
10  before any of this litigation started.
11  THE COURT: All right. Well, thank you, Mr. Rasmussen.
12  Thank you very much. Mr. Arenson or Ms. Robbins, I'll be glad to
13  hear from you.
14  MR. ARENSON: Your Honor, just addressing the last
15  point first. The reason the FTC doesn't know about that transfer
16  is that the defendants refused to tell us. We've asked for
17  information relating to that transfer. Defendants again have
18  declined to provide that information. We've asked for the
19  settlement agreement. Defendants have declined to provide us
20  with that information. This is yet another example of the
21  defendants demanding specificity from the FTC, but refusing to
22  provide the very documents that would allow that kind of
23  specificity. But let's talk a little bit bigger picture here.
24  Mr. Rasmussen declared that Mr. Maurice is just an innocent
25  spouse here, the equivalent of innocent spouse. That's simply

121

1  not the case and I think even Mr. Rasmussen would agree with
2  that. In the Canadian litigation, Maurice D'Souza countersued
3  the defendants here and claimed 25% of their profits on the basis
4  of quantum meruit because he was so critical to the company that
5  he was entitled to 25% of its total income. In his counterclaim,
6  he states that the business became entirely contingent upon him
7  and that it would not have been able to operate without him. Now
8  Mr. Maurice D'Souza is not an innocent spouse who was given some
9  money and then ran. He was a critical part of the operation. In
10  fact we've deemed him the financial mastermind of this
11  organization and let's talk about some of the connections he has
12  with the United States. One, he has two bank accounts, not one
13  as the defendants continue to say and accuse us of
14  misrepresenting. He actually has two bank accounts in the State
15  of Hawaii. He has wholly-owned companies that do extensive
16  business in the United States and we've listed more than 20
17  different transactions with U.S. companies found in the ledgers
18  submitted by Marc D'Souza in the Canadian litigation. Millions
19  of dollars of business that he's done in the United States with
20  U.S. companies. He's agreed on multiple occasions to submit to
21  the jurisdiction of U.S. Courts via contracts. He's directly
22  collected tens of millions of dollars in payments from consumers
23  that were defrauded by this enterprise. Those payments as we
24  showed in our pleadings and the flow chart that was submitted
25  went directly into his bank accounts. Now those all are relevant

122

1  to general jurisdiction which we think exists here. But even if
2  it doesn't, specific jurisdiction certainly does. There's no way
3  that D'Souza can argue he hasn't directed his action at U.S.
4  consumers. It is the U.S. consumers' money who is making its way
5  into his bank accounts and again we have submitted a remarkable
6  amount of evidence considering we have not had any opportunity to
7  conduct any discovery whatsoever and --
8  THE COURT: What discovery would you want, Mr. Arenson?
9  MR. ARENSON: Your Honor, if we could depose
10  Mr. D'Souza and ask him about his jurisdictional conducts and we
11  have cited a case, Taylor v. Bridgestone, which basically says
12  that unless he files a frivolous claim for jurisdiction, then
13  discovery should be granted. Now we would make the case that
14  discovery isn't even necessary here because we've submitted so
15  much evidence already from these Canadian pleadings of the
16  extensive contacts between Maurice D'Souza and the United States.
17  Again, the defendants, Innovative Marketing, their accounting
18  department had access to Maurice D'Souza's bank accounts, Your
19  Honor. He refers to Innovative Marketing as one of his associate
20  companies. You know, I can't think of much more evidence
21  especially at this stage of the proceeding and it's important to
22  remember that at this stage absent an evidentiary hearing, all
23  the FTC need do is make a prima facie case. We've certainly done
24  that with the evidence we've submitted with the Canadian
25  pleadings and if the Court would like to hear additional

123

1  evidence, I encourage the Court to grant us jurisdictional
2  discovery and we'll develop much more evidence.
3  THE COURT: All right. Thank you very much.
4  Mr. Rasmussen, I'll be glad to hear from you.
5  MR. RASMUSSEN: Yes.
6  THE COURT: Did your client in Canadian litigation
7  represent that he has 25% ownership of or rights to proceeds of
8  Innovative Marketing?
9  MR. RASMUSSEN: No. What he did say was that he was
10  entitled to be paid for the services that he provided the
11  business and the plaintiffs there were saying you're not entitled
12  to any money because all the work you've done. He said yes to
13  standard fee for processing merchant accounts is 25% or 20%,
14  whatever it was and he made a claim for it and said yes, I've
15  provided the service and I needed to be paid for that service and
16  you can't -- yes, there was some money there that was supposed to
17  be proceeds of that of that and that was money that was given
18  back. But he was entitled to his service for just like a lawyer
19  is entitled to his service when he provides a service. They
20  don't doubt he provided merchant service. They allege he
21  provided merchant services in paragraph 59. There's real
22  services. I mean there's nothing wrong about it and that is the
23  fee they charged. If banks don't like to do this kind of work,
24  he has a good relationship with the bank, it's time consuming.
25  They have to investigate, you know, charge backs and whether

124

1  these things are authorized. So it's a real service. That's all
2  he asked for. And yes, he did say his work was essential to the
3  company because it sure was. Just like sometimes the lawyer's
4  work is essential to a company and sometimes like an accountant's
5  work is essential to a company. Yes. If they don't get their
6  bills paid, they're going to be out of business. But that's not
7  the same thing as saying that they are conspiratory. And indeed
8  the facts sometimes --
9        THE COURT:  Well, the issue really is the matter of the
10 systematic and continuous contacts with the United States.
11       MR. RASMUSSEN:  And we can't really gloss over it
12 because the Fourth Circuit won't allow us to. Indeed I really do
13 direct your attention to this Consulting Engineers case which is
14 this March case and involved -- I'll just summarize it very
15 quickly. It involved a Virginia corporation that was doing
16 business in India at the suggestion of a Colorado corporation
17 that decided to involve -- so the Colorado corporation decided
18 to, the Colorado company was helping the Indian company do
19 something. It said, well, you're going to need to help this
20 Virginia company so the Virginia company knows how to do business
21 with India.
22       THE COURT:  Is your client available for a deposition?
23       MR. RASMUSSEN:  Yes. I'd say he is available for
24 deposition. The issue is where. And he lives in Singapore. He
25 is not in good health. He's had an automobile accident. So the

125

1  issue is as you know from our protective order has been where.
2  And we think that because certainly he's not a party, they should
3  go and depose him where he is.
4        THE COURT:  Well, we can do it by videotape deposition,
5  could we not, Mr. Arenson?
6        MR. RASMUSSEN:  We could.
7        MR. ARENSON:  We have no objection to that, Your Honor.
8  Our one concern is that the Court mentioned we'd like to be on
9  call and I believe Singapore is exactly the opposite of the
10 United States. So it would be a 12-hour difference and Your
11 Honor would be asleep.
12       THE COURT:  Well, my staff would indicate that given my
13 schedule, that really shouldn't be a problem sometimes.
14       (Laughter.)
15       MR. RASMUSSEN:  Your Honor, one additional point on
16 that --
17       THE COURT:  I'm sorry. Go ahead, Mr. Rasmussen.
18 Anything further?
19       MR. RASMUSSEN:  Your Honor, I think that procedurally
20 the discovery at this stage would be limited to whether he has
21 sufficient contacts.
22       THE COURT:  Yes. Because I'll tell you the reason I'm
23 having difficulty with this is that you're indicating that he has
24 literally none and the government is representing that he clearly
25 is an active international business person who has extensive

126

1  contacts --
2        MR. RASMUSSEN:  But they didn't allege it in the
3  complaint.
4        THE COURT:  I understand that. The point is that
5  they're essentially contending that he, you know, dealt with bank
6  accounts in the United States, that he actively is involved in --
7        MR. RASMUSSEN:  Yeah. But you saw that chart. I
8  direct your attention to that little table I made. One thing
9  that was good about this trial is I made a table where I put
10 every one of their allegations in and I quoted from what they
11 were citing. So yes. Two accounts, linked accounts in the bank
12 of Hawaii. Is that really worth fighting over? So, you know,
13 you have a checking account and you have a line of credit. You
14 can do two things on your account. The bottom line is $50,000 is
15 his personal account in Hawaii. There's no dispute he has never
16 conducted business in the United States. He's been here maybe
17 twice for travel a long time ago. He has a business. They don't
18 dispute he has a business, a legitimate business outside of the
19 United States. They don't dispute that Marc D'Souza took
20 advantage of it. Just like if my father had a business and I
21 could give him some referral, I would refer it to him. And it's
22 something to say that he's the mastermind because what he did was
23 important because he asked for a fee for it when somebody tries
24 to get all his money. They froze his money in Canada. His money
25 was, all his accounts were frozen and he said well, wait a

127

1  minute, I'm entitled to my fee. And they said well, where is
2  your contract? He said well, I don't have a contract. I
3  provided valuable services to a quantum meruit. And maybe 25% is
4  too high, but --
5        THE COURT:  All right. Thank you, Mr. Rasmussen. It
6  seems to me, Mr. Arenson, that just as I've accorded a window
7  here as to an evidentiary hearing that was urged by Mr. Webb with
8  respect to the matter of the issue of the freezing of assets, it
9  seems to me that the government is also entitled to a window here
10 with respect to the matter of jurisdiction over Maurice D'Souza
11 and you're prepared to do a videotaped deposition of that. Is
12 that correct?
13       MR. RASMUSSEN:  That's correct, Your Honor.
14       THE COURT:  All right. Okay. I'm going to withhold
15 ruling on this motion to dismiss for lack of personal
16 jurisdiction, paper number 90 filed by the defendant, Maurice
17 D'Souza, to accord the government an opportunity to conduct
18 jurisdictional discovery on this matter and that jurisdictional
19 discovery quite simply will be the deposition of Mr. Maurice
20 D'Souza and I'll leave it to Mr. Rasmussen and to Mr. Arenson and
21 Ms. Robbins to coordinate the taking of that deposition. Let me
22 give you a timeframe reference here. I've been looking at my and
23 I'll withhold ruling on this until, you know, this order will be
24 pending. I think as I go through the checklist that I have ruled
25 on all motions that we had before me here with the exception of

128

1  paper number 58, the motion of Sam Jain to modify the preliminary
2  injunction, paper number 71, a portion of that motion filed by
3  Mr. Madigan on behalf of Marc D'Souza with respect to the issue
4  as to the freezing of assets and a modification of the
5  preliminary injunction and then the oral motion of Mr. Webb
6  joining in that motion.  And then paper number 90, the motion to
7  dismiss by Mr. Maurice D'Souza.  So I think that but for paper
8  numbers 58, 71 and 90, Madam Clerk, I've ruled on all the other
9  motions here.  What I'm going to suggest here, counsel, is I've
10  been looking at my calendar here and there is one week in terms
11  of my schedule which is open and then I've really got some
12  scheduling problems.  But I'm going to ask everyone if you would
13  look at your calendars for the week of Monday, July the 6th.
14  I'll hear from everyone before I hear from Mr. Madigan because
15  Mr. Madigan is recently remarried and so he's under a short lease
16  here in terms of his schedule.  It's a very sensitive matter for
17  him.  As to the others who have been married as long as I have,
18  you know, maybe we can just do some modification.  But I know Mr.
19  Madigan has a difficult time having any modification in his
20  personal life because of his recent nuptials within the last two
21  years.  So Mr. Arenson and Ms. Robbins, are you available the
22  week of Monday, July the 6th, specifically either Tuesday the 7th
23  or Wednesday the 8th to continue this hearing on these, just the
24  matter of the still pending motion to modify the preliminary
25  injunction and the matter of the asset, freezing of assets?

129

1  bringing the jury back on the 6th and that trial is going to
2  clearly run at least through that week.  That's what he expects
3  and that's what we expect.  I normally would never like my
4  schedule to interfere with anything else.  I have a partner named
5  Tom Kirsch who's working on this case with me.  But he happens to
6  be my -- I have him on that other case, too, just by coincidence
7  and so both of us are on trial in front of --
8          THE COURT:  Both of you are in trial, not on trial.
9          MR. WEBB:  That's a very important distinction.  We are
10  in trial and now like every major case, sometimes things fold at
11  the end as Your Honor knows better than anybody.  If there's any
12  chance that my case doesn't go to trial, I would be here.  Okay.
13  And --
14          THE COURT:  Well, could you not have someone else from
15  your firm address this issue if we go for Wednesday morning,
16  July the 8th, Mr. Webb, because we're really just getting to the
17  matter of linking of assets and the matter of whether or not
18  there's evidence as to Kristy Ross' assets being in any way
19  related to the drive, as the result of ill-gotten gains?
20          MR. WEBB:  I'll do everything I can, Your Honor.
21          THE COURT:  It's a fairly narrow issue here.  It's
22  going to take about two hours at most and it just seems to me
23  that that's really the only window I have looking at my calendar.
24          MR. WEBB:  Your Honor, I'll have to find somebody else.
25          THE COURT:  I mean I apologize to you.  How about you,

131

1          MR. ARENSON:  We are, Your Honor.  Tuesday will be
2  slightly better for us.
3          THE COURT:  All right.  Okay.  That's fine.  Let's take
4  a shot at --
5          MR. MADIGAN:  If I may, Your Honor, Tuesday falls right
6  into the problem that Your Honor was describing.  Wednesday I
7  could do it.  It would be terrific.
8          THE COURT:  You would be available Wednesday, July the
9  8th.  Is that right?
10          MR. MADIGAN:  Yes, Your Honor.
11          THE COURT:  All right.
12          MR. WEBB:  Judge, while you're looking at the time, can
13  I, just so I can run something off?
14          THE COURT:  Sure.
15          MR. WEBB:  I'm starting a major jury trial in the
16  Southern District of New York on June 23rd.  We just had a
17  hearing in front of the judge last week, the trial judge and he's
18  told us -- we've tried to project out the trial.  It's a pretty
19  big case.  That trial clearly, everyone expects it to go about a
20  week beyond that July 4th weekend.  In other words, we're
21  resuming -- he's going to recess the jury for the Fourth of July
22  and he's bringing the jury back on the 6th and I think that's the
23  6th.
24          THE COURT:  That's a Monday.
25          MR. WEBB:  That's Monday, right, the 6th?  So he's

130

1  Mr. Wood?  Are you available?
2          MR. WOOD:  I'm available, Your Honor.  I would like to
3  consult with Mr. Luskin, but one or the other of us --
4          THE COURT:  Okay.  And Mr. Rasmussen, I'm inclined to
5  also schedule the matter of your pending motion to dismiss for
6  lack of personal jurisdiction on that day and make sure that the
7  deposition of your client would be taken sometime prior to
8  Wednesday, July the 6th?
9          MR. RASMUSSEN:  That would be fine, Your Honor.
10          THE COURT:  Okay.  All right.  So we're going to
11  schedule this in for 10:00 Wednesday morning, July the 6th to
12  continue this hearing.  I don't think it would take more than --
13          MR. MADIGAN:  The 8th you meant, Your Honor.
14          THE COURT:  It's Wednesday, July the 8th.  Yes.
15  Wednesday, July the 8th.  I'm sorry.  And I don't think it would
16  take -- I've got a hearing that afternoon.  But I would certainly
17  think that we would anticipate this would take no more than two
18  hours.  It will be from 10 to 12.  Mr. Webb, I don't want to foul
19  up the court up there in the Southern District of New York.
20  Depending upon how long this case is going to go, maybe, you
21  know, if you wanted to come down here the night before and hop on
22  the train on the Acela and go back up for an afternoon session of
23  the court.  It's about a two-hour run on the train.  I apologize
24  to you.  But if one of your partners is not able to do it as
25  well --

132

1        MR. WEBB:   We'll figure it out, Your Honor.

2        THE COURT:   All right. And I do apologize to you. I

3   think it's important to pick up on it. I'm not prepared to rule

4   on it. I think it's important for your clients to be able to

5   address this issue on the matter of these gains.

6        Now as to submissions, it would be very helpful to the

7   Court. I'm certainly prepared to take testimony on Wednesday,

8   July the 8th if you believe it's necessary, if you proffer

9   exactly what evidence you want to present or what testimony you

10  want to present and you can certainly do so in terms of

11  attachments for supplemental briefing. Both sides can brief this

12  and engage in supplemental briefing. My view is is that both

13  sides can supplement their briefs on this question. If you can

14  do it by -- the problem is I'm going to be out for about a week

15  and a half and then arriving back here on Monday the 6th. If

16  everyone can brief this question by Wednesday, June the 24th.

17  Actually, I'm going to ask you if you'll do it in the next two

18  weeks, by Tuesday, June the 23rd so that I can take some light

19  reading with me when I'm out of the courthouse in terms of any

20  supplemental briefing when I leave the courthouse that next day.

21  So if you just, any supplemental briefing you want to, you know,

22  engage in on this, just get your briefs in by Tuesday, June the

23  23rd. I don't think they need to be particularly exhaustive. It

24  seems to me that we can observe some kind of reasonable page

25  limitation here in that increasingly I'm finding that we're

133

1   looking at cases measured by the pound it seems in terms of a

2   submission. Is there any reason to have more than ten pages

3   submitted on this from the point of view of the government?

4        MS. ROBBINS:   No.

5        MR. ARENSON:   No, Your Honor.

6        THE COURT:   Counsel for the defendants, you can zero in

7   on this in about ten pages, wouldn't you think, Mr. Madigan?

8        MR. MADIGAN:   Yes, Your Honor.

9        THE COURT:   You can attach whatever days you want. To

10  the extent if you think it's necessary to present any evidence,

11  you indicate to me if you've got a witness you want to call. I'm

12  just trying to focus on the matter of the financial situation,

13  the accounts that are in question, evidence with respect to

14  whether or not they're traceable to allegedly ill-gotten gains or

15  not. To the extent that the defendants can show that some of

16  these funds are just as a result of other sources of money,

17  that's educational. Just so the government understands, the

18  reason for it is is that ordinarily in a civil case with a

19  Federal Trade Commission case, the cases you're citing are very

20  much on point with respect to the fact that you're looking to

21  have a fund of money for a potential recovery for victims of the

22  public. The problem here is that we have a Sixth Amendment

23  overlay on this because of a criminal case that is clearly on the

24  same facts here and I'm satisfied that there is a criminal

25  investigation. So I'm not just bound by the matter of the

134

1   alleged damage and the extent of damage to the public. I have to

2   look at trying to trace that these are traceable to ill-gotten

3   gains as counsel for the defendants have noted because there's a

4   higher standard I have to apply here because of this Sixth

5   Amendment overlay in this case. So --

6        MR. ARENSON:   And, Your Honor, the defendants will be

7   appearing at that hearing and the government will have a chance

8   to cross-examine them on their affidavit?

9        THE COURT:   Well, we'll have to wait and see. I don't

10  know if that's what they're going to do in terms of submission.

11  Yes. It certainly seems to me -- that's a very good question,

12  Mr. Arenson. It certainly seems to me that we should be able to

13  within the parameters of their Fifth Amendment privilege, to the

14  extent Mr. Madigan and Mr. Marc D'Souza or Mr. Webb and Ms.

15  Kristy Ross wants to represent the status of their accounts and

16  the source of funding for their accounts, that will be very

17  helpful and I don't think we can just do that by an affidavit.

18  You're going to have to just think through this. I'm not sure

19  what the answer is right now. But I'm not going to permit a

20  deposition of your clients. But for example, if Kristy Ross says

21  I inherited $3 million from my grandmother, here's the will and

22  the account and the transfer of money, that's a perfectly valid

23  thing to present to me in terms of then permitting the government

24  to seize those accounts. I don't think that will be appropriate

25  and I'm not going to permit the government to seize an account

135

1   that clearly has funding from another source. So we're going to

2   need to address the matter of how those facts are presented to

3   me, Mr. Webb.

4        MR. WEBB:   Your Honor, that's an issue -- the

5   government is aware of this. I mean Kristy Ross is no longer in

6   the United States.

7        THE COURT:   Right.

8        MR. WEBB:   They may have to seal the indictment of her

9   right now. I don't know. I truly don't know. I have to talk to

10  her, okay, because whether -- well, I have to deal with whether

11  she will -- so I don't want to mislead her. I don't know --

12       THE COURT:   I understand.

13       MR. WEBB:   Just so you understand.

14       THE COURT:   I mean I'm setting a hearing on this to get

15  more evidence before me because I don't feel quite prepared to

16  rule on it today and I think there's some very important issues

17  here and because of it, I'm willing to extend this out until

18  Wednesday, July the 8th to try to see whatever other facts can be

19  presented to me with respect to the factual record here.

20       MR. WEBB:   I understand.

21       THE COURT:   Yeah. That's where I'm going on it. So

22  we'll have to wait and see. Yes, Mr. Arenson?

23       MR. ARENSON:   Your Honor, I just want to point out that

24  it wouldn't exactly be fair to the commission for them to offer

25  up affidavits that were uncross-examined.

136

THE COURT:   Well, it may go to the weight, not the
admissibility on that, Mr. Arenson. I may say fine, you've
submitted the evidence. I'm not satisfied as to that because the
government hasn't had a chance to attack it or cross-examine it.
So it's going to be up to the defendants to satisfy me in terms
of the independent source of funding. That's what I'm really
looking for. And to the extent, for example, that a great deal
of money has been paid to the defendants by Innovating Marketing,
Incorporated over a period of time and that money has gone into
bank accounts, that clearly is a source of funds that they would
have gained from the -- and I've looked at the complaint. The
complaint clearly references conduct going back to 2002 and 2003.
So I'm going to need to be able to flesh this out. But just to
say this is a personal bank account doesn't really satisfy my
inquiry. I've got to have some indication of what the source of
the funding is and there may be W-2's, for example, of income
from other companies that are unrelated to this and I can get
some measure of what money was paid into those individuals from
other sources of income. I just don't know. But again, that's
part of the reason I'm doing this is because I'm devoid of a
record here and I think it's a very important issue. Same matter
as to Mr. Maurice D'Souza's motion. I think it's important to
develop a factual record and I am confident as to the record on
those motions on which I ruled today. But these are two areas
where I need more record before me.

137

MR. ARENSON:   Fair enough, Your Honor. I realize it's
getting late. One more question. As to the preliminary
injunction and when the defendants will be complying is, the
Court going to give additional guidance on that point?
THE COURT:   The point is is that with respect to my
rulings thus far, I'm expressing compliance. The only open
issues now are the matter of the freezing of assets and the
matter of the personal jurisdiction of Maurice D'Souza. As to
Sam Jain, Kristy Ross and Marc D'Souza, they've acknowledged the
jurisdiction of this court. The preliminary injunction remains
operative. To the extent that there are documents that you're
awaiting, you should be getting those documents. To the extent
that there's an assertion of a Fifth Amendment privilege as to
particular documents, they can assert those on an individual
basis as they go. So I'm expecting their counsel to act in good
faith on that and I'll expect, we can have a status review on
Wednesday, July the 8th in terms of where we are on this matter.
That's exactly, that would be exactly a month, essentially four
weeks from tomorrow we're going to have another hearing and I
expect there to be some discovery going on and I expect some
compliance and some documents being turned over within the next
four weeks. But I'll leave that to counsel to work out and
certainly, if there's any foot dragging on that, I expect to be
told and be aware of it by Wednesday, July the 8th. I mean yes,
Wednesday, July the 8th and then we can enter into a scheduling

138

order at that time. My clerk will make a note to remind me on
Wednesday, July the 8th, we will enter a scheduling order. I'm
going to wait for now in terms of these other preliminary
matters. But we'll have a scheduling order that we'll discuss
and in my scheduling orders, I have a letter that's attached to
it. In light of the -- I've been doing this for a while anyway
and I've received reinforcement on my view of civil discovery
from the American College of Trial Lawyers within the last month
in terms of the problem with discovery in civil cases. And
really the crisis in the legal community that's been created by
unnecessary discovery disputes. So as you all may or may not
have heard or you'll find out, I just have a very short patience
for those. I don't refer discovery disputes to any magistrate
judges. We have the leading national expert here, Chief
Magistrate Judge Paul Grimm, who's a close friend, a wonderful
guy and he has expertise in an area that didn't exist 25 years
ago and that's civil discovery. And he's got great expertise in
electronic stored information, in ESI. I do acknowledge that
there are issues as to ESI that I may, I haven't had to do it
yet, but I may have to address him. But on discovery
disputes, nobody in my case has filed any motion of any kind for
motion to compel, motion for protective order. When I issue the
scheduling order, you'll see there's a standard letter that goes
out in my cases that says any lawyers that have any disputes on
discovery, the first step is you have to arrange a telephone call

139

and you call me. And 85 to 90% of the time, all those matters
are resolved with me on a telephone call and I've gotten very
good feedback from the bar both from the plaintiff's bar and the
defense bar about how that works. So we don't get bogged down in
a lot of filing of motions and discovery disputes and stays of
the scheduling order and I make myself available and not often,
but on occasion, I've made myself available for a dispute at a
deposition table and it seems to work. One of the reports
I'll tell you from the American College of Trial Lawyers I guess
about six weeks ago was that along with all the other problems
with the bar, they've also I think appropriately noted that
judges need to put their fingerprint on a case and hold on to it
and rule and the judges are not totally free from blame on this
either in terms of not ruling quickly enough on discovery
disputes. I make every effort to resolve discovery disputes as
fast as possible so cases move along and that will be true in
this case as well. So that's how that scheduling order will be
implemented. And we'll get a scheduling order and a discovery
deadline and get this case to move. So anything further from the
point of view of the government?
MR. ARENSON:   One small point, Your Honor, we have
withheld going forward with discovery pending these motions and
now that they're resolved, the FTC intends unless Your Honor
directs --
THE COURT:   Go right ahead. In terms of discovery

140

1  requests, I don't see any reason why you can't.  Again, to the

2  extent that there are any Fifth Amendment issues, they will have

3  to be very carefully indicated.  We'll have to wait and see.

4          MR. ARENSON:  And one other issue, Your Honor, we asked

5  for a repatriation order in our contempt motion.  We would ask

6  the Court to re-investigate and reconsider that at the asset

7  freeze hearing.

8          THE COURT:  Well, the whole matter of asset forfeiture,

9  I will look into.  That's the whole point.  I've ruled as I have.

10  But I'll reconsider.  I'm just going to look at the matter of not

11  asset forfeiture, but the freezing of assets pending this

12  litigation.  We'll have to wait and see where we are on that.

13          MR. ARENSON:  Thank you, Your Honor.

14          THE COURT:  Okay.  Thank you.  Anything further from

15  the point of view of plaintiffs, Marc D'Souza, Mr. Madigan?

16          MR. MADIGAN:  No, sir.

17          THE COURT:  Anything further, Mr. Webb, from the point

18  of view of Kristy Ross?

19          MR. WEBB:  No, Your Honor.

20          THE COURT:  All right.  Mr. Wood, on the defendant, Sam

21  Jain, anything further?

22          MR. WOOD:  No.  Thank you, Your Honor.

23          Tell him I'm anxiously awaiting his arrival

24  in my courtroom.  I'd like to see him.  It would be very helpful

25  to his cause.  And Mr. Rasmussen, anything further on behalf of

141

---

1  the defendant, Maurice D'Souza?

2          MR. RASMUSSEN:  No, Your Honor.

3          THE COURT:  All right.  Thank you very much.  It was

4  very nice having you all in my courtroom.  I will just tell you

5  that it's always the mark of the quality of lawyers when you

6  suddenly see all the summer interns come in to watch legal

7  argument in this case and that's what we had earlier today with

8  all the summer interns who were here.  So it's nice to have you

9  all in my courtroom and I'll see you on Wednesday, July the 8th.

10          MR. ARENSON:  Thank you, Your Honor.

11          MR. MADIGAN:  Thank you, Your Honor.

12          (Proceedings concluded.)

13  I, LISA K. BANKINS, certify that the foregoing is

14  a correct transcript from the record of

15  proceedings in the above-entitled matter.

16

17  Signature of Court Reporter/          Date
   Transcriber

18

19

20  Typed or Printed Name

21

22

23

24

25

142