# RDX 28

# In the Matter of:

# FTC v. Innovative Marketing

*September 9, 2010*
*Scott R. Ellis*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1

```
                    FEDERAL TRADE COMMISSION
                        I N D E X
WITNESS:                              EXAMINATION:
SCOTT R. ELLIS
    BY MR. ARENSON                           5
    BY MS. GURLAND                         296
```

```
EXHIBITS         DESCRIPTION               FOR ID
Number 1      Scott R. Ellis Report            40
Number 2      ErrorPatrol Screen Shots        168
Number 3      System Detection List           175
Number 4      ErrorPatrol Screen Shots        201
Number 5      Microsoft Website Screen Shot   204
Number 6      ErrorPatrol Screen Shots        207
Number 7      ErrorPatrol Screen Shots        217
Number 8      OnGuard Online Screen Shots     228
Number 9      PerformanceOptimizer Screen Shot 231
Number 10     WinFixer Screen Shots           241
Number 11     Westcoast Labs Report           263
Number 12     Johnson Rebuttal Report         272
Number 13     Value Click Advertisements      283

OTHER EXHIBITS REFERENCED                      PAGE
None
```

2

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

FEDERAL TRADE COMMISSION,   )

    Plaintiff,    )

v.     ) Case No. RBD 08-CV-3233

INNOVATIVE MARKETING, INC.,  )
et al.,
           )

    Defendants.

Wednesday,
September 30, 2010

Suite 4200
Winston & Strawn
35 West Wacker Drive
Chicago, Illinois 60601

The above-entitled matter came on for
deposition, pursuant to notice, at 10:30 a.m.

3

APPEARANCES:

ON BEHALF OF THE FEDERAL TRADE COMMISSION:
    ETHAN ARENSON, Attorney
    COLLEEN ROBBINS, Attorney
    Federal Trade Commission
    600 Pennsylvania Avenue NW
    Washington, DC  20580
    (202) 326-2351

ON BEHALF OF DEFENDANT KRISTY ROSS:
    CAROLYN GURLAND, Attorney
    Law Office of Carolyn Gurland
    2731 North Mildred Avenue
    Chicago, Illinois  60614
    (312) 420-9363

4

P R O C E E D I N G S
- - - - -

MR. ARENSON:  On the record.  Mr. Ellis, my name is Ethan Arenson.  I represent the Federal Trade Commission in this matter.  Why don't we start with having counsel introduce themselves.

MS. ROBBINS:  Colleen Robbins from the Federal Trade Commission.

MS. GURLAND:  Carolyn Gurland, G-u-r-l-a-n-d, on behalf of the Defendant Kristy Ross.

MR. ARENSON:  And, Carolyn, Marc's counsel, I take it, will not be participating today?

MS. GURLAND:  I did not know that.  The last I heard they were.  Should we check with them before we go on the record?  I hadn't heard anything.  Do we know that they might not?

MR. ARENSON:  Why don't we go off the record for a second.

(An off-the-record discussion was had.)

MS. GURLAND:  Back on the record.  Counsel for Marc D'Souza will just get the transcript.

MR. ARENSON:  Okay.  Why don't we just confirm that on the record.  We have talked to counsel for Marc D'Souza and they have elected not to participate today.

Mr. Ellis, we're here today in connection with

1 (Pages 1 to 4)

5

1 FTC versus Innovative Marketing, Case No. 08-CV-3233,
2 filed in the district of Maryland. Have you been sworn
3 by the reporter yet?
4      THE COURT REPORTER: No.
5      MR. ARENSON: Why don't we go ahead and take
6 care of that then.
7           SCOTT R. ELLIS,
8 a witness, called for examination, having been first
9 duly sworn, was examined and testified as follows:
10          EXAMINATION
11 BY MR. ARENSON:
12   Q. Mr. Ellis, we'll go over some ground rules. I
13 understand this isn't your first deposition.
14   A. That's correct.
15   Q. We'll go over briefly some ground rules so
16 we'll -- my sense is you understand how this works.
17      I will be asking the questions today. Let me
18 finish my question before you go ahead and start
19 answering. That will make sure the transcript is clear.
20 If you don't understand any question that I have asked,
21 just go ahead and ask me to rephrase it or explain it,
22 and I'm happy to do that. If you do go ahead and answer
23 one of my questions, I'll assume you did understand the
24 question. If you need to take a break at any point
25 today, let me know, and I will be happy to accommodate

6

1 that. If you hear your defense attorney make an
2 objection at any point today, you can go ahead and
3 answer the question as I've stated it unless she
4 specifically instructs you not to.
5   A. Okay.
6   Q. And is there any reason today you can't give us
7 your best testimony, such as drugs or alcohol or
8 medication?
9   A. No.
10   Q. Okay. And all the instructions I have given you
11 make sense?
12   A. Yes, sir.
13   Q. Okay. Why don't we get started with some
14 background information. What have you done to prepare
15 for today's deposition?
16   A. I have, you know, looked through the reports
17 that I have. The -- my own report, the Kevin Johnson
18 report.
19   Q. Let's break that out just a little bit.
20      So your report, I'm definitely familiar with,
21 that's the Ellis report. Now, Johnson had two reports.
22 Did you look at both of them or just the original one?
23   A. I believe I looked at both of them.
24   Q. Okay. And anything else you did to prepare for
25 today's deposition? Did you speak with Ms. Gurland?

7

1   A. Yes.
2   Q. What did you guys talk about?
3   A. Just in general about how to answer -- you know,
4 to answer questions truthfully, fully, to the best of my
5 ability and to make sure that I have a -- you know, the
6 question's are clear and that I understand the question
7 being asked and to not, you know, get too excited and
8 answer questions too quickly or talk too much about --
9 you know, just try not to over-explain things and that
10 kind of stuff. Just pretty standard stuff.
11   Q. Uh-huh. Were there any questions you asked her
12 that you can remember?
13   A. No. I don't think there was anything that I had
14 in particular that I asked about. I mean, I think I
15 might have just asked, you know, is it going to go all
16 day, is it going to go past 5:00, stuff like that.
17   Q. Those are good questions. Hopefully we'll try
18 to avoid that.
19   A. Do I get lunch.
20   Q. All good questions.
21      Other than Ms. Gurland, any other counsel you
22 have spoken with? Mr. Kirsch?
23   A. No.
24   Q. And has that been true of your entire, say,
25 employment as an expert? Is it just Ms. Gurland that

8

1 you have spoken or have there been other attorneys that
2 you've spoken with?
3   A. Ms. Gurland has been my point of contact in this
4 case.
5   Q. Okay. And have you read any of the deposition
6 transcripts prior to today's deposition?
7   A. No.
8   Q. So no deposition transcript in the case at all.
9   A. No, not at all.
10   Q. Okay. Thank you.
11      All right. Why don't we get into the areas in
12 which you believe you are qualified to give expert
13 testimony.
14   A. Okay.
15   Q. And we'll just start listing them, and I'll
16 start writing them down.
17   A. Sure. With respect to computers, generally
18 speaking when it comes to computer hardware, I'm very
19 well-versed in network architecture, firewalls, servers,
20 SAN devices, load balancers, you know, attached storage
21 of any kind, database technologies such as MSSQL,
22 applications, software applications, the use of software
23 applications and business applications in --
24   Q. Let me slow you down just a little bit. If we
25 are going to go -- the first one I had was computer

2 (Pages 5 to 8)

9

1  hardware. So if we're moving on to No. 2, just let me
2  know so I can keep them straight.
3      A. Okay. And certainly I'm not going to be able to
4  think of every single thing -- I have been working in IT
5  since 1987.
6      Q. Sure. Let me see if I can focus --
7      A. The scope is really, really broad of what I have
8  worked with in the past.
9      Q. Maybe I can focus you then. What areas of
10  expertise did you draw on in preparing your report?
11      A. I think my forensic skills were vital to me. My
12  software analysis skills. My understanding of how the
13  Internet works, of how websites interact with users as
14  an application. I have done extensive work with
15  websites as applications.
16      Q. How the Internet works is a little bit broad.
17  Can we drill down on that a little bit?
18      A. Yeah. I think that anything to do with the HTTP
19  protocol, HTTPS, FTP, Telenet. There is a number of
20  technologies that are leveraged by the Internet to
21  create the whole Internet, SMTP, POP, MAPI, M-A-P-I.
22      Q. Okay. Anything else with Internet
23  infrastructure?
24      A. Again, firewalls and security software. I have
25  done a lot of work with Internet security in the past.

10

1      Q. You are an expert at security software?
2      A. I would say so.
3      Q. Okay. What qualifies you as an expert at
4  security software?
5      A. I have been working with it for many years. It
6  is part of my job. It is part of what I do. It is part
7  of my troubleshooting in my day-to-day work that I do
8  now as well as for the past, you know, nine years, maybe
9  more.
10      Q. And can you be any more specific? There are a
11  lot of different types of security software out there, I
12  would imagine. Can you tell me what specific types of
13  security software?
14      A. Certainly different types of firewalls have
15  different applications that run on them, do things like
16  proxying. Antivirus software I have set up and, you
17  know, and -- that's not a word -- antivirus, virus
18  removal software, malware, adware.
19      Q. So you feel you are an expert in all of those
20  areas?
21      A. It is part of what I do. You know, it depends
22  on what your definition of expert is. I have certainly
23  worked with these things to a great extent.
24      Q. So you have stolen my next question, which is
25  what is your definition of an expert?

11

1      A. Well, I think I asked you first. I will answer
2  your question.
3      My definition of an expert would be somebody
4  that knows a lot about a subject area and is somebody
5  who people -- you know, kind of like a go-to guy.
6  Somebody that people go to when they have a problem and
7  somebody that can root out what the problem is and
8  what's causing it and can identify the root cause.
9      This person is probably very good at identifying
10  root causes and being able to run the tools that are
11  needed to do network monitoring. Tools like Wireshark.
12  Tools like HTTP Watch, is a good one. Javin, that's
13  another packet analysis software tool. You know,
14  Processmon, Perfmon, being able to get a sense for
15  what's going on, having all the tools and knowing how to
16  use them.
17      Q. Now, those tools you just mentioned, are those
18  relevant to security software or are those more just
19  general --
20      A. Those would be relevant to security definitely.
21      Q. Security software.
22      A. I'm not sure I understand the question.
23      Q. You told me about a bunch of tools that you are
24  familiar with. Perfmon, I think, is one of them. I
25  know you used some of that in your report. Is that

12

1  directly relevant to security software, is my question?
2      A. If you were doing -- if you were looking at a
3  problem and you were trying to establish what the need
4  was, what the circumstances are, and what software tool
5  you needed to use to remedy a problem or to set up a
6  security perimeter, you would want to evaluate the
7  network first and find out what's what, what's where,
8  and how is it all set up and how is it all
9  interoperating, what ports are being used.
10      And these are all tools you would use in
11  evaluating like an enterprise situation where you had a
12  need for security. You don't want to just come in and
13  say oh, here, use this piece of software. First you
14  want to know what the problem is or what they are doing.
15  You don't want to install a piece of software on a
16  server and have everything on that server break.
17      That just happened to me the other week. It was
18  a piece of software that requires the use of SMTP but
19  somebody had installed an antivirus software on the
20  machine without looking to see what's going on on the
21  machine first. So the SMTP broke and the software could
22  no longer send e-mails. So that would be probably a
23  good example.
24      Q. Okay. Now, with respect to security software,
25  have you ever worked for a security vendor?

3 (Pages 9 to 12)

13

1    A. I was -- when I worked for Computer Bits, we
2    were what you would call a re-seller, a certified -- I
3    guess we were a certified re-seller of a company called
4    E-Soft.
5    Q. And did that entail writing code for the
6    software or just selling it?
7    A. It involved installing it and setting it up.
8    Q. Okay. So you were involved in installing it,
9    setting up security software?
10    A. Right. And with respect to security, my
11    experience with security has been in application
12    development and writing applications to prevent things
13    like sequel injection, cross-site scripting.
14    Q. And I want to focus just for the moment on
15    security software, antivirus, antimalware software just
16    for a minute.
17    A. Sure.
18    Q. Now, you said your experience with Computer Bits
19    is relevant to that expertise that we are talking about.
20    Any other experience that is relevant to your expertise
21    at security software itself?
22    A. Yeah. I have deployed security solutions in
23    many locations on many computers.
24    Q. And that's, again, installing the software?
25    A. Yes. Installing it, making sure that it is

14

1    working properly, rooting out viruses, fixing them
2    manually if needed, going into a person's computer when
3    it's maybe -- for example, like a zero day virus is one
4    where there is no virus definition for it, and you might
5    have to go into the registry and start looking for where
6    it is; go into the startup run files to see why is the
7    software re-installing itself and stop it from doing
8    that, and then, if needed, submit the -- the findings to
9    a security company.
10    Q. Okay. Have you ever written code for a security
11    software program?
12    A. No.
13    Q. And other than your experience installing and
14    configuring security software, is there other experience
15    you have that would be relevant to your expertise with
16    security software?
17    A. No.
18    Q. Let's talk about on-line advertising. Do you
19    claim to be an expert in on-line advertising?
20    A. I have done quite a bit of work with on-line
21    advertising. I worked for a company called Art.com in
22    1998, and we had an affiliate marketing program, and I
23    was a technical project manager and I worked side by
24    side with the affiliate marketing manager to make sure
25    that we could support the affiliate program with the

15

1    Art.com software.
2    Q. And that was back it in 1998?
3    A. '98, '99. And then in 2000 I worked for Leo
4    Burnette, which is actually in this building, for their
5    web division for a few months. For like five months.
6    Q. And were you involved in on-line advertising
7    there?
8    A. Yeah. We did the Go Army, the Army-of-One
9    campaign.
10    Q. Uh-huh. And what was your role specifically?
11    A. I was a web producer.
12    Q. What does that mean?
13    A. I helped manage deliverables to the U.S. Army on
14    what we were putting together so far as like the
15    advertising campaign, the on-line campaign.
16    Q. So did you do the targeting of where those ads
17    would end up? I guess I need more information.
18    A. I helped develop the ads and made sure that the
19    deliverables and the schedules were met.
20    Q. Did you interact with the on-line ad networks
21    that actually displayed these ads?
22    A. Not directly.
23    Q. And have you had any -- throughout your entire
24    career have you had any experience with on-line ad
25    networks placing ads?

16

1    A. Only with respect to trying to stop them when
2    they would get aggressive or, you know, dumping a lot of
3    cookies on a person's computer, creating problems with
4    trying to install software on people's computers, things
5    like that, just from a security standpoint.
6    Q. I would like to talk about that, but let me
7    round out the first question, which was I had asked if
8    you had ever placed an ad or directly dealt with an
9    on-line advertising agency in the context of someone
10    placing an advertisement.
11    What's the answer to that question?
12    A. I think that I have had that experience. I
13    can't specifically recall it, but I certainly -- when I
14    worked for Art.com I would be in meetings where we would
15    be talking to like the actual affiliate marketer who is
16    placing the banner ads for us. I certainly have that
17    understanding of how that technology works.
18    Q. So you would hear from the affiliate marketer
19    how the ads were being placed, but you didn't directly
20    place them yourself.
21    A. No. No. I didn't directly say, here's a banner
22    ad, put this on your website.
23    Q. And have you ever been involved in targeting of
24    ads to users?
25    A. I would say not directly, no.

4 (Pages 13 to 16)

17

1  Q. Now, you mentioned before -- I want to get back
2  to -- and I don't want to put words in your mouth. You
3  said there were aggressive ads that you would actually
4  communicate with on-line ad services about? Am I
5  getting that right?
6  A. No.
7  Q. Explain to me what you meant.
8  A. Like my clients -- one of my clients would be
9  experiencing like lots of popups, for example, and they
10 would say I want the popups to stop.
11 Q. So a client would say to you that one of my
12 users is getting popups on their screen and ask you to
13 fix the problem?
14 A. That's correct.
15 Q. And do you remember what kind of popups you were
16 dealing with?
17 A. Usually they were pornographic.
18 Q. Do you ever recall any of these popups trying to
19 sell something?
20 A. Pornography.
21 Q. They were trying to sell pornography?
22 A. Sure.
23 Q. Any other instances other than pornography?
24 A. Sure. I have seen popups that would be trying
25 to sell you things to, you know, clean your computer,

18

1  clean your PC, those kind of things.
2  Q. Is that known as scare-ware in the industry?
3  A. Yeah, I believe that's the correct term.
4  Q. And these are popup ads that try to intimidate
5  or scare users into buying rogue software. Is that a
6  generally accepted definition of scare-ware?
7  A. Yeah, I believe that would be.
8  Q. Do you recall what those ads said when you saw
9  them on the screen?
10 A. No, I can't -- I can't recall any specific --
11 any specific case, no.
12 Q. Was it multiple cases or just once? How many
13 times did this happen?
14 A. I couldn't tell you. I have worked with
15 thousands of users in the past 10 years.
16 Q. And you don't by any chance remember any of the
17 products being sold in these popups?
18 A. No.
19 Q. Are you 100-percent certain that they are not
20 the products discussed in your report?
21 A. I can't be 100-percent certain about that no,
22 because I don't remember anything specifically so --
23 Q. Okay. Do you recall if any of these scare-ware
24 ads involved a free scan?
25 A. Yeah. That sounds -- that sounds reasonable.

19

1  The method -- that would be the method as to -- you
2  know, to tell people your computer may be infected,
3  click here to run the scan.
4  And certainly you go to websites like Panda or
5  McAfee or any of the security websites, they will say
6  similar things; that your computer could be infected
7  with viruses; that you should download our free scan utility
8  and scan your computer. I think that's a really common
9  practice.
10 Q. Let's actually talk about that, because I think
11 there is a distinction -- and correct me if I'm wrong --
12 about a popup ad that claims to be running a scan and an
13 application that's downloaded from a Panda software, for
14 example, and running on your computer. Is there a
15 distinction there?
16 A. I don't think -- I certainly remember seeing
17 like popups trying to get me to, you know, scan things,
18 and they were some of the more familiar companies. I
19 can't name them specifically, but certainly I think in
20 the past 10 years everybody's been guilty of overusing
21 the popup.
22 Q. Okay.
23 A. It's definitely a problem -- or it was an
24 extreme problem at one point where every website you
25 would go to there would be popups.

20

1  Q. Popup Blocker helped put a dent in that market;
2  is that fair to say?
3  A. Yes. And there were popups to get a popup
4  blocker too, right? I used to call it popup popcorn.
5  Especially with the pornography ones, you could
6  experience a blitz creed of popups and the only thing
7  you could do is just hit the power button and kill your
8  computer to make it stop.
9  Q. Right. And when this happened, the users would
10 complain to you about the volume of the popups they were
11 using?
12 A. Yeah. They would lose control of their computer
13 the popups would be so bad, and I think part of it was
14 attempts to get you to click on things that would cause
15 like a file -- like file-open dialogue, like how when
16 you click on it and then it says you need to open this
17 file and then you click open and next thing you know
18 there is viruses and all kinds of crazy stuff happening
19 to your computer.
20 That happened to me one time. I can't remember
21 the exact year. It was probably around 2002. I went to
22 a -- I was looking for the lyrics to a song. Lyrics
23 websites were one of the really bad ones, so I was
24 looking for the lyrics to a song and the next thing you
25 know I'm getting all these popups and next thing you

5 (Pages 17 to 20)

21

1  know there is a file installing on my computer. And I
2  was using -- what was I using. Zone Alert. I was using
3  the free version of Zone Alert at the time, and I came
4  to find out later that the free version of Zone Alert
5  did not monitor or block or protect you from these
6  attacks, so my computer literally got hacked while I was
7  sitting there watching it happen, and Zone Alert was
8  telling me all about it saying that this file is
9  requesting to download from another website. And it
10 was -- in the end I just powered off the computer and
11 pulled the hard drive and attached it to another
12 computer and cleaned it.
13     Q. Have you heard those type of ads referred to as
14 auto downloads or forced downloads before?
15     A. Yeah, I believe that would be correct. I'm not
16 sure about auto downloads but the word works for me.
17     Q. Okay. And have you had complaints from users
18 that when they receive one of these downloads, or forced
19 downloads, that they just click without thinking and
20 actually end up installing things on their computer.
21 Does that happen?
22     A. I did have that happen once where it was the
23 vago virus, and the vago virus was one that was going
24 around in 2005. It was -- there was lots and lots of
25 versions of that because the original author of the

22

1  software had posted the code for it on a news group so
2  anybody could basically download this virus and
3  recompile it to do what they wanted it to do.
4      And I did have a user who her -- I believe her
5  husband worked in security -- her husband worked in
6  security and she got an e-mail that said, you know, you
7  need to install this antivirus tool and it looked like
8  it was from her husband so she installed it and it was
9  the vago virus. And the next thing you know her
10 computer was an FTP server and it was sending e-mails
11 out and distributing the virus further and that would be
12 what I would really call a problem.
13     Q. Uh-huh. Now, you have talked in your report --
14 and we'll get into it a little bit later -- about users
15 in general aren't very sophisticated about how the
16 Internet works and technology in general. Is that a
17 fair assessment of what you said?
18     A. I would say it depends on the users, but
19 certainly I have worked with users that had that.
20     Q. Do you think it is common that users aren't very
21 sophisticated about how the Internet works?
22     Carolyn is showing you your report.
23     MS. GURLAND: Just for the record, I'm giving
24 him a copy of his report, because this is on a computer.
25 Just to direct you, this is the Section 5 we were

23

1  talking about computer users and 5J.
2      BY MR. ARENSON:
3      Q. This is just a random question but you can go
4  ahead and read your report, if you would like.
5      I was wondering your opinion, do you think users
6  in general are sophisticated or unsophisticated when it
7  comes to the Internet?
8      A. In general, no. In general most users -- it is
9  in my report that people can show an alarming
10 misunderstanding of technology. They really can.
11     Q. Okay. So in general many users are not very
12 sophisticated.
13     A. That would be true.
14     Q. That was just a background question, but you
15 have your report now.
16     Now, in connection with these unsophisticated
17 users, when they would see popup windows telling them to
18 conduct a free scan or what ever else was being sold
19 through these windows, was it your experience that the
20 users would sometimes just click because they didn't
21 know any better or thought that that was the right
22 action?
23     MS. GURLAND: Wait. So you are asking for him
24 to speculate about an unsophisticated user that he is
25 working with, or what he thinks that -- in his

24

1  experience or what he thinks an unsophisticated user
2  might do?
3      MR. ARENSON: That's a fair clarification.
4      BY MR. ARENSON:
5      Q. In your experience with an unsophisticated
6  user -- which you have said that's what most users are;
7  right?
8      A. Yes.
9      Q. There is the question. In your experience with
10 most users, what has been their reaction when they see,
11 for example, a popup window trying to tell them
12 something?
13     A. With most users, even the unsophisticated users,
14 most of them know not to click on things like that.
15 Most of them do but there are some that don't. You
16 might have a new user in the mid -- 2004, 2003, a lot of
17 people were new to the Internet. I think at this stage
18 in 2010 it is a different story, but in the beginning,
19 sure, people would click on things they shouldn't click
20 on. That would happen.
21     Would most users click on it? No. No. Most
22 users would know that the firm they are working for had
23 security software and they would recognize that it was
24 an ad and they should click off of it and go and do
25 something else.

6 (Pages 21 to 24)

25

1    Q. So in the complaints that you received, were
2  there instances where users did indeed click on an ad
3  and, for lack of a better description, got themselves in
4  trouble?
5    A. Yeah. Sure.
6    Q. Now, that was a bit of a detour from on-line ad
7  serving. We are going to get back to that.
8       Have you ever worked with Mediaplex in your
9  career?
10    A. Not directly, no.
11    Q. Are you familiar with Mediaplex's MOJO adserver?
12    A. Not directly. I have heard of Mediaplex. I am
13 not intimately familiar with how the service works.
14    Q. What about the MOJO adserver in particular?
15    A. No, I don't -- Mediaplex serves up banner ads,
16 targeted banner ads, to people and perhaps the MOJO
17 server is what does it. I don't know.
18    Q. Do you know for sure?
19    A. No, I don't know for sure. I could Google it,
20 though, and find out.
21    Q. I'm sure that's true. How about the Value Click
22 Media Network?
23    A. Again, I have seen their cookies. I'm familiar
24 with them.
25    Q. What's the connection between the Value Click

26

1  Media Network and Mediaplex, if you know?
2    A. I don't know.
3    Q. Were you familiar with the IAB?
4    A. No.
5    Q. They are impression measurement guidelines?
6    A. No, I'm not familiar with the exact guidelines.
7  I'm certainly familiar with impressions and the
8  difference between impressions and click-throughs.
9    Q. So is it safe to say you are not an expert on
10 on-line ad serving?
11    A. I'm an expert in the technology that underlies
12 how that works.
13    Q. Okay. Well, what technology does Mediaplex use
14 to serve their ads?
15    A. They use web servers, HTTP, HTML. They have
16 graphics that they use. They check for cookies to see
17 if they can target an ad. There is IDs that are
18 floating around. There is a central database that's
19 being accessed that lists all the people that they have
20 marketing demographics on, and they target ads in that
21 manner.
22    Q. What software runs on the MOJO adserver?
23    A. I couldn't tell you. I would have to work there
24 or I would actually have to do a scan of their system to
25 find out. It is likely IIS or Apache. It would be one

27

1  of those two, IIS or Apache, most likely. Could be
2  something else. Could be their own system they have
3  custom developed.
4    Q. You are just not sure.
5    A. I'm not sure. I think the underlying
6  technologies, the core technologies, behind it are all
7  the same. The HTTP request is made and an HTP response
8  is returned, and the documents and the imaging are
9  served up to the user.
10    Q. What type of targeting options are available on
11 the Mediaplex network, if you know?
12    A. So far as demographics?
13    Q. Any type of targeting.
14    A. It would be speculation. I can't speculate to
15 that. I mean, I could speculate if you wanted me to.
16    Q. Nope.
17    A. It would be speculation.
18    Q. Because you don't have any background in the
19 Mediaplex adserver system.
20    A. No.
21    Q. What about other adserving systems?
22    A. In what respect?
23    Q. Fair question. I'm going to try to break this
24 into two categories. My sense is you have a general
25 understanding and a high-level understanding of the

28

1  infrastructure of the Internet, how things are
2  transmitted over the Internet, and that's the expertise
3  that you are talking about when you say that you
4  understand how ads are served on the Internet; is that
5  correct?
6    A. Yeah. And I think that if somebody put the code
7  down in front of me or allowed me access to the system
8  to review and examine, I would be able to make sense of
9  it. I would be able to diagram and tell you exactly how
10 it works without any problems whatsoever.
11    Q. Because you understand how images, for example,
12 are displayed on the Internet.
13    A. Yes. And I understand Java Script and I
14 understand the ASP. I understand HTML. I understand
15 XML. These are the technologies that I know, and when
16 an application is put in front of me, a web-based
17 application, I can pick it apart and determine how it
18 works.
19    Q. Uh-huh. But information specific and
20 proprietary to an ad network, like Mediaplex, you don't
21 have any background in that.
22    A. I don't have any access to it, how would I?
23    Q. I completely agree with you. How would you
24 because you don't have any access.
25    A. Right. But what I do know is how these -- when

7 (Pages 25 to 28)

29

1   I see an ad on a web page, I can understand how that web
2   page that I'm seeing works, and I can understand that
3   the ad that I'm seeing is actually coming from somewhere
4   else and it is not, for example, coming from -- you
5   know, if I go to Yahoo.com, I might see 16 different
6   banner ads on there, and I understand those aren't being
7   hosted by Yahoo. Those are coming from people that are
8   serving up these ads. These are coming from people like
9   Mediaplex and Value Click.
10      Q. **Right. Understood all of that.**
11      A. And I think did we say Doubleclick. I think
12   there is one called Doubleclick too. There is a lot of
13   these companies and I can't even remember the names of
14   the ones that I've worked. But we worked with companies
15   like this, if not these, when I was at Art.com.
16      Q. **But at no time at Art.com did you directly place**
17   **ads or target ads to users; is that correct?**
18      A. I think I answered that question already.
19      Q. **You can answer it again.**
20      A. Yes, that's -- I believe that's -- I have worked
21   with the people in that process, but did I actually put
22   together an e-mail and send it directly to someone
23   there? No. But I certainly was involved in everything
24   that went on to support that activity.
25      Q. **Well, there is more than just sending an e-mail,**

30

1   **right? If you are going to target ads to a user, you**
2   **have to configure the business logic on the server, you**
3   **have to decide what ads you want serve up to which**
4   **users. There is more than just sending an e-mail;**
5   **right?**
6      A. That would be true.
7      Q. **And you have never done any of that.**
8      A. Not directly, no.
9      Q. **Okay. And you were at Art.com from 1998 to**
10   **1999. Is it safe to say that the on-line advertising**
11   **market has changed significantly from 1999?**
12      A. The technology -- the core technologies have
13   changed. I think the mission is the same.
14      Q. **That's fair. So the mission of displaying ads**
15   **hasn't changed.**
16      A. Targeting them to users based on where they have
17   been and what they are interested in.
18      Q. **But the technology and sophistication of**
19   **targeting and the means of targeting, those all have**
20   **dramatically changed, haven't they?**
21      A. I don't know that they have. I can't imagine
22   they would have changed that much, other than just to
23   be -- you know, there is more of it. There is more
24   information now, because they have been collecting data
25   for 10 years, so they certainly -- there is a greater

31

1   wealth of information about the consumer that's
2   available now than was available in 1998 when the
3   Internet was in its infancy.
4      Q. **What about targeting options, as far as**
5   **targeting of ads or sophistication of targeting, has**
6   **that changed dramatically since 1998?**
7      A. Well, the basic way that the Internet functions
8   hasn't changed that much since 1998. It is still based
9   on the HTTP protocol, TCPIP. You have an IP address,
10   you have a Mac address for a machine, if you can get it,
11   and then you know who the person is based on, you know,
12   cookies that they might have on their computer or the IP
13   address they are coming from.
14      So, really, the way that you would identify a
15   user hasn't changed but the amount of information that
16   you have available about that user and his activity has
17   increased because the databases that are out there are
18   better able to bring the data in, put it into like a
19   data warehouse or into a format that's -- there is just
20   a much greater wealth of information about users
21   available.
22      And the logic, the algorithms, that are behind
23   making those decisions about what ad I should show a
24   user, that's gotten better over time as the programs
25   have written more of it and refined it and gotten better

32

1   at it so --
2      Q. **So a significant difference in those categories**
3   **you've just mentioned between 1999 and today, which is**
4   **2010.**
5      A. Well, even in 1999 if you went to a website and
6   you were looking at a product and you were clicking
7   around and maybe you clicked on a banner ad and you were
8   looking at a product and maybe it was airline tickets or
9   something like that, then the next day you come back and
10   go to look at a different website and all of a sudden
11   you are seeing ads to go to Jamaica, because the day
12   before maybe you were pricing tickets for Jamaica, that
13   would happen in 1999.
14      Q. **To the same extent it happens today?**
15      A. I think it does, yeah. Maybe it happens more
16   now because there is more websites in the networks. So
17   it wouldn't happen as much then because, again, the
18   wealth of information. There weren't as many people in
19   the network then. So if a company like Mediaplex has a
20   network of people using their service, it is much larger
21   now.
22      So the chances that -- when I go and look for --
23   for example, the other day I was looking for a watch. I
24   wanted to buy a new watch and I was pricing watches and
25   pricing watches, and then I went to another website that

8 (Pages 29 to 32)

33

1  was totally unrelated and I actually saw one of the
2  watches that I was looking at. So I think that's the
3  overall objective, is to do that. I think there is
4  other -- I'm sure there is other angles to how it is --
5     Maybe you have heard the term gorilla marketing.
6  That's really what it is, it is called gorilla
7  marketing, where you are trying to get people interested
8  in something by throwing ads at them when they don't
9  expect it. And that hasn't changed. It has just gotten
10  worse. I don't mean to say worse. It has gotten more
11  prevalent, is the word that I should use.
12     **Q. Let me ask one wrap-up question on this and**
13  **we'll move on, because we are spending a lot of time on**
14  **it.**
15     **Do you think the options available to users as**
16  **far as targeting were the same in 1999 as they are today**
17  **on the Mediaplex system?**
18     A. I think there is probably more options. Any
19  product grows over time. There is probably more
20  options, better demographics now, because you didn't
21  have the demographics then.
22     **Q. Okay.**
23     A. If that's what you mean. I'm not sure that
24  that's what you mean.
25     **Q. I think that's a fine answer.**

34

1     **Let's move on to Microsoft Windows. Are you an**
2  **expert in the functioning of Microsoft Windows?**
3     A. That's a broad question. Microsoft Windows is a
4  massive application. Nobody is an expert in every
5  single portion of it at any given time, but the -- I
6  think the ability to go in and figure out what's going
7  on in Microsoft in a certain part of the application,
8  that ability is more what makes somebody an expert than
9  just knowing how the entire application works.
10     Because nobody knows how the entire application
11  works. Nobody's an expert in the entire suite of tools
12  that is Microsoft Windows, because it is almost like a
13  conglomerate of lots of different software; Internet
14  Explorer, which originally was Mosaic. That was brought
15  into the fold. There has been -- you know, like
16  processmon, for example, perfmon, all of these different
17  things that you see, many of them were originally a
18  software company in and of themselves. They were
19  purchased by Microsoft, and the technology was licensed
20  so there is teams of people that work on all of these
21  different components. I'm familiar with most of the
22  components in Windows and how they work.
23     **Q. And does that apply across all versions of**
24  **Windows or is your expertise specific to some versions**
25  **and not others?**

35

1     A. I would say that my experience with Microsoft
2  really started with I want to say Windows 3.2 back when
3  there was INI files that ran everything and there was no
4  registry at all.
5     **Q. I remember it well.**
6     A. And then they packed the INI into the registry,
7  I think in Windows 95. Yeah, I would say that I have
8  been with the software since the beginning, and i
9  actually worked on the team that -- I worked as a beta
10  tester when I was in college for NCSA for a software
11  product called Mosaic and I had no idea what I was
12  looking at.
13     So it is just amazing to think back, that I was
14  sitting there in a room with Marc Andreesen while he
15  invented the Internet.
16     **Q. So Windows 3.2, Windows 95 -- there have been so**
17  **many versions -- XP?**
18     A. Windows 98, Windows Millennium, Windows XP, SP1,
19  SP2, Windows Vista. I don't really want to talk about
20  Windows Vista.
21     **Q. And Windows 7 as well?**
22     A. Windows 7. I have Windows in 64 bit versions as
23  well.
24     **Q. If you are like most computers guys I know, you**
25  **have multiple computers. Would that be a correct guess?**

36

1     A. That would be a correct guess, yes.
2     **Q. On which operating systems do your various**
3  **computers run?**
4     A. I have Windows XP on a laptop. I have
5  Windows 7, 32-bit edition, and Windows 7, 64-bit
6  edition, and I also have a Windows 98 machine.
7     **Q. Are these all different computers? I should**
8  **have been clearer. Why don't we list the computer and**
9  **the operating system, and if there is more than one**
10  **operating system per computer, just let me know.**
11     A. The only one that has more than one operating
12  system is the Windows 7 machine.
13     **Q. So let's just start. You have a laptop and**
14  **that's running what?**
15     A. Windows 7, 32 bit, and Windows 7, 64 bit dual
16  boot.
17     **Q. And what's the second computer?**
18     A. My wife's computer, which used to be mine, is an
19  XP machine.
20     **Q. Is that a laptop or desktop?**
21     A. That's a laptop.
22     **Q. And that's a window what machine?**
23     A. That's Windows XP.
24     **Q. XP --**
25     A. I believe it is -- yeah, I believe it is SP2.

9 (Pages 33 to 36)

37

1    Q. So Windows XP, SP2. Next computer?
2    A. Windows 98, and I couldn't tell you which
3    version of Windows 98 it is.
4    Q. Is that a desktop or laptop?
5    A. Laptop.
6    Q. And that's running Windows 98. And next
7    computer, if there is one?
8    A. That's the only ones that are running.
9    Q. Okay. So three laptops that you are —
10   A. I have a server too but it is not running, and I
11   think it has Server 2000 on it.
12   Q. Okay. And any computers that you have recently
13   retired? And I will refined recently as 2004 or
14   forward.
15   A. I don't know. I don't think they would still
16   exist. I had a laptop that the hard drive blew on it
17   and it was Windows Vista and I didn't keep -- that would
18   be the only one that's retired, and I have a Windows --
19   and I have a Windows 7, 32-bit laptop that the hard
20   drive got -- it is egg-scrambled too. I'm not always
21   the nicest person to my own computers.
22   Q. So two computers on the scrap heap, fair to say,
23   and then three that are in circulation?
24   A. Yeah. The Windows 98 one, that one will boot
25   up. That's all I can say about that. My son uses it.

38

1    It has Photo Shop 3.0 on it, and he plays around in
2    there and he is eight and he likes to draw pictures and
3    he hasn't done that for a while.
4    Q. So kind of a utility laptop, but the Windows 7,
5    32 bit and 64 bit, that's your main computer.
6    A. Yeah.
7    Q. Your wife is the one that use the XP computer.
8    A. Yeah. And at work I use -- but that's my
9    day job.
10   Q. Let's talk about that as well. You work, as I
11   understand it, at a software provider, is that accurate?
12   A. Software company.
13   Q. Software company. It is kCura?
14   A. Yeah, k-C-u-r-a.
15   Q. And when you -- do you go to work every day,
16   like Colleen and I do, or are you a consultant that
17   works —
18   A. I go to work every day. I'm an employee there.
19   Q. Okay. So you report to the office and you sit
20   at a desk.
21   A. Yes.
22   Q. And is there a computer there?
23   A. Yes.
24   Q. And what kind of computer is that? What
25   operating system?

39

1    A. I'm not really not sure -- that's my day job. I
2    don't do any work related to this there. I'm not sure
3    that's appropriate for me to talk about, you know, what
4    might be a kCura proprietary --
5    Q. I don't think the operating system on your kCura
6    computer would be proprietary. I promise you I won't
7    ask you anything about what's contained on the computer.
8    I just need to know what operating system it is.
9    A. Windows -- I believe it is Windows 7, 32 bit.
10   And the reason I'm not that familiar with it is because
11   I'm not on it that often. I'm usually at a VM, and my
12   VM is Windows 7, 64 bit.
13   Q. Now, explain to me how you are in a VM machine
14   at work. Do you operate that off of your work computer?
15   A. No. The VM sits on a -- I wish I could tell you
16   the exact machine, but it sits on a VM -- what we call a
17   VM host, which is a very massive computer that has lots
18   of CPUs, lots of RAM, and it gets chopped up, and its
19   sole purpose in life is to present VMs to developers and
20   service specialists.
21   Q. And is that VM server owned by kCura or someone
22   in the --
23   A. Yes, it is owned by kCura.
24   Q. So you -- you go to work, you turn on your
25   Windows 7 desktop, and then you access the VM server

40

1    through that Windows 7 desktop; do I have that right?
2    A. That's right.
3    Q. Okay. Why don't we at this point go through
4    your employment history, and this may be easier if you
5    have your report in front of you.
6    MR. ARENSON: Why don't we introduce your report
7    as Exhibit 1.
8    (Ellis Exhibit Number 1, Ellis Report, was
9    marked for identification.)
10   BY MR. ARENSON:
11   Q. Take a quick look at that and just verify that
12   that is the report that you submitted in this case.
13   A. It looks like it. It has got my signature.
14   Q. Okay. So I want to talk about the jobs that you
15   have held that are relevant to the opinions in this
16   report, so you don't need to tell me about every job you
17   have ever had but jobs that you have held that gave you
18   experience that you drew on to put together this report.
19   A. Okay.
20   Q. Why don't we start with the furthest one back
21   and we'll work forward. And if you can give me a page,
22   that would be helpful.
23   A. 27, I think we are on here, 28. We are starting
24   with back in time?
25   Q. Whatever the first job was that you held that

41

1  you developed experience relevant to your report. If
2  you look at 27, you can find a listing of the jobs. Is
3  that helpful?
4      A. Yeah. Thank you.
5      Q. No problem.
6      A. Well, I mean, I began working in computers in
7  1986 and 1987. I worked in the missile facilities data
8  center.
9      Q. Did you draw on that experience in preparing
10  your report?
11      A. I think I draw on my life experience when I do
12  anything and -- technical or analysis-wise, and that was
13  really where I began to lay the groundwork for knowledge
14  about distributed systems.
15      Q. Okay.
16      A. You know, we had a number of missile --
17  intercontinental ballistic missile sites.
18      Q. Sounds scary.
19      A. They were nuclear in nature.
20      Q. You can tell me about this stuff but you can't
21  tell me about kCura Corporation?
22      A. Well, I think that's all been declassified now.
23  There are things I can't tell you, that I don't think
24  there are declassified yet.
25      Q. Okay. I understand. So what did you do while

42

1  you were working in these nuclear missile facilities?
2      A. I would develop reports and print reports and
3  fix printers and, you know, analyze soft-- -- like when I
4  first started working there, they had a -- this is
5  like -- you remember those green terminals with the
6  green screens and they had the little function buttons
7  on the bottom and you would click the function button to
8  get into the application.
9          We had no manuals that explained how any of this
10  stuff worked, and that was one of the first things I had
11  to do was write a manual for the software. That was
12  like the beginning of my software analysis, was like,
13  okay, how does that work, what does this do, find out,
14  and write the manual for it.
15          And that would -- that's just the start, right?
16  How is it relevant? Is there a specific thing that I
17  did at that job that's relevant to this? Other than
18  just adding to my experience, no, there is no one thing
19  I can say was like, wow, I learned this here and it is
20  applicable here.
21      Q. Okay. That's fair. So let's move on to the
22  next job that is relevant to this report.
23      A. Well, I worked as a -- as a research assistant
24  at the University of Illinois Chicago is when I really
25  began to get into web design. The professor there, when

43

1  I started to work as an assistant, he asked me, he said,
2  hey, everybody's getting a website. I want a website
3  for my research group. Can you build a website? And I
4  said, sure, I can build a website. I have done that
5  before. Because when I was working as a student at
6  another college, I had gotten a lot of -- when I began
7  my experience working with Mosaic -- and you might
8  remember a piece of software called Lynx, which was like
9  a text version of the Internet? I think it was spelled
10  L-y-n-x. This was one of the early -- I'm dating
11  myself, but -- so I had experience developing websites,
12  you know, building websites for fun, right.
13      Q. Writing HTML code?
14      A. Yeah. I probably wrote my first line of HTML
15  code in 1993, I would guess, '94. Yeah, I can't put a
16  specific date on when I did the work with Mosaic but it
17  was around that time frame, '92, '93, around there.
18      Q. Okay.
19      A. And that was what got me -- you know, it was --
20  everybody was really excited about the Internet back
21  then so everybody was writing web pages. And when I
22  came to work as a research assistant there, I built
23  their website, and then I built a website for a couple
24  other people, and then I built lots of websites. And
25  then I worked for a company that that's all we did was

44

1  build websites for on-line magazines.
2      Q. Which company is that?
3      A. That would be H & S Media.
4      Q. Okay. And --
5      A. I apologize. This is not nearly as complete as
6  it should be. This was the resume that I listed when I
7  worked for another company, and this is -- yeah.
8      Q. So there is some jobs that aren't included in
9  here. One of them is H & S Media?
10      A. Yeah.
11      Q. And what did you do at H & S Media? Actually,
12  before I ask that, is that before or after University of
13  Illinois at Chicago?
14      A. That was after.
15      Q. Okay.
16      A. No. It would be -- when did I work there. It
17  was right before Art.com and I started working at
18  Art.com in '98, so it was just five months that I worked
19  there.
20      Q. Okay. So let's sum up. University of
21  Illinois --
22      A. I'm sorry. I wanted to finish answering your
23  question.
24      Q. Sure. Go ahead.
25      A. I was the webmaster. That was my official

11 (Pages 41 to 44)

45

1    title, was webmaster.
2    **Q. At H & S?**
3    A. Yes. At H & S Media.
4    **Q. All right.**
5    A. And you may have heard of such publications as
6    Mary Beth's Beanie Baby Monthly Magazine?
7    **Q. Personally haven't, although I remember Beanie**
8    **Babies very well.**
9    A. They published that magazine and they had an
10   on-line site.
11   **Q. Sounds like very exciting times.**
12   A. It was a wild time.
13   **Q. So at the University of Illinois at Chicago you**
14   **were the guy designing web pages; is that a fair**
15   **assessment?**
16   A. For my research group, yeah.
17   **Q. Anything else you did at the University of**
18   **Illinois Chicago?**
19   A. Yeah. We developed an application that was
20   based in C++ that was designed to be available via the
21   web that would allow people to submit a crystal
22   structure based on data collected from electron
23   microscopes to analyze grain boundaries in the
24   substrates of --
25   **Q. It is okay. Probably doesn't matter.**

46

1    A. Solid state materials.
2    **Q. Okay. So is it fair to say you were doing**
3    **coding while you were there?**
4    A. Yes.
5    **Q. You were writing HTML. You were writing code**
6    **for C++. Was that your primary function at University**
7    **of Illinois Chicago?**
8    A. I was a student. That was my primary function.
9    I was a student. I was studying physics there.
10   **Q. Okay. So that's new information.**
11   A. I was an undergrad.
12   **Q. So you were studying and you held -- were these**
13   **paid positions?**
14   A. Yes, this was a paid position. I had my own
15   cubicle and computer and everything.
16   **Q. So you were a student at University of Illinois,**
17   **and at the same time on the side you are doing some**
18   **programming for some extra cash?**
19   A. I was doing this for that group and I was doing
20   it on the side for extra cash. My roommate had worked
21   at a company and I was telling my roommate about, you
22   know, that I'm building a website and he said my boss
23   wants a website. And then it kind of snowballed from
24   there, and then I ended up getting a job with Mary
25   Beth's Beanie World Monthly.

47

1    **Q. Got you. So from your student days at**
2    **University of Illinois, you went onto H & S, and that's**
3    **when you did the Beanie Baby monthly work.**
4    A. Yeah. It was an on-line -- we would do on-line
5    contests. I wrote some code to do a -- to pick a random
6    winner for a contest from a list of contestants. People
7    would enter into the contests and get a free Beanie. I
8    did some graphics work, not a lot. My coworkers would
9    design most of the graphics, but I would do some touchup
10   work and resizing of images, things like that.
11   **Q. What kind of code were you writing at the time?**
12   A. That was written in -- it was a CGI script, and
13   I believe I -- I believe that was in C++. It was common
14   gateway interface. Back then CGI was the way that you
15   would interface with the users. You would pass
16   variables into a -- basically a CGI executable that
17   would be running on the computer that would be able to
18   process it. ASP was a baby at that time. CGI was a
19   more mature programming language.
20   **Q. Okay. And then anything else that we should**
21   **talk about at your time at H & S that's relevant to what**
22   **you wrote in your report?**
23   A. Not that I can think of.
24   **Q. Okay.**
25   A. That was a long time ago. There was a lot of

48

1    marketing that went on -- we had affiliates as well,
2    people that we were having -- we were placing banner ads
3    with people that we knew were -- this sounds ridiculous,
4    but we knew that there were some people that were
5    considered experts and they had websites, and they would
6    get hits on their websites, and we would be like, hey,
7    put our banner ad, and we would pay them to put our
8    banner ad on their website.
9    **Q. Now, were you directly placing those banner ads**
10   **or was that something the company was doing?**
11   A. That would have been me directly sending
12   somebody a banner ad to do.
13   **Q. So this was a one-to-one transaction.**
14   A. Yeah.
15   **Q. You would contact these website owners and say**
16   **we have an ad we would like to you to run and we'll pay**
17   **for it.**
18   A. I didn't say that we would pay for it, but I was
19   involved in that conversation and I would be the one
20   that would work with the person to make sure that it got
21   posted correctly, and if there was a new ad, they
22   would -- I apologize about that. I completely forgot
23   about that. I have had a lot of experience.
24   **Q. That's fine. There was no third-party ad**
25   **network involved in that transaction though.**

12 (Pages 45 to 48)

49

1    A. Not to my knowledge.
2    Q. So from H & S you moved on to Art.com.
3    A. I did.
4    Q. And that was in 1998. What did you do at
5    Art.com?
6    A. I was a project manager there.
7    Q. What does that entail?
8    A. That entailed -- we had a website called
9    Art.com, and we also had a website called
10   Artprintindex.com, and I would work to establish
11   projects, technical projects of a technical nature, and
12   then I would work with developers to make sure they got
13   executed in a timely fashion.
14        Most of my time would be spent doing that, and I
15   would work with -- we had contractors that worked with
16   us. I can't remember the names of the companies. They
17   would be working on projects to develop additional code.
18   I worked on the payment system. I worked heavily on the
19   financial -- the back-end system. Warehouse projects
20   would be mine, anything that involved -- one time we had
21   a problem where we had a large amount of money in our AR
22   that had to be -- we had to figure out where it was
23   coming from, and I did provide a data analysis for that.
24   I had done a lot of data analysis as physics student in
25   research; you know, handling large sets of data,

50

1    filtering data out, parsing data. That was what I was
2    good at doing also.
3    Q. Are you writing code at this point or is this
4    more of a different type of experience?
5    A. I was writing some HTML code, like somebody
6    would say how do I do this and it would be like -- I
7    would explain to them -- I would work directly with the
8    developers and say why don't you do it this way.
9        We had a problem where people were complaining
10   about, you know, our members were artists, right, and
11   they would say, hey, I was on Art.com and I downloaded
12   this image and, yeah, it is only 120 by 200 pixels big
13   but it says it is 300 DPI and I'm concerned people could
14   print this out and it would be art quality.
15        It would be the size of a thumbnail if they did,
16   but to satisfy them I developed a method and a script
17   that went through and changed all of them to say 72 DPI.
18   That's just exif, e-x-i-f, data.
19   Q. So a little bit of code writing but more of a
20   data analysis role. What else did you do?
21   A. That was it.
22   Q. Okay. So --
23   A. Project management, work with people, coding,
24   work with the affiliate manager on his projects, help
25   him, you know, put things together, understand like how

51

1    our website works and how we are driving traffic in. I
2    can't remember the specific projects.
3    Q. That's fine.
4    A. There were a lot.
5    Q. Are there specific experiences you had at
6    Art.com that you drew on in preparing your report?
7    A. That was where I really learned about the whole
8    affiliate marketing. How an affiliate marketing program
9    works.
10   Q. Now, what was your interaction with the
11   affiliate -- the affiliates, I guess, or the affiliate
12   marketers? What was your job?
13   A. What was my job? Specifically if we needed to
14   modify code or change the way things worked to
15   accommodate the affiliate marketers, that would be a
16   project that would have fallen under my belt that I
17   would have had to work on.
18   Q. Can you explain to me what role the affiliates
19   played with Art.com?
20   A. They drove traffic to the site.
21   Q. How would they do that?
22   A. They would post banner ads on their sites. You
23   know, an affiliate might have 20 websites that they
24   manage.
25   Q. So strictly banner ads or were there anything

52

1    else?
2    A. Banner ads. They wouldn't place orders for us.
3    We also had the art print index but I think that's a
4    different animal. That was a standalone software
5    application in a catalog that we would mail out.
6    Q. Let me make sure I have this right. The
7    affiliates would have their own websites. You would
8    give them banner ads to display on these websites, which
9    would in turn drive traffic back to Art.com and
10   presumably buyers.
11   A. Right. And they were also working with -- I
12   want to say somebody like a Mediaplex. It might have
13   been Mediaplex. I don't remember who it was.
14        I know that there was a couple of big names,
15   like companies that had the ability to target ads on
16   lots of different sites, so those would also be part
17   of that.
18   Q. Okay. Now, you left Art.com in 2000? Do I have
19   that right?
20   A. Yeah. I think it was early 2000, maybe late '99
21   or earlier 2000.
22   Q. You can look right there. It is not a guessing
23   game. You said 2000. Do you think that was right?
24   A. I don't see Art.com. Am I looking at the right
25   page?

13 (Pages 49 to 52)

53

1     **Q. 27, professional history.**
2     A. Oh, thank you. Yeah, that's -- yeah, that was
3     late 2000.
4     **Q. Okay. After you left Art.com, did you have**
5     **further involvement with affiliates in your future jobs?**
6     A. No.
7     **Q. Okay. Is it safe to say that the --**
8     A. Maybe at Chemistri, at Leo Burnett. I'm sure
9     that, you know --
10    **Q. You don't know.**
11    A. I can't recall. I don't recall. It is a
12    very -- it was more than 10 -- it was almost 10 years
13    ago.
14    **Q. So no specific recollection of working with**
15    **affiliates at Chemistri.**
16    A. No.
17    **Q. Is it safe to say that the affiliate -- is it**
18    **safe to say that affiliate marketing programs have**
19    **changed significantly since the year 2000?**
20    A. I think we already had this discussion.
21    **Q. Nope. This one I'm sure about. We haven't had**
22    **the discussion about affiliates.**
23    A. About whether or not it has changed
24    significantly? I think the individual sole proprietor,
25    the person that can say, hey -- I think that's probably

54

1     not as prevalent as it was back then. The bigger
2     companies have edged out the smaller companies. They
3     have bought them up.
4     Certainly I know of -- I remember there was one
5     called -- I think it was called -- I want to say Lincton
6     but I know that's not right. There was a company that
7     was doing -- like you could get -- they would send you
8     links and stuff and I know they got bought out by one of
9     the bigger guys. So there was a lot of that going on
10    back then. The landscape is different with respect to
11    the size.
12    **Q. The players are different.**
13    A. Yeah. You know, yes.
14    **Q. Okay.**
15    A. They are bigger. Obviously the players are
16    bigger.
17    **Q. And different. They are not the same players**
18    **you dealt with that have grown bigger, are they?**
19    A. I don't know. Like I said, I couldn't remember
20    the names of the companies that I worked with at
21    Art.com.
22    **Q. Do you know who the top five affiliate networks**
23    **are now?**
24    A. Yeah. There is Mediaplex, Doubleclick. I can't
25    think of --

55

1     **Q. Maybe we need to define what you mean by**
2     **affiliate. I'm not sure we mean the same thing. What**
3     **do you mean when you say "affiliate"?**
4     A. Somebody who is an affiliate is somebody that
5     you are affiliated with.
6     **Q. I guess that's fair. But not using the word in**
7     **the definition, what do you mean by "affiliate"?**
8     A. For example, you would have a person that runs
9     some websites, and if they are an affiliate, then they
10    would be producing and providing and serving up banner
11    ads or advertisements for you, and then you would pay
12    them based on what's coming through.
13    And that's really -- I don't think that's
14    changed. I think it is just there is people that are --
15    grouped all of those people together, and then they
16    can -- and then all of those people are working with
17    just one big company, like Doubleclick or something like
18    that.
19    **Q. Okay. So is Mediaplex an affiliate?**
20    A. I don't think that the company is an affiliate
21    in and of itself, but they drive -- that's how they are
22    driven. I don't -- I'm not an expert on the corporate
23    structure of Mediaplex.
24    **Q. I'm not asking you if --**
25    A. I was --

56

1     **Q. Hold on.**
2     A. -- under the impression that we would be talking
3     about my report and the specific software today, and so
4     I didn't do any research on like how these companies are
5     actually interacting with their affiliates. Whether or
6     not they are an actual affiliate and they own many, many
7     websites, and people just visit those websites, maybe
8     they -- you know, I don't know who owns Yahoo.com
9     anymore, Yahoo.com would be a company that would work
10    with an affiliate, a company that has these
11    relationships with big corporate companies, to get these
12    banner ads onto their sites.
13    **Q. Okay. But I guess my question to you was is**
14    **Mediaplex an affiliate? And your answer is --**
15    A. It is not a yes or no question. My answer would
16    be I don't know.
17    **Q. Okay. Because you are not an expert at the**
18    **affiliate marketplace.**
19    A. I'm not an expert on Mediaplex.
20    **Q. Are you currently an expert on the affiliate**
21    **marketplace?**
22    A. What I said is I'm an expert on how the
23    underlying technology works, and I can look at the
24    relationships and see how they work and understand them.
25    I'm capable of doing that.

14 (Pages 53 to 56)

57

1    Q. I have no doubt that that is the case. I think
2 you have said that three times now. My question is more
3 specific to the affiliates and the affiliate
4 marketplace.
5       Do you claim expertise in the affiliate
6 marketplace? How affiliates receive assignments and how
7 affiliates carry out assignments, that type of activity?
8 Not the underlying code of the Internet, which I
9 understand you have a significant amount of expertise
10 in. The actual day-to-day interaction with affiliate
11 networks, are you an expert in that area?
12    A. I would say on the business side, no.
13    Q. Okay. And just so I'm understanding what that
14 clarification means. What you mean by "on the business
15 side, no"?
16    A. Like how they are networked together, how these
17 companies -- how they talk to each other, how they
18 establish their relationships. I know the relationships
19 exist. I know that the affiliate marketers, the big
20 companies that are responsible for pushing the ads out
21 to people, I know how they work.
22       I know how that side of things works. I know
23 how it operates. I know how cookies land on your
24 computer. I understand how another website will pick
25 that cookie up and know who you are.

58

1    Q. And you are getting back into the technical --
2    A. On the technical side, yes, I'm an expert.
3    Q. Understood. So you understand the technical
4 background of how information is transmitted between
5 affiliates, for example, but as far as how affiliate
6 networks work on a day-to-day basis, the interactions
7 between people, how affiliates sign up with a website,
8 and who the biggest affiliates are right now, you don't
9 know any of that stuff, do you?
10    A. No. I don't know who the biggest affiliates are
11 right now, no.
12    Q. Not just that but the day-to-day interaction
13 between affiliates and how affiliates interact on a
14 business level with companies, are you an expert in that
15 area?
16    MS. GURLAND: Is there a definition for "on a
17 business level"?
18    MR. ARENSON: He actually used the term, so I'm
19 quoting back a term that he used.
20    A. I'm not sure what you mean.
21    BY MR. ARENSON:
22    Q. Well, when you told me you weren't an expert on
23 the business end, what did you mean when you said that?
24    A. Oh, I don't know how they are financed. I don't
25 know who calls who. I can -- I can speculate with a

59

1 reasonable degree of certainty as to how it works
2 because it works like anything else. You call somebody
3 up, you want a service, you order the service, there's
4 options. I did once work with the -- I was actually --
5 probably Google is the biggest advertiser, right, so
6 they are probably the biggest. You know, the Google --
7 I actually have done -- this is great. I'm remembering
8 lots of stuff now. I have worked for the Google ad
9 works campaign. I have directly done that.
10    Q. Is Google an affiliate?
11    A. Google has affiliates. Their affiliates would
12 be people that post Google's ads for them. If I'm doing
13 a search on Google and I see -- and you see the banner
14 ads, those are paid for by people.
15    Q. So you define --
16    A. I would say that -- yeah, I guess Google would
17 be an affiliate.
18    Q. An affiliate for who?
19    A. Of whoever they are putting ads up for. Like if
20 I wanted to put ads onto Google's website, then Google
21 would be my affiliate.
22    Q. And is Google what's known as an affiliate
23 network?
24    A. It depends on what your definition of affiliate
25 network is. I feel like we are going down a path here,

60

1 and you are trying to get me to say something. I'm
2 really not sure what the objective here is, other than
3 for me to state that I have a very strong understanding
4 of this business.
5    Q. Which business?
6    A. Of the business of the Internet. I have a very
7 strong understanding, expert understanding --
8    Q. But that's a large statement, right? You don't
9 have an understanding, or an expert level understanding,
10 of all the business on the Internet. That would be
11 impossible.
12    A. I don't think that's true. I think that we are
13 mixing words here.
14    Q. I'm really not trying to trap you on anything.
15 I just need to understand the difference between the
16 technical side, which you have explained in significant
17 detail that you have expertise in, and the business
18 side, which is a word that you gave me.
19       The interactions between the parties, the
20 individual networks, that side, the affiliate business
21 side, the day-to-day activity, do you have expertise in
22 that area, technical area aside?
23    A. I have experience in that area.
24    Q. Okay.
25    A. I don't do it every day.

15 (Pages 57 to 60)

61

1    Q. When was the last time you did it?
2    A. The last time I submitted like an ad-works
3    campaign was probably 2004. I think it was 2004. I'm
4    guessing. It was when I was working for Computer Bits.
5    2002, 2003 I worked with a Google ad-works campaign.
6    Q. Okay. So six years ago. And I don't mean to
7    belabor this: Are you an expert in the day-to-day
8    business activities of an affiliate network?
9    A. I can speak to it. I believe that I have
10   sufficient experience in how that sort of thing works to
11   provide knowledge that would be like suitable to help
12   somebody understand how it works.
13       If somebody needed help from me to understand
14   how that whole networking side of things works and how
15   the information comes down to people's computers and how
16   the cookies appear and how banner ads are targeted, I
17   can provide that knowledge.
18   Q. You define an expert as a go-to person; is that
19   right?
20   A. Yeah.
21   Q. So you are a go-to person on how affiliate
22   networks function.
23       MS. GURLAND: I think that's not what his
24   testimony was.
25       MR. ARENSON: Well, I'm asking the question.

62

1    BY MR. ARENSON:
2    Q. Are you a go-to person on how affiliate networks
3    function?
4    A. I would be -- I would not say that that's my
5    role every day.
6    Q. In fact --
7    A. But in the experience of doing my work in the
8    forensic side of things, can I speak to it? Yes, I can.
9    Q. Okay. Let's move forward.
10       Let's actually dive into the next job -- I guess
11   we didn't talk about Chemistri and Leo Burnett. What
12   did you do there?
13   A. We did talk about that.
14   Q. Remind me.
15   A. I was the web producer. We talked about this.
16   Q. I don't remember. Help me out. What kind of
17   web producing did you at Chemistri?
18   A. It was the -- it was the Army campaign, Go Army,
19   Army of One.
20   Q. Was that all you worked on?
21   A. Yes.
22   Q. Okay. And that was the sum total of your
23   experience at Chemistri; is that correct?
24   A. Yes.
25   Q. And is any of that experience relevant to what

63

1    you wrote in this report?
2    A. Just my experience with working on a big
3    campaign and understanding the scope of a campaign.
4    Q. Okay.
5    A. Not particularly. It wasn't the most --
6    Q. Okay. Next job, Computer Bits, tell me a little
7    bit about that?
8    A. Computer Bits I would provide support for law
9    firms. That's where I did a lot of network
10   architectural work, did a lot of PC installs, server
11   installs, designed and built websites.
12   Q. What kind of company is Computer Bits?
13   A. It is a privately held small company of about
14   eight guys. It is a computer consulting firm. They
15   provide everything from network architecture to
16   application design, software support.
17   Q. And what experience at Computer Bits did you
18   rely upon to draft your report?
19   A. I wrote a lot of code when I worked for Computer
20   Bits. I wrote a lot of code and I got into forensics
21   there. That's where I began to do forensic work.
22   Q. Okay. What kind of code --
23   A. That's where I went to a class on forensics. I
24   got certified in forensics when I worked there. I wrote
25   ASP using VB script, wrote with sequel server, wrote

64

1    sequel queries, worked with Cold Fusion, wrote a cold
2    fusion application for the Illinois comptrollers office
3    that would handle scheduling and -- for the comptroller.
4    Q. I don't need to know about every piece of code
5    you wrote. I think I have a general sense of what you
6    did there.
7        How did you use that experience in writing this
8    report?
9    A. Well, it's my forensic experience and my
10   experience with security and with the popups that we
11   talked about, with analysis of what software was doing,
12   going into log files, examining log files, examining IAS
13   log files. All this work that I did, you know, using
14   processmon to figure out what was going on on a computer
15   when something was happening, analyzing software.
16   Q. Okay.
17   A. Working on performance issues, dealing with
18   companies like setting up spam filters, setting up popup
19   blockers, all that work, that was what I did there day
20   in and day out.
21   Q. Okay.
22   A. Something night in and night out too and on the
23   weekends.
24   Q. I believe it. Next job, RGL. What kind of
25   company is RGL.

16 (Pages 61 to 64)

65

1    A. RGL is a forensic consulting firm.
2    Q. All right. What did you do there?
3    A. I was a manager of the forensic and litigation
4  technologies practice.
5    Q. Okay. And what did that entail?
6    A. That entailed handling forensic engagements
7  where there would be a -- for example, there would be a
8  company called -- like patent infringement case or a TRO
9  going on, imaging systems and doing the analysis,
10  doing analysis of financial systems, pulling data out.
11  More of the same type of stuff that I had been doing for
12  the last few years but more focused on doing it like for
13  preparation for a court case.
14    Q. And how did you draw on that experience in
15  writing your report?
16    A. Report writing, understanding what I -- being
17  focused on what I need to do. You know, I certainly
18  took more classes on forensics when I worked there so
19  the forensic side of things. Understanding how a
20  forensic case is built and what you need, what are the
21  requirements to be able to say that something is
22  forensic; learning about chain of custody and
23  establishing chain of custody, and working with
24  attorneys to ensure that checks and balances were in
25  place to protect data.

66

1    Q. Okay.
2    A. All of those things were excellent background
3  for doing this kind of work.
4    Q. Okay. Anything else?
5    A. In fact, I was there when this engagement began.
6    Q. Okay. So you started writing this report while
7  you were at RGL and you subsequently moved over
8  to kCura?
9    A. Yes.
10    Q. All right. Have we covered everything -- the
11  experience that you drew on to write your report at RGL?
12    A. Probably not everything. That would certainly
13  be a topic for an entire day, all the experiences that I
14  had there that gave me the experience to be good at
15  what I do.
16    Q. Have we been given a fair overview of --
17    A. I think we have given it a fair overview.
18    Q. You moved to kCura Corporation in 2009. Has
19  there been experience that you gained at kCura
20  Corporation that you applied in writing this report?
21    A. Yes. I'm elbows deep in servers all day long
22  every day understanding how a very complex application
23  works, running things like perfmon, processmon, writing
24  reports, examining software behavior, looking for the
25  unexpected, uncovering -- working with the Windows

67

1  registry.
2    Q. Okay.
3    A. Working with HTTP, protocols, mapping out
4  protocols.
5    Q. Okay.
6    A. I mean, the software is called Relativity.
7  That's the name of the software tool that we provide,
8  and it is a -- it is an enterprise class application and
9  it involves users going to a web browser and downloading
10  like an active-x object and installing it and reviewing
11  documents. And lots of times there can be conflicts,
12  right?
13    Because there is so many different Windows
14  systems out there and so many softwares that they have,
15  things get into the registry that shouldn't be there.
16  They need to removed so our software will work. Not all
17  software plays nice in the registry.
18    Q. Okay. Any other overview topics you want to
19  talk about that you applied to your report from your
20  time at kCura?
21    A. I think that I have covered the high levels
22  of -- I certainly don't want to say that, you know,
23  there is something -- that we have covered everything in
24  my experience that could have been used in this report.
25    Q. Okay.

68

1    A. I can certainly rely back to my memory and think
2  back to things that -- if I were to read through my
3  report, I could very likely think of examples from
4  different jobs of what was -- you know, how did I learn
5  how to do that, and there was probably new things that I
6  decided to do with this that I hadn't done before. It
7  was an art.
8    Q. Can you give me some examples of new things that
9  you decided to do with this report that you hadn't done
10  before?
11    A. Well, I think that loading something onto an
12  older version of software and throwing it into a VM and
13  doing that, that's not something that I would normally
14  do in my daily practice, but it is something that I --
15  it is something that I do.
16    We have VMs in my practice. We do use virtual
17  machines to load software onto it. We just use current
18  versions of software, but to try to go back in time like
19  that, it was --
20    Q. Okay. Any other examples?
21    A. No. That's it.
22    Q. Okay. And then Scott R. Ellis Consulting, is
23  this a company you set up for the purposes of this case
24  or did that company do other work?
25    A. I do other work for law firms. I have other

17 (Pages 65 to 68)

69

1    cases. When I left RGL, I had a number of engagements
2    that I took with me that I continued to work on.
3        Q. Did Scott R. Ellis Consulting exist before you
4    were retained in this case or after?
5        A. It existed prior to that. I have been doing --
6    I have been doing work under my own name for a long
7    time.
8        Q. Okay. So prior to the engagement for this.
9        A. Yeah. Scott R. Ellis Consulting is in existence
10   as a corporation. I'm a single person so I do business
11   in Illinois. I'm registered in Illinois, I believe.
12   I'm not sure how that works. Somebody did that for me.
13       Q. What kind of work do you do at Scott R. Ellis
14   Consulting?
15       A. Forensics.
16       Q. Solely forensics?
17       A. I do some web design, website support, as well.
18   I do some training, although I haven't done training in
19   a while. It has been a few years.
20       Q. What kind of website design do you do?
21       A. It is a website like HTML graphic design-type
22   stuff.
23       Q. Are you writing code for websites?
24       A. Yeah, sure. Cold Fusion, in fact. I still
25   write Cold Fusion code.

70

1        Q. Anything else you do at Scott R. Ellis
2    Consulting?
3        A. Not that would be relevant.
4        Q. So we have covered all the relevant experience
5    you gained at Scott R. Ellis Consulting that was applied
6    to this report?
7        A. Yes.
8        Q. And have we covered all the experience at kCura
9    Corporation that was relevant to this report?
10       A. I believe so. I'm not going to answer that and
11   say conclusively, because it would take me a couple of
12   hours to go through the entire report.
13       Q. Understood. All right. We are just going to go
14   a little bit longer, if that's okay. I want to get us
15   out of here at a reasonable hour tonight. So if that's
16   okay with you, I want to press ahead rather than take a
17   bunch of breaks. But if you need a break at any point,
18   just let me know.
19       A. Okay. I could use a break right now, if that's
20   okay.
21       MR. ARENSON: All right. Let's take a break and
22   go off the record.
23       (A brief recess was taken.)
24       MR. ARENSON: Back on the record.
25   ///

71

1    BY MR. ARENSON:
2        Q. Mr. Ellis, we were talking at the break about --
3    just rapping through your employment history. One
4    follow-up questions about the training you said you had
5    done as part of Scott R. Ellis Consulting --
6        A. Yes.
7        Q. -- what kind of training was that?
8        A. I gave training on the use of a software
9    application to the -- to FHA.
10       Q. Which software application?
11       A. It is called Right Now. It was a customer
12   support portal, and I worked with the vendor to develop
13   training materials, and then I delivered that training
14   in Denver and in California, southern California, like
15   San Jose, La Joya maybe, and then I also did -- and that
16   was for FHA, and then I also did a training program for
17   the U.S. Department of Commerce.
18       Q. And what was that about?
19       A. That was about, you know, Internet --
20   establishing an Internet business and running an
21   Internet business and the different -- you know, how to
22   market yourself with a website, and that involved --
23   also that was a joint training session that I did with a
24   guy named Larry Tracy, who was a presentations expert,
25   somebody who talks about how to deliver a presentation.

72

1        And we did that for a group of -- we did that
2    for two different groups of people that had -- that were
3    members of -- that were from Latin America. They were
4    from like foreign business owners that wanted to do
5    business in America. That was a training program that
6    was run by the Department of Commerce.
7        Q. Okay. Let's go back to your report, which we
8    have marked as Exhibit 1, and I would like to take you
9    back in time to when you were preparing this report.
10       Who did you talk with in the process of
11   preparing your report?
12       A. Carolyn.
13       Q. Okay. Anyone else?
14       A. I was working at RGL at the time, and I had
15   people, technicians, that I might ask them, hey, set up
16   a VM for me, install a software, do this, do that, kind
17   of stuff.
18       Q. The technicians would install which software?
19       A. Like the VM, the Windows XP, they would install
20   on a VM.
21       Q. So they would install the operating system or
22   are you talking about the actual files you tested?
23       A. The operating system, and in the very beginning
24   I had a technician that installed and did some screen
25   shots for me of the software that we were testing.

18 (Pages 69 to 72)

73

1    Q. Okay. And how did that work? Were you sitting
2    over his shoulder or her shoulder, while he was taking
3    those screen shots or did he just kind of operate
4    independently?
5    A. Some of the time, little bit of both.
6    Q. So at some point you were sitting over watching
7    the technician -- why don't he give him a name.
8    A. Joe.
9    Q. So Joe would take some screen shots for the
10    files that you tested in your report, and at some points
11    you were standing over Joe's shoulder and at some points
12    Joe was acting independently and taking shots on
13    his own.
14    A. Yes.
15    Q. And do you remember which programs that Joe took
16    screen shots of? Was it all of them or just some of
17    them?
18    A. No. It was just DriveCleaner and WinFixer. I
19    think those were the two. I ended up really redoing
20    everything so that I could see it for myself. That was
21    the initial phase, just take a look at this and let me
22    know what you find and let's take a look at it, and then
23    I reviewed it and then I ended up redoing everything
24    again at a later date.
25    Q. The screen shots in your report, did Joe —

74

1    A. No. Everything that is in my report I did
2    personally.
3    Q. Okay. So what did you do with the screen shots
4    that Joe took?
5    A. Oh, I couldn't tell you what happened to them
6    eventually.
7    Q. Are they still around?
8    A. Probably not. Probably not.
9    Q. Deleted them?
10    A. Yeah.
11    Q. Did you or Joe take notes during the process of
12    testing the software?
13    A. You know, I developed my report. That's really
14    where I -- that's my working environment, is my report.
15    Q. So —
16    A. And the documents -- that's where the screen
17    shots would end up, in the documents, which you have.
18    Q. So were there notes that you took in addition to
19    your report, or is this the sum volume of everything?
20    A. No.
21    Q. What about Joe?
22    A. No. I mean -- no. Just screen shots and
23    that's it.
24    Q. Okay. What else did Joe do?
25    A. That was it.

75

1    Q. And why did you ask Joe to take screen shots?
2    A. Probably because I was busy at the time.
3    Q. Okay. So you told me that Joe did screen shots
4    of DriveCleaner and WinFixer, you think. Could there
5    have been more programs or are you sure those are the
6    only —
7    A. No. I'm sure those would be the only two.
8    Q. Let me finish my question because the court
9    reporter will get mad at me.
10    So you are sure those are the only two?
11    A. Yes.
12    Q. Okay. All right. So you talked to Joe. What
13    did you and Joe talk about?
14    A. The functionality of the software.
15    Q. And what did Joe tell you?
16    A. That it -- the software said that it would do
17    certain things and that it did it.
18    Q. And was there a specific piece of software that
19    he was taking about or was it just in general
20    DriveCleaner and WinFixer, I guess?
21    A. It was both of them.
22    Q. So he said to you that DriveCleaner and WinFixer
23    said they would do something and they actually did it.
24    A. Yeah.
25    Q. And did you rely on that in your report?

76

1    A. His statements to me? I relied on that to make
2    my decision about whether or not to progress with the
3    case. That was like an initial exploration to find out
4    is it complete vaporware or does it work, does it do
5    anything.
6    I wasn't going to spend my time, you know,
7    working on something where the initial examination would
8    prove out that it was just not even worth looking at.
9    Q. Why don't we take a step back. You were
10    approached by Carolyn at some point?
11    A. Yes.
12    Q. Did that come out of the blue or did you two —
13    MS. GURLAND: Are we talking about in
14    preparation of this report? So this report that's
15    dated, you know, whenever -- for this report and this
16    engagement, is that what you are asking?
17    MR. ARENSON: Well, I mean you raise an
18    interesting question.
19    BY MR. ARENSON:
20    Q. Do you two have a preexisting professional
21    relationship? Does she use you as a consultant in other
22    cases?
23    A. It has been a few years, but, yeah, I worked
24    with her on another case in the past.
25    Q. What case was that?

19 (Pages 73 to 76)

77

1    A. That was the Fabio v. Carani, C-a-r-a-n-i, case.
2    Q. And what was that case about?
3    A. That was about a man who had been using piece of
4    software called Limeware -- I'm sorry, Kazaa, K-a-z-a-a,
5    and he had been downloading pornography, and he had
6    downloaded things that the -- that ICE, I-C-E, had
7    intercepted like overseas, so they got involved and then
8    he was charged with a crime.
9         And then my job was to take a look, do a
10   forensics examination of his computer, and find out to
11   what extent it was intentional or not intentional. That
12   involved looking at temporary Internet files and his is
13   Kazaa database and booting the machine -- booting a
14   virtual copy of the machine and examining its behavior
15   and looking for things like virus infections.
16   Q. And is that the only case that you have worked
17   with Ms. Gurland on or have there been others?
18   A. Yes, that was the only other one.
19   Q. So how did she come to retain you in this case?
20   A. She called me up.
21   Q. What did she tell you in that first phone call?
22   A. That there was some software that she needed
23   examined and that she thought it was right up my alley,
24   something that I could do.
25   Q. Okay. And then what happened next?

78

1    A. We did an engagement letter and I began -- I
2    began working on the case.
3    Q. And is this when Joe started testing the
4    software?
5    A. Yes.
6    Q. Okay. So Joe took a look at DriveCleaner and
7    WinFixer and told you that they did what they said they
8    were going to do.
9    A. That's right.
10   Q. And then what happened next?
11   A. And then I basically took the reins of the
12   examination and reviewed his work, asked him for a fresh
13   VM with Windows XP on it, and basically redid the work
14   and examined it for myself.
15   Q. So did Joe create all the VM machines that you
16   used?
17        MS. GURLAND: Can I just -- for clarification,
18   because there is -- we need a time frame of what -- of
19   what investigation that we are talking about with me in
20   this case, because there is this -- I think there is
21   some confusion already.
22        If we want to talk about this report that was
23   turned in March 26th in connection with the FTC case,
24   there are a certain set of answers about what he did,
25   but there is also a role that he had in this case that

79

1    has to do with the United States' Attorney's Office and
2    some things that he did that are separate but not
3    unrelated to what's in this report.
4         MR. ARENSON: Okay.
5         MS. GURLAND: That predates this report.
6         MR. ARENSON: That's fine. What's the
7    distinction?
8         MS. GURLAND: The distinction is that if you
9    want to ask him about -- I just want to know when you
10   are asking questions and when he is answering, I want to
11   make sure that everyone's on the same page. I want to
12   know if he is talking about -- at which phase, at the
13   initial phase where he is preparing something that
14   wasn't for the FTC and at a later phase where he was,
15   because I think that distinction would be meaningful to
16   you.
17        MR. ARENSON: Okay.
18   BY MR. ARENSON:
19   Q. As we go through this you can feel free to
20   clarify if this was work done for your report or done
21   for some other work that you did for Ms. Gurland.
22   A. The Joe work would have been done for the other
23   work. I wasn't making a distinction between the two,
24   but that work would have been for the initial
25   examination that we did for the --

80

1    Q. Just so I understand, so Ms. Gurland called you
2    and sent you some software but this was in connection
3    with the potential criminal case, not the civil case?
4    A. Yes. That would be true.
5    Q. And how was that explained to you?
6    A. That it was a -- that there was a criminal case.
7    Q. Was the civil case mentioned?
8    A. Not -- I don't recall at that time if it was
9    mentioned that there would be a civil case also or if
10   they were the both or if the one turned into the other
11   one. I'm definitely not an expert on being a lawyer so
12   I'm not that familiar.
13   Q. Okay. Do you remember when this was? When were
14   you first approached by Ms. Gurland?
15   A. It was -- I want to say it was about two years
16   ago, a little under, maybe a year and 10 months ago.
17   Q. Okay. So it is -- help me with the dates. It
18   is October 2010, so we are talking about January of
19   2009; is that right?
20   A. Maybe it was as far back --
21        MS. GURLAND: I was not yet pregnant with Cole.
22   A. (Continuing.) She became pregnant with Cole
23   shortly after.
24        MS. GURLAND: Who is 10 months old.
25   A. (Continuing.) All right. So it was roughly 20

20 (Pages 77 to 80)

81

1  months ago.
2       BY MR. ARENSON:
3       Q. Can you give me a month and a date because I'm
4  not good at math?
5       A. You are not good at math?
6       Q. Terrible.
7       A. So it is almost October now so for all intents
8  and purposes let's say it is the beginning of October,
9  which is the 10th month. So if we go back -- if we were
10  to go back nine months it would actually be January 1st,
11  right? January 1st and that would be nine months ago,
12  and then nine plus 12, 21.
13      Q. So we are talking January 1st, 2009.
14      MS. GURLAND: If you know. If you know an exact
15  date --
16      A. I don't know an exact date. I would have to --
17      BY MR. ARENSON:
18      Q. But you think it was on or about January
19  of 2009.
20      A. On or about.
21      Q. Okay. And at the point where Ms. Gurland called
22  you in January 2009, on or about, she mentioned the
23  criminal case but didn't make any mention to the civil
24  case.
25      A. I don't recall.

82

1       Q. When did you first understand the distinction
2  between the civil and the criminal case?
3       A. Well, I created a couple of reports for the
4  criminal case.
5       Q. Okay.
6       A. And then I would say it was a year ago, a
7  year -- about a year ago that we began to focus on the
8  civil case, I think. I apologize. I didn't --
9       Q. All you can tell me is what you remember so
10  that's fine.
11      So you prepared a series of reports for the
12  criminal case. Do you know what was done with those
13  reports?
14      A. No. Well, they were delivered to the
15  federal defenders -- or not the federal defenders. Help
16  me out here.
17      MS. GURLAND: United States' Attorney's Office.
18      THE WITNESS: Yeah.
19      A. The United States' Attorney's Office.
20      BY MR. ARENSON:
21      Q. Okay. So you did reports that were delivered to
22  the United States' Attorney's Office.
23      A. Yes.
24      Q. And then you wrote a separate report, obviously,
25  for this case.

83

1       A. That's right.
2       Q. And the first time you remember thinking of the
3  civil case was when?
4       A. Probably after those reports were delivered,
5  which would have been about a year -- I think it was
6  April of last year that those were delivered. Maybe
7  even further back.
8       MR. ARENSON: Let the record show that Carolyn
9  is motioning him backwards.
10      MS. GURLAND: I think he doesn't know the dates
11  so I don't want there to be confusion. These are facts
12  that exist so --
13      MR. ARENSON: All he can tell us is what he
14  knows.
15      THE WITNESS: There you go.
16      BY MR. ARENSON:
17      Q. Okay. So you -- all the work that Joe did, is
18  it your testimony that Joe did work exclusively for
19  these criminal reports that you put together?
20      A. Yes.
21      Q. And Joe had nothing to do with this civil report
22  that you put together.
23      A. No.
24      Q. Okay. So let's get back to this report and who
25  you spoke with. You said you spoke with Ms. Gurland on

84

1  numerous occasions; is that fair?
2       A. Yes.
3       Q. Okay. And after the initial -- well, I guess it
4  is a little more complicated because you were retained
5  initially for the criminal case, as I understand it.
6       A. Right.
7       Q. What was your first discussion with Ms. Gurland
8  about the civil case and preparing this report?
9       A. That the software needed to be tested; that I
10  would be testing the software again and that there would
11  be new software to test.
12      Q. Which software did you test in connection with
13  the criminal report?
14      A. That was the DriveCleaner and WinFixer. I
15  believe those were the two that were tested.
16      Q. Okay. So the sum total of the criminal report
17  was just DriveCleaner and WinFixer.
18      A. That's right.
19      Q. Okay. So your first conversation that you
20  recall with Ms. Gurland is -- about the civil case is we
21  need to test more software.
22      A. That's right.
23      Q. And then what happened next?
24      A. Then I was given a FTP access to an account
25  where I could download the software that we believed

21 (Pages 81 to 84)

85

1  correlated with the software that we needed to be
2  examining.
3      There was some uncertainty as to exactly which
4  software would be examined and lacking that
5  clarification in the reports that I had seen -- I had
6  also received some reports. And lacking clarification
7  as to exactly what the MD5 hash was of the software,
8  Carolyn said -- you know, gave me a list of items to
9  test.
10     Q. So backing up. There was a lot there.
11        FTP access to what?
12     A. To an FTP server.
13     Q. And who controlled that server?
14     A. I don't know.
15     Q. So -- well, I mean, do you have any idea?
16     A. I have no idea.
17     Q. So Carolyn just gave you a series of numbers and
18  you punched them into your FTP program and you went
19  there.
20     A. Yes.
21     Q. No questions asked.
22     A. No. I may have asked, you know, where is this
23  thing, whose is it, but I don't recall that there was an
24  answer; that it was something to do with -- I think the
25  private investigator had arranged it somehow. I really

86

1  don't -- I don't know.
2      Q. Who is the private investigator?
3      A. I don't know his name.
4      Q. Have you had any interaction with the private
5  investigator?
6      A. I met with him once not -- prior to this with
7  respect to the criminal defense.
8      Q. Okay.
9         MR. ARENSON: Go off the record for just one
10  second.
11        (An off-the-record discussion was had.)
12        MR. ARENSON: Back on the record.
13        BY MR. ARENSON:
14     Q. Was his name Jack Paladino?
15     A. That rings a bell.
16        MR. ARENSON: Thanks to Colleen.
17        BY MR. ARENSON:
18     Q. What was your interaction with Jack Paladino?
19     A. We met once and said hi. It was very cordial
20  and professional and cursory. It was just kind of a
21  meet and greet.
22     Q. No talk about the case?
23     A. Really no. It was more talking -- asking me
24  about my background. It was kind of like an interview,
25  what is your background, what have you done, that kind

87

1  of thing.
2      Q. And do you remember when this meeting was?
3      A. No, I don't.
4      Q. Do you remember a year?
5      A. It would be February, possibly, of 2009.
6      Q. Okay. And was it your understanding that
7  someone had tested the software before you got it? Were
8  you the first one to do a test on this software, is my
9  question?
10     A. To my knowledge, there was another expert
11  working with another defendant that had done some work
12  on it.
13     Q. And that's --
14     A. And there was another company that had been
15  initially contacted to do some work on the software. I
16  don't know if they tested it. I don't think they tested
17  it. I don't know if they actually got to the point
18  where they tested it or not.
19     Q. Another company contacted by who?
20     A. Like another company that got contacted by the
21  client, by Kristy Ross, that worked through Carolyn or
22  Winston & Strawn with this other company.
23     Q. Do you remember anything about that other
24  company?
25     A. No. They were an offshoot from Navigant maybe.

88

1      Q. Did you have any discussions with them?
2      A. No, none.
3      Q. Okay. So we are going back to the very early
4  days of the engagement. You -- and just tell me
5  again -- the software was given to you from an FTP
6  server, you were given a location to download the
7  software, and you were told which files to test?
8      A. Yes.
9      Q. And were just those files present on the FTP
10  server or were there a huge number of files, do you
11  remember?
12     A. I believe it was just those files.
13     Q. I would have to look. I think you tested six or
14  nine files, somewhere in that range. It was less
15  than 10.
16     A. It was less than, because there was the ones
17  that I tested; then when I got the materials -- the FTC
18  materials, I didn't have those in the beginning.
19     Q. Okay.
20     A. I didn't have any drives. I didn't have
21  anything. Then once I got those, then I tested from the
22  FTC materials, the FTC's media. I tested some files
23  from there.
24     Q. I'm a little confused in the timing here. So
25  when you wrote your report, did you base the conclusions

22 (Pages 85 to 88)

89

1  in your report on just the FTP downloads or was it based
2  on the FTC hard drive you were provided?
3     MS. GURLAND: When you say "report," there were
4  several reports, so maybe it would be good to make a
5  distinction as to which report.
6     BY MR. ARENSON:
7     Q. The only report that I'm talking about, unless I
8  make another reference saying I'm not, is the report in
9  your civil case. When you wrote your report in this
10 civil case, the one we are here about today, did you
11 base your analysis on the files from the FTC hard drive
12 or was it solely on the FTP site?
13    A. There is an MD5 hash that's listed with each
14 software that I tested.
15    Q. Uh-huh.
16    A. And I -- my recollection is that all of these
17 MD5 hashes match up with the MD5 hashes that were on the
18 disk.
19    Q. Okay. What about the FTP site? Was that for
20 the criminal report that you wrote and had no relevance
21 here, or did you pull files off the FTP site for this
22 case?
23    A. I would -- I believe that -- for this case I
24 think that the FTP was relevant only for the criminal
25 case, I believe.

90

1     Q. Because you told me for the criminal case you
2  only tested --
3     A. That's my recollection.
4     Q. For the criminal case you told me you tested
5  DriveCleaner and WinFixer; right?
6     A. Right.
7     Q. So were there only two files on the FTP server?
8  I thought you said there were like six or nine or 10.
9     MS. GURLAND: That misstates what he said. He
10 never ever said that there were six or nine or 10.
11 There were two.
12    MR. ARENSON: That's not how I recall it but --
13    BY MR. ARENSON:
14    Q. Correct me if I'm wrong.
15    A. I think there is some confusion as to when the
16 FTP was used. To my recollection, everything that I
17 tested was on the FTC media.
18    Q. Are you sure?
19    A. I need to look through this report.
20    Q. That's fine.
21    A. I don't believe I made mention of exactly which
22 ones.
23    Q. I don't want you to guess, so if you are not
24 sure, let me know.
25    A. I'm not sure but it is certainly something I can

91

1  verify. It is certainly something that I'm capable of
2  checking using standard MD5 hash. I believe that all
3  the MD5 hashes that I tested were on that -- the FTC
4  media. That's my understanding right now.
5     Q. Okay.
6     A. But it is something that I would want to reserve
7  the right to verify that, and I could certainly get back
8  to you with an answer on that.
9     Q. So when you say the MD5 hashes were all present
10 on the FTC hard drive, what exactly are you referring
11 to? What do those MD5 hashes match to?
12    A. They would match to files that were on the FTC
13 media.
14    Q. Would those be different on the FTP site?
15    A. Not if they were -- if it was the same software
16 and the MD5 hashes matched, then it would be the same
17 software.
18    Q. So the MD5 hash values probably don't tell you
19 whether you got them from the FTP site or the hard
20 drive, do they?
21    A. No. But they would tell me whether or not they
22 are the same piece of software.
23    Q. So the underlying question, which was did you
24 get it from the FTP site or the hard drive, that's not
25 answerable from the MD5 hash.

92

1     A. No. But in the beginning I believe I did test
2  some pieces of software before I had access to the FTC
3  media that was not on -- that was from the FTP site and
4  it was not on the media, and I believe that's why it
5  would have been eliminated from my final report. That
6  would be the standard forensic methodology, right,
7  which --
8     Q. Okay.
9     A. Clearly the forensics in this case were very,
10 very difficult simply because I don't know where the FTC
11 stuff came from either.
12    Q. Right. You don't have any information about
13 where the FTC got its information.
14    A. It was -- my understanding it was somebody in
15 Germany that accessed it and put it together. Other
16 than that, I know nothing. I don't know where he got it
17 or how he accessed it. I don't know if there was a
18 change in custody that I haven't seen. I don't know if
19 there was a search and seizure that was done. It
20 doesn't appear that there was.
21    It appears as though these files just appeared
22 off of the Internet and the FTC received them. I make
23 considerable comment in my report about the origination
24 of these files and the dates created of these files, and
25 it is nothing -- I mean, it is nothing less than bizarre

23 (Pages 89 to 92)

93

1  where this came from and how this whole case has played
2  out. And it has not been the standard way that a
3  forensic investigation would be undertaken at all.
4       Typically in an investigation the other side
5  sends me a drive, there is chains of custody, they know
6  where it came from. In this case I don't have anything
7  on it.
8    Q. So you don't know where the data came from, but
9  you believe -- and tell me if I'm wrong -- you believe
10  that all the data you have seen came from a researcher
11  in Germany?
12   A. I wouldn't -- I couldn't even use the word
13  researcher. I don't know. A man in Germany.
14   Q. So you think that all the data you looked at
15  came from a man in Germany.
16   A. I don't know if all of it. Some of it possibly.
17   Q. You don't know one way or the other.
18   A. I don't know which way or the other, from up or
19  down.
20   Q. So getting back to your testing of the software.
21  So at some point -- and we are not exactly sure of the
22  date -- Ms. Gurland provided you with the FTC hard
23  drive; is that accurate?
24   A. Yes.
25   Q. And this was after the FTP download?

94

1   A. Yes.
2    Q. Now, when you received the hard drive, did
3  you -- what was your process in looking at the files on
4  the hard drive?
5    A. Well, I accessed the hard drive and there was
6  forensic images on the hard drive and I copied them onto
7  a disk and then I used EnCase to open them and review
8  them.
9       One of them had an invalid partition that I had
10  to rebuild, and I reviewed the files and I looked -- ran
11  an MD5 hash. I built the MD5 hash against the files so
12  I would have that available so I would know what I was
13  testing.
14   Q. Okay. And at some point you made a decision to
15  test some of the software; correct?
16   A. Right.
17   Q. Who made that decision?
18   A. I believe a lot of that was driven by the FTC.
19   Q. Okay.
20   A. In that at some point we received the MD5
21  hashes -- I believe his name is Kevin Johnson, the
22  Johnson report, one of his later reports he decided to
23  include the MD5 hashes, so then I could check and see if
24  what I had been running and testing matched the software
25  that he was testing, because I wanted to test the same

95

1  stuff he was testing.
2       That was important to me to have that degree of
3  forensic certainty; that I'm, in fact, looking at the
4  same thing that he is looking at and that I can, in
5  fact, experience -- watch the software operate in the
6  same way that he would have been able to had he chosen
7  to do so.
8    Q. One of the things you were doing here was
9  analyzing Kevin Johnson's methodology; is that accurate?
10   A. That's accurate.
11   Q. And it would be important to test the same files
12  that Mr. Johnson tested in order to do that.
13   A. Yes.
14   Q. So you indicated that -- and when you say the
15  FTC decided which files you should test, you really mean
16  that Kevin Johnson did, because he picked out files and
17  then you did the test based on what he picked out; is
18  that accurate?
19   A. I would have to assume he received his direction
20  from the FTC.
21   Q. But you don't know one way or the other.
22   A. No.
23   Q. But the important part is you based your testing
24  regimen based on what Kevin Johnson did.
25   A. Yeah. There was software that -- I would have

96

1  to say my recollection is that there was also software
2  that we wanted to test because we felt that it had been
3  a subject of conversation perhaps. I received some
4  things in that direction from Carolyn.
5       But when we looked at it and I said, well,
6  here's the ones, I have these, and the regimen of what I
7  tested was ultimately decided by Carolyn Gurland.
8    Q. So she told you which files to test and which
9  ones not to test.
10   MS. GURLAND: Was there testimony that I told
11  him about what files not to test? I didn't know there
12  was testimony --
13   BY MR. ARENSON:
14   Q. Well, it would seem that if she told you to test
15  these files but none others, then that would by
16  definition mean that there were some that you weren't
17  supposed to test.
18   MS. GURLAND: And "none others" is the problem.
19  I don't think he testified to that. You can ask him
20  that question, that I told him not to test some files.
21   BY MR. ARENSON:
22   Q. Well, did she tell you to test all the files on
23  the hard drive or --
24   A. She didn't tell me not to test anything.
25   Q. Did she tell you to pick out the files that look

24 (Pages 93 to 96)

97

1    interesting to you?
2    A. No. There was far too many.
3    Q. Did she say do a random sampling and let me know
4    what happens?
5    A. No.
6    Q. She told you to test these specific files.
7    A. She told me to look for these particular ones
8    with these particular titles in the file name, and at
9    that point there would be a number of them and I would
10   check the MD5 hash and then -- it is in my report what
11   materials I relied on.
12   Q. But she never said test these files and whatever
13   other ones you want.
14   A. She never told me to -- no. No.
15   Q. Okay. I mean, it seems like a simple question.
16   She told you which files to test and you tested them.
17   A. Right.
18   Q. And none others.
19   A. I did not test anything else, no.
20   Q. Okay.
21   A. But, let me be clear, she didn't tell me not to.
22   She didn't say -- you said -- a moment ago you said did
23   she ask you to -- did she tell you to test these files
24   and none others. No, she didn't say that. She said
25   test these files.

98

1    Q. And you never tested any files other than those,
2    other than the exact ones she told you to test.
3    A. Not to my recollection, no.
4    Q. Okay. So you selected the files that
5    Ms. Gurland told you to test and you proceeded to test
6    them.
7    Did Ms. Gurland explain to you why those
8    specific files should be tested?
9    A. Yes. Because they were IMI files and they were
10   programs that IMI had developed.
11   Q. So she said you should test these files because
12   they are IMI developed.
13   A. And because they were relevant to this case.
14   Q. Exactly -- as best you can recall, what exactly
15   did she tell you? Did she say because they were
16   relevant? That doesn't sound like something she would
17   tell you. Maybe it is but it doesn't sound like a
18   conversation you would have, but if it is you can tell
19   me.
20   A. I don't recall the exact words of the
21   conversation. All I can say is I received my direction
22   from her.
23   Q. I understand. But what's your best recollection
24   of the conversation? You told me she said that these
25   files were IMI products; is that accurate?

99

1    A. Yes.
2    Q. Did she tell you anything else?
3    A. Not that I can recall.
4    Q. Okay.
5    A. She may have mentioned -- again, I think it was
6    understood that these were part of the case.
7    Q. Okay. So she gave you your instructions to test
8    the files. Do you know whether previous to you
9    receiving those instructions if anyone else had tested
10   the other files on the FTC hard drive?
11   A. No, I don't know.
12   Q. Okay. Did you ask?
13   A. I don't know. No, I don't think I asked.
14   Q. Okay. So we have established that you tested
15   the files, and we'll talk about the ones you tested in
16   detail a little bit later.
17   What was the next conversation you had with
18   Ms. Gurland?
19   A. I didn't keep notes on every conversation that
20   we had.
21   Q. I'm not asking for your notes.
22   A. It would have just been things like did you read
23   the Johnson report or I'm trying to get this material or
24   I would ask -- well, I would explain that the Johnson
25   report listed some software and I'm looking at this

100

1    thing and I don't know which ones they are. Can we
2    figure this out. Is there any way to figure out -- to
3    find out, you know, which files I really need to be
4    testing for this case. I wanted to have this clear
5    focus of what do I need to be looking at.
6    Q. I think we talked that part of your process
7    would be testing the same files that Kevin Johnson
8    tested; right?
9    A. Part of my process would be to test, yes.
10   Q. Because in order to critique his methodology,
11   you would need to test the same files.
12   A. That's right.
13   Q. Okay. So you told her -- and I just want to
14   keep — as many of these conversations as you can
15   recall, I want to keep going.
16   So you told her that you read the Johnson
17   report. What happened next?
18   A. I think there was a lot of back and forth, and
19   eventually we received the hard drive. I think I had
20   the hard drive already but eventually Johnson provided
21   the MD5 hashes of the report of the items that he
22   examined. And I also believe at one point I received
23   the MD5 hashes for files that IMI -- you know, were IMI
24   programs.
25   Q. Okay. Who gave you those?

25 (Pages 97 to 100)

101

1    A. That would have come from Carolyn.
2    Q. Okay. And was there any discussion at that
3 point of how it was determined that they were IMI
4 programs?
5    A. You know, I can only speculate.
6    Q. Well, you can just answer the question. It is
7 easier. Was there any discussion at that point as to
8 how it was determined that they were IMI programs?
9    A. No.
10    Q. Okay. What happened — what was the next
11 conversation you recall?
12    A. l would have -- more than likely the next
13 conversation would be talking about, you know, next
14 steps and maybe amount of time that would be involved
15 and where I was at with the investigation, you know, had
16 l finished testing, that kind of thing.
17    Q. Okay. And then what happened next?
18    A. Eventually I provided a report on my findings.
19    Q. Did you give -- the draft of your report that we
20 have in front of us, is this the draft that you wrote or
21 did Ms. Gurland have comments or suggestions or
22 critiques or revisions?
23    A. She had questions about, you know, things she
24 wanted clarified.
25    Q. What were those questions?

102

1    A. Perhaps I wouldn't have been as detailed or
2 certainly -- you know, I talk with a lot of attorneys
3 about a lot of different cases. At the time I was
4 working a lot of cases. I really can't accurately
5 recall a conversation I had with an attorney on any
6 given day with respect to -- it is kind of the standard
7 stuff with a report.
8    Q. So your sworn testimony is you can't recall any
9 conversation you had with Ms. Gurland about your report.
10    A. I can't recall any specific exact conversation
11 or moment in time. Give me a minute, I can think
12 about it.
13    Q. Okay. I don't need the replay of the
14 conversation. I'm just interested in topics that you
15 talked about. You said she had questions and you
16 responded.
17    A. You know, there would be like a -- you know,
18 some verbiage that I would have written that wasn't
19 clear that -- techno speak, maybe I was too technical,
20 and maybe needed to make it a little easier to read.
21    You know, this phrase doesn't make any sense,
22 Scott. Can you rewrite this so it makes sense to me or
23 can you explain it so it makes sense to me, that type of
24 thing. And that would have gone on throughout the
25 course of developing this report.

103

1    Q. Okay. Other than wording changes, were there
2 any substantive changes that Ms. Gurland recommended?
3 Testing one program versus another, how you described a
4 certain program, anything like that?
5    A. I think at one point I had been testing the
6 wrong program, and I had to kind of throw that out and
7 test a different one based on the MD5 hashes that we
8 received.
9    Q. Which program did you test that was the wrong
10 one? Do you recall?
11    A. It was WinAntivirus, I think.
12    Q. Why was it the wrong one?
13    A. Because it wasn't the one that Kevin Johnson had
14 tested.
15    Q. And your goal was to test the exact same
16 software that Kevin Johnson tested.
17    A. That was one of my goals, yes.
18    Q. So what happened next? What was the next
19 conversation?
20    You deliver your report to Ms. Gurland, and, as
21 I understand it -- and correct me if I'm wrong -- you
22 don't recall any other conversations you guys had about
23 the substance of your report.
24    A. There were lots of conversations.
25    Q. Can you recall any additional conversations you

104

1 had with Ms. Gurland about the substance of your report?
2    A. Things like include your CV and, you know, the
3 format. I mean, I use pretty much a standard report
4 format, materials used, procedures, qualifications,
5 assignment. Those were all things that I created, and
6 then I don't -- I'm not really sure what you are
7 asking me.
8    We had lots of conversations about the
9 development of this report, and I drove the development
10 of this report. This is my report. These are my words.
11    Q. Understood. I'm going to break this down into
12 two categories. There are the substantive changes,
13 which involved changes in the substance of what you have
14 written here, and then there are technical changes,
15 wording changes, format changes, what header to use,
16 what -- that kind of thing.
17    You don't need to tell me every heading change
18 that Carolyn suggested. That's not what I'm interested
19 in. I would like to focus on the substantive changes
20 that were made or suggested by Ms. Gurland. Can you
21 recall any of those?
22    A. I would say the ones I have recalled I have
23 outlined for you.
24    Q. None others that you can recall.
25    A. None others that I can recall. I imagine there

26 (Pages 101 to 104)

105

1   were others but none that I can recall.
2       Q. Okay. So you are done with the report and you
3   give it to Ms. Gurland. Is that how it happened?
4       A. Yes.
5       Q. And then what was your next conversation with
6   Ms. Gurland?
7       A. We certainly -- well, that was an ongoing thing,
8   right? I would do -- I would send it to her and review
9   it and there would be changes and I would send her
10  another copy.
11      Q. How were the changes communicated?
12      A. By phone.
13      Q. So how many different revision cycles were
14  there?
15      A. I couldn't tell you.
16      Q. Can you give me an estimate?
17      A. Less than 10.
18      Q. So more than five?
19      A. Between five and 10.
20      Q. So five or 10 different times the report went to
21  Carolyn, she reviewed it, called you with changes, you
22  would make them, it went back to Carolyn, and that
23  process repeated itself five to 10 times.
24      A. That would be standard in any report that's
25  written by an expert, yeah. That's generally how it

106

1   works.
2       Q. Was that a yes to my question?
3       A. Yes. Sure.
4       Q. Okay. So after that cycle of five to 10 changes
5   occurred, what was your next conversation with
6   Ms. Gurland?
7       A. It was really -- there was other -- there was a
8   point where the report -- other reports were issued. I
9   didn't keep a timeline. If I had known I was going to
10  receive all these questions, I would have kept a better
11  timeline so I could explain all these things to you. I
12  have never been asked questions at this level before
13  about the process of creating an expert report.
14      Q. All you can do is tell me what you know.
15      A. All I can tell you is that at one point the report
16  was finished and sent to the FTC, and then the only
17  other conversations that would have come along after
18  that would have been am I going to be deposed, when am I
19  going to be deposed, that kind of thing.
20      Q. Okay. So after the completion of your report,
21  you and Ms. Gurland never had any substantive
22  conversations about this case other than scheduling
23  issues; is that accurate?
24      MS. GURLAND: You mean other than -- about his
25  report or after we got the next report from -- the

107

1   rebuttal report?
2       MR. ARENSON: We can clarify.
3       BY MR. ARENSON:
4       Q. My question was what was the next conversation.
5   You said beyond that, after your report was done, you
6   had a series of questions about scheduling and am I
7   going to have to testify.
8       A. There was a rebuttal report. I just wasn't sure
9   of the -- yes, the rebuttal report and we discussed the
10  rebuttal report.
11      Q. So now there was another substantive
12  conversation after you completed your report and that
13  was when the rebuttal report was issued.
14      A. Right.
15      Q. And what did you and Ms. Gurland discuss at that
16  point?
17      A. The rebuttal report.
18      Q. What did you talk about in particular?
19      A. Like the -- can I see the rebuttal report?
20  Well, I think one of the things we talked about was the
21  lack of response from Kevin Johnson about my criticism
22  of his forensic techniques.
23      Q. Okay. What else did you talk about?
24      A. We talked about the -- you know, about how he
25  talked about the -- you know, the invalid items found.

108

1   You know, I think this was a major point, where we talk
2   about these invalid registry keys that were found and
3   how Kevin Johnson says that there is no way that these
4   could ever cause any damage on any system at any time
5   anywhere, and we talked about how that was incorrect.
6       Q. What did you specifically tell Carolyn?
7       A. What I told her was that -- I explained to her
8   what that registry key did. So I explained how that
9   registry key is actually responsible for those popups
10  that you see. When you click on a link and it says
11  please download this file and you see a popup that says
12  open or save to disk and then you click open and you
13  might see -- it might ask you which file do you want to
14  use to open that, basically this registry key controls
15  when that popup appears.
16      So if you go to a website and you click on a
17  link to a file and click on one of the extensions
18  that's found in here -- these are basically the orphaned
19  extensions -- basically what this is saying is that
20  there are these extensions in this registry key that
21  don't have programs associated with them, so if you
22  click on a file on the Internet that has one of those
23  extensions, that little popup pops up.
24      If the extension that's on the file that you
25  clicked on is not in here, that little popup won't pop

27 (Pages 105 to 108)

109

1   up. Does that make sense to you?
2       Q. I think so. What happens if it is not in here?
3       A. If it is not in here, it just turns into a dead
4   link. Nothing happens.
5       Q. Okay. So you indicated that you and Carolyn
6   talked about Kevin Johnson's conclusion that those
7   registry keys -- I want to use your words -- could never
8   ever cause these issues. What did you tell Carolyn in
9   response to that?
10      A. I told her that his explanation of what that key
11  does is wrong.
12      Q. Okay.
13      A. He clearly -- from his report he clearly doesn't
14  know what that registry key does. And what I explained
15  is that in the case of a malicious operator operating a
16  website, if you use it to download and execute one of
17  these files using one of these programs, then the
18  program operator could conceivably take control of one's
19  computer and execute the code of their choice.
20          Which is one of the most dire circumstances that
21  you can have in any web-browsing circumstance; is where
22  a remote operator has taken control of your computer and
23  launched the code of his choice.
24      Q. Okay. So you talked about his conclusion with
25  the registry keys.

110

1       A. Yes.
2       Q. Were there other things that you talked about?
3       A. We can go through the report.
4       Q. Well, I mean, you can.
5       A. We talked about the flash ad and I -- and I
6   explained that, you know, if you think about a company
7   like Mediaplex and their software -- their website
8   software that they use, you can think about it as an
9   application. Okay? They are running an application and
10  there is lots of people that have integrated into that
11  application. And they have code on their websites
12  that's going and getting and requesting ads based on
13  things that the user is doing.
14          So my conclusion was that without looking at it,
15  without having forensic images and WireShark capturers
16  and a very good understanding of what's happening when
17  the ad was seen, I can't just -- I can't just pick up a
18  file and say with any degree of reasonable forensic
19  certainty what that file was ever used for or how it was
20  presented to a user. I just can't.
21      Q. Okay. So that was your discussion about the
22  flash files. What else did you talk about?
23      A. So, actually, here -- yeah, here's what I was
24  looking for before. So three of the softwares that I
25  analyzed and the other three were just -- yeah. Again,

111

1   I would have to go back and say I can't say with
2   reasonable certainty, you know, what the purpose was of
3   analyzing the code. It was just IMI software and we
4   need to present that and that was it. That's all I can
5   say about that.
6       Q. I'm sorry. I didn't follow that part. What are
7   you talking about?
8       A. Well, on the second page of his report he talks
9   about how, you know, we didn't have -- and I think at
10  that point we didn't have all the -- my memory is fuzzy
11  on that.
12      Q. I'm still unclear what you are talking about.
13      A. The three overlapping files, the
14  ErrorPatrolFreeSetup, WinAntivirus2005ProScannerSetup,
15  and PerformanceOptimizerFreeSetup, these were the three
16  software tools -- the three software items that he
17  tested that had MD5 hashes that matched. Do we have his
18  original report?
19      Q. We do. But I'm a little bit concerned that we
20  are getting beyond the question, which is conversations
21  you had with Carolyn at the time.
22          Are you continuing to talk about that or are you
23  now jumping into other conversations?
24      A. No. These were the topics of the conversations
25  and it was about the forensics and we didn't have the

112

1   MD5 hashes. I don't believe we had the MD5 hashes for
2   the other software at this time.
3       MS. GURLAND: For the record, this is the first
4   report, which is the same system contacts, which was the
5   first Johnson report of February 22nd and I'm showing
6   Mr. Ellis the page in which the software was --
7       A. All right. So he lists six different pieces of
8   software here.
9       BY MR. ARENSON:
10      Q. And, again, I just want to be sure. This is a
11  conversation that you and Carolyn had?
12      A. Yes. This is a conversation we had.
13      Q. Okay. Keep going.
14      A. There is six pieces of software listed here and
15  this is his expert report and he is a forensic expert
16  technologist presumably. And he lists six pieces of
17  software here and there is no MD5 hash listed.
18      Q. Uh-huh.
19      A. Okay? The three that I did that were not listed
20  in here would be our best guess as to which ones they
21  were.
22      Q. The three that you did --
23      A. Or I think it was just two. I did not analyze
24  AntiMalwareGuardFree; so ErrorClean and
25  AntivirusXP2008Installer.

28 (Pages 109 to 112)

113

1    Q. We are going to dive into this deep in a minute,
2  so I don't know if you want to get into this now.
3    A. These were the conversations we had, was about
4  how inadequate it is to try to figure out what you guys
5  were doing and what he was doing and what he was
6  analyzing when he submits an expert report where he
7  doesn't even list an MD5 hash of what he did.
8    Q. So you and Carolyn had a discussion about him
9  not listing the MD5 hash, and what did you tell her?
10  That you were unable to find those files?
11    A. No.
12    Q. Did you tell her that you looked for them?
13    A. We had already made a best guess as to which
14  pieces of software he was talking about based on the
15  file names.
16    Q. So you looked at the original Kevin Johnson
17  report, and then you made your best guesses as to which
18  files he was talking about --
19    A. With guidance from the client.
20    Q. Hold on. Let me finish my question.
21    You looked at the original Kevin Johnson report,
22  you made your best guesses as to which files he tested,
23  and then it was your goal to test the exact same files
24  that he tested.
25    A. That was the goal. That was what I had been

114

1  saying all along, was that -- and the information was
2  not forthcoming --
3    Q. Okay.
4    A. -- until he decided to include some MD5 hashes
5  in his rebuttal report.
6    Q. We're getting a little bit out of order but
7  let's not leave this.
8    Let's take a look at your report and we'll also
9  take a look at -- just a second. This is the first
10  Kevin Johnson report. I think you have the same thing
11  in front of you.
12    A. I do.
13    MS. GURLAND: Theirs is longer.
14    MS. ROBBINS: It has the attachments.
15    MS. GURLAND: If you are going to ask him about
16  it, I don't think ours has all the attachments that
17  she's talking about.
18    MR. ARENSON: I'm not going to ask him about the
19  attachments.
20    BY MR. ARENSON:
21    Q. So we are talking about the same report. And
22  Kevin Johnson in here lists the files that he tested;
23  right?
24    A. He says here that he was provided with a CD of
25  web files as well as a list of graphics.

115

1    Q. If you could turn to this page. And
2  unfortunately they are not numbered, but if you keep
3  flipping you will find this page. Are you there?
4    A. I'm there.
5    Q. These are the one, two, three, four, five, six
6  files that Kevin Johnson tested, right? And you -- what
7  I think you just told me -- correct me if I'm wrong --
8  was that your goal was to test these exact same files.
9    A. No. One of the files is -- and I would want to
10  look at my -- do we have my attachments?
11    Q. Your attachments to what?
12    A. My attachments where I listed out all of the
13  screen shots and files.
14    Q. Those weren't turned over to us. What you have
15  got in front of you is what was given to us, so if there
16  are attachments, we don't have them.
17    MS. GURLAND: I don't have attachments. Do you
18  mean the separate material that was delivered to you
19  pursuant to a discovery request?
20    MR. ARENSON: You are talking about the --
21    MS. GURLAND: Materials delivered pursuant to a
22  discovery request.
23    MR. ARENSON: There were documents turned over
24  to us.
25    A. Those have screen shots in them.

116

1    BY MR. ARENSON:
2    Q. I don't have the discovery materials that were
3  produced back to us. Those weren't part of your report,
4  were they? Or were they?
5    MS. GURLAND: Here is your report.
6    A. I did not include any screen shots.
7    MR. ARENSON: Let's let Mr. Ellis answer the
8  questions, Carolyn, please.
9    A. (Continuing.) I did not include any screen
10  shots in my report.
11    BY MR. ARENSON:
12    Q. Okay. So those weren't part of your report.
13    A. They are part of the materials that I turned
14  over. I had thought that they would be turned into
15  attachments.
16    Q. So you intended to include those as part of your
17  report.
18    A. Well, I intended to be able to have them to
19  refer to later so I could refresh my memory as to
20  exactly what software I looked at. Because to be able
21  to say was this AntivirusXP2008, was that one of the
22  ones I tested --
23    Q. I think we can solve that because very helpfully
24  on the fourth page of your report you've listed all the
25  files you tested; is this right?

29 (Pages 113 to 116)

117

1      A. Right. But give me a second here. I don't have
2  MD5 hashes on his report.
3      Q. I'm not asking about the MD5 hashes. I'm just
4  asking you this: You told me that you attempted to test
5  the same files that Kevin Johnson tested and six of
6  those are right there. And then these are the files
7  that you tested in your report right here; right?
8      A. Yeah. I didn't do that 2008 one. I don't know
9  why --
10     Q. So do you want to rescind your statement that
11 you tried to test the same files that Kevin Johnson
12 tested?
13     A. I tried to test the files that he tested that I
14 was asked to test.
15     Q. Well, that's different, right? You didn't try
16 to test all the files that Kevin Johnson tested. You
17 took instruction from Ms. Gurland and tested those
18 files.
19     A. Yeah. But where there was an alignment between
20 the files that I was supposed to be testing and his
21 files, those are the files where I really wanted to test
22 the same ones that he tested. Does that make more
23 sense?
24     Q. That makes perfect sense. So when you said that
25 you were trying to test the same files, you were trying

118

1  to match up -- of the files you did choose to test, you
2  were trying to match up with the files that he tested.
3      A. That would be correct.
4      Q. But you didn't make any effort to test all the
5  files that he tested, because obviously you didn't.
6      A. That would be correct.
7      Q. Okay. All right. We are going to go back to my
8  outline, if you can give me that.
9      A. I'm glad we cleared that up.
10     Q. I'm glad we cleared that up too.
11     So back to our previous discussion. You spoke
12 with Ms. Gurland when the rebuttal report came in -- and
13 just before I leave that topic entirely: Did you ever
14 ask Ms. Gurland why you wouldn't test the same files
15 Kevin Johnson tested?
16     A. I did.
17     Q. What did she say?
18     A. They aren't IMI files. That was the answer, was
19 that they weren't IMI files.
20     Q. So for the three files you didn't test, she told
21 you those didn't belong to Innovative Marketing.
22     A. Were there three? I don't know.
23     Q. There is a discrepancy of three different files
24 between the files you tested and the files Kevin Johnson
25 tested.

119

1      A. Where is the report? Did you take it back?
2      Q. I did.
3      MS. GURLAND: It was ours, too.
4      MR. ARENSON: Maybe it was. We have got
5  one too.
6      BY MR. ARENSON:
7      Q. So you did not test AntivirusXP2008, ErrorClean,
8  or AntiMalwareGuard; right?
9      A. Yes.
10     Q. That's correct?
11     A. That's correct.
12     Q. And you asked Ms. Gurland why am I not testing
13 those files; correct?
14     A. That's correct.
15     Q. And her response to you was?
16     A. That they weren't IMI files.
17     Q. Did she tell you what the basis of her belief
18 was?
19     A. No.
20     Q. No explanation as to why they weren't IMI files?
21     A. That they weren't IMI files, yeah, that was it.
22     Q. No explanation.
23     A. No explanation. I didn't request an
24 explanation.
25     MR. ARENSON: Okay. If that's yours, you can

120

1  keep it.
2      MS. GURLAND: Yep, it is.
3      BY MR. ARENSON:
4      Q. So your next conversation with Ms. Gurland
5  after -- actually, I guess we are still working on the
6  rebuttal report.
7      So we talked about the rebuttal report earlier.
8  What other conversations did you have in that phone call
9  with Ms. Gurland about the rebuttal report?
10     MS. GURLAND: Can we have a time frame here? We
11 have been time traveling backwards and forwards. If we
12 are going to be talking about discussions with me, are
13 we talking about after we received the rebuttal report?
14     BY MR. ARENSON:
15     Q. We are actually still in the middle of the
16 conversation that you had with Ms. Gurland when the
17 rebuttal report came in.
18     A. And these conversations, I wouldn't say there
19 was one conversation where we sat down and talked about
20 everything. It would have been multiple conversations
21 over time talking about the report.
22     Q. Okay.
23     A. It was -- you know, certainly we talked about
24 things that he said in his report where he would say
25 things like -- I quote from the expert report of Kevin

30 (Pages 117 to 120)

121

1  Johnson, quote, These warnings have no chance of causing
2  the widespread havoc the warning message claims, end
3  quote.
4      And my response to that is that it is clearly
5  impossible to say without examining each and every
6  invalid -- certainly missing or invalid ComActiveX
7  entries can cause problems, certainly. And the problems
8  in the registry do cause problems on computers, and
9  whether or not it would be something that would cause
10  the computer like to shut down and die, no. But whether
11  or not it could cause issues with the computer and in
12  the use of the computer, yes.
13  **Q. What kind of issues?**
14  A. Windows XP certainly doesn't come out of the box
15  perfect. There is security flaws in it, as we have
16  already discussed.
17  **Q. All right. We are -- actually, we are going to**
18  **get into all of this after lunch, so I just want to**
19  **focus on the conversations that you had with**
20  **Ms. Gurland.**
21  A. Yeah. We talked about -- you said we are going
22  to get into this after lunch. We talked about the
23  WinAntivirusPro2005, you know, your
24  system-is-infected-banner that would pop up on the free
25  version.

122

1  **Q. What did you talk to Carolyn about that?**
2  A. He talks about how he goes -- he goes to
3  Wikipedia to get his definition of what software is, and
4  I thought that was interesting. And, you know, a
5  software package is -- really constitutes and comprises
6  of any and every part of that software that's needed to
7  make it operate in a functional way, which would include
8  website cookies.
9      So if cookies are downloading to a site and
10  there's an application that comes along looking for
11  those cookies and it finds them and there is an exchange
12  of information between any two components of a software
13  system, those components are part of a software system.
14  That's basic.
15  **Q. That's something else you told Ms. Gurland.**
16  A. Definitely that's something I told Ms. Gurland.
17  **Q. Okay. What else?**
18  A. I believe that was the extent of our
19  conversations about this report. There may have been
20  more that I will recall later. If we continue to talk
21  about it, I may remember that I told something to
22  Carolyn. We certainly can't cover the period of several
23  years of conversations into a single day of deposition,
24  even if I could recall all of them.
25  **Q. Well, we can try.**

123

1  **So after the rebuttal report, did you have**
2  **further conversations with Ms. Gurland?**
3  A. Certainly. We have met socially and had dinner.
4  **Q. That's a fair point. Specific to this case.**
5  A. We had conversations about this case up until,
6  you know, this morning talking about my testimony and
7  what I would -- and mannerisms and how to explain things
8  and what manner -- like at what level to explain things
9  and to try to keep things simple.
10      Because I do have a tendency to elaborate on
11  something if I don't -- I'm not sure that you are
12  understanding my point, I may just go on and on and on
13  until you tell me to be quiet. And that's the kind of
14  things we talked about.
15  **Q. Okay. And are you and Ms. Gurland social**
16  **friends as well?**
17  A. I think that we have become social friends since
18  this. Our families have gotten together maybe three or
19  four times in the past two years.
20      Do I see her every Friday night for drinks, no.
21  Yeah, I have two children of my own and a wife and a
22  very busy life outside of work, so socially we are
23  friends.
24  **Q. Okay. So since the report was finished, from**
25  **the time you handed it in to Ms. Gurland to give to us,**

124

1  **have you reviewed additional documents from that point**
2  **to now?**
3      MS. GURLAND: Sorry. Can I -- since his --
4  Mr. Ellis' report was finished has he reviewed
5  additional documents other than the rebuttal report?
6      MR. ARENSON: Well, that would be one.
7  BY MR. ARENSON:
8  **Q. So we can start with the rebuttal report. We**
9  **have talked about that.**
10  **Were there other documents you have reviewed,**
11  **other than the rebuttal report which we discussed at**
12  **some length, relevant to this case obviously, since you**
13  **submitted your report?**
14  A. I'm looking at the report to see the list of
15  materials that I used to see if anything I have seen
16  since then is in my list already or not.
17  **Q. Okay.**
18      MS. GURLAND: Your question is after -- from
19  after March 26th when he turned in his report, after
20  that time?
21      MR. ARENSON: Yes.
22      MS. GURLAND: So other than the rebuttal report
23  of Kevin Johnson that came after, any other materials
24  other than Kevin Johnson's rebuttal report since your
25  report.

31 (Pages 121 to 124)

125

1    A. You know, the rebuttal report of Kevin Johnson
2  and my report are the only two that I recall. I know
3  that I have been e-mailed other reports and, to be frank
4  with you, I didn't read them.
5        BY MR. ARENSON:
6    Q. Okay. That's frank.
7        So you were e-mailed by Ms. Gurland other expert
8  reports?
9    A. Yes. And he -- he has an Asian name.
10    Q. Mr. Kim?
11    A. Mr. Kim's report. I may have glanced through
12  that. I have a vague recollection of having glanced
13  through that.
14    Q. Okay. Any other reports that you recall either
15  reading or glancing through?
16    A. I received a report -- no. I know that I have
17  some other reports, but I know that I didn't read those,
18  so I'm not even going to mention them.
19    Q. Okay. No deposition transcripts.
20    A. No. As much as they would have been interesting
21  to read, I did not -- didn't ask for them.
22    Q. Sure. All right. So have we now covered all of
23  your conversations with Ms. Gurland up to today or are
24  there any others that I missed?
25        And when I say all conversations, I should ask a

126

1  better question. Relevant to this case other than the
2  ones we have already talked about.
3    A. The ones that were memorable.
4    Q. The ones that you can recall.
5    A. The ones that I can recall we have covered.
6    Q. Okay.
7    A. I'm not keeping anything from you that I can
8  remember.
9    Q. Fair enough. That's all I can ask.
10        Other than Ms. Gurland, are there any other
11  lawyers in this case that you spoke with?
12    A. I met with Dan Webb. Is Dan Webb involved in
13  this case?
14    Q. Kind of.
15    A. I met with him once very briefly, and he said,
16  good job, Scott, and I said thank you, sir, and that was
17  the extent of my conversation with him.
18        MS. GURLAND: Do you want a time frame so you
19  know if it is relevant to your reports or to the prior
20  reports?
21    A. (Continuing.) That happened prior to this --
22  that was the other case. That was the federal case.
23        BY MR. ARENSON:
24    Q. So he told you good job in response to your work
25  in the criminal case.

127

1    A. Yes.
2    Q. Okay.
3    A. Maybe it was just thank you. I'm just saying he
4  said good job. I think maybe he said thank you. He was
5  smiling. He is a nice guy.
6    Q. Okay. So you've talked to him and he said good
7  job or something similar.
8        Anyone else? Any other lawyers in this case
9  that you spoke with?
10    A. About this report? About my work here or
11  something even if it was a different engagement?
12    Q. Well, let's explore that.
13    A. I don't know if that was a different engagement.
14  Somebody needed a copy of -- like I have all the EnCase
15  images for the -- for this case.
16    Q. Okay.
17    A. So somebody has requested a copy and that was
18  Duffy. I guess they have it -- they have a copy as well
19  and they need somebody that has EnCase knowledge to be
20  able to --
21    Q. Who is Duffy?
22    A. It is a law firm, I believe, that's involved
23  with another defendant possibly. I'm not sure.
24    Q. Do you know who they are representing?
25    A. No, not exactly.

128

1    Q. Do you know if it is Kristy Ross?
2    A. You know what, it is Kristy Ross.
3    Q. So do you know if they are representing her in
4  the criminal matter?
5    A. No, I don't.
6    Q. Okay. So you have spoken with attorneys at the
7  Duffy Law Firm. What did you talk about with them?
8    A. Just exactly what I said, just about needing --
9  that they have EnCase images, and I'm assuming they are
10  the same EnCase images that I have. I'm not sure, but
11  they have EnCase images that they need access to.
12    Q. Okay. And did you provide them access to the
13  EnCase images?
14    A. No, not yet. That's a conversation that --
15  that's a conversation that we need to have, about how
16  that works. About how it's going to proceed and what
17  the deliverables are.
18    Q. Okay. Do you know where the Duffy firm is
19  located? Are they here in Chicago?
20    A. I believe so.
21    Q. All right. Any other conversations with the
22  Duffy attorneys about anything relevant to this case?
23    A. No, not at all.
24    Q. Other than Duffy attorneys, Ms. Gurland, and
25  Mr. Webb, any other conversations with attorneys --

32 (Pages 125 to 128)

129

1    A. No.
2    Q. -- about this case?
3    A. No.
4    Q. Have you ever spoken with Kristy Ross?
5    A. No.
6    Q. Any of the other defendants in this case?
7    A. No.
8    Q. Any of the other expert witnesses in this case?
9    A. No. I believe I have had e-mail conversations
10   with -- I think I e-mailed you once, didn't I?
11   Q. If you did, I don't recall it, but I could be
12   wrong. What did you e-mail me about?
13   A. I don't remember. Something about not being
14   able to access one of the EnCase images, and I think it
15   was the thing with the partition.
16   Q. Okay. Any other e-mails to any of the folks we
17   have talked about in the last minute, attorneys,
18   Ms. Ross -- when I say conversations, I should have been
19   more clear. I meant to include e-mail conversations as
20   well.
21       Have you had -- that we haven't already talked
22   about, have you had e-mail conversations or instant
23   message conversations or any other type of conversations
24   with -- and I will start over -- with any other attorney
25   other than Ms. Gurland?

130

1    A. No. Not to my knowledge, no. It has been --
2    really it has been -- Ms. Gurland has been the focus.
3    Q. Okay. No conversations of any type with Kristy
4    Ross?
5    A. No.
6    Q. No conversations of any type with --
7    A. You included e-mail. I did receive an
8    engagement letter from her. I sent an engagement letter
9    to Carolyn asking her to get it signed. I want a signed
10   engagement letter. And Kristy Ross did e-mail that
11   directly to me. But I guess conversation would mean it
12   goes two ways, and I don't believe I responded other
13   than maybe to say thank you.
14   Q. Okay. And that's the only conversation you have
15   had with her?
16   A. That's it.
17   Q. Any other conversation as we have defined it
18   right now with any other expert witness?
19   A. No.
20   Q. And no other defendant either --
21   A. No.
22   Q. -- in this case?
23   A. No.
24   Q. Okay.
25   A. I get confused a little if you ask me the same

131

1    question twice. I get a little confused as to maybe
2    something changed in the definition.
3    Q. I'm just trying to expand it to include e-mail
4    and instant messages and any other form of conversation,
5    but it sounds like the answer is still the same.
6    A. No. I don't use IM, not much. It is bad enough
7    people e-mail you all the time and want to know stuff.
8    Now do I want it in the bottom corner of my screen too?
9    No, thank you.
10   Q. All right. So since your report was finished
11   and you turned it in to Ms. Gurland, have you done any
12   additional testing of software for this case?
13   A. No.
14   Q. All right.
15       MR. ARENSON: At this point I think it makes
16   sense to grab lunch, and when we get back, we'll dig
17   into the exhibits. So off the record.
18       (A lunch recess was taken.)
19       MR. ARENSON: Okay. We are back on the record,
20   and, Mr. Ellis, as you know, you are still under oath
21   from this morning.
22       BY MR. ARENSON:
23   Q. We are going to turn to what we have marked as
24   Exhibit 1, which is your report in this matter.
25   A. Sure.

132

1    Q. Would you bring that out in front of you.
2    Couple of just general questions about your
3    report. Are there opinions contained in this report
4    that you no longer want to offer in connection with this
5    matter?
6    A. At this moment, no.
7    Q. At any moment up until now?
8    A. At this moment I have no reservations about
9    anything in this report.
10   Q. Okay. Since you wrote this report, are there
11   any new opinions that you have formulated regarding this
12   matter?
13   A. I wouldn't say that they were new.
14   Q. Okay. In arriving at your opinions, did you
15   come to any other opinions that you have not included in
16   this report?
17   A. No.
18   Q. And does this report include all of the opinions
19   you intend to offer at summary judgment or at trial?
20   A. I wouldn't want to rule myself out from
21   developing additional opinions about things and limit
22   myself to just what's in this report. I may have other
23   opinions about things that come up in the course of
24   conversation and that are not in this report.
25   Q. Here's the trick. We need to know what those

33 (Pages 129 to 132)

133

1 opinions are, so if there are other opinions that you
2 have, we need to know about them.
3     A. I don't have them yet.
4     Q. So standing here today, you have no opinions
5 other than what's in your report.
6     A. I have opinions about the registry stuff that I
7 think isn't as detailed in this report as it should have
8 been.
9     Q. Okay.
10    A. Certainly what we discussed earlier about the
11 way certain areas of the registry function, there may be
12 additional areas of topics of conversation about the
13 registry that I may need to do more research on and
14 develop further opinions on. I feel that that's still
15 an area that's not been 100-percent explored or
16 understood.
17    Q. Okay. So you intend to do additional research
18 on the registry questions and produce a supplemental
19 report?
20    A. I may do that.
21    Q. Have you spoken with Ms. Gurland about this
22 idea?
23    A. No, not yet. But there certainly may be areas
24 that -- where -- that come to light this afternoon
25 perhaps that my report isn't as solid as I would like it

134

1 to be. That may happen.
2     Q. Okay.
3     A. In that case I would want to be able to submit
4 additional information to you to assist you with
5 understanding and clarifying the technology that's
6 behind this.
7     Q. But as of right now and as of the beginning of
8 when you wrote this report to right now, there are no
9 other opinions that you are intending to offer that
10 aren't in your report. And if there are, tell me what
11 they are.
12    A. I don't think that I detailed in this report
13 exactly how that section of the registry works, and I
14 will do that for you this afternoon. Okay? And if
15 that's what you qualify as an opinion --
16    Q. Okay. So we are going to get into the registry
17 issues. Anything else that you are going to offer
18 opinions on that aren't in your report?
19    A. Not that I can think of right now at this
20 moment, no.
21    Q. Okay. Let's look at page 1 of your report,
22 which is actually page 4 here because there is a cover
23 letter.
24    A. Okay. I just -- there is one more thing, if I
25 can clarify from earlier.

135

1     Q. Uh-huh.
2     A. When you were asking about conversations that I
3 had with Carolyn, Carolyn asked me that question at
4 lunch, are you sure there wasn't other stuff. And my
5 memory does serve me that I did talk with her about like
6 technical stuff with respect to the depositions that she
7 would be taking.
8     Q. Okay. So you and Carolyn had a discussion just
9 now at lunch?
10    A. Yes.
11    Q. And what did you guys talk about?
12    A. The sum of what I just said.
13    Q. So there were technical discussions that you had
14 with Carolyn --
15    A. I recall technical -- discussions of a technical
16 nature about depositions and questions that she would be
17 asking her witnesses.
18    Q. Okay. And what were those discussions?
19    A. Like what does this mean, how does this work, I
20 don't understand this technical term, like what is a hex
21 editor, simple stuff like that. Nothing of real
22 substance.
23    Q. Application highjacking? Is that one of the
24 things you guys talked about?
25    A. No, I don't think so.

136

1     Q. Okay. On page 4, which is page 1 of your
2 report, there are eight programs listed under
3 "Assignment"; do you see that?
4     A. Yes.
5     Q. Did you test any software other than the eight
6 programs listed here?
7     MS. GURLAND: For this report?
8     MR. ARENSON: No.
9     BY MR. ARENSON:
10    Q. Did you test any other software in connection
11 with this case other than the eight programs listed in
12 this report?
13    A. Before we had the materials I had tested a
14 couple of pieces of software.
15    Q. Okay.
16    A. In connection with this case?
17    Q. Uh-huh.
18    A. No, I don't think so, not to my recollection at
19 this moment. I know there was some confusion around
20 which ones we were supposed to be looking at, and I do
21 know at one point there was one that I had examined that
22 had the wrong -- that was not a match, the hash value,
23 and then I corrected that and we redid the work.
24    Q. And we talked about that before. It was
25 WinAntivirus?

34 (Pages 133 to 136)



137

1    A. I think so.
2    Q. And -- taking a bit of a detour -- you tested
3    WinAntivirus and how did you eventually conclude that
4    that wasn't the right one?
5    A. Because we got the MD5 hash values from the
6    rebuttal report -- no. No. Maybe you provided the MD5
7    hashes. I don't know. I don't recall.
8    Q. And what was the result of your testing on the
9    WinAntivirus program that you eventually discarded?
10    A. It is the same. I had the same result from it
11    that I did from the other one. There was virtually no
12    difference to me in the way it operated.
13    Q. So in your report you say, I was asked to test
14    various software, and then you say "these products
15    included," and you list a series of eight products. Are
16    there other products that are not listed here that you
17    tested?
18    A. No.
19    Q. When you say "these products included," you mean
20    these products including the following and none others.
21    A. Yeah. And I'm being specific about MD5 hash.
22    Maybe we are bantering words a little bit. If we are
23    going by file names, yes. MD5 hash, no. File names,
24    yes.
25    Q. Okay. Let's put that WinAntivirus, let's put

138

1    that one aside for a moment and not talk about one.
2    Other than that outlier, does this represent the
3    whole body of research that you did on the programs in
4    connection with this case?
5    A. Yes.
6    Q. Okay. Now, we have talked about this
7    previously. You elected not to test three of the six
8    files that Kevin Johnson tested; right?
9    A. That's right.
10    Q. And that was based on Ms. Gurland's instruction
11    to you.
12    A. That's correct.
13    Q. So you have no basis to disagree with any of
14    Mr. Johnson's conclusions about these three programs.
15    And I will list them: AntivirusXP2008, ErrorClean, and
16    AntiMalwareGuard.
17    A. I have basis to object to any report that I see
18    from a forensic examiner that's not based on solid
19    forensic technology or practices or methods or
20    procedures.
21    Q. So you did not test the programs.
22    A. I did not test the programs.
23    Q. But you feel you have an objection to
24    Mr. Johnson's testing.
25    A. I question the processes that he used in his --

139

1    I would reserve the right to look at those items, and I
2    think I could certainly question him.
3    Q. That would be great. Would you test those
4    items? Are you willing to do so?
5    A. Certainly I'm willing to do so provided that my
6    fees and time are compensated.
7    Q. Well, I mean, it is part --
8    MS. GURLAND: Are you giving my expert an
9    assignment? I'm not sure this is how this goes.
10    MR. ARENSON: Well, he just said he is willing
11    to test them, and I think they are certainly relevant to
12    this case.
13    MS. GURLAND: Are you going to employ him as an
14    expert? Don't you see that as a conflict?
15    MR. ARENSON: I don't think I can employ him as
16    an expert, but these files are directly relevant to the
17    case and you have instructed him not test them and --
18    MS. GURLAND: I haven't instructed him not to
19    test them and that's not the testimony. He can test
20    whatever he wants to test.
21    MR. ARENSON: Well, let's let him answer the
22    question then.
23    BY MR. ARENSON:
24    Q. Mr. Ellis, if you can test anything you would
25    like to test, would you like to test these three files

140

1    that you didn't test before that Kevin Johnson
2    specifically did test?
3    A. If counsel directs me to do so and deems it
4    relevant to the case and it is part of my examination --
5    are you asking me if I'm curious?
6    Q. Yes.
7    A. I certainly am not curious about creating more
8    work for myself.
9    Q. Did you see the results that Mr. Johnson got
10    when he tested them?
11    A. Yes. I reviewed this.
12    Q. And doesn't that make you curious about what
13    these files did?
14    A. Well, my wife would tell you that everything
15    makes me curious.
16    Q. Fair enough.
17    A. So I have a great deal of curiosity. I have
18    more than enough to go around so, yes, I'm certainly --
19    Q. But you won't test these files unless
20    Ms. Gurland let's you.
21    A. It is not a matter of her letting me. I'm a
22    retained expert, and if I felt there was a need to test
23    them, I would test them, and that's certainly a
24    discussion that we may have.
25    Q. Okay. Let's talk about why you currently don't

35 (Pages 137 to 140)

141

1    think there is a need to test these files.
2        A. I'm currently under the impression that they are
3    not IMI products.
4        Q. And what's that based upon?
5        A. That's based on direction from counsel.
6        Q. Okay. So Ms. Gurland has told you that they are
7    not IMI files and hasn't provided you any information as
8    to why that might be, has she?
9        A. Not to my recollection, no.
10       Q. Okay. So getting back to your objections about
11   Mr. Johnson's testing, you -- you have an objection to
12   Mr. Johnson's testing of these three files; is that
13   correct?
14       A. No, I don't have any objection to him testing
15   them. I have reservations about the chain of custody.
16   I have a -- that's what I really don't understand and
17   that's what I have been asking questions about, is where
18   is the chain of custody? How do I know that these
19   files -- how do I know that the files I did test are IMI
20   files? How do I know that they came from an IMI server?
21       Q. That's a bit of a different question. I'm not
22   asking you to establish the chain of custody. You've
23   already told us that you don't know. You don't know
24   where these files came from or what the source was;
25   right?

142

1        A. Right.
2        Q. So that's really not what I'm asking you. I'm
3    asking you the programs themselves —
4        A. Right.
5        Q. — which you haven't tested but Mr. Johnson has,
6    do you have objections to the methodology that
7    Mr. Johnson used to test those programs?
8        MS. GURLAND: Define methodology.
9        MR. ARENSON: No.
10       A. I guess the one question I have -- and then I
11   guess we can then answer the question of methodology --
12   the one question I have is that it appears that he says
13   he ran PCTurboProSetupFree and that's not in my list and
14   that MD5 hash that he lists here is not in the list of
15   files I have tested.
16       And then he says that -- he says that this is --
17   and I quote, This is yet another free version of the
18   software viewed in comparison to the paid versions Kim
19   and Ellis tested.
20       I don't understand where he got the impression
21   that I tested the software. I did not.
22       BY MR. ARENSON:
23       Q. I can explain it to you but I'm not sure it is
24   really relevant. He is testing the free software and
25   you tested the paid versions of the software. And we'll

143

1    talk about that there are significant distinctions
2    between the free and the paid versions --
3        A. I don't think I tested a free version of this
4    PCTurboProSetupFree. I don't see that in my list of
5    titles.
6        Q. You didn't. But what you did do was select the
7    paid versions of the software to test in almost every
8    case, and what Mr. Johnson did was test the free version
9    of the software. That's the distinction he is drawing
10   there.
11       But that's not relevant to my question, which is
12   do you have objections to Mr. Johnson's methodology of
13   testing these programs which you haven't tested?
14       A. I think this speaks to his methodology where he
15   doesn't even know what I tested and he says that I
16   tested it.
17       Q. He doesn't say that.
18       A. He says that's a version of WinFixer. I don't
19   know. It is confusing.
20       Q. So you don't -- that's really --
21       A. That was a different -- I was on the wrong page.
22   He is talking about this is yet another free version of
23   the software viewed in comparison to the paid version --
24   I'm assuming -- of the software that Kim and Ellis
25   tested.

144

1        I did not test this. He did not know that.
2    That's a methodology issue.
3        Q. I think your assumption is the problem, but
4    let's put that aside because at the end of day it is
5    going to be a nonissue.
6        Let's talk about other objections you have to
7    the methodology Mr. Johnson used and is described in
8    this report.
9        A. He doesn't talk about actually using any sort of
10   tools to examine what the software is actually doing.
11   It is kind of like a mechanic listening to an engine and
12   saying, well, it is knocking so maybe the spark plug's
13   loose. You have to lift up the hood and take a look and
14   see.
15       Q. Really. So let's talk -- there is two Johnson
16   reports. Let's take a look at the one that you are
17   looking at to start with. So let's look at PCTurboPro.
18   You see that? Right there.
19       Now, Mr. Johnson has compared the detections by
20   PCTurboPro to the tools that Windows provides, correct,
21   and they don't even come close to matching; right?
22       A. Oh, like -- sure.
23       Q. Okay. So when you say Mr. Johnson didn't use
24   any tools, that wasn't right.
25       A. He opened up Windows Task Manager and then he

36 (Pages 141 to 144)

145

1  looked at -- you know, this could have been -- I haven't
2  tested this software. I can't speak to it. All I can
3  say is he is not showing me a perfmon trace of what the
4  CPU usage was over a period of time. The task manager
5  tells us what the CPU usage is right now.
6      If he ran perfmon and had a data collector
7  running on the CPU itself and provided that, that would
8  be forensics.
9      Q. Why don't you take a --
10     A. Popping up the Windows Task Manager and showing
11 me what the CPU is, that's not forensics.
12     Q. Take a look at the next one. The hard drive
13 space, same page --
14     A. Sure.
15     Q. Explain to me why that's not a valid forensic
16 analysis.
17     A. The hard drive space is going to show the usage
18 of space -- this is not a forensic analysis of the hard
19 drive. A forensic analysis of the hard drive would be
20 an EnCase view of the disk usage and it would show you
21 what the actual usage was. This could certainly --
22     Q. Could what?
23     A. I'm sorry?
24     Q. You were going to say something and then you cut
25 yourself off. What objection do you have to the disk

146

1  space that Windows is displaying versus the greatly
2  inflated number that PCTurboPro is displaying?
3      A. The answer is that I have not examined this
4  myself.
5      Q. And that's exactly my point, Mr. Ellis. You
6  haven't examined these files yourself; right?
7      A. But there is not enough here to convince me of
8  what's going on.
9      Q. And are you willing to undertake the tests?
10     MS. GURLAND: I'm going to object to this and
11 ask him not to answer it, because I don't think that it
12 is appropriate for you to ask my expert to do something.
13     MR. ARENSON: I think it is entirely
14 inappropriate for you to instruct your expert not to
15 answer a question.
16     BY MR. ARENSON:
17     Q. Mr. Ellis, I would encourage you to answer the
18 question but ultimately it is your decision.
19     Are you willing to undertake the tests that you
20 say are demanded in order to know the answers to the
21 questions --
22     MS. GURLAND: That misstates what he said.
23     BY MR. ARENSON:
24     Q. You can go ahead and answer.
25     Are you willing to undertake the tests that you

147

1  say are required in order to convince you of the results
2  that you see right in front of you?
3      A. Of course. I would be willing to -- I was
4  willing to do those tests for the software that I have
5  already examined.
6      Q. So the answer is yes.
7      A. The answer is that I'm not going to commit to do
8  anything for you.
9      Q. Okay.
10     A. But, yes, if I were asked, I would certainly be
11 willing do whatever I was asked to do.
12     Q. I'm not sure that's an answer at all.
13     So what other objections to Mr. Johnson's
14 methodology do you have? And why don't we -- we can
15 look at his initial report as well, because there are
16 other tests here that we haven't discussed.
17     So why don't we take a look at AntivirusXP2008,
18 this page. Now, on a clean VMWare image AntivirusXP2008
19 detected 2,794 threats. Can you explain that?
20     A. No.
21     Q. Do you have any critiques of Mr. Johnson's
22 methodology in opening that program and running it on a
23 clean VM machine?
24     A. Again this is software that I haven't examined.
25 This is not -- his methodology is not my methodology,

148

1  and to the extent where I would have been running a
2  trace to find out exactly what the software did and what
3  it was purporting to scan, it is not --
4      I can answer your question that it would not be
5  normal to find 2,794 viruses on a brand-new computer,
6  but I would want to make sure that I was the one that --
7  that I had control of that computer, because certainly I
8  have plugged brand-new machines, XP machines, into the
9  Internet and had them become massively infected within
10 moments. And I would want to make sure that that didn't
11 happen in this case, and I would just want to know that
12 with forensic certainty.
13     Q. Understood.
14     A. And I don't get that from his report.
15     Q. You want to verify Mr. Johnson's conclusions
16 yourself.
17     A. That would be -- if you are going to ask me
18 about them, then yes.
19     Q. Okay. But what I'm asking you, and where we
20 started with this whole path, was that you haven't
21 tested AntivirusXP2008, ErrorClean, or AntiMalwareGuard;
22 is that correct?
23     A. That's correct.
24     Q. So what basis do you have to object to the
25 findings in Mr. Johnson's report?

37 (Pages 145 to 148)

149

1    A. He doesn't -- he doesn't -- I think I have
2    already answered this question. He doesn't use the same
3    sort of methodology that a forensic examiner would use
4    with the analysis of looking under the hood to see
5    what's going on and then laying it out in a nice
6    easy-to-read format.
7        Basically he is saying the sky is blue and I'm
8    saying are you looking through blue glass. I don't
9    know, because I don't know. I didn't do the testing on
10   that piece of software and his tests are not that
11   comprehensive.
12       **Q. Okay. So based on the testing that he did --**
13   **let's just focus on what he did -- what is your**
14   **objection to opening up AntivirusXP2008 on a clean**
15   **VMWare image not connected to the Internet and then**
16   **finding that there were 2,794 infections on that**
17   **computer?**
18       A. I would have no objection to that as an initial
19   finding, yeah.
20       **Q. Okay. And if you were told that he ran the**
21   **exact same process for ErrorClean and AntiMalwareGuard**
22   **and there were fake detections for both of those, large**
23   **number of detections on a clean computer, what would**
24   **your objections be to those tests?**
25       A. I believe that the ErrorClean is more about

150

1    problems with Windows as it is out of the box, so that
2    would be probable that it would find issues with the
3    registry and with files in Windows. I mean, the Windows
4    themselves, they -- Microsoft will acknowledge that
5    there is bugs and things that happen with their software
6    when it gets released. Their software is not clean
7    coming out of the box. I've reported three bugs myself
8    this year, and I'm working with Microsoft technologists
9    on fixing those bugs. I've identified new bugs myself.
10       **Q. Right. So you haven't tested ErrorClean.**
11       A. Does he have an MD5 hash listed here for it
12   anywhere?
13       **Q. Maybe you could look at the list of the files --**
14       A. I don't believe he ever provided the MD5 hash
15   for the ErrorClean so I'm not sure how I would have.
16       **Q. Maybe you could look at the files that you**
17   **tested and see if any of them are ErrorClean?**
18       A. How can I tell that without an MD5 hash?
19       **Q. Because he provided you the file name.**
20       A. So if something has a file name -- just because
21   two files have the same file name does not make them the
22   same file.
23       **Q. I think that's understandable. You know the**
24   **files you tested. Can you tell me if any of those files**
25   **are ErrorClean?**

151

1    A. No, I can't.
2        **Q. Really?**
3    A. Does he have screen shots of ErrorClean? He
4    might have screen shots and I can look at his screen
5    shots.
6        **Q. So you can't tell looking at the files you**
7    **tested which programs you tested. You don't know.**
8    A. Yeah, I can.
9        **Q. Then tell me, did you test ErrorClean?**
10       MS. GURLAND: Are you asking whether or not --
11   did -- is the question did Mr. Ellis test ErrorClean?
12   Is that the question?
13       BY MR. ARENSON:
14       **Q. The question is does your report indicate that**
15   **you tested ErrorClean? It is right there in front of**
16   **you.**
17       A. And my answer is that he doesn't list the MD5
18   hash, so I don't know -- it could have a different name.
19       **Q. So you are not sure which files you tested.**
20       A. I'm sure the -- which files I tested. I'm not
21   sure which files he tested.
22       **Q. I understand. So I'm telling you that he tested**
23   **ErrorClean, and you are not able to tell me whether you**
24   **tested ErrorClean or not.**
25       A. Could ErrorClean be ErrorPatrol? Maybe that's

152

1    what that file was called. I need screen shots or more
2    information. There is nothing here. This report is
3    pathetic. It is small. It is lacking so much
4    information. It is such an opportunity to have a wealth
5    of information about what's going on and it is not
6    there. It is like five page.
7        **Q. So you don't know whether you tested ErrorClean**
8    **or not.**
9        MS. GURLAND: Whether you tested ErrorClean?
10       A. I did not test this piece of software that he
11   has, to my knowledge. I don't know if I did or not. If
12   one of these was called ErrorClean --
13       BY MR. ARENSON:
14       **Q. Can't you read?**
15       A. He doesn't provide a screen shot. This is just
16   a file name.
17       **Q. Mr. Ellis, do you know which files you tested?**
18       A. Sir, these are file names that he lists here.
19   We have observed already that some of these file names
20   are sometimes different. Mr. Johnson identifies that
21   and highlights that and illustrates that in his report.
22       **Q. So you don't know which files you tested.**
23       A. I do know which files I tested because they are
24   listed right here.
25       **Q. And were any of them ErrorClean?**

38 (Pages 149 to 152)

153

1    A. I believe I have already answered the question
2  that you are asking me.
3    Q. I'm sure you haven't.
4    A. I'm trying to explain it to you. In forensics
5  we have what's called an MD5 hash that identifies what a
6  file is. That's how we talk to each other. That's how
7  forensic experts talk to each other with the language of
8  MD5 hashes.
9      If I download a file from the Internet to
10 install it on my computer, oftentimes on that site there
11 will be an MD5 hash that says this is the genuine
12 article. This is what says that this software is this
13 software.
14     Anybody else can fabricate, create, replicate a
15 piece of software. It is done. It is done often.
16 Software forgery is a huge issue. Whether or not it got
17 called ErrorClean, if he had included screen shots, I
18 may be able to identify, yes, it looks similar to
19 perhaps ErrorPatrol. I just don't know. There may be
20 screen shots here and I'm not seeing them.
21   Q. I'll tell you what --
22   A. Let's look through -- this report may have
23 screen shots in it, the expert report of Kevin Johnson.
24   Q. Before you do that though, I'm curious whether
25 you know whether you tested ErrorClean or not?

154

1  Presumably you opened these files up and looked at the
2  names, right, when you were testing them?
3      Wait, before you go through that. I would like
4  you to answer this question. Do you know whether you
5  tested ErrorClean or not?
6    A. I can't conclusively say from a file name what
7  the software is called.
8    Q. That's fine. Let me represent to you that
9  ErrorClean is, when you open it, named ErrorClean.
10   A. It says ErrorClean at the top of the thing
11 there?
12   Q. The program name is ErrorClean. That's how it
13 is batched.
14     Looking at the files that you tested, can you
15 tell me whether you tested ErrorClean?
16   A. None of them had ErrorClean on the slash screen.
17   Q. Wonderful. That's all we need to know. So you
18 didn't test ErrorClean.
19   A. I did not test ErrorClean.
20   Q. Thank you. Right.
21   A. I just wanted to be clear.
22   Q. When you were testing the executables that you
23 did test, did you notice any difference between the paid
24 and the free versions?
25   A. Yes.

155

1    Q. Why don't we talk about those differences.
2    A. Okay.
3    Q. What were they? And we can start, if you would
4  like, with your -- let's go to ErrorPatrol, since you
5  tested both the free and paid version of that. That's
6  on page 14 of your report.
7    A. Okay.
8    Q. Now, in your conclusion here on page 14 you say:
9  "My tests of the free version revealed similar
10 functionality to the paid version with the exception
11 that the free version did not perform the repair."
12   A. That's right. It would ask you to buy it. It
13 would have a window that popped up that said your
14 system -- and it would look very similar to the screen
15 that listed the problems, and it would, you know,
16 basically say warning, if you want to fix this, you have
17 to click here.
18   Q. So that's one difference between the free and
19 paid version.
20   A. Yeah.
21   Q. Any others that you recall?
22   A. Not that I recall off the top of my head, no.
23   Q. Okay. Were you aware when you were doing your
24 testing that five of the eight files you tested were the
25 paid versions of the software and not the free version?

156

1    A. Yeah. Yes, I was aware of that.
2    Q. So you knew when you were testing that five of
3  the eight files you tested were the paid versions.
4    A. Yes.
5    Q. When you wrote your report, had you read the
6  FTC's complaint?
7    A. I'm not sure -- I'm not sure that I ever did
8  read the FTC complaint, to be frank. I would have
9  listed -- yeah, I probably would have listed it if I had
10 spent a lot of time on it. I don't recall.
11   Q. Okay.
12   A. I may have read the complaint. I don't recall.
13   Q. You just don't know.
14   A. I just don't remember.
15   Q. What is your understanding of the FTC's
16 allegations against the defendants?
17   A. My understanding is that they were forcibly
18 downloading the software to people's computers and
19 forcibly installing it and -- or that they were just --
20 had popups that would ask people to run a scan and
21 download it.
22   Q. Okay. Let me give you some more information.
23     The FTC has charged the defendants with
24 misleading consumers in order to trick them into
25 purchasing software, so making misleading statements in

39 (Pages 153 to 156)

157

1  order to trick consumers into purchasing software.
2      Did you know that previous to me telling you?
3      A. Yes. You said it very succinctly.
4      Q. Okay. So you would agree with me that if we are
5  examining whether the defendants misled consumers in
6  order to purchase software, we need to look at the
7  representations the defendants made prior to purchase;
8  right?
9      A. Yes.
10     Q. So by testing five of the paid versions, what
11 relevance does that have to the central allegation in
12 this case, that the defendants made false
13 representations to induce consumers into purchasing the
14 software?
15     MS. GURLAND: You are asking for what the legal
16 relevance is?
17     MR. ARENSON: I'm asking for his opinion.
18     MS. GURLAND: His opinion about the --
19     MR. ARENSON: The relevance to the case of his
20 analysis.
21     MS. GURLAND: So your opinion about the legal
22 case and the court case and the relevance in the court
23 case. So you can offer a legal opinion like a lawyer,
24 if you would like to.
25     MR. ARENSON: That's a completely inappropriate

158

1  objection.
2      BY MR. ARENSON:
3      Q. Mr. Ellis, you did the testing here; right?
4      A. I believe that the -- my understanding --
5      Q. We have to fix Ms. Gurland's speaking objection
6  first. Let's get that fixed.
7      So you did the testing here; right?
8      A. Yes.
9      Q. And presumably you believe your testing had some
10 relevance to this case.
11     A. Yes.
12     Q. So my question to you is what relevance does
13 testing the paid version of the software have to this
14 case which revolves around the defendants making
15 misrepresentations to consumers in order to induce them
16 to buy the software?
17     MS. GURLAND: You want his legal opinion?
18     MR. ARENSON: Carolyn, please do not enter that
19 same speaking objection again.
20     MS. GURLAND: I'm going to make an objection if
21 I think it is proper. If you are asking him to render
22 an opinion about the legal case, I just want that to be
23 clear that that's what you are asking for.
24     MR. ARENSON: My statement stands.
25     BY MR. ARENSON:

159

1      Q. Mr. Ellis, you can go ahead and answer.
2      A. I think I can offer a technical foundation for
3  why I would do that that has nothing to do with the
4  legal --
5      Q. Okay.
6      A. -- stuff that you guys are talking about, and
7  the answer would be if somebody purports to sell me a
8  piece of software that does something and then I buy it,
9  I would want to know if the software actually could do
10 what the person said it could do.
11     So if I buy -- on-line I buy a virus scanning
12 software because they did an on-line scan that says my
13 computer is infected and then I download a piece of
14 software that does nothing, that is a problem. That is
15 a big problem.
16     So if, for example, I had not tested these paid
17 versions and then we had been sitting here and you said
18 to me, Mr. Ellis, you did not test these paid versions,
19 why not? Mr. Ellis, Kevin Johnson says these paid
20 versions do nothing. I would be in a bit of a
21 predicament right now.
22     On the other hand, if somebody says that a piece
23 of software does something and then it actually does
24 it -- if it says it can find viruses and then it
25 actually is able to find viruses and remove them, it is

160

1  legitimate software in my opinion.
2      Q. So software that misrepresents the security
3  status of your computer but at the end of the day
4  actually functions, that's legitimate software.
5      A. I can't speak to that part. I think that I can
6  speak to the software that I tested, that it did not
7  misrepresent the condition of my computer.
8      Q. Really?
9      A. In my report I don't believe that there is --
10 there was any misrepresentation.
11     Q. Okay.
12     A. It said that there were registry problems and
13 there were registry problems. That registry key is one
14 that in Windows 7 doesn't contain all of those files
15 anymore, doesn't contain all of those references.
16     That's been fixed in 7 so -- but when you go
17 back to the Kevin Johnson report, that's a different
18 area altogether.
19     Q. So if we are focusing on the representations
20 made to consumers in order to induce them to purchase
21 the products, would you agree with me that testing the
22 paid versions, the postpurchase versions of the
23 software, wouldn't shed any light on what
24 representations were made to the consumers by the
25 defendants prior to purchase? Would you agree with that

40 (Pages 157 to 160)

161

1  statement?
2    A. Can you break that down?
3    Q. Sure. We are focusing on the representations
4  made to consumers in order to induce them to purchase
5  the product.
6    A. Okay.
7    Q. That's the first part.
8      Now, you have tested in five out of eight cases
9  the software that consumers received after they made
10  their purchase. And my question to you is, if we are
11  focusing on what representations were made to consumers
12  prior to purchase, we need to test the free versions of
13  the software, not the paid versus; right?
14    A. I think you need to test both.
15    Q. Okay. That's fair. So we need to test the free
16  and the paid.
17    A. Right.
18    Q. Okay. And in five out of eight cases you only
19  tested the paid versions; is that right?
20    A. I believe I had tested -- I definitely tested
21  two of them, three of them. Yeah, without looking at
22  the screen shots in front of me, I believe that I
23  tested -- can I see a pen?
24    MS. GURLAND: You can look at the body of your
25  report too if it helps you.

162

1    THE WITNESS: Okay. Yeah.
2    A. Yeah. So it looks like DriveCleaner, WinFixer,
3  and WinAntivirus2006 I did not test the free version,
4  but in ErrorPatrolSetup, PerformanceOptimizer, and
5  WinAntivirus I did.
6    BY MR. ARENSON:
7    Q. Okay. I think that's what I said. There were
8  three files where you tested the free version and five
9  that you didn't. Is that right?
10    I mean, do you want to go through them and we'll
11  work it out? Let's go through each one and we'll talk
12  about whether it's paid or free.
13    DriveCleaner2007PaidSetup, was that a paid
14  program or free program?
15    A. My recollection is that was a paid setup.
16    Q. ErrorPatrolSetup.Exe, paid or free?
17    A. That was paid. It says right there.
18    Q. WinAntispyware --
19    MS. GURLAND: Are you not going to read the one
20  underneath it that says he tested the free version of
21  the exact same thing?
22    MR. ARENSON: Carolyn, I'll tell you what, I
23  will ask the questions and then you can ask questions at
24  the end, if you'd like.
25  ///

163

1    BY MR. ARENSON:
2    Q. WinAntispyware2006Setup, paid or free, or do you
3  not know?
4    A. The ProSetup, I believe that was --
5    Q. I didn't ask about that.
6  WinAntispyware2006Setup, paid or free?
7    A. I believe that was paid.
8    Q. WinAntivirus2006ProSetup, paid or free?
9    A. That was free -- I'm sorry, that was the paid.
10    Q. And WinFixer2006PaidSetup.
11    A. That was paid.
12    Q. Okay. So the only three free files you tested
13  would be ErrorPatrolFreeSetup; right?
14    A. Right.
15    Q. WinAntivirus2005ProScannerSetup.
16    A. Right.
17    Q. And PerformanceOptimizerFreeSetup.
18    A. I believe that's correct.
19    Q. Okay. Glad we ran that down.
20      So, again, you told me that it would be
21  important to test both the free and the paid version of
22  the software if we are evaluating the defendants'
23  representations to consumers prior to purchase; is that
24  correct?
25    A. I had them -- yeah. I'm not sure that I had

164

1  them available to me. I would have to go back and look
2  and see if those were available to me. There was a lot
3  of issues of availability.
4    Q. Isn't it the case that Ms. Gurland told you
5  which ones to test?
6    A. Yes, that's true, but certainly I would have had
7  discussions about testing. I would have had those
8  discussions with her. I don't recall.
9    Q. Were there files that you asked to test that
10  Ms. Gurland said no?
11    A. No. No.
12    Q. So you didn't have any discussions with
13  Ms. Gurland about testing.
14    A. It may have been -- I'm not going to talk about
15  what may have been.
16    Q. Okay. So we have established that you haven't
17  tested the free versions of all the paid versions we
18  just talked about, with the one exception of
19  ErrorPatrol, which you did test both the paid and the
20  free; right?
21    A. Right.
22    MS. GURLAND: That's misstates the testimony.
23    MR. ARENSON: He just said right and he is
24  right.
25    A. (Continuing.) Can you rephrase?

41 (Pages 161 to 164)

165

1    BY MR. ARENSON:
2      Q. The testimony's fine.
3      Why would it be important to test both the paid
4    and the free version in order to determine what
5    representations the defendants made to consumers
6    prepurchsae?
7      A. Well, I think it would be important to look at
8    the free version to see what functionality it was
9    purporting to do.
10     Q. Uh-huh. What about the paid version? You said
11    you had to test the paid version too.
12     A. As to whether it could execute the functionality
13    that it said it could, and the paid versions list the
14    same things that they say that they will do so --
15     Q. But --
16     A. -- I think it is more critical to be able to
17    test the paid versions and say can the software perform,
18    can it work, can it say what it says it will do.
19     Q. Let me give you a hypothetical: If the
20    defendants misrepresented the security status of a
21    computer and then subsequently sold a piece of software
22    that did function to remove viruses, let's say, do you
23    have any issues with that type of marketing?
24     A. That would be dependent on -- yeah, certainly.
25    But that would be dependent on how it was being

166

1    portrayed, who was doing the portrayal. Certainly there
2    has been lots of cases where software's been downloaded
3    on the Internet, bought, and installed, only to find out
4    that somebody had used their methodology to tell you
5    what was wrong, why you have to buy this product.
6      Q. So if we agree -- and I will represent to you
7    that this is true -- that this case is about the
8    defendants' representations made prepurchase, okay --
9    and I'm going to represent to you that that's what the
10    FTC is alleging here, that the defendants misrepresented
11    prepurchase; okay?
12     A. Okay.
13     Q. Now, if we assume that that's true, isn't it
14    important to test the free versions versus the paid
15    versions?
16     A. I don't know that it was represented to me that
17    the free versions misrepresented --
18     Q. I'm not sure what that has to do with the
19    question.
20     A. Well, you asked me if the -- if they
21    misrepresented what the software does, and there are so
22    many different mediums whereby any sort of
23    representation about software could be made, I would
24    want to see -- I would want to see more exploration of
25    that. Like was it done on a website, was it a

167

1    third-party website, was it an affiliate, was it the
2    software itself.
3      Q. The representations made prepurchase.
4      A. But prepurchase, what was making the
5    representations? Was it a third-party vendor making the
6    representations? Was it a reseller of the software
7    making these representations? I don't know.
8      Q. So -- and maybe we are just not going to get an
9    answer, but my original question, which we'll try one
10    more time, is if this case is about the representations
11    made to consumers prepurchase, then what is the
12    relevance of the software provided postpurchase?
13     A. Whether or not it can meet up to those
14    representations.
15     Q. All right. That's actually a fair point.
16     So if -- do you think it is important whether
17    the representations made prepurchase are accurate or is
18    that not an important consideration?
19     A. I think it is important to know who was making
20    the representations and how they were being made and
21    delivered. And I don't know in the cases we are talking
22    about whether or not it is the software that was making
23    the representations. I would have to look at the
24    software and that I would do and that I will do.
25     Q. In your personal view, do you think it is okay

168

1    if the defendants misrepresented the security status of
2    a computer and then sold a product that ultimately
3    functioned?
4      A. No, I don't think that's okay.
5      Q. Okay. Let's talk about ErrorPatrol. Now, I
6    think you told me -- and correct me if I'm wrong -- that
7    the difference between the ErrorPatrolFree and the
8    ErrorPatrolPaid, both of which you tested, was that
9    ErrorPatrolPaid actually would repair the, quote, end
10    quote, errors, whereas ErrorPatrolFree would prompt you
11    to register the program; is that correct?
12     A. That's correct.
13     Q. Any other differences that you noticed between
14    the two programs that you can recall?
15     A. No.
16     Q. Okay. I'm going to mark as Exhibit 2 screen
17    shots from ErrorPatrolFree and ErrorPatrolPaid.
18     (Ellis Exhibit Number 2, ErrorPatrol Screen
19    Shots, was marked for identification.)
20     MS. GURLAND: Screen shots taken by whom and
21    when?
22     MR. ARENSON: That's actually not relevant to
23    the question, Carolyn, but I will tell you. These are
24    screen shots taken by me in preparation for this
25    deposition.

42 (Pages 165 to 168)

169

1    MS. GURLAND: That's relevant.
2    MR. ARENSON: I don't see how.
3    BY MR. ARENSON:
4    Q. So we'll look at the first image, and you can
5    tell the difference between the free and the paid
6    version by the top of the menu bar where it says "Not
7    Registered"; do you see that?
8    A. Yes.
9    Q. Did you encounter that when you were testing the
10   software?
11   A. I believe so.
12   Q. Okay. And is that a way to distinguish between
13   the free and the paid versions?
14   A. Yeah.
15   Q. Now, if you look at the first two pages of the
16   screen shot, you will see severe errors detected on the
17   first page; do you see that?
18   A. Severe systems threats such as -- yes.
19   Q. Actually, if you look up above on the menu bar,
20   286 severe errors.
21   A. Sure. Okay.
22   Q. And then onto page 3 -- are you there?
23   A. Yes.
24   Q. So same number of errors, quote, end quote,
25   "detected," but I will represent to that you this

170

1    warning message doesn't appear in the paid version.
2    A. Okay.
3    MS. GURLAND: Are you -- are you going to be a
4    witness?
5    BY MR. ARENSON:
6    Q. Did you encounter that in your testing?
7    A. Yes. Yeah. I encountered that same -- then you
8    click repair and it would say you need to buy the
9    software, right.
10   Q. So that's kind of a difference between the paid
11   and the free version; right?
12   A. That was the difference that I mentioned
13   earlier, that it would prompt you. I'm sorry if I
14   wasn't as clear.
15   Q. Well, I think it is a pretty large oversight but
16   let's focus on it.
17   A. I don't think so at all.
18   Q. You didn't say anything in your report about
19   this error message, which says -- and I will read it for
20   the record: "Error Patrol has detected 286 severe
21   system threats on your computer. The errors found on
22   your computer are very likely to create further problems
23   if not fixed immediately, such as lost documents and
24   profile settings, physical data loss, system not
25   starting up, system slowdowns, crashes, and freezes."

171

1    Now, that message didn't exist in the paid
2    version.
3    A. Well, the message here is specifically to say
4    you need to register ErrorPatrol to fix these errors.
5    So clearly in the next one you have done so, so why
6    would I tell you that you need to register it to fix
7    these errors when you have already done that?
8    And this is just what they were showing you.
9    They were breaking this stuff out, the 248 invalid items
10   found and the 38 invalid items found, they were breaking
11   that out into a popup that said here's what's going on.
12   Q. So you didn't think it was significant that the
13   free version of ErrorPatrol describes the errors as,
14   quote, end quote, "severe system threats," and then
15   provides four -- a parade of horribles as to what could
16   happen as a result of these system threats.
17   MS. GURLAND: Objection as to the
18   mischaracterization by counsel as to what he believe
19   that it is, a parade of horribles. It says what it
20   says.
21   BY MR. ARENSON:
22   Q. And then the paid version doesn't include that
23   list at all, and you didn't think that was worth
24   mentioning in your report?
25   Or I will ask you the question: Did the paid

172

1    version say anything about severe system threats?
2    A. The assumption is that you already know that
3    once something is in here, you know the purpose of the
4    software. The purpose of the software is to detect what
5    may be severe system threats.
6    Q. Really? How would a consumer know that?
7    A. Because they have seen this popup already and
8    purchased the software and downloaded it and installed
9    it and hopefully they remember why they installed the
10   software.
11   Q. So the reason you didn't think this was
12   important is because the consumer already would have
13   seen this when they got the free version and the paid
14   version didn't need to repeat the message.
15   A. This would have been in the screen shots that
16   were included in the materials that I used.
17   Q. Those weren't part of your report, sir, so I
18   don't have those with me. What we are talking about now
19   is the screen shot in front of you.
20   Now, is the reason you decided not to discuss
21   this difference between the paid and the free version is
22   that you assumed consumers would have already seen this
23   message when they got the paid version; is that -- do I
24   understand your testimony correctly?
25   A. That would be the difference that I was talking

43 (Pages 169 to 172)

173

1  about when I said the difference -- when I was talking
2  about difference, I was talking about functionality in
3  the way that the software works and doesn't work and
4  what it is doing.
5      So far as the dialogue that happens, I did
6  mention that one difference was that the not-registered
7  version would pop up a popup telling you that you needed
8  to buy the software. That's what I was talking about.
9  That's the difference and I did mention that, and that
10  was the difference that I was talking about. And it is
11  right here. So I'm not sure where you are going with
12  that but that's my answer.
13  **Q. Okay. So you don't view this as a significant**
14  **difference between the programs. This is just a popup**
15  **dialogue.**
16  A. This is the difference that I mentioned in my
17  report. Didn't I not mention that the only difference
18  between the two softwares was that one requested that
19  you buy it? And this is the request to purchase.
20      I didn't go into great detail about what it was.
21  I wasn't trying to hide it. It is obvious that it is
22  there. I think this is something that Johnson shows in
23  a screen shot in his report.
24  **Q. You understand this is a case about**
25  **representations made to consumers prepurchase.**

174

1  A. And this is -- yes, this is a representation and
2  this one happens to be an accurate one.
3  **Q. And we are going to get into that in a minute.**
4  **But you understand this is a case about representations**
5  **made to consumers prepurchase.**
6  A. Sure.
7  **Q. Okay. And the fact that the free version**
8  **declares these severe system threats and lists four**
9  **potential outcomes and the paid version doesn't say**
10  **anything about that, you didn't think that was**
11  **significant enough to put in your report.**
12  A. I'm sure that I did think it was significant.
13  It was significant enough to mention that there is a
14  difference and that it asks you -- and these are things
15  that were -- it is in my report in the sense that I
16  referred to it as a material that I relied upon and then
17  I mention in my procedures that I took screen shots of
18  software performing actions and that I made those screen
19  shots available.
20      And in retrospect I should have made that as an
21  attachment, and I will concede that point, that I should
22  have made it as an attachment.
23  **Q. And.**
24  A. And that that was an oversight on my part and
25  I'm totally responsible for that.

175

1  **Q. Okay. But you would agree with me that in a**
2  **case about representations made to consumers**
3  **prepurchase, that the difference in language between the**
4  **paid and the free version is potentially important?**
5  A. No. I don't agree that what you are telling
6  somebody when you are selling them something -- you
7  know, certainly when you are telling somebody that their
8  house is going to fall apart if you don't replace the
9  roof, I don't keep talking about how your house is going
10  to fall apart if you don't fix your roof while I'm
11  fixing the roof.
12  THE WITNESS: And that being said, can I take a
13  quick break? I need to use the bathroom.
14  MR. ARENSON: Sure.
15  (A brief recess was taken.)
16  MR. ARENSON: Okay. Go back on the record and
17  I'm going to introduce Exhibit 3.
18  (Ellis Exhibit Number 3, System Detection List,
19  was marked for identification.)
20  BY MR. ARENSON:
21  **Q. Mr. Ellis, I will represent to you that this is**
22  **a document created by the FTC which lists out all of the**
23  **detections from the software we were just discussing,**
24  **which is ErrorPatrol. And, as you can see from this**
25  **document, there are two categories that ErrorPatrol has**

176

1  detects issues and that's System Clean and Disk Clean,
2  and if you look at the last exhibit, you can see those
3  two there. Are you with me?
4  A. Yes.
5  **Q. So, again, looking at Exhibit 2, ErrorPatrol**
6  **detect system clean issues and disk clean issues, and**
7  **this is a list of issues typed out because on the screen**
8  **they are too small.**
9  MS. GURLAND: Do you want to enter this into
10  evidence as something?
11  MR. ARENSON: It is already a deposition
12  exhibit.
13  BY MR. ARENSON:
14  **Q. So let's talk about the system clean errors**
15  **first; okay?**
16  A. Okay.
17  **Q. Now, let's take a look at the first three, which**
18  **all have the extension AIF; are you with me?**
19  A. Sure.
20  **Q. Okay. What's an AIF file?**
21  A. It is audio -- I believe it is a multimedia
22  format.
23  **Q. Audio interchange file?**
24  A. Yeah, audio interchange.
25  **Q. Okay. What do these three registry keys here**

44 (Pages 173 to 176)

177

1   do?
2       A.  What these do is if somebody is on a website and
3   they click on a link that has a dot AIF -- and the file
4   behind the link has a dot AIF extension, when they click
5   on it, because this registry entry exists and because it
6   does not have any sort of program ID associated with it
7   on the computer, it will cause that little popup that
8   you see that says save to disk or run --
9       Q.  Is it accurate to say --
10      A.  -- or open.
11      Q.  -- this is an instruction to Windows as to what
12  file to use to open up AIF files; is that correct?  Or
13  application, I should say.
14      A.  No, that's not correct.  I just explained to you
15  what these do.
16      Q.  I don't understand so maybe you need to try
17  again.
18      A.  If you are on a website --
19      Q.  So this only applies to websites.
20      A.  Yes.  These entries only apply to -- there is
21  another section of the registry that does what you are
22  talking about.
23      Q.  Okay.  So explain this to me.  If you are on a
24  website --
25      A.  And you click on a link that has -- all right.

178

1   So, first of all, these will exist in this area if there
2   is a program ID associated with a file, okay?  These
3   will exist.  These will stay in here and new entries
4   will come into here when you install new software.
5       But for anything that's orphaned in here -- and
6   I would say that what DriveCleaner was doing is finding
7   the orphaned entries.
8       Q.  To be clear, we are talking about ErrorPatrol
9   right now.  Let's stay focused.
10      A.  I'm sorry.
11      Q.  So continue your explanation of what these
12  registry keys do.
13      A.  So when there is an orphaned entry in here and
14  you click on a link, a little popup will pop up that
15  says save to disk or open with.
16      Q.  Okay.
17      A.  If this entry is not in here and you click on
18  that, it will turn into a text link and nothing will
19  happen.
20      Q.  Okay.
21      A.  That's what all of these do, every single one of
22  them, in those circumstances.
23      Q.  Okay.  And these registry keys are part of
24  Windows when it ships from the factory; is that correct?
25      A.  Not Windows 7 but in Windows XP, yes, these were

179

1   shipped with Windows XP.  And I would have to compare to
2   know exactly -- some of these are in Windows 7 but not
3   nearly to this extent.
4       Q.  So there is some overlap in 7 and Vista?
5       A.  I think in 7 the only thing -- you are not going
6   to get any orphaned entries in 7, I don't believe, and
7   Vista I couldn't speak to.
8       Q.  So this shipped from the factory in Windows XP,
9   these registry keys shipped just like this.
10      A.  Yeah.
11      Q.  So every install of Windows XP in the world
12  would have these registry keys.
13      A.  More than likely.
14      Q.  Okay.
15      A.  Just like every version of Windows XP that was
16  shipped had the problem with the -- one of the servers
17  that allowed the Sasser worm virus to pretty much take
18  control of many, many, many computers.
19      Q.  Now, it is your testimony that these registry
20  keys are not orphaned in Windows 7 and Windows Vista or
21  you are not sure?
22      A.  It would depend on what you have installed on
23  your program.  I don't believe it ships with any -- I
24  haven't tested a brand-new install of Windows 7, but it
25  doesn't have the orphaned entries.  Most of these

180

1   entries -- I'm not going to speak to that because I
2   haven't compared the two.
3       Q.  Do you know?
4       A.  I do know that it is a lot smaller of a list and
5   that it is -- I don't believe that there were any
6   orphaned prog IDs in this key in Windows 7.
7       Q.  So if we were to run ErrorPatrol on Windows 7,
8   would it detect these registry keys?
9       A.  Oh, no.
10      Q.  Why not?
11      A.  Because they are not -- I'm fairly certain these
12  were taking just the ones that were orphaned that didn't
13  have actual programs IDs associated with them, like
14  there was no software installed on the computer that
15  would open AIFC files.
16      Q.  I'm sorry, explain that to me.
17      A.  I would really have to look at them one by one
18  and tell you.  But all I can tell you right now with
19  certainty is what I have already told you, and that's
20  that orphan entries in here are a problem and that --
21      Q.  Let's talk about that.  These registry keys when
22  Windows ships from the factory are empty; is that a
23  correct way of saying it?
24      A.  No.  They don't reference any real program --
25  prog ID.

45 (Pages 177 to 180)

181

1    Q. Okay.
2    A. Which is interesting in and of itself because an
3  AVI should.
4    Q. So --
5    A. If the Windows Media Player views AVI, and I'm
6  not sure that it does.
7    Q. So if ErrorPatrol was run on any installation of
8  Windows XP in the world, it would detect these same
9  errors.
10   A. If they existed. If there were entries that
11 lacked prog IDs in this key, that's the ones -- that's
12 my understanding of the software, that's what it was
13 detecting.
14   Q. And we have established that every copy of
15 Windows XP that is installed in the entire world has
16 these registry keys by default.
17   A. On a clean install, yeah, I think so.
18   Q. So any user in the world that ran
19 ErrorPatrolFree -- let's focus on free versus paid --
20 would receive this error message -- going back to
21 Exhibit 2 -- about severe errors detected.
22   A. Yes.
23   Q. Okay. Now, explain to me how these first three
24 registry keys could -- would be very likely to create
25 lost documents and profile settings.

182

1    A. The way it would work is that a remote operator
2  of a website would create a malformed link that would
3  refer to one of these files, and then you would click on
4  it and you would -- the popup would pop up and then that
5  would -- that could potentially deliver a payload to a
6  trojan that was installed on the computer already. It
7  would receive it and execute the code of the operator's
8  choice. Any of these could do that.
9    Q. Okay.
10   A. In those particular circumstances.
11   Q. Okay. In that case is it the registry key
12 that's causing the lost documents and profile settings
13 or is it the virus or trojan that's causing the lost --
14   A. Well, the registry key created the security
15 vulnerability that opened the door so it could happen.
16   Q. Okay. So the registry key --
17   A. And of itself no component in Windows, whether
18 it be a service that's running that has a vulnerability,
19 anything that is a vulnerability, in and of itself the
20 vulnerability doesn't do anything. It is the people
21 exploiting the vulnerability that causes the problem.
22   Q. Okay. So --
23   A. And I think that's a clear distinction between
24 what's a vulnerability and what's the actual person
25 performing the exploit on the person's computer.

183

1    Q. So it is accurate to say the registry keys
2  wouldn't cause the lost documents and profile settings.
3  That would be the malicious program attacking the
4  computer.
5    A. It would be the person exploiting the computer
6  that's created this registry keys.
7    Q. Again, I'll keep asking the same question until
8  you answer it. Is not the registry key that's
9  causing --
10   A. I'm not going to answer that question. That's a
11 poorly formed question.
12   Q. You don't get to grade the questions today,
13 Mr. Ellis, unfortunately. I'm going to ask it again.
14   It is not the registry key that's causing the
15 lost documents and profile settings, it is the malicious
16 hacker who would be doing that; is that correct?
17   A. He couldn't have done it without the registry
18 keys, so your question is lacking in the foundation
19 needed to understand the answer.
20   Q. There is no way that a malicious hacker can
21 access a computer without these registry keys.
22   A. No. There is other ways.
23   Q. Lots of other ways, in fact.
24   A. Sure, lots of other ways. For Windows XP,
25 Service Pack 1, there were many, many ways to get in,

184

1  and this would have just been one part of a concerted
2  attack.
3    Q. So we'll try it again and if you refuse to
4  answer it, that's fine.
5    The registry keys don't cause the lost
6  documents. A third party who is loading malicious code
7  onto the computer would be the actual cause of the lost
8  documents.
9    MS. GURLAND: Objection to asked and answered.
10 You can answer it again if you want to answer it again.
11   BY MR. ARENSON:
12   Q. You don't want to answer that question.
13   A. I don't know how to answer that question in a
14 way that isn't ridiculous, because it -- you are making
15 it sound like I'm -- like if I say -- you are making it
16 sound like if I say no -- I'm not going to answer the
17 question.
18   Q. Okay. You are refusing to answer the question.
19   MS. GURLAND: No. It is asked and answered. He
20 is refusing to answer the same question for the fourth
21 time.
22   MR. ARENSON: Carolyn, you don't get to decide
23 if it's answered.
24   MS. GURLAND: I get to make objections, and my
25 objection is asked and answered times four.

46 (Pages 181 to 184)

185

1    MR. ARENSON: Okay. Your objection is on the
2 record.
3    BY MR. ARENSON:
4    Q. Why don't we continue to page through this list
5 of registry keys, and just tell me if your answer is
6 going to be the same because we don't need to go through
7 every one.
8    A. Yes, my answer is going to be the same. This is
9 just an explanation --
10    Q. Why don't you actually look at them before you
11 decide that.
12    Is your answer the same for all of these
13 registry keys; that all of these registry keys could be
14 exploited by a third party and that could result in the
15 horrible things described in this popup?
16    MS. GURLAND: Objection to the characterization
17 of the words in the popup.
18    A. Well, I don't believe that all of them would be,
19 because some of them are handled by other parts of
20 Windows, but what the software is trying to do is
21 identify orphaned items in this key.
22    BY MR. ARENSON:
23    Q. Are there entries here that would not be very
24 likely to create lost documents and profile settings?
25    A. I would say like the HTML one is handled by

186

1 Internet Explorer so that would be a prog ID that would
2 be in a different location, so it wouldn't cause the
3 effect that we talked about.
4    But I would also qualify that by saying that
5 that shouldn't be in there and how would the software
6 know to differentiate. It would -- text scanning and
7 text searching is one of the most -- it is one of the
8 most exhaustive and CPU -- it is one of the most
9 intensive processes that a computer can undertake to do.
10    So to be able to say, okay, I'm going to start
11 doing a semantic interpolation of what these are and
12 comparing them to a database, it creates more overhead
13 for the software when it's easy to say these shouldn't
14 be here, get rid of them. The temp directories
15 shouldn't contain anything, just get rid of it all. It
16 doesn't matter what it is, just get rid of it.
17    Q. So are there other entries here that would not
18 be, quote, very likely to create lost documents and
19 profile settings? You said the HTML is one of them.
20    A. Right.
21    Q. Are there others?
22    A. I would say that, if anything, GIF, JPEG. I
23 haven't tested that particular -- I'm not sure why these
24 are in here to begin with, why they would be in this
25 area of the registry.

187

1    Q. And I'm not asking you to try to explain why
2 they are here. I want to focus on if these are very
3 likely to cause lost documents and profile settings.
4    So you said the GIF and JPEG, HTML. Any other
5 of these registry keys that would not be very likely to
6 create lost documents and profile settings? Just look
7 through the list and, if you would, just call them out
8 and I will make a mark.
9    A. It would depend on the user system. Like on a
10 fresh system -- I don't even really want to -- I don't
11 really want to go there, because I don't know the extent
12 that these could cause harm on a system postlaunch --
13 say if somebody removed Internet Explorer and used
14 something else, then certainly these could cause trouble
15 if they were using a different program or if they
16 removed certain software from their machines, then these
17 could cause troubles. There are too many variables.
18    Q. Would you say that's a very likely outcome?
19    A. That people modify their systems heavily?
20    Q. That people remove Internet Explorer and add a
21 different program and then run -- how you just described
22 it, you tell me.
23    A. Yeah.
24    Q. That's a very likely outcome.
25    A. Certainly people remove software from their

188

1 computers that they don't want that helps with Windows.
2 I don't know the extent anymore that you can remove
3 Windows Explorer. I know you can certainly deactivate
4 it and prevent it from working.
5    Q. So is it -- you said you don't want to talk
6 about it.
7    A. I said that there is too many variables to
8 really accurately sit here and do any accurate forensics
9 on this.
10    Q. So you are not sure in the case of at least some
11 of these registry keys whether they would be very likely
12 to cause lost documents and profile settings.
13    A. I'm not sure, that's right.
14    Q. And I assume the answer is the same for the
15 other three conditions: Physical data loss, system not
16 starting up, system slowdowns, crashes, and freezes.
17    A. That's right.
18    Q. Same answer that you just gave.
19    A. That's right.
20    Q. Okay. Now, you said that your wife is running a
21 laptop with Windows XP; is that right?
22    A. Yes.
23    Q. Have you removed all of these registry keys from
24 her laptop?
25    A. I don't manage -- I don't -- the shockeeper's

47 (Pages 185 to 188)

189

1  son has no shoes, right? No. 1 think I might have
2  actually -- I may actually have run DriveCleaner on her
3  machine.
4      Q. You ran DriveCleaner on her machine?
5      A. Not DriveCleaner, whichever one we are talking
6  about.
7      Q. You ran ErrorPatrol on her machine?
8      A. I don't recall if I did or not. Certainly I
9  wouldn't -- they should be removed and I -- yeah.
10     Q. That's not what I asked you.
11     A. It is my wife's machine.
12     Q. Did you tell me it was your computer before you
13 gave it to your wife?
14     A. Yes, it was mine before.
15     Q. So when it was your computer, did you remove all
16 of these registry keys?
17     A. No. I actually didn't know about them at that
18 time. That was years ago.
19     Q. Okay. And with -- now that your wife is running
20 the computer, you haven't gone and removed all of these
21 registry keys?
22     A. No. But I'm going to tonight.
23     Q. Okay. That's fair.
24     A. My wife isn't one to wander around aimlessly on
25 the Internet clicking on things.

190

1      Q. But I thought you told me that it was very
2  likely that if you had these registry keys you could
3  experience lost documents, physical data loss, system
4  not starting up; right?
5      A. I said in the circumstances as I described them
6  where you clicked on a malform link, and this is --
7      Q. That's an important distinction, because what
8  the software is telling us is that it is very likely
9  that these problems will result.
10     A. Well, in 2006 and 2007 the Internet was a lot
11 more dangerous than it is today. It was very likely --
12     Q. During 2006 and 2007 had you removed these
13 registry keys from your Windows XP laptop?
14     A. No, I didn't know about them yet, and I did
15 click on a link once that did cause my computer to be
16 compromised, and I discussed that with you earlier.
17     I couldn't tell you this is exactly how it
18 happened, but I do remember a dialogue popping up asking
19 me if I wanted to open a file, and I tried to cancel it
20 and that's when things went south quickly. So there
21 were a lot of people that were experiencing issues.
22 There were a lot of exploits.
23     Q. Okay. All right. Why don't we move on to the
24 disk clean errors, which is the second half of the
25 detections here, and that's the last page. It is just a

191

1  one-pager.
2      A. Okay.
3      Q. Again, I will represent to you that this is an
4  FTC created document that just lists all of the disk
5  clean errors that are found by ErrorPatrol.
6      Now, if you take a look at these, every one but
7  one is a file within the Windows prefetch directory.
8      A. Every one of these files but one is in the
9  prefetch directory?
10     Q. True or untrue?
11     A. They all look to be in the prefetch directory.
12     Q. What about the last one?
13     A. Oh, that's like a history item.
14     Q. Okay. So am I right when I say that every one
15 but one is in the prefetch directory?
16     A. Yes. The bottom one is not a directory so I was
17 confused.
18     Q. Can you explain to me what function is served by
19 Windows prefetch?
20     A. It allows like for -- when you are running
21 certain pieces of software, it allows it to run more
22 quickly.
23     Q. Okay. Now --
24     A. It is like a place where software things can get
25 cached.

192

1      Q. Okay. Now, which one of these files listed here
2  do you believe is very likely to create lost documents
3  and profile settings?
4      A. It is an accumulation of files here that causes
5  the problem. It is not any individual file.
6      Q. Okay. So --
7      A. So if you were to let this go unchecked and just
8  let your temp folders fill up and let your files --
9  eventually your computer would, in fact, crash and die
10 and it happens.
11     Q. Okay. Well, this is run on a clean image. This
12 is run right after bootup on a clean image. Now, in
13 this condition, would these files be very likely to
14 cause lost documents and profile settings?
15     A. That's extreme, I think. You are going with
16 what the extreme interpretation of that popup is, and --
17     Q. I'm not asking you to do --
18     A. I believe if we look at the popup it says -- it
19 says they are very likely to. It doesn't say these
20 definitely are causing it. It says they are very likely
21 to create further problems if not fixed.
22     Q. Okay. So do you believe that these --
23     A. Yeah, I mean, I know there is problems on my
24 computer. If we don't fix them, eventually my computer
25 will crash.

193

1    **Q. So these files that are listed here which were**
2  **detected as severe system threats -- and why don't we**
3  **start there. Do you agree these are severe system**
4  **threats?**
5    A. I would agree that eventually that this area --
6  files in this area eventually could lead to performance
7  degradation of your machine.
8    **Q. I understand that's your position. I'm asking**
9  **you are these files, which have been detected as severe**
10  **system threats, are they severe system threats?**
11    A. These files in and of themselves, I don't -- I
12  don't know. I don't know if these are executables. The
13  prefetch area doesn't have the tightest permission and
14  securities in the world. I don't know if there is an
15  exploit that's out there that can grab one of these
16  files and do damage.
17    So I would say keep that area clean and that
18  would be my recommendation to people. If I see files in
19  there, I would say this is an area that needs to be kept
20  clean. This is an area of the computer that lots of
21  security products do keep clean and will identify as
22  being areas that should be kept clean. And at this
23  moment in time I'm not exactly certain if they are a
24  security threat or not but it's something I would like
25  to look into further.

194

1    **Q. Okay. You are not sure. So let's look at the**
2  **bolded item here, which is about almost halfway down**
3  **the list.**
4    A. Okay.
5    **Q. Do you recognize that file?**
6    A. NTOSBOOT?
7    **Q. Yep.**
8    A. I'm not sure what that file is, no. It must be
9  the -- something to do with the boot record of the
10  machine. It probably -- possibly the machine is built
11  and it dumps stuff into here.
12    **Q. Would it surprise you to learn that file is a**
13  **boot trace file?**
14    A. No, it wouldn't surprise me.
15    **Q. Okay. Were you aware that this file is accessed**
16  **every time that Windows boots up?**
17    A. I would have to verify that.
18    **Q. So you weren't aware of that.**
19    A. No.
20    **Q. Were you aware that if you delete this file,**
21  **Windows will automatically recreate it upon every**
22  **bootup?**
23    A. I know that there is a lot of files that if you
24  delete it, it will recreate them, yes.
25    **Q. For this specific --**

195

1    A. Again, we talked about how software can't
2  necessarily differentiate between what's semantically --
3  because there can be thousands upon thousands of files
4  in here and to compare that to a database and there is
5  maybe millions of files in temp directories -- so you
6  could have millions of files in your Internet temporary
7  folders, and for you to give me that list and say this
8  one's not harmless or this one's not harmless, that
9  doesn't make sense to me because it's all of them
10  together that need to be cleaned out.
11    I think that's in the spirit of the software,
12  saying these areas need to be kept clean and these don't
13  need to be here. It wasn't necessarily picking out this
14  file is going to cause your computer to crash.
15    **Q. That may be what you think the software --**
16    A. That's not how I understand it. That's not how
17  I interpret it.
18    **Q. That's fine. And you are entitled to your**
19  **interpretation. As I read this it says there are 286**
20  **severe system threats and this file, NTOSBOOT, is one of**
21  **those severe system threats.**
22    **Now, do you believe that NTOSBOOT is a severe**
23  **system threat? Yes or no?**
24    A. No.
25    **Q. Okay. And do you believe that NTOSBOOT is very**

196

1  **likely to cause lost documents, physical data loss,**
2  **system not starting up, or system slowdowns, crashes,**
3  **and freezes?**
4    A. Well, if it is a file that Windows NT reads and
5  creates and looks at during the boot cycle, I don't
6  think I would want anybody to get anything -- yeah, that
7  could be interesting if somebody were to put something
8  into there and -- some sort of code that could inject
9  into the operating system at boot. I shouldn't be
10  speculating so I will stop but --
11    **Q. Well, in your version of Windows 7, do you**
12  **delete the Windows prefetch directory?**
13    A. Yes, I believe I run Port Impulse CCleaner on my
14  computer periodically.
15    **Q. Well, NTOSBOOT would recreate itself every time**
16  **you reboot your machine.**
17    A. Right.
18    **Q. Do you go into your prefetch directory every**
19  **time you reboot your machine and delete that file?**
20    A. No, but it would be gone. It would be gone when
21  the computer shuts down and restarts. It has to
22  recreate it from somewhere else. The one that's already
23  there isn't going to be used.
24    **Q. Do you run CCleaner every time --**
25    A. And I don't know exactly what the file does, so

49 (Pages 193 to 196)

197

1  I can't speak to -- at this moment.
2      Q. You can't say that this is a severe system
3  threat that's very likely to cause lost documents,
4  physical data loss, system not starting up, and system
5  slowdowns, crashes, and freezes.
6      A. If there were a million files listed here and
7  you went through each one of them and asked me that, I
8  would say no. So I'm going to say no to all of them
9  individually. It is the collective that is the problem.
10     Q. Okay.
11     A. But you are -- never mind.
12     Q. Now, on your computer at work -- you work at
13  kCura and you have a Windows 7 desktop there; is that
14  correct?
15     A. And I'm not going to discuss anything about how
16  our IT department takes care of my computers at work or
17  how I take care of my computer. I have an IT department
18  that's responsible for the security on my machine. I
19  have other things to be doing.
20     Q. Do you know if your IT department routinely
21  deletes the prefetch files out of your work system?
22     A. I do not know.
23     Q. And if you believed that these were dangerous
24  files that were likely to cause the problems we have
25  discussed, wouldn't you insist that these files be

198

1  deleted from your computer?
2      A. Well, I do know that I have had a VM stop
3  working that they were taking care of.
4      Q. That's interesting but I'm not sure that answers
5  the question.
6      A. So point taken. Perhaps I should be more
7  involved in what's going on with my machine.
8      Q. Because if your machine crashed and you couldn't
9  start it up again, that wouldn't be a good outcome at
10  work; right?
11     A. I would just get another VM. I'm not so
12  attached to my computers that if they die -- I'm not
13  that attached to them. My files are in a share. I
14  would have to reload some software but there is a
15  snapshot of my VM from at least a month ago.
16     Q. But you have never told your IT department, hey,
17  guys, we should shall delete these prefetch files
18  because they are dangerous.
19     A. I don't do that any more than your legal aides
20  tell you how to practice law.
21     Q. You would be surprised.
22     A. They are the IT guys. That's their job. I
23  don't go tell them how to do their job and they don't
24  tell me how to do mine. Again, I don't want to discuss
25  the internal politics of the company I work for. That

199

1  has no bearing or relevance here.
2      Q. All right. Were you aware that every time an
3  application launches in Windows, there is an application
4  trace file created in the prefetch directory?
5      A. I'm not familiar -- I'm not familiar with that
6  process. I know that when an application launches,
7  there is a counter that latches onto the process, and it
8  stores information that other software applications use.
9  Perhaps that's the file where it puts them. And, again,
10  we talked about these are files that are used to enhance
11  the performance of applications, so that's very probably
12  where that performance improvement comes from, is it
13  stores that information there.
14     Q. Okay.
15     A. And those files can get large and get to be a
16  lot of them because the Internet also, I believe, uses
17  this area. When you install a software, an installer
18  will run and it will get a file in there. There is a
19  lot of software programs out there that will remove the
20  prefetch files.
21     Q. If it is true that every time you launch an
22  application something is added, a prefetch file is added
23  to the prefetch directory, it would be virtually
24  impossible to keep that directory empty of files, would
25  it not?

200

1      A. That's the point, is to just minimize the
2  possibility that that area will grow very large. Just
3  like the temp directories and the Internet temporary
4  files, those can be large as well.
5      Q. Let me show you an example and maybe we can make
6  this a little bit more concrete.
7      A. I don't have any anecdotal stories to tell you
8  about the prefetch. All I can say is that the prefetch
9  falls under the category of temp files that are not
10  cleaned up by Windows and anecdotally I can tell you
11  that the temp folders can get to be massive; that
12  Windows can create temp files that literally will cause
13  a computer to stop working.
14     Q. Let's introduce Exhibit 4 at this point.
15     MS. GURLAND: I'm going to object to that
16  methodology of introducing exhibits that he's not being
17  asked to -- that no one is authenticating and we have
18  no -- absolutely no idea where they come from other than
19  they are a piece of paper that you say you got
20  somewhere.
21     The procedure in these depositions has been to
22  say is it a true and authentic copy of something. He
23  doesn't have any information to give about these things.
24  I object to this methodology in this deposition. I
25  don't know what these are, who made them, where they

50 (Pages 197 to 200)

201

1  came from or when. I don't know that they were made
2  from any of the software programs that we have been
3  analyzing or that Mr. Ellis has any familiarity with.
4       I'm going to object to that process and go back
5  and object to 2 and 3 as well, just because -- to the
6  extent that I don't know what they are and where they
7  come from.
8       MR. ARENSON: Okay. Your objection is on the
9  record.
10      MS. GURLAND: And if it is not introduced into
11  evidence, then I object to talking about it and reading
12  from it until we can figure out what in the name of --
13  what it is.
14      MR. ARENSON: Your objection is on the record.
15      (Ellis Exhibit Number 4, ErrorPatrol Screen
16  Shot, was marked for identification.)
17      BY MR. ARENSON:
18      **Q. Moving on to Exhibit 4. I will represent to you**
19  **that this is a test that I actually conducted, and what**
20  **I did here was delete everything from the prefetch**
21  **folder. I then ran two programs in Windows, and that**
22  **would be Solitaire and Mind Sweeper, two games that ship**
23  **with all versions of XP as understand it. I then ran**
24  **ErrorPatrol and these are the results.**
25      **If you take a look, SOL.EXE and WINMINE.EXE both**

202

1  **appear in the prefetch directory and they also were**
2  **detected as severe system threats by ErrorPatrol; do you**
3  **see that?**
4       A. I don't see where you are saying that they are
5  detected as severe system threats.
6       **Q. That's a fair point. So this is the screen**
7  **after you get the severe system threat warning.**
8       A. Okay. I will take your word for it.
9       **Q. I will represent to you -- if it is false, I**
10  **will take responsibility. I will represent to you that**
11  **these were detected as severe system threats, just like**
12  **the other ones were, and, in fact, everything in the**
13  **Windows prefetch directory is detected as a severe**
14  **system threat.**
15      **Now, in this case -- and I should also point out**
16  **that ERP.EXE was added to the Winfetch directory, which**
17  **is ErrorPatrol's prefetch entry.**
18      **Now, in this case, are any of these three files**
19  **severe system threats?**
20      MS. GURLAND: I object to -- I want to renew my
21  objection on the record to this case -- and, Mr. Ellis,
22  you can answer these questions to the extent that you
23  would like to speculate about tests that Mr. Arenson,
24  not an expert --
25      MR. ARENSON: Totally inappropriate objection.

203

1       MS. GURLAND: -- ran in his office. If you
2  would like to speculate about tests that the attorney,
3  who can never be examined about a test, ran, if you want
4  to speculate about his test that he ran himself, you
5  can.
6       BY MR. ARENSON:
7       **Q. Mr. Ellis, you are actually obligated to answer**
8  **my question, so you should ignore Ms. Gurland's**
9  **statement.**
10      MS. GURLAND: If you can answer it, answer it.
11      A. Okay.
12      BY MR. ARENSON:
13      **Q. My question to you is, are these three files in**
14  **the Windows prefetch directory, are those severe system**
15  **threats?**
16      A. They fall in the same category as the
17  questions -- as the files that -- as just the general
18  discussion that we are having when we talk about keeping
19  areas clean. So the question really is and can be
20  translated directly into does allowing things to pile up
21  in here threaten your system. The answer is yes.
22      And that's the nature of the problem, that's the
23  nature of the question, that's the -- that's really
24  what's going on here, is that things can pile up in
25  here, and when things pile up in here, it is a threat.

204

1       Q. And do you understand that things are allowed to
2  pile up unchecked in the Windows prefetch directory?
3  That Windows doesn't have any mechanism to maintain that
4  directory itself?
5       A. Windows has mechanisms in place to do a lot of
6  things that it doesn't do, that don't get activated,
7  that are supposed to happen at certain times, and if
8  they don't happen, then the areas won't get cleaned up.
9       Q. So --
10      A. I don't -- this says -- it is calling -- it is
11  putting it under the category of Intemet history and,
12  why, I'm not sure. I would want to do more exploration
13  of how the prefetch works. I'm not going to tell you
14  that, no, there is nothing in place to clean up the
15  prefetch, but I do know that there are tools out there
16  that want to clean this area up.
17      Q. So back to my question: Do you believe that
18  these three files are severe system threats?
19      A. Not in and of and by themselves.
20      Q. Okay. Let's go to Exhibit 5, which is a screen
21  shot directly from Microsoft's website.
22      Read that and let me know when you are ready.
23      (Ellis Exhibit Number 5, Screen Shot From
24  Microsoft's Website, was marked for identification.)
25      BY MR. ARENSON:

51 (Pages 201 to 204)

205

1    Q. Are you ready?
2    A. I'm ready.
3    Q. So according to this article on Microsoft's own
4  website, the Windows prefetch folder is, quote,
5  "self-maintaining and there is no need to delete it or
6  empty its contents. If you empty the folder, Windows
7  and your programs will take longer to open the next time
8  you turn on your computer."
9    Do you disagree with Microsoft on this?
10    MS. GURLAND: I would like to lodge an objection
11  before you read from this, which hasn't even been
12  introduced into evidence yet. It is totally irrelevant.
13  It is Microsoft 2010. We're not talking about what
14  happened in 2010. We are talking about things that
15  happened in 2005, 2006, -7.
16    There is absolutely no relevance that this has
17  to anything in this case and there is no information
18  that this shows up or has ever -- that this was the
19  system or this was the advice that Microsoft had at the
20  point in time that's relevant to this case as opposed to
21  in 2010.
22    MR. ARENSON: Thanks for your objection.
23    BY MR. ARENSON:
24    Q. Mr. Ellis, you can answer.
25    A. The article applies to Windows Vista. I will

206

1  not disagree with this. This applies to Windows Vista.
2    Q. Do you think Microsoft's advice is different as
3  to Windows XP?
4    A. I don't know.
5    Q. Okay. So you don't know whether the Windows
6  prefetch folder in XP is self-maintaining.
7    A. I have seen that they do get quite a bit of
8  files in there, and that if -- certainly if this is
9  accurate, that it is looking at all of these files to
10  help you kind of -- to help determine how to manage
11  things, having fewer amounts of files in there should
12  improve performance because Windows isn't trying to
13  anticipate too much of what you are doing. And that can
14  certainly happen.
15    And, again, I would -- I would love to spend
16  more time with this. I will definitely spend more time
17  with what prefetch does and how it works and I'll pick
18  it apart and figure it out. But at this moment in time
19  I would say it definitely requires further exploration,
20  and I would love to get back to you on that, and I would
21  be happy to sit down with you again just to discuss this
22  point.
23    Q. So is it fair to say, based on your knowledge
24  right now, based on what you know today and more
25  importantly when you wrote your report, you can't say

207

1  whether the Windows prefetch file is self-maintaining?
2    A. I don't -- I can't say whether it is or not.
3  All I can tell you is there must be a reason why so many
4  software manufacturers clean it out.
5    Q. And based on your knowledge today and, again,
6  more importantly when you wrote your report, you can't
7  say whether you agree or disagree with Microsoft's
8  advice not to delete files in the prefetch folder.
9    A. I don't know.
10    MS. GURLAND: Now would be a good time for a
11  break for me.
12    MR. ARENSON: Sure. We can take a brief break.
13    (A brief recess was taken.)
14    MR. ARENSON: Okay. Back on the record and we
15  are going to introduce Exhibit 6.
16    (Ellis Exhibit Number 6, ErrorPatrol Screen
17  Shots, was marked for identification.)
18    BY MR. ARENSON:
19    Q. Mr. Ellis, more questions about ErrorPatrol
20  here.
21    MS. GURLAND: Can I make my same objection?
22    MR. ARENSON: Please.
23    MS. GURLAND: Unless this is a screen shot that
24  comes from an expert or Mr. Ellis, same objection.
25    MR. ARENSON: More FTC testing of these

208

1  programs.
2    MS. GURLAND: Okay. So the same objection that
3  I made before. There is not any foundation for this
4  exhibit and there won't be any way to lay a foundation
5  of this exhibit. There is not any way to know if this
6  is really ErrorPatrol that was being tested, what tests
7  were run, how the tests were run, and what machine the
8  tests were run on, and it is inadmissible as a document.
9    BY MR. ARENSON:
10    Q. All right. Mr. Ellis, were you aware that
11  ErrorPatrol detects any file in the cookie folder as a
12  severe system threat?
13    A. Yes.
14    Q. And do you agree with that characterization of a
15  cookie?
16    A. I don't like cookies.
17    Q. So —
18    A. I'm a huge proponent of removing any cookies at
19  all that land on your system that are not directly
20  related to an application that you are actively using
21  that requires those cookies to function properly.
22    Q. And while I understand your personal preference,
23  would you say that a cookie is a severe system threat?
24    A. I would say it could be.
25    Q. Would you say that a cookie is very likely to

209

1    create lost documents and profile settings?
2    A. The potential is there.
3    Q. And how would that be?
4    A. Through an exploit that existed. I believe in
5    2006, 2005, around that time, there was an exploit that
6    would allow anybody to read any cookie at all that was
7    on your system, which cookies could contain passwords
8    and stuff like that.
9        So, yeah, it was definitely something that all
10   software was wanting to -- any security software at all
11   would scrub cookies from your system if you wanted to
12   keep it clean.
13   Q. Is there other software that declares cookies a
14   severe system threat or a manual or some type of an
15   authoritative document that you can point me to where
16   cookies are defined as a severe system threat?
17   A. I guess that would depend on what your
18   definition of "severe" is and some people have different
19   definitions of severe.
20       There are definitely people that are out there
21   that are experts in the field that consider cookies to
22   be -- at that time they were considered to be a severe
23   threat. The security has tightened up on them so it is
24   not so easy to read cookies that are not your own, but
25   there was a time that you could read cookies that were

210

1    not your own.
2    Q. Can you give me an example of an expert that
3    declares cookies a severe system threat?
4    A. I would say that I would be one that would say
5    cookies at that time -- I would have to go back and look
6    through but companies like -- you know, when that
7    exploit was -- existed. Anybody who was involved in
8    security was concerned about that.
9    Q. But let's be careful with our words. Severe
10   system threat is what we are talking about here.
11       Can you point me to any authoritative source in
12   which cookies have been defined as a severe system
13   threat?
14   A. I would gladly research that for you later. At
15   this moment in time, I cannot.
16   Q. What about any authoritative source that states
17   that cookies are very likely to create lost documents
18   and profile settings?
19   A. I would say that would be part and parcel of my
20   previous answer.
21   Q. So you can't point to anything right now.
22   A. I can't point to anything right now.
23   Q. And would your answer be the same for the other
24   three categories; physical data loss, system not
25   starting up, and system slowdowns, crashes, and freezes?

211

1    A. Any time your computer gets comprised those
2    things can happen. It would depend on the nature of the
3    cookie itself, and, again, it talks about doing -- the
4    software is doing such a detailed analysis to figure out
5    what the cookie is.
6        They are just garbage. Generally speaking,
7    cookies are garbage left behind by people that want to
8    track user activity on different websites that are
9    affiliated together.
10   Q. Cookies never serve a beneficial purpose?
11   A. Sure, they do. They can be used to store your
12   passwords and things likes that. And that was the
13   problem at the time, that there was a belief -- and I'll
14   have to get back to you on that, but there was a belief
15   that cookies could be read by people that shouldn't be
16   reading them.
17   Q. So just so we have a clean answer on that last
18   question, can you point me to any authoritative source
19   that states that cookies are very likely to create
20   physical data loss, systems not starting up, or system
21   slowdowns, crashes, or freezes?
22   A. The cookie by itself -- and we have had this
23   conversation a number of times today; that things by
24   themselves that represent vulnerabilities are not going
25   to cause problems in and of themselves. It is when

212

1    somebody exploits the vulnerability that you get the
2    problem, so yeah.
3    Q. And it is your position that any cookie is a
4    vulnerability?
5    A. It depends on the cookie.
6    Q. Do you know if ErrorPatrol can differentiate
7    between --
8    A. I don't think it can.
9    Q. Let me finish the question.
10       Do you know if ErrorPatrol can differentiate
11   between the type of cookies that you believe are
12   dangerous and the type of cookies that aren't?
13   A. No, I don't think it can.
14   Q. And do you think it is likely that ErrorPatrol
15   would have detected any cookie in the cookie folder as a
16   severe system threat?
17   A. Yeah, I think that's how the software operates.
18   Q. And in some cases those would actually not be
19   severe system threats.
20   A. That would be accurate.
21   Q. In fact, in the experiment that I conducted, if
22   you take a look at the first page of this exhibit, I
23   created a text file called "not a cookie" within the
24   cookie folder, and, indeed, ErrorPatrol detected that as
25   a severe system threat.

53 (Pages 209 to 212)

213

1    A. Okay.
2    Q. Now, that's not a severe system threat, is it?
3    A. No. But if it contained passwords, if you had
4  put your passwords in there, then that would be a severe
5  system threat.
6    Q. I will represent to you that it didn't.
7    A. And I will represent to you that -- how would it
8  know?
9    Q. Okay. So ErrorPatrol doesn't know one way or
10  the other --
11    A. No software would be able to know except for the
12  software that created the cookie.
13    Q. Right.
14    A. Or somebody what had expertise in reading
15  cookies for that specific purpose.
16    Q. So let's flip to the -- the first two pages are
17  just two screen shots to show you the cookie files. The
18  third screen shot is a run of ErrorPatrolFree on a
19  computer that was connected to the Internet.
20        And if you flip to the last page --
21    MS. GURLAND: I would like to renew my
22  objection, same objection, as when this -- as to the
23  methodology and -- to the use of this exhibit and to the
24  methodology in which this is being conducted with tests
25  that we have no way of knowing anything about and would

214

1  never be able to examine an attorney on the case.
2    BY MR. ARENSON:
3    Q. Okay. If you look at the last page, you will
4  see that on this computer that was connected to the
5  Internet a series of Internet sites were visited.
6  House.gov, the website for the United States House of
7  Representatives; mdd.uscourts.gov, which is the website
8  for the federal court that is trying this case;
9  senate.gov, the United States senate; whitehouse.gov,
10  self-explanatory; and fcc and ftc.gov.
11        Now, all of those visits were detected as severe
12  system threats by ErrorPatrol. Do you agree that all of
13  those visits are severe system threats?
14    A. Were those cookies? No.
15    Q. I can't answer that question.
16    A. That's Internet history.
17    Q. I can't answer that question. All I can tell
18  you is what ErrorPatrol reported.
19        Now, do you believe that all of those visits are
20  severe system threats?
21    A. That would be very subjective to the person who
22  was making those visits. If you really didn't want
23  people to know that you were visiting those websites and
24  somebody came along and seized your computer, for
25  example, and looked -- yeah. I mean, it is privacy,

215

1  right? That's going to have --
2    Q. So it would depend on the privacy preferences of
3  the individual.
4    A. Exactly.
5    Q. So some people wouldn't care that you are
6  looking at their browsing history and some people would.
7    A. Exactly.
8    Q. But, in any case, ErrorPatrol would detect all
9  of your visits as severe system threats.
10    A. Yeah.
11    Q. So -- now, the other half of the equation is
12  that ErrorPatrol says that these cookies -- I'm sorry,
13  these website visit records are very likely to create
14  lost documents and profile settings. How would that be
15  the case?
16    A. You know, the bigger your history becomes, the
17  more difficult -- and you begin to experience -- you
18  could begin to experience performance issues. And it is
19  really a -- it is the sum total that's the problem, is
20  when you have an extremely large DAT file that's
21  containing all your histories and you have lots of
22  temporary files on your Internet and in your temp
23  directory, you have lots of files left over from
24  updates, lots of things in the prefetch folder that are
25  impacting performance.

216

1        And this is the fact, that when these things
2  begin to pile up on computers at this time, this -- it
3  was the accumulation of all of these things that would
4  cause performance problems that would impact your system
5  performance to the degree where, yes, you could
6  experience those things. At this small amount, no.
7    Q. And do you think ErrorPatrol was able to
8  differentiate between a large number of URL visits and a
9  small number as, in this case?
10    A. I don't think it was differentiating. I don't
11  think it had any threshold set that said maybe 20 items
12  in the history is okay but 300,000 items is not.
13        And that's generally how these software programs
14  work; they say this is a problem, you need to clean it
15  up, even if there is just one cookie or one URL history
16  item in there. They will mention it and say these are
17  problems.
18    Q. Just to be clear, in this case with just a few
19  visits to websites, you don't think that that's very
20  likely to create lost documents and profile settings,
21  do you?
22    A. I think it is a good start.
23    Q. It is a clever answer but maybe not an answer to
24  the question.
25        In this case do you believe that these few

54 (Pages 213 to 216)

217

1   visits to URLs would be very likely to create further
2   problems, such as lost documents and profile settings?
3       A. I would say that it depends on if there is a
4   thousand more or if there is just -- it sounds like you
5   are saying that there is just these ones, so I'm saying
6   not likely.
7       Q. So with a small number of visits, not likely.
8       A. Not likely.
9       Q. And do you have any idea of how many visits it
10  would take before you reached the threshold of lost
11  documents and profile settings?
12      A. It would depend on the system as a whole. 1
13  couldn't tell you. It could be, you know, the straw
14  that broke the camel's back. It could be the first
15  straw you put on the camel's back. It just depends on
16  how many straws you have loaded onto the camel's back.
17      Q. Okay. We are done with that exhibit. Let's
18  move on to Exhibit 7.
19      (Ellis Exhibit Number 7, ErrorPatrol Screen
20  Shots, was marked for identification.)
21      BY MR. ARENSON:
22      Q. Mr. Ellis, I promise this is the last exhibit on
23  ErrorPatrol.
24      A. Are you sure? I'm going to hold you to that.
25      Q. You can. We have talked quite a bit about

218

1   ErrorPatrol.
2       MS. GURLAND: Before we get started, same
3   objection, lack of foundation and improper methodology
4   to any discussion of this exhibit.
5       BY MR. ARENSON:
6       Q. This is a screen shot of what happens when you
7   try to shut down a computer with ErrorPatrolFree
8   installed on it. Did you attempt do this during your
9   testing?
10      A. I believe I did.
11      Q. Did you get this window?
12      A. Yeah. And I believe I was able to dismiss it
13  and just shut down.
14      Q. Okay. So this would be another difference
15  between the paid version and the free version of
16  ErrorPatrol that wasn't mentioned in your report; right?
17      A. This would fall under the category that I did
18  mention that there is a difference in that it tells you
19  that you need to repair and shut down and -- or that you
20  need to repair, and it is -- again, it was my oversight
21  not to attach that document as an attachment. It was my
22  intention to do so.
23      MS. GURLAND: When you say "that document," are
24  you talking --
25      THE WITNESS: The one with the screen shots.

219

1   The document that I prepared where I had screen shots,
2   and this was in there, and I believe there was some
3   commentary in that document as well as to what was
4   going on.
5       MS. GURLAND: And, for the record, is it the
6   screen shots taken throughout the analysis process that
7   show functionality of the software? Is that what you
8   are talking about?
9       THE WITNESS: Yes.
10      MS. GURLAND: And is that in materials that you
11  used in coming up with your report?
12      THE WITNESS: Yes.
13      MS. GURLAND: Okay. And do you believe that
14  that material has been otherwise provided to the Federal
15  Trade Commission?
16      THE WITNESS: Yes.
17      BY MR. ARENSON:
18      Q. So let's take a look at this error message, and
19  this -- let's start with some foundation.
20      So when you shut down the computer, this is the
21  error message that you saw?
22      A. Yes.
23      Q. Okay.
24      A. To my recollection, that is what I saw, and, to
25  my recollection, that is in my document.

220

1       Q. Okay. Now, this error message says, "Shutting
2   down your computer is strongly not recommended since
3   your computer has 287 severe system errors. If you shut
4   your computer down while it has errors in the registry
5   database or file system, it is very likely that further
6   problems, such as" -- and then there is our list that we
7   have talked about many, many times, lost documents,
8   etcetera.
9       Now, is it your belief that shutting down a
10  computer with the registry keys that we have talked
11  about and the prefetch files that we have talked about
12  would result in lost documents, physical data loss,
13  system not starting up, and system slowdowns, crashes,
14  and freezes?
15      A. Well, as I have been saying all along, I believe
16  that the software is rather agnostic as to what exactly
17  the registry keys are. It seems to know what areas need
18  to be kept clean, and certainly if the right
19  circumstances were in play -- I don't think it is the
20  intent of any software cleaning tool to be used on a
21  fresh install.
22      What I really kind of imagine myself doing and
23  envisioned doing was getting a computer and infecting it
24  and doing mean things to it and then running the
25  software and seeing what would happen. And to that

55 (Pages 217 to 220)

221

1  effect, had I done that, I do believe that I could have
2  created a circumstance on the computer where shutting it
3  down would have been a bad idea.
4       That being said -- I wanted to qualify my answer
5  with that. That being said, on a brand-new PC with the
6  stuff that we have seen, no.
7       MS. GURLAND: Do we know? Because we don't know
8  anything about any of this testing --
9       MR. ARENSON: Carolyn, are you asking the
10  witness a question?
11       MS. GURLAND: I'm clarifying for the record,
12  since we are working now with some test that somebody
13  did in their office that I have no idea about, nor does
14  the witness, I'm asking -- because the witness has said
15  it is important to him to know whether or not this is on
16  a clean install of the software, but I think that the
17  witness is -- has not even been told or doesn't know
18  from what he is looking at what happened with this test.
19       MR. ARENSON: That's quite a speaking objection,
20  and I think you got it out.
21       MS. GURLAND: It is.
22       MR. ARENSON: So let's continue.
23       BY MR. ARENSON:
24  **Q. So how would shutting down a computer cause lost**
25  **documents or physical data loss?**

222

1       A. If the registry had enough problems in it where
2  it had a virus or it had an item in the startup that
3  shouldn't be there, you might not be able to restart
4  your computer. If your hard drive were completely full,
5  for example, you may have trouble restarting your hard
6  drive, definitely.
7  **Q. But ErrorPatrol doesn't detect viruses, does it?**
8       A. No. But it detects invalid registry entries
9  which could have been put there by viruses, so to that
10  extent. I'm not sure -- and, again, this is something
11  that would require further testing and I would be happy
12  to do that.
13  **Q. If it is the case that every time you shut down**
14  **a computer with ErrorPatrolFree on it you get this**
15  **message, you would agree with me that there would be**
16  **instances where that would be not true? This is one**
17  **example.**
18       A. I'm not sure I caught the entire question.
19  **Q. If it is the fact that this error message**
20  **appears every time you attempt to shut down a computer**
21  **that has ErrorPatrolFree installed, isn't it the case**
22  **that this message would be displayed at times when it**
23  **wasn't true?**
24       A. I don't think it is -- this is making any
25  statement of truth. It is not saying -- the statement

223

1  isn't saying shutting down your system --
2  **Q. I think it is.**
3       A. It is not saying if you shut down your system
4  right now, you will lose documents, you will lose
5  physical data loss, your system will not restart, it
6  will crash. It is not saying that. It is saying that
7  if you have -- if you shut down while it has errors in
8  the registry base or the file system, it is likely it
9  could cause it to occur, which is a true statement.
10  **Q. In all instances?**
11       A. In all instances if you shut your computer down
12  while it has errors in the registry database or file
13  system, these things could happen depending on what
14  those errors are.
15  **Q. Well, we've talked about ErrorPatrol detects**
16  **errors on a clean install of Windows XP, right? So**
17  **every time you shut down Windows XP, even minutes after**
18  **you have installed it for the first time, is it very**
19  **likely that you are going to experience lost documents,**
20  **physical data loss, system not starting up, or system**
21  **slowdowns?**
22       A. I have had that happen to me so I can't answer
23  that. That has happened to me; that it has been a
24  brand-new install of Windows XP and I went to restart it
25  and it failed. And I don't know why it failed. I don't

224

1  know if there was some error in the registry or if some
2  portion of the registry offloaded into the RAM
3  incorrectly. I don't know.
4  **Q. Do you think as an expert you would probably**
5  **know if a lot of people -- it very likely would indicate**
6  **if a lot of people experience this, right?**
7  **Do you think as an expert you would be aware if**
8  **a fresh install of Windows XP could never be booted up**
9  **again and that routinely happens? Don't you think**
10  **that's something you would probably know about?**
11       A. Sure, I would know about that. Not until I
12  tried to reboot the machine though.
13  **Q. Is there a epidemic of people in installing**
14  **Windows XP and then never being able to boot up their**
15  **computer again?**
16       A. Well, there was an epidemic of that actually at
17  the time. The Sasser virus definitely. Brand-new PCs
18  out of box plugged into the Internet would get the
19  message, the RPC service has entered a stop state and
20  your computer is shutting down and you would not be able
21  to get that computer to restart again. So that would
22  happen.
23       And that's not to say that that's what this is
24  talking about here, but certainly there were enough
25  problems with Windows XP that that's why I -- I think

56 (Pages 221 to 224)

225

1  that's what spawned all of these products, because there
2  were problems. It was inherently flawed. It was very
3  buggy.
4      Q. So let me ask it this way: On a clean install
5  of Windows XP on a VM machine not attached to the
6  Internet, you agree with me that this same system
7  error-found message would be displayed? In fact, it was
8  displayed on your image; right?
9      A. Yeah.
10     Q. And in that case, on a clean VM image, is the
11 statement that you -- if you shut your computer down
12 while it has errors in the registry database that it's
13 very likely you would have lost documents, physical data
14 loss, system not starting up, and system slowdowns? In
15 that case was that an accurate statement?
16     A. If we are talking about the particular system --
17 I can't say that I would be sure what had caused the
18 registry errors without looking at it. But you are
19 talking about the registry errors that we saw -- and I
20 don't think that's really an ideal state either, to talk
21 about a VM not connected to the Internet. That's not --
22 that's like a laboratory experiment. That's not like a
23 real-world situation where users are doing that --
24     Q. I understand your views.
25     A. -- and then running it.

226

1      Q. But you have to answer my question at the end of
2  the day. You have qualified it but now can you
3  answer it?
4      A. In that particular laboratory environment, no.
5      Q. Okay. Let's move on.
6         We are now going to talk about DriveCleaner.
7  Now, you tested the paid version of DriveCleaner, not
8  the free version; is that right?
9      A. I'll take your word for it.
10     Q. I don't want you to take my word for it. You
11 take a look at your report and let me know.
12     A. Yes. I tested the DriveCleaner2007 paid
13 version.
14     Q. If you had seen the differences between paid and
15 free versions of ErrorPatrol, do you think it is
16 important to test the free version of DriveCleaner in
17 addition to the paid version?
18     A. Yes.
19     Q. In your report you state that DriveCleaner is
20 similar to products endorsed by the federal government;
21 right?
22     A. Yes.
23     Q. And that statement, is that based entirely on
24 your review of OnGuard Online, an Internet website, or
25 are there other bases for your statement that the

227

1  federal government has endorsed DriveCleaner -- or I
2  should say products similar to DriveCleaner?
3      A. Yes. That's from that website, which I believe
4  onguardonline.gov is a site that is maintained -- and
5  when I say "maintained," in that they receive
6  significant contributions from a number of governmental
7  entities. So whether or not that means that they are
8  endorsed -- did I use the word "endorsed"?
9      Q. You do.
10     A. Or recommended?
11     Q. I think you say "endorsed," but if I'm wrong,
12 let me know.
13     A. Yeah. And I think I'm probably making the
14 assumption that the fact that the government contributes
15 money to those entities that it is endorsing those
16 activities.
17     Q. For the record, on page 10 of your report you
18 say -- are you with me -- "endorsed by the federal
19 government"?
20     A. Yeah, I saw that.
21     Q. Okay. So the sole basis of that statement was
22 your review of OnGuard Online; right?
23     A. Yes.
24     Q. Okay. Let's take a look --
25     A. And I'm not actually sure that CCleaner was on

228

1  that site. That might have been -- I don't remember
2  seeing --
3      Q. We'll learn in a minute that none of those
4  products are on that site.
5      (Ellis Exhibit Number 8, OnGuard Online Screen
6  Shots, was marked for identification.)
7      BY MR. ARENSON:
8      Q. What I did -- because I was a little bit
9  confused by this and I had not previously heard about
10 the federal government endorsing software programs -- I
11 searched OnGuard Online and actually looked at every
12 page on it as well, but I tried to use the search
13 function, trying to find any reference to any of these
14 products, and I couldn't find any reference to them.
15     A. Okay.
16     Q. What I did find was a page on OnGuard Online,
17 which is page 4 -- you are with me?
18     A. Okay.
19     Q. Which says -- is a link to another site to find
20 software and applications. Do you remember seeing this
21 page? Is this the link that you followed?
22     A. This looks familiar.
23     Q. So you clicked on this link and that would have
24 taken you to a third-party site called GetNetWise; does
25 that look familiar?

57 (Pages 225 to 228)

229

1    A. Yeah. It is the Internet Education Foundation's
2    website, and I believe that's the OnGuard Online.
3    Q. Actually, I will tell you that GetNetWise has no
4    affiliation with the federal government.
5    A. Okay. So if you would like to redact that
6    portion of my --
7    Q. Wait. There is more.
8    A. All right.
9    Q. So next page there is actually a disclaimer on
10   the OnGuard Online website and let me read it to you.
11   A. Okay.
12   Q. "Further, the inclusion of links to particular
13   items in hypertext is not intended to reflect their
14   importance nor is it intended to endorse any views
15   expressed or products or services offered on these
16   outside sites."
17   That's the disclaimer that exists on OnGuard
18   Online. Now, there is a further disclaimer once you get
19   to GetNetWise. If you click on any of these programs --
20   and this is the last page -- GetNetWise, which is a
21   third-party site unaffiliated with the federal
22   government itself says, "We have provided links to
23   resources that we hope will be helpful to you but,
24   remember, GetNetWise cannot vouch for their content."
25   So you have actually got two levels of

230

1    disclaimers here, right? The federal government is
2    saying we are not endorsing this stuff, and then a third
3    party is also saying we are not endorsing this stuff.
4    A. Okay.
5    Q. So knowing what you know now, you would take
6    back the statement that the federal government endorses
7    these products; right?
8    A. I would probably refine my language, yes. I
9    would -- I would certainly refine my language.
10   Q. How would you refine it?
11   A. Just to say that the federal government does
12   fund the site. It does support links to these software
13   tools, and that's the truth, as they are doing that, and
14   they are linked.
15   Q. I think it is close. The federal government
16   funds a site that links to another site which, in turn,
17   links to a third-party site that has the software.
18   A. Yeah. That would be fair.
19   Q. Okay.
20   A. Yeah, I agree.
21   Q. Okay. So the federal government has never
22   endorsed Privacy Guardian, Acronis Privacy Expert Suite,
23   or CCleaner?
24   A. I can't say to what extent these softwares are
25   installed on government computers, but I assume there

231

1    are tools that are used within government organizations,
2    and that does indicate their endorsement. But that
3    would be a --
4    Q. Speculation.
5    A. Yes, thank you. That would be speculation.
6    Q. So, as far as you know, based on your personal
7    knowledge, the federal government doesn't endorse the
8    three products I just talked about, Privacy Guardian,
9    Acronis Privacy Expert, or CCleaner.
10   A. Yes.
11   Q. Yes, correct?
12   A. Correct.
13   MR. ARENSON: Why don't we take a quick break.
14   We are making good time. Why don't we take five minutes
15   and get things organized and that will speed things up.
16   (A brief recess was taken.)
17   MR. ARENSON: Okay. Back on the record. I'm
18   going to introduce Exhibit 9.
19   (Ellis Exhibit Number 9, PerformanceOptimizer
20   Screen Shots, was marked for identification.)
21   BY MR. ARENSON:
22   Q. These are screen shots from a
23   PerformanceOptimizer program which you tested; correct,
24   Mr. Ellis?
25   MS. GURLAND: Are these his screen shots?

232

1    MR. ARENSON: No. We don't actually have his
2    screen shots, at least not here. His report doesn't
3    have any.
4    BY MR. ARENSON:
5    Q. Do you recognize these?
6    A. No, I don't. And, again, I would have to say
7    that -- I mean, it comes back down to the question of
8    forensics, right? Without having done the forensics or
9    seeing a forensic report with some descriptions of
10   what's going on and what other tests we are running,
11   something really comprehensive, it gets difficult for me
12   to make comments about these sorts of things.
13   Q. Did you talk to counsel at the break, Mr. Ellis?
14   A. Yes.
15   Q. What did you guys talk about?
16   A. We talked about sticking to what I -- sticking
17   to my guns when it comes to forensics.
18   Q. Why don't you tell me what Carolyn said and what
19   Mr. Webb said and what was the conversation?
20   A. The conversation was if I don't feel the
21   forensics are there, and I don't, and I have said that
22   before, that I should mention that.
23   Q. Okay. So Carolyn told you that?
24   A. She didn't give me the words that I said, no.
25   She suggested that I be honest and stick to my guns and

233

1    remember that I'm a forensics analyst.
2    Q. So you don't have any recollection of what
3    PerformanceOptimizer looked like?
4    A. I do but I don't have any recollection of
5    exactly how many files it found or --
6    Q. Presumably it would be easy for you to verify
7    since you tested the program.
8    A. Sure, it would be.
9    Q. So in this screen shot of PerformanceOptimizer,
10    there are 57 severe errors detected on the computer; do
11    you see that?
12    A. Yes.
13    Q. And what we have done here in the attachments is
14    print out the list of what was actually detected by
15    PerformanceOptimizer.
16    MS. GURLAND: I would like to just -- sorry, I
17    don't want to make the whole speaking objection. I
18    renew the objection to every time there is a test being
19    conducted by counsel in the case.
20    MR. ARENSON: Well, I think Mr. Ellis made your
21    objection for you so I think we're all good.
22    BY MR. ARENSON:
23    Q. This is a printout easily verifiable by you,
24    right, because you could look at the screen shots that
25    you did. Simple to verify; right?

234

1    A. Sure.
2    Q. And you tested this exact program; right?
3    A. Yes. Again, I'm not being provided with an MD5
4    hash. I don't know that I tested the exact same one.
5    If you can tell me that you ran an MD5 hash against the
6    software for PerformanceOptimizerFreeSetup and that you
7    came up with this exact same MD5 hash as the software
8    that I tested, I would agree, yes.
9    Q. Fair enough. But it would be very simple for
10    you to verify the results; right?
11    A. Assuming you can provide me with the MD5 hash
12    and the software that you used.
13    Q. Or you could just take the results and compare
14    them to the results you got and compare the two.
15    A. Yes, I could.
16    Q. Simple, right?
17    A. Yeah.
18    Q. Let's look at the results that
19    PerformanceOptimizer detected, and they are in -- keep
20    going one more page to the actual list.
21    A. Yes.
22    Q. So they are categorized as medium and high-level
23    threats. Let's jump to the high-level threats.
24    Can you tell me what this registry key that
25    PerformanceOptimizer is detecting is and what it does?

235

1    A. No, I couldn't tell you this exact -- all I can
2    tell you it says missing or invalid application path
3    entry and the assumption is that the -- the application
4    that it is referring to doesn't actually -- is actually
5    invalid and doesn't exist in that location.
6    Q. What about the next one?
7    A. It would be the same answer.
8    Q. So for all of these would it be the same answer?
9    A. Wherever it says missing or invalid path.
10    Q. Why don't you take a look. I think it says that
11    for all of them.
12    A. Yes.
13    Q. So you don't know what any of these registry
14    keys do.
15    A. I would have to research them to find out
16    exactly. My initial impression is that they have to do
17    with setup and install of Windows.
18    Q. Okay.
19    A. And they refer to files -- the files that were
20    removed after the installation.
21    Q. You had a very succinct explanation of what the
22    registry keys protected by ErrorPatrol did.
23    A. Yeah, I knew those.
24    Q. But you don't know these.
25    A. I haven't look into these. I haven't examined

236

1    these particular keys. That would be an oversight on my
2    part, and I would definitely want to go back and do
3    that. It is probable and likely that I did research
4    these at the time of my examination, and I simply don't
5    recall exactly what I came across. There was a lot of
6    different things that I looked at.
7    Q. Okay. But standing here today, if you don't
8    know what these registry keys do, how do you know that
9    they are severe system errors?
10    A. I would want to reserve judgment on that.
11    Q. Okay. And how would you have known at the time
12    that you wrote your report that they were severe system
13    errors?
14    A. I'd have to look at my report and see what
15    conclusions I came to about those.
16    Q. Sure. It is page 15 of your report.
17    MS. GURLAND: Are you asking him what
18    conclusions he came to the tests that you ran in your
19    office?
20    MR. ARENSON: Carolyn, your objections are
21    entirely inappropriate. Let's keep moving.
22    BY MR. ARENSON:
23    Q. Page 15 of your report. You say,
24    "PerformanceOptimizer does detect" -- I think that's a
25    typo there -- "are generally considered items that

59 (Pages 233 to 236)

237

1  should be removed from the system."
2      So maybe the better question is, you actually
3  don't go as far as PerformanceOptimizer does.
4  PerformanceOptimizer says these are severe system errors
5  and it says system errors may lead to corrupted files,
6  permanent data loss, system startup failure, and loss of
7  documents.
8      And in your report, to be fair, you don't say
9  any of that. All you say is that PerformanceOptimizer
10  does detect are generally considered items that should
11  be removed from the system.
12      I guess my first question is, do you agree with
13  PerformanceOptimizer, that these are severe system
14  errors that could -- I should say may lead to the four
15  categories that are described on the page?
16      A. I would say that while not knowing what these
17  specific keys refer to, I would say that missing or
18  invalid com and activeX information could lead to
19  problems when you are attempting to do certain things on
20  the Internet.
21      Q. Can you give me an example?
22      A. Well, if you had a reference to an activeX
23  object that didn't actually exist on the system and then
24  something such as a -- you know, the Internet Explorer
25  were to read the registry and say, oh, hey, this exists

238

1  and then it goes to look for it and it's not there, you
2  might get -- you would have problems.
3      Q. Now --
4      A. But that being said, I don't know exactly which
5  ones these are or if this is a security -- a
6  vulnerability problem with Windows not cleaning up after
7  itself and just, again, contributes to the sum total of
8  problems that you can have with your registry.
9      Q. Well, this is a test of a clean VMWare image,
10  and I assume yours was the same, is it not?
11      A. Yes.
12      Q. So if it turns out that you detected the exact
13  same errors on your VM machine -- which I think we'll
14  find that you did --
15      A. Sure.
16      Q. -- then that would indicate that all Windows XP
17  versions have these errors; right? Installs?
18      A. All fresh installs. I think there is certainly
19  options and things that you can do when you are
20  installing Windows that may effect that. Not sure
21  exactly. I'm speculating.
22      Q. So if every install of Windows XP has these
23  errors, anyone that ran PerformanceOptimizer would get
24  these same messages; correct?
25      A. Yes.

239

1      Q. So any XP system that hadn't altered these
2  registry keys, was a base install that hadn't altered
3  these registry keys --
4      A. Was this Service Pack 1 or Service Pack 2, do
5  you know?
6      Q. SP2. And were you on Service Pack 2 as well?
7      A. Yes.
8      Q. And, again, I encourage you to verify the
9  findings. Every installation of XP that hadn't taken
10  affirmative steps to change these registry keys would
11  get the same warning from PerformanceOptimizer; correct?
12      A. Yeah. And I would have to test to see if other
13  software -- I would have to find out exactly why these
14  are a problem. They very well may be a problem. They
15  may very well be an example of something existing that
16  given enough of it or given the right circumstances, the
17  existence of this can be a problem.
18      All through the history of Windows, uninstalling
19  software can create eventual performance problems with
20  your computer because of items that get left behind in
21  the registry because of pieces that get left behind that
22  really shouldn't be there.
23      Q. But this is a fresh install of Windows so no
24  program should have been installed. And that's what you
25  tested; right?

240

1      A. No. Windows XP, as I mentioned before, is a
2  conglomerate of a bunch of different software, and
3  during the installation process things are installed
4  that have a certain purpose and then they are
5  uninstalled, and the registry is used during the
6  installation process to perform certain functions to set
7  up things in a certain way and then those things go away
8  or they are deleted, such as setup files and things
9  likes that. It is a very complex environment.
10      Q. Have you removed these registry keys from your
11  wife's computer?
12      A. I think -- no.
13      Q. And while you owned that computer did you remove
14  these registry keys?
15      A. I believe that I have run CCleaner on that
16  computer so they may be removed. Now that I think about
17  it, I -- there is a high degree of certainty that
18  CCleaner has been run on that machine and that -- I
19  would have to check to see if CCleaner cleans these out,
20  but I do run tools that are designed to clean up things
21  like this.
22      Q. So you are not sure whether these keys exist
23  or not.
24      A. No. Not on her computer, no, or my own. Again,
25  the shoemaker's son has no shoes.

60 (Pages 237 to 240)

241

1    Q. Did these keys exist in Windows Vista and
2  Windows 7?
3    A. I don't know.
4    Q. Have you checked your install of Windows 7 to
5  see if these registry keys exist?
6    A. No, but I would be happy to do so.
7    Q. What about your work computer? Have you checked
8  on your work computer to see if these registry keys
9  exist?
10    A. Again, that's not my responsibility. We are a
11  team at kCura in every sense of the word and people have
12  their jobs to do and I trust them to do it until my
13  computer breaks.
14    Q. Okay. We are done with that one, and we'll move
15  on to Exhibit 10.
16    (Ellis Exhibit Number 10, WinFixer Screen Shots,
17  was marked for identification.)
18  BY MR. ARENSON:
19    Q. Okay. Now we are talking WinFixer, and you
20  tested the paid version of WinFixer, as I recall; is
21  that correct?
22    A. Yes.
23    Q. Go ahead and look. Don't take my word for it
24  but I want to make sure. It is the last entry.
25    A. WinFixer, right.

242

1    Q. You tested the paid version of WinFixer; right?
2    A. Yes. That's correct.
3    Q. In your testing of the paid version of WinFixer,
4  did you see this error message box?
5    A. I do recall that I -- yeah, I believe I
6  mentioned that there was the -- you know, the popup that
7  says that you need to click repair to register the
8  application and fix all the errors. And, again, this
9  exhibit is something you did on your computer?
10    Q. Well, let's look on your report. I'm not trying
11  to ambush you. Why don't you read over what you wrote
12  about WinFixer and maybe we'll be in a better spot.
13  MS. GURLAND: While he's examining it, I'd like
14  to renew my same objection that I have to every single
15  one of these exhibits. On the record, I object to
16  Exhibit 10 on the same basis.
17    A. I don't believe I tested the WinFixer -- I
18  recall having tested it, yeah.
19  BY MR. ARENSON:
20    Q. You know, I want you to be in the position to
21  testify, so why don't you read over your report and let
22  me know when you are ready.
23    A. Yeah. I make no mention here of a free version,
24  so that would be something that I would want to come
25  back to. I would want to do that examination and append

243

1  my report.
2    Q. Okay. Back to my original question. Did you
3  see this error message when you were testing the paid
4  version of WinFixer?
5    A. No, I don't believe that I -- no, that would not
6  have showed up on the paid version, because it has
7  already been registered so it wouldn't have come up.
8    Q. All right. Now, if you flip to page 2, you get
9  a system analysis result and these -- if you want to do
10  the math, the 113 severe system threats detected on the
11  first page are listed here.
12    A. Okay.
13    Q. One more page, that just expands the cookies
14  section?
15    A. Uh-huh.
16    Q. Let's not jump ahead.
17    A. Yes.
18    Q. So we have expanded the cookie section, and the
19  cookie being detected here is temp@jp.winfixer[2[.txt.
20  Now, this is a file that was created during the
21  installation of WinFixerFree. Is this a severe system
22  threat?
23    A. I didn't see that, but, again, that falls under
24  the category of where if you had enough of them and if
25  it were -- you know, it certainly could represent a

244

1  threat to your computer where personal information could
2  be captured and read by people that you don't want to
3  see that information, which some people would consider a
4  threat. Many people would consider it a threat.
5    Q. Does it concern you at all that WinFixer is
6  installing a file on the computer and then detecting a
7  file that it installed as a severe system threat? Does
8  that trouble you?
9    A. It is not -- it is not -- it is not the best
10  software practice to leave stuff behind and not know
11  that it is there. I could not speak to whether or not
12  that was intentional, that somebody left that behind for
13  the purpose of doing that. I couldn't speak to the
14  motive or the reason why it is there without doing an
15  analysis and finding out how that ended up there
16  and why.
17    Q. I encourage you to do that analysis.
18  Mr. Johnson tested this file and it is available to you
19  on the hard drive that you have.
20    A. Sure.
21    Q. But speaking in general terms, a security
22  product that creates a file that is then detected as a
23  severe system threat, does that trouble you? Or is that
24  not a practice that troubles you?
25    A. It is troublesome.

61 (Pages 241 to 244)

245

1    Q. And we have talked about whether cookies are
2 severe system threats previously, and I don't want to
3 rehash all that testimony.
4    A. Thank you.
5    Q. Is it safe to say that your opinions on whether
6 cookies are severe system threats wouldn't have changed
7 since the last product we talked about?
8    A. Yeah, it is safe to say that my opinion hasn't
9 changed in last hour or two.
10    Q. Okay.
11    A. I certainly do want to do more analysis on --
12 and find the reports that I do recall having read at the
13 time about the problem nature of cookies. I would want
14 to find that and review that and provide that.
15    Q. Okay. Now, if you look at the last two pages of
16 this -- I'm sorry, not the last page but the two pages
17 before that. Keep going. One more. Okay?
18    A. Yes.
19    Q. Now we have listed again all of the registry
20 keys detected by this program as severe system threats.
21 What do these registry keys do?
22    A. Well, they are IDs for classes of software, so
23 they are referring to -- you know, they appear to be,
24 you know, keys and IDs for programs or for classes of
25 software.

246

1    Q. Do you know what they do?
2    A. I would have to look into that. I don't know
3 exactly what these particular ones do. I do know
4 throughout the registry there is areas in the registry
5 where items use keys like these to link to other areas
6 of the registry, and the purpose of a software like that
7 is to chain through those references and make sure the
8 chains are complete. And incomplete chains with orphan
9 records, they are generally not a good thing to have on
10 your computer. But, again, I would want to look more
11 into these and provide you a detailed explanation as to
12 exactly what these do before I were to give any forensic
13 opinion on the nature of these and whether they can
14 cause damage or not and to what degree of damage they
15 would cause, other than to say they are there and they
16 shouldn't be and they lack references and they're orphan
17 records.
18    Q. And do you know whether these ship with every
19 copy of XP that leaves the factory?
20    A. No, I don't. But I think that that's a
21 reasonable assumption to make; that if this -- if this
22 was done on a Windows XP -- on a copy of Windows XP that
23 was fresh out of the box, Service Pack 2, on a VM not
24 connected to the Internet with no additional software
25 installed, and if the VMWare itself didn't put these

247

1 registry keys in -- because certainly VMWare does
2 install things on the local machine so that it can
3 communicate with it, otherwise it is just a file on a
4 computer. So VMWare does have a certain amount of
5 interaction with the install, and I would want to make
6 sure that this wasn't something that was caused by the
7 VMWare.
8    Q. Okay. I would encourage you to undertake those
9 tests.
10    Can you point me to any authoritative source, a
11 treatise, manual, any other expert, that recommends that
12 these registry keys be removed from Windows XP?
13    A. I think that I could probably find something
14 with respect to application development where it talks
15 about how a -- good-housekeeping in so far as when
16 software's uninstalled, registry items should be removed
17 and not left behind. I could probably find that for you
18 very easily.
19    Q. Let me ask a better question.
20    Can you point me to any authority that defines
21 these registry keys as sever system threats that are
22 very likely to create lost documents, physical data
23 loss, system not starting up, system slowdowns, crashes,
24 and freezes?
25    A. To the degree that we have had conversations

248

1 today already suggesting that when there is too many of
2 these, the registry can become a burdensome item for
3 Windows to manage because there is only a set amount of
4 memory that Windows is ever going to give to the
5 registry, and when it exceeds that, it becomes
6 problematic because then it has to page out a lot of the
7 entries.
8    And garbage in, garbage out. If you are getting
9 a lot of garbage into the registry when it is reading
10 certain areas, it could overwhelm it and cause a
11 slowdown on the machine.
12    Q. So that would be in the case --
13    A. But these particular 50 or so entries by
14 themselves causing a problem, no, not yet, but it would
15 eventually contribute to the problem as it grows over
16 time.
17    Q. So when WinFixer2005 says these are severe
18 system threats that are very likely to create lost
19 documents, etcetera, etcetera, based on this install,
20 that's not true.
21    A. Well, if somebody punches me once, it is not
22 going to hurt that bad, but if they punch me 40 times,
23 it is going to be pretty bad.
24    I think that's really what they are talking
25 about, is -- you know, they are warning you, hey, this

62 (Pages 245 to 248)

249

1  is a slap in the face, get rid of it, stop it from
2  happening, let's clean it up.  So as far as it being a
3  system threat, certainly it is one of the straws on the
4  camel's back.
5  **Q. So every version of Windows XP right out of the**
6  **box is very likely to experience lost documents,**
7  **physical data loss, system not starting up, and system**
8  **slowdowns as a result of these registry keys.**
9  A. Again, I don't know exactly how these registry
10 keys -- what they are from, and I would want to examine
11 the machine, the VM, as it is being --
12 **Q. That's fair.  Let's assume that you undertake**
13 **that test and you get the same results --**
14 A. Right.  And earlier today we talked about my
15 opinions and how I might formulate new opinions.  I just
16 formulated one, because I do know that the VM does have
17 interaction with the guest operating system, and to the
18 extent the VMWare does that, that's something new that I
19 thought up this afternoon that I hadn't given a lot of
20 thought to.
21     But since I work with a VM on a daily basis now,
22 it is something that I have noticed more and more, that
23 there is an interaction there that needs to be explored
24 to find out if these are, in fact, part and parcel of
25 that.  I would want to eliminate that from -- I would

250

1  want to know whether or not these are actually on every
2  XP machine, and I would start by actually installing XP
3  on a fresh machine, not a VM, to see.
4  **Q. Okay.**
5  A. I think that would be the better approach.
6  **Q. Okay.**
7  A. I think we were doing VMs because that's what
8  they were doing, because it was what Kevin Johnson was
9  doing, and I didn't give that as much thought as I
10 should have; that perhaps using a VM is not the best
11 approach.
12 **Q. But that was --**
13 A. Certainly you might get -- depending on the
14 hardware of the machine, you could get a whole set of
15 different classes.  There could be a problem with a
16 drive.  These could be as a result of a driver that
17 failed to install.  There is so many things that could
18 be behind this.
19 **Q. I understand.  And --**
20 A. I don't want to tell you that these -- that
21 these are not all the straws on the camel's back because
22 they might be.  If there is, in fact, a problem with a
23 driver or something like that and that's why these
24 didn't get installed, I wouldn't know.
25 **Q. Is it safe to say you don't know the answer at**

251

1  this point.
2  A. It is safe to say I don't know the answer at
3  this point.
4  **Q. Last question on WinFixer, last page.  This**
5  **error message looks familiar.  This is the error message**
6  **you get when you try to shut down a computer with**
7  **WinFixerFree installed.  And, again, the error is if you**
8  **shut down your computer while it has errors in the**
9  **registry database or file system, it is very likely**
10 **you'll have further problems, such as lost documents,**
11 **physical data loss, system not starting up, system**
12 **slowdowns.**
13     **Now, is that the case in this instance on a**
14 **clean VM image?**
15 A. Again, I'm going to have to say I don't know and
16 I want to explore this further because of the issues
17 with these particular entries.  Because these could have
18 something to do with a driver that failed to install or
19 installed incorrectly.
20     And to give you a little anecdotal story about
21 that -- and it is a little embarrassing for me to tell
22 this story but I think it is relevant -- and that's that
23 I was trying to install a driver on my Windows 7,
24 32-bit, machine and because I have -- you know, I had
25 several Windows 7 machines, I downloaded the 64-bit

252

1  driver for the machine and it let me install it.  And
2  the computer was running and I was trying to get the
3  device to work and it wouldn't work and I restarted my
4  machine and it would not reboot.
5  **Q. Understood.**
6  A. And all the repair utilities, all the repair
7  disks, the boot disks, nothing would work.  I thrashed
8  my machine at a very deep system level by doing that.
9     So I kind of want to explore it further.  I
10 think we are just kind of -- I need to explore it
11 further.
12 **Q. Sure.  So did you remove these registry keys**
13 **from your wife's computer?**
14 A. I haven't -- again, I haven't examined these.  I
15 don't know if these exist on her computer or not.
16 **Q. If they do, you haven't removed them though.**
17 A. I don't know if they are there to be removed.  I
18 don't know what causes these.  If these were caused by a
19 problem of some sort with software or with the install
20 and I were -- and I were giving my wife's computer a
21 tune-up, I would run a piece of software, such as
22 CCleaner.  This is something that I would look for.
23 **Q. Okay.  But you haven't --**
24 A. No, I haven't.  I have run -- I believe I have
25 run CCleaner on her machine but haven't done it with the

63 (Pages 249 to 252)

253

1  express intent of looking for these particular items. I
2  have run it with the intent of cleaning out things, like
3  the temporary files, the bad registry entries, and that
4  sort of thing, so there you have it.
5      Q. Okay. So in your testing of the paid version of
6  WinFixer -- and this is 12 going on to 13 -- you
7  indicate that the items that WinFixer does detect are
8  generally considered items that should be removed from
9  the system; right?
10     A. Yeah. Invalid registry entries.
11     Q. Now, if those items detected by the paid version
12  are the same as the free version, the ones we just saw,
13  you just told me, I think, that you are not sure whether
14  those items should be removed or not; right?
15     A. I said I'm not sure whether those items would
16  cause a problem at restart. That's what I said.
17     Q. I see. So you do believe they should be removed
18  though?
19     A. I do believe that invalid entries in the
20  registry should be removed, yes.
21     Q. Even though you don't know what they do.
22     A. Again, it would depend on the software that I'm
23  using to make that judgment, because I can't know
24  everything about the registry. That's massive.
25     Q. What's your basis for relying on WinFixer? You

254

1  wouldn't rely on just any piece of software, would you?
2      A. I frequently do rely on software that I don't
3  know much about, because it is -- I have a lot of faith
4  in humanity.
5      Q. Do you know the company that made WinFixer?
6      A. I believe IMI made WinFixer.
7      Q. Okay. Do you have a good opinion of IMI? You
8  thing they produce trustworthy software?
9      A. I think the software that I've tested that said
10  it would do what it did, it did it. And WinFixer, you
11  know, it does what it says it would do. It cleans out
12  temporary Internet files. It cleans out temp files. It
13  finds orphaned entries in the registry and cleans them
14  out.
15         And these are all things that -- if you look in
16  my report on -- where I did a comparison to a piece of
17  software called CCleaner, which is literally used -- it
18  is a free tool and it's used by millions upon millions
19  and millions of users -- I'm not sure I wrote down in
20  here the number of downloads at the time but it was
21  definitely in the millions of people that used the
22  software, and I hear nothing but good things on the
23  Internet and the message boards, people I know, people
24  in the industry with me recommend CCleaner, and it does
25  those things.

255

1      Q. See, but here's the issue. I think you are
2  focused -- and I understand why -- on functionality,
3  because you are testing software and you are focused on
4  functionality. And as I understand your comparison to
5  CCleaner, you are comparing the functionality of these
6  products to the functionality of CCleaner. That's what
7  the genesis of that chart is; is that right?
8      A. Right.
9      Q. Here's the problem. Does CCleaner indicate that
10  what it's detecting are severe system threats that are
11  very likely to cause lost documents, physical data loss,
12  system not starting up, and system slowdowns?
13     A. I couldn't tell you at this time.
14     Q. I can tell you it didn't for me.
15         So there is a difference between functionality
16  and representations made to consumers. And as I
17  understand your report, you are not making any judgments
18  on the representations made to consumers. You are
19  making judgments on the functionality of the product; is
20  that fair?
21     A. That's fair.
22     Q. Okay. Let's go to your tests of WinAntivirus
23  and WinAntispyware.
24     A. Okay.
25     Q. Now, you tested multiple versions of these

256

1  programs and these are both -- unlike what we have
2  talked about I think exclusively until now -- these are
3  purported virus and spyware removers, right, not error
4  detectors.
5      A. Right.
6      Q. Now, for WinAntispyware, you tested the paid
7  version of that program; right?
8      A. Yes.
9      Q. And as I understand your test, you simply ran
10  the program on a clean computer, didn't get any
11  detections, and concluded that the program was
12  functioning appropriately. Is that a fair summary of
13  your test?
14     A. No. I concluded that it wasn't finding false
15  threats; that it wasn't indicating that there were
16  threats that existed that didn't exist.
17     Q. But based on your testing, you don't have any
18  idea if WinAntispyware would actually detect spyware, do
19  you?
20     A. I don't believe I put spyware onto the computer
21  and tested it. That should have been something I should
22  have done.
23     Q. Take a look at your report.
24     A. I didn't.
25     Q. So you -- at this point you don't have any idea

257

1 whether the WinAntispyware would actually detect
2 spyware, do you?
3     A. Yeah. I was looking more towards -- I don't
4 believe I stated in here that it does what it said it
5 would do. What I said is that it wasn't doing something
6 that it didn't say it would do.
7     Did you understand that?
8     Q. I actually understood that but I'm not sure --
9     A. That you will understand it later.
10     Q. -- that anyone else will months from now.
11     So is it fair to say that you can't say one way
12 or the other whether WinAntispyware would actually
13 detect spyware based on the testing that you have done?
14     A. Based on my testing to date, I can't say that it
15 would find -- all I can say is that I did notice that it
16 was behaving in a way that one would expect a software
17 to behave that was doing something. It was scanning
18 areas of the computer. I was watching it do things,
19 looking at things, etcetera.
20     Q. But, again, at the end of the day, based on your
21 testing, you can't conclude at this point whether
22 WinAntispyware would actually detect spyware.
23     A. No, not at this time.
24     Q. And can you explain how an antispyware product,
25 such as WinAntispyware, would actually go about

258

1 detecting spyware?
2     A. Yeah. It would look for executables that match,
3 like a hash of a known like signature.
4     Q. So would there be a database of signatures?
5     A. Yeah. And that's my assumption, is that the
6 enemies.dat would be that signature database, but I
7 wasn't able to get into that file and actually read the
8 entries to test and see.
9     I tried. I made like a couple attempts to do
10 it, and it came down to needing to decompile and I
11 didn't have the tools readily available to do that.
12     Q. Okay.
13     A. But that was something kind of on my to-do list,
14 but I had a limited amount of time to get this report
15 prepared. If I had two years to do this, we would have
16 a much thicker report.
17     Q. Understood. So you don't know how often that
18 detection database was updated, do you?
19     A. No. I don't know how often that was going out
20 and looking for -- I do recall seeing it making --
21 attempting to make a connection to see if -- and I'm --
22 but because there is no -- because the servers are all
23 down now and there is no way for me to really know how
24 often it would make that attempt, assuming that it -- it
25 may say, hey, I made an attempt, I can't make an

259

1 attempt, I will try again in 30 days or a day. I don't
2 know.
3     Q. Actually I think we are talking about two
4 different things and I don't mean to confuse you. But
5 as I understand it -- and correct me if I'm wrong -- the
6 detection database would be maintained by the company
7 that created the software; right?
8     A. Yes. And it would ship with signatures to date,
9 and then it would update it in the future.
10     Q. Right. And by updating, you mean the program
11 would reach out and grab updates and pull them down to
12 the machine.
13     A. Yeah, that's how it works.
14     Q. And what I'm talking about is the updates that
15 would be stored on the server that the program is
16 reaching out to, you don't know how often those updates
17 were published for WinAntispyware, do you?
18     A. No, I don't.
19     Q. And you would agree with me that it would be
20 important to regularly update antispyware definitions in
21 order to keep up with the current threats.
22     A. Yes.
23     Q. So, again, based on your testing, you can't say
24 whether WinAntispyware would be an effective antispyware
25 product because you don't know whether the signature

260

1 database was updated regularly.
2     A. No. And I don't believe I made that
3 representation in my report.
4     Q. I'm not saying that you did.
5     A. Okay. At this time I don't know. I would
6 certainly like to know. That's another item that I
7 would like to -- would have liked to have explored
8 further had I had more time.
9     Q. So when you say in your report -- and this is
10 where we have a bit of an issue -- you said that
11 WinAntispyware performs similarly to other antispyware
12 and antimalware products of the same time period.
13     Now, I don't think you've got enough information
14 to make that decision. Do you disagree with me?
15     A. I think that when I'm talking about that, what
16 I'm talking about is the areas where I was looking and
17 areas of examination, because I was watching what it was
18 doing while it was doing it using a process monitor. I
19 could see what it was accessing, where it was going, and
20 what it was doing, and I could observe that its
21 functionality was not simply just to pop up a window
22 that says your computer is not infected.
23     It scanned the computer, and the assumption was
24 that it was looking at something. I didn't go so far
25 as -- you know, to crack the data stream and see that it

261

1   was hashing things and checking them against -- but I
2   did see it making frequents checks to the enemies.dat
3   file, which I assume -- that was an assumption, I will
4   admit -- that that file contained signatures.
5       Q. But isn't it true in order to know that
6   WinAntispyware performed similarly to other antispyware
7   and antimalware products, you would have to know things
8   that you don't, like how often the detection database
9   was updated?
10      A. I think I would just have to know that it could
11  find spyware that was on the computer in its signature
12  file. I think that that would satisfy me.
13      Q. But you don't know that.
14      A. And I don't know that and I would like to.
15      Q. So as of you sitting here today and when you
16  wrote your report, you don't really know whether
17  WinAntispyware performed similarly to other antispyware
18  and antimalware products. You need to do more research.
19      A. I need to do more research, yes.
20      Q. And you don't know whether it performed
21  similarly.
22      A. I know that it --
23      Q. Let's focus on performs, I guess, because I
24  guess it depends on what you mean by that.
25      A. Operates, right? I guess I would say that it

262

1   operates similarly. Whether or not it performs as well,
2   I don't know.
3       Q. Okay. That's good.
4           So on to WinAntivirus, which was a different
5   type of test with WinAntivirus. For WinAntivirus, you
6   actually tested whether WinAntivirus could detect
7   anything on your computer by using two different threat
8   files; is that right?
9       A. That's correct.
10      Q. Okay. Now, these test files aren't malicious,
11  are they?
12      A. No.
13      Q. So you never actually tested if WinAntivirus
14  would detect a real malicious file, just the
15  nonmalicious test files.
16      A. No. It is not my practice or custom to download
17  actual live viruses to my computer. Number one, they
18  may -- it is dangerous to handle viruses, and, number
19  two, I'm not even sure if it is -- I'm not even sure if
20  it is legal.
21      Q. So I want to show you a report -- have you heard
22  of the organization called Westcoast Labs?
23      A. It is ringing a bell.
24      Q. They are a certification body for security
25  software.

263

1       A. Okay.
2           MR. ARENSON: I'm going to mark this as the next
3   exhibit, 11.
4           (Ellis Exhibit Number 11, Westcoast Labs Report,
5   was marked for identification.)
6   BY MR. ARENSON:
7       Q. And this is a long report, and I wouldn't ask
8   you to read the whole thing. But if you turn to
9   page 11, this is an analysis of how Westcoast Labs
10  tested a variety of security products. Take a look.
11  Give it a glance and let me know when you are ready.
12      A. Okay.
13      Q. Okay. So here Westcoast Labs took a total of
14  156,587 unique files and tested them against all of
15  these security products to try to determine
16  effectiveness of the security products.
17          Now, you tested WinAntivirus against two files;
18  is that right?
19      A. Yes.
20      Q. And neither of those files were actually
21  malicious; right?
22      A. That's correct.
23      Q. You don't contend that your test is a serious
24  test of WinAntivirus's detection abilities.
25      A. I contend that it is not comprehensive -- it is

264

1   not as comprehensive as this test, but it is a serious
2   test designed to show that it -- at least the software
3   does recognize when a file is a virus.
4       Q. Well --
5       A. At least that file. It found at least that
6   file. And, again, I certainly can't compete with your
7   time, you know, or resources with a fully
8   comprehensive -- and I certainly -- you know, that
9   certainly speaks to, you know -- I didn't see that -- I
10  didn't see that test done by Mr. Johnson either so --
11      Q. But Mr. Johnson didn't --
12      A. If Mr. Johnson had conducted a test and had
13  found that the software was saying that there were
14  viruses that were there and they were not, or if he had
15  conducted a test --
16          So my goal was to mimic what the other people
17  were doing to at least run the same tests that they did
18  to see if I got the same results, and then to even take
19  it a step further and say, well, at least it does this
20  test virus, it finds this, so it is obviously smart
21  enough -- it is obviously checking all these files
22  against something and at least that virus definition is
23  in its virus database.
24          And it didn't seem likely to me that somebody
25  would just put that one test virus in there unless they

265

1    were actually doing, you know, real virus detection
2    software development.
3       Q. But here's the difference between you and
4    Mr. Johnson. You stated in your report that
5    WinAntivirus offered similar features to those offered
6    by the leading products in the industry.
7       Were those your words?
8      A. Yes.
9       Q. Now, how could you possibly know that if you
10   haven't conducted a rigorous test of its detection
11   capabilities? And I assume the answers to my questions
12   from before about the detection database are all the
13   same.
14      MS. GURLAND: Can he answer?
15      MR. ARENSON: Sure. Let me just finish my
16   question. That'd be great.
17      THE WITNESS: I'm sorry, who is objecting?
18      MR. ARENSON: I'm not sure.
19      MS. GURLAND: I just -- we had the question and
20   then we were going to have both the question and the
21   answer from Mr. Arenson, so I thought maybe at some
22   point we should see whether or not Mr. Ellis agrees.
23      MR. ARENSON: Sure. And if I can just ask my
24   question, that'd be great.
25   ///

266

1      BY MR. ARENSON:
2      Q. So, again, back to my question. I assume and --
3   let's make it easier for Ms. Gurland.
4      Your answers for whether WinAntivirus, whether
5   its detection database was updated on a daily or weekly
6   or monthly basis, do you know the answers to those
7   questions?
8      A. I don't know.
9      Q. Okay. So if you don't know how often the
10   detection database was updated -- and I assume that
11   that's an important fact in comparing antivirus
12   products?
13      A. I believe it was making a check every time. I
14   would want to come back to that, because I don't know if
15   I wrote that down in here, but I did see these making
16   attempts to access --
17      Q. We talked about the distinction between it
18   making a check and what it is making a check for.
19      A. Right. And there is really no way to tell;
20   right?
21      Q. Because you don't have the data.
22      A. Because the data is not there anymore.
23      Q. Exactly.
24      A. The servers aren't there anymore.
25      Q. Exactly right.

267

1      A. It is a forensic impossibility to make a
2   determination about whether the software -- maybe the
3   software only shipped with a bare minimum of signatures
4   and then it downloaded all the rest of the ones that it
5   needed. I don't know.
6      And that's been my problem with this entire
7   thing the entire time, is that I can't recreate the
8   Internet and all these systems as they were in 2006
9   or -7 and nobody's gone through the trouble of doing
10   that for me and presenting it to me and saying, here you
11   go, Scott, go to town, have fun. We are going to give
12   you access to all of these systems where we know where
13   they came from or we know how they were put together and
14   where we know these servers had these signature files in
15   them, etcetera, etcetera, ad nauseam.
16      Q. I understand that. But without that
17   information -- which we both agree, I think, is
18   critical -- how can you make the judgment that
19   WinAntivirus offers similar features to those offered by
20   the leading products in the industry? Don't you need
21   more information to draw that conclusion?
22      A. Again, it comes back to taking it on good faith;
23   that when you see software set up to work in a certain
24   way and that it is doing -- that it's reading these
25   files -- that it is going through and reading all the

268

1    files, when I can see it doing that, and then I see that
2   it catches on that one file, I assume it is reading
3   those files and it is checking that file and it is
4   checking it against its signature database. It is doing
5   that.
6      But whether or not that is -- you are right.
7   You are right. A more comprehensive understanding of
8   the signatures that are in there and how often it
9   updates, those would be important things to say that it
10   is just as good as those other software tools. But for
11   me to say that it functions as those do, I think
12   that's fair.
13      Q. So maybe we don't disagree here. What you are
14   saying is that WinAntivirus functions similarly to other
15   leading software in that it scans and that it attempts
16   to draw signatures from a database; is that correct?
17      A. Yes.
18      Q. But what you are not saying is that it is as
19   effective as leading -- and this is an important
20   distinction -- that it is as effective as leading
21   products in the industry, because you don't have the
22   information to make that judgment.
23      A. Right. And I don't believe I made that -- I
24   don't believe I said that.
25      Q. I don't think you did either. I just want to

67 (Pages 265 to 268)

269

1  clear up when you say "offers similar features," I
2  originally read that as you saying it is as effective.
3  And maybe that's my fault.
4       You are not ready to say that at this point.
5  You are just saying that it is appears to go through the
6  same motions that other leading programs do.
7       A. That's right. And that's why we are talking
8  now, to clear up things like that. I think it is
9  brilliant.
10      Q. Fair enough. Okay. We are done with that
11  exhibit -- no, we have one more question on that.
12      You say in the report that WinAntivirus runs
13  system scans -- which I think we have talked about --
14  and then you also say it is capable of detecting viruses
15  and handling them in an industry-standard manner. And
16  I'm not sure I see the data supporting the second half
17  of that statement.
18      A. It quarantines them. I believe it quarantines
19  the virus. It removes the file and removes it from the
20  system.
21      Q. But there weren't any real viruses on your
22  machine.
23      A. The ability to remove a file -- you know,
24  certainly the ability to detect a file that's a virus --
25  and certainly not all -- yeah, I can stand by that. I

270

1  would want -- certainly I would want -- not even the
2  best antivirus software can remove successfully all
3  viruses, and I -- I could agree that that would need
4  further testing to make sure.
5       Q. Based on the data you have at this point, you
6  can't really say whether it can detect viruses and
7  handle them in an industry-standard manner because you
8  have never had it detect a virus; right?
9       A. The trojan simulator, I would probably want to
10  give you more information about how that works. I
11  believe it actually does behave in the same way as a
12  trojan behaves.
13      Q. Is it a malicious file?
14      A. It does the same sorts of things and it behaves
15  in the same way that something that wanted to do
16  something malicious could. I mean, in and of itself the
17  command window could be used for malicious purposes, so
18  the existence of a certain file in a certain type -- say
19  you have a file that's capable of making a call to a
20  remote server and downloading software to the site, you
21  know, that -- and it is put in the place where these --
22  we won't know it is there, it is not registered
23  properly, you don't see it, that would be a trojan, a
24  back door of sorts.
25      And that's what -- it is capable of at least

271

1  removing that type of threat. Whether or not it can get
2  in and remove things, the higher -- again, it goes to
3  quality, right? Whether or not it is capable of
4  removing the more advanced types of threats that are on
5  a system, things aren't loaded into RAM or, for example,
6  root kits, I would question McAfee and Symantec on some
7  of that. Because I have seen it where McAfee can't
8  remove a virus, Symantec can't remove a virus, and I end
9  up just going in and rooting it out myself.
10      Q. I understand. But based on the data you have
11  got, you have established that WinAntivirus -- to your
12  satisfaction you've established that WinAntivirus can
13  detect the two test files that you put on the machine;
14  right?
15      A. Yes.
16      Q. But as far as actual malicious viruses, that
17  just wasn't a test that you ran and you have explained
18  why that is; right?
19      A. I think that the trojan simulator is supposed to
20  simulate a malicious virus. In and of itself it is not
21  malicious, but for all intents and purposes the system
22  is agnostic to the intent of a thing. Even real viruses
23  your system doesn't know -- it doesn't know the
24  difference.
25      Q. Okay. Let's move on. You tested the free

272

1  version of WinAntivirus; right?
2       A. Yeah. That was the
3  WinAntivirus2005ProScannerSetup.
4       Q. I don't want to put words in your mouth, but my
5  understanding is you tested the free version of
6  WinAntivirus.
7       A. My understanding is that the
8  WinAntivirus2005ProScannerSetup is the free version, so
9  let me take a look at that section. Yes.
10      MR. ARENSON: We can mark this as the next
11  exhibit.
12      (Ellis Exhibit Number 12, Rebuttal Report of
13  Kevin Johnson, was marked for identification.)
14      BY MR. ARENSON:
15      Q. Okay. So I'm going to introduce Exhibit 12,
16  which is actually a document we have talked about to
17  some length today. This is the expert report of Kevin
18  Johnson. This is the rebuttal report. And we are going
19  to flip to page 13 of this report and talk about
20  Mr. Johnson's tests of the same programs that you
21  tested.
22      A. This?
23      Q. Yes. So Mr. Johnson visited the MSN website and
24  then ran the WinAntivirusPro2005, the same program you
25  tested, and he got the following warning from

68 (Pages 269 to 272)

273

1  WinAntivirusPro: Your system is infected. So I want to
2  just break this down by line.
3      Now, do you agree that what was detected here,
4  the cookie from -- that was detected, which is from
5  Doubleclick, is an infection of the computer? Is that
6  an industry-standard term, you are infected with a
7  cookie? I'm not making this stuff up.
8      A. I don't know if it is an industry-standard term
9  or not. I wouldn't refer to it that way.
10     Q. Have you heard a lot of your colleagues say my
11  machine is infected with cookies?
12     A. I wouldn't put it past having been heard that I
13  have got an adware infection, or that I'm -- I don't
14  know exactly what people would say, you know, I'm
15  polluted with cookies or I'm -- I have got a lot of
16  cookies. I don't know exactly what people would say.
17     I think that if I were to say that I had a piece
18  of software that was looking for cookies and I found
19  cookies, then there is cookies. I think that the word
20  infection --
21     Q. It is a loaded term; right?
22     A. It is not a term that really makes sense to use
23  with computers at all. When you think about it
24  semantically, we use a lot of -- what's the word I'm
25  looking for, when you apply human attributes to an

274

1  object.
2      MS. GURLAND: Personification.
3      A. Onamonapia. I'm not sure.
4      BY MR. ARENSON:
5      Q. But I think --
6      A. Anthropomorphization, I think that's the word.
7      THE WITNESS: You don't need to type that one.
8      MR. ARENSON: Unfortunately she does.
9      BY MR. ARENSON:
10     Q. So the root of that -- and correct me if I'm
11  wrong -- is that viruses, which also affect humans, and
12  the root of a person being infected with a virus is why
13  a computer would also be termed infected; right? The
14  root is a virus; right?
15     A. Malware would really be a better word than
16  virus. I think that certainly there is -- everything
17  falls into that category. Virus is the -- the word
18  infection is just something that has been associated
19  with the word virus and it comes down to a question of
20  language and I'm not a language expert on the semantics
21  of how people talk about things.
22     Q. But it is safe to say that not a lot of people,
23  or any people, say that my system is infected with
24  cookies. Have you ever heard anyone say that? I'm
25  infected with cookies, Scott. Ever heard it?

275

1      A. I don't recall having heard that.
2      Q. Okay. Now, the next representation from this
3  program is WinAntivirusPro has detected viruses, adware
4  trojans, and performance issues on this computer.
5      And let's go through those one by one. Now, a
6  cookie isn't a virus; right?
7      A. I would say no.
8      Q. Okay. What's a trojan?
9      A. A trojan is something that's on your computer
10  that could be -- could release things within the
11  security zone of your computer that you may not want to
12  be released, just like trojans. It comes back to -- the
13  Greek tale of Troy and --
14     Q. I think you've got it. I always understood --
15  and correct me if I'm wrong -- a trojan to be something
16  that hides within something else and then infects a
17  user.
18     A. Yeah, it would typically be an executable.
19     Q. An executable that hides within something else
20  and then tricks the user into installing it. Is that
21  pretty much what people understand trojans to be?
22     A. Yes.
23     Q. Okay. So how is a cookie an adware trojan? Or
24  is it?
25     A. Yeah. I think that may be a typo. Maybe there

276

1  was supposed to be a comma in there. Adware, trojan, or
2  maybe it is not. Maybe it is considering a cookie to be
3  an adware trojan and that something could come along
4  later and pick that cookie up.
5      Certainly adware -- a cookie would be part and
6  parcel of adware in that adware is not going to function
7  to some degree. Certain types of adware probably
8  wouldn't function if the cookies aren't there.
9      Q. But the trojan part is the part that troubles
10  me. How is a cookie a trojan? What's hiding inside the
11  cookie that would infect the computer and cause harm?
12     A. Well, it could be information about your
13  computer that's there or about you, information about
14  you.
15     Q. But it is not an executable.
16     A. No. But it could be part of an executable
17  program.
18     Q. Have you ever heard anyone refer to a cookie as
19  a trojan? Scott, my computer is infected with cookie
20  trojans?
21     A. That would be like saying, you know -- I don't
22  know what that would be like saying.
23     Q. Have you ever heard of it?
24     A. Let me think a minute. I mean, it is saying
25  adware trojans and cookies could be part of that.

69 (Pages 273 to 276)

277

1  Cookies would be part of adware, so what somebody would
2  say is that my computer is infected with adware.
3     **Q. That's not what this says, right? This says**
4  **adware trojans.**
5     A. I have never heard the term adware trojans
6  before, no, but it not unreasonable to put those two
7  words together.
8     **Q. Give me an example of an adware trojan.**
9     A. That would be one that's capable of highjacking
10  your browser session and highjacking the contents of its
11  choice that's maybe even stored locally on your machine.
12  I've seen entire Internet caches of websites stored on
13  people's local machine and the contents have been served
14  up to the person.
15     **Q. Okay. Do you have an opinion whether a**
16  **Doubleclick cookie is an adware trojan?**
17     A. My opinion on that is that there is too many ads
18  on the Internet and that it is almost unbearable, the
19  amount of advertising that you see on the Internet. And
20  that if there is a program that could keep me from
21  seeing banner ads -- the constant onslaught of banner
22  ads that we see is -- it is obnoxious.
23     And that's like the definition of adware. Is it
24  obnoxious? Does it get in your way? Is it causing
25  problems? Is it creating files on your computer? Is

278

1  there a little blinking thing down on the bottom of your
2  screen when you are trying to read a report or a message
3  board, something that somebody has useful information
4  on? It is annoying.
5     **Q. Right.**
6     A. And those cookies are a big part of how that
7  system works. I think they could still make it work
8  even without cookies but it wouldn't be as targeted.
9  They wouldn't be able to target me directly, and that's
10  what's offensive, is sometimes I will be surfing along
11  and I will be working and I see an advertisement for
12  something that I'm actually interested in and it is
13  distracting.
14     **Q. Understood.**
15     A. And that's a problem for corporate America. I
16  would say that the amount of time lost in America by
17  people surfing the Internet because they got distracted
18  by some pretty banner ad is probably huge.
19     **Q. I hear you, but let's try to get back to the**
20  **question, which was would you define a Doubleclick**
21  **cookie as an adware trojan?**
22     **You said that's not a term you've heard before;**
23  **right?**
24     A. It is not unreasonable to put those two words
25  together. I'm not sure that I haven't seen that.

279

1     **Q. Where would you have seen adware trojan?**
2     A. You may have seen it -- certainly it is a -- I
3  would have seen that. I think -- the more I think about
4  it, the more sense it makes, that there could be
5  trojans -- that there are trojans on your computer that
6  are serving up content to people.
7     And especially at that time. It was a lot worse
8  in 2004, 2005, 2006. It was very prevalent that people
9  would lose their -- their browser would be highjacked
10  and they would be served up content that they didn't
11  want and there would be popups and popovers and
12  pop-arounds. I think the term is reasonable, adware
13  trojans.
14     And I think that companies that engage in the
15  practice of dumping lots of cookies onto my machine and
16  then serving ads up to me and tracking what I'm doing
17  and where I'm going, I feel it is invasive and invades
18  my privacy, and I feel those companies are adware
19  and that --
20     **Q. Understood.**
21     A. -- the cookies are part of their adware program.
22     **Q. Understood. So is it safe to say that virtually**
23  **all consumers have cookies on their computers?**
24     A. If they are browsing the Internet --
25     **Q. That's an important --**

280

1     A. -- and their computer is configured to allow
2  cookies and they are not running a software tool that's
3  removing them, then it would be safe to say that they
4  have cookies.
5     **Q. You have told me before that consumers aren't**
6  **particularly sophisticated when it comes to the Internet**
7  **in general and that most consumers aren't very**
8  **sophisticated. So is it safe to say that most consumers**
9  **who connect to the Internet have cookies on their**
10  **computer and are not running special software to block**
11  **them?**
12     A. I think these days it is safe to say that people
13  are more savvy about that.
14     **Q. Is your wife running that software?**
15     A. Wife is running an antivirus tool, yeah,
16  definitely.
17     **Q. There is a difference, though, between an**
18  **antivirus tool and blocking cookies; right?**
19     A. My wife goes to Facebook and that's about it.
20     **Q. Facebook uses cookies, doesn't it?**
21     A. Yeah. But she's not browsing all over the place
22  and it's not something that she's complained to me
23  about.
24     **Q. I understand. But it is very likely there are**
25  **cookies on your wife's computer.**

70 (Pages 277 to 280)

281

1    A. It is very likely that there is many, many
2 people that have -- that are actively guarding their
3 computers against cookies.
4    **Q. But your wife isn't one of them.**
5    A. I don't know how that's relevant, and I almost
6 find it offensive.
7    **Q. I apologize. I don't mean to -- the only reason**
8 **it is relevant to this is that you are a computer**
9 **expert, and if your own wife has cookies on her**
10 **computer, then I guess I just -- I don't see how the**
11 **wife of a computer expert is not even more sophisticated**
12 **than a typical consumer. And if your wife allows**
13 **cookies on her computer, I would think that even less**
14 **sophisticated consumers would be even more likely to**
15 **allow cookies on their computer.**
16    **I apologize for any other inference. There was**
17 **none there. Do you agree with at least that theory? Or**
18 **maybe I can put this another way.**
19    A. I think I --
20    **Q. You haven't --**
21    MS. GURLAND: Can he answer?
22    MR. ARENSON: If he wants. I'm just trying to
23 get out of this.
24    A. I think that -- I have in the past run tools on
25 her -- on that computer, on her computer, to clean out

282

1 things, and one of the things that would be cleaned
2 out -- I believe I have run CCleaner on that machine. I
3 would have to check. I don't maintain my wife's
4 computer. I apologize. I'm going to go home tonight
5 and apologize to her for not doing as good of a job of
6 maintaining her computer as I should.
7    Because it is true. I take better care of my
8 machine than her machine, and when I was working in this
9 industry -- when I was doing my job that gave me the
10 expertise on this, yes, I was running tools to clean out
11 cookies on people's computers all the time.
12    BY MR. ARENSON:
13    **Q. Okay.**
14    A. It was a common practice to install some sort of
15 adware preventative measure at this time. Now, whether
16 I'd do this today, now? The problem isn't as prevalent
17 with the security risk that cookies present. But at the
18 time as a professional for clients that were paying me
19 money to take care of their systems, yes.
20 Unequivocally, yes, I removed cookies from their
21 machines.
22    **Q. But removing cookies and blocking cookies is a**
23 **different issue, and what you haven't told me yet is**
24 **were you affirmatively blocking cookies in all instances**
25 **and every time you surfed the web you were blocking**

283

1 cookies and not allowing them onto your machine.
2    A. Yes. There would be machines where cookies
3 would have been turned off. The problem became as more
4 and more pieces of software depended on cookies to
5 operate properly, that became a difficult setting to
6 maintain because it wouldn't work.
7    **Q. Right.**
8    A. It was kind of like you just had to take it.
9    **Q. And I'm not making any judgment as to whether**
10 **that's right or wrong. I'm saying there were cookies on**
11 **your machine; correct?**
12    A. That would be correct.
13    **Q. So if you had run WinAntivirusPro on your**
14 **machine, it would have detected the same adware trojans**
15 **that it detected here.**
16    A. Unless I had just run CCleaner.
17    **Q. Now, the last question on this performance**
18 **issue. Can one cookie cause a performance issue on a**
19 **computer?**
20    A. Probably not.
21    **Q. Okay. We are done with that.**
22    MR. ARENSON: You can mark this as 13.
23    (Ellis Exhibit Number 13, Advertisements from
24 Value Click Network, was marked for identification.)
25 ///

284

1    BY MR. ARENSON:
2    **Q. This is actually going to be somewhat of a**
3 **strange exhibit because it may not apply to you.**
4    A. Okay.
5    **Q. This is a series of advertisements that Marc**
6 **D'Souza purchased and ran on the Value Click network.**
7    A. Okay.
8    **Q. And if you just flip through these, you will see**
9 **that there is all kinds of different variations of**
10 **basically the same ad.**
11    A. Oh, my goodness, yeah.
12    **Q. Do you intend to offer any testimony about**
13 **whether these ads are false or misleading? Because it**
14 **is not mentioned in your report and I'm just trying to**
15 **determine if you are going to offer testimony about**
16 **these ads.**
17    MS. GURLAND: If it is not mentioned in his
18 report, he could not legally do that.
19    MR. ARENSON: Well, there is a lot of things
20 that you've have been talking about updating today that
21 aren't mentioned in your report so I'd like to nail this
22 down.
23    BY MR. ARENSON:
24    **Q. Are you going to offer any testimony about these**
25 **ads, whether they are false or misleading?**

71 (Pages 281 to 284)

285

1  MS. GURLAND: Can I represent -- maybe it is
2  hard for you to know. I represent that we are not going
3  to offer testimony --
4  MR. ARENSON: Okay.
5  MS. GURLAND: -- about that. If it is not in
6  his report and he hasn't disclosed it to you and -- that
7  would be not just something like, oh, I would like to do
8  another test. That would be a whole new topic area that
9  wasn't in his report. I wouldn't go through the effort
10 of trying to introduce that, which I think would not be
11 appropriate.
12 MR. ARENSON: I would tend to agree.
13 BY MR. ARENSON:
14 **Q. But the only thing that gives me a little bit of**
15 **pause is that in one of the lists of things you**
16 **considered I think you referenced just generically**
17 **Mediaplex.**
18 A. Yeah, I think there was some question as to -- I
19 mean, I may certainly offer my opinion as to how
20 something like this -- how that sort of thing works but
21 not as to whether --
22 MS. GURLAND: Can I just say there was in --
23 MS. ROBBINS: It is on page 9.
24 MS. GURLAND: -- in Johnson's rebuttal report
25 there was discussion of the investigation that was done

286

1  from Mediaplex, perhaps on the first page where he shows
2  the wrapper code and then Johnson says that he obtained
3  it by the investigation done by Mediaplex.
4  So one of the things I gave to Scott, which he
5  may or may not have read, is that investigation from
6  Mediaplex. So it is listed in his materials in the
7  abundance of caution that he put everything that he
8  possibly looked at and that's the basis.
9  MR. ARENSON: I'm not making any judgment as to
10 whether that was right or wrong. I just don't want to
11 get ambushed.
12 BY MR. ARENSON:
13 **Q. So I'm just trying to see if you are going to be**
14 **offering any opinions. If you are, I have got pages of**
15 **questions about these ads, but if you are not going to**
16 **offer an opinion, then those questions aren't relevant**
17 **to you.**
18 A. Are you going ask me about them?
19 **Q. It depends. Are you going to testify about**
20 **them? Are you intending to talk about --**
21 A. If she's not going to ask me about them and
22 you're not --
23 MS. GURLAND: No. I'm going to represent that
24 we are not going to -- he can talk about the things that
25 are in his report, because there are certain things that

287

1  he talks about about SWF files and GIF files that touch
2  on it, but in terms of vouching for those particular
3  advertisements and offering an expert opinion that was
4  not done in his report, I will not seek to have him do
5  that in the future.
6  MR. ARENSON: Okay. And the only thing I need
7  to clarify is there mention in his report about the SWF
8  file. There is a brief discussion of that. There is no
9  discussion of the GIF files.
10 A. There actually is. I think that I can tell you
11 to the extent that my report mentions it -- and all I'm
12 saying -- and the only thing I'm saying is that I would
13 never rely on a single GIF or SWF file to conclude what
14 an entire website of network of websites does. And
15 that's the end of my opinion on that.
16 BY MR ARENSON:
17 **Q. But these aren't part of a website. These are**
18 **banner ads that ran on the Value Click Media Network.**
19 **So are you intending to offer an opinion on these**
20 **banner ads?**
21 A. Does the Media Click Value Network, was it their
22 websites -- did these banner ads appear on websites that
23 were under their control where the entire code behind
24 the website, where the ad appeared, that website was
25 under Media Click's control?

288

1  **Q. These ads appeared on thousands, if not tens of**
2  **thousands, of websites in the Value Click Media Network,**
3  **and we actually have the code that was used to**
4  **display it.**
5  A. But the code from the website -- because
6  certainly you can have conditional code on a website
7  that can be based on cookies.
8  **Q. See, this is what we are going to need to get**
9  **into if you are going to offer expert testimony on this.**
10 **You haven't yet and there is all kinds of questions**
11 **about business logic on the Value Click server and the**
12 **Media Click server. Believe me, it is complicated.**
13 **And so far you haven't dove into it, but if you**
14 **are going to, I need to ask you a whole series of**
15 **questions, and I just need to know if you're planning to**
16 **offer testimony on this product. I will be happy to**
17 **take Carolyn's word for it or your word for it.**
18 MS. GURLAND: He will not be offering testimony
19 on anything other than -- other than what is in his
20 report. So to the extent that he is -- how it is
21 phrased in his report, he might want to testify about
22 that, but there is -- he was not -- I will represent to
23 you -- and we'll do it this way, and if you'd like you
24 can add Colleen because now I will make sure that he
25 can't legally do it, and I will tell you that this

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

289

1  Exhibit 13 is not anything that's listed in the
2  materials that he relied upon in rendering his expert
3  opinion in his report.
4      These were not materials that he considered or
5  relied upon in reaching his conclusions, and he is not
6  going to come up with new opinions that were not
7  disclosed to you during the discovery phase of
8  this case.
9      MR. ARENSON: I think that answers it.
10     BY MR. ARENSON:
11     Q. The only remaining part -- and I'm sorry to be
12  difficult here -- is that actually is an exhibit created
13  by the FTC. Those files were included, I believe, in
14  this disk that you have listed. You have listed one of
15  the things you considered is the Mediaplex disk, which
16  has hundreds of thousands of files on it, I think, a lot
17  of files. And these files are part of that gigantic
18  mass of files.
19     MS. GURLAND: Okay.
20     BY MR. ARENSON:
21     Q. In your report you haven't made any discussion
22  of the targeting of these ads or how they were displayed
23  or the business logic, and there are other expert
24  witnesses in this case who have waded into this area. I
25  just need to know whether you are intending to wade into

290

1  it area or not. You haven't in your report. Are you
2  intending to offer new additions to your testimony going
3  forward?
4      A. I don't think that I can, because I don't have
5  the code. I don't have the business logic. I don't
6  have the materials to be able to do that.
7      Q. Fair enough.
8      Okay. Last topic on my outline.
9      MR. ARENSON: Let's go off the record for a
10  minute.
11     (An off-the-record discussion was had.)
12     MR. ARENSON: All right. Back on the record.
13     BY MR. ARENSON:
14     Q. The last topic for today, from us, is page 17 of
15  your report. This is Internet marketing and FTC
16  e-mails.
17     A. Okay. Is that like the last page?
18     Q. I don't think so. Nope. It is kind of in the
19  middle.
20     A. All right.
21     Q. Okay. So you state in here that it is not
22  possible to conclude with reliability that the subject
23  ads are the same as the ads placed by Ms. Ross or to
24  conclude that she was in any way responsible for the
25  functioning of the ads.

291

1      And you proceed to give A through J and these
2  are the reasons, the bases, for your conclusion, and I
3  want to go through these one by one.
4      So for "A" you say there are hundreds of
5  thousands, if not millions, of PCs and servers that have
6  been compromised; right?
7      A. Certainly.
8      Q. Okay. Is there any evidence in your possession
9  that a compromised PC or server was involved in this
10  particular case?
11     A. There is no forensics at all, and that's the
12  point that I'm trying to make with all of these. Is
13  that when -- for example, I got contacted by an attorney
14  talking about whether or not his client sent an e-mail
15  to somebody. He was accused of sending the e-mail and
16  he says he didn't send it. And what the attorney wants
17  to know is did he send it.
18     The first thing I do is say do you have a
19  forensic image of his computer? We can look at the
20  forensic image of his computer and we can ascertain if
21  it is there. If it is not there, it doesn't mean it was
22  never there, but certainly if we find it, that means
23  that he did send it. I'm all about like -- this is a
24  very difficult situation. Maybe I don't fully
25  understand what's going on but the forensics is an

292

1  important side of things.
2      Q. And just to get back to my question: Do you
3  have any evidence that you can point me to that there
4  was a compromised PC or server involved in this
5  particular case? And if you do, let me know.
6      A. Neither supporting nor not supporting it.
7      Q. And then you say in "B" that time on slave
8  networks of computers can be purchased on the black
9  market. Can you point me to any evidence of which you
10  are aware that a slave network of computers was involved
11  in this particular case?
12     A. I can't point to it one way or the other.
13     Q. Next you say browser highjacking by malware was
14  common. Can you point me to any evidence of which you
15  were aware that browser highjacking was involved in this
16  case?
17     A. I have no evidence suggesting either yes or no.
18     Q. "D" you say PCs were easily infected in 2004.
19  Do you have any evidence that an infected PC was
20  involved in this case? Anything you can point me to?
21     A. Just statistically speaking, if we were to look
22  at the numbers of how many computers were involved,
23  there may be a certain -- and that's probably true with
24  any of these. You can do statistical sampling. That's
25  not my forte.

73 (Pages 289 to 292)

293

1  Q. But any evidence you can point me to
2  specifically in this case?
3  A. I think statistical evidence can be pretty
4  powerful.
5  Q. Do you have any?
6  A. I can get some. I think I mentioned it here,
7  hundreds of thousands, if not millions. I don't have
8  the exact numbers.
9  Q. So any evidence you can point me to at this
10  point today?
11  A. Not right at this moment, but I would certainly
12  be happy to undertake that research. Again, time was
13  very limited on this report.
14  Q. And when you prepared this report, did you have
15  any evidence?
16  A. I had done the research on the Internet and
17  looked up like statistically where that -- I can't
18  remember the exact sites I looked at. It was likely
19  from Symantec or something like that that listed a
20  number of infections in certain years. And I have seen
21  the evidence. I have gone to lectures and I have --
22  there is a company -- I can't remember the name of it --
23  security expert, it was -- you know, put graphs up on
24  the board showing the number of infections in PCs
25  worldwide, showing where they were phoning home to.

294

1  And I would have to look for that and access it
2  to demonstrate and show -- because there are people that
3  have done the homework on that.
4  Q. Would you ever be able to definitively prove to
5  me that an infected PC was involved in this case?
6  A. I would have to hire -- we would have to have
7  another expert on that, because the other expert would
8  have to show and explain through statistical reasoning
9  why something is a statistical probability.
10  Q. Understood. So as of right now you don't have
11  the evidence.
12  A. No.
13  Q. Now, E through I are all about affiliates. Can
14  you point me to any evidence that affiliates were
15  involved in this case?
16  A. No. This was five years ago -- or four years
17  ago that this went on. This was the Internet as it
18  existed. I don't know. I don't think that I'm saying
19  that -- I'm just making statements about the conditions
20  in the environment at the time when this happened.
21  Q. Is it safe to say that these are theories about
22  what could have happened?
23  A. If the evidence were presented to me -- yeah,
24  that's safe to say.
25  Q. These are theories about what could have

295

1  happened.
2  A. Yes.
3  Q. But you don't have any hard evidence to support
4  these theories at this point.
5  A. That was my litany, was a complaint that I don't
6  have that. That's what I want to see.
7  Q. Right.
8  A. And I'm not seeing it and I wish it would be
9  given to me so that we could say, oh, this is not what
10  the problem was. We don't know.
11  Q. Right. So for any of your theories, A
12  through J, can you point me to any evidence that would
13  prove them based on what you know right now?
14  A. That's a real broad question, and let me just
15  maybe break that down. When you say "evidence," you
16  mean evidence pertaining to this particular -- like
17  specific computers where we would be able to say that
18  this particular affiliate was fraudulent or not?
19  Q. Right. You have come up with a bunch of
20  theories as to what could have happened, but what I'm
21  asking is do you have any evidence to back these up, or
22  is this just this could have happened but I can't say
23  for sure whether it did or not?
24  A. That would be an accurate statement.
25  Q. Okay. Give me five minutes to just go over my

296

1  notes but we very well may be done.
2  MR. ARENSON: Off the record.
3  (A brief recess was taken.)
4  MR. ARENSON: Okay. Back on the record. FTC
5  has no further questions. Mr. Ellis, thank you very
6  much for your time today.
7  THE WITNESS: You are welcome.
8  EXAMINATION
9  BY MS. GURLAND:
10  Q. Some follow-up questions. Mr. Ellis, when you
11  started the examination today, you talked about some of
12  your global concerns that you had with the -- all of the
13  forensic methodology in the case, and I was just
14  wondering if you wanted to just expand on what problems
15  do you feel that -- I mean, relatively briefly, what are
16  the main problems that you feel exist in this case which
17  you were referring to when you said that?
18  A. I really feel there is no strong forensic
19  foundation with respect to what forensics really mean,
20  which is all about preservation and knowing where things
21  came from and when they were in play and having images
22  of the machines that were involved at the time, you
23  know, when the behavior occurred.
24  This is such -- the scope of this is so large
25  that understandably rewinding the Internet to the time

74 (Pages 293 to 296)

297

1  when this happened would be very difficult.
2  Q. When you say "this," you mean when the products
3  that are the subject of this case were evidently
4  marketed and sold? Is that the "this"?
5  A. Yes. And it also refers to the entire
6  affiliate -- the network, the affiliates, the people
7  presenting the ads, the methods they were using to sell
8  the software, everything that's involved in that.
9  It would be really -- it would really be
10  beneficial to see more information about that and to
11  have been given that information up front as opposed to
12  having to, you know, look for it, hunt for it, try to
13  figure out what the other guy was looking at, you know,
14  trying to do an examination almost in the dark.
15  Q. Okay. And as you sit here, given the way that
16  you were -- that the -- say the binary programs that we
17  have been talking about, the ones that you have in your
18  report, the WinFixer and the WinAntivirus, the programs
19  that you analyzed in your report, given the way that
20  those products were delivered to you, do you have any
21  doubts about whether or not they were the actual
22  products that IMI ever sold to customers? Do you know
23  that they were or they weren't?
24  A. I believe that in my report -- can I see my
25  report? These images that I used to access these

298

1  files -- you know, here we have one that says file
2  acquired 03/03/2010, that's -- and it was really just
3  a -- just a copy of what -- it appeared to be a copy of
4  a drive.
5  And, just to be clear, a forensic copy of a
6  drive is not a forensic image of the original, so it is
7  kind of like we are getting away from first principles
8  where somebody creates a copy of a computer and all the
9  file-created dates are in sequence, that pretty much
10  demonstrates that this is a copy that was made.
11  And then you take a forensic image of that copy
12  that was made, that doesn't make it a -- that doesn't
13  make it forensic just because somebody used EnCase to
14  create the copy. They may as well have just created a
15  copy of the drive and sent to it me. I'm not sure why
16  it was a forensic image.
17  You know, I certainly spoke to that in my
18  report. When you are examining what's going on and when
19  people have -- an infection is happening with their
20  computer, you would want to be able to capture that,
21  capture files -- when you are capturing files from the
22  Internet from external forces -- and this happens in law
23  enforcement all the time. They use a version of
24  WireShark. They use a geo-location tool built into
25  WireShark that's built specially for law enforcement and

299

1  that helps determine where the files are coming from.
2  Then they get the IP address and they trace it
3  back to the owner of that IP address and then they
4  execute a search warrant. And this is the world I'm
5  used to working in, and this is vastly different in that
6  that doesn't appear to have happened, and I'm not sure
7  of the origin of the files that I have looked at.
8  I have done what I can do to examine the files
9  in ways that I know how to examine them, but to the
10  degree that I can speak to the accuracy, I can't speak
11  to that at all.
12  Q. Okay. And there was some questions about the
13  lack of testing of some of the free products. For
14  example, WinFixerFree and DriveCleanerFree. And just
15  for clarity, I think you had indicated those were
16  products you would like to test.
17  Has there ever been any instruction from counsel
18  not to test the free version of WinFixer and
19  DriveCleaner? Or, to the contrary, do you have a
20  recollection that that would be something that counsel
21  would have liked to have done if there was time?
22  A. I think that was something we would have liked
23  to do, but my recollection is that we didn't do it
24  because we didn't know which ones he was looking at
25  because we did not receive -- the Johnson report did not

300

1  list MD5 hashes, and then I had to give my report, and
2  then in his rebuttal report he came back and gave the
3  MD5 hashes, which was -- I won't speak to that.
4  Q. Were these MD5 hashes -- I will represent to you
5  that there were not MD5 hashes in the Johnson second
6  report, the rebuttal report, either for WinFixerFree or
7  DriveCleanerFree.
8  A. I don't believe there are.
9  Q. I have no recollection of MD5 hashes. Maybe I
10  shouldn't represent it without seeing it. I don't
11  remember for those two that there were MD5 hashes.
12  MS. GURLAND: So I guess since we have talked
13  about doing other tests, I guess I would wonder if there
14  were WinFixer -- or a WinFixerFree product and a
15  DriveCleanerFree product for which he has an MD5 hash,
16  would it be possible for him to provide us the ones that
17  he tested so we can run the same --
18  MR. ARENSON: The WinFixerFree product is the in
19  the report. It has an MD5 hash.
20  MS. GURLAND: I need to see the report.
21  MR. ARENSON: The rebuttal report?
22  MS. GURLAND: Yes.
23  THE WITNESS: The hashes that are in here are
24  for ErrorPatrol, PerformanceOptimizerFree, and
25  WinAntivirus2005ProScannerSetup.

75 (Pages 297 to 300)

301

1    MS. GURLAND: So, again, I would -- I don't -- I
2 continue not to see anyplace in the Johnson report where
3 the hash values have been provided for the WinFixer or
4 DriveCleaner free versions, nor do I see those products
5 as even being products that he tested.
6    MR. ARENSON: If you look at -- there is no
7 page numbers. That makes it difficult. But if you
8 start at the last page and work backwards, one, two,
9 three, four, five, six pages back, you'll find the MD5
10 hash for WinFixer2005ScannerSetup.
11    MS. ROBBINS: On the bottom.
12    THE WITNESS: This is the rebuttal report.
13    MS. GURLAND: Okay. So in the rebuttal report
14 there is one for WinFixer -- I now see it -- and there
15 is one for DriveCleaner as well? Is that accurate?
16    MR. ARENSON: That I would have to check.
17    MS. GURLAND: Okay.
18    BY MS. GURLAND:
19    Q. Anyway --
20    A. Did we see an MD5 hash for the WinFixerFree?
21    Q. Yes. But not one for the DriveCleaner.
22    Now that there is an MD5 hash, is there any --
23 has there ever been any conversation between you and
24 counsel that indicated that they wouldn't want the free
25 products of those tested?

302

1    A. No, I don't recall any -- anyone saying don't do
2 that, no.
3    Q. Okay. And, indeed, with respect to any of the
4 products, there was no direction to tell you what to do;
5 is that right? That you couldn't do something?
6    A. Right.
7    Q. Because -- and, just to be clear, if counsel
8 would have told you, here's a hard drive, and I'm
9 instructing you you may not run those tests, would you
10 have agreed to the engagement?
11    A. Probably not.
12    Q. Okay. When we were talking about some of the
13 different registry keys and prefetch keys and cookie
14 keys, I made a note that you had made a comment that
15 software can't differentiate semantically and does a
16 text search, or something along those lines.
17    And I was wondering, could you explain exactly
18 what you mean by that? And when you say "software," did
19 you mean just the products that you looked at or do you
20 mean software generally?
21    MR. ARENSON: Objection to Windows prefetch
22 keys. It is nonsensical.
23    A. I think that what I was referring to was that
24 there are certain areas of the computer where it is a
25 common practice and custom to simply keep those areas

303

1 clean and to remove entries that have a certain feature
2 to them as opposed to looking at the exact reason or the
3 ancestry of the item, which may or may not be possible
4 to figure out and you may have to have an extremely
5 large database to find that out.
6    So that's really what I was talking about there,
7 was just that there is areas it is custom and practice
8 to keep clean and that the softwares that keep those
9 areas clean are completely -- again, the word agnostic,
10 as to what's in there and they just get rid of it.
11    BY MS. GURLAND:
12    Q. So when you say the software that does that,
13 what software are you aware of that cleans out items in
14 the registry and is agnostic about what it finds there?
15 What products are you aware of that operate like that?
16    A. Well, I mean, like CCleaner is one of my
17 favorites and I have mentioned that a lot today. That
18 would be one that cleans that stuff out and it just --
19 it doesn't say that it is bad or good. It just says,
20 you know, this stuff just needs to go away, and then it
21 gets rid of it.
22    Q. And do you know, as you sit here, the
23 advertisements that CCleaner and other security products
24 that people would refer to or that you might refer to as
25 standard in the industry, are you aware of the ads that

304

1 that they ran in the 2005 through -7 time period? Do
2 you know all the ads that they ran?
3    A. My recollection would be the software at that
4 time was -- security software in general was very
5 adamant about making sure you don't have threats on your
6 computer. I don't recall with specifics anything in
7 particular.
8    I do know that the security -- the whole ad
9 environment at that time with respect to security was
10 trying to get the word out and trying to get people to
11 download products that would clean their computers of
12 these problems that Windows XP had, and then Windows
13 Service Pack 2 came out, which was a giant leap forward
14 for Microsoft in terms of security in that they
15 acknowledged that there were problems with Windows XP,
16 and Service Pack 2 installed a whole new level of
17 security for Windows.
18    Q. And the products that you would -- the security
19 software products that you would categorize as being
20 standard in the industry in 2005 through 2007, are you
21 aware of any of those products running ads that alerted
22 that there were errors or even serious or severe errors
23 on a customer's computer?
24    A. A lot of those products did offer on-line
25 scanning tools. I know that Panda was one that offered

76 (Pages 301 to 304)

305

1  an on-line scanner that warned you. And that was one of
2  the largest antivirus firms.
3       I'm not sure today what their standing is, but I
4  was running the Enterprise version of Panda at a
5  network, and I basically found it because one of the
6  other consultants I worked with said, you know, this is
7  a -- you can get onto this website and run the scanner
8  and it will tell you if you have infections and it will
9  can clean them off.
10 **Q. And with respect to the 2005 through 2007 period**
11 **and other security software products that were**
12 **considered standard in the industry, are you aware of**
13 **instances in which those security products issued**
14 **warnings to customers based on things that the scan**
15 **would have found in the customer's computer?**
16      A. Well, I certainly did see warnings from Panda
17 when I scanned computers when the computer was infected,
18 but it was with respect to viruses. It believed the
19 computer had viruses, which that was the reason I was on
20 the site in the first place, because the computer was
21 behaving in a way that I knew it had a virus, lots of
22 RAM being eaten up, lots of disk activity.
23 **Q. In terms of registry cleaner security software**
24 **products in the 2005 to 2007 time frame, do you have any**
25 **recollection of what those ads looked -- what ads, if**

306

1  **you have seen any, looked like?**
2       A. No, I don't have any specific recollection. I
3  do know that l did see a lot of ads for registry
4  cleaners and that they would advertise the fact that
5  having corrupt or invalid registry entries would cause
6  problems. It does bring to mind one -- Norton Disk
7  Utilities, which I think later became part -- you know,
8  Norton became Symantec or Symantec bought Norton. I'm
9  not sure of the -- I'm not sure of the business side of
10 things, what happened there.
11      But they did have a tool called Norton Disk
12 Doctor that would purportedly clean registry problems
13 and it was advertised as being something that would find
14 severe errors, and l did run it on my computer and it
15 did say I had severe registry errors. I don't recall
16 what the errors were but they were ones that would cause
17 problems according to the tool.
18      And I ran the tool and l did not have a good
19 result with that tool. The computer never worked again
20 after that. So the registry is a very complex thing and
21 even big companies like Norton -- it is tough. It is a
22 real tough thing. The Microsoft Windows box is very
23 complex and a lot of stuff is very much removed from
24 where it used to be.
25      Things have gotten a lot more complex. There is

307

1  lots of layers now and data streams that are being
2  accessed, and then I think it was in -- I don't want to
3  go back in time too much here.
4  **Q. Okay. Now, I'm going to refer you to certain**
5  **pages in the rebuttal report of Kevin Johnson, which is**
6  **Exhibit 12 for the record. And specifically I want to**
7  **show you two of the warning boxes in Mr. Johnson's**
8  **report that he discussed; one for ErrorPatrol, which is**
9  **on the sixth page of his report. And it starts at the**
10 **top, 318 severe system -- or 318 severe errors detected;**
11 **do you see that?**
12      A. Yes.
13 **Q. Okay. And looking at that warning box, can you**
14 **show me -- can you show me where on that warning box**
15 **that you see that ErrorPatrol is telling the user that**
16 **every -- that a single file by itself causes -- is very**
17 **likely to cause further problems if not fixed**
18 **immediately?**
19      **Where does it say that just one file by itself**
20 **will cause -- where does ErrorPatrol tell the user that**
21 **just one file by itself is very likely to cause these**
22 **things, or does it say that at all?**
23      A. It doesn't say that.
24 **Q. What does it say?**
25      A. It says that the errors found on your computer

308

1  are very likely to create further problems if not fixed
2  immediately.
3  **Q. And the errors, is that referring to 318 severe**
4  **system threats?**
5       A. Yes.
6  **Q. So does ErrorPatrol then take any -- make any**
7  **particular representation about any single one of the**
8  **threats, or does it rather express a warning about all**
9  **of the threats together that it found?**
10      A. It is talking -- this is likely a system
11 variable that just is put into there and this text would
12 be the same regardless of that number, because you can
13 even see where it is a slightly different font.
14 **Q. Right. But my question to you is is it**
15 **differentiating between individual files that it found**
16 **or is it telling you that the total number of files are**
17 **the threat that's very likely to create further**
18 **problems?**
19      A. I don't believe the software differentiates.
20 **Q. Well, you can see -- I mean, from what it says,**
21 **if we are talking about -- we are not talking about the**
22 **functionality of the software now. We are talking about**
23 **advertisement that's shown. Does the advertisement tell**
24 **the user that it is just one file or is it talking about**
25 **a group of files together?**

77 (Pages 305 to 308)

309

1    MR. ARENSON: I'm going to object to the extent
2  Ms. Gurland is asking the witness to read and interpret
3  something that is readable and interpretable by
4  everyone. There is no special expertise that Mr. Ellis
5  has in interpreting the English language, I think, so I
6  think this entire line of questioning is improper.
7    MS. GURLAND: Your objection is noted.
8    BY MS. GURLAND:
9    Q. And you can answer, because we have had a great
10  deal of testimony about this particular language all day
11  long.
12   A. The line of text doesn't say -- it doesn't come
13  out and say any one of these can cause a problem. It is
14  saying the errors. So I believe it is assuming there is
15  going to be plural errors and more than one.
16   Q. And then turning to the PerformanceOptimizer,
17  which is four pages further from there -- and not the
18  Portuguese one, sorry. I will go with the WinFixer and
19  the page that starts, 120 severe errors detected.
20   Same question. Is WinFixer -- is this
21  advertisement -- or this advertisement that we are
22  looking at here indicating that it is just one file
23  that's going to -- that's very likely to cause further
24  problems or is it referring to a number of files?
25   A. I don't think that's what it is trying to

310

1  say, no.
2    MR. ARENSON: Objection; lacks foundation as to
3  what the program is trying to say.
4    MS. GURLAND: Okay.
5    BY MS. GURLAND:
6    Q. I'm not asking about the functionality of the
7  program. I'm just asking about the advertisement and
8  the same advertisement that we have talked about today.
9    A. My answer is the same; that it is not coming out
10  and saying there is just one threat that would cause a
11  problem.
12   Q. Okay. We talked a little bit about antivirus,
13  the -- your analysis of WinAntispyware and WinAntivirus,
14  the free unpaid versions of that, earlier this
15  afternoon; do you remember that testimony?
16   A. Yes.
17   Q. Okay. And one of the -- one of the topics was
18  the things that you were able to do and what you weren't
19  able to do to analyze those antivirus programs; do you
20  remember that?
21   A. Yes.
22   Q. Or antispyware in this case.
23   A. Sure.
24   Q. Can you explain why it is not possible in the
25  instance of, say, WinAntivirus, why couldn't you go and

311

1  figure out what file it was accessing now in 2010 or
2  2009 when you did it?
3    A. Well, the server that it was talking to isn't
4  there anymore.
5    Q. So it is not a problem in your methodology,
6  is it?
7    A. No.
8    Q. Is it an impossibility to access a server that's
9  gone?
10   A. Without the server, it is -- you can't access a
11  server that's not there.
12   Q. We talked a little bit about the test files, two
13  test files, a trojan test file and the -- I don't know
14  if we talked about it with the name, but is the other
15  file called an ICAR file?
16   A. Yeah.
17   Q. Were those -- what were those files -- if you
18  know, what were -- the simulated trojan file and the
19  ICAR file, what were they designed to do, if you know?
20   A. I think the purpose of them is to allow you to
21  test the functionality of maybe -- you know, like for a
22  developer testing the functionality of his software, he
23  would put the entry so that he doesn't have to work with
24  real viruses to develop it. He would be able to create
25  a signature database and maybe his signature database --

312

1  the developer's signature database would have just one
2  entry or two entries for these viruses and then the
3  purpose would be to run his tool and make sure he can
4  find these test files on the system.
5    Q. Is there a reason to use these test files on the
6  system rather than to just go ahead and put real viruses
7  on your system?
8    A. It is dangerous to put viruses on your computer.
9  They can be activated -- yeah, inadvertently activated.
10  That would not be good, and it is not something -- for
11  the same reason you don't want to play around with
12  viruses in a laboratory.
13   Q. Right. So in your experience with computers, is
14  the use of an ICAR file or the simulated trojan file to
15  evaluate antivirus software a valid exercise?
16   A. It is a valid exercise.
17   Q. And the -- we have had a number of discussions
18  today about some other tests that you would like to run
19  if you had more time; is that right?
20   A. Yes.
21   Q. And other things you would like to follow up on;
22  right?
23   A. Yes.
24   Q. And there were areas of the registry that you
25  said that you wanted to learn more about what those keys

78 (Pages 309 to 312)

313

1   definitely did; is that right?
2      A. Sure.
3      Q. Let me ask you, Mr. Ellis, does any of these
4   things that you said you would like to follow up on, any
5   of those things that you said you would ideally like to
6   do, any of those things change the opinions that you
7   have expressed in your report about the -- the fact that
8   the programs that you tested functioned in -- you know,
9   functioned appropriately, as you have said, or
10  functioned as operated -- I think we have changed the
11  term to operated -- as other products that were standard
12  in the industry?
13     A. I think with respect to the antispyware one, I
14  would like to be able to test that one further.
15     Q. Okay.
16     A. With the antivirus one, I believe that if I were
17  to able to get my hands on the database of viruses from
18  2006, and if that was an appropriate thing for me to
19  do -- which they may be contraband, I'm not sure -- that
20  would be an exercise that would be -- would further, I
21  think, support my testimony.
22     Q. But my question was, putting aside the fact that
23  there are things you say that you would do to even
24  become more comprehensive or more clear, does any of
25  that that you have said change the opinions that you

314

1   have rendered in the expert report that you have?
2      A. No, I don't think so.
3      Q. You don't think so?
4      A. No, it doesn't change -- the opinion that was
5   asked of me and the opinion that was presented in the
6   report were different, and it had a different spirit
7   behind them, what I was trying to show with the
8   antispyware ones, so my opinion does not change at all.
9      The software does not make claims of spyware
10  being there when spyware is not there.  That was the
11  point of that exercise and my opinion of -- my results
12  from that exercise have not changed.
13     And, likewise, with the antivirus, the point of
14  the exercise was to demonstrate that it functioned; that
15  it could find a test virus and it did.  At that level it
16  is a functioning piece of software.  It is not what we
17  would call vaporware.
18     Q. So is it fair to say you stand by your report?
19     A. I stand by my report.
20     Q. Apart from the revision, I think, to the --
21  saying that the government endorsed, but apart from that
22  you stand by the content of your report; is that
23  accurate?
24     A. Yes.
25     Q. Okay.  And then lastly, Mr. Ellis, I want to

315

1   turn to the elusive page 17 of your report in which we
2   talked about your certain conclusions A through -- I
3   have got the wrong one -- A through J, the last topic.
4      A. Yes.
5      Q. Okay.  And then directing your attention to your
6   conclusion in that section, two conclusions, that I want
7   to talk to you about in particular.
8      First, "It is my opinion that it is not possible
9   to conclude with reliability that the subject ads are
10  the same as the ads placed by Ms. Ross"; do you see
11  that?
12     A. Right.
13     Q. And, "It is not possible to conclude with
14  reliability that she was in any way responsible for the
15  functioning of the ads"; do you see that?
16     A. Yes.
17     Q. Okay.  Could you tell me -- and tell us all --
18  what information you would need in order to make those
19  two conclusions with reliability?  What are the things
20  that you would need to -- what is the information you
21  would need to have to make those conclusions with
22  reliability?
23     A. I would want to see an e-mail perhaps from
24  Ms. Ross to whoever was placing -- you know, to whoever
25  was controlling the ad content saying change this or

316

1   something to show that she was involved.  And my
2   understanding -- correct me if I'm wrong -- is that she
3   submitted an ad and that ad changed.  I have no evidence
4   that tells me that she's the one that changed it.
5      I couldn't see anything that allowed me to
6   conclude that she's the one that changed it.  Based on
7   an e-mail, it was her response that she would attempt --
8   research and attempt to fix the problem.  And, again,
9   from what I have, it is a single thread of e-mail, it is
10  hard to draw any comprehensive conclusions about what is
11  going on.
12     Q. What type of forensic evidence would you want to
13  see to make a conclusion as to who it was that was
14  changing the content of an Internet ad?  What would you
15  need to see?
16     A. There would certainly be FTP logs that would be
17  on the server maybe; FTP logs that were preserved from
18  the time period that could say, okay, at this time we
19  see that this ad was loaded, this is the one that
20  Ms. Ross gave us or that Ms. Ross loaded, and then at
21  this time it changed and became something and, you know,
22  you could see that in the FTP log.
23     I don't know the -- I don't know the method
24  behind how banner ads were transmitted to these
25  companies, so, again, I don't know and that's

79 (Pages 313 to 316)

317

1  information I don't have, I have not been given.  I
2  can't -- and this is where I come up with it is not
3  possible to conclude with reliability -- with what I
4  have, I can't conclude with reliability with any
5  reasonable degree of forensic certainty.  I can't say
6  that anything happened or how it happened.  All we can
7  kind of do is look at the mess that we have here.
8      MS. GURLAND:  Okay.  Thank you.
9      MR. ARENSON:  Give us just one minute.  I think
10  we have a couple of questions on redirect.
11      (A brief recess was taken.)
12      MR. ARENSON:  Mr. Ellis, we take it back.  We
13  are done.  We'll waive signature.
14      (Whereupon, at 4:28 p.m., the deposition was
15  concluded.)
16
17
18
19
20
21
22
23
24
25

318

1  C E R T I F I C A T I O N   O F   R E P O R T E R
2  DOCKET/FILE NUMBER: 08-CV-3233
3  CASE TITLE: FTC v. INNOVATIVE MARKETING, INC., et al.
4  DATE: September 30, 2010
5
6      I HEREBY CERTIFY that the transcript contained
7  herein is a full and accurate transcript of the notes
8  taken by me at the deposition in the above cause taken
9  by the FEDERAL TRADE COMMISSION to the best of my
10  knowledge and belief.
11          DATED:  10/11/2010
12
13
14          LYNETTE J. NEAL,
15          CSR-RPR
16
17
18
19
20
21
22
23
24
25

80 (Pages 317 to 318)