IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FEDERAL TRADE COMMISSION,  *

  PLAINTIFF,  *

   V.  *  CIVIL ACTION NO.: RDB-08-3233

KRISTY ROSS, *INDIVIDUALLY AND* *
*AS AN OFFICER OF INNOVATIVE*
*MARKETING, INC.*,  *
  DEFENDANT.

  *

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

The Federal Trade Commission ("FTC") brought this case under Sections 5(a) and 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a) and 53(b), against a group of corporate entities and individuals for alleged deceptive conduct in connection with the sale of software. Specifically, the FTC alleged that two companies, Defendants Innovative Marketing, Inc. ("IMI") and ByteHosting Internet Services, LLC ("ByteHosting"), operated as a common enterprise (the "IMI Enterprise" or "Enterprise") to conduct a massive "scareware"[1] scheme that marketed a variety of computer security software via deceptive advertising. The FTC alleged that several of the companies' officers and directors, namely, Sam Jain ("Jain"), Daniel Sundin ("Sundin"), Marc D'Souza ("D'Souza"), Kristy Ross ("Ross"), and James Reno ("Reno"), directed or participated in the

---

[1] As noted in the FTC's Complaint, "scareware" is a common term that refers to a software-driven, Internet-based scheme that "exploits consumers' legitimate concerns about Internet-based threats like spyware and viruses by issuing false security or privacy warnings to consumers for the sole purpose of selling software to fix the imagined problem." Compl. ¶ 15, ECF No. 1.

IMI Enterprise.  The FTC also named Maurice D'Souza, the father of Marc D'Souza, as a defendant in this suit.  Of the original eight defendants, four have settled with the FTC, and three are in default and have had judgments entered against them for failure to appear and participate in this litigation.  Defendant Kristy Ross is the only remaining defendant at issue.[2]

Jurisdiction over this case is based on the United States' status as a plaintiff under 28 U.S.C. § 1345 and federal question jurisdiction under 28 U.S.C. § 1331.  After a two-day bench trial from September 11 to September 12, 2012, this Court has carefully considered the exhibits introduced into evidence, the testimony of the witness who testified in person, the testimony of the witnesses presented by deposition, the Proposed Final Pretrial Order, the written submissions of the parties, and the oral arguments of counsel.  The following constitutes this Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.  The accompanying Order enters Judgment in favor of Plaintiff Federal Trade Commission against Defendant Kristy Ross individually, and as an officer of Innovative Marketing, Inc.

## I.    BACKGROUND

The FTC filed the present action on December 2, 2008 against Defendants Innovative Marketing, Inc. ("IMI"), ByteHosting Internet Services, LLC ("ByteHosting"), Sam Jain ("Jain"), Daniel Sundin ("Sundin"), Marc D'Souza ("D'Souza"), Kristy Ross ("Ross"), and James Reno ("Reno"), and later added Maurice D'Souza as a defendant.  After a hearing was held on December 12, 2008, this Court entered a Preliminary Injunction that served to, *inter alia*, prohibit Defendants from continuing the alleged deceptive business

---

[2] While she has been served and has retained counsel, she has failed to answer and respond to any discovery requests and to appear for trial.

activities, freeze Defendants' assets, and compel Defendants to turn over certain business records to the FTC.  In February 2010, Defendants ByteHosting Internet Services, LLC, James Reno, Marc D'Souza and Maurice D'Souza settled with the FTC.  That same month, default judgments were entered against corporate Defendant Innovative Marketing, Inc., and Defendants Sam Jain and Daniel Sundin for failure to appear and participate in this litigation.[3]

Ultimately, the FTC filed a Motion for Summary Judgment against Defendant Ross. The sole count of the Complaint against her alleges that in the course of marketing, offering for sale, and selling computer software, she and her co-defendants misrepresented, expressly or by implication, that they had conducted scans of consumers' computers and detected security or privacy issues, including viruses, spyware, system errors and pornography.  The Complaint also alleges that since 2004 or earlier, Defendants had placed misleading advertisements for their software products with major Internet advertising networks, which serve as brokers that distribute advertisements to their website partners.  The advertising networks contracted with their partners to display the Defendants' advertisements across the Internet.  After the advertising networks, such as MyGeek, began to receive complaints, they stopped accepting Defendants' advertisements.  At that point, in 2007, Defendants began

---

[3] A criminal action was brought against Defendants Sundin, Jain and Reno in the U.S. District Court for the Northern District of Illinois in connection with their activities with IMI.  *See USA v. Bjorn Daniel Sundin, Shaileshkumar P. Jain, a.k.a Sam Jain, and James Reno*, Criminal Action No. 1:10-cr-00452.  This case was assigned to the Fugitive Calendar on June 7, 2012 with respect to Defendants Sundin and Jain.  Additionally, two other actions are presently pending against Defendant Jain.  First, he is charged with Failure to Appear After Pre-Trial Release in the U.S. District Court for the Northern District of California in a case where he was charged with Criminal Copyright Infringement, Trafficking in Counterfeit Goods, as well as Mail and Wire Fraud.  *See USA v. Shaleshkumar Jain, a/k/a/ Sam Jain*, Criminal Action No. EXE-09-00137.  Second, he was indicted on May 20, 2010 in the U.S. District Court for the Southern District of New York for International and Domestic Money Laundering with respect to a number of internet-based companies, including IMI, owned and operated by him.  *See USA v. Shaileshkumar Jain, a/k/a Sam Jain*, Criminal Action No. NRB-10-00442.

creating a number of sham Internet advertising agencies that duped advertising networks and commercial websites into accepting their misleading advertisements.   Toward this end, Defendants falsely represented that they were authorized to place advertisements, and they used sophisticated program coding that concealed the exploitative nature of the ads in order to gain approval for distribution from the advertising networks.   Once distributed and placed on popular Internet sites, the exploitative content of the ads was revealed to many of the consumers, who were thereupon redirected to the Defendants' websites that operated the bogus scans.

In her opposition to the FTC's Motion for Summary Judgment, Defendant Ross argued that she was merely an employee and not a "control person" at the company, she did not have the requisite knowledge of the misconduct at issue, and as a result she bore no individually liability under the Act.   On June 11, 2012, this Court denied the FTC's Motion for Summary Judgment and noted that despite the FTC's substantial evidence, it was unable, at this stage of the litigation, to conclusively determine "whether the FTC was entitled to summary judgment against Kristy Ross because to do so would require [it] to make credibility findings, inferences, and findings of fact that are more properly made in the context of a bench trial."   (Mem. Op. at 8, ECF No. 227).   However, the Court held that there was no genuine issue of material fact that Ms. Ross's co-defendants violated Section 5 of the FTC Act by making misrepresentations to consumers through Internet-based ads and software-generated reports that induced consumers to purchase their computer security products.   (Mem. Op. & Order, ECF Nos. 227 & 228; Ltr. Order, ECF No. 229).

Accordingly, a bench trial was scheduled.  Prior to trial, this Court found that the total amount of consumer injury calculated by the FTC ─$163,167,539.95─ was a proper measure for consumer redress in this case.  (ECF No. 246).[4]  Additionally, this Court issued a ruling in which it granted Defendant Ross's Motion *in Limine* to Preclude Application of an Adverse Inference because of her assertion of the Fifth Amendment privilege.  (ECF No. 254).  Pursuant to the same order, this Court denied Defendant Ross's Motion *in Limine* to Exclude Hearsay (ECF No. 241).  In this motion, Defendant Ross sought to exclude the out-of-court statements and documents made in connection with the lawsuit in Canada ("Canadian Litigation") in which Ms. Ross's co-defendants sued each other over the profits of IMI, the business at the center of the present case.  This Court held these statements and documents admissible under Rule 807 of the Federal Rules of Evidence.  Specifically, this Court determined that the statements were made by Innovative Marketing's high-ranking executives, and although they were not subject to cross-examination, they were made in anticipation that they would be evaluated and challenged in a court of law.  Moreover, the Court concluded that the challenged evidence was offered as evidence of a material fact and was more probative than other evidence that could reasonably be obtained as it related to the scope and nature of the alleged conspiracy, and served to illustrate a major element of the trial in this case—namely, the role Ms. Ross played while working at Innovative Marketing.  (Mem. Op. at 5, ECF No. 254).  As a result, the precise issues remaining in this

---

[4] This Order also denied Defendant Ross's Motion *in Limine* in support of calling Scott Ellis as an expert witness (ECF No. 236).  Having already determined that IMI was engaged in deceptive marketing, this Court found Mr. Ellis's opinion that advertisements placed by Ms. Ross were neither false nor deceptive to be irrelevant.  (Mem. Order at 4, ECF No. 246).

case concerned the extent of Defendant Ross's control over or participation in IMI's deceptive marketing practices, and her knowledge of these practices.

On September 11 and 12, 2012, a bench trial was held, and Defendant Ross was tried *in absentia*. Consistent with its prior rulings, this Court has not applied an adverse inference against Defendant Ross for electing not to appear at trial and for asserting her Fifth Amendment privilege against self-incrimination. During trial, the FTC called one witness: Bhaskar Ballapragada, president of AdOn Network, an advertising network formally known as MyGeek. The Defendant did not call any witnesses, but each party entered large volumes of documents into evidence.

This Court, having considered the evidence presented at trial and having reviewed the parties' pre-trial submissions, finds that Defendant Kristy Ross had authority to control the deceptive practices or acts of Innovating Marketing and that she participated directly in these deceptive practices. Additionally, the FTC has shown by a preponderance of the evidence that Defendant Ross had knowledge of the deceptive practices of Innovative Marketing, Inc. ("IMI") or that alternatively she clearly acted with reckless indifference and intentionally avoided the truth. As a result, Kristy Ross is individually liable for IMI's unlawful practices and judgment shall be entered in favor of the Federal Trade Commission ("FTC") against her. The FTC shall be awarded injunctive relief and monetary relief in the form of consumer redress and disgorgement. Specifically, Defendant Ross shall be permanently restrained and enjoined from the marketing and sale of computer security software and software that interferes with consumers' computer use as well as from engaging in any form of deceptive marketing. Defendant Ross shall also be jointly and severally liable with the co-

Defendants Innovative Marketing, Inc., Sam Jain and Daniel Sundin for the consumer redress amount of $163,167,539.95.

## II.   FINDINGS OF FACT

1. <u>Formation of Innovative Marketing, Inc. ("IMI") & the Canadian Litigation</u>

In November 2001, Defendant Daniel Sundin ("Sundin") started a business which he incorporated, in July 2002, as Innovative Marketing, Inc. ("IMI")[5] pursuant to the laws of Belize and with its headquarters in Ukraine.  The aim of the business was to develop and market online consumer products on an international platform.  In early 2002, Defendants Sam Jain ("Jain") and Kristy Ross ("Ross") were exploring new e-commerce opportunities for investment and collaboration.  At the time, Ms. Ross was romantically involved with Mr. Jain and had previously held positions in companies held by him.  In April 2002, Ms. Ross introduced Mr. Sundin, whom she had known since September 2000 through other business acquaintances, to Mr. Jain.  Ms. Ross and Mr. Jain were interested in joining forces with Mr. Sundin as they perceived IMI to have "tremendous growth potential . . . [but] felt it lacked the marketing expertise that [Ross and Jain] would be able to bring to the venture."  Jain Aff., Pl.'s Ex. 27 at 328, ¶ 3.  After several meetings, Mr. Jain and Mr. Sundin both agreed to participate in this new business venture and to take lead roles in it.  While the partnership agreement was never reduced to a writing, it was understood that Defendants Jain, Sundin and Ross would share in the profits of the business.  Both Jain and Sundin recognized that Ms. Ross had valuable marketing expertise and while her percentage of the profits was to be smaller than theirs, there was no disagreement that she would be entitled to certain

---

[5] It is important to note that the Defendants also used the name Globedat to refer to IMI.

percentages of IMI's profits.  Sundin Aff., Pl.'s Ex. 21 at 453-54, ¶ 7; Jain Aff., Pl.'s Ex. 27 at

330, ¶ 14 & at 402, 471-72; Marc D'Souza Aff., Pl.'s Ex. 24 at 146.

Upon joining IMI, Mr. Jain brought a number of employees with him.  Defendant

Marc D'Souza ("D'Souza") was one of these employees.  Mr. D'Souza worked as a sales and

marketing consultant to secure lucrative advertising and media buying deals and had been

trained by Ms. Ross and Mr. Jain.  At the time that IMI was being formed, Mr. D'Souza was

renegotiating his contract with Mr. Jain.  The finalized negotiations were then proposed to

Mr. Sundin who did not object.  According to these terms, Mr. D'Souza was to receive "1%

of the company's profits up to $200,000 a month and 20% of the company's profits in

excess of $200,000 per month."  Sundin Aff., Pl.'s Ex. 21 at 454, ¶ 8; Jain Aff., Pl.'s Ex. 27 at

330-32, ¶¶ 13-23.  Again, this agreement was not reduced to a writing, but a partnership was

formed between Defendants Jain, Sundin, D'Souza and Ross whereby each individual would

receive a share of the profits of IMI.  The shares were apparently not equal as Jain and

Sundin had made initial monetary contributions to the business which Ross and D'Souza

had not.  As of 2002 and until 2008, IMI was formed and engaged in the business of selling

web-based software such as antivirus software, anti-spyware software and registry cleaners

which were marketed through IMI-owned and maintained websites.  At trial the parties

agreed that IMI was a corporation which grew to employ over six hundred (600) employees

over several countries including, among others, the United States, Argentina, India and

Ukraine.

On December 29, 2006, Mr. D'Souza contacted Ms. Ross, Mr. Jain and Mr. Sundin

on behalf of Web Integrated Net Solutions, Inc. to inform them of the termination of their

joint venture.  Jain Aff., Pl.'s Ex. 27 at 475-78.  In January of 2007, Mr. D'Souza again contacted Defendants Jain, Sundin and Ross to inform them of the termination of approximately forty (40) advertising contracts.  *Id.* at 479.  Later that year, Defendants Jain, Sundin and D'Souza were involved in a lawsuit in Canada (the "Canadian Litigation"), in which Defendants Jain and Sundin sought to recover $48 million which Defendant D'Souza had allegedly embezzled from IMI.  While Ms. Ross was neither named in that litigation nor included in the Settlement Agreement, she was the only other person, apart from Defendants Jain, Sundin and D'Souza, to submit an affidavit in the case.  Ross Aff., Pl.'s Ex. 20; Settlement Agreement, Def.'s Ex. 2.  Mr. D'Souza also made an attempt to settle the case by giving Ms. Ross, Mr. Jain and Mr. Sundin percentages of the business.  In response to that proposal, Mr. Jain stated that "it was 'extortion for you [Marc] to hold hostage money belonging to me, Daniel & Kristy so as to force us to make a deal with you."  Jain Aff., Pl.'s Ex. 27 ¶ 43.  During the bench trial, Ms. Ross's counsel sought to explain her involvement in the Canadian Litigation by stating that at the time Ms. Ross had been romantically involved with Mr. D'Souza since 2006, and he had confided in her that he intended to "run off with the money."  Bench Trial, Sept. 11, 2012, ECF No. 255.  Despite the best efforts of her counsel, Ms. Ross has presented no evidence to that effect nor is her lawyer's argument evidence in this case.

2. The IMI Deceptive Marketing Scheme

This Court has previously held that the conduct in this case violated Section 5 of the Federal Trade Commission Act as a result of representations being made to consumers through Internet-based ads and software-generated reports that induced consumers to

purchase their computer security products. (Mem. Op. & Order, ECF Nos. 227 & 228; Ltr. Order, ECF No. 229). Specifically, the Defendants –both corporate and individual– developed a series of software advertisements, in the form of popups and warnings, purporting to discover malicious software ("malware") on consumers' computers and provide a "cure" at a cost ranging from $30 to $100, depending on the software involved. Essentially, these deceptive advertisements, some of which included sham "system scans," had the effect of convincing internet users that their computers contained malicious software, "illegal" pornography, or critical system errors, and that to fix these problems they needed the Defendants' repair software. The repair software sold by IMI included WinFixer, WinAntiVirus, WinAntiVvirusPro, WinAntiSpyware, Popupguard, WinFirewall, InternetAntispy, WinPopupguard, ComputerShield, WinAntispy, PCsupercharger, ErrorSafe, SysProtect, DriveCleaner, SystemDoctor and ErrorProtector. However, both the advertisements and the repair software were deceptive. In fact, the number of errors found on any given computer was pre-determined by the Defendants. Moreover, the Defendants sold scareware as these repair products did not in fact repair or clean consumers' computers. As a result, more than one million consumers purchased Defendants' products, and approximately three thousand customers filed complaints with the Federal Trade Commission ("FTC").[6] Consumer Compls., Pl.'s Ex. 40. Moreover, every major computer security vendor considered these products to be system threats.

---

[6] In addition, the FTC submitted fifty-three (53) sworn customer declarations detailing consumer interactions with forty-seven (47) of Defendants' products. Consumer Decls., Pl.'s Ex. 39.

3.  Defendant Kristy Ross's Role at IMI

Having already determined that a deceptive marketing scheme existed, the remaining issue before this Court and addressed at the bench trial was the extent to which Defendant Ross was involved in this marketing scam and could be held responsible.  After conducting a significant investigation into the IMI deceptive marketing scheme, Federal Trade Commission investigator Sheryl Drexler, now known as Sheryl Novick, specifically identified Ms. Ross as one of the "individuals [ ] responsible for the scheme."  Drexler Decl., Def.'s Ex. 1 at ¶ 3.

Defendant Ross worked at Innovative Marketing, Inc. from 2002 to 2008.  She was in charge of business expansion, sales and marketing, as well as product optimization.  Although IMI did not use formal titles until late 2005, from 2006 to 2008 she essentially performed the same functions but held the position of Vice President of Business Development.   She also intermittently replaced Defendant Sundin as Chief Operating Officer and Chief Technology Officer from 2004 to 2007.  She assumed these roles because Mr. Sundin was suffering from bacterial overgrowth syndrome and because he considered her "to be a savvy manager and technically knowledgeable in [his] areas of computer software and design as well as marketing skills."  Sundin Aff., Pl.'s Ex. 21 ¶ 15.  Moreover, at times she had access to his email account and was carbon copied on all emails sent to him. *See, e.g.*, Chat Log, Def.'s Ex. 9A; *see also* Email, Def.'s Ex. 3.

As part of her duties, Ms. Ross often approved and requested payment for expenses incurred by IMI, and on several occasions, used her personal credit card to pay for certain advertising and operating expenses.  Specifically, she was one of seven people to approve

expenses at IMI.  Additionally, she was in charge of reorganizing IMI's operational structure and dealt with accounting, hiring and IMI product issues.  Notably, a chat log[7] reveals that she and Defendants Jain and Sundin were to finalize the "todos [sic]" for the company reorganization prior to their distribution to the managers.  Chat Log, Def.'s Ex. 3A at 365.  In the same chat log, she instructs "James"[8] to provide her with a problem-solving matrix which would contribute to the reorganization of certain departments.  *Id.*  Another chat log indicates that on several occasions she attended meetings with a major venture capital firm interested in doing business with IMI.  Chat Log, Def.'s Ex. No. 11A at 3.  Furthermore, the bulk of the IMI chat logs reveal that Ms. Ross routinely made executive-type decisions, demanding that employees fix problems and follow company procedures, and delegating IMI business projects.  *See generally* Chat Logs, Def.'s Exs. 1A - 16A.  Ms. Ross even threatened to fine an entire department if it did not complete a project on schedule.  Chat Log, Def.'s Ex. 1A at 323; *see also* Chat Log, Def.'s Ex. 7A.  Additionally, she often demanded and obtained reports on web traffic, sales numbers, and click-through response rates for IMI's products and advertising campaigns.  She also participated in strategic discussions regarding IMI's future, was actively involved in the daily operations of the company and had the authority to set prices for IMI's products.  *See, e.g.*, Chat Log, Def.'s Ex. 14A.

With respect to the deceptive ads, Ms. Ross used her expertise in marketing and personally approved, developed, wrote, altered, reviewed, and contributed to a large number

---

[7] The parties have stipulated to the fact that Ms. Ross's username in the chat logs was "fuzzy."  Prop. Final Pretrial Order at 15, ¶ 8, ECF No. 239.

[8] The parties agree that "James" in the chat logs refers to James Reno, one of the former Defendants in this case who settled with the FTC.  As noted, Reno was indicted in Criminal Action No. 1-10-cr-00452 in the U.S. District Court for the Northern District of Illinois.  *See supra* n. 3.

of them.  In fact, she dictated the appearance and style of certain ads, suggested which words should or should not be included and how certain sentences should be translated, as well as decided the level of aggression to consumers that these ads should present.  *See, e.g.*, Chat Log, Pl.'s Ex. 1 at 326; Chat Log, Pl.'s Ex. 2 at 351; Chat Log, Def.'s Ex. 1A at 322, 326, 331; Chat Log, Def.'s Ex 2A at 348, 351-52.   On two occasions, Ms. Ross instructed ad developers to remove advertising disclaimers which would have indicated to consumers that these popups or warnings were mere advertisements as opposed to real scanners.  *See, e.g.*, Chat Log, Def.'s Ex. 2A at 352.   In the company's chat logs, Ross is observed directing employees to make ads more aggressive because "aggression zero doesn't [sic] give sales." Chat Log, Def.'s Ex. 2A at 350.  In another instance, she specifically instructs the developers to "add aggression" to certain creatives.  Chat Log, Def.'s Ex. 2A at 347.

In October 2004, Ross opened fifty-four (54) individual password-protected accounts with MyGeek, an internet advertising company which would later become known as AdOn. She used these accounts until 2007 to place advertisements in the form of Flash ads[9] for IMI products including Winfixer, DriveCleaner, FreeRepair, WinAntivirus, WinAntispyware, System Doctor and others.   These ads reached customers over 600 million times.   She personally funded the advertisements placed at MyGeek for up to approximately $23,000 and then used Marc D'Souza and Daniel Sundin's credit cards as well as wire transfers from IMI's account to place additional advertisements.  Pl.'s Ex. 35; Drexler Decl., Def.'s Ex 1, ¶¶ 106, 111.   "In total, Kristy Ross placed $3.3 million of advertisements for Defendants'

---

[9] "A Flash object is a binary file that can contain multiple graphics and logic to animate those graphics.  The file can then be opened by a Flash player plug-in within a consumer's browser much like a word document can be opened in Microsoft Word."  Prop. Final Pretrial Order at 28, ¶ 22.

products with MyGeek." Drexler Decl., Def.'s Ex. 1 ¶ 111. Ms. Ross also possessed a password-protected account at ValueClick which allowed her to use ValueClick's adserver, Mediaplex, to store ads which were disseminated though the MyGeek ad network.

As the direct contact at IMI for MyGeek, Ms. Ross interacted daily with the MyGeek account manager, Geoff Gieron. Specifically, Mr. Gieron would get in touch with her when publishers and other ad networks complained about the Defendants' advertisements. In attempts to resolve the problems, publishers would contact MyGeek, who would in turn contact Ms. Ross, by forwarding screenshots of the problems and asking for an immediate fix. Ms. Ross was repeatedly informed that these ads violated company policy as they included download software without content. *See, e.g.*, Drexler Decl., Def.'s Ex. 1 ¶¶ 115-117. Accordingly, Ms. Ross routinely communicated with MyGeek regarding complaints that the company received pertaining to IMI ads, and approved and edited the contents of ads placed on the MyGeek network, but the problems continued to occur. *Id.* In one instance, MyGeek contacted Ms. Ross about a specific DryCleaner advertisement containing a popup window which read "DriveCleaner found 948 Dangerous Files in your system. Get rid of them?" Gieron Dep., Pl.'s Ex. 55 at 318. Upon reviewing this advertisement, Ms. Ross responded "This is not a popup, it is flash in the website . . . this is an example of the scanner . . . This is certainly not a popup or Active x." *Id.* at 36, lines 140:1 – 140:18.

Accordingly, Ms. Ross was aware that these advertisements purported to do more than they actually did. Additionally, other chat log conversations involving Ms. Ross indicate that she was aware that the ads were "unpleasant" and that she knew that IMI's advertising was causing problems, including low customer retention and even lawsuits. *See, e.g.*, Chat

Log, Pl.'s Ex. 11 at 3.  On March 29, 2007, MyGeek terminated its relationship with IMI by informing Ms. Ross that it " 'will no longer be running ads from any advertiser that sell products in the area of spyware, antivirus, registry cleaner, system doctor, evidence eraser and the like' because their relationships with 'traffic partners have been threatened and we just can't afford the risk any longer.' "  Drexler Decl., Pl.'s Ex. 1 ¶ 118.

## III.   CONCLUSIONS OF LAW

The FTC has brought the present action under sections 5(a) and 13 of the FTC Act. Section 5(a) of the Act, 15 U.S.C. § 45(a)(1), prohibits engaging in "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce."  Section 13, 15 U.S.C. § 53(b), authorizes the FTC to seek injunctive relief for section 5 violations.  To succeed under section 5(a), the FTC must prove (1) that there was a representation; (2) that the representation was likely to mislead consumers; and (3) that the misleading representation was material.  *See FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003).

Having established liability for Defendant IMI, Defendant Ross may be held individually liable upon a showing by the FTC that she "participated directly in the practices or acts or had authority to control them."  *FTC v. Amy Travel Service, Inc.*, 875 F.2d 564, 573 (7th Cir. 1989); *see also, e.g.*, *FTC v. Freecom Commc'n., Inc.*, 401 F.3d 1192, 1203 (10th Cir. 2005); *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997).  "Authority to control the company can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer."  *Amy Travel*, 875 F.2d at 573.  In addition, the FTC must show that Defendant Ross had some

knowledge of the violative conduct. *See Publishing Clearing House*, 104 F.3d at 1170 (noting that corporate individuals are liable if they "had knowledge that the corporation or one of its agents engaged in dishonest or fraudulent conduct, that the misrepresentations were the type which a reasonable and prudent person would rely, and that consumer injury resulted"). In this regard the FTC need not make a showing of "intent per se"—instead the knowledge requirement may be "fulfilled by showing that the individual had 'actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth.'" *Amy Travel*, 875 F.2d at 574 (quoting *FTC v. Kitco of Nevada, Inc.*, 612 F. Supp. 1282, 1292 (D. Minn. 1985)); *see also FTC v. Direct Mktg. Concepts, Inc.*, 569 F. Supp. 2d 285, 311 (D. Mass. 2008) (noting that the FTC must prove "that the individual defendants either knew or should have known about the deceptive practices, but it is not required to prove subjective intent to defraud").

It has been Defendant Ross's position that she should not be held individually liable because the FTC has not satisfied its burden to prove by a preponderance of the evidence that she either had authority to control or directly participated in the deceptive acts. Moreover, Defendant contends that the FTC failed to demonstrate that she knew of the IMI deceptive marketing scheme. At trial, Defendant's counsel made much of the fact that at the time of the formation of IMI, Ms. Ross was a twenty-two-year-old woman romantically involved with one of the main partners of IMI. Her counsel further explained that she was not a corporate officer but that she held a position of favor due to her status as Mr. Jain's girlfriend. She contended that instead she held a type of administrative assistant's role,

facilitated employee relations because she was kinder and easier to work with than Defendant Jain, and stepped up when necessary to help out when Mr. Sundin became too ill to fulfill his responsibilities.   Ms. Ross's counsel repeatedly argued that she was a troubleshooter and introduced the idea, for the first time at trial, that her position was not that of a Vice President but more that of a media buyer which is considered to be a lower level employee.   During the brief bench trial, Ms. Ross's counsel sought to paint the picture of a betrayed young woman who had made poor choices in both work and life partners.[10] Once again, the argument of counsel is not evidence in this case in which Ms. Ross not only failed to respond to any discovery request but declined to appear for trial.[11]

1. Ms. Ross's Authority to Control or Her Direct Participation in the Deceptive Acts

To secure individual liability under the FTC Act, there must be a showing of participation or control in an enterprise's unlawful activity, which in turn may be indicated by an individual's assumption of duties as a corporate officer, involvement in business affairs, or role in the development of corporate policies.   *See Publ'g Clearing House*, 104 F.3d at 1171; *Amy Travel*, 875 F.2d at 573; *FTC v. Neovi, Inc.*, 598 F. Supp. 2d 1104, 1117 (S.D. Cal. 2008); *FTC v. Nat'l Urological Group, Inc.*, 645 F. Supp. 2d 1167, 1207-08 (N.D. Ga. 2008); *FTC v. Wilcox*, 926 F. Supp. 1091, 1104 (S.D. Fla. 1995).   On the one hand, authority to control is also evidenced by an individual's ability to review and approve advertisements as well as his or her ability to issue checks, make hiring decisions and personally finance or pay for corporate expenses.   *See Kitco of Nevada, Inc.*, 612 F. Supp. at 1293; *FTC v. USA Financial*,

---

[10] Ms. Ross was romantically involved with both Defendants Jain and D'Souza at different times during the deceptive marketing scheme.

[11] While this Court does not apply any adverse inference against Ms. Ross for her assertion of her Fifth Amendment privilege, her counsel cannot offer testimony on her behalf.   The creative argument of counsel is not evidence in a case.

No. 10-12152, 2011 WL 679430, at * 3 (11th Cir. Feb. 25, 2011); *FTC v. Stefanchik*, No. C04-1852RSM, 2007 WL 1058579, at * 6-7 (W. D. Wash. Apr. 3, 2007). The FTC need not show that the Defendant was the Chief Executive Officer ("CEO") of a company to demonstrate authority to control, active involvement in the affairs of the business and the deceptive scheme is sufficient. *See Kitco of Nevada, Inc.*, 612 F. Supp. at 1293; *FTC v. J.K. Publ'n, Inc.*, 99 F. Supp. 2d 1176 (C.D. Cal. 2000).[12]

On the other hand, direct participation can be demonstrated through evidence that the defendant developed or created, reviewed, altered and disseminated the deceptive marketing materials. *See FTC v. Direct Mktg. Concepts, Inc.*, 569 F. Supp. 2d 285, 310-11 (D. Mass. 2008); *Nat'l Urological Group, Inc.*, 645 F. Supp. 2d at 1207-08; *Kitco of Nevada, Inc.*, 612 F. Supp. at 1293; *J.K. Publ'n*, 99 F. Supp. 2d at 1203; *FTC v. Am. Standard Credit Sys.*, 847 F. Supp. 1080, 1088 (C.D. Cal. 1994). Active supervision of employees as well as the review of sales and marketing reports related to the deceptive scheme is also demonstrative of direct participation. *See Wilcox*, 926 F. Supp. at 1104; *FTC v. Consumer Alliance*, No. 02-C-2429, 2003 WL 22287364, at *6 (N.D. Ill. Sept. 30, 2003).

Although the FTC is only required to prove (a) that Ms. Ross had authority to control or (b) that she directly participated in the deceptive acts, the evidence in this case demonstrates that Defendant Ross had both the authority to control the deceptive acts within the meaning of the Section 5 of the FTC Act and that she directly participated in said acts. Although not explicitly labeled as a controlling shareholder or partner of IMI, the

---

[12] Defendant argued that the "control person" standard enunciated in *Dellastatious v. Williams*, 242 F.3d 191 (4th Cir. 2001) should be applied. However, that case involved the "control" standard enunciated in Section 20(a) of the Securities Exchange Act of 1934 ("SEC Act"), 15 U.S.C. § 78t(a). As the FTC correctly argued, the SEC Act's control standard is not applicable in FTC Act cases where FTC precedent is controlling and applies a different "control" standard.

evidence reveals that Ms. Ross was an original founder of the company and was known by all three of the other main officers of the company as someone who would receive and who received shares of the profits.   As far as IMI is concerned, none of the partnership agreements were reduced to a writing but Mr. D'Souza sent letters in late 2006 terminating the Joint Venture between himself, as a representative of Web Integrated Net Solutions, Inc., Mr. Jain, Mr. Sundin and notably Ms. Ross.   Moreover, Ms. Ross herself identified herself as the IMI Vice President of Business Development and stated that she was responsible for business expansion, sales and marketing, as well as product optimization.   Nowhere did she state that she was a media buyer.   While she argued that her corporate title was meaningless because IMI did not operate under traditional corporate formalities, her role with the company, her adoption of Defendants Jain and Sundin's affidavits in the Canadian Litigation and the plethora of evidence in emails and chat logs indicate that she was a control person at IMI.

Out of the six hundred employees, Ms. Ross has been shown to be one of the founders, one of seven people to approve expenses, one of the four to receive percentages of the profits of IMI, and one of the main individuals to appear in a managerial role in chat logs, emails and advertising contracts.   Furthermore, in her affidavit, Ms. Drexler, now known as Ms. Novick, explicitly identified Ms. Ross as one of the individuals responsible for the deceptive marketing scheme at IMI.   As such, the FTC demonstrated by a preponderance of the evidence that Ms. Ross had authority to control the deceptive marketing scheme at IMI.

Arguendo, even if Ms. Ross had not had authority to control the deceptive acts at IMI, compelling evidence establishes that she directly participated in the deceptive marketing scheme.  First, her interactions with the staff and the developers indicate that she not only controlled the contents and appearance of the ads, but that she also reprimanded and disciplined departments when the work did not coincide with her standards.  Her co-defendants even acknowledged that they partnered with her because of her marketing expertise.  Secondly, the chat logs also establish that she was involved in key company decisions such as partnership arrangements (e.g., Sundin and a major U.S. venture capital firm), how to reorganize the company and whom to hire.  Furthermore, she also had access to company accounts and approved corporate expenses.  On several occasions she even opened advertising accounts using her own personal credit card.  While her counsel argued at trial that she only personally spent approximately $23,000 on accounts with MyGeek of the $3.3 million spent, Ross did not submit any evidence that other IMI employees funded those accounts.  Moreover, the Drexler affidavit specifically states that "[t]o place these advertisements with MyGeek, she used credit cards in the name of "M D" (which [Ms. Drexler] believe[d] to be Marc D'Souza . . .), "Daniel Sundin," and wire transfers from IMI's account."  Drexler Aff., Def.'s Ex. 1 at ¶ 106.  The FTC's evidence demonstrates that Ms. Ross was not just a staff member but that she supervised the ad developers, made changes and gave orders concerning the ads, and funded the dissemination of these ads, whether through her own personal account or other accounts such as those of IMI, Daniel Sundin and Marc D'Souza.  As such, Ms. Ross directly participated in the deceptive marketing scheme.

Accordingly, Ms. Ross's broad responsibilities at IMI coupled with the fact that she personally financed corporate expenses, oversaw a large amount of employees and had a hand in the creation and dissemination of the deceptive ads proves by a preponderance of the evidence that she had authority to control and directly participated in the deceptive acts within the meaning of Section 5 of the FTC Act.

2. <u>Knowledge</u>

As mentioned previously, Defendant Ross contends that even if she is found to have had authority to control or directly participated in the deceptive acts, she did not know of the deceptive marketing scheme.  To establish individual liability under section 5(a) the FTC must also establish that an individual defendant had some knowledge of the unlawful conduct.  As previously mentioned, the knowledge requirement may be "fulfilled by showing that the individual had 'actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth.' "  *Amy Travel*, 875 F.2d at 574 (quoting *FTC v. Kitco of Nevada, Inc.*, 612 F. Supp. 1282, 1292 (D. Minn. 1985)); *see also FTC v. Direct Mktg. Concepts, Inc.*, 569 F. Supp. 2d 285, 311 (D. Mass. 2008) (noting that the FTC must prove "that the individual defendants either knew or should have known about the deceptive practices, but it is not required to prove subjective intent to defraud.").  "[T]he degree of participation in business affairs is probative of knowledge."  *Amy Travel*, 875 F.2d at 574.

Courts have held that defendants have knowledge of the deceptive marketing scheme where they "wrote or reviewed many of the scripts that were found to be deceptive and

[where] they were undoubtedly aware of the avalanche of consumer complaints." *Id.* at 575; *see also FTC v. Cyberspace.com, LLC*, No. C00-1806L, 2002 WL 32060289, at * 5 (W.D. Wash. 2002) ("There is ample evidence in the record that defendant Eisenberg was directly involved in the development of the deceptive marketing scheme . . . that he reviewed at least some of the solicitation forms before they were mailed, that he knew very few subscribers used the internet services for which they were being billed, and that he was aware that some of the consumers . . . did not realize they had contracted for internet services."). In *FTC v. Direct Marketing Inc.*, two defendants were held to be "at least willfully blind or recklessly indifferent to the deceptive" scheme because one was a co-owner of the company, and attended managerial meetings where he heard concerns about the product; and the other had a controlling position at the corporation and "procured placement" for the deceptive advertisements. 569 F. Supp. 2d 285, 311 (D. Mass. 2008). In *FTC v. J.K. Publications, Inc.*, involving credit card fraud scheme, the defendant's wife was held to be individually liable because her actions demonstrated intentional avoidance of the truth and reckless indifference. 99 F. Supp. 2d 1176, 1207 (C.D. Cal. 2000). She was a corporate officer of the company, had five years of experience as a bank teller and loan officer, was aware of her husband's criminal past, and personally signed for purchases and opened bank accounts used to perpetrate the deceptive acts. *Id.* at 1206-07. Moreover, the court made note of the fact that she accepted the large sums of money her husband brought into the household despite knowing that his previous business ventures were unsuccessful. *Id.* Conversely, the wife of the defendant in *FTC v. QT, Inc.*, a case which involved the marketing of a bracelet which falsely purported to cure arthritis, was not determined to have had knowledge of the

deceptive scheme because she was only listed as a corporate secretary and her responsibilities "did not include the marketing of the Q-Ray bracelet or anything pertaining to the marketing of the Q-Ray bracelet."  448 F. Supp. 2d 908, 973 (N.D. Ill. 2006).  Accordingly, when an individual (1) had some level of participation in the development, review, creation or editing of the deceptive marketing scheme, (2) disseminated the deceptive advertisements, and (3) was aware of complaints or problems surrounding the marketed product or the advertisements, while he or she may not necessarily have actual knowledge of the unlawful acts, this individual is at best recklessly indifferent to the truth or intentionally avoids it.

At trial, Ms. Ross's counsel repeatedly argued that Ms. Ross was duped by Defendants Jain, D'Souza and Sundin.  There is no evidence in this case to support this argument, and once again counsel cannot testify for her client.  Another contention was that, unlike Mr. Jain and Mr. Sundin, she used her real personal information when opening accounts and that someone seeking to deceive would have used false identifiers.  She also argued that some of the chat logs indicated that, if anything, she actually believed IMI was a legitimate company that provided "sound products" to its customers.

Nevertheless, the evidence presented in this case demonstrates by a preponderance of the evidence that Ms. Ross had actual knowledge of the deceptive marketing scheme.  She wrote, edited, reviewed and participated in the development of multiple advertisements.  She instructed developers to make the advertisements more aggressive and on at least two occasions ordered them to remove the term "advertisement" from certain ads.  She funded the accounts through which the ads were disseminated to consumers.  She was fully aware of the many complaints from consumers and ad networks and was in charge of remedying the

problems.  Moreover, she had the marketing expertise and was trusted by her partners because of that expertise.

Even if Ms. Ross, despite exercising significant control over the advertisements, had not had actual knowledge of their deceptive nature, the facts demonstrate that she was at the very least recklessly indifferent or intentionally avoided the truth.  First, she was romantically involved with Defendant Jain since before the creation of IMI.  Later on, in 2006, she became romantically involved with Defendant D'Souza and submitted an affidavit against him in the Canadian Litigation.  Additionally, she had access to Defendant Sundin's email when she covered for him while he was dealing with his illness.

Second, the evidence demonstrates that she received shares of the business's profits and made large sums of money from it.  Third, she received and was aware of the numerous consumer and ad network complaints.  Notably, she knew that complaints concerned the fact that the advertisements purported to scan but that the ads themselves were not supposed to scan.  She also knew that the ads were "unpleasant" and that customer retention was low.  She purported to fix the problem, but the problem continued to occur and she continued to receive complaints.  Additionally, MyGeek terminated the relationship with IMI by informing her that her advertisements were threatening MyGeek's reputation.  Moreover, she actively participated in making the advertisements unpleasant and instructed her developers to increase their aggression level.  Finally, she requested that the term "advertisement" be removed from certain ads thereby further contributing to the deception of customers.  Consequently, the FTC has demonstrated by a preponderance of the evidence that Ms. Ross had actual knowledge of the deceptive marketing scheme.  Alternatively, her

involvement with IMI and her participation in the deceptive marketing scheme as well as her awareness of consumer complaints demonstrate that she acted with reckless indifference and intentionally avoided the truth.  As such, she is individually liable for the deceptive acts of IMI, and judgment shall be entered in favor of the Federal Trade Commission ("FTC").

### 3.  Injunctive and Monetary Relief

Under Section 13(b) of the FTC Act, "in proper cases the Commission may seek, and after proper proof, the court may issue a permanent injunction."  15 U.S.C. § 53(b).  This Court has previously held that "[t]he authority to grant such relief includes the power to grant any ancillary relief necessary to accomplish complete justice, including ordering equitable relief for consumer redress through the repayment of money, restitution, rescission, or disgorgement of unjust enrichment."  *FTC v. Ameridebt, Inc.*, 373 F. Supp. 2d 558, 562 (D. Md. 2005) (citing *FTC v. Febre*, 128 F.3d 530, 534 (7th Cir. 1997)).  "To insure that any final relief is complete and meaningful, the court may also order any necessary temporary or preliminary relief, such as an asset freeze."  *Ameridebt*, 373 F. Supp. 2d at 562 (citing *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 469 (11th Cir. 1996)).  The court therefore possesses broad equitable authority which it must particularly exercise to protect the public interest.  *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946) (citing *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)).  "Permanent injunctive relief is appropriate when there is 'some cognizable danger of recurring violation.' "  *FTC v. Medical Billers Network, Inc.*, 543 F. Supp. 2d 283, 323 (S.D.N.Y. 2008).  To make this determination a court can consider the following factors: "the defendants' scienter, whether the conduct was isolated or recurrent, whether defendants are positioned to commit future violations, the degree of consumer harm caused

by defendants, defendants' recognition of their culpability, and the sincerity of defendants' assurances (if any) against future violations." *Id.* (citing *FTC v. Minuteman Press*, 53 F. Supp. 2d 248, 260-61 (E.D.N.Y. 1998)). "Moreover, the egregious nature of past violations is a factor supporting the need for permanent injunctive relief of a broad nature." *Kitco of Nevada*, 612 F. Supp. at 1296. Finally, the injunction must not "unduly harm the defendants . . . [by] put[ing] them out of business, but [must] simply ensure that they will conduct their business in a manner which does not violate Section 5 of the FTC Act, 15 U.S.C. § 45." *Id.*

In this case, the FTC seeks to permanently restrain and enjoin Ms. Ross from the marketing and sale of computer security software and software that interferes with consumers' computer use as well as from engaging in any form of deceptive marketing. Ms. Ross is found to be responsible for the deceptive marketing scheme at IMI which affected a large number of online consumers and led to the filing of three thousand consumer complaints with the FTC. The scheme generated large sums of money, a portion of which went to Ms. Ross. Her expertise in marketing was touted by her partners and used to deceive and defraud a large number of consumers. As such, a permanent injunction prohibiting Ms. Ross from marketing computer security software and software that interferes with consumers' computer use is appropriate. Finally, this permanent injunction does not in any way harm her or deprive her of other employment opportunities. She may still utilize her marketing talents as long as they are used for legitimate products and ventures and do not contribute to deceiving the public.

As far as consumer redress is concerned, "[t]he power to grant ancillary relief includes the power to order repayment of money for consumer redress as restitution or recession."

*Febre*, 128 F.3d at 534; *see also Ameridebt*, 373 F. Supp. 2d at 563.  As a permanent injunction can be imposed on Ms. Ross she may also be liable for monetary damages.  *Medical Billers Network, Inc.*, 543 F. Supp. 2d at 324.  In order to obtain restitution under Section 13(b), however, the FTC must establish that "(1) the business entity made material misrepresentations likely to deceive consumers, (2) those misrepresentations were widely disseminated, and (3) consumers purchased the entity's products."  *FTC v. Free Commc'n, Inc.*, 401 F.3d 1192, 1206 (10th Cir. 2005).  "The proper measure of consumer restitution is the amount that will restore the victims to the *status quo ante*, not what defendants received as profit."  *FTC v. Cyberspace.com, LLC, et al.*, No. C00-1906L, 2002 WL 32060289, at *5 (W.D. Wash. 2002).  Specifically, "allowing a damages determination based on gross receipts in a case arising directly under the FTC Act furthers the FTC's ability to carry out its statutory purpose."  *FTC v. Kuykendall*, 371 F.3d 745, 765-66 (10th Cir. 2004); *see also Febre*, 128 F.3d 535-36.  As such the amount of consumer redress is the amount paid by consumers for the Defendants' products minus any refunds.  Additionally, under section 13(b) a court may order disgorgement of a defendant's "unjust enrichment" when it is not possible to reimburse all of the consumers who have been injured by the defendant's misrepresentations.  *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 470 (11th Cir. 1996) (citing *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1103 n. 34 (1994), *cert. denied*, 514 U.S. 1083 (1995).  Once the FTC has satisfied its burden, it is up to the defendant to show that the calculations are not accurate.  *FTC v. QT, Inc.*, 448 F. Supp. 2d 908, 974 (N.D. Ill. 2006).

In this case, the FTC has satisfied its burden to show that the Defendants made material misrepresentations which were likely to deceive, that those misrepresentations

affected a large number of consumers and that more than one million consumers bought Defendants' products. The FTC correctly notes that if Defendant Ross is found to be individually liable for the deceptive scheme, she is jointly and severally liable for the consumer redress amount of $163,167,539.95 calculated by the FTC.[13] Defendant Ross argued, however, that this sum was grossly overinflated and that she should only be held liable for the ads and products she herself marketed at MyGeek. Specifically, counsel for Defendant Ross noted that "the FTC cannot disgorge from an individual defendant net revenue received by the Enterprise before or after the defendant directly participated in, or had authority to control, the deception." *FTC v. Wash. Data Res.*, 2012 U.S. Dist. LEXIS 56233, at *86 (M.D. Fla. Apr. 23, 2012). In response, the FTC has correctly noted that Ms. Ross had the opportunity to present financial information and to respond to discovery but has failed to do so.

It is well established that once a defendant is found to be individually liable for a corporate defendant's deceptive acts, he or she is jointly and severally liable for the total amount of consumer redress. *See, e.g., FTC v. J.K. Publ'n*, 99 F. Supp. 1176 (C.D. Cal. 2000); *FTC v. Kitco of Nevada, Inc.*, 612 F. Supp. 1282 (D. Minn. 1985). Ms. Ross participated and had authority to control the advertising scheme from its inception until it was interrupted by the FTC. Moreover, Ms. Ross was at least recklessly indifferent to or intentionally avoided the truth when it came to the deceptive marketing scheme, and the FTC satisfied its burden with respect to the imposition of consumer redress. Defendant Ross had sufficient time to

---

[13] According to the FTC, this amount was calculated based on Defendants' profit and loss statements for 2004-2006, and Defendants' payment processor records for 2006-2007. Proposed Final Pre-Trial Order at 22, ECF No. 239. Moreover, the FTC has repeatedly stated that this amount represents a ceiling for monetary recovery and this Court has previously held that this amount was a reasonable approximation of the damages in this case.

challenge the amount of recovery proposed by the FTC by proposing her own calculation and amount but failed to do so.  Having previously determined that the amount calculated by the FTC was a reasonable approximation of consumer redress, this Court finds that Defendant Ross is jointly and severally liable for $163,167,539.95 in this case.  Accordingly, Defendant Ross shall be permanently restrained and enjoined from the marketing and sale of computer security software and software that interferes with consumers' computer use as well as from engaging in any form of deceptive marketing.  Defendant Ross shall also be jointly and severally liable with co-Defendants Innovative Marketing, Inc., Sam Jain and Daniel Sundin for the consumer redress amount of $163,167,539.95.

## IV.   CONCLUSION

For the reasons stated above, Judgment is hereby entered in favor of Plaintiff Federal Trade Commission against Defendant Kristy Ross, individually and as an officer of Innovative Marketing, Inc. on all Counts contained in the FTC Complaint.  Defendant Ross shall be permanently restrained and enjoined from the marketing and sale of computer security software and software that interferes with consumers' computer use as well as from engaging in any form of deceptive marketing.  Defendant Ross shall also be jointly and severally liable with co-Defendants Innovative Marketing, Inc., Sam Jain and Daniel Sundin for the consumer redress amount of $163,167,539.95.

A separate Order and Judgment follows.


Dated: September 24, 2012                    ____/s/_____
                                             Richard D. Bennett
                                             United States District Judge